```
 1                  IN THE UNITED STATES DISTRICT COURT
                   FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
 2

 3   UNITED STATES OF AMERICA      )    CASE NO. 1:19CR529-1
                                   )
 4            vs.                  )
                                   )    Winston-Salem, North Carolina
 5   MAURICE OWEN WILEY, JR.       )    April 20, 2021
     _____    9:17 a.m.
 6

 7                    TRANSCRIPT OF THE TRIAL
                     VOLUME II OF VII (Pgs. 248-457)
 8            BEFORE THE HONORABLE THOMAS D. SCHROEDER
                   UNITED STATES DISTRICT JUDGE
 9

10   APPEARANCES:

11   For the Government:      GRAHAM GREEN, AUSA
                              CRAIG M. PRINCIPE, AUSA
12                            Office of the U.S. Attorney
                              251 N. Main Street, Suite 726
13                            Winston-Salem, North Carolina 27101

14
     For the Defendant:       JOHN D. BRYSON, ESQ.
15                            Wyatt Early Harris & Wheeler, LLP
                              P.O. Drawer 2086
16                            High Point, North Carolina 27261-2086

17                            MARK P. FOSTER , JR., ESQ.
                              Foster Law Offices, PLLC
18                            409 East Boulevard
                              Charlotte, North Carolina 28203
19

20   Court Reporter:          BRIANA L. BELL, RPR
                              Official Court Reporter
21                            P.O. Box 20991
                              Winston-Salem, North Carolina 27120
22

23

24
           Proceedings recorded by mechanical stenotype reporter.
25         Transcript produced by computer-aided transcription.
```

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 1 of 210

```
 1                            INDEX

 2  GOVERNMENT'S WITNESSES:                          PAGE:

 3  WAI PING CHAN

 4       Direct Examination by Mr. Green            297
         Cross-Examination by Mr. Bryson            312
 5

 6  CRYSTAL RODRIGUEZ

 7       Direct Examination by Mr. Principe         317

 8  EASTERN ZHENG

 9       Direct Examination by Mr. Green            321
         Cross-Examination by Mr. Bryson            333
10

11  JADE ZHENG

12       Direct Examination by Mr. Green            336

13  DETECTIVE ROBERT TURNER

14       Direct Examination by Mr. Principe         346
         Cross-Examination by Mr. Foster            357
15       Redirect Examination by Mr. Principe       359

16  CORPORAL REX MCQUEEN

17       Direct Examination by Mr. Principe         361
         Cross-Examination by Mr. Foster            368
18

19  DAVID LAXTON

20       Direct Examination by Mr. Green            371
         Cross-Examination by Mr. Bryson            380
21

22  MATTHEW HOFMEIER

23       Direct Examination by Mr. Green            384
         Cross-Examination by Mr. Bryson            389
24

25
```

US v. Wiley  -- Trial/Vol II of VII -- 4/20/21

```
 1                    INDEX (Continued)

 2   GOVERNMENT'S WITNESSES:                        PAGE:

 3   EVRARDO MACIAS

 4        Direct Examination by Mr. Green          391

 5   BETTY SCRUGGS

 6        Direct Examination by Mr. Principe       396
          Cross-Examination by Mr. Bryson          405
 7

 8   MARCUS A. EDWARDS, JR.

 9        Direct Examination by Mr. Green          407
          Cross-Examination by Mr. Foster          417
10

11   OFFICER JEFFREY T. CLEARY

12        Direct Examination by Mr. Principe       418

13   DETECTIVE JEFFREY MITCHELL

14        Direct Examination by Mr. Principe       425

15

16                       EXHIBITS
```

| Exhibits: | | Identified | Received |
|---|---|---|---|
| G-1 | Photograph of victim | 305 | 306 |
| G-2 | Photograph of China Wok | 298 | 299 |
| G-3 | Food sale receipt from store in Virginia | 300 | 302 |
| G-4 | Photograph of victim's house | 303 | 304 |
| G-5 | Photograph of 4617 Carlton Crossing Drive | 322 | 322 |
| G-6 | Photograph of FNS-9 | 328 | 328 |
| G-7 | CD of 911 recording | 319 | 320 |
| G-8 | CD of video from house surveillance footage | 329 | 330 |
| G-9 | Photograph of 4617 Carlton Crossing Drive | 337 | 338 |
| G-10 | CD of Detective Turner's dash camera and body camera footage | 350 | 350 |

```
17   Exhibits:                       Identified   Received

18

19

20

21

22

23

24

25
```

US v. Wiley  -- Trial/Vol II of VII -- 4/20/21

EXHIBITS

| Exhibits: | | Identified | Received |
|---|---|---|---|
| G-11 | Photograph of image from dash camera footage | 354 | 355 |
| G-12 | Aerial photograph of Carlton Crossing Drive | 372 | 373 |
| G-13 | Photograph of 4702 Carlton Crossing Drive | 385 | 385 |
| G-14 | Photograph of 4705 Carlton Crossing Drive | 391 | 392 |
| G-15 | Photograph of 4618 Carlton Crossing Drive | 401 | 402 |
| G-16 | Photograph of 4618 Carlton Crossing Drive | 401 | 402 |
| G-17 | Photograph of bullet hole in window of 4618 Carlton Crossing Drive | 401 | 402 |
| G-18 | Photograph of bullet hole in window of 4618 Carlton Crossing Drive | 401 | 402 |
| G-19 | Photograph of inside of 4618 Carlton Crossing Drive | 402 | 403 |
| G-20 | Photograph of living room of 4618 Carlton Crossing Drive | 402 | 403 |
| G-21 | Photograph of piano in music room of 4618 Carlton Crossing Drive | 403 | 403 |
| G-22 | Photograph of wall inside 4618 Carlton Crossing Drive | 403 | 403 |
| G-23 | Photograph of bullet | 404 | 405 |
| G-24 | Photograph of bullet | 405 | 405 |
| G-25 | Aerial photograph of outside of Kroger | 409 | 409 |
| G-26 | CD of photographs of surveillance footage of Kroger | 410 | 411 |
| G-27 | Screenshot from CD of surveillance footage at 2205 on 4/15/18 | 413 | 414 |
| G-28 | Screenshot from CD of surveillance footage at 2205 on 4/15/18 | 413 | 414 |
| G-29 | Screenshot from CD of surveillance footage at 2206 on 4/15/18 | 414 | 415 |
| G-30 | Screenshot from CD of surveillance footage at 2241 on 4/15/18 | 416 | 417 |

US v. Wiley -- Trial/Vol II of VII -- 4/20/21

```
 1                          EXHIBITS

 2   Exhibits:                              Identified    Received
     G-31     Screenshot from CD of            416          417
 3            surveillance footage at 2241 on
              4/15/18
 4   G-32     CD of footage from Officer       421          422
              Cleary's body camera
 5   G-33     Photograph of image from body    423          424
              camera footage
 6   G-34     Photograph of image from body    423          424
              camera footage
 7   G-35     Photograph of image from body    424          424
              camera footage
 8   G-36     Photograph of AVIS car rental    427          427
              store
 9   G-37     Photograph of Lincoln MKX        428          428
     G-38     Photograph of parking space      429          429
10            with Lincoln MKX
     G-39     Photograph of back of Lincoln    429          429
11            MKX
     G-40     Photograph of side view of       430          431
12            Lincoln MKX
     G-41     Photograph of front view of      430          431
13            Lincoln MKX
     G-42     Photograph of driver's side of   431          433
14            Lincoln MKX
     G-43     Photograph of driver's side of   432          433
15            Lincoln MKX
     G-44     Photograph of passenger side of  432          433
16            Lincoln MKX

17

18

19

20

21

22

23

24

25
```

US v. Wiley -- Trial/Vol II of VII -- 4/20/21

1                 P R O C E E D I N G S

2      (The Defendant was present.)

3      **THE COURT:**  All right.  Mr. Green, let me just say I

4 apologize for the delay.  I don't know if you're aware; one of

5 the alternates tripped coming up the steps, as I understand it,

6 into the building.  Unfortunately, from what I hear, she may

7 have face-planted.

8         Now, having said that -- and I think it was

9 Ms. Frazier.  I'm not sure, but I think so.  Yes.  Having said

10 that, I asked Ms. Engle just to make an inquiry whether she

11 felt like she wanted to proceed or not, and she's interested in

12 serving.

13         So the EMS are, I hope, finishing up whatever

14 treatment they are doing.  So within the next few minutes,

15 hopefully we'll be ready, but that's what the delay has been.

16 We'll just have to manage that the best we can.  If she's able

17 to serve and willing to serve, I would like to keep her on just

18 in case we might need her at some point.

19      **MR. GREEN:**  Yes, Your Honor.

20      **THE COURT:**  All right.

21      **MR. GREEN:**  In this time, if it please the Court, it

22 might be useful to go ahead and just demonstrate for the Court

23 how the -- and I've had discussions with counsel, and I think

24 they are agreeable -- how we intend to introduce the

25 documentary evidence, and we can display it.

US v. Wiley  -- Trial/Vol II of VII -- 4/20/21

1          **THE COURT:**  All right.

2          **MR. GREEN:**  So if you'll just pick an exhibit.  Maybe

3  the China Wok picture.

4          **THE COURT:**  They did put a monitor -- or they were

5  going to.  I can't see it.

6          **MR. RENTERIA:**  I ran out of time, Judge.

7          **THE COURT:**  We're going to put another monitor for

8  the jurors on the floor there just to make sure everybody can

9  see.

10          **MR. GREEN:**  So what we would intend to do, with the

11  Court's blessing, is display the exhibit as you see it on your

12  screen.

13          **THE COURT:**  All right.

14          **MR. GREEN:**  I don't believe the witness -- I don't

15  believe the jurors can see.  They cannot.  These monitors are

16  off.

17          **THE COURT:**  Okay.

18          **MR. GREEN:**  I'll ask the witness to -- yep, the

19  monitors -- I would ask the witness to identify the exhibit.

20  And then when it's properly introduced, then I would ask that

21  exhibit to be published; at which point, Ms. Engle will throw

22  the magic switch, and they will see the exhibit, and then we'll

23  proceed in that manner.

24          These should match exhibit per exhibit the trial

25  notebook that the Court has been presented and Ms. Engle has

US v. Wiley  -- Trial/Vol II of VII -- 4/20/21

1    been presented.

2          **THE COURT:**  Excuse me.  Is there a way we can pull

3    that this way some more or not?

4          **MR. RENTERIA:**  I think there were some concerns,

5    Judge, that if we tilt it any further, some of the jurors on

6    the floor would not be able to see it.

7          **THE COURT:**  That was what I was wondering, whether

8    they could see it better if we tilt it or not, the jurors on

9    the floor.

10         **MR. RENTERIA:**  We can.  Plus, there's another one,

11   Judge, right here in the front of the bench, and it's tilted

12   straight this way at all five of them so they can either look

13   to the one on the floor or the one to their right.

14         **THE COURT:**  Okay.  All right.

15         **MR. GREEN:**  And then we would just proceed in that

16   manner with the exhibits.

17         **THE COURT:**  All right.  So it will not be published

18   to the jury until you've admitted it; right?

19         **MR. GREEN:**  That's right.  That's certainly the

20   intention, Your Honor.  We'll be very deliberate about that

21   process.

22         **THE COURT:**  Are there going to be objections to some

23   of the exhibits?

24         **MR. BRYSON:**  Well, other than the text messages.

25   That's the only one that comes to mind right now.

US v. Wiley  -- Trial/Vol II of VII -- 4/20/21

| | |
|---|---|
| 1 | **THE COURT:** Okay. And those aren't going to happen |
| 2 | for a while; right? |
| 3 | **MR. BRYSON:** Right. |
| 4 | **MR. GREEN:** Right, Your Honor. |
| 5 | **THE COURT:** All right. |
| 6 | **MR. GREEN:** And to be clear, we did have that meeting |
| 7 | on Friday. We discussed and reviewed the exhibits that the |
| 8 | Government intends to introduce. And, of course, during the |
| 9 | course of trial, there may be one or two extra or something we |
| 10 | see and say this is a point we need to hit, and we'll obviously |
| 11 | discuss that with counsel before we attempt to introduce it. |
| 12 | **THE COURT:** All right. Well, for the time being, |
| 13 | there is a motion in limine on the text messages. My |
| 14 | instruction is do not introduce any of those until it's brought |
| 15 | to the Court's attention and the Defendant has an opportunity |
| 16 | to be heard. |
| 17 | **MR. GREEN:** Yes, Your Honor. |
| 18 | There is also a pending -- just so the Court is |
| 19 | aware, there was a pending motion in limine that related to a |
| 20 | chase. |
| 21 | **THE COURT:** Yes. |
| 22 | **MR. GREEN:** And we will not mention that. That |
| 23 | evidence would also likely come in, if at all, at a period of |
| 24 | time close in time to those text messages. So we will, |
| 25 | likewise, not make any reference to them until such time -- |

US v. Wiley -- Trial/Vol II of VII -- 4/20/21

1        **THE COURT:**  All right.  One issue I will have with

2    that, as the Defendant pointed out, is whether the Defendant

3    was aware that the reason he was being chased had to do with

4    this event as opposed to his being sought for some other

5    warrant for something else, which was, in fact, what the

6    Government had indicated originally in a prior briefing.  So

7    that would be a concern of mine.

8        **MR. GREEN:**  Sure.  And then -- and we have some

9    evidence on that point.

10        In any event, Your Honor, another kind of

11    housekeeping matter, while we're waiting for the EMT, the first

12    Government's witness will be Ms. Chan.  Ms. Chan speaks

13    Mandarin.  She also speaks English very well.  We have an

14    interpreter here.  That name has been provided to the clerk.

15    We'd obviously want that interpreter sworn.

16        It is the witness' desire, and if it meets with the

17    Court's desire -- she's very concerned about making sure she

18    understands the questions.  So, if possible, what we would ask

19    is that the interpreter interpret in Mandarin every question;

20    and then if she is able to articulate clearly in English, that

21    she answer in English.  If there is at any point where she is

22    struggling with words, then we ask that she be able to go ahead

23    and speak in Chinese.

24        **THE COURT:**  All right.  What's the Defendant's view

25    about proceeding in that fashion, which would be different from

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 10 of 210

1 having the witness speak in Mandarin and then having the

2 translator indicate what the witness said?

3         **MR. BRYSON:**  We have no objection, Your Honor.

4         **THE COURT:**  Okay.  Yes, Mr. Foster?

5         **MR. FOSTER:**  Yes, Your Honor, just one quick thing.

6 We move under Rule 615, if it's not already been done, to

7 exclude all witnesses.

8         **THE COURT:**  That was my next question is where the

9 parties were on that.

10         So they are invoking the rule.  So all of your

11 witnesses will remain outside the courtroom before testifying.

12         **MR. GREEN:**  We do -- we acknowledge and have

13 instructed the witnesses not to discuss their testimony at any

14 time until released by the Court.

15         And then also I would ask that Agent Jocys, who is

16 identified as a witness but also the lead case agent, be able

17 to be -- remain in the courtroom.

18         **THE COURT:**  She's permitted under 615.

19         Any objection?

20         **MR. FOSTER:**  No, Your Honor.

21         **THE COURT:**  Okay.  Now, the scope of Rule 615 is not

22 entirely clear and sometimes subject to judicial modification,

23 but right now the ruling is that any person who's a witness

24 remain outside the courtroom until they are done testifying.

25 And I imagine if they are subject to recall as well, that they

    US v. Wiley  -- Trial/Vol II of VII -- 4/20/21

1  not return to the courtroom.

2          Is that your understanding of the rule?

3          **MR. GREEN:**  It certainly -- it can be.  I have

4  previously had the rule --

5          **THE COURT:**  Let me just ask it that way.  Any

6  objection to proceeding in that fashion?

7          **MR. GREEN:**  We do have victims who have independent

8  rights, I think, under the Crime Victims' Act.  I do not --

9  have not been told or anticipate that they would --

10      (Assistant U.S. attorneys conferred.)

11          Those witnesses, which are early in the trial who

12  would be released, the victims, they may desire to stay and

13  watch the proceedings.

14          **THE COURT:**  Any objection to that?

15          **MR. FOSTER:**  No, Your Honor.

16          **THE COURT:**  So then the last question is any

17  discussion with any of the witnesses about the trial testimony,

18  even though they are outside the courtroom, not to share the

19  trial testimony with the witnesses -- any objection to

20  proceeding in that fashion?

21          **MR. GREEN:**  Do not, and we've so instructed each and

22  every witness.

23          **THE COURT:**  Okay.  All right.  I'm told -- yes.

24          **MR. GREEN:**  And just the last matter, while we're

25  waiting, of course, the best-laid plans, as we start -- I know

        US v. Wiley  -- Trial/Vol II of VII -- 4/20/21

1 we'll move quickly to the first witness and introduction of
2 evidence.
3          The first Government's exhibit, No. 1, will actually
4 be introduced a little later on.  So you will hear me ask about
5 Government's Exhibits 2 and 3 and maybe even 4 before I get to
6 1.  I haven't lost track.  I hate to start out like that, but
7 that's kind of how it got organized.
8          **THE COURT:**  That's all right.  It's like writing a
9 check out of order.  That's fine.
10          Is everybody ready to proceed?  I am told the jurors
11 are here, and I would like to bring them in and get underway.
12          What we'll do is swear the jury panel.  I will give
13 the preliminary charge.  Then we'll allow you to do your
14 opening statements.  And you are going to do them here from the
15 lectern; right?
16          **MR. GREEN:**  I guess the final question is -- I
17 believe we had an indication there was going to be another
18 monitor installed.
19          Do we want to get that accomplished?
20          **THE COURT:**  Well, there may be.  Is it needed?  I
21 mean, we can add it.
22          **MR. RENTERIA:**  Is it needed for opening?
23          **MR. GREEN:**  Well, there is going to be obviously --
24          **THE COURT:**  How long will that take?
25          **MR. RENTERIA:**  Five minutes, if that, Judge.

US v. Wiley  -- Trial/Vol II of VII -- 4/20/21

1    **THE COURT:**  Can we do it in two?

2         **MR. RENTERIA:**  Yes, I can do it in two.

3         Be right back.

4    (Pause in the proceedings.)

5    (The jury returned to the courtroom at 9:29 a.m.)

6         **THE COURT:**  There are some cables on the ground, so

7    please watch your step.

8         Ladies and gentlemen, welcome back.  I'm sorry we got

9    a late start.  We had an unfortunate incident.  I think it's

10   Ms. Frazier may have had a spill outside the courthouse.

11        Are you okay, ma'am?

12        **ALTERNATE JUROR NO. 1:**  Yes.

13        **THE COURT:**  Do you feel like you are ready to serve

14   as a juror or not?

15        **ALTERNATE JUROR NO. 1:**  Sure.

16        **THE COURT:**  I'm sorry that that happened.  If anybody

17   ever has any trouble, there are security guards out there and

18   others to help you at any time.  They just redid that whole

19   plaza, so I'm sorry that happened.  That's brand new out there,

20   but I'm glad you're okay.  If you have any trouble as we go

21   forward through the day, just let us know, ma'am.

22        Please administer the oath to the jury.

23     (The jury panel was duly sworn/affirmed.)

24        **THE COURT:**  Members of the jury, now that you have

25   been sworn, I will give you some preliminary instructions that

US v. Wiley  -- Trial/Vol II of VII -- 4/20/21

1   will you guide you in your participation in the trial.  My

2   instructions will probably take about eight or nine minutes.

3              It will be your duty to find from the evidence what

4   the facts are.  You, and you alone, will be the judges of the

5   facts.  You will then have to apply to those facts the law as I

6   give it to you.  You must follow the law whether you agree with

7   it or not.

8              And if you have any trouble hearing me or any of the

9   lawyers at any time or a witness, raise your hand so that we

10  will know that.  All right?

11             Nothing that the Court, meaning me -- that I may say

12  or do during the course of the trial is intended to indicate

13  nor should it be taken by you as indicating what your verdict

14  should be.

15             As you know, this is a criminal case.  There are

16  three basic rules about a criminal case that you must keep in

17  mind:

18             First, the Defendant is presumed innocent until

19  proven guilty.  The indictment brought by the Government

20  against the Defendant is only an accusation and nothing more.

21  It is not proof of guilt or anything else.  The Defendant,

22  therefore, starts out with a clean slate.

23             Second, the burden of proof is on the Government

24  through the very end of the case.  The Defendant has no burden

25  to prove his innocence or to present any evidence or to

1  testify.  Since the Defendant has the right to remain silent,

2  the law prohibits you from arriving at your verdict by

3  considering that the Defendant may not have testified or

4  offered evidence.

5          Third, the Government must prove the Defendant's

6  guilt beyond a reasonable doubt.  The Government's burden is

7  not beyond all doubt but beyond a reasonable doubt.  I will

8  give you further instructions on this point later, but, bear in

9  mind, that in this respect a criminal case is different from a

10 civil case.

11         I will give you detailed instructions on the law at

12 the end of the case, and those instructions will control your

13 deliberations and decisions; but in order to help you follow

14 the evidence, I will now give you a brief summary of the

15 charges against the Defendant and the elements of the offenses

16 that the Government must prove to make its case.

17         The Government charges the Defendant, Mr. Wiley, with

18 four offenses under the United States Code listed in the

19 superseding indictment, which I will also simply call "the

20 indictment."  I will now describe to you each element of the

21 charged offenses.  Remember that the elements of the offenses

22 are what the Government must prove beyond a reasonable doubt

23 before you may find the Defendant guilty of that offense.  And

24 I would add that each offense must be considered separately.

25         In Count One of the indictment, it charges Mr. Wiley

1  with conspiracy to commit a Hobbs Act robbery in violation of

2  Title 18 of the U.S. Code, Section 1951(a). To prove this

3  offense, the Government must prove each of the following

4  elements beyond a reasonable doubt:

5        First, that the Defendant conspired with one or more

6  persons to commit a robbery. In this case the Government

7  charges that on or about April 13, 2018, through on or about

8  April 15, 2018, the Defendant, Maurice Owen Wiley, Jr., also

9  known as Tweet, conspired with Darryl Bradford, Jr., also known

10 as Stretch; Hykeem Deshun Cox, also known as Chub; Semaj

11 Jayron-Maleek Bradley, also known as Squeeze; Charles Winfor

12 Daniels, also known as Murda; and other persons, known and

13 unknown, to take and obtain U.S. currency and merchandise from

14 owners and employees of China Wok by robbery in Durham, North

15 Carolina.

16       To prove a conspiracy, the Government must establish

17 the following beyond a reasonable doubt:

18       One, an agreement between two or more persons to do

19 something the law prohibits;

20       Two, the Defendant knew of the agreement or

21 conspiracy;

22       And, three, the Defendant knowingly and intentionally

23 joined the agreement or conspiracy.

24       Robbery, within the meaning of the Hobbs Act, is the

25 unlawful taking or obtaining of personal property from the

1  person or in the presence of another against his will by means

2  of actual or threatened force or violence or fear of injury,

3  immediate or future, to his person or property, or property in

4  his custody or possession, or the person or property of a

5  relative or member of his family, or of anyone in his company

6  at the time of the taking or obtaining.

7  　　　　And, second, the Government must prove beyond a

8  reasonable doubt that the robbery would probably have

9  obstructed, delayed, or affected commerce or the movement of

10  any article or commodity in commerce.

11  　　　　Commerce means commerce within the District of

12  Columbia or any territory or possession of the United States,

13  all commerce between any point in a state, territory,

14  possession or the District of Columbia and any point outside

15  thereof, all commerce between points within the same states,

16  through any place outside such state, and all other commerce

17  over which the United States has jurisdiction.

18  　　　　I instruct you that this second element may be

19  satisfied where the evidence shows that the Defendant and his

20  coconspirators targeted the proceeds of a business that was

21  engaged in interstate commerce.

22  　　　　The law allows proof of a conspiracy by direct or

23  circumstantial evidence, and, therefore, you may consider

24  either or both in reaching your verdict.

25  　　　　Count Two of the indictment charges Mr. Wiley with

US v. Wiley　--　Trial/Vol II of VII　--　4/20/21

attempted Hobbs Act robbery in violation of Title 18, U.S. Code, Section 1951(a).

To prove this offense, the Government must prove each of the following elements beyond a reasonable doubt:

First, the Defendant had the culpable intent to commit a Hobbs Act robbery;

And, second, the Defendant took a substantial step toward the completion of the Hobbs Act robbery that strongly corroborates the intent to commit the offense.

A Hobbs Act robbery has the same definition as I have stated as to Count One, including the effect on interstate commerce I previously instructed you about.

With respect to the second element, a substantial step is a direct act in a course of conduct planned to culminate in the commission of a crime that is strongly corroborative of a defendant's criminal purpose.

In this case, the Government charges that on or about April 15, 2018, the Defendant, Maurice Owen Wiley, Jr., also known as Tweet; Darryl Bradford, Jr., known as Stretch; Hykeem Deshun Cox, also known as Chub; Semaj Jayron-Maleek Bradley, also known as Squeeze; and Charles Winfor Daniels, also known as Murda, did unlawfully attempt to take and obtain U.S. currency and merchandise belonging to the China Wok from the possession of owners and employees of the said business by robbery in Durham, North Carolina.

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 19 of 210

1          I instruct you that the effect on interstate commerce

2    may be satisfied where the evidence shows that the Defendant or

3    his coconspirators targeted the proceeds of a business that was

4    engaged in interstate commerce during an attempted robbery.

5    The Government may meet its burden of proof by using direct or

6    circumstantial evidence.

7          Count Three of the indictment charges Mr. Wiley with

8    conspiring to possess firearms in furtherance of a crime of

9    violence in violation of Title 18, U.S. Code, Section 924(O).

10   To prove this offense, the Government must prove each of the

11   following elements beyond a reasonable doubt:

12          First, two or more persons agreed to possess a

13   firearm or firearms in furtherance of a crime of violence which

14   may be prosecuted in federal court.  For purposes of this

15   count, a Hobbs Act robbery, as I have previously defined it, is

16   a crime of violence.  The term "firearm," as used in these

17   instructions, means any weapon which will or is designed to or

18   may readily be converted to expel a projectile by the action of

19   an explosive;

20          Second, the Government must prove that the Defendant

21   knew of this agreement or conspiracy;

22          And, third, that the Defendant knowingly and

23   voluntarily participated in or become a part of this agreement

24   or conspiracy.

25          In this case, the Government charges that on or about

     US v. Wiley  -- Trial/Vol II of VII -- 4/20/21

1  April 13, 2018, continuing up to and including on or about

2  April 15, 2018, the Defendant, Maurice Owen Wiley, Jr., also

3  known as Tweet; Darryl Bradford, Jr., also known as Stretch;

4  Hykeem Deshun Cox, also known as Chub; Semaj Jayron-Maleek

5  Bradley, also known as Squeeze; Charles Winfor Daniels, also

6  known as Murda, and other coconspirators did unlawfully

7  conspire with each other and other persons, known and unknown,

8  to possess firearms in furtherance of a crime of violence.

9        Count Four of the indictment charges Mr. Wiley with

10  possession of ammunition by a convicted felon in violation of

11  Title 18, U.S. Code, Section 922(g)(1).  To prove this offense,

12  the Government must prove each of the following elements beyond

13  a reasonable doubt:

14        First, on or about April 15, 2018, the Defendant

15  knowingly possessed ammunition;

16        Second, at the time of the possession, the Defendant

17  had previously been convicted in any court of a crime

18  punishable by imprisonment for a term exceeding one year, that

19  is, a felony offense, and that the conviction had not been

20  expunged, set aside, or pardoned;

21        Third, at the time of the possession, the Defendant

22  knew that he had previously been convicted in a court of a

23  crime punishable by imprisonment for a term exceeding one year,

24  that is, a felony offense;

25        And, fourth, that the possession of the ammunition

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 21 of 210

1  was in or affecting commerce, that is, at some time prior to

2  the Defendant's possession, the ammunition had traveled from

3  one state to another or from a foreign country to the United

4  States.

5         The term "ammunition," as used in these instructions,

6  means ammunition or cartridge cases, primers, bullets, or

7  propellant powder designed for use in any firearm.  The term

8  "firearm" carries the same definition that I previously stated

9  to you.

10         It is not necessary for the Government to prove that

11  the Defendant knew that the ammunition had traveled in or

12  affected interstate or foreign commerce, nor is it necessary to

13  prove that the Defendant knew he was prohibited from possessing

14  the ammunition; rather, ignorance of the law is not a defense

15  to this charge.

16         In this case, the Defendant and the Government have

17  stipulated, that is, they have agreed, that the Defendant has a

18  prior felony conviction.  Therefore, the Government is not

19  required to present additional evidence on this element, and

20  you may properly consider that as having been proved.

21         The guilt of a defendant in a criminal case may be

22  proved without evidence that he personally did every act

23  involved in the commission of the crime charged.  The law

24  recognizes that ordinarily anything a person can do for himself

25  may also be accomplished through the direction of another

        US v. Wiley  —— Trial/Vol II of VII —— 4/20/21

person as an agent or by acting together with or under the
direction of another person or persons known as a principal in
a joint effort.

In two of the counts, in Count Two and Count Four,
the Government has also charged Mr. Wiley with aiding and
abetting the charged crime in each count in violation of Title
18 of the U.S. Code, Section 2. To prove this offense, the
Government must prove each of the following elements beyond a
reasonable doubt:

First, that the Defendant aided, abetted, counseled,
commanded, induced, or procured the commission of the offense
described in Count One [sic] or Count Four, or that the
Defendant willfully caused an act to be done, which, if
directly performed by him or another, would constitute the
offense described in Count Two or Count Four.

I will now define possession, as used in these
instructions. The law recognizes several kinds of possession.
A person may have actual possession or constructive possession.
A person may also have sole or joint possession.

A person who knowingly has direct physical control
over a thing at a given time is in actual possession of it.

A person who, although not in actual possession,
knowingly has both the power and the intention at a given time
to exercise dominion or control over a thing, either directly
or through another person or persons, is then in constructive

US v. Wiley -- Trial/Vol II of VII -- 4/20/21

possession of it.  To prove constructive possession, the
Government must prove beyond a reasonable doubt that the
Defendant had knowledge of the presence of the item or items in
question and that he had both the power and the intention to
later take control over the item or items.

Constructive possession may be inferred from the
facts and circumstances, including, for example, evidence that
a person exercised control over a vehicle or a residence in
which he knew the item in question was present.  However, a
Defendant's mere presence at the location where the item was
found is insufficient, standing alone, to support a guilty
verdict.

The law recognizes also that possession may be sole
or joint.  If one person alone has actual or constructive
possession of a thing, possession is sole.  If two or more
persons share actual or constructive possession of a thing,
possession is joint.

When I use the word "possession," I am referring to
actual as well as constructive possession and sole as well as
joint possession.  Therefore, you may find that the element of
possession, as that term is used in these instructions, is
present if you find beyond a reasonable doubt that the
Defendant had actual or constructive possession, either alone
or jointly with others.

Now, the evidence from which you will find the facts

1    will consist of the testimony of witnesses, documents, and

2    other things received into the record as exhibits and any facts

3    that the lawyers agree to, or stipulate to, or that the Court

4    may instruct you to find.

5            There are two kinds of evidence:  Direct and

6    circumstantial.  Direct evidence is direct proof of a fact,

7    such as testimony of an eyewitness.  Circumstantial evidence is

8    proof of facts from which you may infer or conclude that other

9    facts exist.  I will give you further instructions on these as

10   well as other matters at the end of the case, but keep in mind

11   that you may consider both kinds of evidence.

12           A stipulation is when the parties agree that

13   something is true.  When the parties agree that something is

14   true, you should, therefore, treat that fact as having been

15   proved.  Otherwise, it is up to you to determine whether you

16   believe or do not believe the evidence that is presented to you

17   in the case.

18           Certain things are not evidence, and they must not be

19   considered by you.  I will list them for you now.  The

20   statements, the arguments, and the questions by the lawyers are

21   not evidence.  Objections to questions are not evidence.  The

22   lawyers have an obligation to their clients to make objections

23   when they believe evidence that's being offered is improper

24   under the Rules of Evidence.  You should not be influenced by

25   the objection or by the Court's ruling on it.

        US v. Wiley  -- Trial/Vol II of VII -- 4/20/21

1            If I sustain the objection, then you must ignore the

2    question.  If I overrule the objection, you should treat the

3    answer like you would any other.  If you are instructed that

4    some item of evidence is received for a limited purpose only,

5    you must follow that instruction.

6            The testimony that the Court has excluded or told you

7    to disregard is not evidence and must not be considered.

8    Anything you may have seen or heard outside the courtroom is

9    not evidence and must be disregarded.  You are to decide the

10   case solely on the evidence presented here in the courtroom.

11           As you listen to the witnesses, watch them carefully.

12   Ask yourself:  Does it appear that they are being sincere in

13   what they are telling you?  Did the person have the opportunity

14   to observe carefully what they are telling you?  Does the

15   person have a good memory and the ability to accurately

16   remember whatever it is they are telling you?  Does the person

17   have anything to gain by testifying falsely in the case?

18           It will be up to you to decide which witnesses to

19   believe, which witnesses not to believe, and how much of any

20   witness' testimony to accept or to reject.

21           Now, I mentioned attorney objections a moment ago.

22   Let me say a few more words about objections.

23           When one of the attorneys is asking questions, the

24   other may object to a question being asked.  When that happens,

25   what the lawyer is saying is this:  Judge, under the Federal

US v. Wiley  -- Trial/Vol II of VII -- 4/20/21

1  Rules of Evidence, it is my position that the witness should

2  not be allowed to answer the question.  Do not hold it against

3  either party if their lawyer asserts an objection.  It has --

4  they, rather, have a right to do that.

5         Now, there'll be times when I will be able to rule on

6  the objection without talking with the lawyers, but there may

7  be times when I need to talk with the lawyers.  We've tried to

8  anticipate those and to avoid stopping the trial, but sometimes

9  we cannot anticipate them all.  In those cases, if I think it

10 can be handled quickly, I may ask the lawyers to approach the

11 bench.  When we discuss matters here at the bench, do not try

12 to determine what we are saying.  You are not supposed to hear

13 what we're saying.  That's why we are having a meeting outside

14 of your presence.  If you can hear, please raise your hand and

15 let us know that we may be speaking too loudly.  If you can

16 read lips, do not try to do that here.  I will try to get

17 everyone in a position so you will not be tempted to do that.

18        If we need to have a more expensive discussion, I

19 will excuse you and send you back to the jury room.  If I have

20 to do that, please understand that we are working on something

21 that we must discuss outside of your presence.  In any event, I

22 will try to resolve the issue with the least inconvenience to

23 you as jurors.

24        When I do rule on an objection, if I say "overruled,"

25 it means I will allow the question or questions to be answered;

US v. Wiley  -- Trial/Vol II of VII -- 4/20/21

1    I'm overruling the objection.  You may then consider the answer

2    that you hear.  If I say "sustained," it means I will not allow

3    the question to be answered; and in that case, do not consider

4    the question and do not try to guess what you think the answer

5    might have been.  That would be speculation, and speculation is

6    not evidence.

7        It's not unusual that witnesses themselves are not

8    familiar with these rules; and, on occasion, they may not

9    understand that, when there is an objection, they should wait

10   until I rule before they answer.  Or it may be that the witness

11   did not hear the objection and started to answer anyway.  If

12   that happens and I have said "sustained," meaning that the

13   witness should not be allowed to answer the question, you must

14   erase what you've heard.  You cannot consider the answer or a

15   partial answer at all for your deliberations.

16       Now, just a few words about your conduct as jurors

17   and then we will begin.

18       First, I instruct you, as I have previously, that

19   during the trial you are not to discuss this case with anyone

20   or to permit anyone to discuss it with you.  Until you retire

21   to the jury room at the end of the case to deliberate on your

22   verdict, you simply are not to talk about the case.  Do not

23   talk about the case until you are instructed by me to

24   deliberate at the end of the case, and then you may only talk

25   about the case among your other jurors when all of you are

present.  You cannot discuss the case with anyone else until
you have returned a verdict and the case is at an end.

I know many of you, probably all of you, use cell
phones and BlackBerries, the Internet, and other tools of
technology.  I instruct you that you also must not talk to
anyone about this case or use these tools to communicate
electronically with anybody about the case.  This includes your
family and your friends.  This prohibition includes any form of
communication whatsoever, including through your cell phones,
BlackBerries, through text messaging, through email, on
Twitter, through any blog or website, through any Internet chat
room, or by way other social network, such as Facebook,
MySpace, LinkedIn, and YouTube.  Simply do not talk about the
case in any way with anyone.

Second, do not read or listen to anything touching on
the case in any way.  If anyone tries to talk to you about the
case, bring it to my attention promptly.  Do not communicate
with any of the persons connected with the trial, including the
lawyers, the parties, or the witnesses, not even a greeting or
conversation unrelated to the case.  They have all been
instructed not to communicate with you, and they also know that
you have been instructed not to communicate with them.  So
simply avoid them during the trial.  Nobody will be offended if
you do not say hello if you see somebody, and your best
practice is simply not to say anything.

US v. Wiley  —— Trial/Vol II of VII —— 4/20/21

1          Third, do not try to do any research or make any

2    investigation about the case or any aspect of the case or the

3    trial on your own.  For the reasons I previously explained to

4    you during the jury selection process, you, as jurors, must

5    decide this case solely on the evidence presented here within

6    the four walls of this courtroom.  This means that, during the

7    trial, you must not conduct any independent research about the

8    case, the matters in the case, or the individuals involved in

9    the case.  In other words, you should not consult dictionaries

10   or reference materials, search the Internet, websites, or

11   blogs, or use any other electronic tools to obtain information

12   about the case or to help you decide the case.

13          If any of you does communicate about this case or

14   conduct any research about it in any aspect -- or any aspect of

15   it in violation of my instruction, then this may cause serious

16   consequences.  Those include having to start the trial all

17   over, and it would be with another jury.  And the Court could

18   hold the juror or jurors involved in contempt of court with

19   potential significant penalty or even punishment.  So please

20   follow my instructions precisely.  It is also your duty to

21   report to me if you observe any other juror who violates these

22   rules.

23          Importantly, do not form any opinion until all the

24   evidence is in.  Keep an open mind until I instruct you to

25   start your deliberations at the very end of the case.

     US v. Wiley  -- Trial/Vol II of VII -- 4/20/21

1          Finally, as you are all well aware, we're dealing

2   with the coronavirus pandemic.  Please make sure that you

3   follow the guidance of the public health officials, which this

4   court is endeavoring to do, that is, observe social distancing,

5   wear a mask, and wash your hands frequently.  We have

6   configured the courtroom and arranged for your breaks and

7   deliberations to comply with this guidance, and there are

8   plenty of masks and hand sanitizer for your use.  This is for

9   everyone's protection, and we ask that you observe the rules.

10  If you have any concern in this regard as the trial progresses,

11  please let Ms. Engle, the deputy clerk, know.

12         A few notes on housekeeping.  The parties estimate

13  that the trial may take approximately five up to seven days.

14  Normally, we will take a morning recess at about 10:30 or

15  10:45.  We'll break for lunch at 12:30.  You'll need to be back

16  at 1:45, reporting to Courtroom No. 3 across the hall where you

17  were this morning.  You will gather there until we are ready

18  for you.  We will start just as soon as all of you all are

19  collected, and so if you are early and we are ready to go, we

20  may start early.  We will take an afternoon break at about

21  3:30, and I commit to you we will recess every day at 5:00 p.m.

22         It will be a priority to proceed with the testimony

23  during the times you are here.  I will try to avoid any delays

24  as much as I can.  You should know that the lawyers are coming

25  in early and staying late to handle any matters that are

US v. Wiley  -- Trial/Vol II of VII -- 4/20/21

1  necessary outside of your hearing so we can be as on time as

2  possible while you're here.

3          Do not loiter in the corridors of this courthouse.

4  Embarrassing contacts may occur with persons interested in the

5  case.  If anyone attempts to talk with you about the case, tell

6  them it is improper for a juror to discuss the case or to

7  receive information except here in the courtroom.  Do not

8  listen to that person, and it is your duty to report the

9  incident to me at once.

10          If you want to take notes during the course of the

11  trial, you may do so.  Ms. Engle has given you legal pads and

12  envelopes and pencils for your use in taking notes, if that

13  helps you.  However, it is difficult to take detailed notes and

14  to pay attention to what the witnesses are saying at the same

15  time.

16          If you do take notes, be sure that your note-taking

17  does not interfere with your listening to and considering all

18  the evidence.  Also, if you do take notes, do not discuss them

19  with anyone before you begin your deliberations.  Do not take

20  your notes with you at the end of the day.  Be sure to leave

21  them in your chair.  Also, do not loan your notes to anyone,

22  not even another juror; and by the same token, do not borrow

23  anyone else's notes.

24          If you choose not to take notes, remember it is your

25  own individual responsibility to listen carefully to all the

US v. Wiley  —— Trial/Vol II of VII —— 4/20/21

1  evidence.  You cannot give this responsibility to someone who

2  is taking notes.  We depend on the judgment of all members of

3  the jury.  You all must remember the evidence in this case.

4          If you wish to take notes, please write your name or

5  your juror number on your envelope.  Every time we take a

6  recess, please place your legal pad back in the envelope.  At

7  the end of the court day, please your envelope in your seats,

8  and Ms. Engle will place them in the jury room for the evening.

9  We'll place a note on the door to the jury room so that nobody

10 goes in there other than you, and we'll have the room cleaned

11 at night, so those folks will be; but your notes will be secure

12 there.  The jury room is set aside for your use and for your

13 use only.  You can leave your notes in your envelopes without

14 any fear that anyone will look at them.

15          As I said, do not forget; if you have your envelopes

16 there, please write your number or your name on your envelope

17 at this time so that you know whose is whose and we won't get

18 them mixed up with anybody else's.  Just write something on the

19 outside of your envelope just to indicate what your juror

20 number or name is, that would be helpful.

21          So the trial is now going to begin.  First, the

22 Government will make an opening statement, which is simply an

23 outline to help you understand the evidence as it comes in.

24 Next, the Defendant's attorney may, but does not have to, make

25 an opening statement.  Opening statements are neither evidence

US v. Wiley  -- Trial/Vol II of VII -- 4/20/21

1  nor arguments.  They are merely forecasts of what the lawyers
2  think the evidence will be.
3          The Government will then present its witnesses, and
4  counsel for the Defendant may cross-examine them.  Following
5  the Government's case, the Defendant may, if he wishes, present
6  witnesses whom the Government may cross-examine.
7          After all the evidence is in, the attorneys will
8  present their closing arguments to summarize and interpret the
9  evidence for you, and then I will instruct you on the law.
10 After that, and only after that, you will then retire to
11 deliberate on your verdict.
12         The Government may now give its opening statement.
13         There should be monitors for every juror.
14         Is there any juror or alternate who does not have a
15 monitor that they can see?  If so, please raise your hand if
16 you cannot see one.
17         It looks like everyone can see.  If at any point you
18 have trouble seeing something, raise your hand.
19         Mr. Principe.
20         **MR. PRINCIPE:**  Thank you, Your Honor.
21         This is Chin Wok.  China Wok is a small Chinese
22 restaurant in a strip mall on Roxboro Street in Durham, North
23 Carolina.  If you were to go back in time to April 2018 and
24 open that front door, you would go inside and you would see
25 Hong Zheng and his wife, Wai Ping Chan.  Her friends and family

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 34 of 210

1 call her Shirley.  And you would see Hong and Shirley working

2 in their restaurant side by side, opening the restaurant in the

3 morning, cooking the food together side by side, serving the

4 customers side by side, handling the takeout orders.

5         And after the long days, the seven days a week, the

6 364 out of 365 days a year, they would close down the

7 restaurant late at night.  They would get inside their minivan,

8 Hong driving and Shirley in the passenger seat, and they would

9 drive a short distance down to the road to their home on

10 Carlton Crossing Drive, riding together side by side.  And they

11 would retreat to the safety and comfort of the home that their

12 hard work had afforded them, that nice big house on Carlton

13 Crossing Drive where their two children, Jade and Eastern,

14 would be waiting for them, for mommy and daddy to come home

15 after a long day of work.  If you went back in time to 2018,

16 Jade and Eastern were in high school.

17         And on April 15 of 2018, at 10:10 p.m., Hong and

18 Shirley were inside that restaurant, getting ready to go home

19 for the night.  And what they didn't know was that the

20 Defendant, Maurice Owen Wiley, Jr., and five other men were

21 inside of that Lincoln MKX automobile.  Wiley had obtained that

22 rental vehicle from AVIS at Northgate Mall through a woman that

23 he used to rent the vehicle who gave it to him the day before,

24 who he would reimburse with money for the rentals.  And he was

25 driving that vehicle, and there were five other men inside that

1  vehicle.  And they had five guns:  Two .40 calibers, two 9mms,

2  one .45 caliber.  Wiley had a gun, a 9mm.  And those guns were

3  loaded with ammunition, bullets.

4          And you will hear from a cooperator -- I am going to

5  refer to him as "the cooperator" -- and the cooperator will

6  tell you that their plan that night was to rob China Wok, but

7  they weren't going to rob them at their business.  They already

8  knew where Hong and Shirley lived.  They had been to the

9  restaurant days prior.  They had been past their house days

10 prior.

11         And you'll see in the surveillance footage that that

12 white Lincoln leaves the parking lot before Hong and Shirley

13 get into their minivan to go home.  They leave before because

14 the cooperator will tell you that they already knew where they

15 lived, and they wanted to get there first so that they could

16 catch them by surprise.

17         So there they were, Mr. Wiley and his coconspirators,

18 sitting in that Lincoln, the driver's window facing China

19 Wok -- you can see the lights in the background -- watching,

20 waiting for that moment.

21         But what Mr. Wiley didn't know at the time was that

22 that vehicle had a black box, an Infotainment system, and that

23 system was also watching and monitoring and recording data,

24 like GPS location data, that would later tell the investigators

25 exactly where that vehicle had been driven to and where it was

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 36 of 210

1  at different places and time, like breadcrumbs.

2          It also recorded things like event data:  When the

3  driver side door opened in front Carlton Crossing Drive; when

4  the vehicle was put in park in front of Carlton Crossing Drive

5  on April 15, 2018, at exactly the time when the attempted

6  robbery happened.

7          It also had the ability for people who rented that

8  nice vehicle from AVIS to connect their phones, the devices we

9  carry around with us all the time, so they could play their

10  music or make hands-free phone calls.  You will hear that the

11  Defendant's phone, a ZTE cell phone that was later seized by

12  law enforcement with a phone number ending in 6112, that phone

13  had been paired to that Infotainment system.  It was connected

14  by Bluetooth to that Infotainment system at the moment the

15  vehicle was in front of Hong and Shirley's home.

16          When Hong and Shirley left the restaurant that night,

17  they had no idea what was waiting for them just five minutes

18  down the road.  It was a short distance from China Wok to their

19  house.

20          This is Hong and Shirley's house on Carlton Crossing

21  Drive.  That's where they raised their two children, Jade and

22  Eastern.  That's where they sat down and had their family meals

23  at the dinner table.  That driveway -- at the bottom of that

24  driveway, that is where Hong Zheng was shot in the head with a

25  .40 caliber bullet, killed by one of the robbers on April 15,

        US v. Wiley  -- Trial/Vol II of VII -- 4/20/21

1  2018.

2          Here's how it happened.  Hong and Shirley were

3  driving down Carlton Crossing Drive approaching their house.

4  Hong pulls the family's minivan into the driveway.  Shirley

5  gets out of the passenger seat and starts walking to the front

6  door.  This is their typical nightly routine when they come

7  home late at night from China Wok, because they had been

8  victims before.  You'll hear that they had had a breaking and

9  entering at their house before.  They had had a home invasion

10  at their house before, and because they had been victimized,

11  they decided that they needed to arm themselves with a handgun.

12  They bought a 9mm handgun.  Hong and Shirley took lessons,

13  learned how to use it.

14          And that night, when Shirley approached the front

15  door to get the handgun from her son, while her daughter waited

16  at the upstairs window near an alarm system, what they didn't

17  know that night was that that was the night they were going to

18  need it.

19          Here's what the robbers did.  When they pulled into

20  the driveway, the robbers got out of the SUV, the Lincoln that

21  was right across the street.  All of them got out.  Mr. Wiley

22  got out.  He had a firearm.  His cell phone that was connected

23  by Bluetooth disconnected from the system.  Some of the robbers

24  chased Shirley to the front steps.  They thought they saw her

25  with the money bag.  She got the gun.  She saw the robbers.

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 38 of 210

1    She fell down.  She tried to put the loaded magazine into the
2    gun.  She tried to fire it.  It wouldn't fire.  She had to rack
3    three rounds out of the gun before it would fire, and then she
4    fired at those robbers to protect herself and her children who
5    were still inside the home.
6            When those robbers were sitting in the Lincoln just
7    before Hong pulled into the driveway, they were probably
8    thinking about the money they would be counting at the end of
9    the night; but what they weren't counting on was that Shirley
10   would have a gun and that she would fire that gun to defend
11   herself.
12           Investigators would later determine that Shirley
13   fired 14 rounds from her 9mm handgun; and because she fought
14   back, those robbers fled.  They got nothing.  All of them got
15   back into the Lincoln.  Wiley got back into the driver's seat.
16   He drove off, leaving the neighborhood.  Two neighbors saw a
17   white SUV driving southbound on Carlton Crossing at a high rate
18   of speed.  They fled.  They thought maybe they could get away,
19   but they couldn't escape the consequences of their actions
20   forever, because as they fled, there were things they left
21   behind.  Many of the witness you will hear from throughout the
22   course of this trial will be about the things they left behind,
23   the evidence they left behind, the recordings they left behind,
24   the surveillance footage that was left behind, and, most
25   importantly, the data that was left behind.

US v. Wiley  -- Trial/Vol II of VII -- 4/20/21

1          You will hear how crime scene investigators at

2    Carlton Crossing Drive collected 14 rounds that were fired from

3    Shirley's handgun and 13 more rounds that were fired by the

4    four handguns that were discharged by the robbers, 9mm caliber

5    shell casings, .40 caliber shell casings, .45 caliber shell

6    casings on the front porch, along the walkaway, near the

7    sidewalk in the street.

8          And because Shirley fought back, because she fired

9    her weapon at the robbers, guess what?  She hit that SUV.  She

10   damaged the left rear passenger door and put a bullet hole

11   through it.  She caused additional damage when a bullet

12   ricocheted and struck the glass of that rear passenger door,

13   shattering the glass, leaving glass fragments in the street at

14   Carlton Crossing Drive.

15         The robbers left a blue latex glove on the front

16   porch, because that's how far they got.  One of the robbers ran

17   out of a shoe, leaving his sneaker in the front yard.  And as

18   the robbers fled, Mr. Wiley drove that Lincoln MKX, and he

19   drove it back to the meet spot, the place where the robbers had

20   originally gotten into the vehicle in the first place before it

21   went to China Wok, before it went to Carlton Crossing.  And

22   it's approximately a 15-minute drive to the meet spot.

23         And the cooperator will tell you that on the way back

24   to the meet spot, there was a conversation in the vehicle about

25   discharging the gun and calling 911 to create a false story

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 40 of 210

1  about a drive-by shooting.  And Durham Police Department

2  officers would receive a 911 call and would be sent to that

3  location only 15 minutes after the attempted robbery at Carlton

4  Crossing Drive.  And when they got there, they found one of the

5  robbers that Shirley had shot in the back with a bullet wound

6  to his back.  The cooperator had been shot in the wrist.  A

7  third robber had been cut on his face.  And when that

8  officer -- that patrol officer responded to the meet spot, they

9  saw one of those robbers who was seeking medical treatment with

10 a bullet wound to his back.

11        But at that point, the Lincoln was no longer at the

12 meet spot.  Wiley had driven it to the next location, that the

13 Infotainment system would record the date, the time, the GPS

14 location.  He went back to his momma's house, 1413 Maplewood

15 Drive.  And that Infotainment system would record when the

16 vehicle got there, and it would record when the vehicle left

17 again, and that vehicle sat at that address for over an hour;

18 but it didn't stay there.

19        The evidence will show that Wiley next took the

20 vehicle to Chapel Tower Apartments across town.  That's the

21 surveillance footage from Chapel Tower Apartments.  You'll see

22 that footage when Wiley was driving the Lincoln back to Chapel

23 Tower Apartments at 12:19 a.m. on April 16.  And the vehicle

24 went back to Chapel Tower Apartments because that's where

25 Taquila House lived.  Taquila House is the woman that helped

Case 1:19-cr-00529-TDS  Document 360  Filed 02/04/22  Page 41 of 210

1  Wiley rent the vehicles from AVIS who received money back.  It
2  was reimbursement for the rentals.

3           And Taquila House, eight hours later, called 911 to
4  report that that Lincoln that she had rented from AVIS had been
5  shot up overnight on some street in Durham.  She didn't know
6  how it happened, but she saw the damage, and she called 911 to
7  report it.  The officer who responded, Officer Cleary, will
8  testify.  And he had a body-worn camera, and that's an image
9  from his body-worn camera.  And at that moment, at 8:00, the
10 very next day after the murder, it documented the damage to
11 that Lincoln MKX.  It documented the license plate.  It's the
12 same vehicle.  There was damage:  A bullet hole to the door and
13 a shattered window.

14          But after the report was taken, that vehicle didn't
15 stay there for very long, because Wiley got the vehicle back
16 and he took to Auto Glass Now in Durham.  And there are
17 receipts from Auto Glass Now from April 16 when the window was
18 replaced on that rear passenger door, and that business record,
19 that data, the receipt, has the name Reese on it and a number
20 that ended in 6112 on the receipt.  The Infotainment system
21 data puts the vehicle at Auto Glass Now at that time.  And
22 after the glass was repaired, Wiley took it to the Amigos auto
23 repair shop.  And after that, the vehicle was eventually
24 returned to AVIS at Northgate Mall.

25          But that was two more days later, on April 18, 2018.

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 42 of 210

1  And on April 18, 2018, it's not just the data or the business

2  records that will show this.  Mr. Wiley admitted he had

3  possession of the vehicle on April 18 because by April 18,

4  Detective Cramer of the Durham Police Department had caught up

5  with Taquila House, and they had interviewed her once or twice.

6  And on April 18, he was at her workplace, and he was standing

7  there talking with her.  And at that point she admitted that

8  she had rented vehicles for Mr. Wiley, more than one vehicle;

9  that she originally rented a red Ford Explorer on the 13th;

10  that they swapped it out for the Lincoln on the 14th; that

11  Mr. Wiley took immediate possession of the Lincoln; that he had

12  it on April 15 and told her that it had been damaged in his

13  possession.

14         And during this conversation between Detective Cramer

15  and Miss House, guess who calls from a phone number ending in

16  6112?  Mr. Wiley.  And during that conversation, Detective

17  Cramer recorded it, and you will hear the recording.  And he

18  told Miss House that he had the vehicle currently in his

19  possession.  He told Detective Cramer he had the vehicle in his

20  possession, that he was just taking it to get it fixed, that it

21  had been damaged, and he was going to return it to AVIS.

22         And then later that day, on April 18, the vehicle was

23  returned to AVIS, but it was returned outside of business

24  hours, parked in a parking spot.  And the following day, on

25  April 19, is when investigators got a call from AVIS at

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 43 of 210

1  Northgate Mall, and they said, hey, the vehicle you have been

2  looking for was returned last night.  So investigators went out

3  there, and this is what they found:  That same Lincoln MKX, but

4  there was no more bullet holes in the door, and the window had

5  been replaced, but it only rolled halfway up.

6         So they seized that vehicle.  They took it to the

7  Durham Police Department garage, and their crime scene

8  investigators began to look throughout the vehicle for

9  evidence.  And guess what?  Things were left behind.  They

10 opened up the internal paneling of that left rear passenger

11 door; and when they did that, they saw that even though the

12 outside had been repaired, the inside still had bullet holes.

13 That evidence had been left behind.  They found shards of

14 shattered glass in three different places in the vehicle.  The

15 glass had been left behind.

16        They found areas of suspected blood, and they swabbed

17 those areas of suspected blood, and they sent those samples to

18 the FBI laboratory for DNA testing.  They developed several

19 suspects, and they obtained DNA samples from them.  An analyst

20 will come and testify, and he will tell you that, based on his

21 analysis, there is very strong support for inclusion that DNA

22 from two of the robbers, the one shot in the back and the one

23 who had the cut on his face -- was very strong support for

24 inclusion of their DNA in the swabs of blood taken from the

25 Lincoln.

US v. Wiley  -- Trial/Vol II of VII -- 4/20/21

1        But they also found the black box.  They took the

2   black box out of the car.  You will hear from the person who

3   did that and extracted the data, and you will hear about just

4   how robust that data is.  And it will tell you the locations

5   and the places where the Lincoln had been driven by Mr. Wiley,

6   all the places that it had been.

7        But there's one thing that that Infotainment system

8   data will not tell you but this surveillance footage will and

9   so will the cooperator.  They'll tell you how Mr. Wiley was

10  driving this red Ford Explorer on April 13, 2018, and how he

11  drove that Ford Explorer into the parking lot of the shopping

12  center where China Wok was, how he backed it into exactly the

13  same parking spot that he would park the Lincoln two nights

14  later.  And there that red Ford Explorer sat, and they watched

15  and they waited, because the plan to commit the China Wok

16  robbery happened -- came together days before the attempted

17  robbery on April 15.

18       In fact, the cooperator will tell you that the plan

19  was to commit the crime that night, that they also left the

20  parking lot before Hong and Shirley left in their minivan; but

21  when they got to Carlton Crossing, the plan was to have the

22  robbers wait for them in the yard, but there was too much light

23  and thought they would be seen.  So they aborted the plan that

24  night, got back into the red Ford Explorer.  Mr. Wiley swapped

25  the vehicle the next day.  They went back and surveilled the

US v. Wiley  -- Trial/Vol II of VII -- 4/20/21

1 business and the house on the 14th, and then they went back to

2 commit the crime again on the 15th.

3          You will hear about phone records that were obtained

4 from the suspects, the robbers, and how those phone records

5 were then analyzed by a CAST analyst with the FBI and how they

6 took the historical cell location data associated with those

7 phone numbers, including Mr. Wiley's phone ending in 6112.  And

8 you will hear how that data places his phone connecting to a

9 cell tower near China Wok on April 13, 2018, around the time

10 when that red Ford Explorer was in the parking lot.  You'll

11 hear how that phone was connecting to cell towers on April 14,

12 one near China Wok, one near Carlton Crossing Drive.

13          You will hear how on April 15, as Mr. Wiley was

14 driving the Lincoln away from the crime scene, trying to flee

15 and get away, how his phone connected to a cell tower just

16 south of the Carlton Crossing area as that vehicle was

17 traveling along the highway back to the meet spot.

18          April 15, 2018.  April 13, 2018.

19          Ladies and gentlemen, you're about to hear evidence

20 in the case.  You're about to hear from the witnesses that

21 heard, saw, and did the things I just described to you.  A lot

22 is going to happen in this courtroom over the next couple of

23 days.  You're going to hear from over 40 witnesses.  Some of

24 them will be very short and brief.  Others will take more time

25 and have physical exhibits, photographs, and other kinds of

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 46 of 210

1    evidence.  But when this trial is over, there will only be one

2    thing left behind:  Your just and truthful verdict.

3            **THE COURT:**  All right.

4            Mr. Bryson.

5            **MR. BRYSON:**  This trial is a contest between the two

6    parties:  The Government who says that Maurice Wiley is guilty

7    of the offenses that he is charged with, and the defense, the

8    other party, who says he is not guilty of any of these charges.

9            Now, because this is a contest, there are certain

10   rules that we will follow, and the rule that I want to talk to

11   you about now is this rule:

12           The rules say that when presenting evidence, the

13   Government goes first.  That's the rule.  The Government gets

14   to put on their case first.  It's only fair.  They have the

15   burden of proof.  I am not complaining, but they get to go

16   first.  What that means is for the first part of this trial,

17   and to be honest with you, probably for the rest of this week,

18   you're going to hear only from Government witnesses.  Now, we

19   get to ask them questions.  That's called cross-examination,

20   but they will be Government witnesses.

21           And I want to alert you to this fact:  For many of

22   the witnesses that they call, when they are done testifying and

23   Judge Schroeder turns to myself or Mr. Foster -- and the judge

24   will say, Do you have any questions?  And there may be many

25   times when we say, no, we don't have any questions.  I want you

US v. Wiley  -- Trial/Vol II of VII -- 4/20/21

1  to know that's because, for large parts of the Government's

2  case, we really don't dispute what witnesses are saying.  The

3  Government is going to prove that this attempted robbery

4  occurred.  We don't dispute that.  We don't dispute that it

5  occurred.  We don't dispute that it was a terrible and tragic

6  thing that occurred out there.  We're not disputing that

7  whatsoever.  What we do dispute is that Maurice Wiley was

8  involved; and those witnesses that connect him to it, we will

9  be questioning those witnesses very sharply.

10          And so what I want you to do is when you sit here and

11  hear us say to numerous witnesses, well, we don't have any

12  questions, Judge, I want you to know it's not because we have

13  given up, not because we don't have a defense.  We have a case

14  to make.  We have an argument that you need to hear, but the

15  rules say that you can't hear that for a while.  And so all I

16  want to say to you at this point is this:

17          While you're listening to all these Government

18  witnesses, while you're hearing from their case, please do not

19  make up your mind; do not pass judgment on this case until you

20  have had a chance to hear from us later when the rules permit

21  us to make our case.

22          Thank you.

23          **THE COURT:**  All right.  The Government may call its

24  first witness.

25          **MR. GREEN:**  The Government is going to call Wai Ping

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 48 of 210

1  Chan.

2          May I step outside, Your Honor?

3          **THE COURT:**  Yes.

4          **MR. GREEN:**  Thank you.

5      (Mr. Green stepped out of the courtroom to retrieve the

6      witness and returned.)

7          **THE COURT:**  Let's swear the interpreter first.

8      (The interpreter was duly affirmed.)

9          **THE COURT:**  The interpreter may stand over to the

10  side here.

11          If anybody has any trouble hearing, just let me know.

12          Good morning.  If you'll take your mask off, please.

13          You can keep yours on, if you like.  Thank you.

14          Would you bend the microphone, ma'am, towards your --

15  thank you.

16  **WAI PING CHAN**, GOVERNMENT'S WITNESS, being first duly affirmed,

17  at 10:35 a.m. testified as follows:

18                      DIRECT EXAMINATION

19  **BY MR. GREEN**

20  Q    Would you tell these jurors your name, please.

21  A    (English) Wai Ping Chan.

22  Q    And do folks call you Shirley?

23  A    (English) Yes.

24          **THE COURT:**  All right.  So are we proceeding with the

25  interpreter?

Case 1:19-cr-00529-TDS  Document 360  Filed 02/04/22  Page 49 of 210

1           Go ahead and interpret the questions, please.

2           And then my understanding is the witness indicated

3   she would prefer to answer in English, but you may also answer

4   through the translator, whichever you wish.

5           Pose your question again, please.

6   **BY MR. GREEN**

7   Q    Do people call you Shirley?

8   A    (English) Yes.

9   Q    Where do you live generally?

10  A    (English) 4617 Carlton Crossing Drive, Durham, North

11  Carolina 27013.

12  Q    And where did you live in April of 2018?

13  A    (English.)  Same address.

14           **THE INTERPRETER:**  The same place.

15  **BY MR. GREEN**

16  Q    I'll ask if you have a business?

17  A    (English) Yes.

18  Q    And what is that business?

19  A    (English) Chinese takeout restaurant.

20  Q    And what is the name of that business?

21  A    (English) China Wok.

22  Q    I'm going to show you what's marked as Government's

23  Exhibit No. 2, and ask if you are familiar with what's in that

24  exhibit?  There should be something on your monitor.

25       Do you see the picture?

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 50 of 210

1   A    (English) That's my restaurant.

2   Q    And where is that located?

3   A    (English) You need the address?

4          **THE INTERPRETER:**  Yes.

5   **BY MR. GREEN**

6   Q    Just generally, where is it located?

7   A    (English) 3825 South Roxboro Street, Durham, North

8   Carolina, 27713 Suite 124.

9   Q    And that Government exhibit, is that a picture of your

10  restaurant?

11  A    (English) Yes.

12         **MR. GREEN:**  I'm going to move introduction of

13  Government's Exhibit 2, Your Honor.

14         **THE COURT:**  Admitted.

15         **MR. GREEN:**  I'd ask that it be published?

16         **THE COURT:**  It may be.

17  **BY MR. GREEN**

18  Q    Is the China Wok in a shopping center?

19  A    (English) Yes.

20  Q    And what kind of business is it?

21         **THE COURT:**  Hold on just a minute.  Go ahead and

22  interpret the questions.  My understanding is she preferred to

23  answer in English but wants the questions interpreted.

24         **THE WITNESS:**  (English) Takeout restaurant.

25         **THE INTERPRETER:**  It's a taking out Chinese

US v. Wiley  -- Trial/Vol II of VII -- 4/20/21

1  restaurant.

2  **BY MR. GREEN**

3  Q    And how long have you had that business?

4  A    (Interpreted) The restaurant was opened February 2002.

5  Q    And the food that's sold in that restaurant, where do you

6  get that from?

7  A    (Interpreted) It come from several places.  Some came from

8  New York, some came from Virginia, and some came from

9  Winston-Salem here, and we buy from other places, too.

10        **THE COURT:**  Let me ask the interpreter to remove your

11  mask so we can hear you more clearly, too.

12        Thank you, sir.

13        **THE INTERPRETER:**  The food come from New York,

14  Virginia, Winston-Salem, and some other small places, too.

15  **BY MR. GREEN**

16  Q    And was that true in April of 2018?

17  A    (Interpreted) Yes.

18  Q    I'm going to show you on your monitor Government's Exhibit

19  No. 3.

20  A    (Interpreted) This is a receipt from a seafood place

21  from -- in Virginia.

22  Q    In Virginia?

23        **THE INTERPRETER:**  Yep.

24  **BY MR. GREEN**

25  Q    And I'm going to flip the page to the next page of

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 52 of 210

1    Government's Exhibit No. 3, and I'll ask if you are familiar

2    with what that is?

3    A    (Interpreted.) Okay.  This is a store owned by Chinese in

4    Virginia.  They sell seafood and all dried food as well.

5              **THE COURT:**  The court reporter is having a little

6    difficulty understanding the interpreter's English.  And my

7    understanding is the witness and the parties agreed she could

8    answer in English?

9              **MR. GREEN:**  Yes, Your Honor.

10             **THE COURT:**  So if the interpreter would interpret the

11   question, and then you may answer in English, if you wish.  If

12   you wish to answer in Mandarin, you can do that; but if you

13   want to answer in English, that's fine.  We just want to make

14   sure the questions are interpreted in Mandarin.

15             So why don't you pose your last question to be sure.

16   **BY MR. GREEN**

17   Q    Looking at the second page, which is on your monitor, do

18   you recognize that?

19             **THE COURT:**  Can you interpret that question?

20             **THE WITNESS:**  (English) Same way.  You haven't

21   changed anything here.  I already say that this --

22        (Interpreter and witness converse.)

23             **THE WITNESS:**  (English) Okay.  This is a same -- it's

24   a company I order the dry food, seafood, and meat from.

25

1    **BY MR. GREEN**

2    Q    And looking at the last page of Exhibit 3, do you

3    recognize that?

4    A    (English) This is from Georgia.

5    Q    And do each of these exhibits -- are they related to the

6    shipment of goods that you got in your restaurant in 2018?

7    A    (English) Yes.

8              **THE COURT:**  Wait.  Interpret the question.

9              **THE WITNESS:**  (English) Yes.

10             **THE INTERPRETER:**  Yes.

11             **MR. GREEN:**  Your Honor, I move introduction of

12   Government's Exhibit 3.

13             **THE COURT:**  Admitted.

14             **MR. GREEN:**  I would ask that they be published?

15             **THE COURT:**  They may be published.

16        (Interpreter and witness converse.)

17             **THE COURT:**  There are no questions.  Your job is

18   simply to interpret, no more, no less.  All right.

19   **BY MR. GREEN**

20   Q    Looking at Government's Exhibit No. 3, at the top of that

21   exhibit, is that the company where they were sending foods from

22   Virginia?

23   A    (English) Yes.

24   Q    And it also bears a date of March 15, 2018.  Is that

25   accurate?

US v. Wiley  -- Trial/Vol II of VII -- 4/20/21

1   A    (English) Yes.

2   Q    Looking at the next page, the next receipt, at the top,

3   does that invoice also show shipment from Sandston, Virginia?

4   A    (English) Yes, from Virginia.

5   Q    And it looks like the date of that shipment was April 13,

6   2018?

7   A    (English) Yes.

8   Q    Looking at page 3 of Exhibit 3 at the top, can you tell

9   what company that was -- where that company was located where

10  you received inventory?

11  A    (English) A&W Food from Allentown, Georgia.

12  Q    And does it also bear a date in the right-hand side?

13  A    (English) Yes.

14  Q    And how often would you receive shipments from out of

15  state in your business?

16  A    (Interpreted) Every week.

17  Q    I'm going to show you Government's Exhibit No. 4.

18       And do you recognize that?

19  A    (English) My house.

20  Q    And is that the house on Carlton Crossing Drive?

21  A    (English) Yes.

22  Q    And does that photograph fairly and accurately depict your

23  house?

24  A    (English) Yes.

25            **MR. GREEN:**  I'm going to move introduction of

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 55 of 210

1  Government's Exhibit 4.

2           **THE COURT:**  Admitted.

3           **MR. GREEN:**  And ask that it be published?

4           **THE COURT:**  It may.

5  **BY MR. GREEN**

6  Q    How long had you lived in this house?

7  A    (English) Sixteen years.

8  Q    And who lived with you in this house?

9  A    (English) My husband; my boy, Eastern Zheng; my girl, Jade

10 Zheng.

11 Q    And was your husband involved in working at China Wok?

12 A    (English) Yes.  We worked together.

13 Q    And how long had you all worked together?

14 A    (English) The business opened on 2001 -- 2002.  This house

15 is after few months I open the business.  It's about -- it will

16 be 16 years from the time.

17 Q    And did you own that business together with your husband?

18 A    (English) Yes.

19 Q    Describe what a day looked like in April 15, 2018, working

20 in the business.

21      (Interpreter and witness converse.)

22 A    (Interpreted) The rains were hard that night, then the

23 lightning and the rain.

24 Q    Ms. Chan, I would like you to describe prior to the event

25 in April -- what would a day look like in your business

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 56 of 210

1  typically?  What would you and your husband do?

2  A    (Interpreted) On a normal day, they will leave their house

3  around 10:40.  And their house is very close to the restaurant.

4  Q    And what would you do when you got to work?

5  A    (Interpreted) Open the door and let the customers come in.

6  Q    And how many customers might you have come in on a typical

7  day?

8  A    (Interpreted) A few dozen up to 100 every day.

9  Q    And how late would you stay at work?

10  A    (Interpreted) On a normal day, they open at 11:00, close

11  at 11:00.  On Sunday, they open at 12:00 and close at 10:00.

12            **THE INTERPRETER:**  Right?

13            **THE WITNESS:**  (English) 10:00 or 10:30, depends on --

14            **THE INTERPRETER:**  Yeah.  Sometimes 10:00, sometimes

15  10:30.  It depends on the day.

16  **BY MR. GREEN**

17  Q    And how many days a week did you work?

18  A    (Interpreted) Seven days a week.

19  Q    And how many days a year would you work up until April 18?

20  A    (English) Except for Thanksgiving, we be open all day

21  long.

22            **THE INTERPRETER:**  Except Thanksgiving Day, they opens

23  every day.

24  **BY MR. GREEN**

25  Q    I'm going to ask to you look at Government's Exhibit No. 1

1  on your monitor.

2       Can you tell us who that is?

3  A    (English) My husband.

4  Q    Is this the man who would work with you every day?

5  A    (English) Yes.

6  Q    And where was that photograph taken?

7  A    (Interpreted) This picture was taken in Wuyi Mountain in

8  Fujian Province, China, when her husband went back home to

9  visit his parents at home about three years before the

10  incident.

11  Q    What is your husband's name?

12  A    (English) Hong Zheng.

13  Q    And approximately how old was he before April 15, 2018?

14       **THE INTERPRETER:**  What's your question?

15  **BY MR. GREEN**

16  Q    How old was he?

17  A    (English) 42.

18       **MR. GREEN:**  I'm going to move introduction of

19  Government's Exhibit No. 1, Your Honor.

20       **THE COURT:**  Admitted.

21       **MR. GREEN:**  And I ask it be published?

22       **THE COURT:**  It may.

23  **BY MR. GREEN**

24  Q    I would like to direct your attention to April 15, 2018.

25       Did you and your husband work that day?

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 58 of 210

1  A    (Interpreted) Yes.  On that day, she and her husband were

2  working in the restaurant.

3  Q    And how late did you work that day?

4  A    (Interpreted) They left the restaurant around 10:20 p.m.

5  Q    Prior to that day, did you make it a habit to bring home

6  the proceeds of the business, the money that customers had paid

7  you, and bring them to your house?

8  A    (English) Yes.

9  Q    Do you recall if you had money from the business on this

10  occasion, on April 15?

11  A    (English) Yes.

12  Q    When you left, how was the weather?

13  A    (Interpreted) It rained very hard.  There were lightning.

14  The rain was very heavy.

15  Q    Where did you go when you left your restaurant?

16  A    (Interpreted) They went home directly.

17  Q    And approximately how long did it take you to get home?

18  A    (Interpreted) Two or three minutes.

19  Q    And what happened when you pulled in the driveway?

20        **THE COURT:**  Is she answering in English or in

21  Mandarin?

22        **THE INTERPRETER:**  She was answering in Chinese.

23        **THE COURT:**  If you would interpret as we go along.

24        **THE INTERPRETER:**  Normally, her husband will pull up

25  at the bottom of the hill.  But that day, her husband drive her

Case 1:19-cr-00529-TDS  Document 360  Filed 02/04/22  Page 59 of 210

1  up the hill, and she was about to open the door.

2  **BY MR. GREEN**

3  Q    What was your routine typically when you got home from the

4  business?

5  A    (Interpreted) Normally, the husband will park at the

6  bottom of the hill, and then she went out up the hill, opened

7  the door.  The children came out, hand her the gun and

8  ammunition.  The gun and ammunition were kept separately in the

9  home because they worry the children might get hurt.

10  Q    Why did you have a gun and ammunition?

11  A    (Interpreted) They bought a gun because several burglaries

12  and robberies took place in their house.  They bought a gun to

13  defend themselves.  So when they bought the gun, they took

14  themselves and two of their children to get the training for

15  using the gun.

16          **THE COURT:**  Before you go further, let me just ask

17  the interpreter -- when you translate, make sure you translate

18  literally what she's saying.  So if she says "I", then

19  translate "I" and not put it in the third person.  In other

20  words, you're literally translating what she says.

21          **THE INTERPRETER:**  Okay.  Yeah.

22          **THE COURT:**  Thank you.

23          All right.  Please proceed.

24  **BY MR. BRYSON**

25  Q    On April 15, when you came home and got out of the car,

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 60 of 210

1  what happened next?

2  A    (Interpreted) I went up the hill, opened the door.  My son

3  came out, hand me two things.  And I look up at my son's face,

4  and his face changed.

5  Q    What happened next?

6  A    (Interpreted) And he looked towards the one and saw

7  several people came out of white car and running with a gun in

8  their hands, and they're shooting.

9  Q    What happened next?

10  A    (Interpreted) They fall to the ground, and he struggled to

11  get up.  I struggled to get up.  And I think about my son.  He

12  was inside -- he is at the door.  My daughter was upstairs.

13  She was also supposed to watch what's happening outside.

14  Q    What happened next?

15  A    (English) When I stand up -- I know I stand up.  My boy is

16  right behind me.  I'm still here.  He's back right behind me --

17  he's hurt or not.  I saw all the five -- four, five already run

18  through close to me.  At that time I don't even have a minute

19  to think.  I step out from the door.  I'm standing in front of

20  the door, and I try to shoot the gun.  I try to pull it in,

21  pull back together.  I try to shoot the gun, but my gun -- I

22  pull one time, I pull two times, several times.  And I got the

23  gun, shot it up.  I was standing outside.  And I shoot.  I

24  shoot.  I shoot.  I shoot.

25  Q    What happened after you shot?

US v. Wiley  -- Trial/Vol II of VII -- 4/20/21

1  A    (English) The white van -- they run -- everybody was --

2  four, five guy run into the car, and they run.  And then I turn

3  around and call my kid's name:  Jade, Eastern, Jade, Eastern.

4  I call my husband.  I call my husband:  Dangai, Dangai, Dangai.

5  And then I be running.

6       He's outside the hill in the car.  I'm in between.  I

7  don't know my kids is safe or not.  I don't know my husband is

8  safe or not.  I be running in between.  I call my kids' name:

9  Eastern, Jade, Eastern, Jade.  Call police.  Dangai, Dangai,

10 are you okay?

11      I run through -- I run through my driveway -- my

12 husband -- driveway, and I saw there's a hole -- bullet hole go

13 through the window.  And then I tried to call my husband:  Open

14 the door.  I can't open the door.  I run back to home because

15 my -- I have an extra pair of key for the car, and I tried go

16 to the car to open my husband's way and still not work.  I use

17 my hand.  I tried to shake the window, shake the window.  I

18 tried to open the window to call my husband because he already

19 on the car seat and over there.  He's not answering me.  He's

20 not answering me.

21 Q   And when that -- when you fired your gun, did the robbers

22 shoot at you?

23          **THE INTERPRETER:**  She said:  The robbers were

24 shooting at me.  The guy was firing all the time while I was

25 shooting.

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 62 of 210

1   BY MR. GREEN

2   Q    Were you able to get inside the van?

3            THE INTERPRETER:  Repeat, please.

4   BY MR. GREEN

5   Q    Were you able to get inside the van with your husband?

6   A    (English) I'm at the front door.  My boy was handing me

7   the gun with the bullet separately to me.

8        (Interpreter and witness converse.)

9        (English) I break the window.  There's a neighbor from

10  across street.  He run over to help me -- to help me.  I do go

11  inside -- inside the car and was holding my husband's hand.

12  His hand was -- first, from beginning, I hold my husband's

13  hand.  His hand is cold, and I keep calling my husband's name:

14  Dangai, Dangai, don't scare me.

15       And then later, there's a neighbor's wife.  She came to do

16  CPI for my husband.  His hand get warming up again.  I felt,

17  oh, my husband, he came back.  My husband, he come back.

18  Q    Did he come back?

19  A    (English) He never came back.

20       His last sentence is from the first time the van -- the

21  van was coming down there.  He tried to moved a little bit, but

22  my -- looking at him, the reason is I'm asking, What happened?

23  He was telling me if I move a little bit -- because outside is

24  raining, heavy raining.  I can -- they can watch me walking to

25  the front door.  That's all I hear from him at that night.  I

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 63 of 210

1  lost my husband at that night.  My family lost him at the

2  night.

3  Q    How long was your business closed after this happened?

4  A    (Interpreted) My restaurant was closed for about one

5  month.  I don't remember exactly --

6          **THE WITNESS:**  (English) More than a month.  I don't

7  want to remember everything.  I want the time be stopped.

8          **MR. GREEN:**  That's all the questions I have.

9          **THE COURT:**  Any examination?

10                       Cross -- Wai Ping Chan

11                       CROSS-EXAMINATION

12 **BY MR. BRYSON**

13 Q    The night of the robbery, you did not bring any money home

14 from the restaurant; correct?

15 A    (Interpreted) I carried the money home.  Every day we make

16 money, we take it home.

17 Q    When you bring the money home, it's for the family to

18 keep?

19 A    (Interpreted) The restaurant and my home are both not

20 safe, but I bring home the money.  I feel a little bit safer.

21 Q    But you keep the money that you bring home?

22 A    (Interpreted) Yes.  They take it home.

23 Q    On April 19, four days later, Detective Cramer from the

24 Durham Police Department came to your home; correct?

25 A    (Interpreted) I don't remember how many days after, but I

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 64 of 210

1  do remember they came to ask me some questions.

2  Q   And when he came to your home, you knew he was a Durham

3  police officer; correct?

4  A   (Interpreted) They did tell me they were police officer.

5  Q   And they were investigating the robbery; correct?

6  A   (Interpreted) I don't know if they were investigating the

7  robbery, but I just know my husband died.  My home is break up.

8  Q   You did answer Detective Cramer's questions?

9  A   (Interpreted) I answered the detective's questions to help

10  him catching the bad guys.

11  Q   And you told Detective Cramer that you had not brought any

12  money from the business home that night?

13  A   (Interpreted) My everyday business is money come in and

14  money come out, and the remaining we brought home.

15  Q   Here's my question.  My question is:  Did you tell

16  Detective Cramer that you did not bring any money home from the

17  business that night?

18  A   (English) I really can't remember exactly does Cramer, the

19  police officer, ask me this question or not.

20          MR. BRYSON:  Those are my questions?

21          THE COURT:  All right.  Any redirect?

22          MR. GREEN:  No, Your Honor.

23          THE COURT:  All right.  Thank you.  You may step

24  down, ma'am.

25          MR. GREEN:  May this witness be released, Your Honor?

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 65 of 210

1          **THE COURT:**  Any objection?

2          **MR. BRYSON:**   No objections.

3          **THE COURT:**  She may be released from her subpoena.

4       (At 11:12 a.m., witness excused.)

5          **THE COURT:**  All right.  Ladies and gentlemen, we're

6    going to take our morning break.  This would be a good time to

7    do that.  If you're taking notes, please put your notepads in

8    your envelopes.  Leave your envelopes in your chairs.  They

9    will be safe here.

10          We'll take a break for 20 minutes.  That will give

11   you an opportunity to go back across the hall, use the

12   facilities.

13          Remember all my admonitions to you.  So that I don't

14   have to read two pages of admonitions to you, everything I told

15   you in my jury selection process and then all the admonitions I

16   just read to you in my preliminary charge I am going to call my

17   standard admonitions to you, which include not talking about

18   the case, not doing any research, et cetera, and reporting to

19   me if anybody does.  That's for your own protection and for the

20   protection of the parties and for the system.

21          So simply take a break, relax.  We'll start back

22   promptly 20 minutes later with our next witness.  Leave your

23   envelopes in your chairs, and Ms. Engle will escort you to the

24   jury room.

25          Everybody else please remain in the courtroom until

1  the jurors are safely in the jury room.

2           Please watch your steps.  There are some cables

3  there.  We are going to get those taken care of shortly.

4       (The jury departed the courtroom at 11:14 a.m.)

5           **THE COURT:**  Everybody may be seated, please.  Give

6  them a moment just to get across the hall.

7           All the jurors have left the courtroom, let the

8  record reflect.

9           Okay.  Do we have any more witnesses with Mandarin

10  translators?

11           **MR. GREEN:**  No, Your Honor.

12           **THE COURT:**  All right.

13           Any questions -- any objection to the preliminary

14  charge?

15           **MR. GREEN:**  Not from the Government.

16           **THE COURT:**  Defendant?

17           **MR. BRYSON:**  Your Honor, I did just want to point

18  this out.  It's a minor point, but I noticed on page 6, when

19  you were instructing on aiding and abetting, under the first

20  count, instead of -- it says Count Two and Four.  As I recall,

21  you said, Count One and Four.

22           **MR. GREEN:**  I heard "Two" and "Four" when you said

23  it.  Maybe you misheard it then.

24           **THE COURT:**  All right.  The court reporter says I

25  said "Two" and "Four"; is that correct?

       US v. Wiley  -- Trial/Vol II of VII -- 4/20/21

1              **THE COURT REPORTER:**  No.  You said Two and Four
2    first, One and Four second, and then third time, Two and Four.
3              **THE COURT:**  Do you want me to correct that or not?
4              All right.  Having heard nothing, I will correct it.
5    So I will let them know.
6              Let me also, for the record, say since all folks
7    are -- jurors are out of the courtroom, in terms of the jury
8    composition, I have counted five members of the jury who are --
9    appear to be African-American.  That's Juror No. 4, No. 5,
10   No. 7, No. 10, and No. 11.
11             Any disagreement about that?
12             **MR. GREEN:**  No, Your Honor.
13             **MR. BRYSON:**  No.  Are you just talking about the 12?
14             **THE COURT:**  Yes, the 12.  I don't believe any
15   alternates are African-American, is there?
16             **MR. BRYSON:**  I thought Ms. Slade was?
17             **MR. GREEN:**  That was my perception.
18             **THE COURT:**  You're correct.  Ms. Slade is
19   African-American.  Those are all the members of the jury that
20   are African-American.
21             **MR. FOSTER:**  Your Honor, you asked about objections
22   to the preliminary instructions you gave to the jury.  I just
23   want to preserve our objection that we made earlier to the
24   instruction on Count Three about the Hobbs Act robbery being a
25   crime of violence.

US v. Wiley  -- Trial/Vol II of VII -- 4/20/21

1          **THE COURT:**  I understand.  That's preserved.  I was

2    more interested in whether I made a mistake.  Apparently, I

3    did, and I will correct that when we come back.

4          Okay.  Let's take a break.  We'll see you in 15

5    minutes since I told them 20.

6          (Proceedings recessed at 11:18 a.m.)

7          (Proceedings called back to order at 11:37 a.m.)

8          (The Defendant was present.)

9          **THE COURT:**  All right.  Please bring the jury in.

10         (The jury returned to the courtroom.)

11         **THE COURT:**  You may be seated, please.

12         Ladies and gentlemen, when I read the preliminary

13    charge and I mentioned the aiding and abetting, I indicated

14    that there were two counts, Counts Two and Four, that had

15    aiding and abetting charges.  At one point in my comments, I

16    may have inadvertently said Counts One and Four, or something

17    other than Two and Four.  I meant to say Counts Two and Four.

18    Those are the two counts that have the aiding and abetting,

19    just so that's clear.

20         The Government may call its next witness.

21         **MR. PRINCIPE:**  Thank you, Your Honor.  The Government

22    calls Crystal Rodriguez.

23    **CRYSTAL RODRIGUEZ,** GOVERNMENT'S WITNESS, being first duly

24    affirmed, at 11:40 a.m. testified as follows:

25         **THE COURT:**  You may remove your mask for your

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 69 of 210

1  testimony, please.

2          Please proceed.

3                  DIRECT EXAMINATION

4  **BY MR. PRINCIPE**

5  Q    Would you please state your name.

6  A    Crystal Rodriguez.

7  Q    And who do you work for, Ms. Rodriguez?

8  A    For Durham Emergency Communications Center.

9  Q    How long have you worked there?

10 A    About six months now.

11 Q    Okay.  And are you familiar with the records that are kept

12 by that agency and the manner in which they are kept?

13 A    Yes, I am.

14 Q    And did you -- can you describe, generally speaking, what

15 happens when a person calls 911 and that call is routed to the

16 Durham Communications Center?

17 A    Well, our 911 dispatchers -- well, call-takers, they take

18 the call and then they route it, and they send the appropriate

19 person to help to aid them.

20 Q    Okay.  And so are those people in communication with the

21 people who place the 911 calls?

22 A    Yes.

23 Q    Do they receive any information on a computer screen in

24 front of them when a 911 call is routed to the 911 operator?

25 A    Yes.

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 70 of 210

1  Q    What kinds of information do they get?

2  A    We have something called the CAD report.  It's a

3  computer-aided dispatch, and we input the entry for the

4  dispatcher, whoever is dispatched to the call.

5  Q    And when you say "dispatched to the call," you're

6  referring to the police officers typically?

7  A    Yes, police officers, EMS, fire.

8  Q    Okay.  And then are there certain things that 911 call

9  operators are trained to do or information they are trained to

10 provide to people who might be calling in an emergency?

11 A    Yes, they are trained.  They are trained to give CPR

12 orders over the phone and other training mechanisms.

13 Q    Okay.  And are 911 calls recorded?

14 A    Yes.

15 Q    And are they stored for some period of time?

16 A    Yes.  State law requires 911 calls be stored and preserved

17 for 30 days.

18 Q    Okay.  And are these 911 recordings kept in the ordinary

19 course of business?

20 A    Yes.

21        **MR. PRINCIPE:**  May I approach the witness, Your

22 Honor?

23        **THE COURT:**  Yes.

24 **BY MR. PRINCIPE**

25 Q    I'm showing you a disk that's marked Government's

1  Exhibit 7.  Do you recognize that disk?

2  A    Yes, I do.

3  Q    And did you have a chance to look at the contents of that

4  disk?

5  A    Yes, I did.

6  Q    And are there five audio recordings on the disk?

7  A    Yes, there are.

8  Q    And do you recognize those five audio recordings to be

9  authenticate 911 calls that were placed to the Durham City

10  Communication Center on April 15, 2018?

11  A    Yes, I do.

12  Q    Now, three of those calls, were they placed from callers

13  near Carlton Crossing Drive?

14  A    Yes, they were.

15  Q    And were two of those calls placed from callers near

16  Driver Street?

17  A    Yes.

18        **MR. PRINCIPE:**  Your Honor, Government moves to

19  introduce Government's Exhibit 7 into evidence.

20        **THE COURT:**  Admitted.

21        **MR. PRINCIPE:**  No further questions.

22        **THE COURT:**  Any examination?

23        **MR. FOSTER:**  No, Your Honor.

24        **MR. GREEN:**  May the witness be released?

25        **THE COURT:**  Any objection?

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 72 of 210

1          **MR. BRYSON:**  No objection.

2          **THE COURT:**  All right.  She may be released.

3          Thank you, ma'am.

4       (At 11:44 a.m., witness excused.)

5          **MR. GREEN:**  If you will allow me, I will get the next

6    witness, Your Honor?

7          **THE COURT:**  Yes.

8    **EASTERN ZHENG,** GOVERNMENT'S WITNESS, being first duly affirmed,

9    at 11:44 a.m. testified as follows:

10                         DIRECT EXAMINATION

11   **BY MR. GREEN**

12   Q    Could you tell the jurors your name.

13   A    My name is Eastern Zheng.

14   Q    And who is your mother?

15   A    Wai Ping Chan.

16   Q    And who is your father?

17   A    Hong Zheng.

18   Q    And I want to direct your attention to April 15, 2018.

19        Where were you living on that -- at that time?

20   A    It was at our old house in Durham, 4617 Carlton Crossing

21   Drive.

22   Q    And is that near your family's business?

23   A    Yes, it is.

24   Q    Approximately how far away is it?

25   A    About a five-minute drive.

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 73 of 210

1  Q    And describe that house for the members of the jury.

2  A    I mean, it's like a typical family house.  There's

3  rooms -- like, four rooms, and, I mean, I don't know how you

4  would want me to explain, but it's just like --

5  Q    Sure.  If you look at your monitor -- I want you to look

6  at Government's Exhibit 5.

7  A    Is it on?

8  Q    It should be coming up.

9       Do you see it?

10 A    Yes.

11 Q    What is that a photograph of?

12 A    It's the house.

13 Q    And the house where you lived?

14 A    Yeah, it is.

15 Q    And with regard to Government's Exhibit No. 5, is that an

16 accurate depiction of your house as it appeared in April, 2018?

17 Do you recall?

18 A    Yeah, I mean, there were -- there weren't a lot more

19 greens -- the trees were basically, like, a little bit dead at

20 that point, but that's about it.

21       **MR. GREEN:**  All right.  I am going to move

22 introduction of Government's Exhibit 5, and ask it be

23 published?

24       **THE COURT:**  It's admitted.  You may publish it.

25

1  BY MR. GREEN

2  Q    Now, did your family have a routine when your parents came

3  home from working at the China Wok?

4  A    Not at first, but it was towards the latter parts of

5  living there where the routine started.

6  Q    And describe when that started.

7  A    I can't give you an exact date, but it was after the -- it

8  was after they, like, robbed us or burglarized our home a

9  couple of times, but it's been some time after that where we

10 decided, okay, we need this routine just to keep everyone safe.

11 Q    And your house had been robbed before?

12 A    It's been broken into once when we weren't there.

13 Q    And was there another time?

14 A    And then the other time was at the restaurant when -- it

15 was a while back.

16 Q    Did your family decide to get a firearm?

17 A    Yeah.

18 Q    Could you describe for the members of the jury what you

19 know about that?

20 A    It was a handgun, a FNS-9, and then the other one was a

21 rifle, which I can't recall the exact -- exactly what it is.

22 All I know is it was just a rifle.

23 Q    And with regard to the handgun, did you practice shooting

24 that?

25 A    I shot it a couple of times at the range.

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 75 of 210

1    Q    And did your father?

2    A    Yeah, he was there with me.

3    Q    And what about your mother?

4    A    My mother was working most of the time.  I don't think

5    she's ever had -- she's not experienced with that firearm.

6    Q    Did -- with regard to this routine, when your parents came

7    home, usually what time of night would they come home?

8    A    Sometime around after 10:00 on, like, a weekday.

9    Sometime, like, 10:00 to 11:00 on, like, weekdays, yeah.

10   Q    And describe the routine that had developed.

11   A    So, basically, they would give me a call when they drive

12   home, and then they'll be, like, we'll be there in, like, three

13   to five minutes and just have everything ready.  That's when I

14   knew I had to go, like, get the guns and stand by the door and

15   wait for them.

16   Q    And how many times had you all had this routine before the

17   events of April 15?

18   A    It's been too long to count.  There's been plenty of

19   times.  It's just been, like, a standard routine at that point.

20   Q    And what would happen specifically with regard to the

21   routine?

22   A    Normally, it would be either my mother or my father will

23   walk in first while the other one sits in the car, and I will

24   hand the firearm off to them, and then they will wait outside

25   for the other one to come inside the door.

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 76 of 210

1  Q    And was the firearm loaded at that time?

2  A    No, it's unloaded in my hands.

3  Q    When you described that, when you mean unloaded --

4  A    It means, like, the magazine, it's not in the chamber yet.

5  Q    Okay.  So the magazine is separate than the actual

6  firearm?

7  A    Yeah.

8  Q    And so when they come to the door after calling you, you

9  would do what with that?

10 A    I will hand it over to them, and then I will either take

11 their bags or usually they bring home food.  So then I'll grab

12 the food from them, and then hand them the firearm.

13 Q    And what would happen after that -- what was the routine

14 after one of the parents got the firearm and you got the bags?

15 A    I will usually just set up, like, the dinner table if it's

16 usually stuff to eat, and then I just assume it would be,

17 like -- it would be, like, normal, and they would walk in

18 afterwards.

19 Q    Directing your attention to April 15, 2018, do you recall

20 that day?

21 A    Uh-huh.

22 Q    And were you at home?

23 A    I was at home.

24 Q    Was your sister with you?

25 A    She was upstairs.

US v. Wiley  -- Trial/Vol II of VII -- 4/20/21

1  Q    And was that part of the routine for her to be upstairs?

2  A    She will watch through the window from an upstairs room.

3  Q    And what would she be watching for?

4  A    Just that they get in and that everything is okay.

5  Q    Was there an alarm up there?

6  A    There is an alarm system upstairs.

7  Q    Did your home also have video?

8  A    We had a camera that was positioned to capture whatever

9  comes through the front door.

10 Q    On April 15, 2018, do you recall your parents coming home?

11 A    Yeah.  It was a rainy day, and they were driving home.

12 Q    Did they call you first?  Did someone call you and let you

13 know they were coming?

14 A    Either they called me or my sister to let me know that

15 they were coming home, and so I'd just get everything ready.

16 Q    And what did you do?

17 A    I got the firearms and then just stood by the door waiting

18 for them.

19 Q    And what happened next?

20 A    I saw my mom walk up first, but then right as she got up

21 to the top steps and was about to enter the door, there was a

22 car in the background where, like, the door is open and then

23 there were some people, like, to the side of us that started,

24 like, scrambling and running towards the front.

25 Q    Can you describe in detail the car you saw?

US v. Wiley  -- Trial/Vol II of VII -- 4/20/21

1   A    I can't describe in detail unless -- it was too dark to

2   see.  All I know is it was just in the background.

3   Q    And how many people did you see?

4   A    That was the first car, and then I saw another one, like,

5   drive by after, like -- I'm pretty sure I saw two cars.

6   Q    And what about the second car you saw?

7   A    I can't give -- like, I don't know exactly.  I just saw it

8   drive through.  It was -- about at that time I just -- I had to

9   leave.

10  Q    And do you recall how many people you saw?

11  A    I saw the doors open on the cars.  So I saw, like, at

12  least three or four doors open, and then there was at least,

13  like, about three people to the side of us.  About seven to

14  eight people.

15  Q    Do you recall how they were dressed?

16  A    It was too dark to see, but they were also dressed in dark

17  clothing.

18  Q    What happened when you handed your mother the firearm and

19  the magazine?

20  A    I handed her the firearm and magazine.  She tossed me the

21  food.  And then as I -- as we were in the process of doing

22  that, somebody was already, like, on the front steps.  So I

23  tried to close the door.  I shoved her to the ground so -- to,

24  like, avoid any direct line of fire before I just ran off to

25  find safety for myself.

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 79 of 210

1  Q    What did you hear?

2  A    I heard some noises, and then I heard the first gunshot,

3  which was not from the FNS.

4  Q    What did you hear next?

5  A    A series of gunshots and then, like, glass breaking, a

6  couple shots.

7  Q    I want to show you Government's Exhibit No. 6.  Is that on

8  your screen?

9  A    Yep.

10 Q    Do you recognize what that is?

11 A    Yeah, that's the FNS.

12 Q    And is that the gun you handed your mother?

13 A    Yes, sir.

14 Q    And where is that depicted?  Do you recognize the room?

15 A    That's my mom's room where she would sleep.

16        **MR. GREEN:**  Your Honor, I will move introduction of

17 Government's Exhibit No. 6.

18        **THE COURT:**  Admitted.

19        **MR. GREEN:**  I ask that it be published?

20        **THE COURT:**  You may.

21 **BY MR. GREEN**

22 Q    Is that object there on the bed the firearm you just

23 described?

24 A    Yep.

25 Q    And is that the firearm you handed your mother?

1    A    Uh-huh.  Yes, sir.

2    Q    And do you recall the caliber of that firearm?

3    A    I can't recall exactly.  I'm pretty sure it's a 9mm.

4    Q    What happened after you heard the gunshots?  What do you

5    recall?

6    A    I was already running to find, like, some cover when I had

7    already saw them once I had no weapon to defend myself.  So I

8    was already trying to find kind of cover that's not, like, the

9    front door where it's not, like, a safe spot if something was

10   to happen.

11   Q    All right.  I'm going to show you Government's

12   Exhibit No. 8.

13        (Government's Exhibit No. 8 was played.)

14        I'll pause it.  Can you see that on your screen?

15   A    Yeah.

16   Q    Do you recognize what that is?

17   A    Yeah, that's the camera that captures partially what comes

18   through the front door.

19   Q    And you've seen this video before?

20   A    Yeah.

21   Q    And is that a video of the events from that camera's angle

22   on 4/15/2018?

23   A    Yeah.

24        **MR. GREEN:**  Your Honor, I would ask that they be

25   published -- this exhibit be moved into evidence, Exhibit

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 81 of 210

1  No. 8, and ask that it be published?

2          **THE WITNESS:**  That's fine.

3          **THE COURT:**  Any objection?

4          **MR. BRYSON:**  No.

5          **THE COURT:**  All right.  It's admitted.  It may be

6  published.

7          (Government's Exhibit No. 8 was played.)

8  **BY MR. GREEN**

9  Q    Looking at Government's Exhibit 8, can you describe what

10  we're looking at?

11  A    Yeah, that was me looking through the blinds just to make

12  sure that that was my mom coming up the steps first; and then

13  when I saw her come up the steps, that's when I decided to open

14  the door.

15  Q    And as we play this video, behind us, if we're standing

16  where the camera is, what is the room that's located in?

17  A    That's like -- it's just where, like, people would sit

18  down just, like, to have talks and stuff.  It wasn't, like, a

19  specific room.  It's just the downstairs, like, where people

20  would just sit down and just chill.

21  Q    Where is your sister?

22  A    She's upstairs.

23  Q    Thank you.

24          **MR. GREEN:**  Your Honor, I would like to play the

25  exhibit.

        US v. Wiley  -- Trial/Vol II of VII -- 4/20/21

1         **THE COURT:**  All right.

2         (Government's Exhibit No. 8 was played.)

3    **BY MR. GREEN**

4    Q    At the beginning of the exhibit, there's a bag that hits

5    the floor.

6         Do you recall what that bag was?

7    A    That was the food that they brought home that day.

8    Q    That your mother gave you?

9    A    Yeah.

10   Q    And had you at that point handed her the firearms as

11   you -- as we see?

12   A    Yeah, uh-huh.

13   Q    After you heard the gunshots, what's the next thing you

14   did?

15   A    I didn't do anything else.  I was just hiding, just trying

16   to wait it out.

17   Q    Did you call 911?

18   A    I tried to call 911, but my -- no, no.  Sorry.  I was

19   waiting until everything was over.  I don't think I had my

20   phone on hand at the time.  And then I know my sister was

21   dialing for 911, but the calls weren't, like, running through

22   for some reason.

23   Q    Do you recall speaking to an operator?

24   A    Yes, later on I recall.  Like, when I had my phone, when I

25   actually could get the call through, I was trying to, like,

         US v. Wiley  -- Trial/Vol II of VII -- 4/20/21

1 tell them, like, get over here. It was, like, just -- yeah, it

2 was later on, though.

3 Q    I'll ask if -- after you heard the gunshots, did you go

4 outside?

5 A    I did not go outside. I was -- after the initial round of

6 gunshots was over, the gunfire was over, I was running upstairs

7 to, like, secure the rifle.

8 Q    And what was your -- what do you recall about what your

9 mother was doing?

10 A    She was outside. And afterwards, she noticed that my

11 father was -- the car was, like, rolled down, like, on the

12 bottom of, like, basically where the street was, and he wasn't

13 responding. And so she ran in to call us to, like, bring a

14 towel or bring something to help him and call 911 and let them

15 know.

16 Q    And you did?

17 A    I did, as I was trying to get the rifle.

18 Q    Were your -- do you know if any of your neighbors had at

19 that point come outside?

20 A    I can't recall their exact address, but I know that one of

21 my neighbors came out to try to perform CPR on my dad, and then

22 the other ones -- I can't tell how many people were out there

23 since I wasn't out there initially.

24 Q    I'm going to play for you an excerpt from a call, and I

25 want to see if you recognize your voice on that call.

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 84 of 210

1          **MR. GREEN:**  And this is from Government's Exhibit

2    No. 7, Your Honor.

3          (Government's Exhibit No. 7 was played.)

4          **THE WITNESS:**  That's my voice.

5    **BY MR. GREEN**

6    Q    You do recognize that as your voice?

7    A    Yeah.

8    Q    This is the call in which you attempted to talk to the 911

9    operator?

10   A    Yeah.

11         **MR. GREEN:**  Your Honor, I'm going to play one of the

12   files on Government's Exhibit No. 7 that's been identified by

13   the witness.

14         (Government's Exhibit No. 7 was played.)

15   **BY MR. GREEN**

16   Q    Did the ambulance come?

17   A    Yeah.

18   Q    And when did you find out your father had been killed?

19   A    We were -- I mean, it was -- we already knew at that

20   point, but we didn't want to believe it.  I, like -- I already

21   knew.  It was, like -- like, I didn't need them to tell me or

22   anything.

23         **MR. GREEN:**  That's all the questions I have.

24         **THE COURT:**  Any cross?

25                         CROSS-EXAMINATION

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 85 of 210

**BY MR. BRYSON**

1

2  Q    The gun and the magazine you kept separate; is that

3  correct?

4  A    Yes, sir.

5  Q    And so when you carried them to the door, you would carry

6  one in one hand and one in the other; is that correct?

7  A    It would be one in one hand and one in the other, but then

8  when I am trying to grab for the bag, it would be, like,

9  clamped together, like, how you hold, like --

10 Q    So did you actually put the magazine --

11 A    No.

12          **MR. BRYSON:**  Can you bring up Government's 5 for me,

13 please?

14 **BY MR. BRYSON**

15 Q    Can you look at your monitor?

16 A    Yeah.

17 Q    And do you see Government's Exhibit 5 there?

18 A    Yeah.

19 Q    That's a picture.  There's actually two houses in this

20 picture; is that correct?

21 A    Yeah.

22 Q    Yours is the one on the left; is that right?

23 A    Far left, yep.

24 Q    Okay.  And you're saying that the leaves on the trees in

25 this photograph are thicker than they were on the night of

1  April 15.  Is that what you're saying?

2  A    I can't tell you clearly.  It was just too dark to,

3  like -- where I could see, like, all the leaves.

4  Q    Okay.  You don't know when this picture was taken;

5  correct?

6  A    I don't.  It looks like it was, like, the following

7  morning or sometime.

8  Q    All right.  So you wouldn't have any dispute that the

9  leaves, as they are depicted in this picture, would have been

10 consistent with the way they were on the night of April 15;

11 correct?

12 A    I just couldn't see, like, at night when you're trying to

13 look out that they are there.  It looks a lot more different

14 than that.

15 Q    Okay.  And when you were talking to the 911 operator, you

16 indicated that you had seen a black car out there; correct?

17 A    Yeah, like I said, it was too dark.

18 Q    Okay.  And -- well, on the 911 call you actually described

19 it as a black Honda-type car; correct?  Is that yes?

20 A    I said Honda, yep.

21 Q    All right.

22        **MR. BRYSON:**  Thank you.

23        Those are my questions.

24        **THE COURT:**  Any redirect?

25        **MR. GREEN:**  No, Your Honor.

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 87 of 210

1         **THE COURT:**  You may step down, sir.

2         **MR. GREEN:**  May the witness be released?

3         **THE COURT:**  Any objection?

4         **MR. BRYSON:**  No objection.

5         **THE COURT:**  He may be released.

6      (At 12:13 p.m., witness excused.)

7         **THE COURT:**  Call your next witness.

8         **MR. GREEN:**  Jade Zheng.

9  **JADE ZHENG,** GOVERNMENT'S WITNESS, being first duly affirmed, at

10 12:13 p.m. testified as follows:

11        **THE COURT:**  You may remove your mask, ma'am, while

12 you testify.

13        Please proceed.

14                      DIRECT EXAMINATION

15 **BY MR. GREEN**

16 Q    Would you tell the jurors your name.

17 A    My name is Jade Zheng.

18 Q    And who is your mother?

19 A    My mom is Wai Ping Chan.

20 Q    Who is your brother?

21 A    Eastern Zheng.

22 Q    And who is your father?

23 A    Hong Zheng.

24 Q    I'm going to ask you whether in the months prior to

25 April 15, 2018 -- did your family have a routine when your

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 88 of 210

1  parents came home from work?

2  A    We did.

3  Q    And do you know why that routine developed?

4  A    Yes, it's because we had been targeted so many times, we

5  wanted to protect ourselves.

6  Q    And describe generally -- when would your parents come

7  home from work?

8  A    Usually around 10:30, I believe, 10:30 or 11:00 or 11:30.

9  Q    And what would happen when they'd leave the restaurant?

10 A    When they leave the restaurant, my mom would give me a

11 call, letting me know that she's coming home.  And then my

12 brother and I would get ready at home to wait for them to come

13 home.

14 Q    And what was required?

15 A    So my brother would get the gun out and get ready, and I

16 would go into my brother's room and look out the window and

17 watch as they come up the driveway and get him.

18 Q    I'm going to show you what's been marked as Government's

19 Exhibit No. 9 on your monitor in front of you.  It will flash

20 up in a minute.

21 A    Okay.

22 Q    Do you recognize Government's Exhibit No. 9 as the

23 photograph of your home?

24 A    I do.

25 Q    And would you wait on the second floor?

1  A    Yes, second floor.

2  Q    Do you see the windows in which you would look out?

3  A    Yes.

4  Q    And could you -- let me ask this:  Is it the windows above

5  the garage or above the second floor main building?

6  A    Above the second floor in the top right.

7  Q    All right.

8          **MR. GREEN:**  Your Honor, I am going to move

9  introduction of Government's Exhibit No. 9?

10         **THE COURT:**  Admitted.

11         **MR. GREEN:**  And ask that it be published?

12         **THE COURT:**  You may.

13 **BY MR. GREEN**

14 Q    So you've indicated in the top right-hand on the second

15 floor there is a set of windows?

16 A    Yes.

17 Q    Is that where you would wait?

18 A    Yes.

19 Q    And what would you do while waiting?

20 A    I had a key fob for our security alarm, and I would have

21 my hand over the siren one just in case something would happen,

22 and I would have my phone ready in case I would need to call

23 the cops.

24 Q    And were you doing that on April 15, 2018?

25 A    I was.

1  Q    Did your mom call and say they were on the way?

2  A    She did.

3  Q    Did you alert your brother?

4  A    Yes, I did.

5  Q    Did he get the pistol?

6  A    Yes.

7  Q    Was there also a rifle in your house that you all had

8  purchased?

9  A    There was a larger gun, but that was stored away.

10 Q    Do you recall your parents -- do you recall anything about

11 the weather that night?

12 A    Yes.  It was horrible weather.  It was really raining, and

13 it was -- it was really bad weather, I just know that.

14 Q    Do you recall what time it was roughly when your parents

15 came home?

16 A    I do not.  But, usually, they would get home around 11:00,

17 and on Sundays, they would get home around 10:00 or 10:30, I

18 believe.

19 Q    And what day was the 15th; do you recall?

20 A    It was a Sunday.

21 Q    Did you go upstairs to look out the window?

22 A    I was already upstairs.  My brother was downstairs.

23 Q    Do you recall them coming home?

24 A    I do.

25 Q    Would you tell the jurors what you remember?

1  A     Yes.  I remember my parents pulling up to the driveway,

2  and my dad stopped closer to the walkway for my mom to get out

3  since it was horrible weather.  And as she was going up, I was

4  thinking, okay, my mom is safe.  And I look over, but I heard

5  gunshots, and I was really worried.  So I hit the alarm button,

6  and I stepped away from the window for my safety, and I called

7  the cops.

8  Q     What do you recall seeing, if anything?

9  A     Because it was very dark out and there's a tree blocking

10 my view, I did not see anything other than my parents pulling

11 up to the driveway and my mom walking up to the steps.

12 Q     After you heard the gunshots, what did you do?

13 A     I pressed the siren alarm on my key fob for the security

14 system, and I tried calling the cops.

15 Q     How many gunshots did you hear?

16 A     I don't recall, but I do know there was a lot of gunshots.

17 Q     Were you able to get through to 911?

18 A     No.  I tried so many times, but none of the calls would

19 get through.

20 Q     What's the next thing you remember?

21 A     I remember my -- I think my mom went out -- stepped out

22 and started firing back to protect us, and I'm on the phone

23 trying to call the cops.  It wouldn't work.  I screamed out to

24 my brother, "I'm not able to reach the cops."  And that's what

25 I remember from then.

US v. Wiley  -- Trial/Vol II of VII -- 4/20/21

1      But after the criminals fled the scene, my mom came up --
2  my mom walked up to the house and told me, "Call the cops."
3  Call my neighbor, which is my friend from school, Alicia, her
4  mom, to get help.  And I am telling my brother, "Hey, I am not
5  being able to call the cops.  Can you try?  I am going to try
6  calling Alicia's mom."
7  Q    Did you?
8  A    I did, but it didn't work.  It didn't go through.
9  Q    What happened next?
10 A    What happened next was my brother was getting on the call,
11 so I stopped calling.  I didn't want to interrupt any lines.
12 He said his call got through; but as he was talking, his call
13 got disconnected.
14 Q    Did you all try again?
15 A    I'm sorry?
16 Q    Did you try and call again?
17 A    He did, but I didn't.  I don't believe I did.  I don't
18 recall.  Sorry.
19 Q    In these moments, what are you thinking?
20 A    I was thinking, "Is my dad okay?  Is my mom okay?  Are we
21 going to be okay?" because my mom was outside trying to help my
22 dad.
23 Q    Could you hear your mother?
24 A    Yes.  She was screaming, and she came into the house.
25 She's, like, "Your dad's hurt.  I am going to keep trying to

1  help him."

2  Q    Did the police or ambulance come?

3  A    Not until a very long time.

4  Q    Did your neighbors come?

5  A    They did.  Alicia, who is a friend of mine, her dad came

6  to help, and her mom came to do CPR on my dad.

7  Q    Is Alicia's dad David?

8  A    Yes.

9  Q    What happened next?

10  A    After my -- Alicia's mom and dad came, we were in the

11  house waiting for the cops to come.  And that's all I remember

12  was when they came, and we were in the house waiting as the

13  ambulance came, but they didn't come until after the cops came.

14  Q    Where was the van with your father?

15  A    Down at the bottom of the driveway.

16  Q    Did it move?

17  A    No.  Well, he -- when he pulled up to the driveway, he

18  honked the horn, and that's -- I guess when he got shot, he was

19  at the bottom of the driveway.  I just remember him being at

20  the top of the driveway, and after the accident, he was at the

21  bottom of the driveway.

22  Q    You heard him honk the horn?

23  A    Yes, he was honking the horn to let us aware that there's

24  people targeting us.

25  Q    And then you heard the gunshots?

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 94 of 210

1  A    Well, the gunshots and the horn was at the same time.

2  Q    How long was your father in the van?

3  A    Well, he was in there the whole time.  He didn't step out

4  of the van.

5  Q    And did -- when did you find out that your father had

6  passed?

7  A    When -- it was -- I would say, like, a very -- it was a

8  very long time afterwards that we were informed that my father

9  had passed.

10            **MR. GREEN:**  That's all the questions I have.

11            **THE COURT:**  Any cross?

12            **MR. BRYSON:**  No questions.

13            **THE COURT:**  All right.  You may step down, ma'am.

14  You can put your mask back on, please.

15            **THE WITNESS:**  Thank you.

16            **MR. GREEN:**  May this witness be released?

17            **MR. BRYSON:**  No objection.

18            **THE COURT:**  Yes, she may.

19       (At 12:24 p.m., witness excused.)

20            **MR. GREEN:**  May we approach, Your Honor?

21            **THE COURT:**  Yes.

22       (The following proceedings were had at the bench by the

23       Court and Counsel out of the hearing of the jury:)

24            **THE COURT:**  Yes, Mr. Green?

25            **MR. GREEN:**  The next witness is going to be

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 95 of 210

1    Mr. Turner.  I believe there is a video that is going to take

2    some time to play -- a couple of videos.  So I don't know if

3    this is an appropriate time to break, if the Court -- I am just

4    telling you the next witness is going to be about 25 minutes

5    and --

6            **THE COURT:**  All right.  We can stop five minutes

7    early, and we'll just start five minutes early afterwards.

8            **MR. GREEN:**  I'm sorry.  And then regarding the

9    witnesses, we did keep them excluded, the family, but the

10   last -- both Shirley and the two children, I believe,

11   consistent with your order, I have told them that they may now

12   return to the courtroom and watch the proceedings if they

13   choose to.

14           **THE COURT:**  Is that acceptable?

15           **MR. BRYSON:**  Yes.

16           **THE COURT:**  All right.  Thank you.

17      (End of bench conference.).

18           **THE COURT:**  All right.  Ladies and gentlemen, it's

19   almost time for our break, and it would make more sense to stop

20   right here.  And then we'll start with a new witness when we

21   come back.

22           So please put your notepads in your envelopes.  Leave

23   your envelopes in your chairs.  Remember all my admonitions to

24   you in my standard admonition:  Don't do any research.  Don't

25   discuss the case.  You have not heard all the evidence.  Keep

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 96 of 210

1   an open mind.  Remember all my admonitions.

2           I think it's a pleasant day outside.  So go out and

3   get yourself something to eat, and then please be ready to go

4   across the hall in Courtroom No. 3 at 1:45.  All right.  And if

5   everybody is ready and we're good to go at that point, we'll

6   start at 1:45.  As soon as you all are collected, we'll be good

7   to go.

8           Please be careful as you go outside, and we look

9   forward to seeing you then shortly.  Remember my admonitions.

10  We'll see you at 1:45 across the hall.  Leave your notes in

11  your chairs, please.  You may leave the courtroom.  The jurors

12  may leave.

13          Everybody else just remain in the courtroom until

14  they have cleared the hallway, please.

15      (The jury departed the courtroom at 12:27 p.m.)

16          **THE COURT:**  You may be seated.  All the jurors have

17  left the courtroom.

18          Anybody have any issue that you want to bring to my

19  attention?

20          **MR. GREEN:**  Not from the Government?

21          **MR. BRYSON:**  No, Your Honor.

22          **THE COURT:**  Okay.  All right.  If you could be back

23  and ready to go at 1:45.  If they are ready, we'll start.  We

24  lost a little time with the extended break this morning.

25          Is that enough time for everyone?

1              MR. GREEN:  Yes, Your Honor.

2              THE COURT:  If that's a problem in the future, let me

3   know.

4              So we'll be in recess until 1:45.  I think I am

5   swearing in some probation officers at 1:00, if I'm not

6   mistaken, so there will be some activity in the courtroom in

7   the interim.

8              Enjoy your lunch.  We'll see you at 1:45.

9        (Proceedings recessed at 12:28 p.m.)

10       (Proceedings called back to order at 1:48 p.m.)

11       (The Defendant was present.)

12             THE COURT:  Are we ready to proceed?

13             MR. PRINCIPE:  Yes, Your Honor.

14             THE COURT:  Please bring the jury in.

15       (The jury returned to the courtroom.)

16             THE COURT:  Please be seated.

17             Ladies and gentlemen of the jury, welcome back.  I

18  hope you had a good lunch.  I understand it's nice outside.

19             The Government may call its next witness.

20             MR. PRINCIPE:  Thank you, Your Honor.  The Government

21  calls Robert Turner.

22  **DETECTIVE ROBERT TURNER,** GOVERNMENT'S WITNESS, being first duly

23  affirmed, at 1:50 a.m. testified as follows:

24             THE COURT:  You may remove your mask while you're

25  testifying, sir.

        US v. Wiley  -- Trial/Vol II of VII -- 4/20/21

 1              **THE WITNESS:**  Thank you, sir.

 2              **THE COURT:**  Please proceed.

 3                            DIRECT EXAMINATION

 4    **BY MR. PRINCIPE**

 5    Q    Would you please state your name.

 6    A    My name is Robert Turner.

 7    Q    Who do you work for?

 8    A    Durham Police Department.

 9    Q    What's your current position?

10    A    My current position is a detective within our Homicide

11    Division.

12    Q    And how long have you worked for the Durham Police

13    Department?

14    A    Roughly seven and a half years.

15    Q    What was your role in April of 2018?

16    A    I was a patrol officer assigned to District 4.

17    Q    Can you explain what the general responsibilities of a

18    patrol officer are?

19    A    Yeah.  Patrol, we are basically the primary source for 911

20    calls, calls for service.  That's got a wide range of

21    responsibilities:  Larcenies, robberies, general calls for

22    service, harassment, shootings, things like that.

23    Q    And you were working on April 15, 2018?

24    A    I was.

25    Q    What shift were you working?

1  A    That would be our night shift, which would encompass the

2  hours of 6:00 p.m. to 6:00 a.m.

3  Q    And what was the area of Durham that you were responsible

4  for?

5  A    My specific area would be the Southside neighborhood of

6  Durham, which is Southeast Durham, but District 4 encompasses

7  most of South, Southeast Durham.  It's a pretty large district.

8  Q    And did you eventually get a call for service and respond

9  to Carlton Crossing Drive?

10  A    I did.

11  Q    And can you explain when you got that call?

12  A    I don't know the exact time.  It was nighttime.  It came

13  out as a gunshot wound call that I responded to.  It was out

14  of -- it was an out-of-district call.

15  Q    And so how far away were you from that location at the

16  time you got the call?

17  A    I don't want to speculate distance, but I -- looking at

18  the map that we can see everyone's location on the map, I was

19  the closest unit.  A few miles maybe.

20  Q    Okay.  And what did you do when you got that call for

21  service?

22  A    I responded.

23  Q    And approximately how long did it take you to get there?

24  A    Less than ten minutes, I believe.

25  Q    Okay.  And can you describe what you saw when you arrived

1  at Carlton Crossing Drive?

2  A    Yes.  As I arrived on scene, there was a small crowd in

3  the middle of the street flagging me down when they heard the

4  lights and sirens.  I noticed that there was a minivan that was

5  blocking my -- blocking the road so no one can get around it.

6  It was almost in the middle of the street, facing the driveway

7  and the house.

8  Q    And what was the weather like at that time?

9  A    It was a rather heavy downpour.

10  Q    And was your -- were you in a patrol car?

11  A    I was.

12  Q    Was it marked?

13  A    Marked car, yes, sir.

14  Q    Can you just describe it briefly for the jury?

15  A    Durham Police Department uses mostly white cars with black

16  trim with a large "POLICE" on each side and the rear, and then

17  we have an overhead light bar.

18  Q    And was that vehicle equipped with a dash camera?

19  A    It was.

20  Q    Was it activated when you responded to Carlton Crossing

21  Drive?

22  A    It was.

23  Q    Did you also have a body camera that day?

24  A    I did.

25  Q    And where did you have the body camera affixed?

1  A    When I was on patrol, I would wear it on my chest.

2  Q    And at some point did you also activate your body camera

3  during the response to Carlton Crossing Drive?

4  A    I did.

5  Q    And have you had an opportunity to review both of those

6  footage before the trial today?

7  A    I have.

8            **MR. PRINCIPE:**  May I approach, Your Honor?

9            **THE COURT:**  Yes.

10 **BY MR. PRINCIPE**

11 Q    I'm showing you a disk marked Government's Exhibit 10.

12     Did you have an opportunity to look at the contents of

13 that disk?

14 A    I did.

15 Q    Does it have two files -- two video files on it?

16 A    Yes.

17 Q    Is that your dash camera and your body camera from

18 April 15, 2018?

19 A    It is.

20 Q    Has it been modified or altered in any way?

21 A    No.

22            **MR. PRINCIPE:**  Your Honor, we move it into evidence

23 as Government's Exhibit 10.

24            **THE COURT:**  Admitted.

25            **MR. PRINCIPE:**  Permission to publish the dash camera

Case 1:19-cr-00529-TDS  Document 360  Filed 02/04/22  Page 102 of 210

1  footage, Your Honor?

2          **THE COURT:**  You may.

3      (Government's Exhibit No. 10 was played.)

4  **BY MR. PRINCIPE**

5  Q   Were you able to see the time and date on your dash

6  camera?

7  A   I am.  I can see it, yes.

8  Q   And is that typically calibrated to the correct time?

9  A   It is.

10 Q   What time was it at the time you first started to respond

11 to the call?

12 A   10:27 and 3 seconds p.m.

13         **MR. PRINCIPE:**  Continue playing.

14     (Government's Exhibit No. 10 was played.)

15 **BY MR. PRINCIPE**

16 Q   Pausing it right here at 4 minutes and 55 seconds, do you

17 recognize what street you just turned onto?

18 A   I do.

19 Q   What street was that?

20 A   That would be South Roxboro street -- or South Roxboro

21 Road on that part.

22 Q   Okay.

23         **MR. PRINCIPE:**  Keep playing.

24     (Government's Exhibit No. 10 was played.)

25         **MR. PRINCIPE:**  Pause it.

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 103 of 210

1  BY MR. PRINCIPE

2  Q    And at 5 minutes and 42 seconds, we're stopping it.

3       What street did you just turn on there?

4  A    I wouldn't know without looking at a map that street.

5            MR. PRINCIPE:  Keep playing.

6       (Government's Exhibit No. 10 was played.)

7  BY MR. PRINCIPE

8  Q    Now, was that the moment that you arrived at Carlton

9  Crossing Drive?

10 A    Yes, it was.

11 Q    Okay.  And you mentioned before there was a group of

12 people standing around the minivan?

13 A    Yes.

14 Q    Okay.  And what was the first thing you did once you

15 arrived?

16 A    I got out of my car, which I positioned my car where my

17 driver's door is right up to the van.  I believe I began to

18 assess the victim at that time.

19 Q    What did you see?

20 A    There was someone on top of him performing CPR, and I

21 believe there was someone in the passenger side, but I'm not

22 exactly sure.

23 Q    Did you give any instructions to the person who was

24 performing CPR?

25 A    I did.

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 104 of 210

1  Q    What did you tell them?

2  A    I told them to continue what they were doing and that we

3  should try to get him on the ground to a solid surface.

4  Q    Did you try to do that?

5  A    We did.

6  Q    And what happened?

7  A    The door was jammed.

8  Q    Which door?

9  A    The driver's door.

10 Q    Could you tell why?

11 A    It appeared to have bullet holes in it.

12 Q    Did you notice any injuries on the man's body?

13 A    I did.

14 Q    What did you see?

15 A    The gentleman had two wounds that I -- through my training

16 and experience would be gunshots to his left side of his face.

17 Q    At some point did Durham County EMS arrive?

18 A    They did.

19 Q    How soon after you arrived did they get there?

20 A    Maybe a few minutes.

21 Q    Do you know if there was a time of death that was

22 announced by EMS?

23 A    I never got that.

24 Q    At some point did you began to secure the crime scene?

25 A    I did.

US v. Wiley  -- Trial/Vol II of VII -- 4/20/21

1  Q    At what point did you begin to do that?

2  A    As EMS arrived, I believe, within a few minutes, I started

3  directing additional units that were arriving where to go and

4  where to set up crime scene tape.

5  Q    Did you notice any shell casings anywhere?

6  A    Initially, no.

7  Q    At some point did you?

8  A    Yes.

9  Q    And what did you do when you saw that?

10 A    I marked them with orange cones.

11 Q    Okay.  Did you notice any other damage to any property?

12 A    Later on after the scene was secure, inside of the

13 house -- we had officers stand by inside and outside the

14 house -- I noticed defects in the floor, I believe, damage to

15 the floor and maybe wall of the inside of the house.

16 Q    I'm now going to show you on your monitor Government's

17 Exhibit 11.

18     And do you recognize that to be a still image from the

19 dash camera we just watched?

20 A    Yes.

21 Q    And that's exactly where the van was positioned when you

22 got there?

23 A    Yes.

24 Q    Does it fairly and accurately depict that?

25 A    Yes.

1          **MR. PRINCIPE:**  Your Honor, the Government would move

2    Government's Exhibit 11 into evidence.

3          **THE COURT:**  Admitted.

4          **MR. PRINCIPE:**  And permission to publish it to the

5    jury?

6          **THE COURT:**  You may.

7          **MR. PRINCIPE:**  Your Honor, now permission to publish

8    his body-worn camera footage, which is on Government's

9    Exhibit 10?

10         **THE COURT:**  You may.

11       (Government's Exhibit No. 10 was played.)

12   **BY MR. PRINCIPE**

13   Q    Right at that moment, stopping at 35 seconds, do you

14   recognize the people that were just in that footage?

15   A    I do.

16   Q    And who were they?

17   A    That would be, I believe, fire personnel -- fire

18   department personnel and the supervisor on scene.

19   Q    And who was the supervisor?

20   A    Corporal McQueen.

21   Q    Who was the first to arrive on scene, though?

22   A    That would be fire.

23   Q    Out of the officers from the police department, were you

24   the first to arrive on scene?

25   A    Yes, I was the first police officer on scene.

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 107 of 210

1  Q    How soon after did Officer McQueen arrive?

2  A    Within a few seconds, maybe not even a minute.

3  Q    And then he was in charge at that point?

4  A    Correct.

5           **MR. PRINCIPE:**  Continue playing.

6       (Government's Exhibit No. 10 was played.)

7  **BY MR. PRINCIPE**

8  Q    I'm stopping it at 5 minutes and 28 seconds.

9       At that point was EMS still working on Mr. Zheng in the

10 minivan?

11 A    No.

12 Q    And do you know why?

13 A    He was pronounced deceased prior to that?

14 Q    And you're seen placing down orange cones; is that right?

15 A    Correct.

16 Q    Is that a standard procedure for marking evidence?

17 A    It is.

18 Q    And what happens after that with those items that have

19 been marked that way?

20 A    They will be collected as Forensics processes it with

21 their own equipment.

22 Q    And whose responsibility is it to do that?

23 A    Forensics.

24 Q    So not patrol officers?

25 A    Correct.  Forensics will pick up -- we'll help Forensics,

1  but Forensics will tell us what needs to be picked up, and they

2  will place their markers down.

3  Q    Okay.  So while you're there initially setting up the

4  crime scene, you're marking items that might be significant for

5  crime scene investigators?

6  A    Correct.

7  Q    There was mention of a gun inside the minivan.

8       Did you ever see a gun inside the minivan?

9  A    No.  That was what was told to me.

10  Q    Okay.  And who told that to you?

11  A    I believe it was a neighbor that was on scene.

12  Q    Okay.  When you arrived, at any point did you see family

13  or non-law enforcement inside the van?

14  A    Yes.

15            **MR. PRINCIPE:**  No further questions, Your Honor.

16            **THE COURT:**  Any cross?

17            **MR. FOSTER:**  Thank you, Your Honor.

18                      CROSS-EXAMINATION

19  **BY MR. FOSTER**

20  Q    Good afternoon, Officer Turner.

21  A    Good afternoon.

22  Q    So you were the first police officer on the scene;

23  correct?

24  A    I was.

25  Q    And were there any fire or EMS people there before you, or

1  were you the first of all those responders?

2  A    First emergency personnel, correct.

3  Q    Okay.  And so in the video we saw, as you pull up, there's

4  two gentlemen out in the street.  One is kind of flagging you

5  down.

6       So they were civilians or neighbors?

7  A    I believe so at that time, yes.

8  Q    Okay.  And then when you first pulled up, was this

9  person -- I think a woman was in the car on top of Mr. Zheng

10  giving him CPR?

11  A    Correct.

12  Q    Okay.  And do you know who she was?

13  A    At that time, no.

14  Q    At this time do you know who it was?

15  A    No.

16  Q    Okay.  So the area that was eventually going to be staked

17  out by you or secured as a crime scene, all three of these

18  people were inside that area when you arrived; correct?

19  A    There were people in and around the car, yes.

20  Q    So when your body-worn camera was activated, unless it was

21  turned off -- turned on midway through it -- it appeared when

22  it first came on Corporal McQueen was already there.  You could

23  see his back that said "POLICE."  Is that correct?

24  A    Yes, sir.

25  Q    Okay.  And so what was it that caused you to turn on your

Case 1:19-cr-00529-TDS  Document 360  Filed 02/04/22  Page 110 of 210

1  body-worn camera at that point?

2  A    When I had first arrived on scene, I was more concerned

3  about patient care and securing the crime scene.  That's

4  probably why I forgot to turn it on initially.

5  Q    So for what period of time was it that the civilians, the

6  woman in the car and the two men, were -- how long did it take

7  before you secured the crime scene and got everybody outside

8  that perimeter?

9  A    Initially, I told who was doing CPR and the gentleman to

10  keep going because I didn't have any access to the victim.  I

11  don't want to speculate, but it would be a few minutes -- not

12  more than a few minutes before EMS came and got everybody out

13  of the car.

14  Q    In the areas where the shell casings eventually were found

15  included areas where these two neighbors or civilians were

16  standing when you pulled up; correct?

17  A    Roughly, yes.

18         MR. FOSTER:  I have no further questions.

19         THE COURT:  Any redirect?

20         MR. PRINCIPE:  Yes, Your Honor.

21                    REDIRECT EXAMINATION

22  BY MR. PRINCIPE

23  Q    Officer Turner, your dash camera that we played, that was

24  just a portion of the dash camera footage; correct?

25  A    Yes.

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 111 of 210

 1  Q    And that video kept recording for a long time, didn't it?

 2  A    Yes.

 3  Q    And there was no break in that footage, was there, when

 4  you reviewed it?

 5  A    No.

 6  Q    And then your body-worn camera, when you turned that on,

 7  you were actually at another patrol vehicle; is that right?

 8  A    Yes.

 9  Q    And do you recall or know what you were doing at that

10  other vehicle?

11  A    I believe I was either getting cones or the supervisor,

12  Corporal McQueen, may have asked me to grab the AD at that

13  time.  I'm not exactly sure.

14  Q    But the patrol vehicle you were standing near when your

15  body-worn camera footage began was not your patrol vehicle;

16  correct?

17  A    Correct.

18  Q    Your vehicle was the one that was in the front closest to

19  the minivan?

20  A    Yes.

21  Q    And that dash camera was playing the whole time?

22  A    Yes.

23          **MR. PRINCIPE:**  No further questions, Your Honor.

24          **THE COURT:**  Anything further?

25          **MR. FOSTER:**  No, Your Honor.

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 112 of 210

 1             **THE COURT:**  Thank you.  You may step down, sir.

 2             **MR. PRINCIPE:**  Your Honor, may this witness be

 3  released?

 4             **THE COURT:**  Any objection?

 5             **MR. FOSTER:**  No objection.

 6             **THE COURT:**  He may be released.

 7        (At 2:18 p.m., witness excused.)

 8             **THE COURT:**  You can call your next witness.

 9             **MR. PRINCIPE:**  Yes, Your Honor.  The next witness is

10  Rex McQueen.

11  **CORPORAL REX MCQUEEN,** GOVERNMENT'S WITNESS, being first duly

12  affirmed, at 2:18 p.m. testified as follows:

13             **THE COURT:**  You may remove your mask, if you would,

14  please, while you're testifying.

15             Please proceed.

16                         DIRECT EXAMINATION

17  **BY MR. PRINCIPE**

18  Q    Would you state your name.

19  A    Corporal Rex McQueen.

20  Q    And what is your occupation?

21  A    Police Corporal, Durham Police Department.

22  Q    How long have you worked for the Durham Police Department?

23  A    Since 2006, so 15 years.

24             **THE COURT:**  Would you turn the mic towards you just a

25  little bit.  Thank you, sir.

    Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 113 of 210

1          **THE WITNESS:** Do you need me to repeat that?

2    **BY MR. PRINCIPE**

3    Q    Sure.  Why don't you.

4    A    Fifteen years.

5    Q    And what was your position in April of 2018?

6    A    I was in the same position as a police corporal.  At the

7    time I was District 3 supervisor.

8    Q    And were you working on patrol at the time?

9    A    I was.

10   Q    And as a corporal, does that mean you were supervising

11   other people on patrol?

12   A    Yes.  I was the patrol supervisor for that shift.

13   Q    And can you describe -- were you working on April 15,

14   2018?

15   A    I was.

16   Q    What shift were you working?

17   A    Night shift.

18   Q    And what area of Durham did your district cover?

19   A    District 3, which is the southwestern section of the city.

20   It spans between about roughly the county line, Orange County,

21   to the west, the Chatham County line to the south, I-85 to the

22   north, and to the east roughly where Duke University is.

23   Q    Okay.  Are you familiar with the Carlton Crossing

24   neighborhood?

25   A    I am.

Case 1:19-cr-00529-TDS  Document 360  Filed 02/04/22  Page 114 of 210

1  Q    And have you been to that location before prior to that

2  night?

3  A    Yes, I have been to that -- not that specific location,

4  but that street.

5  Q    Do you recall where you were when you first got the call

6  for service that brought you to Carlton Crossing Drive on

7  April 15, 2018?

8  A    Yes.  I was in the parking lot at Police Substation No. 3.

9  Q    Okay.  And how far away is that from Carlton Crossing

10 Drive?

11 A    I'm not sure on actual mileage.  My guess would be

12 approximately six or seven miles.

13 Q    Okay.  How long did it take you to get there?

14 A    About seven minutes.

15 Q    What was the nature of the call for service when it was

16 communicated to you?

17 A    Originally the call for service was a panic alarm.

18 Q    Okay.  Did that change as you were responding to that

19 location?

20 A    Yes, it did.

21 Q    What information were you provided?

22 A    When I was en route to it, the call upgraded to a gunshot

23 wound.

24 Q    Do you know who the first officer to arrive at the scene

25 was?

1  A    That was Officer Turner.

2  Q    Was he on your squad or somebody you were supervising?

3  A    No.  He was the next district over.  That specific area is

4  very close to District 4, so it borders the district.  He was

5  on patrol in District 4, but the geographic area is technically

6  District 3.

7  Q    And when you arrived at Carlton Crossing Drive, how many

8  other officers were on scene when you got there?

9  A    At that time it was just Turner, and I believe he had a --

10  he may or may not have had a trainee with him.

11  Q    Okay.  And was EMS on scene at that point when you

12  arrived?

13  A    No, not quite yet.

14  Q    Do you know what time it was when you arrived?

15  A    I want to -- do you mind if I check my notes?

16  Q    Would it be in your notes?

17  A    Yes.

18          MR. PRINCIPE:  May I approach the witness, Your

19  Honor?

20          THE COURT:  Yes, that's fine.

21  BY MR. PRINCIPE

22  Q    Do you recall what time it was?

23  A    I arrived at approximately seven minutes after dispatched.

24  I was dispatched 2222 hours, so 10:22 p.m.  And I arrived

25  approximately seven minutes later, so it would be 2229.

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 116 of 210

1  Q    And what was the weather like at that point?

2  A    Pretty heavy downpour, heavy winds, quite a bit of rain,

3  very low visibility, and very hazardous road conditions while

4  driving there.

5  Q    What did you see when you arrived at Carlton Crossing

6  Drive?

7  A    When I arrived, I saw several individuals -- I saw Officer

8  Turner near a gray minivan, several individuals outside of a

9  minivan.  It appeared to be, just from initial looks, what I

10  would characterize as a middle-aged Asian female, what appeared

11  to be two teenage Asian males, and an individual, a middle-aged

12  white female, performing CPR on the victim inside the vehicle.

13  Q    What did you do?

14  A    At that time I coordinated with EMS to get there and told

15  them to roll in.  With the amount of people who were around it

16  and what was going on, I -- at one point we had to physically

17  tell everyone to leave the area and almost pull everybody off

18  so EMS can actually get in and begin working on the victim.

19  Q    So you were trying to get control of the crime scene?

20  A    Yes.

21  Q    And trying to help Mr. Zheng?

22  A    Yes.

23  Q    At some point did you transition into trying to establish

24  a perimeter for a crime scene?

25  A    Yes.  After -- obviously our first priority is the life of

1  the victim or doing lifesaving measures.  As soon as that is

2  done, there's going to be evidence with the victim in the

3  vehicle, all around the area to an extent that we don't

4  initially know how much evidence there is.  So at that point,

5  once you can kind of ensure that EMS can get in there and

6  perform lifesaving measures, then we start trying to preserve

7  the crime scene; at which time, I would tell certain officers

8  to put out crime scene tape; if they spot something such as

9  shell casings, anything else, blood spatter, to preserve that

10 or watch it; if there is a firearm or something on the scene,

11 to watch that.

12 Q    And did you actually engage in that process in this case?

13 A    Yes, I did.

14 Q    And what were some of the things that you observed or

15 tried to mark as possible evidence?

16 A    We spotted some shell casings.  We tend to mark those

17 where they are laying at.  We didn't go in the vehicle much.  I

18 was notified there was a firearm in the vehicle via radio; but

19 at that point, since we had secured the area and gotten people

20 away from the vehicle while EMS is working on the victim, we

21 set to leave everything in the vehicle -- once the -- we

22 decided -- I'm sorry.  I believe I said we decided to leave or

23 not search the vehicle anymore to not disturb the scene any

24 further, expanded the crime scene.  I told several officers to

25 take crime scene tape, expand it up the road and around on the

1  northern side of the road; another officer to go down and block

2  the southern end of the road and to be putting out crime scene

3  tape there.

4       We also discovered that the house -- the inside of the

5  house, or the house in general, may be involved in it.  So we

6  expanded to go around the house to further preserve that.

7  Q    Okay.  With regard to the driveway, the walkway, and the

8  porch, was anything -- did you observe anything -- items of

9  potential evidence in those areas?

10 A    Again, shell casings.  There was a random shoe sitting

11 there, which we assumed was part of that.  I was notified that

12 there was a firearm near the internal vestibule area.  I did

13 not personally see it, but, of course, once we find something

14 like that, specifically, if it's a firearm, we'll have an

15 officer stand by with that.  We, in this case, could keep it

16 where it was at and not take it and secure it.

17 Q    Was anything done to -- where did the family members

18 eventually go once they were moved away from the minivan?

19 A    Once we got them moved away from the minivan, since they

20 are all witnesses, we attempted -- and it was powering rain --

21 we attempted to get them up towards the house, toward the

22 garage -- back towards the house to keep them there while we

23 are searching for evidence to make sure that the entire -- any

24 evidence isn't contaminated.

25 Q    At that point you thought that some portions of inside the

1  house might have been part of the crime scene?

2  A     Yes.

3  Q     So was there a particular area of the home that the family

4  members were moved to?

5  A     Primarily toward the garage area where the officers via

6  radio told me that -- when he told me about the firearm being

7  seen, he explained it was closer -- like initial vestibule or

8  mudroom area.  We figured the best place to put them would be

9  toward the garage.

10 Q     Okay.  And approximately how long would you say it took

11 from the time that you arrived to the time that you felt you

12 had established a relatively secure crime scene perimeter?

13 A     It took a little longer initially.  You can kind of see

14 where the crime scene is.  However, it's a rather large crime

15 scene.  So as we started to think we had it all together, we

16 would find additional shell casings and additional things.  So

17 we expanded it and expanded it, I would say, approximately ten

18 minutes in total time from my arrival until the crime scene is

19 secured.

20          **MR. PRINCIPE:**  No further questions, Your Honor.

21          **THE COURT:**  Any cross?

22                    CROSS-EXAMINATION

23 **BY MR. FOSTER**

24 Q     Good afternoon, Corporal McQueen.

25       Can you hear me?

US v. Wiley  -- Trial/Vol II of VII -- 4/20/21

1    A    Yes, sir.

2    Q    So you responded, which means you began your travel to

3    this crime scene, at 2220; correct?

4    A    Yes.

5    Q    Which is 10:22 p.m.?

6    A    That's correct.

7    Q    So seven minutes later is roughly when you arrived?

8    A    That's correct.

9    Q    So that makes it 10:29 p.m.?

10   A    That's correct.

11   Q    Okay.  And when you arrived, Officer Turner was the only

12   other law enforcement or emergency person there?

13   A    The only one I saw.  He may have had a trainee with him

14   that I didn't see.

15   Q    I mean, do you remember that he did have a trainee?

16   A    I'm not sure.

17   Q    Did you have a dash camera in your vehicle that night?

18   A    I did.

19   Q    You did?

20   A    Yes.

21   Q    Okay.  Was it running?

22   A    It was.

23   Q    How about a body-worn camera?

24   A    Yes, I did.

25   Q    Was that running?

1   A    Yes, it was.

2   Q    Did that capture what happened that night?

3   A    Yes.

4   Q    And so when you arrived, as your report indicates, there

5   were basically six individuals around the minivan?

6   A    Correct.

7   Q    Okay.  And so your goal was to try to move them away so

8   that the crime scene could be secured?

9   A    While our first goal is to attempt to -- if there is an

10  injured person in this case, our first goal is to perform

11  lifesaving measures, either ourselves or, if EMS is very close,

12  to get them in there.  Obviously you want to preserve as much

13  evidence as possible, but the first thing you do is try to

14  preserve life.

15  Q    So there is actually somebody in the car already giving

16  CPR to the victim; correct?

17  A    Correct.

18  Q    And do you know who that was?

19  A    I believe it was the neighbor, but I'm not 100 percent who

20  it was.  I can just describe her.

21  Q    So she was inside the car, which was part of the crime

22  scene; right?

23  A    Yes.

24  Q    And you also had been notified that there was apparently a

25  gun in that vehicle?

1  A    Yes, I was told that there was a firearm inside.

2  Q    But I think I heard you say that you did not search the

3  vehicle?

4  A    No, I did -- I visually looked inside, but we didn't want

5  to go inside and contaminate it.

6          **MR. FOSTER:**  No further questions.

7          **THE COURT:**  Any redirect?

8          **MR. PRINCIPE:**  No, Your Honor.

9          **THE COURT:**  Thank you.  You may step down, sir.

10         **MR. PRINCIPE:**  May the witness be released, Your

11  Honor?

12         **THE COURT:**  Any objection?

13         **MR. BRYSON:**  No.

14         **THE COURT:**  You may be released.

15     (At 2:32 p.m., witness excused.)

16         **THE COURT:**  You may call your next witness.

17         **MR. GREEN:**  The Government calls David Laxton.

18  **DAVID LAXTON,** GOVERNMENT'S WITNESS, being first duly affirmed,

19  at 2:32 p.m. testified as follows:

20         **THE COURT:**  Please remove your mask just for your

21  testimony.

22         Thank you.

23                        DIRECT EXAMINATION

24  **BY MR. GREEN**

25  Q    Would you tell the jurors your full name.

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 123 of 210

```
 1  A    David Laxton.

 2  Q    And, Mr. Laxton, where do you live?

 3  A    4620 Carlton Crossing Drive, Durham.

 4  Q    And I'll ask if you knew Hong Zheng?

 5  A    Yes.  He was our neighbor across the street.

 6  Q    And when you say "across the street," is that directly

 7  across the street or at an angle?

 8  A    No, over and then diagonal to the left.

 9  Q    I'm going to show you Government's Exhibit No. 12.

10       Can you see it on your screen?

11  A    Yes.

12  Q    Do you recognize that as your street?

13  A    Yes, it is.

14  Q    And do you see 4617 Carlton Crossing Drive?

15  A    I do.

16  Q    And is that -- are you familiar with that address?

17       Is that your neighbor's address?

18  A    Yes, it is.  I'm sorry.  I was just getting familiar with

19  the angle of the photograph.

20  Q    Sure.

21       Using Government's Exhibit 12 --

22            MR. GREEN:  I'm going to approach, Your Honor.

23            THE COURT:  Yes.

24  BY MR. GREEN

25  Q    Would you put an X where your house is, using the pen?
```

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 124 of 210

1    A    Let's -- (indicating) this is my house.

2    Q    Thank you.

3              MR. GREEN:  Your Honor, I move to introduce

4    Government's Exhibit 12.

5              THE COURT:  Does that include the hard copy version?

6              MR. GREEN:  Yes, Your Honor.

7              THE COURT:  All right.  Admitted.

8              MR. GREEN:  Thank you.

9    BY MR. GREEN

10   Q    Directing your attention to April 15, 2018, were you home

11   that evening?

12   A    Yes, I was.

13   Q    And where were you?

14   A    Upstairs bedroom, getting ready for bed.

15   Q    Approximately what time was this?

16   A    I think it was around 10:15, give or take a few minutes.

17   Q    And was there anything that -- are you on the second floor

18   at that time of your residence?

19   A    Correct.  Yes.

20   Q    Was there anything that caught your attention on that

21   evening?

22   A    It was raining that -- it had been raining.  I can't

23   remember if it was raining.  But as I was getting ready to get

24   in the bed, starting having -- there was sounds of loud -- I

25   wasn't sure what it was at first.  I wasn't sure if it was

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 125 of 210

1  fireworks, but then it became very clear very quickly that it
2  was not fireworks; it was some type of gunfire coming from
3  outside.  I started to go to the window.  I realized I did not
4  have my glasses on, and at that point in time, I got my
5  glasses.  And as it continued, yelled for my family members to
6  stay down, get to the other side of the house, because I
7  realized probably what was going on.
8  Q    And what did you surmise was going on?
9  A    There had been some situations where our neighbors had
10 been robbed and/or kids held at gunpoint in the past.  I was
11 familiar with that; and then when I realized that it was what
12 sounded like back-and-forth gunfire, I grabbed my pistol, went
13 downstairs.  Also heard the sounds of tires kind of burning out
14 and a car.  So I went -- I told them to dial 911.  And by the
15 time I got out the door, cars were already gone, the gunfire
16 had stopped, and I went running over to the Zheng house.
17 Q    When you heard the gunfire, did you have any idea how many
18 shots you heard fired?
19 A    A lot.  I would say anywhere from a dozen to a couple of
20 dozen, it sounded like.  I mean, it was just -- it started off
21 a couple, but then it was rapid fire, like a clip was being
22 unloaded, if not more than one.
23 Q    When you ran outside, what did you see?
24 A    The door to their house was open.  I could see the lights
25 on inside.  I heard some yelling.  I looked around to make sure

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 126 of 210

1  there was nobody out in the street or near me, went over up the

2  driveway.  And when I got to the front door, I was yelling for

3  Jade to also see if she was okay, to see if everybody was okay.

4  She was in there.  Eastern was in there.  Mom was in there.

5  They were yelling.  And then they said that the father was

6  still in the car, and I had run past him.  So at that point in

7  time, I went back down to check on him.

8  Q    And did you know Jade?  Had she been in your home before?

9  A    I don't think she had been in the home before, but I knew

10  the kids.  My daughter is a friend of hers, and we talked to

11  the kids probably more than we talked to the parents because

12  they were working a lot.

13  Q    When you went back down to the van, what did you see?

14  A    The driver's side window had holes in it, couple of holes

15  in it, I think, from gunshot shots.  There was a hole in the

16  driver's side door near where the lock or the handle were.  I

17  saw him through the glass.  The glass had not fallen out.  It

18  was still kind of intact, kind of like shattered.

19       So I tried to get in to -- I couldn't get the door open,

20  the driver's side door open.  I finally got in through the

21  driver's side rear door.  It was a minivan.  And inside there

22  was glass everywhere.  I was trying to figure out if he had a

23  pulse.  I was asking if he's okay.  I believe the car might

24  have still been on.  I'm not really sure.  But it was angled

25  towards the -- kind of diagonal to the entrance of the

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 127 of 210

1  driveway, near where the mailbox was.  And I was trying to get

2  a pulse.  You know, noticed he had been shot.

3      And then mom got down there.  I yelled for her to get

4  towels.  I was also probably trying to dial 911 myself or

5  asking other people to dial 911 and yelling for neighbors to

6  help at that point in time.

7  Q    And did your neighbors respond?

8  A    Yes.

9  Q    Who came outside?  Do you recall?

10 A    There was a lot going on.  I know that neighbor Matt ended

11 up over there.  Some neighbors from up the street came down at

12 one point in time.  My next-door neighbors, George and Betty,

13 were out at one point in time as well.  I ended up getting

14 through to the 911 dispatcher, I believe, encouraging them to

15 get an ambulance there as quickly as possible.  Then also, you

16 know, I ended up calling, trying to get my wife out there to

17 help with CPR because she knows it better than I do.

18 Q    What did you assess as far as how bad Mr. Zheng was

19 injured?

20 A    I could not -- I could not tell if he -- if he had a pulse

21 or not, and there was not, that I could tell, an exit wound

22 from the gunshots that he received.  There might have been some

23 motion, but it did not seem to be necessarily responsive to me

24 giving any verbal inputs, and just trying to get him to hold

25 up -- or to get him upright to be able to stop whatever blood

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 128 of 210

1    there was.  I was just doing the best I could in the situation.

2    Q    Did your wife come outside?

3    A    Yes.

4    Q    What did she do?

5    A    She tried to give CPR and basically get -- we could not

6    get -- I guess one of the gunshots messed up the door.  We

7    could never get the door unlocked, could not get the seat back

8    down to where he was in a positon where I felt like -- like, I

9    couldn't do good chest compressions.  I'm not the smallest of

10   people trying to wedge myself between his body and the steering

11   wheel.  She got in.  And, again, she's much more proficient at

12   that type of aid than I was.  I was trying to make sure nothing

13   else happened.

14        And at one point in time, one of my neighbors, I guess,

15   was going to pick up his wife, and we saw headlights coming

16   towards us from a vehicle that was not making much noise.  And

17   I ended up basically pulling my gun telling whoever it was --

18   at the time I didn't know it was my neighbor, but I didn't also

19   know if somebody was coming back to finish what they had

20   started.  I probably used some strong terms, but basically had

21   that person turn around and go the other direction so that we

22   could -- they could keep doing what they were doing in the

23   vehicle, trying to help him.

24        But your original question I think was what was my

25   assessment of his condition.  It was grave at that point in

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 129 of 210

1  time, if not beyond grave.

2  Q    Did you speak to the 911 operator?

3  A    I probably did.  I have no idea.  Kind of when I got

4  through, probably involved profanity, but also it was a

5  situation where I knew, based on some other stuff, that time

6  was of the essence if we were going to have a chance for him to

7  make it through in any way, shape, or form.

8       And there's not a -- the police substation is not far

9  away, but also at that point in time, it seemed like it was

10 taking a long time to hear any sirens or hear anything coming

11 towards where we were.

12 Q    And describe the weather out there.

13 A    It was -- the ground was wet.  It started drizzling again.

14 I can't remember whether that was whenever I ran over or

15 whether it was after I was out of the vehicle and the police

16 had arrived.  I think it started raining later on that evening,

17 but it was not -- it was not a clear evening in any shape or

18 form.  It had rained earlier in the evening; and if I recall

19 correctly, it was raining while I was in the house after the

20 ambulance had gotten there, after the police had arrived.

21 Q    Did you ever see a gun other than the one you were

22 carrying?

23 A    I thought that I did, but I'm not sure.  I know that I

24 helped encourage Eastern.  He had one in the house and asked

25 him to give it to the police.  I had given the police mine.  I

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 130 of 210

1  told them that I had one on me.  So they held mine until I was

2  released to go back to my property later on that evening.

3        But, you know, beyond the one that I had on my person --

4  and then whenever they said that they had one in the house, and

5  I'm, like, you need to give it to the cops, I wasn't sure what

6  state of mind Eastern was in.  I also didn't want him to leave.

7  So I thought that I had seen one in the vehicle, but, again, it

8  wasn't there whenever I got back in the vehicle.  So, again, I

9  may have just mistaken something in the dim light that there

10 was inside the car.

11 Q    Did you stay with the family as the events of the evening

12 unfolded?

13 A    I did.  I was -- I realized that it wasn't a -- that -- I

14 was in the house because I felt like it would be -- it was,

15 one, helpful or might be helpful.  I recognized a couple of

16 officers that had responded from past contact through some

17 stuff with sports leagues, things like that.  And also given

18 that there had been a history of some incidents where the

19 family had either been robbed or attempted robbery, I was

20 trying to make sure that, to whatever degree, I could help.

21 But I was told I couldn't leave.  It was an active crime scene.

22       And based on -- at one point in time, I think after the

23 ambulance had gotten there, I knew that he had passed I think

24 before the family realized that and were told that.  So I was

25 also trying to help support the family to the degree possible

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 131 of 210

1  and work with the officers on scene to help them, to try to get

2  information, encourage the family to talk to them, tell them

3  whatever they knew.

4          **MR. GREEN:**  Thank you.  No further questions.

5          **THE COURT:**  Any cross?

6                          CROSS-EXAMINATION

7  **BY MR. BRYSON**

8  Q   Mr. Laxton, I take it you were the first person to arrive

9  over there after the shooting stopped?

10 A   Yes.

11 Q   All right.  And you walked up the driveway?

12 A   I didn't walk.  I was running.

13 Q   Okay.  You ran up the driveway?

14 A   Yes.

15 Q   And ran up the walkway?

16 A   Yes.

17 Q   And then you went up the stairs?

18 A   I went up to the front door and stuck my head in, yelling

19 for the family to see if they were okay, to make sure everybody

20 was okay, calling for the children, I think, specifically.

21 Q   You went all way the up and were standing on the front

22 porch?

23 A   Yes.

24 Q   And you did not enter the house?

25 A   At that point in time, I was just in the doorway, I

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 132 of 210

1  believe.  And then later, after the police arrived, yes, I was

2  in the house at that point in time.

3  Q     Okay.  But, initially, you stopped at the front porch?

4  A     I think so, yes.

5  Q     Then you went back down the stairs?

6  A     There's steps.  There's not stairs on their landing.  I

7  went back down to where the van was, whenever they said that

8  dad was in the van, and that involves turning around, going

9  down, taking a right on the sidewalk and going down the

10 driveway to where the van was parked.

11 Q     Okay.  You basically kind of retraced your steps?

12 A     Yes.

13 Q     And then --

14 A     I was barefoot.  I wasn't going to go running through the

15 yard or anything like that.

16 Q     Okay.  That's when you went to the van?

17 A     Yes.

18 Q     And then while you were there trying to render aid, the

19 other neighbor Matt came up?

20 A     At some point in time, yes.

21 Q     And then you said there were two other neighbors that came

22 from down the street?

23 A     There were several people that came out of their houses.

24 Again, it's a little bit fuzzy in my mind as to who arrived and

25 in what sequence.  I remember Betty saying, "We need to pray."

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 133 of 210

1    She was trying to comfort Shirley.  Some other neighbors came

2    down at one point in time, trying to help with traffic control

3    or just trying to get 911.  A lot of people came out of the

4    houses, I think, that we -- I think the 911 center got

5    overloaded from our block at that point in time.

6    Q    And they were all in and around the van?

7    A    No.  I think that they were staying away from it to the

8    degree possible because, while I was in there, it was just me.

9    And then after I got towels and I got help over there for

10   people that were better at -- I felt better qualified than me

11   to try to keep him alive and/or resuscitate him, I got out of

12   the van, and we kept everybody out -- away from the van while

13   they were trying to provide aid.  That's why I pulled the gun

14   on my neighbor because I didn't know it was him at the time but

15   a car coming down street.  We were making sure that we gave

16   every -- I felt like it was more important to try to save a

17   life at that point in time than let somebody drive by because

18   it was convenient.

19   Q    But your wife at some point rendered CPR; correct?

20   A    Yes.

21   Q    And she would have been in the van at that time?

22   A    Yes.

23   Q    And your neighbor Matt, was -- he was near the van;

24   correct?

25   A    I don't know if he got in the van.  I don't know if he was

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 134 of 210

1 standing next to the van.  I can't really remember exactly

2 where he was at that point in time.

3 Q    Jade's mother was certainly near the van?

4 A    She was near the van.  I don't think I let her in the van.

5 I asked her to get towels, and she got towels.

6 Q    Okay.  So you believe you did speak with the 911 operator

7 at some point during this evening?

8 A    Yes.  I know I was trying to dial them frantically.

9 Q    Okay.  And you did express certain frustration at the

10 amount of time that it was taking for a police or ambulance

11 response; correct?

12 A    I probably did.  I mean, I think it's a natural human

13 reaction whenever you are dealing with somebody who has been

14 shot in the head that you don't -- if there's somebody that's

15 not on the way or you don't hear sirens coming and you know

16 that it's a dire situation, that you want it to -- you want all

17 possible assistance on the way as quickly as possible.

18 Q    Okay.  And I think you expressed that it took probably

19 about 15 minutes until people responded after the shooting?

20 A    I have no idea how long it took them to get there.  I was

21 not looking at my watch while all this was going on.

22 Q    Okay.

23 A    I mean, it could have taken that amount of time.  I'm not

24 sure.  I cannot recall.

25           **MR. BRYSON:**  All right.  Thank you very much.

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 135 of 210

1          **THE COURT:**  Any redirect?

2          **MR. GREEN:**  Nothing further.

3          **THE COURT:**  Thank you.  You may step down.

4          **MR. GREEN:**  May the witness be released?

5          **THE COURT:**  Any objection?

6          **MR. BRYSON:**  No.

7          **THE COURT:**  You may be released.  You are free to

8   leave.  Watch your step as you step down there, please.

9        (At 2:52 p.m., witness excused.)

10         **THE COURT:**  You may call your next witness.

11         **MR. GREEN:**  The Government calls Matt Hofmeier.

12  **MATTHEW HOFMEIER,** GOVERNMENT'S WITNESS, being first duly

13  affirmed, at 2:52 p.m. testified as follows:

14         **THE COURT:**  If you turn the mic towards your mouth a

15  little bit and remove your mask while you testify.

16                      DIRECT EXAMINATION

17  **BY MR. GREEN**

18  Q    Would you tell the jurors your name.

19  A    My name is Matthew Hofmeier.

20  Q    And, Mr. Hofmeier, on April of 2018, where did you live?

21  A    I lived on 4702 Carlton Crossing Drive.

22  Q    And, Mr. Hofmeier, what do you do for a living?

23  A    I'm a pharmacist.

24  Q    I'm going to show you what's marked as Government's

25  Exhibit No. 13.

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 136 of 210

1    Are you familiar with what that is?

2  A    Yes, that was my home.

3  Q    And you don't know when this photograph was taken, do you?

4  A    Not precisely, but it would have been once I had that

5  vehicle in the driveway.  So that would have been after 2017.

6  Q    Does this photograph fairly and accurately depict the

7  exterior of your home as it would have appeared in April of

8  2018?

9  A    Yes.

10        **MR. GREEN:**  I am going to move introduction of

11  Government's Exhibit 13.

12        **THE COURT:**  Admitted.

13        **MR. GREEN:**  I ask that it be published?

14        **THE COURT:**  You may.

15 **BY MR. GREEN**

16 Q    Mr. Hofmeier, direct directing your attention to April 15,

17 with 2018, were you at the home that's depicted in Government's

18 Exhibit No. 13?

19 A    Yes.

20 Q    Who was present there?

21 A    I was, my wife, and we had two small kids.

22 Q    And I'll ask you to direct your attention to the evening

23 hours of April 15, 2018.

24        Do you recall what the weather was like?

25 A    It was raining.

1  Q    And was there something that drew your attention or

2  something that caught your attention around 10:20 in the

3  evening?

4  A    My wife and I had just gone to bed and heard gunshots.

5  Q    And describe exactly where you were.

6  A    As relating to that picture?

7  Q    Yes.

8  A    We were on the first level.  They are kind of behind the

9  small tree.  There's two dormers.  It was the level below that

10 and towards the back of the house.

11 Q    And what happened -- what specifically did you hear?

12 A    Several gunshots.  My wife and I both sat up in bed and,

13 you know, said that wasn't lightning.  I ran to the front of

14 the house, which was a closet in the master bedroom, and looked

15 out the window at that point.

16 Q    And when you looked out the window, could you clearly see

17 the street?

18 A    Yes.

19 Q    And when you looked out the window, what did you see?

20 A    There was a white SUV that was leaving pretty quickly, and

21 the back passenger side door was closing as it was driving

22 away.

23 Q    And do you know where Hong Zheng lived?

24 A    It was across the street and a couple of houses down.

25 Q    And so was that white SUV you saw leaving away from that

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 138 of 210

1  area?

2  A    Yeah, it was away from that.

3  Q    Towards your home?

4  A    Towards my home.

5  Q    And what did you do when you saw the white SUV leaving?

6  A    I pretty much immediately knew that something didn't seem

7  right about that, and so I went and got my cell phone and I

8  called 911.

9  Q    Did you get through?

10  A    Yeah.

11  Q    I am going to play a portion of a call from Government's

12  Exhibit No. 11.  I am going to ask if you recognize -- I'm

13  sorry -- Government's Exhibit 7.  I'll ask if you recognize

14  your voice.

15      (Government's Exhibit No. 7 was played.)

16  **BY MR. GREEN**

17  Q    Do you recognize your voice?

18  A    Yes.

19  Q    Is this the call you made?

20  A    Yes.

21          **MR. GREEN:**  Your Honor, I'm going to play the 911

22  call.

23          **THE COURT:**  All right.

24          **MR. GREEN:**  Go ahead.

25      (Government's Exhibit No. 7 was played.)

1  BY MR. GREEN

2  Q    After you placed the 911 call, what did you do?

3  A    I waited for a few moments to see if we heard anything

4  else.  And then after a little bit, I kind of was poking my

5  head out my front door to see if I could see anything; and

6  about that time, I heard one of my neighbors yelling and wanted

7  to go help.

8  Q    And do you recall which neighbor it was?

9  A    It was Dave.

10 Q    Is that Dave Laxton?

11 A    Yes.

12 Q    What did you do then?

13 A    I went and got a flashlight from my bedroom and then went

14 out to the street.

15 Q    What did you see when you got there?

16 A    So I turned towards Dave's house because I wasn't sure

17 where the event had happened, so was walking that way.  And as

18 I got to the street, I saw a van kind of half in and half out

19 of the driveway across the street, and I saw Dave's wife,

20 Dessie, was giving compressions.

21 Q    What happened next?

22 A    Dave came out, and he handed a phone off to me with a

23 dispatcher.

24 Q    And did you tell the dispatcher what you saw?

25 A    Yes.

US v. Wiley  -- Trial/Vol II of VII -- 4/20/21

1  Q    What happened next?

2  A    I stayed to be around with neighbors to help in any way I

3  could and wait for emergency services to arrive.

4  Q    Did you get inside the van?

5  A    No.

6  Q    Did you see what was inside the van?

7  A    I did.

8  Q    What did you see?

9  A    There was a man in the front seat of the driver side

10 that -- they had the seat back, and, like I said, Dessie was

11 giving compressions.

12 Q    And when the police came, what happened?  What did you do?

13 A    At that point I think I may have spoken with an officer.

14 I don't exactly remember, but went back home to my family once

15 they arrived.

16          **MR. GREEN:**  Thank you.  That's all the questions I

17 have.

18          **THE COURT:**  Any exam?

19                        CROSS-EXAMINATION

20 **BY MR. BRYSON**

21 Q    When you walked down to the van, you got close enough to

22 it that you could see inside the van?

23 A    Yeah, close enough that I could see a bit.

24 Q    Did you remain on the passenger side, or did you also go

25 over to the driver's side?

1  A      I stayed on the passenger side.

2  Q      And Mr. Laxton's wife was rendering CPR?

3  A      Yes.

4  Q      And Mr. Laxton was assisting her?

5  A      I think at that time he was up at the house, and he came

6  down a moment later.

7  Q      Were there other neighbors near the van?

8  A      There -- I don't really remember anybody else near the

9  van.  There were some others on the other side of the street.

10  Q      Okay.  And did any other neighbors come out and assist

11  while you were there?

12  A      There were a few other people that were nearby, but I

13  honestly didn't know very many of the neighbors.

14  Q      Could you tell where they were?

15  A      They were kind of in front of Dave's house.

16  Q      Okay.

17          MR. BRYSON:  Those are my questions.

18          MR. GREEN:  Nothing further.

19          THE COURT:  You may step down, sir.

20          MR. GREEN:  May the witness be released?

21          MR. BRYSON:  No objection.

22          THE COURT:  Yes.  You're free to leave, sir.

23      (At 3:03 p.m., witness excused.)

24          THE COURT:  You can call your next witness.

25          MR. GREEN:  Evrardo Macias is the next witness.

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 142 of 210

 1              **THE COURT:**  Ladies and gentlemen, we'll go until

 2    about 3:15 or so.  I'll see how long the testimony is.

 3              Does anybody need an immediate break?  Otherwise, I

 4    figured we'd go about an hour and a half, and then we'll take a

 5    break, and then we'll finish up at 5:00.

 6    **EVRARDO MACIAS**, GOVERNMENT'S WITNESS, being first duly

 7    affirmed, at 3:04 p.m. testified as follows:

 8              **THE COURT:**  If you would remove your mask, please,

 9    just for purposes of your testimony.

10              Thank you.

11                         DIRECT EXAMINATION

12    **BY MR. GREEN**

13    Q    Would you tell the jurors your full name.

14    A    Evrardo Macias.

15    Q    And where do you work, sir?

16    A    Duke University.

17    Q    What do you do?

18    A    I'm an assistant professor.  I do cancer research.

19    Q    Dr. Macias, where did you live in April of 2018?

20    A    4705 Carlton Crossing Drive.

21    Q    And who did you live with there?

22    A    At the time my wife and my stepson.

23    Q    I'm going to show you what's been marked as Government's

24    Exhibit 14 and ask you to look at that.

25              It should be on your monitor now.  Do you recognize that

Case 1:19-cr-00529-TDS  Document 360  Filed 02/04/22  Page 143 of 210

1   as a photograph from the street of your house?

2   A    Yes, that's my house.

3   Q    And you don't know when this picture was taken; correct?

4   A    Might have been the spring of 2019, I believe, when we

5   purchased that car.

6   Q    So at some point after the events of 2018?

7   A    Correct.

8   Q    But does this photograph accurately reflect how your house

9   would have appeared in 2018?  Is there any significant

10  differences?

11  A    No, it's the same.

12          **MR. GREEN:**  All right.  I am going to move

13  introduction of Government's Exhibit 14.

14          **THE COURT:**  Admitted.

15          **MR. GREEN:**  And ask that it be published?

16          **THE COURT:**  You may.

17  **BY MR. GREEN**

18  Q    Were you home on the evening of April 15, 2018?

19  A    Yes.

20  Q    And directing your attention to somewhere approximately

21  10:20 in the evening, what were you doing?

22  A    At that time I was home.  I believe I was -- I can't

23  remember if -- right around that time I was going to pick up my

24  wife, so I don't remember the exact time, but I was home on a

25  Sunday night, and she was at work.

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 144 of 210

1  Q    And was there something that got your attention that

2  evening?

3  A    Yes.  A lot of banging, what I initially thought was,

4  like, a transformer or something going out.

5  Q    And how many did you hear?

6  A    Probably like 15, 16 or so.

7  Q    And what did you do when you heard those sounds?

8  A    I ran to the front of my house to look out the front

9  window.

10 Q    And did you?

11 A    Yes.

12 Q    Did you have a clear view of the street?

13 A    Yes.

14 Q    And describe for the members of the jury what you saw.

15 A    As soon as I opened up the blinds to my front window, I

16 quickly saw -- as soon as I opened the windows, I saw a car

17 speeding by the front of my house.

18 Q    Can you describe that car?

19 A    It looked like a mid-sized SUV, maybe a newer model, light

20 color, maybe white, at the time.

21 Q    And what did you do next after you saw that car speeding

22 by?

23 A    So after that, I had to go pick up my wife.  And so I went

24 and put my shoes on and got in my vehicle, and I backed out of

25 my driveway.  I didn't put anything together at that time.  I

Case 1:19-cr-00529-TDS  Document 360  Filed 02/04/22  Page 145 of 210

1  turned to the right coming out of my house towards where the

2  altercation was happening.  And when I was getting closer, one

3  of the neighbors was in the street with a pistol and told me

4  basically to back up or get out of the area, so I immediately

5  reversed.

6  Q    Had you lived in the neighborhood very long?

7  A    I think I was there maybe about three or four months at

8  the time.  We moved in January 2018.

9  Q    When you turned and went down towards that location, was

10 that the direction from where that light-colored vehicle had

11 come?

12 A    He was speeding away from that direction, yes.

13 Q    And, subsequently, did you have an opportunity to tell law

14 enforcement?  Did they come by and ask to see if anybody had

15 seen anything, and you told them what happened?

16 A    Yes.  I believe it was at the next day.

17           **MR. GREEN:**  Thank you.

18           That's all the questions I have.

19           **THE COURT:**  Any questions?

20           **MR. BRYSON:**  No questions.

21           **THE COURT:**  All right.  You may step down, sir.  You

22 can put your mask back on.

23           Thank you.

24           **MR. GREEN:**  May this witness be released?

25           **THE COURT:**  Any objection?

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 146 of 210

 1              MR. BRYSON:  No objection.

 2              THE COURT:  You are free to leave.  Thank you.

 3         (At 3:09 p.m., witness excused.)

 4              THE COURT:  Do you want to call your next witness?

 5    How long will your next witness be?

 6              MR. PRINCIPE:  She may take a little bit longer, Your

 7    Honor.  There will be some photographs.

 8              THE COURT:  We'll stop right here then because it's

 9    been roughly an hour and a half.

10              Jurors, please put your notes in your envelopes.

11    We'll take our afternoon break.  It's 3:10, so we're going to

12    be back in court no later than 3:30.  When I dismiss you in a

13    minute, make sure you use the restroom and get relaxed and do

14    what you need to do.  Then we'll try to start right back.  I'm

15    trying to keep our breaks long enough so you can do what you

16    need to do, but not any longer than necessary so we just keep

17    moving along.  So if that becomes a problem, just let me know.

18              Leave your notes in your chairs.  Remember all my

19    admonitions to you, and we'll call you to be back at 3:30 then.

20              Everyone else please remain in the courtroom while

21    the jury leaves.

22              Ms. Engle will take you to the jury room.

23         (The jury departed the courtroom.)

24              THE COURT:  Please be seated.  Give them a moment to

25    clear out of the vestibule before we leave.

      US v. Wiley  -- Trial/Vol II of VII -- 4/20/21

 1            All right.  The jury has left the courtroom.  Any

 2   matter you want to bring to my attention?

 3            **MR. GREEN:**  No, Your Honor.

 4            **MR. BRYSON:**  No, Your Honor.

 5            **THE COURT:**  Okay.  We'll take a break for 20 minutes.

 6   Please be ready.  I would like to start right at 3:30, if we

 7   can.

 8        (Proceedings recessed at 3:11 p.m.)

 9        (Proceedings called back to order at 3:32 p.m.)

10        (The Defendant was present.)

11            **THE COURT:**  Ready to proceed?

12            **MR. PRINCIPE:**  Yes, Your Honor.

13            **THE COURT:**  Bring the jury in, please.

14        (The jury returned to the courtroom.)

15            **THE COURT:**  All right.  Please call your next

16   witness.

17            **MR. PRINCIPE:**  Yes, Your Honor.  The Government calls

18   Betty Scruggs.

19   **BETTY SCRUGGS**, GOVERNMENT'S WITNESS, being first duly affirmed,

20   at 3:34 p.m. testified as follows:

21            **THE COURT:**  If you would remove your mask while

22   you're testifying.

23            Thank you.

24                       DIRECT EXAMINATION

25

US v. Wiley  -- Trial/Vol II of VII -- 4/20/21

1  **BY MR. PRINCIPE**

2  Q    Can you please state your name.

3  A    Betty Scruggs.

4  Q    And, Ms. Scruggs, where do you live?

5  A    I live in Durham, North Carolina.

6  Q    And what street do you live on?

7  A    4618 Carlton Crossing.

8  Q    And how long have you lived at that address?

9  A    Almost 11 years.

10 Q    What is your current occupation?

11 A    I'm a retired teacher.

12 Q    And how long did you teach for?

13 A    Off and on, probably about 25 years.

14 Q    And how long have you been retired?

15 A    Right at five years.

16 Q    Okay.  And I'd like to direct your testimony to the night

17 of April 15, 2018.  Do you recall having to call 911 at some

18 point?

19 A    I do.

20 Q    Can you tell the jurors about that?  Why did you call 911?

21 A    Yes.  Well, my husband and I had gone to church that

22 night, came back, watched a little TV.  It was one of those

23 nights when the weather -- they -- a few warnings about storms

24 and so on, and so we decided we'd head on to bed.  I think it

25 was around 11:00.  I really -- I honestly can't tell you the

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 149 of 210

1    time.

2         But I was heading into the kitchen to get some water.  And

3    as I was walking in, I started hearing a pop, pop, pop, pop,

4    pop.  And I told my husband, I said, "Oh, my goodness."  I

5    said, "It must be hailing outside."  So I looked on our deck.

6    Nothing was happening.  And where I was standing in my kitchen,

7    I had a straight shot through the dining room to the music room

8    area to the window that faces our front yard.  I was seeing

9    lighting, just, like, shooting, and then I heard a breakage of

10   our glass in our window, didn't know which one at the time.

11   But then I told my husband, I said, "I'm calling 911," and I

12   told him, "Please call the neighbor; see if they know what's

13   going on," because we had no idea.  All I could figure is

14   people just going wild driving up and down, shooting in windows

15   for all we knew.

16   Q    Let me show you an exhibit.  I am going to show you

17   Government's Exhibit No. 12.

18        And do you recognize that to be the street where you live?

19   A    I do.

20   Q    And are you able to -- are you able to identify your house

21   in relation to that kind of circular marker?

22   A    Yes, the little marker.  If you come straight across the

23   street to the house with the gray roof, that's our home.

24   Q    Okay.  The one with the light gray roof?

25   A    Yes.

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 150 of 210

1  Q    All right.  And that's the house where the glass broke?

2  A    Yes.

3  Q    All right.  And then I would like to play a portion of a

4  phone call to 911.  This is Government's Exhibit 7.

5       (Government's Exhibit No. 7 was played.)

6       Do you recognize your voice in that call?

7  A    Yes.

8  Q    Is that the call you placed to 911 on April 15, 2018?

9  A    Yes.

10  Q    All right.

11       **MR. PRINCIPE:**  We're going to play the call, Your

12  Honor.

13       **THE COURT:**  Yes.

14       (Government's Exhibit No. 7 was played.)

15  **BY MR. PRINCIPE**

16  Q    Mrs. Scruggs, did you eventually find out what did happen?

17  A    Yes.  I had told my husband, while I made the 911 call, I

18  said, "Call our neighbors to see if they have any idea what's

19  going on."  When I got off the 911 call, he was talking with

20  our neighbor, Todd, which is on the left side of us, our

21  driveway side.  And as I'm listening, then I said, "Todd," I

22  said, "it sounds like you're outside."  He says, "Yeah, I'm

23  outside, but the shooters are gone."  I said, "The shooters are

24  gone?"  He said, "Yeah."  He says, "But our neighbor has been

25  shot."

     Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 151 of 210

1   Q    Okay.  And at some -- yes, ma'am.

2   A    That was how we knew.  And then by then, we knew it was

3   okay to go outside, and so then we went outside and we saw.

4   Q    And what did you see when you went outside?  Or how close

5   did you get?

6   A    Well, we went directly over there, but what we saw was the

7   van that Zheng was driving, and it was just at the foot of the

8   drive, and some folks had gathered around there.  Shirley was

9   yelling for someone to help him, and we went over to try to

10  help Shirley.  And by then, some police -- I don't really

11  remember who all had arrived, but the medical had not gotten

12  there yet.  And our neighbor on the other side, Dessie, had

13  come, and Dessie got in and tried to give him resuscitation.

14  And I asked her the next day, I said, "Was Zheng alive?"  And

15  she said, "No."  But she says, "I just wanted Shirley to know

16  someone was trying."  And that's -- and then we got Shirley to

17  go inside.

18  Q    Did you -- you didn't ever go inside the minivan at all,

19  did you?

20  A    No.  I saw in, but that was enough.  And I did not get in,

21  no.  Dessie, as far as I know, did.

22  Q    And then the following day, did law enforcement come to

23  your house?

24  A    They did and came to see the damage they had done on the

25  window and some of the furniture and tried to find the bullet

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 152 of 210

1    or bullets.  We didn't know --

2    Q    Let me show you a series of photographs.  I am going to

3    start by showing you Government's Exhibits 15, 16, 17, and 18.

4         Can you see Government's Exhibit 15 on your screen?

5    A    Yes.

6    Q    What is that a picture of?

7    A    That's a picture of the front of our home.

8    Q    And now Government's Exhibit 16?

9    A    That's the front of our home, the front window that I

10   could see.  All the way back from the kitchen, I could see

11   through it.  Now, it did have sheers there, but you could see

12   through the sheers.

13   Q    And Government's Exhibit 17, do you recognize what that's

14   a photograph of?

15   A    Yes, I recognize that.

16   Q    What is it?

17   A    It is a bullet through -- that's what I heard and when I

18   knew someone was shooting real bullets.

19   Q    Okay.  And Government's Exhibit 18, what does that show?

20   A    That shows the window and the drapery that it hit and the

21   tea table, which you can't see from this side, but it hit the

22   little tea table, too.

23   Q    Is that the same hole in the window but from the inside?

24   A    Yes.

25   Q    Okay.  And do all those photographs fairly and accurately

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 153 of 210

1  depict the things that they are?

2  A    Yes.

3          MR. PRINCIPE:   The Government would move Government's

4  Exhibits 15 through 18 into evidence, Your Honor.   And

5  permission to publish?

6          THE COURT:   Admitted.   And you may.

7  BY MR. PRINCIPE

8  Q    So this is the photograph you identified as the outside of

9  your home?

10  A    Yes.

11  Q    And then Government's Exhibit 16, that's the window that

12  was shot?

13  A    Yes.

14  Q    Government's Exhibit 17, that's the damage you saw in the

15  window?

16  A    Yes.

17  Q    And Government's Exhibit 18, that's the inside view of

18  that same window?

19  A    Yes.

20  Q    Okay.  Now, I would like to show you another series of

21  photographs, Government's Exhibits 19, 20, 21, and 22.

22       Do you recognize what Government's Exhibit 19 is?

23  A    Yes, that was side that the bullet hit first.

24  Q    Government's Exhibit 20?

25  A    Yes.

US v. Wiley  -- Trial/Vol II of VII -- 4/20/21

1  Q    What is that?

2  A    That's our little music room area.

3  Q    Is that where the window was that --

4  A    That's where the window -- yes.  You see the little tea

5  table right against the window there, and then the bullet came

6  in and hit the piano.

7  Q    And what is Government's Exhibit No. 21 a photograph of?

8  A    That's the piano pedal where the bullet went through the

9  wood part.

10 Q    And Government's Exhibit 22?

11 A    That was the wall that the bullet undoubtedly bounced and

12 hit that.

13 Q    So that damage was not there prior to the phone call that

14 you placed?

15 A    No, that was not.

16 Q    And do all of those exhibits, Government's 19 through 22,

17 fairly and accurately depict the damage that you saw at the

18 house the next day?

19 A    Oh, yes.

20         **MR. PRINCIPE:**  Your Honor, the Government would move

21 Government's Exhibits 19 through 22 into evidence and

22 permission to publish those.

23         **THE COURT:**  Admitted.  You may.

24 **BY MR. PRINCIPE**

25 Q    So this is damage to the table near the window; is that

1   right?

2   A     That's correct.

3   Q     Okay.  Government's Exhibit 20, that's the room where the

4   damage was?

5   A     Yes, uh-huh, the table.

6         The piano.

7   Q     And Government's Exhibits 21 is the piano pedal; is that

8   correct?

9   A     That's correct.

10  Q     All right.  And, lastly, Government's Exhibit 22, that's

11  the damage to the wall?

12  A     The wall.

13  Q     Mrs. Scruggs, I'm going to show you one last series of

14  photos, Government's Exhibits 23 and 24.

15        Do you recognize Government's Exhibit 23?

16  A     I do.

17  Q     And what is that a photograph of?

18  A     That is the bullet.  I can't tell how long they looked for

19  that bullet because they were looking all over in the music

20  room area and had almost given up and getting ready to leave.

21  And they were standing there talking, and someone looked down,

22  and that's where it was.

23  Q     And what's the piece of furniture that it's near?

24  A     It's just an entry dresser.

25  Q     Okay.  And Government's Exhibit 24, do you recognize that?

1  A    That's the bullet.

2  Q    All right.

3           MR. PRINCIPE:  Your Honor, the Government moves

4  Government's Exhibits 23 and 24 into evidence.

5           THE COURT:  Admitted.

6           MR. PRINCIPE:  And permission to publish those?

7           THE COURT:  Yes, you may.

8  BY MR. PRINCIPE

9  Q    And that's the furniture with the bullet underneath?

10 A    Yes.

11 Q    And then Government's Exhibit 24, that's a closeup of the

12 bullet they found?

13 A    Yes.

14          MR. PRINCIPE:  I have no additional questions, Your

15 Honor.

16          THE COURT:  Any exam?

17                      CROSS-EXAMINATION

18 BY MR. BRYSON

19 Q    So while you were in the house, you were speaking with

20 your neighbor Todd on the telephone; correct?

21 A    Correct.

22 Q    And during that conversation, you realized he was outside?

23 A    Yes.

24 Q    And then you went outside?

25 A    Right.

   Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 157 of 210

```
1  Q    And when you got out there, did you see Todd out there?

2  A    To tell you the truth, I don't know because, by then, a

3  number of neighbors had come out.

4  Q    Okay.  And you actually went over to the minivan; correct?

5  A    To Shirley's house, yes -- or over to the scene, yes.

6  Q    And you walked up the driveway?

7  A    Yes.

8  Q    All right.  Did you walk up the walkway, too?

9  A    Yes.

10 Q    Did you walk up the front steps?

11 A    The front steps.

12 Q    Did you actually go in the house?

13 A    Yes, I did.

14 Q    Okay.  And then, I take it, you came back and went back

15 the same way?

16 A    Yes.

17 Q    All right.  And you did at some point stand close enough

18 to the minivan that you could see inside?

19 A    To the van, yes, I could.

20 Q    And was that on the passenger side or the driver side?

21 A    I think it would have been more on the passenger side, as

22 I would probably have been heading back to my house and --

23 yeah.

24 Q    I think you said that when you got out there, you saw a

25 group of folks gathered around; is that right?
```

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 158 of 210

1  A    Yes, that's correct.

2  Q    And were they gathered near the minivan?

3  A    They were just scattered different places.  I couldn't

4  tell how many were close and how many were away.

5  Q    Some people were in the driveway?

6  A    Yes.

7  Q    And some people walked up the walkway?

8  A    Right.

9           **MR. BRYSON:**  Thank you.  Those are my questions.

10          **THE COURT:**  Anything on redirect?

11          **MR. PRINCIPE:**  No, Your Honor.

12          **THE COURT:**  Thank you, ma'am.  You may step down.

13  You can put your mask back on.

14          **MR. PRINCIPE:**  May Mrs. Scruggs be released, Your

15  Honor?

16          **MR. BRYSON:**  No objection.

17          **THE COURT:**  You are free to leave.

18      (At 3:50 p.m., witness excused.)

19          **MR. GREEN:**  The Government calls Marcus Edwards.

20  **MARCUS A. EDWARDS, JR.,** GOVERNMENT'S WITNESS, being first duly

21  affirmed, at 3:50 p.m. testified as follows:

22          **THE COURT:**  You can remove your mask, please, so we

23  can see and hear you while you testify.

24                        DIRECT EXAMINATION

25

1  **BY MR. GREEN**

2  Q    Good afternoon.  Could you tell the jury your full name.

3  A    Marcus Anthony Edwards, Jr.

4  Q    And, Mr. Edwards, were you employed for a period of time

5  at Kroger, the grocery store?

6  A    Yes, sir.

7  Q    And were you employed in that capacity during April of

8  2018?

9  A    I was.

10 Q    And what were your duties?

11 A    Loss prevention.

12 Q    And what are some of the duties of loss prevention?

13 A    Monitoring the external, which is the customers, as well

14 as the employees for any type of theft.

15 Q    And do Kroger stores have video cameras in them and on the

16 exterior?

17 A    Several, yes, sir.

18 Q    And was it your job on occasion to review those videos to

19 see if they captured whatever you were looking for?

20 A    Yes, sir.

21 Q    And, in particular, did a Kroger on Roxboro Street in

22 Durham, North Carolina -- was it equipped with cameras in April

23 of 2018?

24 A    Yes, sir.

25 Q    Did you receive a request from the Durham Police

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 160 of 210

1  Department to pull certain surveillance cameras related to

2  dates that they gave you?

3  A    That is correct, yes, sir.

4  Q    I'm going to show you Government's Exhibit No. 25.

5       Can you see that on your monitor?

6  A    I do.

7  Q    And do you recognize that as an aerial photograph of the

8  area around what was then the Kroger store in April of 2018?

9  A    It is, yes, the one on South Roxboro Street.

10 Q    And had you been to that store before?

11 A    Several times, yes.

12 Q    In particular, do you recognize -- there is a pin -- there

13 is a China Wok restaurant.  Do you recognize that restaurant?

14 A    The China Wok restaurant, I do, yes, sir.

15 Q    And with regard to this photograph, would that help

16 illustrate your testimony as to where the cameras were pointed

17 in terms of the surveillance video?

18 A    Yes, sir.

19          **MR. GREEN:**  Your Honor, I'll move introduction of

20 Government's Exhibit No. 25.

21          **THE COURT:**  Admitted.

22          **MR. GREEN:**  May I publish it?

23          **THE COURT:**  Yes.

24 **BY MR. GREEN**

25 Q    I am going to zoom in on one portion of that Government's

1  exhibit.

2      And you see -- are you familiar with those businesses that

3  were in that shopping center?

4  A    I am.

5  Q    And do you see a tobacco shop?

6  A    I do.

7  Q    And a Family Dollar further on?

8  A    I do.

9  Q    And the China Wok?

10  A    Yes, sir.

11  Q    Now, did the Kroger store on April 13 and April 15 have

12  cameras that pointed directly towards the area of the China Wok

13  from the Kroger?

14  A    It did.

15  Q    And so the Kroger would be in the most -- the top of this

16  picture that I'm seeing; is that correct?

17  A    That is correct.

18  Q    And so they would be pointed -- as Government's Exhibit

19  No. 25 is oriented, at least one photograph -- one camera would

20  depict the lot and the area towards the China Wok?

21  A    Correct.

22  Q    Thank you.

23      I'm going to show you what's been marked -- well, what is

24  Government's Exhibit No. 26.

25          **MR. GREEN:**  May I approach?

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 162 of 210

1              THE COURT:  Yes.

2    BY MR. GREEN

3    Q    At the request of the Durham Police Department, did you go

4    into the Kroger video surveillance system and make copies of

5    the various camera angles?

6    A    I did.

7    Q    And how many different camera angles do you recall there

8    were, if you do?

9    A    I know the one camera angle that I did was the outside's

10   camera -- parking lot camera that was facing towards the DMV,

11   tobacco shop, and the China Wok.

12   Q    And did you also pull camera angles from exit walkways?

13   A    Yes, sir.

14   Q    And was that for a period of time between April 13 of

15   2015 [sic]?

16   A    It was.

17   Q    And did you make disks and give those to the Durham Police

18   Department?

19   A    I did.

20             MR. GREEN:  Your Honor, I will move introduction of

21   Government's Exhibit No. 26.

22             THE COURT:  Admitted.

23   BY MR. GREEN

24   Q    Now, the next -- from Government's Exhibit No. 26, I would

25   like to play a clip of a video for you and see if you recognize

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 163 of 210

1  that as video from the Kroger -- the exterior of the Kroger.

2       (Government's Exhibit No. 26 was played.)

3       We'll pause there.  Do you recognize that scene?

4  A    Yes, sir.  That is the parking lot camera for the Kroger,

5  facing towards the DMV and the China Wok.

6            **MR. GREEN:**  Your Honor, may we publish this portion?

7            **THE COURT:**  Yes.

8       (Government's Exhibit No. 26 was played.)

9  **BY MR. GREEN**

10 Q    Now, in the upper left-hand corner of that video, it

11 indicates a date/time group and timestamp.

12      Could you tell us what that information shows?

13 A    It shows the date of April 15 of 2018 at the Kroger.

14 Q    And what was the time group there in the right-hand side?

15 A    2204, which is 10:04.

16 Q    And does that -- does that video fairly and accurately

17 describe and capture what was going on outside the Kroger on

18 that date and time?

19 A    Yes.

20           **MR. GREEN:**  Your Honor, I would like to play this

21 portion.

22           **THE COURT:**  You may.

23      (Government's Exhibit No. 26 was played.)

24           **MR. GREEN:**  If we could pause it.

25

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 164 of 210

1   **BY MR. GREEN**

2   Q    In the upper left-hand corner, there appears to be a car

3   pulled up to a building.

4        Is that generally the area where the China Wok was that

5   you pointed out in the earlier exhibit?

6   A    Correct.

7            **MR. GREEN:**  Go ahead.

8        (Government's Exhibit No. 26 was played.)

9   **BY MR. GREEN**

10  Q    I'm going to show you what's been marked as Government's

11  Exhibit Nos. 27 and 28.

12       Do you see that on your screen?

13  A    I do.

14  Q    Do you recognize that as the screenshot from the video we

15  just watched?

16  A    Correct.

17  Q    And would you give us the date and time -- the date and

18  timestamp?

19  A    April 15, 2018, at 2205.

20  Q    And looking at Government's Exhibit No. 28, I'll ask if

21  you recognize what that is?

22  A    It's the parking lot camera, same angle, facing towards

23  the China Wok.

24  Q    And what is the time and date?

25  A    4/15/2018 at 2205.

US v. Wiley  -- Trial/Vol II of VII -- 4/20/21

1          **MR. GREEN:**  Your Honor, I'll move introduction of

2     Government's Exhibit Nos. 27 and 28, and ask they be published?

3          **THE COURT:**  They are admitted.  You may.

4          **MR. GREEN:**  Now, if we could return to the clip,

5     fast-forward to where we were approximately.

6     **BY MR. GREEN**

7     Q    In Government's Exhibit 26, were you also asked to provide

8     footage going back to two days prior, April 13 --

9     A    Correct.

10    Q    -- 2013 [sic]?

11    A    Yes, sir.

12    Q    I'm going to show you a portion of a video from

13    Government's Exhibit No. 26 and see if you recognize it.

14         Before I do that, if you'll pause it, looking at

15    Government's Exhibit-- looking at your screen, do you see

16    Government's Exhibit 29 on your screen?

17    A    Yes, I do.

18    Q    And do you recognize that as a screenshot from the video

19    of 4/15?

20    A    Yes, sir.

21    Q    And can you tell us what the date associated with that

22    video was?

23    A    The one on 4/15?

24    Q    Yes.  What was the time?

25    A    2206.

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 166 of 210

1          **MR. GREEN:**  And I'm going to move introduction of

2    Government's Exhibit 29, Your Honor, and ask it published?

3          **THE COURT:**  Admitted.  You may.

4       (Government's Exhibit No. 26 was played.)

5    **BY MR. GREEN**

6    Q    Now, returning to the clip of two days earlier on

7    April 13 -- pause it -- do you recognize that as a clip from

8    the surveillance video of the Kroger?

9    A    Correct.

10   Q    And is that from the same camera angle and camera?

11   A    Same camera.

12   Q    And I'll ask if -- I'll ask on 4 -- the date/time -- I'm

13   sorry -- the timestamp on 4/13/28 --

14   A    Yes, sir.

15   Q    -- what is it?

16   A    2241.

17   Q    Thank you.

18          **MR. GREEN:**  If we can play it some more.

19          **THE COURT:**  You said "28."  Do you mean 2018?

20          **MR. GREEN:**  I did.

21       (Government's Exhibit No. 26 was played.)

22   **BY MR. GREEN**

23   Q    I'll show you Government's Exhibit No. 30 on your screen.

24       Do you recognize that as a still shot from the

25   surveillance video --

1    A    Correct.

2    Q    -- of the vehicle backing into the spot?

3    A    Yes, sir.

4    Q    And Government's Exhibit No. 30, can you tell us what the

5    timestamp on that is?

6    A    2241.

7              MR. GREEN:  If we'll return to the clip, please.

8         (Government's Exhibit No. 26 was played.)

9    BY MR. GREEN

10   Q    Can you tell us, now that that vehicle is pulled away,

11   what is the time?

12   A    The time is 2251.

13   Q    There appear to be individuals walking towards the

14   vehicle.

15        Are those individuals walking from the general direction

16   of the China Wok?

17   A    Yes, sir.

18        (Government's Exhibit No. 26 was played.)

19   Q    I'm going to show you Government's Exhibit No. 31.

20        Do you recognize that as a still photograph from -- a

21   still image from the video that we just watched?

22   A    Correct.

23   Q    Could you tell me the time group?

24   A    The time is 2241.

25             MR. GREEN:  Your Honor, I'll move introduction of

Case 1:19-cr-00529-TDS  Document 360  Filed 02/04/22  Page 168 of 210

1  Government's Exhibit No. 31.

2          **THE COURT:**  Admitted.

3          **MR. GREEN:**  If I haven't previously moved admission

4  of Government 30, Your Honor, I would ask to do so.

5          **THE COURT:**  Admitted.

6  **BY MR. GREEN**

7  Q    Turning --

8          **MR. GREEN:**  If you could -- if we could publish

9  Government's Exhibit No. 31.

10 **BY MR. GREEN**

11 Q    I would like you to look now -- after looking at

12 Government's Exhibit No. 31, I would like you to look at

13 Government's Exhibit No. 28.

14     Based on your familiarity with that area, do those two

15 vehicles appear to be backing into the same spot?

16 A    Correct.

17         **MR. GREEN:**  That's all the questions I have.

18         **THE COURT:**  Any cross?

19                    CROSS-EXAMINATION

20 **BY MR. FOSTER**

21 Q    So, Mr. Edwards, are you still with Kroger now?

22 A    I'm not, no, sir.

23 Q    So you've testified about being asked to provide -- first

24 review and then provide video surveillance from April 13 and

25 April 15; correct?

```
1   A    Correct.

2   Q    What about April 14?  Were you asked to provide video

3   surveillance from the date?

4   A    I believe so, yes, sir.

5   Q    And was that -- did you provide that to the police?

6   A    I do not recall.  That was -- I haven't been there in

7   three years.  I don't recall.

8           MR. FOSTER:  I have no further questions.

9           THE COURT:  Redirect?

10          MR. GREEN:  No, Your Honor.

11          THE COURT:  You may step down.  You can put your mask

12  back on.

13          MR. GREEN:  May the witness be released?

14          MR. FOSTER:  No objection.

15          THE COURT:  You are free to leave, sir.

16      (At 4:19 p.m., witness excused.)

17          THE COURT:  All right.  Call your next witness.

18          MR. PRINCIPE:  Yes, Your Honor.  The Government calls

19  Jeffrey Cleary.

20  OFFICER JEFFREY T. CLEARY, GOVERNMENT'S WITNESS, being first

21  duly affirmed, at 4:19 p.m. testified as follows:

22          THE COURT:  If you would pull the microphone around

23  so it's directed toward your mouth and then remove your mask so

24  we can see and hear you while you testify.

25          Please proceed.
```

1                    DIRECT EXAMINATION

2  **BY MR. PRINCIPE**

3  Q    Would you state your name.

4  A    Jeffrey Thomas Cleary.

5  Q    Who do you currently work for?

6  A    The Durham County Sheriff's Office.

7  Q    How long have you been in law enforcement?

8  A    Approximately five years.

9  Q    Where were you working in April of 2018?

10  A    The Durham Police Department.

11  Q    And then you went directly from the Durham Police

12  Department to the sheriff's office?

13  A    Yes, sir.

14  Q    Do you remember responding to a call for service on

15  April 16, 2018?

16  A    Yes.

17  Q    Where did you respond to?

18  A    1315 Morreene Road, Apartment 21H.

19  Q    And can you spell that?

20  A    M-O-R-R-E-E-N-E, I believe.

21  Q    And what is at that address?

22  A    It's an apartment complex.

23  Q    Is it Chapel Tower Apartments?

24  A    Yes, sir.

25  Q    And why did you respond to that location?

 1  A    I got a call for damage to property involving a vehicle.

 2  Q    Prior to getting there, did you know what kind of property

 3  had been damaged?

 4  A    I don't remember the call notes, but I would assume it was

 5  a white SUV.

 6  Q    Was there a name or a person you were supposed to meet in

 7  relation to that call?

 8  A    I don't remember looking at the call notes prior.  Only

 9  when I got to the residence is what I remember.

10  Q    And what time did you arrive at that location?

11  A    I don't recall the time.  It was in the morning.  I just

12  remember the morning.

13  Q    And what did you see when you got there?

14  A    When I initially pulled in the parking lot, I noticed a

15  white Lincoln SUV.  The driver -- the passenger door on the

16  driver's side, it had a bullet hole, and the window was busted

17  out on that same driver's door.

18  Q    Okay.  Did you speak to somebody after you noticed the

19  damage to the vehicle?

20  A    Yes.

21  Q    Do you know the name of that person?

22  A    Miss House.

23  Q    Do you know the first name?

24  A    I can't -- Taquila House.

25  Q    Okay.  And did she give you some account of what happened

1  to the vehicle?

2  A    Yes.  She told me she went to a family member's house or

3  apartment complex the night prior, which was on Wiggins Street

4  in Braggtown, and she noticed -- she didn't notice the damage

5  that night because it was raining really hard.  She said she

6  drove back to 1315 Morreene Road and noticed the damage in the

7  morning.

8          MR. PRINCIPE:  May I approach the witness?

9          THE COURT:  Yes.

10 BY MR. PRINCIPE

11 Q    Did you have a body camera on April 16, 2018?

12 A    Yes.

13 Q    Was it activated when you responded to Chapel Tower

14 Apartments?

15 A    Yes.

16 Q    Did you have an opportunity to view that body-worn camera

17 footage before court?

18 A    Yes.

19 Q    Government's Exhibit 32 has the footage from your body

20 camera.  And you said you had a chance to review that?

21 A    Yes, sir.

22 Q    And does it fairly and accurately depict what you saw or

23 what your camera captured when you looked at that damaged

24 vehicle at Chapel Tower Apartments?

25 A    Yes.

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 173 of 210

1          **MR. PRINCIPE:**  Your Honor, Government would move

2    Exhibit 32 into evidence.

3          **THE COURT:**  Admitted.

4          **MR. PRINCIPE:**  And permission to publish that video,

5    Your Honor?

6          **THE COURT:**  You may.

7      (Government's Exhibit No. 32 was played.)

8    **BY MR. PRINCIPE**

9    Q    Do you recognize that to be your body-worn camera footage

10   from April 16, 2018?

11   A    Yes.

12   Q    And what is the date and timestamp on that video?

13   A    4/16/2018 at 7:54 in the morning.

14   Q    So that would be just before 8:00 a.m.?

15   A    Yes, sir.

16         **MR. PRINCIPE:**  Continue playing.

17     (Government's Exhibit No. 32 was played.)

18   **BY MR. PRINCIPE**

19   Q    Now, can you explain -- what are you doing right at that

20   moment?

21   A    I was writing down the vehicle information.

22   Q    And prior to that, you were talking to somebody?

23   A    Yeah, another squad mate of mine.

24   Q    And what were you talking to him about?

25   A    I believe there was a call on Morreene Road, another

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 174 of 210

 1  incident that I believe maybe this car would be involved with.

 2  Q    At the time you believed that this car could have been

 3  involved in that incident?

 4  A    Yes.

 5  Q    Okay.

 6            MR. PRINCIPE:   Can you continue playing?

 7        (Government's Exhibit No. 32 was played.)

 8  BY MR. PRINCIPE

 9  Q    And can you identify who the woman was at the end of that?

10  A    Yes.  That was Miss House.

11  Q    I'm now going to show you Government's Exhibit 33.

12        Do you recognize that as a still image of the screen

13  capture from your body-worn camera?

14  A    Yes, sir.

15  Q    Does it fairly and accurately depict the license plate on

16  that footage?

17  A    Yes, sir.

18  Q    I'm showing you what's marked as Government's Exhibit 34.

19        Do you recognize that also as a screen capture, or still

20  image, from your body camera?

21  A    Yes, sir.

22  Q    Does it fairly and accurately depict the damage to the

23  door and window of that Lincoln?

24  A    Yes, sir.

25  Q    And showing you Government's Exhibit 35, does that image

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 175 of 210

1  fairly and accurately depict the hole that's in the door?

2  A     Yes.

3          **MR. PRINCIPE:**  Your Honor, the Government would move

4  Government's Exhibits 33, 34, and 35 into evidence.

5          **THE COURT:**  Admitted.

6          **MR. PRINCIPE:**  And permission to publish to the jury?

7          **THE COURT:**  You may.

8  **BY MR. PRINCIPE**

9  Q     Does that show the license plate?

10 A     Yes, sir.

11 Q     Next Government's Exhibit 34, does that show the damage to

12 the door and window?

13 A     Yes, sir.

14 Q     And now Government's Exhibit 35, does that show the hole

15 in the door?

16 A     Yes, sir.

17         **MR. PRINCIPE:**  No further questions, Your Honor.

18         **THE COURT:**  All right.  Any cross?

19         **MR. FOSTER:**  No questions, Your Honor.

20         **THE COURT:**  All right.  You may step down, sir.  You

21 can put your mask back on, please.

22         Is this witness to be released?

23         **MR. PRINCIPE:**  Yes.  May the witness be released?

24         **MR. FOSTER:**  No objection.

25         **THE COURT:**  You're free to leave.

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 176 of 210

```
 1        (At 4:30 p.m., witness excused.)
 2             MR. PRINCIPE:  Your Honor, the next witness would be
 3   Investigator Jeffrey Mitchell.
 4   DETECTIVE JEFFREY MITCHELL, GOVERNMENT'S WITNESS, being first
 5   duly affirmed, at 4:30 p.m. testified as follows:
 6             THE COURT:  If you can direct the microphone toward
 7   your mouth and remove your mask so we can see and hear you.
 8             Please proceed.
 9                       DIRECT EXAMINATION
10   BY MR. PRINCIPE
11   Q    Would you state your name.
12   A    Jeffrey Mitchell.
13   Q    Who do you work for?
14   A    Durham Police Department.
15   Q    How long have you worked for the Durham Police Department?
16   A    Fifteen years.
17   Q    And how many total years in law enforcement do you have?
18   A    Fifteen, sir.
19   Q    And what is your current position?
20   A    I'm a homicide detective.
21   Q    And what was your position back in April of 2018?
22   A    Homicide detective.
23   Q    Do you also work with Detective David Cramer?
24   A    I do.
25   Q    And what's his role?
```

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 177 of 210

1  A    He is a homicide detective as well.

2  Q    Did you have some limited involvement in the investigation

3  of the attempted robbery of China Wok on April 15, 2018?

4  A    Yes.

5  Q    And did you go to Northgate Mall on April 19, 2018, as

6  part of that investigation?

7  A    I did.

8  Q    And why did you respond to that location?

9  A    In reference to a Lincoln SUV.

10  Q    Okay.  And what did you go there to do?

11  A    To help take pictures of it and seize it as part of the

12  investigation.

13  Q    Did you go there with a crime scene investigator?

14  A    Yes.

15  Q    And who was that?

16  A    Ms. Lindsey Kincaid.

17  Q    Did she take photographs in your presence of the vehicle?

18  A    She did, yes.

19  Q    And did you have an opportunity to review those

20  photographs?

21  A    Yes.

22  Q    And where is that AVIS located?

23  A    It's right by Northgate Mall on Guess Road.

24  Q    Is the address 1720 Guess Road in Durham, North Carolina,

25  accurate?

1  A    Yes, sir.

2  Q    I would like to show you a series of photographs.

3       First, I'd like to show Government's Exhibit 36.

4       Do you recognize that photograph?

5  A    I do.

6  Q    What is that a photograph of?

7  A    It's a photograph of the AVIS rental company.

8  Q    Okay.  Does it fairly and accurately show the location of

9  the AVIS in Northgate Mall?

10 A    Yes, sir.

11       **MR. PRINCIPE:**  Your Honor, the Government would move

12 to introduce Government's Exhibit 36.

13       **THE COURT:**  Admitted.

14       **MR. PRINCIPE:**  Permission to publish it?

15       **THE COURT:**  Yes.

16 **BY MR. PRINCIPE**

17 Q    So how would you describe the size and location of that

18 store?

19 A    It's in a strip mall.  It would be on the northeastern

20 side of it.

21 Q    And what is Northgate Mall?

22 A    Northgate Mall is a mall.  This is actually off to the

23 west of it.  It's a little strip mall.

24 Q    So is Northgate Mall itself a traditional shopping mall?

25 A    Yes, sir.

1   Q    Okay.  What is the current status of that mall?

2   A    I think it is closed.

3   Q    And can you describe the parking lot area around the AVIS

4   store?

5   A    Yes.  It's a wide open parking spot -- or public vehicle

6   area.

7   Q    Okay.  It is a very large parking area?

8   A    Yes.

9   Q    Now, I would like to show you Government's Exhibit 37.

10       Do you recognize what that's a photograph of?

11  A    I do.

12  Q    And what is it?

13  A    It is the Lincoln SUV in question.  And then the silver

14  car in the background, that was my city-issued vehicle at the

15  time.

16  Q    Does this photograph fairly and accurately depict the

17  condition of that Lincoln MKX on April 18, 2018?

18  A    Yes.

19          **MR. PRINCIPE:**  Your Honor, permission -- Government

20  moves Government's Exhibit 37 into evidence.

21          **THE COURT:**  Admitted.

22          **MR. PRINCIPE:**  Permission to publish?

23          **THE COURT:**  Yes.

24  **BY MR. PRINCIPE**

25  Q    Did you notice anything about the condition of the vehicle

US v. Wiley  -- Trial/Vol II of VII -- 4/20/21

1   while you were there?

2   A    I did.  The rear driver's door is a different color than

3   the rest of the vehicle.

4   Q    And what did you notice about the left passenger window?

5   A    Yes.  And it was halfway down.

6   Q    I'm now showing you Government's Exhibits 38 and 39.

7        Do you recognize both of those photographs?

8   A    I do.

9   Q    And what was photograph 38?

10  A    It was the parking space the Lincoln was parked in.

11  Q    Okay.  And Government's Exhibit 39, what does that show?

12  A    That's the back of the Lincoln.

13  Q    Did the back of the Lincoln show the make, model, and

14  license plate of that vehicle?

15  A    Yes, sir.

16  Q    Did it fairly and accurately do so?

17  A    Yes.

18          **MR. PRINCIPE:**  The Government would move to introduce

19  Government's Exhibits 38 and 39.

20          **THE COURT:**  Admitted.

21          **MR. PRINCIPE:**  And permission to publish those?

22          **THE COURT:**  You may.

23  **BY MR. PRINCIPE**

24  Q    So that's the Budget parking spot sign where the vehicle

25  was parked?

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 181 of 210

1  A     Yes, sir.

2  Q     And now Government's Exhibit 39, that's showing the rear

3  of the Lincoln MKX --

4  A     Yes, sir.

5  Q     -- and the license plate number?

6        Can you read the license plate?

7  A     Z983205, Illinois state plate.

8  Q     Now I'm showing you Government's Exhibits 40, 41.

9        What does Government's Exhibit 40 show?

10 A     It shows the other side of the Lincoln SUV and also my

11 city-issued vehicle.

12 Q     Okay.  Were the windows on this other side of the vehicle

13 both rolled up?

14 A     Yes, they were.

15 Q     Did you notice anything unusual about the color of the

16 doors on that side?

17 A     No, sir.

18 Q     Does it fairly and accurately show that side of the

19 vehicle?

20 A     Yes, sir.

21 Q     I'm now showing you Government's Exhibit 41.

22        What is that a photograph of?

23 A     It's a photograph from the front of the vehicle.  Again,

24 you can see the different color and the rear door and the

25 window down.

1  Q    Okay.  Does it also fairly and accurately show the front

2  of that vehicle and the design of the body of the car?

3  A    Yes, sir.

4        **MR. PRINCIPE:**  The Government would move to introduce

5  Government's Exhibits 40 and 41 into evidence.

6        **THE COURT:**  Admitted.

7        **MR. PRINCIPE:**  And permission to publish those?

8        **THE COURT:**  You may.

9  **BY MR. PRINCIPE**

10 Q    So this is Government's Exhibit 40 on your screen; is that

11 right?

12 A    Yes, sir.

13 Q    And that shows the passenger side of the Lincoln MKX?

14 A    Yes, sir.

15 Q    And now Government's Exhibit 41, that shows the front and

16 also the driver's side with the rear window rolled halfway

17 down?

18 A    Yes, sir.

19 Q    I'm now showing you Government's Exhibits 42 and 43 and

20 44.

21      First, Government's Exhibit 42, what does that show?

22 A    That is the driver's side of the Lincoln SUV.

23 Q    Okay.  Does it fairly and accurately show that side of the

24 vehicle, including the tires?

25 A    Yes, sir.

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 183 of 210

1  Q    Now, Government's Exhibit 43, what does that photograph

2  show.

3  A    That shows the rear driver's door.

4  Q    Okay.  And can you see the window more closely in this

5  photograph?

6  A    Yes, sir.

7  Q    And what do you see there?

8  A    It's rolled down.

9  Q    Does it fairly and accurately show the condition of that

10 door and window at the time?

11 A    Yes.

12 Q    And now Government's Exhibit 44, what is that a photograph

13 of?

14 A    It's the passenger side of the Lincoln.

15 Q    Okay.  Does it fairly and accurately show that side of the

16 vehicle?

17 A    Yes.

18 Q    And does it fairly and accurately show the headlight and

19 the taillight shape of that vehicle?

20 A    Yes, sir.

21 Q    Can you also see -- does that -- do the windows have any

22 tinting to them, if you can tell?

23 A    The front ones do not.  The back ones do.

24 Q    And does that also fairly and accurately show that side of

25 the vehicle?

1   A    Yes, sir.

2           **MR. PRINCIPE:**  The Government would move Government's

3   Exhibits 42, 43, and 44 into evidence.

4           **THE COURT:**  Admitted.

5           **MR. PRINCIPE:**  And permission to publish those?

6           **THE COURT:**  You may.

7   **BY MR. PRINCIPE**

8   Q    That's Government's Exhibit 42; correct?

9   A    Yes, sir.

10  Q    And 43.

11       And then the passenger side, Government's Exhibit 44.

12          **MR. PRINCIPE:**  I have no additional questions, Your

13  Honor.

14          **THE COURT:**  All right.  Any examination?

15          **MR. FOSTER:**  No questions.

16          **THE COURT:**  You may step down, sir.  If you would,

17  put your mask back on.

18          **MR. PRINCIPE:**  May he be released, Your Honor?

19          **MR. FOSTER:**  No objection.

20          **THE COURT:**  You are free to leave, sir.

21       (At 4:40 p.m., witness excused.)

22          **MR. GREEN:**  May we approach, Your Honor?

23          **THE COURT:**  Yes.

24       (The following proceedings were had at the bench by the

25       Court and Counsel out of the hearing of the jury:)

US v. Wiley  -- Trial/Vol II of VII -- 4/20/21

1           THE COURT:  Mr. Green?

2           MR. GREEN:  Our next witness is en route from

3  Florida, will be here -- planned to be here tomorrow morning.

4  We've gotten a little bit short of the 5:00 goal, but we're on

5  schedule -- the proposed schedule.

6           THE COURT:  Do you have any other witnesses you can

7  call?

8           MR. GREEN:  No, Your Honor.

9           THE COURT:  That's the only one you can call at this

10  time?

11           MR. GREEN:  Yes, Your Honor.

12           THE COURT:  Okay.  How are we looking for the rest of

13  the week?

14           MR. GREEN:  We're on track.

15           THE COURT:  Okay.  All right.  We'll -- I guess we'll

16  have to stop short there.  If you can -- I know you have

17  logistic issues, trying to keep witnesses coming, but if there

18  is any way we can have backups, that would be helpful going

19  forward.

20           MR. GREEN:  Understood.

21           THE COURT:  Okay.

22       (End of bench conference.)

23           THE COURT:  All right.  Ladies and gentlemen, we're

24  going to stop here.  You get to leave just a little bit early

25  today.  I'm going to do my best not to keep you late, and on

1    occasion, maybe we can finish up early with the witnesses.  We

2    have another witness who is en route but will not make it in

3    time for us to wait, so we're going to stop right here.

4            If you're taking notes, please put your notes in your

5    envelopes.  Leave your envelopes in your chair.  Please make

6    sure it has your juror number or your name on the outside.

7    That's going to be critically important so that we can

8    determine -- or Ms. Engle can determine whose is which.  She is

9    going to lock them up for the night, and then we'll put them

10   back in your chairs or give them to you in the morning so you

11   have them.

12           Remember all of my admonitions to you.  You've not

13   heard all the evidence.  You're not to discuss the case.  Don't

14   do any research.  Don't try to learn anything about it or

15   determine if there is anything written anywhere about it, or

16   what have you, or on the Internet.  It's critically important

17   that the only evidence that you hear is the evidence that comes

18   here in the courtroom.  That's what you would want if you were

19   involved, and that's what the rules require.  That way I can

20   rule on the evidence and know what's coming in and what's not.

21           So head home safely.  Put the case out of your mind,

22   don't talk to anybody about it, and just come back tomorrow at

23   8:45 ready to resume across the hall in Courtroom No. 3.  And

24   then we'll bring you in just as soon as we can, and if we can

25   start early, we will.

    US v. Wiley  -- Trial/Vol II of VII -- 4/20/21

1          All right.  So leave your notes there.  Remember all

2  my admonitions, and I look forward to seeing you in the

3  morning.

4          If everybody else would remain in the courtroom while

5  the jury leaves.

6      (The jury departed the courtroom at 4:43 p.m.)

7          **THE COURT:**  Please be seated.  Let's wait until those

8  folks are out of the lobby so that I know it's safe for other

9  folks to head out there.

10          So the jury has left the courtroom.

11          Any issues you want to bring to my attention?

12          **MR. GREEN:**  Well, Your Honor, we do have this time.

13  The Court had indicated it had some thoughts both about the

14  text message exchange as well as the evidence of flight.  I

15  didn't know if the Court wanted to use this time for that

16  purpose.

17          **THE COURT:**  Well, I would be glad to hear from the

18  parties as to what they -- what you intend to use.  I guess the

19  question is what does Government intend to offer if any -- of

20  any of that?  Then I can hear the Defendant's response to that.

21          I can say, based on the briefing, that it's not

22  entirely clear to me that Ms. Poole's comments, accusing the

23  Defendant of being involved in the crime, put into context

24  statements that the Defendant made.  So there are statements of

25  the Defendant that would come in under the hearsay rules

     US v. Wiley  -- Trial/Vol II of VII -- 4/20/21

1  because they are statements by the Defendant.  I don't see that
2  they have to be technically inculpatory statements.  As long as
3  they are relevant, they come in; they are statements by the
4  Defendant.

5        But there are a number of statements where Ms. Poole
6  accuses the Defendant of certain things, and he denies it.  And
7  I'm having a hard time understanding how that puts anything
8  into context as to his statements.  If he admitted it, that
9  would be another thing; but from what I saw, there were several
10 where he denied it.  That's the part that they've objected to,
11 and that's the part that I think is -- I'm not clear on as to
12 why that would come in.

13        **MR. GREEN:**  As I understand it, Your Honor, the
14 defense has informed me they object to all statements made by
15 the Defendant, not just --

16        **THE COURT:**  I understand, and I'll hear from them;
17 but my reading of the law is that they don't have to
18 necessarily be inculpatory.  They are statements of the
19 Defendant.  As long as they are relevant, then they come in.
20 They are statements of the Defendant that constitute admissions
21 by him because they are statements by him.

22        **MR. GREEN:**  I think that's right.

23        Your Honor, I would say obviously, you know, whether
24 it's inartfully worded in our response, one, his denial is not
25 controlling.  It's, in and of itself, an admission in the sense

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 189 of 210

1  that it's a statement.

2          Second, if we look at -- the Government's proposition

3  is that between Miss Poole -- shortly after these events,

4  Miss Poole and the Defendant had a conversation in which he

5  made certain admissions, and those admissions are referenced

6  when she says:  You told me this information.

7          And so if we read -- I think the focus, both by the

8  defense and possibly by the Court, is on the 25th -- on the

9  25th, when she says, "You're a murderer," and he says, "I'm

10 not," in actuality it seems that a clear reading of the entire

11 chain, which we tried to put toward in front of the Court,

12 would suggest that there is an earlier conversation that's

13 occurred between them, and there are obvious admissions by him,

14 talking about that earlier conversation.  Separately --

15          **THE COURT:**  The earlier conversation is not part of

16 the texts, though; correct?

17          **MR. GREEN:**  It is not.  I guess the question is is it

18 a fair reading when Miss Poole says, You told me this

19 information, that there had been an earlier conversation, and

20 then his subsequent -- the entire chain makes more sense, and

21 that is the essence of the Government -- separately, contained

22 within the text messages, he makes reference to paying all this

23 money to fix the rental car and other separate admissions that

24 are both admissions and separately inculpatory.

25          And so we did have a conversation with counsel, and

1   their position is none of it comes in.

2            Also, I would say, of course, Miss Poole now has

3   counsel.  I called her counsel.  I don't know what she --

4            **THE COURT:**  Who is her counsel?

5            **MR. GREEN:**  Corey Buggs.

6            **THE COURT:**  Okay.  I saw Mr. Buggs in the

7   courtroom -- I wondered -- earlier.  I wondered if that's who

8   her counsel was.

9            **MR. GREEN:**  Earlier there was -- in the discovery and

10  provided to the defense, there's jail conversations between

11  them where she references, I think a fair reading, the impact

12  of the socials, meaning the text messages, when the police

13  confronted her with those.

14           So I certainly understand where the Court is coming

15  from.  That's not a legal thing, but I'm picking up what you're

16  putting down, Judge.

17           **THE COURT:**  It's not a legal thing, but it's a thing.

18           **MR. GREEN:**  But the point being, the Government's

19  argument is that, in the larger context, if you read the entire

20  chain starting from the top -- if you assume that there has

21  been an earlier conversation between them -- and I think that's

22  referenced in the text messages as well -- that you then

23  understand in the larger context his admissions.  Why is he

24  talking about "I'm going to go jail for the rest of my life"

25  and other references?

        US v. Wiley  -- Trial/Vol II of VII -- 4/20/21

1    I think there's clear references that he has stored
2  something in her house --"Get it out.  It's my life" -- and
3  those types of admissions, which I think are relevant, and I
4  would just simply say that his denial does not control the
5  inquiry.
6    Thank you.
7    **THE COURT:**  All right.
8    Do you not agree that under the case law any
9  statement the Defendant makes, so long as it's relevant and
10 it's not prejudicial under 403, would be admissible in the
11 case?
12   **MR. BRYSON:**  I don't disagree with that, but the
13 point would be this:  You know, if we're talking about text
14 messages were exchanged where she says, "You're a murderer,"
15 and he says, "No, I'm not," and if I understand the Court
16 saying, well, hers doesn't come in because it's a denial and it
17 doesn't explain any context, well, if we're just going to
18 introduce a text message where he says, "I didn't do it," how
19 is that relevant?
20   I don't think -- I think it loses its relevancy
21 outside of any context, and the context is just that he's
22 denying what he's being accused of.  So I don't disagree with
23 the general principle that any statement that he makes, you
24 know, can be admitted.  But I think, given this circumstance,
25 her accusations are not admissible because they don't provide a

1  context; and once you eliminate her accusations, then you just

2  simply have his denials, and I think they just don't become

3  relevant.

4        And if I can just address two parts of what the

5  Government was arguing and put in their pleading about the

6  prior conversation, and one is, in terms of -- there's

7  reference to "You turning me in" and what's the conflict

8  between the two and "This is my life you're talking about," one

9  of the things that needs to be put in context is this.  When --

10 and we haven't talked about the chase yet, but one of the

11 things that the Government acknowledges is that during the

12 chase situation he was wanted on warrants, and one of the

13 warrants was felony assault by strangulation in which the

14 victim is Demetrice Poole.

15       And so there's a whole other context between the

16 relationship between these two people where she, in fact, was a

17 witness against him for an alleged assault that occurred on

18 March 28, 2018.  This is an outstanding warrant for him at the

19 time.

20       The other thing is --

21       **THE COURT:**  When was the warrant issued?

22       **MR. BRYSON:**  March 28, 2018.

23       **THE COURT:**  All right.

24       **MR. BRYSON:**  The other thing is, in terms of the

25 reference to "Get the stuff out of the house," the Government's

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 193 of 210

1  also aware that one of the cooperating witnesses alleges and

2  says that Mr. Wiley was, in fact, a drug dealer.

3          So I think there's a lot of ways that you can read

4  these things, and I just think it just becomes really

5  speculative.  And, you know, it -- really to introduce this

6  evidence is extraordinarily prejudicial to us because it almost

7  puts us in a position where we have to say, ladies and

8  gentlemen of the jury -- I mean, we almost have to reveal this

9  felony assault warrant in order to explain our situation.  And

10 so it puts us in this situation where we say, ladies and

11 gentlemen of the jury, our client is not guilty of this murder

12 because he was really worried about this felony assault charge

13 against him.  And so we find it extraordinarily prejudicial to

14 us to go into this matter.

15          **THE COURT:**  Is there any chance this would be offered

16 tomorrow?

17          **MR. GREEN:**  No.

18          **THE COURT:**  Okay.  All right.  Well, I can give you

19 some reactions without a ruling, because we'd have to go

20 through this line by line --

21          **MR. GREEN:**  Yes, Your Honor.

22          **THE COURT:**  -- I think.  So I can give you my

23 reactions, and then maybe you can consider what you might be

24 interested in doing, and you can make whatever argument you

25 want to make.  I will just give you my reaction without it

Case 1:19-cr-00529-TDS  Document 360  Filed 02/04/22  Page 194 of 210

1  being a formal ruling because I don't fully follow the context

2  of all this.

3          I understand the Government's argument.  It does seem

4  to presuppose some kind of prior conversation.  It would not be

5  unreasonable to assume that because they are in a relationship

6  of some kind, whatever it is.

7          But there are portions of it that are not entirely

8  clear to me what they would relate to; and when you get to the

9  flight issue, you've got the other question because this

10 warrant then kind of takes front and center of that as well as

11 the potential reason for the flight.  He was fleeing with their

12 child, I think, if I remember the evidence right.

13         **MR. GREEN:**  He was.

14         **THE COURT:**  Yeah.  So -- and I do think -- on the

15 flight issue, I think the case law requires that there be

16 sufficient indication that it was flight from the offense of

17 conviction or sought -- the conviction and not some other

18 offense.

19         **MR. GREEN:**  That would be for a jury instruction on

20 flight.  I think evidence of flight can come in to show

21 consciousness of guilt whether or not there is a jury

22 instruction.

23         **THE COURT:**  Okay.  But I think to be -- my question

24 is, to be admissible, does it have to -- does there have to be

25 sufficient foundation to show it would be related consciousness

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 195 of 210

1  of guilt for this offense and not transferred guilt from some

2  other offense?  That would be my question.  You need to take a

3  look at that.

4         I have some concern about that because there seemed

5  to be maybe dual motives, according to the Defendant.  And your

6  brief originally, when you referenced -- in one of your briefs,

7  where you referenced the flight, you referenced the federal

8  agents were seeking to arrest him for the felony assault

9  warrant.

10         **MR. GREEN:**  They were.

11         **THE COURT:**  So that would suggest to me that, well,

12  maybe there is evidence of guilt, but not for this crime, and

13  it would be prejudicial for the jury to infer that it was for

14  this crime and not that.  That's my concern.

15         **MR. GREEN:**  I understand.

16         **THE COURT:**  So address that.

17         When I go through these -- and they do have to kind

18  of go through each one -- one of the difficulties is there are

19  a lot of generalized references here.  It's hard to know

20  exactly what they are talking about.  But page 7, No. 5,

21  Mr. Wiley makes an admission.  That might be admissible because

22  it's his admission.  I don't know that her comments after that

23  are necessarily necessary for putting that into context, but

24  there is an admission there on No. 5.

25         And the objection, I think, is largely, if I

1  understand it, to her comments which are alleged to

2  contextualize his statements, and it's not entirely clear that

3  it contextualizes it sufficiently.  I'm also concerned that

4  from the 401/403 balance it may not survive that, given the

5  facts.

6          No. 7, page 9, his first comments there, her

7  response, his then response, "I don't want these," and he uses

8  the N word, "in my mouth."  And then she says, "I'ma let it go

9  then.  Get this," uses the S word, "together fast."  Beyond

10 that, I don't understand how the rest of her comments puts

11 anything else into context, and I think that may be gratuitous.

12         No. 8 appears to be an admission, if I understand it.

13         **MR. GREEN:**  That's page 7, Your Honor?

14         **THE COURT:**  Page 10.  You have them numbered.  This

15 is Item 8.

16         **MR. GREEN:**  Yes, Your Honor.

17         **THE COURT:**  Who is Raheem?

18         **MR. GREEN:**  Raheem is someone on the peripheral of

19 this case known by Mr. Wiley and Miss House.

20         **THE COURT:**  Is he -- Mr. Wiley says he's in jail.  Is

21 he in jail related to this?

22         **MR. GREEN:**  No.  He would ultimately be arrested

23 around the time --

24         **THE COURT:**  And who is Shea?

25         **MR. GREEN:**  That's Miss Stackhouse, who is also

US v. Wiley  -- Trial/Vol II of VII -- 4/20/21

referenced in this case in terms of someone who was involved in

Miss House getting rental cars for Shea and Mr. Wiley.

        **THE COURT:**  There is a reference then where he says,

"Shea at headquarters."  What do you contend that means?

        **MR. GREEN:**  Arrested.  "Headquarters" meaning police.

        **THE COURT:**  Related to this?

        **MR. GREEN:**  Not to this case specifically, not to the

homicide, but Shea was at headquarters, had been arrested with

Raheem.

        **THE COURT:**  But arrested in relationship to any

matter related to the case?

        **MR. GREEN:**  No.

        **THE COURT:**  All right.  Well, the difficulty I have

with 8 is I don't know exactly what he's confessing to, so to

speak.  So I don't see any context for that.  I assumed that

Shea and Raheem might have something to do with this case; and

if they don't, then that makes that more problematic.

        No. 9 on page 11, he says, "You did hide it tho..."

What's that a reference to, in your view?

        **MR. GREEN:**  A firearm.

        **THE COURT:**  Okay.  Are you going to have separate

evidence to support that inference?

        **MR. GREEN:**  Within the text messages, she says she is

going to get bullets for it.

        **THE COURT:**  Okay.  I take it -- it doesn't appear

1  she's going to be testifying.

2          **MR. GREEN:**  I don't know the answer, but I doubt it.

3          **THE COURT:**  All right.  If there is evidence that you

4  can tie up that she was hiding a firearm for him that related

5  to this event, then those text messages would be admissible, I

6  would think.  In this instance, not all of those on that page,

7  though, seems to me, would fit that, and the last two lines,

8  one by Mr. Wiley and one by Miss Poole, I would have some

9  concern about those.

10          He makes -- on No. 10, page 13, he makes an

11  admission.  He also seems to be, in a way, threatening

12  Miss Poole about be-careful-what-you-say kind of thing because

13  you're going to say something that might get us in trouble.

14  That's the essence of that.  I don't think her response is

15  necessary for that admission.  It doesn't contextualize it, in

16  my view.  So No. 10 possibly is admissible.

17          I'm not sure why No. 11 -- why the Government desires

18  that.

19          No. 12 is an admission by him in the first statement.

20  He basically admits to having to spend all his savings to get

21  the rental car fixed, as I understand it.

22          **MR. GREEN:**  Yes, Your Honor.

23          **THE COURT:**  I don't know whether all the statements

24  are necessary to contextualize any of that.  On the other hand,

25  I don't know that they are inadmissible.  I mean, perhaps they

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 199 of 210

1   contextualize it because they at least provide some context.

2          No. 13, his first statement appears to be an

3   admission and a threat to Miss Poole, but then he goes on, and

4   she makes accusations against him.  He denies it.  I think

5   that's problematic to be admitted.  However, in her last few

6   statements, she talks about the oil change after the car was

7   fixed within two days after it got shot up.

8          Is that the Lincoln?

9          **MR. GREEN:**  Hurt in the chase -- I believe her car

10  was damaged, and that may be a reference to her car.

11         **THE COURT:**  Okay.  So how would that be relevant to

12  any of this?

13         **MR. GREEN:**  The oil change?

14         **THE COURT:**  Yes.

15         **MR. GREEN:**  I believe she makes a reference -- there

16  appears to be a running argument between you can't fix my car,

17  which you got damaged during the chase, and yet you can ride

18  around in these rentals.

19         **THE COURT:**  Okay.  All right.  Well, she does say

20  that, and he says, in response, "You really...get me jammed up

21  about a...oil change."

22         **MR. GREEN:**  Correct.

23         **THE COURT:**  So he doesn't deny it when he's actually

24  been -- when the statement has been made, which could be

25  potentially deemed by a jury to be accepting the statements.

     US v. Wiley  -- Trial/Vol II of VII -- 4/20/21

1        So the last few comments, starting with "You supposed

2  to got my oil changed" all the way down to the rest of No. 13

3  there on page 16 might be admissible.

4        I have trouble with No. 14 because he basically

5  denies everything throughout.

6        No. 15 is an admission by him and a threat, as I read

7  it, which might be potentially admissible.  However, I don't

8  understand how Poole's four statements on top of page 19 are

9  necessary for any context.

10        No. 16, he makes an admission.  I don't understand

11  how her comments are necessary for context because he basically

12  denies it.  He says, you're believing too much on what you see

13  on TV and "cut it out."  The Defendant raises a 403 challenge

14  to that, and I think that's a legitimate concern.

15        Same -- similar problems with No. 17 starting on page

16  19.

17        When I get to page 21, that one is a little closer

18  because buried in the middle is her statement, "And you right I

19  did you murdered that man and you going to jail periodtttt."

20  And his response is "Whatever."  But then he goes on and says,

21  but "I haven't done anything," which is a denial.  So I don't

22  know about what's on that page.  I will think about that, but I

23  would need some more context for that.

24        No. 18 is your final group.  That's a threat to

25  Miss Poole that if you're going to go down to talk to them,

1  make sure you tell them what you know.  And "if you know

2  details," he says, they are going to want to know how you know

3  it, and that means you must have been involved, a little bit of

4  threat.  So 18 might be admitted, that group.

5          So that's my general reaction to that.  You can

6  consider that.  You can talk with the Defendant.  I don't

7  know -- the Defendant doesn't seem to object to the notion that

8  Mr. Wiley's statements can come in as long as they are not

9  misleading, I suppose, and so any statement he makes might come

10  in.  It's more so Miss Poole's statements and how -- if that's

11  necessary for context, and if it's not necessary for context,

12  then it shouldn't come in.

13          The other question I would suggest is I can't tell

14  you how to try your case.  I won't, but you have to decide what

15  kind of evidence you need to put in.  And if something is a

16  closer argument, you got to decide whether you want to make the

17  argument or not.  That's up to the Government.  I'm not

18  suggesting one way or the other.  I'm just saying, as you look

19  through these, you make that decision, however you want to

20  proceed.  I'll make the legal ruling.

21          **MR. GREEN:**  Understood.

22          **THE COURT:**  All right.  So does anybody want to react

23  further, or do you want to digest that, and we'll talk some

24  more tomorrow?

25          **MR. GREEN:**  I am prepared just to digest it.  Thank

Case 1:19-cr-00529-TDS   Document 360   Filed 02/04/22   Page 202 of 210

1  you, Your Honor.

2          **THE COURT:**  If you would do that.

3          That's my general reaction.  I don't know what you

4  all know in terms of the evidence.  Based on what little I

5  know, that would be my initial reaction.  I would need to hear

6  more on why it should be admitted for some of those, and you

7  can decide how you want to proceed.  And I'm happy to hear the

8  argument, and I will make a ruling, however you want to

9  proceed.

10         **MR. GREEN:**  Yes, Your Honor.

11         **THE COURT:**  Now, on the car chase issue, I do think

12  you need to check the law and see if you're going to -- how

13  you're going to be able to tie that up to this offense,

14  consciousness of guilt for this offense, in light of whatever

15  the facts are that you know them to be.

16         **MR. GREEN:**  I will.

17         **THE COURT:**  And then I would be glad to hear that.

18  We've done some initial looking, and that's my concern.

19         **MR. GREEN:**  Yes, Your Honor.  I will say on that

20  issue -- and I am aware of the case law on that question.  I do

21  believe in some of the case law I found and we can -- I won't

22  argue it now.  I will just forecast it so both the attorneys

23  can be thinking about it as well.  I believe there is a

24  difference between evidence that's consciousness of guilt and

25  an instruction on flight.

        US v. Wiley  -- Trial/Vol II of VII -- 4/20/21

1          Further, I believe that, in the context of this

2     story, it's -- I believe the objection was 404(b) evidence.  We

3     don't believe it's 404(b).  It's inextricably intertwined with

4     the events of the entire --

5          **THE COURT:**  Well, it might be if it's related to this

6     offense, but if it turns out that he had just -- well, if it

7     turns out that the only reason they were chasing him was

8     because of some outstanding warrant on a felony assault and he

9     knew that, then it would be another -- I think another wrong

10    under 404(b), would it not?

11         **MR. GREEN:**  No.  And he did know.  And it,

12    subjectively for them, the police -- I will say they wanted to

13    serve the warrant because they wanted to catch him with his

14    cell phone.  So when the blue lights are flashing, you know,

15    the subjective mind of the pursuing police officer really isn't

16    significant.

17         I will say the evidence will be, and I think it was

18    forecast in Mr. Principe's argument, that before this chase,

19    there was a call recorded where the Durham Police Department

20    had a conversation with Mr. Wiley and said, You need to come on

21    down and talk to us and get this rental vehicle back down to

22    us.  And there is also a text message in the extraction, I

23    believe from Miss House to Mr. Wiley or vice versa, that says

24    "They know."

25         So I guess -- I certainly understand the Court's

consideration and whether it would be 403 a concern, but I'm also trying to be conscious of -- I will put this -- I hope I'm not overstepping, but kind of who gets to make that call. I certainly understand if the judge -- if you say not intrinsically intertwined, it's 403(b), that puts us in a different place.

    **THE COURT:** What is the date of the chase?

    **MR. GREEN:** April 19.

    **THE COURT:** So that's four days afterwards?

    **MR. GREEN:** Yes, Your Honor. And that would be the day after Detective Cramer spoke to him and Mr. Wiley admitted he had the rental car.

    **THE COURT:** I'm not saying that there cannot be more than one reason why somebody is being chased; and if there is more than one reason, then it doesn't come in. I'm not saying that. What I'm saying is I think there has been to be something to connect it up, because to be intrinsic to this, it would have to be part of the same series of events. And as you get past a little period of time, it may be -- there needs to be some evidence to tie it together is all I'm saying.

    **MR. GREEN:** I understand.

    **THE COURT:** So if you have that, I'm glad to consider it, and then it might be enough. I don't know.

    **MR. GREEN:** Understand. Thank you, Your Honor.

    **THE COURT:** That's my concern.

1          Do you want to be heard, Mr. Foster?

2          **MR. FOSTER:**  Yes, Your Honor.  I mean, on this idea

3 that this evidence is intrinsic to the offense --

4          **THE COURT:**  Which evidence?

5          **MR. FOSTER:**  The car chase evidence.

6          **THE COURT:**  Okay.

7          **MR. FOSTER:**  As you just pointed out, this happened

8 four days later.  It's at a different place, removed from the

9 crime scene.  Our client was alone; he was not with any of the

10 co-defendants.  He was in a different vehicle.  There were

11 active domestic violence warrants for him, and I think there's

12 indications in the texts and everything else that they were

13 having problems, and that could easily be the reason why he was

14 fleeing.

15          **THE COURT:**  "That they," he and his girlfriend?

16          **MR. FOSTER:**  Yeah.  I mean, they were constantly

17 arguing about everything.  You know, she's mad at him.  If

18 that's the reason he's fleeing, then it's completely

19 irrelevant.  I mean, consciousness of guilt is only relevant if

20 it's consciousness of guilt for the offense on trial.

21          **THE COURT:**  Well, I understand.  And, like I said, I

22 think it's possible that maybe he was thinking of both; in

23 which case, maybe he would not have a high-speed chase for a

24 felony assault; he would just turn himself in.  But this is a

25 little more serious.

US v. Wiley  -- Trial/Vol II of VII -- 4/20/21

1          And so I think it is going to depend on the facts.

2  It will depend on what foundation is laid.

3          I'm just suggesting you take a look at the case law

4  on what the threshold is for admissibility on that, and then if

5  you make a 403 argument -- if it were to pass the threshold, I

6  will hear your argument on 403 as well, and then we'll make a

7  decision.

8          I take it that's not coming up tomorrow either?

9          **MR. GREEN:**  It is not.

10          **THE COURT:**  Okay.  All right.  So take a look at

11  those.  Those are my initial reactions to both of them.  I will

12  be glad to make a final, formal ruling at some point.  My

13  experience is sometimes if I give you some sense of kind where

14  I'm leaning, that might help parties decide what they want to

15  actually seek to put in and then what the response is.

16          Anything further?

17          **MR. GREEN:**  No, thank you, Your Honor.

18          **MR. FOSTER:**  No, Your Honor.

19          **THE COURT:**  So 8:45 in the morning.  We'll keep

20  moving along with the witnesses.  And if we get done early, if

21  you could have more lined up that would be great.  I understand

22  you have quite a few.

23          **MR. GREEN:**  Your Honor, just for planning and kind of

24  where our heads are at in this case, if you look at the

25  proposed witness list, which the defense has, we continue to

US v. Wiley  -- Trial/Vol II of VII -- 4/20/21

1  call them in order.  Some of those witnesses will be shortish,

2  14 through 17 and 20.  Mr. Benjamin Shields, who you see there

3  at 23, is going to be extensive, collection of forensic

4  evidence.  I just -- I don't know how to make that go fast or

5  slow.  We're talking about 100 pictures.  If you look under our

6  physical evidence over there, probably numbers in the 100.  So

7  that's -- we're just trying to guess.

8       If you look again -- and we ask the Court's

9  indulgence.  We do give some thought about the order and

10 presentation of witnesses.  Thursday we have a series of expert

11 witnesses, some coming from Raleigh.  We try and do a little

12 bit better with them in terms of a date certain.  I will be

13 prepared to call a witness out of order, Mr. Cramer; but,

14 again, if we close in on that 4:30 to 5:00 window, if we can

15 avoid calling a witness outside of order, we're going to seek

16 the Court's indulgence only because it kind of plays havoc with

17 stuff that's already in evidence or not in evidence that we

18 would anticipate a witness relying on.

19       **THE COURT:**  To the extent you have a number of photos

20 and you have a witness who's going to introduce them, you can

21 talk with your opposing counsel and decide whether since -- if

22 they are not objected to, whether there can be an

23 identification as to the group, identify the group.  And then

24 when you publish them all, they can explain what they all are.

25 So you only have to have a witness once say what otherwise

Case 1:19-cr-00529-TDS  Document 360  Filed 02/04/22  Page 208 of 210

1    would be the same thing, because they are explaining what they

2    are when they are identifying them and then they are repeating

3    it when they are published to the jury.

4           That's up to -- if the Defendant wants to agree to

5    that, that's fine.  If they don't want to agree to that, then

6    we'll just go with the procedure that we have.  That would be

7    one way perhaps you could, at least as to photos, move some

8    things along, if you have large collections of them.  I leave

9    that to you all how you want to proceed.

10           **MR. GREEN:**  Thank you.

11           **THE COURT:**  We'll see you tomorrow at 8:45 then.

12           I think that's all I have, so you all have a good

13   night.

14        (Proceedings recessed overnight at 5:19 p.m.)

15

16                    END OF VOLUME II OF VII

17

18

19

20

21

22

23

24

25

US v. Wiley  -- Trial/Vol II of VII -- 4/20/21

1  UNITED STATES DISTRICT COURT

2  MIDDLE DISTRICT OF NORTH CAROLINA

3  CERTIFICATE OF REPORTER

4

5

6          I,  Briana L. Bell, Official United States Court

7  Reporter, certify that the foregoing transcript is a true and

8  correct transcript of the proceedings in the above-entitled

9  matter prepared to the best of my ability.

10

11         Dated this 4th day of February 2022.

12

13

14                    _____
                      Briana L. Bell, RPR
15                    Official Court Reporter

16

17

18

19

20

21

22

23

24

25

US v. Wiley  -- Trial/Vol II of VII -- 4/20/21