```
 1                   IN THE UNITED STATES DISTRICT COURT
                   FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
 2

 3  UNITED STATES OF AMERICA    )   CASE NO. 1:19CR529-1
                                )
 4          vs.                 )
                                )   Winston-Salem, North Carolina
 5  MAURICE OWEN WILEY, JR.     )   April 21, 2021
    _____    9:00 a.m.
 6

 7                   TRANSCRIPT OF THE **TRIAL**
                     **VOLUME III OF VII (Pgs. 458-703)**
 8          BEFORE THE HONORABLE THOMAS D. SCHROEDER
                   UNITED STATES DISTRICT JUDGE
 9

10  APPEARANCES:

11  For the Government:      GRAHAM GREEN, AUSA
                            CRAIG M. PRINCIPE, AUSA
12                          Office of the U.S. Attorney
                            251 N. Main Street, Suite 726
13                          Winston-Salem, North Carolina 27101

14
    For the Defendant:       JOHN D. BRYSON, ESQ.
15                          Wyatt Early Harris & Wheeler, LLP
                            P.O. Drawer 2086
16                          High Point, North Carolina 27261-2086

17                          MARK P. FOSTER , JR., ESQ.
                            Foster Law Offices, PLLC
18                          409 East Boulevard
                            Charlotte, North Carolina 28203
19

20  Court Reporter:          BRIANA L. BELL, RPR
                            Official Court Reporter
21                          P.O. Box 20991
                            Winston-Salem, North Carolina 27120
22

23

24
        Proceedings recorded by mechanical stenotype reporter.
25       Transcript produced by computer-aided transcription.
```

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 1 of 246

1                           INDEX

2    **GOVERNMENT'S WITNESSES:**                          **PAGE:**

3    JOHN WOTTON

4         Direct Examination by Mr. Principe            471

5    JAMES E. BARNETT, JR.

6         Direct Examination by Mr. Principe            488

7    SHAHAB HASSAN

8         Direct Examination by Mr. Green               493
          Cross-Examination by Mr. Foster               502
9

10   TAQUILA M. HOUSE

11        Direct Examination by Mr. Green               504
          Cross-Examination by Mr. Foster               519
12

13   DALE RIO

14        Direct Examination by Mr. Principe            522
          Cross-Examination by Mr. Bryson               544
15

16   COREY BENJAMIN

17        Direct Examination by Mr. Principe            546

18   DAVID JOHNSON

19        Direct Examination by Mr. Principe            555
          Cross-Examination by Mr. Bryson               560
20

21   FORENSICS SPECIALIST WILLIAM MCFAYDEN

22        Direct Examination by Mr. Principe            561

23   CHRIS FILES

24        Direct Examination by Mr. Principe            567

25

        US v. Wiley  -- Trial/Vol III of VII -- 4/21/21

1                          INDEX

2   **GOVERNMENT'S WITNESSES:**                          **PAGE:**

3   INVESTIGATOR BENJAMIN SHIELDS

4       Direct Examination by Mr. Green              576
        Cross-Examination by Mr. Foster             695
5

6                        EXHIBITS

| Exhibits: | | Identified | Received |
|---|---|---|---|
| G-45 | Avis rental contract with Taquila House | 473 | 474 |
| G-46 | Signed Avis Rental Contract | 485 | 485 |
| G-47 | Taquila House Bank Records | 511 | 511 |
| G-48 | CD of Northgate Mall Surveillance Footage | 489 | 490 |
| G-48A | Still image from surveillance footage/Northgate Mall | 490 | 491 |
| G-48B | Still image from surveillance footage/outside of Avis Rental Car | 491 | 492 |
| G-49 | Photograph of white Lincoln MKX | 526 | 527 |
| G-50 | Photograph of rear of white Lincoln MKX | 526 | 527 |
| G-51 | Photograph of back seat of white Lincoln MKX | 526 | 527 |
| G-52 | Photograph of front seat of white Lincoln MKX | 526 | 527 |
| G-53 | Photograph of left rear door of white Lincoln MKX | 529 | 529 |
| G-54 | Photograph of door pocket of white Lincoln MKX | 530 | 531 |
| G-55 | Photograph of glass fragments | 530 | 531 |
| G-56 | Photograph of left rear floor of white Lincoln MKX | 531 | 532 |
| G-57 | Photograph of left rear floor of white Lincoln MKX | 531 | 532 |
| G-58 | Photograph of left front of white Lincoln MKX | 533 | 533 |
| G-59 | Photograph of glass fragments | 533 | 533 |
| G-60 | Photograph of items under driver's seat of white Lincoln MKX | 535 | 535 |
| G-61 | Photograph of glass fragments and lighter | 535 | |

             US v. Wiley  -- Trial/Vol III of VII -- 4/21/21

```
                          EXHIBITS
```

| Exhibits: | | Identified | Received |
|---|---|---|---|
| G-62 | Photograph of white Lincoln MKX after having been processed | 536 | 537 |
| G-63 | Photograph of interior left door of white Lincoln MKX | 537 | 538 |
| G-64 | Photograph of interior panel of left rear door of white Lincoln MKX | 537 | 538 |
| G-65 | Photograph of defect on interior door of white Lincoln MKX | 537 | 538 |
| G-66 | Photograph of metal structure of left rear door of white Lincoln MKX | 539 | 540 |
| G-67 | Photograph of window mechanism in door of white Lincoln MKX | 539 | 540 |
| G-68 | Photograph of window mechanism in door of white Lincoln MKX | 539 | 540 |
| G-69 | Photograph of defect on interior door of white Lincoln MKX | 539 | 540 |
| G-70 | Photograph of reverse side of door panel of white Lincoln MKX | 542 | 543 |
| G-71 | Photograph of defect of door panel of white Lincoln MKX | 542 | 543 |
| G-72 | Screenshot of Auto Glass Now work order | 549 | 551 |
| G-73 | Auto Glass Now work order | 552 | 553 |
| G-74 | CD of Chapel Tower Apartments surveillance footage | 565 | 566 |
| G-75 | Diagram of Chapel Tower Apartments | 569 | 570 |
| G-76A | Aerial map of Chapel Tower Apartments | 572 | 573 |
| G-76B | Photograph of entrance to Chapel Tower Apartments | 573 | 573 |
| G-77 | Aerial map of Chapel Tower Apartments | 574 | 574 |
| G-78 | Property and Evidence Voucher | 580 | |
| G-79 | Property and Evidence Voucher | 583 | 583 |
| G-80 | Sketch of Crime Scene | 585 | 586 |
| G-81 | Crime Scene notes | 587 | 587 |
| G-82 | Photograph of overall crime scene | 594 | 594 |
| G-83 | Photograph of orange cones in driveway | 594 | 594 |

```
                        EXHIBITS

Exhibits:                               Identified    Received
G-84      Photograph of the Toyota Sienna    594          594
          minivan
G-85      Photograph of the Toyota Sienna    594          594
          minivan
G-86      Photograph of 4617 Carlton         596          596
          Crossing driveway and roadway
G-87      Long-exposure photograph of        596          596
          crime scene
G-88      Photograph of residence walkway    596          596
G-89      Photograph of crime scene from     596          596
          front porch
G-90      Photograph of roadway from         598          598
          front porch
G-91      Three 9mm cartridge cases          599          600
G-92      Three 9mm cartridge cases          604          604
G-93      Three 9mm cartridge cases          604          605
G-94      Three 9mm cartridge cases          605          605
G-95      Three 9mm cartridge cases          605          606
G-96      Two 9mm cartridge cases            606          606
G-97      Three .40 caliber cartridge        607          607
          cases
G-98      Two .40 caliber cartridge cases    607          607
G-99      Two .45 caliber cartridge cases    607          608
G-100     Three 9mm cartridge cases          608          608
G-101     Three 9mm cartridge cases          609          609
G-102     Glass fragments                    609          610
G-103     Unfired 9mm cartridges             610          611
G-104     Swab of touch DNA                  611          622
G-105     9mm Handgun                        611          612
G-106     Blue plastic glove                 612          612
G-107     Two projectiles                    613          613
G-108     Projectile fragment                613          613
G-109     Photograph of Hong Zheng in        614          614
          Toyota Sienna minivan
G-110     Photograph of front of Toyota      614          614
          Sienna minivan
G-111     Photograph of front of Toyota      614          614
          Sienna minivan
G-112     Photograph of bullet hole in       614          614
          Toyota Sienna minivan
G-113     Photograph of bullet hole in       616          616
          Toyota Sienna minivan
```

US v. Wiley  -- Trial/Vol III of VII -- 4/21/21

EXHIBITS

| Exhibits: | | Identified | Received |
|---|---|---|---|
| G-114 | Photograph of bullet hole in Toyota Sienna minivan | 616 | 616 |
| G-115 | Photograph of Hong Zheng in Toyota Sienna minivan | 616 | 616 |
| G-116 | Photograph of side of Toyota Sienna minivan with trajectory rods | 616 | 616 |
| G-117 | Photograph of bullet hole in right front door of Toyota Sienna minivan with trajectory rod | 618 | 618 |
| G-118 | Photograph of bullet hole in right rear quarter panel of Toyota Sienna minivan with trajectory rod | 618 | 618 |
| G-119 | Photograph of bullet hole left front exterior door of Toyota Sienna minivan with trajectory rod | 618 | 618 |
| G-120 | Photograph of glass fragments on pavement | 618 | 618 |
| G-121 | Swabs of suspected touch DNA | 619 | 620 |
| G-122 | Swabs of suspected touch DNA | 619 | 620 |
| G-123 | Three projectiles | 622 | 623 |
| G-124 | Projectile from left front interior door panel | 623 | 623 |
| G-125 | Glass fragments from under left front seat of white Lincoln MKX | 623 | 624 |
| G-126 | Glass fragments from left rear compartment of white Lincoln MKX | 624 | 624 |
| G-127 | Glass fragments from left rear door of interior of white Lincoln MKX | 624 | 624 |
| G-128 | Photograph of cartridge cases in roadway | 624 | 625 |
| G-129 | Photograph of cartridge case in roadway | 624 | 625 |
| G-130 | Photograph of evidence placards in roadway | 624 | 625 |
| G-131 | Photograph of cartridge case in roadway | 624 | 625 |
| G-132 | Photograph of evidence placards in roadway | 626 | 627 |

US v. Wiley -- Trial/Vol III of VII -- 4/21/21

```
                              EXHIBITS

Exhibits:                                      Identified   Received
G-133     Photograph of glass fragments          626          627
          in roadway
G-134     Photograph of evidence by              626          627
          Toyota Sienna minivan
G-135     Photograph of .40 caliber              626          627
          cartridge case found in roadway
G-136     Photograph of .40 caliber              629          629
          cartridge case
G-137     Sketch of crime scene                  630          630
G-138     Photograph of cartridge cases          630          630
          in front yard
G-139     Photograph of cartridge cases          630          630
          in front yard
G-140     Photograph of cartridge case           630          630
G-141     Photograph of cartridge case in        632          632
          front yard
G-142     Photograph of front yard               632          632
G-143     Photograph of blue shoe                632          632
G-144     Photograph of blue shoe                632          632
G-144A    Blue Nike shoe                         640          640
G-145     Photograph of cartridge case in        633          634
          flowerbed
G-146     Photograph of cartridge case in        633          634
          flowerbed
G-147     Photograph of cartridge case in        633          634
          flowerbed
G-148     Photograph of cartridge case in        633          634
          flowerbed
G-149     Photograph of front porch area         635          636
          of 4617 Carlton Crossing Drive
G-150     Photograph of front porch area         635          636
          of 4617 Carlton Crossing Drive
G-151     Photograph of front porch area         635          636
          of 4617 Carlton Crossing Drive
G-152     Photograph of front porch area         635          636
          of 4617 Carlton Crossing Drive
G-153     Photograph of cartridge case           637          638
          and blue glove on front porch
G-154     Photograph of 9mm cartridge on         637          638
          front porch
G-155     Photograph of blue glove               637          638
G-156     Photograph of cartridge case on        637          638
          front porch
G-157     Photograph of cartridge case on        639          639
          front porch
```

US v. Wiley  -- Trial/Vol III of VII -- 4/21/21

```
                              EXHIBITS

Exhibits:                                    Identified    Received
G-158     Photograph of cartridge case in       639          639
          flowerbed
G-159     Photograph of cartridge in            639          639
          flowerbed
G-160     Photograph of bullet damage to        639          641
          door frame
G-161     Photograph of bullet damage to        640          641
          front door
G-162     Photograph of bullet damage to        640          641
          floor in foyer
G-163     Photograph of bullet damage to        640          641
          floor in foyer
G-164     Photograph of bullet damage to        642          643
          floor in foyer
G-165     Photograph of bullet damage to        642          643
          floor in foyer
G-166     Photograph of bullet damage to        642          643
          floor in foyer
G-167     Photograph of doorway into            642          643
          living room
G-168     Photograph of freezer                              644
G-169     Photograph of freezer                              644
G-170     Photograph of freezer                              644
G-171     Photograph of bullet hole in          645          645
          rear of freezer
G-172     Photograph of bullet hole in          645          645
          rear of freezer
G-173     Photograph of bullet hole in          645          645
          rear of freezer
G-174     Photograph of projectile in           645          645
          wall
G-175     Photograph of bullet damage in        647          647
          floor of foyer
G-176     Photograph of bullet damage in        647          647
          floor of foyer
G-177     Photograph of staircase               647          647
G-178     Photograph of staircase               647          647
G-179     Photograph of bullet damage on        648          648
          wall of staircase
G-180     Photograph of projectile              648          648
          fragment
G-181     Photograph of projectile              648          648
          fragment
G-182     Photograph of bathroom on             648          648
          second floor
```

US v. Wiley  -- Trial/Vol III of VII -- 4/21/21

```
                        EXHIBITS
```

| Exhibits: | | Identified | Received |
|---|---|---|---|
| G-183 | Photograph of gun case in bathroom | 650 | 650 |
| G-184 | Photograph of open gun case | 650 | 650 |
| G-185 | Photograph of master bedroom | 650 | 650 |
| G-186 | Photograph of right taillight of Toyota Sienna minivan | 651 | 652 |
| G-187 | Photograph of right taillight of Toyota Sienna minivan | 651 | 652 |
| G-188 | Photograph of right taillight of Toyota Sienna minivan | 651 | 652 |
| G-189 | Photograph of right taillight of Toyota Sienna minivan | 651 | 652 |
| G-190 | Photograph of right taillight of Toyota Sienna minivan | | 656 |
| G-191 | Photograph of bullet behind taillight | | 656 |
| G-192 | Photograph of interior door panel | | 656 |
| G-193 | Photograph of projectile | | 656 |
| G-194 | Photograph of projectile | 657 | 657 |
| G-195 | Photograph of bullet hole in windshield with trajectory rod | 657 | 657 |
| G-196 | Photograph of bullet hole in windshield with trajectory rod | 657 | 657 |
| G-197 | Photograph of bullet hole of windshield from interior | 657 | 657 |
| G-198 | Photograph of bullet hole in windshield from interior with trajectory rod | 658 | 659 |
| G-199 | Photograph of dismantled door of Toyota Sienna minivan | 658 | 659 |
| G-200 | Photograph interior and exterior door panel | 658 | 659 |
| G-201 | Photograph of bullet hole in left front door of Toyota Sienna minivan | 658 | 659 |
| G-202 | Photograph of door exterior of Toyota Sienna minivan | 660 | 660 |
| G-203 | Photograph of dismantled door | 660 | 660 |
| G-204 | Photograph of projectiles and glass fragments located inside Toyota Sienna minivan | 660 | 660 |
| G-205 | Photograph of projectiles and glass fragments located inside Toyota Sienna minivan | 660 | 660 |

US v. Wiley  -- Trial/Vol III of VII -- 4/21/21

EXHIBITS

| Exhibits: | | Identified | Received |
|---|---|---|---|
| G-206 | Photograph of projectiles and glass fragments located inside Toyota Sienna minivan | 662 | 662 |
| G-207 | Photograph bullet hole in door of Toyota Sienna minivan | 662 | 662 |
| G-208 | Photograph of bullet hole | 662 | 662 |
| G-209 | Photograph of projectile in Toyota Sienna minivan | 662 | 662 |
| G-210 | Photograph of right side of right front seat of Toyota Sienna minivan | 663 | 663 |
| G-211 | Photograph of right side of right front seat of Toyota Sienna minivan | 663 | 663 |
| G-212 | Photograph of bullet hole in right front seat of Toyota Sienna minivan | 663 | 663 |
| G-213 | Photograph of paneling of right front seat of Toyota Sienna minivan | 663 | 663 |
| G-214 | Photograph of projectile by front seat | 664 | 665 |
| G-215 | Photograph of projectile | 664 | 665 |
| G-216 | Photograph of projectile | 664 | 665 |
| G-217 | Sketch of interior of white Lincoln MKX | 666 | 667 |
| G-218 | Photograph of interior of white Lincoln MKX | | 668 |
| G-219 | Photograph of Bondo repair | | 668 |
| G-220 | Photograph of right front door of white Lincoln MKX | | 668 |
| G-221 | Photograph of blood on right front door of white Lincoln MKX | | 668 |
| G-222 | Photograph of interior of right side door of white Lincoln MKX | 671 | 671 |
| G-223 | Photograph of suspected blood on right interior door | 671 | 671 |
| G-224 | Photograph of blood on console of white Lincoln MKX | 671 | 671 |
| G-225 | Photograph of blood on console of white Lincoln MKX | 671 | 671 |
| G-226 | Photograph of suspected blood on right front seat of Lincoln MKX | 672 | 673 |

US v. Wiley  -- Trial/Vol III of VII -- 4/21/21

```
                            EXHIBITS

Exhibits:                                Identified   Received
G-227    Photograph of suspected blood      672         673
         on right front seat of Lincoln
         MKX
G-228    Photograph of suspected blood      672         673
         on right front floorboard of
         Lincoln MKX
G-229    Photograph of suspected blood      672         673
         on right front floorboard of
         Lincoln MKX
G-230    Photograph of white substance      674         674
         on rear seat of Lincoln MKX
G-231    Photograph of white substance      674         674
         on rear seat of Lincoln MKX
G-232    Photograph of BLUESTAR reaction    674         674
G-233    Photograph of BLUESTAR reaction    674         674
G-234    Photograph of interior of right    676         676
         front door showing the presence
         of blood
G-235    Photograph of right front seat     676         676
         showing the presence of blood
G-236    Photograph of BLUESTAR reaction    676         676
G-237    Blue cigarette lighter             677         678
G-238    Swabs of touch DNA                 677         678
G-239    Swabs of touch DNA                 677         678
G-240    Swabs of touch DNA                 677         678
G-241    Clear plastic bottle from          678         678
         Lincoln MKX
G-242    Clear plastic bottle from          678         678
         Lincoln MKX
G-243    Airhead candy from Lincoln MKX     678         678
G-244    Swab of blood DNA                  679         680
G-245    Swabs of blood DNA                 679         680
G-246    Swabs of blood DNA                 679         680
G-247    Swabs of blood DNA                 679         680
G-248    Swabs of blood DNA                 679
G-249    Cellophane wrapper from Lincoln    680         682
         MKX
G-250    Sample from left rear seat         680         682
         containing white substance
G-251    Wrapper from Lincoln MKX           680         682
G-252    Swabs of touch DNA                 681         682
G-253    Swabs of touch DNA                 681         682
G-254    Swab of touch DNA                  681         682
G-255    Swab of saliva DNA                 681         682
G-256    Receipt                            682         684
```

US v. Wiley  -- Trial/Vol III of VII -- 4/21/21

```
1                          EXHIBITS

2   Exhibits:                              Identified   Received
    G-257   Projectile                        682         684
3   G-258   Projectile located on right       683         684
            front seat of Lincoln MKX
4   G-259   Projectile from neighbor          683         684
            residence
5   G-260   Projectile found in               683         684
            neighborhood
6   G-261   Projectile found in               684         684
            neighborhood
7   G-262   Projectile retrieved from the     684         685
            victim
8   G-263   Projectile retrieved from the     684         685
            victim
9   G-264   Photograph of projectile          685         686
    G-265   Photograph of 9mm magazine        685         686
10  G-266   Photograph of projectile          685         686
    G-267   Photograph of cartridges from     685         686
11          magazine
    G-268   Photograph of projectile          686         686
12          fragment
    G-269   Photograph of projectile          686         686
13  G-270   Photograph of 9mm                 686         686
    G-271   Photograph of projectile from     686         686
14          freezer
    G-272   Photograph of 9mm serial number               688
15  G-273   Photograph of projectile                      688
    G-274   Photograph of projectile                      688
16  G-275   Photograph of projectile                      688
    G-276   Photograph of projectile          688         689
17  G-277   Photograph of projectile          688         689
    G-278   Photograph of projectile          688         689
18          fragment
    G-279   Photograph of projectile          688         689
19  G-280   Photograph of projectile          689         689
    G-281   Photograph of projectile          689         689
20  G-282   Photograph of projectile          689         689
    G-283   Buccal swab from Hykeem Cox       693         695
21  G-284   Buccal swab from Defendant        694         695
    G-285   Buccal swab from Semaj Bradley    694         695
22  G-286   Buccal swab from Darryl           694         695
            Bradford
23  G-287   Buccal swab from Charles          694         695
            Daniels
24  G-288   Diagram where shell casings       690         691
            were located
25  G-289   Diagram of shell casings by gun   692
```

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 12 of 246

P R O C E E D I N G S

(The Defendant was present.)

**THE COURT:**  All right.  Good morning.  We had a couple of jurors who were a little slow getting in.  I understand they're all here now, so we're ready to go.

Mr. Principe?

**MR. PRINCIPE:**  Yes, Your Honor.  There is one brief matter before the jury comes in.  I have spoken to counsel about it.  I received an email this morning from one of the witnesses yesterday, Matt Hofmeier.  He thought he recognized a juror that he may have worked with at Duke University.  He said her name was Joy.  We looked at the juror list again and did not recall there being a juror with the name Joy.  So he might have been mistaken since the jurors were all wearing masks.  But he thought he had worked with this person in the same building, that they were colleagues.  He thought he might know her, but was not friends with her, and just wanted us to know.

So I think -- because, you know, there's not a juror named Joy, we think he's just mistaken, but that's the information.

**THE COURT:**  Does the Defendant want to be heard on that?

**MR. BRYSON:**  Your Honor, all the jurors were read the witness list and asked if they recognized that name.  That's a name I think that you would recognize, and nobody spoke up.  So

US v. Wiley  -- Trial/Vol III of VII -- 4/21/21

1  we think he's just mistaken.

2          **THE COURT:**  Okay.  All right.  Thank you for bringing

3  it to my attention.  I think that's probably the most likely

4  situation.

5          Okay.  Are we ready to proceed then?

6          **MR. PRINCIPE:**  We are, Your Honor.

7          **THE COURT:**  All right.  Please bring the members of

8  the jury in.

9          Before they come in, I was just going to say, I asked

10  that they keep that one side of the courtroom empty where the

11  alternate juror sits, just so that you all are aware of that,

12  in case you have any personnel who are in and out of court.

13        (The jury returned to the courtroom at 9:02 a.m.)

14          **THE COURT:**  All right.  Please be seated, everyone.

15          Welcome back, ladies and gentlemen.  Good to see you

16  here.  I am going to give you a moment to get your notepads out

17  for those who are taking notes.

18          All right.  The Government may call its next witness.

19          **MR. PRINCIPE:**  Thank you, Your Honor.  The next

20  witness is John Wotton.

21  **JOHN WOTTON,** GOVERNMENT'S WITNESS, being first duly affirmed,

22  at 9:03 a.m. testified as follows:

23          **THE COURT:**  If you would remove your mask so we can

24  see and hear you clearly.

25          Thank you.

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 14 of 246

1          Please proceed.

2                      DIRECT EXAMINATION

3   **BY MR. PRINCIPE**

4   Q    Please state your name.

5   A    John Wotton.

6   Q    And what do you do for a living?

7   A    I work for AVIS Rent-A-Car, and I'm a national security

8   manager for the company.

9   Q    Where do you work out of?

10  A    Orlando, Florida.

11  Q    What was your position in April of 2018?

12  A    I was the national security manager, same position.

13  Q    And does your -- does the range of stores that you oversee

14  include stores in North Carolina?

15  A    Yes.  I cover the entire United States, Canada, part of

16  South America, Brazil, Argentina.

17  Q    And are you familiar with an AVIS store that was located

18  at Northgate Mall?

19  A    Yes.  1720 Guess Road in Durham.

20  Q    Okay.  And at some point, did you have a chance to look at

21  records from that store pertaining to a transaction between

22  April 13, 2018, and April 15, 2018?

23  A    Yes, I did.

24  Q    I would like to show you Government's Exhibit 45.

25       And do you recognize that document?

US v. Wiley  -- Trial/Vol III of VII -- 4/21/21

1  A    Yes.  But I have to put my glasses on.

2  Q    Sure.  We can blow up the top half of that for you for a

3  second to look at.

4  A    Yes, this is a rental agreement -- a rental contract for

5  Taquila House.

6  Q    Okay.  And, now, is that a handwritten contract, or what

7  type of document is that?

8  A    This is a document.  It is generated out of our rental

9  operation system, which is called Wizard.  So it's a copy of

10  the contract that a customer would receive.

11  Q    Okay.  And in your role, do you have access to that system

12  and to those records?

13  A    Yes, sir.

14  Q    And can you just explain to the jurors -- when a person

15  comes in to rent a vehicle from AVIS, from any store, can you

16  just walk them through the process of what records get

17  generated in that process?

18  A    Yes.  So the customer will come into the rental counter

19  location.  They may have a reservation.  They may be a walk-up

20  customer where they don't have a reservation.  They will have

21  to produce their driver's license and a credit card.  Typically

22  the age requirements are you have to be over 25.  However,

23  there are some corporate accounts that you can be under 25.

24       But, in any case, we do a license -- we look at your

25  license facially to make sure it looks valid.  We run the

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 16 of 246

1  credit card or debit card.  And then we print out this rental

2  agreement document to show proof that you have the authority to

3  take this vehicle.

4  Q    Okay.  And the document you're looking at right now,

5  Government's Exhibit 45, this is one of those business records

6  that's maintained within the Wizard system?

7  A    Yes, sir.

8  Q    Is this information entered into that record at the time

9  of the transaction?

10  A    Yes, sir.

11  Q    And what if there is any changes or modifications during

12  the rental, does that information change?

13  A    Yes, it does.  It does change.  Yes, it does.

14  Q    Okay.  But after that, does it at some point become a

15  static record of the business?

16  A    Right.  Then it goes into -- after a year, it would go

17  into the archives.

18  Q    Okay.  And you recognize this to be an authentic business

19  record of the AVIS store generated from the Northgate Mall

20  store?

21  A    Yes, I do.

22         MR. PRINCIPE:  Your Honor, Government would move

23  Government's Exhibit 45 into evidence.

24         THE COURT:  Admitted.

25         MR. PRINCIPE:  Permission to publish that, Your

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 17 of 246

1  Honor?

2          **THE COURT:**  You may.

3          **MR. PRINCIPE:**  If we can zoom in on just the first

4  four lines of that document.

5  **BY MR. PRINCIPE**

6  Q    All right.  Can you walk the jurors through the

7  information that's contained in that document?

8  A    The upper left-hand corner, it says "RA."  That means

9  rental agreement.  And then that's the rental agreement number,

10 757819985.  The name of the individual that rented this car was

11 Taquila House.  You can see her name.  And then the Address 1.

12 And then Address 3 is where you have the city and the state.

13 Q    What was the address for this renter?

14 A    1315 Morreene Road from Durham, North Carolina 27705 in

15 the U.S.

16 Q    What information is in the middle column?

17 A    In the middle column, you have -- the "CON" is the contact

18 phone number, and you can see that the phone number there is

19 (252)499-3761.  And the "C" would be for cell phone.  The

20 license number is U.S., North Carolina, and then you would have

21 Taquila House's driver's license number there, C21780415.

22      The "CID" is the credit card, and this is actually a debit

23 card.  The "CX" is just a code that we use internally for a

24 Visa card.  And then there would be the full number there of

25 the debit card, 4327390067753437.

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 18 of 246

1  Q    And then what information is contained on the right-hand

2  side?

3  A    On the right-hand side, when you start at the very top --

4  actually between the center and the right-hand side, you will

5  see "MVA," and that means motor vehicle asset.  And that number

6  is the number that matches up with the car that was rented at

7  the time.  That's how we identify our vehicles, by the motor

8  vehicle asset.

9       And then on the right-hand side, "CPN" could be coupons.

10 There was no coupons for the rental.  The "WPP" would be

11 coverages, if the customer chose to take any liability

12 coverages, any personal protection coverages, anything to that

13 effect.  In this case, for those coverages, there are all Ns,

14 which means that they elected not to take any of the coverages.

15      Then you have the tax, which is 8 percent, at the very

16 bottom there on the right.

17 Q    Okay.  Then we're going to move down to the next -- the

18 middle portion of that document.  If I can direct your

19 attention to the line starting with "MKO," can you describe the

20 information that's in the document starting from there?

21 A    It's -- the line is a little cut off, but I can

22 definitely -- I can --

23 Q    Let's see if we can re-crop that so you can see it

24 completely.

25      Okay.  If you'll go ahead.

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 19 of 246

1  A    Okay.  Thank you.

2       So "MKO" is the mileage out on the rental car.  So in this

3  case there was 29,781.  "MKI" is the mileage in, so 30,343.

4  The "MCA" amount is the total amount of the rental, $424.24.

5  You can also see that same number if you look at the bottom

6  right-hand corner where it says "Amount Due," 424.24.

7       I will continue along the top there.  So you have the

8  "MKO," and then you have the station where the car was rented,

9  the "STA."  It says "D9M."  That's our code for the rental

10 location for the Durham location.  "ETA" is when the rental was

11 taken out, so it's the 13th of April 2018, at 12:06, or a

12 little bit after noon.

13      The authorization -- the 847056 is the authorization code

14 that was achieved on the debit card.  And at that time we took

15 out $53 off the debit card at the time of rental.

16      And then the "FLO" is the fuel level on the vehicle, and a

17 "G8" means that the tank was full.

18 Q    Let me stop you for a second.  Going back to the ETA, the

19 date and the number next to it, the 12:06, that references the

20 time?

21 A    Yes, that's the time.  12:06 on the 13th, yes, sir.

22 Q    That would be 12:06 p.m.; correct?

23 A    Yes.  A little after 12 noon; correct.

24 Q    All right.  If you will continue with the next line.

25 A    And then you have the "ETT," which is the 19th of April,

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 20 of 246

1  which means that's when we obtained possession of the car, when

2  the car was returned, 19 April 2018.  The time was 0842.  This

3  could also mean the time when we knew where the car was located

4  also.  So there is a little variation there.

5      The authorization says "SH/O."  The SH is the initials of

6  the employee that was trying to get additional authorization on

7  the debit card.  At that time there was no authorization given,

8  so it was zero dollar amount.

9  Q    When might an employee need to get additional

10 authorization?

11 A    If they are doing -- trying to do an extended rental.

12 Q    Okay.  And the zero would mean that they took $0 more off

13 of that debit card?

14 A    Correct.

15 Q    All right.  If you will continue.

16 A    The "BFL" is the fuel level.  And in this case, when the

17 car was returned, there wasn't -- the fuel wasn't full.  So

18 there was a charge for $53.10.

19 Q    Okay.

20 A    I will go down to the next line.  I already discussed

21 "MCA."  If you go over to the right, where it says "AWD," that

22 stands for AVIS Worldwide Discount Code, and that code,

23 B126000, is a discount code for General Motors.  So typically

24 those discount codes are 10 percent off the rental.

25 Q    Okay.  If you will continue down to the next line.

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 21 of 246

1  A    And then the "RAT" is the rate code.  We have thousands

2  of -- thousands of different rate codes.  It just depends where

3  you are renting the car at, what time of the year you are

4  renting the car at.

5       But, in any case, this was a rate code for -- the rate

6  code was "UO."  And the "E" is for a full-sized car, which

7  would be like a Toyota Camry.  The rate for that type of car --

8  the hourly rate was 27.76.  You can see the "HRY."  The daily

9  rate was $37 under "DLY."  The weekly rate was 185.  And then

10 if you wanted to keep it for a month, or where it says "OTR" on

11 the right, the monthly rate would be $814 a month.

12 Q    Okay.  And then what does the "DOB" mean on the next line?

13 A    Date of birth, August 7, 1986.  That would be the date of

14 birth of the renter, which was Taquila House.

15 Q    Okay.  And then can you explain the information on the

16 right-hand column below that?

17 A    All the way to the right?

18 Q    Yes.

19 A    Okay.  Where it starts the taxable extras, the 180 --

20 Q    Correct.

21 A    -- taxable total, that line right there?

22 Q    Yes, sir.

23 A    Okay.  So you have the rate code, which is the UO code,

24 and then you have the E code.  You have the mileage, which is

25 767 miles.  That's what the 760 is.  You can also see that in

1  the left-hand column.  So if you take the MKO up in the upper

2  left, minus the MKI, 767 miles were used on this rental,

3  although it didn't have anything to really do with the charges

4  on the rental because there's an unlimited mileage rental.

5  Q    Okay.

6  A    But let me continue down on the right-hand side.  So

7  taxable extra is 180.72, and that's looking at fees and just

8  basic taxes and any other coverages that the rental may have.

9  I believe in this rental there was a roadside service coverage

10 that was taken by the renter.  Then you have the tax at

11 8 percent that I discussed up at the top of the rental.  The

12 total charges were $424.24.

13 Q    Okay.  Let's move down to the next section of the

14 document.

15      Can you provide the information from the document starting

16 with "Agent ID"?

17 A    The agent ID, the 14810 -- each of our employees have

18 their own unique agent ID so we know who rented the car.  And

19 when I mentioned earlier the initials SH, the employee that

20 works at the store, this is that person's ID, 14810.

21      And then if you go to the right, this is the vehicle, the

22 white Lincoln MKX IV.  And the group I mentioned earlier about

23 the rate code was an E rate code.  You can see that it says

24 Group, "GRP", E.  It's just our own internal coding for our

25 vehicles.

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 23 of 246

1      They were charged a Toyota Camry rate charge, a Group E

2   charge.  However, this is a Lincoln MKX, so actually they got a

3   nicer car, but they were only charged the E car rate code.

4      And then you have the owner of the car, 8983, for our

5   internal system.  That's the fleet owner who owns that car.  So

6   we have a lot of different fleet owners throughout the U.S.,

7   New York, Philadelphia, Florida.  And this fleet owner is 8983,

8   which is the North Carolina fleet owner.

9   Q    If I can direct your attention down to where it says

10  "Vehicle Exchange."  Can you explain what that information

11  means?

12  A    Yes.  So on this rental, on the 13th of April, at 12:06,

13  the first car that was given to the customer was MVA84344212.

14  So at the time of the rental, they were given that car, which

15  was a Ford Explorer.  And you can see as you go across to the

16  right, there's out of the store D9M, which is the Durham store.

17      Taquila House.  The car was returned on the 14th of April

18  at 12:58.  You can see the miles out, 6776.  The miles were in,

19  6981.  So as you go to the second line, you will see 81035614,

20  and this is the Lincoln MKX.  So 81035614.  That's the Lincoln

21  MKX.

22      So looking at this information, you can see that the

23  rental occurred on the 13th of April, 2018, at 12:06.  The car

24  that was given at that time was returned on the 14th of April

25  at 12:58.  So basically a day and some minutes the person had

1  the car.  And they did a -- what we call as a vehicle exchange.

2  And you see in the bold letters up there above that section, it

3  says "Vehicle Exchange."  So for whatever reason -- I don't

4  know the reason, but for whatever reason, there was a vehicle

5  exchange done from the red Ford Explorer to the Lincoln MKX.

6  And that was on the 14th of April at 12:58.

7       And then we got possession of that car or we knew where

8  that car was, and we closed out the contract -- our location

9  closed out the contract on the 19th April, 2018, at 8:42.  And

10 the miles when the MKX went out on the 14th was 29,781, and

11 when the miles came in, the mileage, there was 30,343.

12 Q    Thank you.  Now moving a little further down the document,

13 there's two vehicles listed, Vehicle 1 and Vehicle 2.

14           MR. PRINCIPE:  If you can zoom in on both of those.

15 BY MR. PRINCIPE

16 Q    And so is that just reiterating in more detail the two

17 vehicles you just described?

18 A    Yes, sir.

19 Q    And for Vehicle 1, which vehicle was that?

20 A    Vehicle 1 was the Ford Explorer, the red-in-color Ford

21 Explorer.

22 Q    And what model year was that?

23 A    2018.

24 Q    And what color was it?

25 A    Red.

1  Q    And Vehicle 2, can you provide that same information?

2  A    A 2017 Lincoln MKX IV, and it was white in color.

3  Q    Thank you.  Can you -- we are going to zoom in on the last

4  bit of information, the rental return and exchange location.

5       And what do you recognize those locations to be?

6  A    You can see the D9M on the very top line of the rental

7  return location.  That D9M is the AVIS location that is at --

8  in Durham on 1720 Guess Road.  And you can see in the exchange

9  location, it is the same exact location, the Durham location,

10 DM9, on 17 Guess Road.

11 Q    Okay.  And that's the Shops at Northgate?

12 A    Yes, sir.

13 Q    How many locations -- AVIS locations were there in Durham

14 at the time?  Do you know?

15 A    No, I don't know that.

16 Q    Okay.  Was this particular store a certain kind of AVIS

17 store?

18 A    It's a store that is -- it's in a strip mall.  It's -- we

19 have stores that are standalone stores that are by themselves,

20 not connected to any other facility.  This is what we would

21 call a strip mall store where there are other stores

22 surrounding this store.  This store is run by an agency

23 operator.

24 Q    What does that mean?

25 A    Which means it's not an AVIS employee.  We pay the

1  operator commission to rent cars and also rent coverages.

2  Typically it is about 12 percent that we pay the operators to

3  rent the cars.  We give them the cars.  We pay a lease to the

4  building.  They rent the cars.  And, in return, we pay them a

5  commission.

6  Q    Okay.  Is there a reason -- is there a difference between

7  AVIS and Budget?

8  A    No, AVIS Budget is -- I guess the best way to say, that's

9  our -- like the mother ship of the company.  But we have a lot

10 of other businesses under AVIS Budget.  So you have AVIS Car

11 Rental, you have Budget Car Rental, we have Zipcar, Budget

12 Truck.  So Avis Budget Group is the shell group, the mother

13 company of all these other individual companies.

14 Q    Are you familiar with the term "local market store"?

15 A    Yes.

16 Q    And was this a local market store?

17 A    Yes, this is a local market store.  We have airport

18 locations, and then we have local market stores.

19 Q    And would it make sense that this AVIS store would have

20 signage that also have Budget on it, like signs where vehicles

21 were parked?

22 A    Typically, our stores are co-branded, so they would be

23 both AVIS and Budget.  Yeah, this court -- it could have AVIS

24 Budget, yes.

25 Q    Okay.  Now, directing your attention to Government's

1  Exhibit 26 on your monitor.

2          **THE CLERK:**  Can you repeat that number?

3          **MR. PRINCIPE:**  Forty-six.  That was supposed to be

4  Government's Exhibit 46.  My apologies, Your Honor.

5  **BY MR. PRINCIPE**

6  Q    Mr. Wotton, do you recognize what that document is?

7  A    This is the physical rental contract that's signed and

8  given to the customer.  There's actually several copies of this

9  contract.  One goes to the customer -- one is handed to the

10  customer; one is kept at the location; and then the third copy

11  is sent to our Virginia Beach office.

12  Q    Okay.  And do you recognize this to be an authentic

13  document from the AVIS store at Northgate Mall?

14  A    Yes, it is an authentic rental agreement copy, yes.

15  Q    And is that the rental agreement for Taquila House for the

16  rental that started on April 13, 2018?

17  A    Can we zoom in?

18  Q    I apologize.  Sure.

19  A    Yes, it is.

20  Q    Okay.

21          **MR. PRINCIPE:**  Your Honor, Government would move

22  Government's Exhibit 46 into evidence.

23          **THE COURT:**  Admitted.

24          **MR. PRINCIPE:**  And permission to publish that?

25          **THE COURT:**  Yes.

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 28 of 246

1  **BY MR. PRINCIPE**

2  Q    Can you just identify the customer name?

3  A    Customer name is, upper left-hand corner, Taquila House.

4  Q    And the vehicle description on the right-hand side?

5  A    On the right-hand side, you have the AVIS car number,

6  which was the MVA number that I spoke of earlier, 84344212.

7  Then you have the license plate number, North Carolina license

8  plate.

9  Q    Sure.  Just the vehicle description.

10  A    And then the vehicle is the red Ford Explorer.

11  Q    And then below that, the pickup date and location

12  information and the return date and location information, can

13  you identify that?

14  A    Yes.  On the left-hand side, you have April 13 at 12:06 as

15  the pickup date and time.  Pickup location is Guess Road in

16  Durham.  And on the right-hand side, you have the return date

17  and time, April 14 at 12:30 there, and 1720 Guess Road, Durham

18  location.

19  Q    Sure.  We are going to zoom in on the bottom half of that

20  document.

21       And there appears to be handwriting on that document.  Can

22  you tell what that is?

23  A    There are -- it is initials, and the initials are circled

24  in the middle section, and that's typically where a customer

25  would sign off if they want to accept those coverages for the

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 29 of 246

1  car rental.  At the very bottom, that's where the customer

2  would typically sign.  And just reading, it looks like it's

3  Taquila House.

4  Q    All right.  And at the very bottom where it says, "This

5  vehicle was rented to you by," what is that information?

6  A    This was rented to you by Shahab Hassan.  That's the

7  employee that I spoke to you earlier about.  The ID number

8  14810, that would match the employee that rented this car.

9  Q    Okay.  And I know it is hard to read, but did it appear

10 S-H-A-H-A-B, Shahab Hassan?

11 A    That could very well be.  It's just hard to read on this

12 document.

13 Q    Let me see if we can zoom in a little more.

14 A    S-H-A-H-A-B, yes, sir.

15 Q    Thank you.

16         **MR. PRINCIPE:**  No further questions, Your Honor.

17         **THE COURT:**  Any examination?

18         **MR. FOSTER:**  No questions, Your Honor.

19         **THE COURT:**  Thank you, sir.  You may step down.  If

20 you would don your mask again.

21         **MR. PRINCIPE:**  May he be released from his subpoena?

22         **THE COURT:**  Any objection?

23         **MR. FOSTER:**  No objection.

24         **THE COURT:**  You are free to leave.  Thank you, sir.

25         (At 9:31 a.m., witness excused.)

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 30 of 246

1          **THE COURT:**  The Government may call its next witness.

2          **MR. PRINCIPE:**  Yes, Your Honor.  I think we are just

3   confirming that the next witness is here.

4          **THE COURT:**  All right.

5   **JAMES E. BARNETT, JR.,** GOVERNMENT'S WITNESS, being first

6   affirmed, at 9:32 a.m. testified as follows:

7          **THE COURT:**  If you would kindly remove your masks so

8   we can see and hear you well and bend the microphone just a

9   little be toward your mouth.

10         Please proceed.

11                          DIRECT EXAMINATION

12  **BY MR. GREEN:**

13  Q    Would you tell the jurors your full name.

14  A    James Edward Barnett, Jr.

15  Q    Mr. Barnett, were you working in some capacity at

16  Northgate Mall in Durham in April of 2018?

17  A    Yes.

18  Q    And could you describe for the jurors what your job was?

19  A    I was director of security.

20  Q    And could you describe for the jurors some of your

21  responsibilities?

22  A    Director of security was in charge of the security force

23  at the Northgate Mall.

24  Q    As part of director of security, did Northgate Mall have

25  surveillance cameras?

US v. Wiley  -- Trial/Vol III of VII -- 4/21/21

1  A    Yes.

2  Q    And describe generally where those surveillance cameras

3  were located.

4  A    They was located generally inside the mall, interior of

5  the mall and exterior of the mall and parking decks, parking

6  areas, parking spaces.

7  Q    As part of a Durham Police Department investigation, did

8  the Durham Police Department representatives ask that your

9  office make available certain security camera footage of the

10 exterior of certain parts of Northgate Mall?

11 A    Yes.

12 Q    And did you provide that material?

13 A    Yes.

14 Q    I'll show you what's been marked as Government's Exhibit

15 No. 48.

16          **MR. GREEN:**  May I approach?

17          **THE COURT:**  Yes.

18 **BY MR. GREEN**

19 Q    Government's Exhibit No. 48, is that a CD containing video

20 surveillance from the Northgate Mall?

21 A    Yes.

22 Q    And you had an opportunity to review it?

23 A    Yes.

24 Q    And does it accurately reflect the video that you captured

25 and provided to the police?

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 32 of 246

 1  A    Yes.

 2            **MR. GREEN:**  We'll move introduction of Government's

 3  Exhibit 48.

 4            **THE COURT:**  Admitted.

 5  **BY MR. GREEN**

 6  Q    Did you have an opportunity also to review certain still

 7  photographs from exterior video -- surveillance video from

 8  Northgate Mall?

 9  A    Yes.

10            **MR. GREEN:**  May I approach?

11            **THE COURT:**  Yes.

12            **MR. GREEN:**  I'm sorry.  Strike that.

13  **BY MR. GREEN**

14  Q    If you will look at your monitor, I'm going to show you

15  first Government's Exhibit No. 48A.

16       Do you recognize what's on your screen?

17  A    Yes.

18  Q    What is it?

19  A    It's a photo capture of one of the video cameras in our

20  parking lot of Northgate Mall.

21  Q    And does it contain certain information regarding the time

22  of that video capture?

23  A    Yes.

24  Q    And what was the date/time group?

25  A    The date was April 18, 2018, at 6:33:15 p.m.

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 33 of 246

1          **MR. GREEN:**  Your Honor, I will move introduction of

2   Government's Exhibit 48A.

3          **THE COURT:**  Admitted.

4          **MR. GREEN:**  May I publish it?

5          **THE COURT:**  Yes.

6   **BY MR. GREEN**

7   Q    I am going to highlight one section for you down at the

8   bottom and ask if that's where you are getting the date/time.

9   A    Yes.

10  Q    Thank you.

11         I'm going to show you on your monitor Government's Exhibit

12  No. 48B.

13         Do you recognize that still?

14  A    Yes.

15  Q    What is it?

16  A    It's a camera, dome camera, up under the sidewalk of

17  Northgate Mall, depicting the camera directly at the -- at one

18  of the storefronts at Northgate Mall.

19  Q    Do you recognize that as the AVIS rental place?

20  A    Yes, sir.

21  Q    And does that exhibit fairly and accurately capture the

22  still from the video surveillance you reviewed?

23  A    Yes.

24  Q    All right.

25         **MR. GREEN:**  I am going to ask to move introduction of

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 34 of 246

1    48B, and ask that it be published?

2              **THE COURT:**  Admitted.  You may.

3              **MR. GREEN:**  In the upper right-hand corner, if you

4    will highlight that, please.

5    **BY MR. GREEN**

6    Q    Is that the accurate date and time?

7    A    Yes.

8              **MR. GREEN:**  Thank you.  Returning to Government's

9    Exhibit No. 48, Your Honor, I would like to publish one portion

10   of that.

11             **THE COURT:**  All right.  You may.

12        (Government's Exhibit No. 48 was played.)

13   **BY MR. GREEN**

14   Q    I see the camera is oscillating.  Is that what it does,

15   that particular camera?

16   A    Yes.

17   Q    It goes from the storefront area out into the parking lot?

18   A    Yes.

19   Q    And as we've now oscillated back to the -- to the area

20   that was initially shown, that vehicle that has appeared, is

21   that in the sequence -- in other words, is this a continuous

22   sequence; the vehicle would have pulled up when the camera was

23   pointed in another direction?

24   A    Yes.

25   Q    Thank you.  Continue.

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 35 of 246

1       (Government's Exhibit No. 48 was played.)

2           **MR. GREEN:**  Pause.  I am going to fast-forward the

3   video approximately four minutes.

4       (Government's Exhibit No. 48 was played.)

5           **MR. GREEN:**  Pause.  I would like to skip ahead.

6       (Government's Exhibit No. 48 was played.)

7   **BY MR. GREEN**

8   Q    Would you note the time where the video is paused?

9   A    11:39:46.

10  Q    And that's on April 14, 2018?

11  A    Yes.

12          **MR. GREEN:**  Thank you.  That's all the questions I

13  have.

14          **THE COURT:**  Any cross?

15          **MR. FOSTER:**  No questions, Your Honor.

16          **THE COURT:**  You may step down, sir.  You can put your

17  mask back on, please.

18          Mr. Green, are you excusing this witness?

19          **MR. GREEN:**  Yes.

20          **MR. FOSTER:**  No objection.

21          **THE COURT:**  You are free to leave, sir.  Thank you.

22      (At 9:46 a.m., witness excused.)

23  **SHAHAB HASSAN,** GOVERNMENT'S WITNESS, being first duly affirmed,

24  at 9:47 a.m. testified as follows:

25          **THE COURT:**  If you would, remove your mask, please,

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 36 of 246

1  so we can see and hear you clearly.

2        Thank you.

3                    DIRECT EXAMINATION

4  **BY MR. GREEN:**

5  Q    Would you tell the jurors your full name.

6  A    My name is Shahab Hassan.

7  Q    And, Mr. Hassan, how are you employed?

8  A    I'm a rental agent at AVIS Budget Car Rentals in Durham,

9  North Carolina.

10 Q    Were you employed in that capacity in April 2018?

11 A    Yes, sir.

12 Q    And describe generally the process that someone goes

13 through when they rent a car from your business.

14 A    Yes.  So when the customer first comes in, we ask them for

15 their valid driving license and either a major credit card or a

16 national bank debit card that we can use for payment.

17 Q    Do you know Maurice Owen Wiley, Jr.?

18 A    Yes, I knew him as a customer when he was renting cars

19 with us.

20 Q    And on how many occasions did Mr. Wiley himself rent cars

21 from you?

22 A    I don't remember.  Multiple times.  Many times.  I think

23 maybe five times or more.

24 Q    And during the course of that rental, did he rent them

25 individually or did he also rent using other individuals to

1  rent cars?

2  A    He rented by himself initially, and then later on, he

3  would have his friends come in, and they would rent cars.

4  Q    And did you interact with Mr. Wiley on more than one

5  occasion?

6  A    Yes, sir.

7  Q    And during the course of that interaction, did he obtain

8  your cell phone number?

9  A    Yes, sir.  I must have texted him a receipt or some

10 information on the rental, something.  I don't remember exactly

11 how.

12 Q    And you had his cell phone number as well?

13 A    Yes, sir.

14 Q    I'm going to show you what's been marked as Government's

15 Exhibit No. 46.

16 A    Yes, sir.

17         **MR. GREEN:**  If we could publish it, Your Honor?

18         **THE COURT:**  Yes.

19         **THE WITNESS:**  I see it, yes, sir.

20         **MR. GREEN:**  If we could blow up the top portion.

21 **BY MR. GREEN**

22 Q    Do you recall on April 13th Miss Taquila House coming into

23 your store and renting a car?

24 A    Yes, sir.

25 Q    What do you recall about that transaction?

1  A    I remember she was -- she had a baby with her.  She came

2  in with Wiley.  Mr. Wiley was with her too, but she rented the

3  car herself with her license, her credit card, everything in

4  her name.  I explained to her everything.  She is the only

5  authorized driver; nobody else is authorized to drive the

6  vehicle, and she signed the contract agreeing to that.

7  Q    Looking at the bottom section of Government's Exhibit

8  No. 46 -- I'm sorry -- the center section, there are initials

9  on the contract?

10 A    Yes.

11 Q    Is that -- whose initials are those?

12 A    The person who rented the car, sir, Taquila House.

13 Q    All right.  And then just above the Government's exhibit

14 number, there looks to be an initial.  Is that also her

15 initial?

16 A    Yes, sir.

17 Q    And do you recognize that you were the one that actually

18 waited on Miss House when they rented this car?

19 A    Yes, sir, my name is on the bottom right.

20 Q    Do you recall what car was initially rented?

21 A    I think it was a red Ford Explorer.

22 Q    And do you recall a time when that Ford Explorer was

23 exchanged for another car?

24 A    After noontime, sir.  I don't know exactly the hours.

25 Q    Okay.  And what do you recall about when that red Ford

1  Explorer came back to AVIS?

2  A    Just nothing.  I mean, the car looked fine.  There was

3  nothing -- no dents or damages on the Ford Explorer.  Taquila

4  House had to exchange the vehicle because the contract is in

5  her name.

6  Q    Who initially brought the red explorer to AVIS?

7  A    It was first brought in and just parked outside, and Wiley

8  walks in and asked for the exchange.  I tell him we have to

9  have Miss Taquila House come and do exchange.  The vehicle is

10 in her name.  She is the only driver.

11 Q    So Mr. Wiley brought the red Explorer in?

12 A    Yes, sir, that's what it looked like.  He parked it in

13 front of the door there and he walked in.

14 Q    And describe how Mr. Wiley appeared back in April of 2018.

15 A    Long dread hair.  Long dreads.

16 Q    Dreads?

17 A    Color on the dreads.  Green color on the dreads.

18 Q    Had you seen him on multiple occasions?

19 A    Yes, sir.  Yeah, he was, you know, coming with his friends

20 renting cars, so I would see him multiple times.

21 Q    Do you recognize Mr. Wiley being in the courtroom?

22 A    I don't see -- maybe over there (indicating).

23 Q    Are you pointing to the gentleman who is seated beside --

24 A    Pink shirt.

25 Q    -- the individual with the yellow tie?

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 40 of 246

1  A    Yeah.  Yes, sir, with the pink shirt or the white shirt.

2  Pink shirt, I think.

3  Q    I am going to show you a portion of a video and ask if you

4  recognize it.

5  A    Okay.

6       **THE COURT:**  The record will reflect that the witness

7  has identified the Defendant.

8       **MR. GREEN:**  Government's Exhibit No. 48.

9       (Government's Exhibit No. 48 was played.)

10 **BY MR. GREEN**

11 Q    First, do you recognize the camera view there?

12 A    Yes, sir.  This is right outside the door from our rental

13 place on the left side, right outside the door.  Yep, this is

14 the whole parking lot in front.

15 Q    Do you recognize that car that's in the --

16 A    Yes, sir.

17 Q    -- video?

18      What car is that?

19 A    It looks like that rental I rented to Taquila House.

20 Q    The red Explorer?

21 A    Yes, sir, the Ford Explorer, yes.

22 Q    What's depicted there, is that your AVIS store, the

23 windows of your store?

24 A    Yes, sir.

25 Q    Do you recognize the individual who just walked out of

1  your store?

2  A     Yes, sir.

3  Q     Who is it?

4  A     It looks like Wiley.

5  Q     When you say "Wiley," do you mean Maurice Wiley?

6  A     Maurice Wiley, yes, sir.  If I can see that again?

7  Q     You may.

8        (Government's Exhibit No. 48 was played.)

9  A     Yes, sir, that looks like Maurice Wiley.

10 Q     When they came in and exchanged the red Explorer, do you

11 recall the car they got?

12 A     It was a Lincoln, white Lincoln SUV.

13 Q     And who rented that car or who made the exchange?

14 A     Taquila House, the person who rented the car.

15 Q     Do you recall whether Mr. Wiley was with her when that car

16 was rented?

17 A     Yes, sir, he was.

18 Q     And did you complete that exchange?

19 A     Yes, sir, I believe I did, yes.

20 Q     And did they leave with the car?

21 A     The white Lincoln, yes.

22 Q     Was there a period of time in which you received some

23 communication from Mr. Wiley regarding that Lincoln?

24 A     Yes, sir.  Afterwards, I got a call, and he said -- at my

25 work phone -- that the car had been shot.  It was parked on the

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 42 of 246

1  side of the road.  What do we do?  I told him we got to bring

2  the car in.  We have to do an incident report, accident report,

3  fax that to corporate.  The car is not rentable anymore.

4  Q    Do you recall when that call was made?

5  A    It was in the morning time, sir.  Monday, I believe,

6  because it was really busy at work, super busy at 8:00 in the

7  morning.

8  Q    Would that have been Monday, the 16th?

9  A    I don't remember the date, sir.  I don't know.  It was a

10 Monday after the detectives came and talked to me, I think --

11 or before the detectives came to talk to me.  I don't remember

12 the timeline.

13 Q    After you spoke with Mr. Wiley and he mentioned that to

14 you, how long was it -- was there a period of time in which the

15 car actually came back to AVIS?

16 A    Yes, sir.  The car was dropped, like, I think, in the next

17 day or the day after that.  It was parked outside the work --

18 when I came in the morning.  I seen the car.  I brought it up

19 to my manager, and he said go ahead and call the detective.  We

20 called them back, and they just came in and got the car.

21 Q    And when you -- did you notice anything about the car when

22 you looked at it?

23 A    Yes, the color was off.  Some -- like, you know, a new car

24 is very plush and shiny, it has that finish to it.  But this --

25 the door on the backside looked like it wasn't like that.  It

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 43 of 246

1  was kind of -- I don't know.  It looked -- discoloration, you

2  know.  It looked -- it was off.  It didn't match the color for

3  the rest of the car.

4  Q    Mr. Hassan, when the detectives and subsequently the FBI

5  interviewed you, were you truthful about the events when you

6  talked to them?

7  A    Initially, sir, I wasn't.  I was really, really -- I was

8  scared, and I was afraid to say anything at all.  But before

9  the FBI left that day, they came to me.  I told them

10 everything.  They told me call the detectives and tell them

11 everything truthfully.  And I did.

12 Q    You did eventually?

13 A    Yes, the same day that FBI left.

14 Q    Do you acknowledge that you were not truthful about

15 whether you had Mr. Wiley's phone number?

16 A    Initially, yes, sir, I was, because I was scared.

17 Q    Did you acknowledge that you were not truthful about

18 having contact with him?

19 A    I think so, yes, sir, yeah, because I was scared.  I

20 didn't want to say anything.  The way the FBI initially

21 presented themselves, I was really petrified.  I didn't know,

22 you know, what's going on, so I just didn't want to say

23 anything.

24          **MR. GREEN:**  Thank you.

25          **THE COURT:**  Any more questions?  Are you done with

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 44 of 246

1  your exam?

2              MR. GREEN:  I am.

3              THE COURT:  Any cross?

4                      CROSS-EXAMINATION

5  BY MR. FOSTER

6  Q    So, Mr. Hassan, you indicated that when the Explorer was

7  brought back to be exchanged for a different vehicle, at first

8  you said that Mr. Wiley came in, but he couldn't do it because

9  he wasn't on the contract.  You needed Miss House there;

10 correct?

11 A    Yes, sir.

12 Q    Did she show up on that date on the 14th?

13 A    Yes, sir, to exchange the vehicle.  That's the only way we

14 can do it.

15 Q    She's not in the video that was shown; correct?

16 A    No, I didn't see her at all.

17 Q    And so your misrepresentations to the police about whether

18 you knew Wiley and whether you had communicated with him, these

19 misrepresentations by you weren't cured until several days

20 later; correct?

21 A    No.  When the FBI came, sir, they questioned me, and that

22 same day, in the evening, I called the detective and told him

23 everything.

24 Q    Well, the FBI interviewed you on April 27th, didn't they?

25 A    Yes.  Later, yes, sir, after.

1  Q    And so the initial interview of you by the Durham police

2  was on April 19, wasn't it?

3  A    I don't remember the date, sir.  It was before the FBI

4  interviewed me.

5  Q    So wasn't it eight days until you came clean and admitted

6  that you'd lied earlier?

7  A    Yes, sir.

8            MR. FOSTER:  I have no further questions.

9            THE COURT:  Any redirect?

10           MR. GREEN:  No, Your Honor.

11           THE COURT:  All right.  You may step down, sir.  Put

12  your mask back on, please.

13           Is he released?

14           MR. GREEN:  We would like for him to, Your Honor.

15           THE COURT:  Any objection?

16           MR. FOSTER:  No objection.

17           THE COURT:  You are free to leave, sir.  Thank you.

18       (At 10:01 a.m., witness excused.)

19           THE COURT:  The Government may call its next witness.

20           MR. GREEN:  Your Honor, the Government is going to

21  call Miss Taquila House.  She may be upstairs.  May I?

22           THE COURT:  Yes, you may.

23           MR. GREEN:  Thank you.  It will be just a moment

24  before she comes down.

25           THE COURT:  The witness is on the way.  If anybody

US v. Wiley  -- Trial/Vol III of VII -- 4/21/21

1  wants to stand up and stretch, you are welcome to do that, if

2  you are tired of sitting for a moment.  Just do it in place

3  there.

4          We'll take a break at about 10:30.  If you need one

5  before then, just raise your hand.  I would be happy to do

6  that.  That will be about the halfway point for this morning.

7      (Pause in the proceedings.)

8  **TAQUILA M. HOUSE**, GOVERNMENT'S WITNESS, being first duly

9  affirmed, at 10:04 a.m. testified as follows:

10         **THE COURT:**  Ma'am, if you would, remove your mask so

11  we can see and hear you clearly.

12         Please proceed.

13                        DIRECT EXAMINATION

14  **BY MR. GREEN:**

15  Q    Would you tell the jurors your full name.

16  A    Taquila Michelle House.

17  Q    And, Miss House, where do you live?

18  A    Durham, North Carolina.

19  Q    More specifically, do you live in Chapel Towers?

20  A    No, not anymore.

21  Q    Did you live in Chapel Towers on Morreene Road in April of

22  2018?

23  A    Yes.

24  Q    Do you know the Defendant, Maurice Owen Wiley, Jr.?

25  A    Yes.

1  Q    How do you know him?

2  A    Through friends.

3  Q    And how long have you known him?

4  A    Just a couple of years.

5  Q    And you knew him in April of 2018?

6  A    Yes.

7  Q    Was there a period of time in which you rented cars for

8  Mr. Wiley?

9  A    Well, it was for his girlfriend, but I guess he was a

10 driver for her because she didn't have a license.  So, yes.

11 Q    Who was the girlfriend?

12 A    Shea.

13 Q    Do you know her full name?

14 A    Shea.  Shea something.  Shea.

15 Q    Shea is her name?  Did she live in Chapel Towers as well?

16 A    Yes.

17 Q    Couple of buildings down?

18 A    Yes.

19 Q    When do you recall first renting cars for Shea and

20 Mr. Wiley?

21 A    I had just did it a few times.

22 Q    And do you recall which rental agency you used?

23 A    AVIS Budget.

24 Q    And when you rented the cars for Mr. Wiley, describe that

25 process.

US v. Wiley  -- Trial/Vol III of VII -- 4/21/21

1  A    Sometimes I will get the money from him and go pay on the

2  car, or I just tell them to put the car -- put the money in my

3  account, and they will take it out.

4  Q    And did he do that?

5  A    Sometimes, yes.

6  Q    Put money in your account?

7  A    Yes.

8  Q    Did he go to the bank and put your money in your account?

9  A    Yes.

10 Q    Directing your attention to April 13, 2018, do you recall

11 renting a red Ford Explorer from the AVIS?

12 A    I think so.

13 Q    I'm going to show you Government's Exhibit No. 46.

14 A    Yes.

15 Q    Do you recognize that?

16 A    Yes.

17 Q    In the upper right-hand corner, it describes the car as a

18 red Ford Explorer?

19 A    Yeah.

20 Q    There appear to be initials on Government's

21 Exhibit No. 46.  Are those your initials?

22 A    Yes.

23 Q    There is a signature.  Is that your signature?

24 A    Yeah, that's my signature.

25 Q    When you rented the red Ford Explorer, who did you give it

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 49 of 246

1  to?

2  A    Maurice.

3  Q    Are you referring to Mr. Wiley?

4  A    Yes.

5  Q    And did he have the car after you rented it?

6  A    Yeah.

7  Q    Did you have any anything to do with the car after he

8  rented it on the 13th?

9  A    No.

10 Q    Did you drive it?

11 A    No.

12 Q    Did you ride in it?

13 A    No.

14 Q    Was there a period of time in which that red Ford Explorer

15 was returned to AVIS?

16 A    Did I return it?

17 Q    Did Mr. Wiley return it?

18 A    I guess.

19 Q    Do you recall?

20 A    He had to.  I didn't return it.

21       **MR. FOSTER:**  I'm going to object to lack of personal

22 knowledge.

23       **THE COURT:**  Sustained.

24 **BY MR. GREEN**

25 Q    Were you involved in the exchange of that car for a white

1  Lincoln?

2  A    No.

3  Q    After the red car was rented, was there a period of time

4  in which Mr. Wiley contacted you regarding something that had

5  happened to the rental car?

6  A    Like Sunday?

7  Q    Do you recall?

8  A    On Sunday.

9  Q    Approximately what time?

10  A    Late Sunday.

11  Q    Late in the evening?

12  A    Yeah.

13  Q    Did you receive a call from Mr. Wiley?

14  A    Yes.

15  Q    And what did he say?

16  A    Nothing but "Man, sis," like something happened.

17  Q    What did you say?

18  A    "What happened?  What's wrong?"

19  Q    What did he say?

20  A    At the time nothing.

21  Q    Did you find out later what he said?

22  A    All he said with the car -- when I asked what happened to

23  it, all he said was he was somewhere and somebody was shooting,

24  and the car got hit; we were going to try to get away.

25  Q    What did you say?

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 51 of 246

1    A    I reacted as in "What you mean?  What happened?"

2    Q    Did he say anything more about what happened?

3    A    No.  Stuck with the same story.

4    Q    Did the white Lincoln appear outside your apartment?

5    A    That night, yeah.

6    Q    And who was driving it?

7    A    Maurice.

8    Q    Did you see it at that time?

9    A    No, I didn't -- I talked to him by standing outside, but I

10   didn't go to the car.

11   Q    What did he tell you about the car?

12   A    Just that he was so worried; they were shooting and the

13   car got hit.

14   Q    Did he tell you to do anything?

15   A    Get a police report.

16   Q    And did he tell you why to get a police report?

17   A    Because -- to try to get the window fixed.

18   Q    What else did he say?

19   A    Nothing but get a police report and try to get the window

20   fixed.

21   Q    What did you do next?

22   A    Tried to call and get a police report.

23   Q    Was that that night or the following morning?

24   A    That was that morning.

25   Q    Did you go out there and see the Lincoln?

1   A     When I went out to the car, yeah.

2   Q     What do you recall seeing?

3   A     When I opened the door, the window, I guess it wasn't all

4   the way broken, but I guess, since I opened the door, it just

5   went ahead and broke, and a bullet hole on the side.

6   Q     I'm going to show you a Government's exhibit.  That would

7   be Government's Exhibit No. 34.  Do you recognize Government's

8   Exhibit No. 34 as the Lincoln outside your apartment?

9   A     Yes.

10  Q     And are those marks we see there -- is one of them a

11  bullet hole?

12  A     Yes.

13  Q     Did you call the police?

14  A     Yes.

15  Q     What did you tell them?

16  A     Well, because I didn't know what was going on, so I just

17  said the car was sitting on Wiggins Street.  It had been left

18  there, and when I came back later that night, the car -- when I

19  came back later that night, I didn't look at the car.  But when

20  I walked out that morning, that I noticed a broke -- well, I

21  noticed bullet holes in the window.

22  Q     Was that true?

23  A     No.

24  Q     Why didn't you tell them the truth?

25  A     Because I didn't know the truth.

1  Q    I'm going to show you what's marked as Government's

2  Exhibit 47.

3       Do you recognize those documents?  It should be on your

4  monitor.

5  A    That's too close.  I can't really tell.

6  Q    Is it too close?

7  A    Yeah.  Okay.

8  Q    Is that better?

9  A    Yeah.

10 Q    Do you recognize those documents?

11 A    Yeah.

12 Q    What is Government's Exhibit No. 47?

13 A    What do what?

14 Q    Are those your bank records?

15 A    Yes.

16 Q    And are those accounts that you provided -- records you

17 provided the police?

18 A    Them the ones they got on their own, I guess.  Yes.

19 Q    Okay.  And is that your name in the upper left-hand

20 corner?

21 A    Yes.

22       **MR. GREEN:**  Your Honor, move introduction of

23 Government's Exhibit No. 47.

24       **THE COURT:**  Admitted.

25

1  BY MR. GREEN

2  Q    Looking at Government's Exhibit No. 47, page 2, there

3  appears to be a date of March 13 and a point of sale at AVIS

4  Rent-a-Car.

5       Did you rent a car on that occasion?

6  A    Yes.

7  Q    And who did you rent it for?

8  A    Wiley, Maurice.

9           **MR. GREEN:**  Yes.  Publish that, Your Honor.  We

10 request it be published.

11          **THE COURT:**  You may.

12 BY MR. GREEN

13 Q    I'm going to show you another highlighted section on

14 page 2.  At 3:27:18, there is a point of sale at AVIS.

15      Did you rent a car from AVIS?

16 A    Yes.

17 Q    And who was that for?

18 A    Same person.

19 Q    When you say "same person" --

20 A    Wiley.

21 Q    Mr. Wiley?

22 A    Yes.

23 Q    I'm going to show you -- on page 3, there is a member

24 deposit of $340.

25      Did you make that deposit or someone else?

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 55 of 246

```
1   A    I made it.

2   Q    You made it.  Where did you get the money?

3   A    He gave me the money to put in the account.

4   Q    When you say "he," are you referring to Mr. Wiley?

5   A    Wiley, yes.

6   Q    Looking at page 6, can you see the date of that record?

7   A    Yes.

8   Q    What is the date?

9   A    4/19.

10  Q    And who -- there is a deposit -- a member deposit of $250?

11  A    Uh-huh.

12  Q    Do you recall who did that?

13  A    I guess me.

14  Q    Did you do it?

15  A    It says "member," I guess.  I'm not sure.  Sometimes I did

16  it, and sometimes I didn't.  So...

17  Q    If there is a member deposit in these records, tell me the

18  population of people who might be doing that.  You and who

19  else?

20  A    Me.

21  Q    Anyone else?

22  A    No.

23  Q    No one else was making deposits in your account?

24  A    Oh, yeah, Wiley for the cars.

25  Q    Mr. Wiley?
```

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 56 of 246

1  A    Yeah.

2  Q    Looking at 4/16, it looks like there is a record of an

3  AVIS Rental point of sale.

4       Did you make -- did you rent that car on 4/16?

5  A    Yes.

6  Q    Do you recall anything about that transaction?

7  A    No.

8  Q    After you initially told the police where the car had been

9  damaged, do you recall an officer coming by and talking to you

10 more specifically and taking a formal report?

11 A    Are you talking about when I got the police report or

12 after?

13 Q    When you got the police report.

14 A    Yeah, he came by.

15 Q    Did you tell him the same false story about what had

16 happened?

17 A    Yeah.

18 Q    Did a Durham detective subsequently call you on the phone

19 and try to get more specifics?

20 A    Yes.

21 Q    And what story did you tell him on that occasion?

22 A    Same one.

23 Q    The same false story?

24 A    Yes.

25 Q    And where was that story originating from?  Did you make

1  it up?

2  A     Yes.

3  Q     Did you discuss that story with Mr. Wiley?

4  A     Yes.

5  Q     So you told Mr. Wiley that you were telling the police a

6  false story?

7  A     No, I just told them -- he just said to try to get a

8  police report.  So I just said whatever story I said.  I didn't

9  know what was going on.  I didn't ask any questions.  I was

10  just trying to get the rental car away from me.  I didn't know

11  what was going on.  So when I called AVIS, I knew it was going

12  to fall on me as in trying to get the window fixed.  So that's

13  what I was trying to do.

14  Q     Did you discuss with Mr. Wiley the need to get that car

15  fixed?

16  A     Yes.

17  Q     And what did he say?

18  A     "I handled it.  I'll get it fixed."

19  Q     Subsequently, did the police come to your work?

20  A     Yes.

21  Q     And did they talk to you at that time?

22  A     Yes.

23  Q     Did you continue to give them the false story that you had

24  given two times before?

25  A     No.

1  Q    What did you tell them?

2  A    Well, they told me what was going on, and that's when

3  everything changed, and I tried to cooperate and told what I

4  knew.

5  Q    Is that what you knew, what you have told the jury here

6  today?

7  A    Did I do what?

8  Q    Did you tell them what you've told this jury here today

9  about what Mr. Wiley said and where you got the car and how it

10 showed up at your house?

11 A    Yes.

12 Q    Did you talk to Mr. Wiley again after the police came and

13 talked to you?

14 A    Yes.

15 Q    And what did you tell him?

16 A    I asked him what's really going on.  The police came to my

17 job, which he already knew because they started talking to him

18 at my job.  And he just kept saying, "Nothing.  Nothing."

19 Q    Were you worried?

20 A    Was I worried?

21 Q    Worried.

22 A    Yes.

23 Q    Why were you worried?

24 A    Because the police coming to my job and asking me

25 questions about something that happened and I'm not knowing the

 1  truth.  I done got myself wrapped up in something that I don't

 2  know what's going on.  So, of course, I am going to keep asking

 3  what's going on.

 4  Q    Did Mr. Wiley provide any additional information to you?

 5  A    Nope.

 6  Q    Do you recall what Mr. Wiley's telephone number was?

 7  A    I don't know it.

 8  Q    Do you know your telephone number?

 9  A    Yes.

10  Q    What was your telephone number back in April?  Is it the

11  same as it is now?

12  A    The same.

13  Q    What was it?

14  A    (252)499-3761.

15  Q    Do you recall sending text messages to Mr. Wiley?

16  A    Yes.

17  Q    And do you recall anything about those text messages right

18  after the police left?

19       When they talked to you at work, did you text message him?

20  A    Yes.

21  Q    What did you tell him?

22  A    "What happened?"  And that the police at my job.

23  Q    Did you tell him anything else?

24  A    No.

25            **MR. GREEN:**  May I approach the witness?

1            **THE COURT:**  Yes.

2 **BY MR. GREEN**

3 Q    I'm showing you Government's Exhibit 47A.  I would like

4 for you to start at the bottom, and I would like to know if

5 that refreshes your recollection about anything Mr. Wiley

6 texted you or you texted him.

7      First, does it refresh your recollection?  Do you remember

8 now that you've seen it?

9 A    This right here?

10 Q    Yes.

11 A    I mean, I don't remember texts, but I'm sure I texted him

12 before.

13 Q    You did text him?

14 A    Yeah.

15 Q    Is that your number reflected on the text messages, 252 --

16 A    Yes.

17 Q    Is that your message here?

18 A    Yeah.

19 Q    What about up here?

20 A    So he texted me or --

21 Q    I'm just asking:  Is this your number in Government's

22 Exhibit 47A?

23 A    Yes.

24 Q    And that occurred on that date?  Is that the date the

25 police came, 4/19?

1  A    I guess.

2  Q    Do you recall?

3  A    I don't know the date that they came, but --

4  Q    Does this reflect your recollection about what you may

5  have sent to Mr. Wiley?

6  A    What -- I sent this?

7  Q    I'm asking.

8  A    I don't know.  I don't remember the conversation that day.

9  Q    Okay.  During the time when the detectives were at work --

10 came to your work, did you have a telephone conversation that

11 started with Mr. Wiley while they were sitting there?

12 A    Yes.

13 Q    Did they take a -- do you remember them taking a picture

14 of your phone to see what number was calling you?

15 A    Yes.

16 Q    And do you remember the detectives talking to Mr. Wiley on

17 that call?

18 A    Yes.

19        **MR. GREEN:**  I believe that's all the questions I

20 have.

21        **THE COURT:**  All right.  Any cross?

22                    CROSS-EXAMINATION

23 **BY MR. FOSTER**

24 Q    So, Miss House, you were not -- you did not go back in

25 AVIS in person to do anything about exchanging the Ford

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 62 of 246

1 Expedition [sic] for the white Lincoln?

2 A      No.

3 Q      And so you had called the police to report the damage, and

4 the story you told the officer who responded was a false story

5 that you made up?

6 A      Yes.

7           **MR. FOSTER:**  No further questions.

8           **THE COURT:**  Any redirect?

9           **MR. GREEN:**  No, Your Honor.

10           May the witness be released?

11           **THE COURT:**  Any objection?

12           **MR. FOSTER:**  No objection.

13           **THE COURT:**  You're free to leave, ma'am.  If you

14 would put your mask back on as you exit the courtroom, though.

15      (At 10:27 a.m., witness excused.)

16           **THE COURT:**  All right, ladies and gentlemen, it's

17 10:30.  And as I promised, we'll take our morning break at this

18 point.  So for those taking notes, please put your notepads

19 back in your envelopes.  Leave them in your chairs.

20           Remember all of my admonitions to you not to discuss

21 the case; don't do any research.  You have not heard all the

22 evidence.  Keep an open mind.  Remember all my admonitions.

23           We'll take a break.  I would like to start at ten to

24 11:00.  So we'll try to be as punctual as we can.  If you need

25 more time at any point, just let Ms. Engle know.  I know there

US v. Wiley  -- Trial/Vol III of VII -- 4/21/21

 1  is some limitation to the facilities, but hopefully that will

 2  work.

 3          All right.  So at this time I am going to ask the

 4  jurors to take their morning break.  Ms. Engle will lead you to

 5  the jury room.

 6      (The jury departed the courtroom.)

 7          **THE COURT:**  Please be seated, everyone.  Give them a

 8  moment to get across the hall before anybody else leaves the

 9  courtroom here.

10          All right.  The jury is out of the courtroom.  Any

11  issue you need to raise with me?

12          **MR. GREEN:**  No, Your Honor.

13          **MR. BRYSON:**  No, Your Honor.

14          **THE COURT:**  Okay.  All right.  Let's take our morning

15  break.  I would like to start right at ten 'til, if we can.

16      (Proceedings recessed at 10:30 a.m.)

17      (Proceedings called back to order at 10:51 a.m.)

18      (The Defendant was present.)

19          **THE COURT:**  Please bring the jury in.

20          Please be seated, everyone.  You may call your next

21  witness.

22          **MR. PRINCIPE:**  Thank you, Your Honor.  The Government

23  calls Dale Rio.

24  **DALE RIO**, GOVERNMENT'S WITNESS, being first duly affirmed, at

25  10:53 a.m. testified as follows:

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 64 of 246

1          **THE COURT:**  If you would remove your mask so we can

2   see and hear you.

3          Please proceed.

4                          DIRECT EXAMINATION

5   **BY MR. PRINCIPE**

6   Q    Can you please state your name.

7   A    Dale Rio.

8   Q    And who do you currently work for?

9   A    I currently work for the Office of Chief Medical Examiner

10  in Connecticut.

11  Q    When did you start that position?

12  A    Let's see.  In February of 2019.

13  Q    Okay.  And prior to that, in April of 2018, were you

14  working for the Durham Police Department?

15  A    Yes, I was.

16  Q    And what was your role with the Durham Police Department?

17  A    I was a crime scene investigator.

18  Q    Okay.  Can you give the jurors a little bit of background

19  as far as what the education and training is for somebody who

20  works as a crime scene investigator?

21  A    Sure.  Yeah.  I -- personally, I have a master's degree in

22  forensic science, and I have also done extensive training in

23  addition to that coursework.  I have done training classes at

24  various schools and other educational places.

25  Q    Okay.  And was your first job in law enforcement with the

1  Durham Police Department?

2  A    It was, yes.

3  Q    How many years did you spend with the Durham Police

4  Department?

5  A    Approximately two.

6  Q    If you know or can estimate, how many homicide

7  investigations did you do some form of work in?

8  A    It is hard to estimate.  Over the course of the

9  approximate two years that I worked in Durham, I would put it

10 at about 20.

11 Q    Okay.  In those cases, does there tend to be more evidence

12 than, let's say, in a breaking and entering case?

13 A    I would say typically, yes.

14 Q    Is it common for more than one crime scene investigator to

15 be involved in the collection of evidence in a homicide

16 investigation?

17 A    Again, I would say yes.

18         **THE COURT:**  Can I ask you to bend the microphone just

19 a little more toward your mouth so we can hear you clearly.

20 **BY MR. PRINCIPE**

21 Q    And in that kind of a situation, who decides which crime

22 scene investigators do what as part of the investigation?

23 A    I think it would typically be up to the supervisor who got

24 delegated the different aspects of the case.

25 Q    Okay.  And in a case that involved more than one crime

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 66 of 246

1  scene investigator, would somebody be designated the lead for

2  that case?

3  A    Yes.

4  Q    And who would decide that?

5  A    It would usually be the person who was called to the

6  initial scene.  So that's how that would be determined.

7  Q    Okay.  Do you recall in mid-April of 2018 becoming

8  involved in an investigation with an incident report or OCA

9  number of 18-011976?

10 A    Yes.

11 Q    Was that related to the homicide at Carlton Crossing

12 Drive?

13 A    Yes.

14 Q    Did you perform some investigative work as part of the

15 case?

16 A    I did.

17 Q    Who was the lead crime scene investigator for that case?

18 A    That would be Ben Shields.

19 Q    Do you recall who the lead investigator was, the homicide

20 investigator?

21 A    Cramer.

22 Q    Is that David Cramer?

23 A    Yes, correct.

24 Q    Did you perform work as part of that investigation on

25 April 20, 2018, and April 21, 2018?

1  A    Yes.

2  Q    Can you give a very brief description of what you did on

3  those two days?

4  A    Yes.  So on the first day, during my first shift --

5  actually it was -- it spanned the evening of April 20 into the

6  morning of April 21.  And I documented the vehicle, which had

7  been towed to the garage, the forensic garage.  I photographed

8  it.  I also swabbed for DNA and also gunshot residue, and I

9  also processed it for latent fingerprints.  I also collected

10 items that seemed to be of evidentiary value found in the

11 vehicle.

12 Q    Okay.  At the time of the process -- which vehicle -- I'm

13 sorry.  Let me strike all that.  I apologize.

14     What vehicle are you talking about that you performed

15 investigative work on?

16 A    It was a white Lincoln four-door.  I believe the model was

17 MKX.

18 Q    What information did you have at the time in terms of what

19 types of crime scene investigative services might be needed at

20 that point in time?

21 A    I was asked to process the vehicle, which involved what I

22 had mentioned previously:  Swabbing it for DNA, also gunshot

23 residue and processing for latent fingerprints and collecting

24 anything that might be of evidentiary value.

25 Q    Is it pretty standard to go through all those things as

1  the possible processes for investigative collection?

2  A     Yes.

3  Q     When you go through that process and are trying to collect

4  possible evidence, do you always find things of evidentiary

5  value?

6  A     We don't always found objects to collect, no.

7  Q     Let me show you Government's Exhibits 49 through 52.

8        Can you describe -- while we're waiting for them to come

9  up, can you describe where the garage is that you performed

10 that work in this case?

11 A     Yeah.  The garage at the time was located within the

12 forensics unit.  It was in a parking lot that was behind the

13 forensics building, and it was enclosed by a fence and several

14 gates.

15 Q     Okay.  And was this vehicle in an area that had some type

16 of covering to it?

17 A     Yeah, it was in the garage itself.

18 Q     Okay.  So now I'm showing you Government's Exhibit 49.

19       Do you recognize what that's a photograph of?

20 A     Yeah, that's the vehicle.

21 Q     The white Lincoln MKX?

22 A     Correct.

23 Q     And does that fairly and accurately show the condition of

24 the vehicle, including the appearance of the body color?

25 A     It does, yep.

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 69 of 246

1  Q    And that's how it appeared when you started your work on

2  April 20, 2018?

3  A    Yes.

4  Q    I'm now showing you Government's Exhibit 50.  Do you

5  recognize what that's a photograph of?

6  A    Yeah.  It is the same vehicle.

7  Q    Okay.  And I'm showing you Government's Exhibit 51.

8       What's that a photograph of?

9  A    It is the rear compartment of that same vehicle.

10 Q    And, finally, Government's Exhibit 52.  It's loading.

11      What is that a photograph of?

12 A    It is the front compartment of that same vehicle.

13 Q    Do all of those photographs fairly and accurately show the

14 vehicle at the time you started your work?

15 A    They do, yes.

16           **MR. PRINCIPE:**  Thank you.

17           Your Honor, the Government moves Government's

18 Exhibits 49 through 52 into evidence.

19           And permission to publish those?

20           **THE COURT:**  Admitted.  And you may publish them.

21           **MR. PRINCIPE:**  If we can go back to Government's

22 Exhibit 49.

23 **BY MR. PRINCIPE**

24 Q    Let me ask you:  When you were doing your initial

25 assessment of that vehicle for processing, was there anything

1  that you noticed right away?

2  A    Yeah, a couple of things.  The first was that the left

3  rear window was rolled down about two-thirds of the way.  And

4  also that same door, the left rear door, appeared to be a

5  different color than the rest of the vehicle.

6  Q    All right.  I'm now showing you Government's Exhibit 49 --

7  does that show the discoloration that you just mentioned?

8  A    Yeah, it does.

9  Q    I'm now showing you Government's Exhibit 50.

10     Does that show the license plate number of the vehicle you

11 worked on?

12 A    It does.

13         **MR. PRINCIPE:**  And can we zoom in on that?

14 **BY MR. PRINCIPE**

15 Q    Can you read off the plate number of that vehicle?

16 A    It's Z98 3205.

17 Q    And now Government's Exhibit 51, does this show the

18 seating configuration of the inside of that vehicle?

19 A    It does.

20 Q    And, finally, Government's Exhibit 52, does that show the

21 appearance of the front area, including the steering wheel, the

22 center console, and I guess where some of the buttons and the

23 monitor is in the center?

24 A    It does.

25 Q    You mentioned that you swabbed for trace evidence.

1    Can you explain what that means?

2  A    Yeah.  We would swab for touch DNA, and typically we would

3  swab areas where a person was likely to touch.  So that would

4  include the door handles, both the exterior and interior door

5  handles, the window levers, locks, the steering wheel, anything

6  else in the driver's compartment that would pertain to driving,

7  like the blinkers and areas like that that would likely be

8  touched.

9    I believe in this case there was a red discoloration on

10 the exterior of the vehicle that I also swabbed for potential

11 blood DNA evidence, and I also swabbed for gunshot residue in

12 all four compartments of the vehicle.

13 Q    Okay.  Now, I'm going show you a series of photographs

14 starting with Government's Exhibit 53.

15    Do you recognize what that's a photograph of?

16 A    Yeah.  It is the left rear window of the vehicle -- I'm

17 sorry -- the door of the vehicle.

18 Q    Okay.  Does that also show the window rolled down the way

19 you described it before?

20 A    It does.

21       MR. PRINCIPE:  Government would move Government's

22 Exhibit 53 into evidence, and permission to publish?

23       THE COURT:  Admitted.  You may.

24 BY MR. PRINCIPE

25 Q    And at some point, did you collect glass fragments from

1  inside that vehicle?

2  A    I did, yes.

3  Q    Can you explain when you collected them and where you

4  collected them?

5  A    Yes.  So that would have been the shift that took place on

6  the evening of April 20 through the morning of April 21.  And

7  there were some glass fragments in the left rear compartment on

8  the floor and on the seat and also in the door pocket, and then

9  there were also some glass fragments beneath the front left

10 seat.  And I collected all of those.

11 Q    I'm going to show you first two photographs, Government's

12 Exhibits 54 and 55.

13       Can you see Government's Exhibit 54?

14 A    Yes, I can.

15 Q    And what is that a photograph of?

16 A    It is the door pocket from the left rear compartment of

17 the car.

18 Q    I'm now showing you Government's Exhibit 55.

19       And what is that a photograph of?

20 A    It is fragments of glass within that pocket.

21 Q    And is that where you collected one of the samples from?

22 A    Yes.

23       **MR. PRINCIPE:**  Government would move to introduce

24 Government's Exhibits 54 and 55.

25       **THE COURT:**  Admitted.

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 73 of 246

 1              **MR. PRINCIPE:**  And permission to publish those?

 2              **THE COURT:**  You may.

 3   **BY MR. PRINCIPE**

 4   Q    So that's the pocket you're talking about?

 5   A    Yes.

 6   Q    I'm now showing you Government's Exhibit 55.

 7        Does that show some of the glass fragments you collected?

 8   A    It does.

 9   Q    Is that the same door and the same pocket of the door that

10   was in Government's Exhibit 53, the left rear passenger door?

11   A    Yes.

12   Q    Now, I would like to show you two photographs,

13   Government's Exhibits 56 and 57.

14        Can you see Government's Exhibit 56?

15   A    I can.

16   Q    What is that a photograph of?

17   A    It is the left rear compartment of the vehicle, primarily

18   the floor.

19   Q    Okay.  And I'm showing you now Government's Exhibit 57.

20        Is that the same area of the vehicle?

21   A    It is.

22   Q    Is it just more close up?

23   A    Yeah.  And you can see some glass fragments.

24   Q    Okay.  And is that the second area where you collected

25   glass fragments?

1  A    It is.

2  Q    Maybe not in sequence, but that is a second area where you

3  collected glass fragments from?

4  A    Yes.

5         **MR. PRINCIPE:**  Government would move to introduce

6  Government's Exhibits 56 and 57.

7         **THE COURT:**  Admitted.

8         **MR. PRINCIPE:**  And permission to publish them?

9         **THE COURT:**  You may.

10 **BY MR. PRINCIPE**

11 Q    On the right-hand side of that image, Government's

12 Exhibit 56, is that the rear left passenger seat?

13 A    Yes, it is.

14 Q    Okay.  And the glass fragments, where are they located in

15 this image?

16 A    They are kind in the middle bottom area.

17 Q    In the carpeting or matting of the vehicle?

18 A    Yes, in the carpeting and then along the edge of the door

19 frame.

20         **MR. PRINCIPE:**  If we can go to Government's

21 Exhibit 57?

22 **BY MR. PRINCIPE**

23 Q    Can you see them more clearly in this closeup image?

24 A    Yes.

25 Q    Now, I'm going to show you an another two photographs,

1  Government's Exhibits 58 and 59.

2       What is Government's Exhibit 58?

3  A    That appears to be the left front compartment of the

4  vehicle, primarily the seat and the floor.

5  Q    Okay.  And is that where the driver's seat would be?

6  A    Yes.

7  Q    And did you collect glass from somewhere in that general

8  area?

9  A    From below the seat.

10 Q    And now I'm going to show you Government's Exhibit 59.

11      And what is that a photograph of?

12 A    It is the glass fragments that were found below that seat.

13 Q    Below the driver's seat?

14 A    Correct.

15      **MR. PRINCIPE:**  Government would move to introduce

16 Government's Exhibits 58 and 59.

17      **THE COURT:**  Admitted.

18      **MR. PRINCIPE:**  Permission to publish those?

19      **THE COURT:**  You may.

20 **BY MR. PRINCIPE**

21 Q    So that's the driver's seat of the Lincoln MKX?

22 A    It is.

23 Q    And now Government's Exhibit 59, are those the glass

24 fragments you collected from under the driver's seat?

25 A    Yes.

US v. Wiley  -- Trial/Vol III of VII -- 4/21/21

1  Q    So far you've described three places where you collected

2  glass fragments; correct?

3  A    Correct.

4  Q    And all of those were on the left driver's or passenger's

5  side of that vehicle?

6  A    Correct.

7  Q    Can you explain to the jurors:  What do you do as you're

8  collecting evidence?  What do you do?  How do you package it?

9  And where do you place it?

10 A    So we would generally package it in a bag, a breathable

11 bag, so a paper bag or a paper envelope, and then we would put

12 it in a locker in the actual forensics building, and it would

13 be stored there.

14 Q    Okay.  And what kinds of information do you put on the

15 packaging as you collect items?

16 A    The date and time, the case number, the name of the

17 investigator who did the collection, and a description of the

18 item.

19 Q    Okay.  Who has access to that area where you lock the

20 evidence up in the forensic department or area?

21 A    Just the crime scene staff.

22 Q    Did you direct those glass fragments that you collected to

23 the attention of any other investigator?

24 A    Yes, that would be Ben Shields.  He was the lead on the

25 case.

1  Q    Okay.  Now I'm going to show you Government's Exhibits 60

2  and 61.

3       What is Government's Exhibit 60?

4  A    That's underneath the driver's seat.  It's a plastic water

5  bottle and a plastic bag that were located there.

6  Q    What did you do after photographing those items?

7  A    I collected them, and that's when I saw the glass that was

8  in that area.

9  Q    Okay.  I'm now showing you Government's Exhibit 61.

10      What is that a photograph of?

11 A    It looks like glass fragments in the door in the left rear

12 compartment.

13 Q    Did you collect a lighter at some point?

14 A    There is a lighter in the back -- in the seat pocket

15 behind the left front seat.

16 Q    Okay.  Did you collect a wrapper?

17 A    Yeah, there was a candy wrapper under the right front

18 seat, and that was collected.

19 Q    Looking at Government's Exhibit 61, do you know which door

20 this photograph was taken?

21 A    I'm sorry.  I can't identify it.

22      **MR. PRINCIPE:**  Your Honor, the Government is going to

23 move Government's Exhibit 60 into evidence.

24      **THE COURT:**  Admitted.

25      **MR. PRINCIPE:**  Permission to publish that?

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 78 of 246

1           **THE COURT:**  You may.

2  **BY MR. PRINCIPE**

3  Q    And that is the water bottle and the plastic wrapping you

4  collected from under the driver's seat?

5  A    Correct.

6  Q    Did you perform any -- did you attempt to collect any

7  fingerprints from the outside of the vehicle?

8  A    I did, yes.

9  Q    Can you describe what that process is like?

10  A    You use a powder.  In this case I used magnetic powder,

11  which is distributed over the vehicle or the area that you're

12  processing, and then you use fingerprint tape to lift off any

13  latent fingerprints that may be in that area.

14  Q    Okay.  I'm now going to show you Government's Exhibit 62.

15       Do you recognize what that's a photograph of?

16  A    Yes.

17  Q    And what is that a photograph of?

18  A    It is the same vehicle after it's been processed for

19  latent fingerprints.

20  Q    Does the passenger side doors appear different as a result

21  of that?

22  A    You can see the residue of the magnetic powder on the

23  places that have been processed.

24  Q    Okay.

25           **MR. PRINCIPE:**  The Government would move Government's

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 79 of 246

1   Exhibit 62 into evidence.

2              **THE COURT:**  Admitted.

3              **MR. PRINCIPE:**  And permission to publish that?

4              **THE COURT:**  You may.

5              **MR. PRINCIPE:**  Can we zoom in on the rear passenger

6   door?

7   **BY MR. PRINCIPE**

8   Q    Does that reflect the result of the powder that was placed

9   on the door?

10  A    It does.

11  Q    I'm now showing you Government's Exhibits 63, 64 and 65.

12       What is Government's Exhibit 63?

13  A    It is the interior of the left rear door.

14  Q    Is that the same door as in Government's Exhibit 53?

15  A    Yes.

16  Q    Was this photograph taken at the same time or a later

17  time?

18  A    I believe this one was taken during my second shift, which

19  would have been the evening of April 21 through the morning of

20  April 22.

21  Q    And what did you do during that second shift?

22  A    So during that second shift, I identified some other items

23  of -- potential items of evidence, and then I disassembled the

24  door.

25  Q    Is that the door that you disassembled?

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 80 of 246

1   A    Yes.

2   Q    I'm now showing you Government's Exhibit 64.

3        What is that a photograph of?

4   A    That's the interior panel of the left rear door.

5   Q    Is that after you disassembled that component?

6   A    It is.

7   Q    I'm showing you Government's Exhibit 65.

8        And what is that a photograph of?

9   A    It is a defect on the interior of that door.

10           **MR. PRINCIPE:**  The Government would move to introduce

11  Government's Exhibits 63, 64 and 65, and permission to publish

12  those?

13           **THE COURT:**  Admitted.  And you may.

14  **BY MR. PRINCIPE**

15  Q    We're showing you Government's Exhibit 63.

16       That's the left rear passenger door you disassembled on

17  your second shift; correct?

18  A    It is.

19  Q    I'm showing you Government's Exhibit 64.  Is that the

20  paneling after you took it off?

21  A    It is.

22  Q    What is the white object in the middle of that image?

23  A    It is a scale that we used to identify things that we are

24  documenting.

25  Q    Okay.  Is there anything written on there?

1      Let me show the next image, Government's Exhibit 65.  Is

2  that the same marker but close up?

3  A    It is.

4  Q    What is written on there?

5  A    "B8."

6  Q    And why do you write on that sticker?

7  A    It's to identify items of evidence that we find and

8  document.

9  Q    And what is along the right-hand side of that sticker?

10  A    It is a measurement scale.

11  Q    And what scale is it in?  Millimeters?  Centimeters?  What

12  do you usually have on there?

13  A    I believe it is millimeters.

14  Q    And why does it have that on there?

15  A    So that we can measure items of evidence that we find.

16  Q    And you had identified that as a defect at the time?

17  A    Correct.

18  Q    All right.  I'm now showing you a series of photos,

19  Government's Exhibits 66, 67, 68 and 69.

20      What is Government's Exhibit 66?

21  A    It is the metal structure within the left rear door.

22  Q    And that's after you took the paneling off?

23  A    Correct.

24  Q    I'm showing you Government's Exhibit 67.

25      What is that a photograph of?

1  A     It is a closeup of that same panel, and also visible is

2  the window mechanism.

3  Q     Okay.  I'm showing you now Government's Exhibit 68.

4        What is that a photograph of?

5  A     The window mechanism.

6  Q     And Government's Exhibit 69, what is that a photograph of?

7  A     That's the metal panel within the door frame.

8  Q     And what is it showing in that photograph?

9  A     A defect in that panel.

10            **MR. PRINCIPE:**  The Government would move to introduce

11  Government's Exhibits 66 through 69, and permission to publish

12  those?

13            **THE COURT:**  They are admitted.  And you may.

14  **BY MR. PRINCIPE**

15  Q     So that is the left rear passenger door with the paneling

16  taken off?

17  A     Correct.

18  Q     Can you explain -- is there anything you have to do during

19  the process of taking the paneling off?  Can you just walk the

20  jurors through?  What is the process of taking the paneling off

21  that door?

22  A     I don't remember precisely, but we had tools at our

23  disposal in the garage.  So I would have to have loosened some

24  bolts and removed the panel that way.

25  Q     Is it accurate that there is a speaker in the bottom

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 83 of 246

1  right-hand side of that door?

2  A     Yes.

3  Q     Were there other electrical components?

4  A     I believe the window mechanism was electric, yes.

5  Q     I'm now showing you Government's Exhibit 67.

6        There are two stickers on there; correct?

7  A     Correct.

8  Q     And you labeled those stickers?

9  A     Correct.

10 Q     Why did you mark those particular areas?

11 A     Because there were defects that were visible.

12 Q     Okay.  Did you see any corresponding defects on the

13 exterior of that door -- on the outside exterior of that door?

14 A     No.  That was the door where the paint appeared to be a

15 different color than the rest of the vehicle, but there was no

16 defect visible.

17 Q     I'm now showing you Government's Exhibit 68.

18       Is that a closeup of the defect that you labeled "B4"?

19 A     Yes, it is.

20 Q     And is that what you're referring as to the window

21 mechanism?

22 A     Yes.

23 Q     I'm now showing you Government's Exhibit 69.

24       That's the defect you labeled "B6"?

25 A     Correct.

1   Q    Can you describe the nature of that defect?

2   A    It is penetrating the metal frame of the door.

3   Q    In which direction does the metal appear to be penetrated?

4   A    It appears to be coming towards the interior of the

5   vehicle.

6   Q    At some point, did you try to manipulate or adjust the

7   left rear passenger window?

8   A    Yeah.  Initially, I had tried to raise it all the way up

9   so that I could access the areas that I wasn't able to access

10  the previous evening so I could fingerprint -- process them for

11  fingerprints, but I found that the window wouldn't remain

12  closed.  It kept slipping down to that approximate two-thirds

13  open position.

14  Q    Okay.  Now I'm going to show you two other photographs,

15  Government's Exhibits 70 and 71.

16       What is Government's Exhibit 70?

17  A    That's the reverse side of the inside panel of that door.

18  Q    Did you examine that?

19  A    I did.

20  Q    And now I'm showing you Government's Exhibit 71.

21       What is that a photograph of?

22  A    It is a defect in that panel.

23  Q    That's a closeup of the same panel?

24  A    Correct.

25            **MR. PRINCIPE:**  The Government would move Government's

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 85 of 246

1  Exhibits 70 and 71 into evidence, and permission to publish

2  those?

3          **THE COURT:**  Admitted.  And you may.

4  **BY MR. PRINCIPE**

5  Q   So this is Government's Exhibit 70, and that's the inside

6  of the paneling you took off?

7  A   Correct.

8  Q   Can you see a sticker on there?  If we zoom in, do you see

9  a sticker marked "B7"?

10  A   I do.

11  Q   Now we'll move to Government's Exhibit 71.

12      That's a closeup photograph of that same sticker?

13  A   It is.

14  Q   Can you describe the nature of the defect that you marked

15  here?

16  A   It is a hole in the -- I believe it's plastic material on

17  the interior of that door panel.

18  Q   Do you recall -- you mentioned that you did collect a

19  lighter from the vehicle?

20  A   Yes.

21  Q   Do you recall where you collected it from?

22  A   I believe it was from the pocket behind the left front

23  seat.

24  Q   So if you are sitting in the rear of the vehicle, the

25  pocket would be in front of the person sitting there?  Is that

Case 1:19-cr-00529-TDS  Document 361  Filed 02/04/22  Page 86 of 246

1  what you're talking about?

2  A    Yes.

3            MR. PRINCIPE:  No further questions, Your Honor.

4            THE COURT:  Any cross?

5            MR. BRYSON:  Can I ask for Government's Exhibit 58,

6  please?

7                      CROSS-EXAMINATION

8  BY MR. BRYSON

9  Q    Can you see Government's Exhibit 58?

10 A    Yes, I can.

11 Q    And this is a photograph that you took; correct?

12 A    Correct.

13 Q    And it's of the front passenger area of the Lincoln;

14 correct?

15 A    It appears to be the front driver's area.

16 Q    Okay.  And in this vehicle in the front passenger

17 compartment -- and I'm talking both passenger and the driver's

18 side -- there are bucket seats; correct?

19 A    Correct.

20 Q    And the bucket seats are separated by a center console; is

21 that correct?

22 A    Correct.

23 Q    All right.

24           MR. BRYSON:  Can I ask for Government's Exhibit 52 to

25 be brought up now?

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 87 of 246

1  BY MR. BRYSON

2  Q    Can you see Government's 52 now?

3  A    I can.

4         MR. BRYSON:  I'm sorry.  Fifty-one.  My mistake.

5  BY MR. BRYSON

6  Q    And you can see 51 now?

7  A    I can.

8  Q    And this is a photograph that depicts the rear compartment

9  of the Lincoln; is that correct?

10 A    It does.

11 Q    And in the backseat area, there are two seat areas that

12 correspond with the front bucket seats; is that fair?

13 A    Could you repeat that, please?

14 Q    There are two seating areas that are directly behind the

15 bucket seats in this vehicle; is that correct?

16 A    Yes.

17 Q    And then there is a smaller seating area that's located

18 behind the center console; is that correct?

19 A    Yes.

20 Q    Are you the only CSI to have worked on this vehicle?

21 A    I don't know.

22 Q    You, yourself, did not find any projectiles in the

23 vehicle?

24 A    I did not.

25         MR. BRYSON:  Those are my questions.

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 88 of 246

1           **THE COURT:**  Any redirect?

2           **MR. PRINCIPE:**  No additional questions.

3           **THE COURT:**  Thank you.  You may step down.

4           **MR. PRINCIPE:**  May the witness be released, Your

5    Honor?

6           **MR. BRYSON:**  No objection.

7           **THE COURT:**  Yes.

8           You are free to leave.

9        (At 11:28 a.m., witness excused.)

10          **MR. PRINCIPE:**  The Government would next call Corey

11   Benjamin.

12   **COREY BENJAMIN,** GOVERNMENT'S WITNESS, being first duly affirmed

13   sworn, at 11:28 a.m. testified as follows:

14          **THE COURT:**  If you would remove your mask so we can

15   see and hear you.  Direct the microphone toward your mouth so

16   we can hear you.

17          **THE WITNESS:**  Okay.

18          **THE COURT:**  Please proceed.

19                          DIRECT EXAMINATION

20   **BY MR. PRINCIPE**

21   Q    Can you please state your name.

22   A    Corey Benjamin.

23   Q    Who do you work for?

24   A    Auto Glass Now.

25   Q    What is your job with Auto Glass Now?

1  A    District manager.

2  Q    What does your district cover, what areas?

3  A    Durham, Raleigh, Greenville, and Fayetteville, North

4  Carolina.

5  Q    How long have you been in that position?

6  A    About three years.

7  Q    And what are some of the responsibilities of a district

8  manager?

9  A    Day-to-day operations of the four stores, making sure they

10  are fully staffed, make sure everybody is doing their job.

11  Q    Are you familiar with the types of positions at the store

12  level?

13  A    Yes, sir.

14  Q    What kind of positions are at each store level?

15  A    Store manager; most of the stores have an assistant

16  manager; the ones that don't have a CSR, customer service

17  representative; and then technicians and trainees.

18  Q    What are some of the products and services that Auto Glass

19  Now provides?

20  A    Replacement of automobile glass windshields, door glasses,

21  back glasses.  Essentially any glass in an automobile.

22  Q    So that's basically the specialty of Auto Glass Now?

23  A    Yes, sir.

24  Q    Is that why the Auto Glass Now portion is in the name?

25  A    Yes.

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 90 of 246

1  Q    Do people generally want quick service from that business?

2  A    Yes, sir.

3  Q    Are you familiar with the store located at 1600 South

4  Miami Boulevard, Durham, North Carolina?

5  A    Yes.

6  Q    What store is that?

7  A    That's our Durham store.

8  Q    How many Durham stores do you have?

9  A    Just one.

10 Q    Are you familiar with the people who work there?

11 A    Yes, sir.

12 Q    Who is the manager at that store?

13 A    That store, the manager right now is David Leo.

14 Q    Are you familiar with an individual named David Johnson,

15 Jr.?

16 A    Yes, sir.

17 Q    And who is that person?

18 A    A technician.

19 Q    Okay.  And you were in your same position back in April of

20 2018?

21 A    Yes, sir.

22 Q    Have you had a chance to review some business records from

23 that store prior to trial?

24 A    Yes, sir.

25 Q    I would like to show you Government's Exhibit 72.

1      Do you recognize what that document is?

2  A    Yes, sir.

3  Q    What kind of document is that?

4  A    It is a printout of one of our invoices for a work order

5  that was performed in that store.

6  Q    Is that a copy of what a customer would get if they placed

7  an order with you?

8  A    No, sir.  That's a screen print of -- from our system

9  after a job has been done.

10 Q    So that's an internal document that your business records

11 and keeps?

12 A    Yes, sir.

13 Q    And what kind of information is in this document?

14 A    The type of vehicle, customer name and phone number, and

15 the part that we replaced.

16 Q    Can you describe the general process for the jury of how a

17 person might place an order and obtain services, drop off a

18 vehicle, and then pick that vehicle up when it's completed.

19 A    Yes, sir.  Generally, a phone call comes in when a

20 customer needs work done.  We ask year, make, and model.  We

21 enter that into the system; find out which piece of glass they

22 are looking for, whether it be the windshield, door glass, or

23 anything else in the vehicle; take their name and phone number,

24 at which point we search our vendors to see who has the part in

25 stock and what our cost is on the part, and we quote the

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 92 of 246

1  customer that price.  And then we ask them how soon they would

2  like to get it done.  That's -- timing on a schedule and

3  appointment's dictated on how quickly we can get the glass and

4  how quickly the customer wants to bring it in.

5  Q    So you don't know always have the exact glass that

6  somebody may need right there in the store?

7  A    No, we don't stock glass, but we have three warehouses in

8  Raleigh that we buy from that deliver multiple times during the

9  day to us.

10 Q    Okay.  And referring you back to Government's Exhibit 72,

11 what type of vehicle does that record pertain to?

12 A    A 2017 Lincoln MKX four-door utility SUV.

13 Q    What store does that record pertain to?

14 A    The Durham, North Carolina, store, the one at 1600 South

15 Miami Boulevard.

16 Q    And is there a date associated with that record?

17 A    Not on this piece of paperwork here, no, sir.

18 Q    But is there an identifier for that record that matches up

19 to an invoice or customer receipt?

20 A    Yes, a transaction number in the top left corner.  The

21 4141590 is the invoice number.

22 Q    Thank you.  And these records are generated as part of

23 your business at the time that the information is entered into

24 the system?

25 A    Yes, sir.

US v. Wiley  -- Trial/Vol III of VII -- 4/21/21

1          **MR. PRINCIPE:**  The Government would move to

2     Government's Exhibit 72 into evidence.

3          **THE COURT:**  Admitted.

4          **MR. PRINCIPE:**  And move to publish that?

5          **THE COURT:**  You may.

6     **BY MR. PRINCIPE**

7     Q    I would like to zoom in on the top portion of that

8     document.

9          So you've already mentioned the transaction ID in the

10    upper left corner; correct?

11    A    Yes, sir.

12    Q    What other information is contained in this document?

13    A    Well, in the middle of it, it identifies what part we

14    replaced, which was the rear driver's side door glass, and the

15    part number for it.  And then in the bottom left, it has the

16    customer name and phone number there.

17    Q    Okay.  And you said the "rear driver's side door."  So you

18    are talking about the driver's side of the vehicle, but the

19    rear passenger door?

20    A    Yes, sir.

21    Q    How much was charged for that?

22    A    190 plus tax.  So it came to a total of 213.94.

23    Q    Is there vehicle information on this document?

24    A    Like I said, up at the top right corner, it lists what

25    kind of vehicle is -- we worked on, which is the 2017 Lincoln

US v. Wiley  -- Trial/Vol III of VII -- 4/21/21

1    MKX.

2    Q    Okay.  And at the bottom, is there customer information?

3    A    Yes.  It has a name of Reese and then the customer's phone

4    number that they gave us or -- well, gave us or what they

5    called from.

6    Q    Can you identify the name and how it's spelled?

7    A    It says Reese, R-E-E-S-E.

8    Q    And what was the phone number that was documented in the

9    record?

10   A    (864)484-6112.

11   Q    That number ends in 6112?

12   A    Yes, sir.

13   Q    I'm now showing you Government's Exhibit 73.

14        What kind of record is that?

15   A    That is the work order.

16   Q    Okay.

17   A    That's what the customer would receive and what our

18   technicians use for doing the jobs.

19   Q    So multiple people might put information into or on that

20   document?

21   A    Yes, sir.

22   Q    And does this document pertain to the store in Durham,

23   North Carolina?

24   A    Yes, sir.

25   Q    And what is the date associated with that invoice or

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 95 of 246

1  receipt?

2  A    I can't make it out.  It's in the middle section there.

3  Also, there at the top, it's 4/16/18.

4  Q    So April 16, 2018?

5  A    Yes, sir.

6  Q    And, again, is there customer information in the upper

7  left-hand area?

8  A    Yes, sir.

9  Q    What is the information on there?

10 A    Customer is Reese and phone number is (864)484-6112.

11 Q    What is the vehicle associated with the document?

12 A    The 2017 Lincoln MKX four-door utility.

13        **MR. PRINCIPE:**  Your Honor, Government moves to

14 introduce Government's Exhibit 71 into evidence, and permission

15 to publish -- I'm sorry -- 73.  My apologies.

16        **THE COURT:**  Seventy-three is admitted.  And you may

17 publish it.

18 **BY MR. PRINCIPE**

19 Q    Okay.  So, again, I would like to zoom in on the store and

20 date information in the upper right-hand corner.

21        And that shows the address on South Miami Boulevard of the

22 Durham store; is that correct?

23 A    Yes, sir.

24 Q    And date of April 16, 2018?

25 A    Yes, sir.

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 96 of 246

1          MR. PRINCIPE:  And now if we can zoom in on the

2     customer information?

3     BY MR. PRINCIPE

4     Q    And that shows the customer information and the vehicle

5     information?

6     A    Yes, sir.

7     Q    And now looking -- is there some handwritten information

8     on the receipt as a whole?

9     A    Yes, sir.

10    Q    And where are those areas?

11    A    You've got the notation by the amount that says it was

12    paid in cash.  And then two different notations on the

13    paperwork where it's got the technician name on it at the top

14    and down the bottom where it says technician name of David.

15    Q    Is that a typical thing for your technicians to do when

16    they work on a particular order?

17    A    Yes, sir.  They put their name on it so they get credit

18    for the job they did.

19    Q    And the notation you said about --

20          MR. PRINCIPE:  Let's zoom in on the payment amount.

21    BY MR. PRINCIPE

22    Q    So what does that handwritten notation mean?

23    A    It's saying cash, that the ticket was paid in cash.

24    Q    And it also has a typed notation "cash"?

25    A    Yes.

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 97 of 246

1  Q    All right.  And then, finally, I would like to zoom in on

2  where it is a diagram of a vehicle.

3       What is that part of the invoice or job ticket used for?

4  A    It is our preinspection.  It's to notate any damage to the

5  vehicle so that we don't get blamed for anything that's

6  previously on the vehicle before we start work.

7  Q    Do people ever do that?

8  A    Yes, sir.

9  Q    I have no additional questions.

10          **THE COURT:**  Any cross?

11          **MR. BRYSON:**  No questions, Your Honor.

12          **THE COURT:**  All right.  You may step down, sir.  If

13  you would put your mask back on.

14          **MR. PRINCIPE:**  May this witness be released, Your

15  Honor?

16          **MR. BRYSON:**  No objection.

17          **THE COURT:**  You're free to leave.

18       (At 11:40 a.m., witness excused.)

19          **MR. PRINCIPE:**  Your Honor, the next witness would be

20  David Johnson, Jr.

21  **DAVID JOHNSON**, GOVERNMENT'S WITNESS, being first duly affirmed,

22  at 11:40 a.m. testified as follows:

23          **THE COURT:**  If you would remove your mask so we can

24  see and hear you, sir.

25          Thank you.

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 98 of 246

```
 1                    DIRECT EXAMINATION
 2  BY MR. PRINCIPE
 3  Q    Would you please tell the jurors your name.
 4  A    David Johnson.
 5  Q    Do you go by David -- I'm sorry.  Are you a junior?
 6  A    No.
 7  Q    You're not?
 8  A    No, I'm not a junior.
 9  Q    I'm sorry.
10       And how old are you?
11  A    Thirty-six.
12  Q    And do you live in the Durham area?
13  A    Yes, sir.
14  Q    Where do you work?
15  A    Auto Glass Now.
16  Q    And which store location is that?
17  A    I'm in the Durham location.
18  Q    And what is the address?  Is that on South Miami
19  Boulevard?
20  A    Yes, sir, 1600.
21  Q    How long have you worked there?
22  A    I have been there off and on about 12 years.
23  Q    Were you working in there in April of 2018?
24  A    Yes, sir.
25  Q    And what is your job there?
```

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 99 of 246

1  A    I'm an auto glass technician.

2  Q    Can you tell the jurors just a little bit about what you

3  do and how you do it?

4  A    Pretty much if your windshields are broken, door glass are

5  broken, they come to us, and we install the windshields and

6  door glasses for you.

7  Q    How long does it typically take to replace either a

8  windshield or a window from a side door?

9  A    Windshield's probably about an hour.  Door glass is

10 probably about 45 minutes, depending on the vehicle.

11 Q    Okay.  And where do you get your parts from when you have

12 to replace something like that?

13 A    We got them from the warehouse, Mygrant Glass or PGW.

14 Q    When you personally work on a vehicle, do you have to

15 document anything as you do your work?

16 A    If the vehicle has any damage, we have to notate that just

17 so we're not held liable for the damages on the vehicle.

18 Q    Can you describe your store a little bit, the one that's

19 on Miami Boulevard?

20 A    We have three bays, an awning in the front, and just

21 pretty much standard shop, mechanic shop.

22 Q    Is it a big store or it is a small store?

23 A    Small.  We are not that big.

24 Q    How many people are typically working there on a given

25 day?

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 100 of 246

1  A    We have a crew of five.

2  Q    Do you typically have direct contact with customers when

3  they bring jobs in?

4  A    Not all the time.  We are not supposed to have them in the

5  bay.  So other than just going over the preinspection, we have

6  everybody sit in the office while we work on the vehicle.

7  Q    Describe the preinspection progress.  What is that like?

8  A    We just -- hey -- bring the customer out.  Hey, sir, how

9  you doing today?  We just want to show you you have a few nicks

10  on your vehicle.  There is a rip in your seat here.  We noticed

11  a dent here on your vehicle.  Just pointing this out to you

12  just so you, you know, don't say we're liable for the damages

13  on the car.

14  Q    And now I would like to show you a document.  This is

15  Government's Exhibit 73, which is in evidence.

16       Do you recognize that document?

17  A    Yes, I do remember this piece of paper.

18  Q    I'm going to zoom in a little bit at the top.

19       Is your name written on there?

20  A    Uh-huh.  That's me.  That's my handwriting.

21  Q    Do you see the date April 16, 2018?

22  A    Yes, sir.

23  Q    Were you working that day?

24  A    Uh-huh.

25  Q    I'm going to zoom in on the vehicle and customer

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 101 of 246

1  information.

2      Did you perform work on a Lincoln MKX 2017?

3  A    I get so many Lincoln MKXs, I couldn't remember which one

4  individually.

5  Q    So you work on a lot of vehicles in a given day?

6  A    Yes, sir.

7  Q    So you wouldn't remember every single one?

8  A    Not right offhand, sir.

9  Q    But if your name is written on there, you performed the

10  work?

11  A    Yes, correct.  We get a commission, so we have to write

12  our name on each ticket just so we get paid for that commission

13  on working on that vehicle.

14  Q    So you want to make sure your name is on there?

15  A    Yes, sir.

16          **MR. PRINCIPE:**  Now, if we can zoom down to the

17  diagram?

18  **BY MR. PRINCIPE**

19  Q    Did you mark any damage that you noticed on that vehicle

20  you worked on that day?

21  A    Yes, sir.  Right here, there were -- we had an FBI agent

22  come in, and she asked me what I wrote.  But I think I just

23  wrote down "body damage," from what it looks like.

24  Q    Now, do you try to write down what you see in the area

25  where you saw it?

1  A    Uh-huh.

2  Q    So it looks like you wrote that on the rear passenger

3  door?

4  A    Yes, sir.

5  Q    And that would be on the driver's side of the vehicle;

6  correct?

7  A    Yes, correct.

8  Q    Okay.  Do you remember in any detail what that damage was

9  exactly?

10 A    Not right offhand.  Not right offhand.  It's been a while.

11         **MR. PRINCIPE:**  I have no additional questions, Your

12 Honor.

13         **THE COURT:**  Any cross?

14                         CROSS-EXAMINATION

15 **BY MR. BRYSON**

16 Q    So you don't have a specific recollection of the repairs

17 that you did on this vehicle?

18 A    No, sir.

19 Q    When you are replacing a door glass, as part of the

20 process in replacing it, once you put in the new glass, do you

21 make sure that the window rolls up all the way up?

22 A    Yes, sir.

23 Q    And if it wouldn't roll all the way up, would you make a

24 note of that and/or put something on the invoice?

25 A    We would just make a verbal.  We wouldn't just write just,

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 103 of 246

1  hey, buddy -- let's, for instance, say your regulator is

2  damaged; you might want to get a regulator.  But we go ahead

3  and we'll stabilize the windshield just so it's up and, you

4  know, no rain or anything gets in like that.

5  Q    You don't have any recollection of that occurring on this

6  occasion?

7  A    No, sir, not that far back.

8           MR. BRYSON:  Okay.  Those are my questions.

9           MR. PRINCIPE:  I have no additional questions, Your

10  Honor.

11           THE COURT:  Sir, you may leave -- is he being

12  excused?

13           MR. PRINCIPE:  Yes, may he be released?

14           THE COURT:  Any objection?

15           MR. BRYSON:  No, Your Honor.

16           THE COURT:  All right.  You are free to leave.  If

17  you would put your mask back on as you leave.

18           Thank you, sir.

19       (At 11:47 a.m., witness excused.)

20  **FORENSICS SPECIALIST WILLIAM MCFAYDEN**, GOVERNMENT'S WITNESS,

21  being first duly affirmed, at 11:48 a.m. testified as follows:

22           THE COURT:  If you would remove your mask so we can

23  see and hear you.  You're welcome to have a seat.

24           THE WITNESS:  Yes, sir.

25           THE COURT:  Just make sure the microphone is directed

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 104 of 246

1  toward your mouth so we can hear you.

2              Thank you, sir.

3                      DIRECT EXAMINATION

4  **BY MR. PRINCIPE**

5  Q    Can you please state your name.

6  A    William McFayden.

7  Q    And who do you work for?

8  A    The Durham Police Department.

9  Q    How long have you worked there?

10 A    Approximately 18 years.

11 Q    And what is your current position?

12 A    Digital forensic specialist for the police department.

13 Q    What does a digital forensic specialist do?

14 A    I get evidence off of devices that would hold digital

15 data.  It could be computers, cell phones, tablets, and then I

16 also go and retrieve surveillance video.

17 Q    And do you have any specialized training related to your

18 work with digital devices or surveillance video?

19 A    Yes, I have approximately 600 hours' worth of training in

20 computer forensics, cell phone forensics, and then also video

21 retrieval and enhancement.

22      For videos, I went to classes put on by a company called

23 Signalscape.  They do training for video enhancement and video

24 retrieval, and then they also have a product that does the

25 enhancements on videos.

Case 1:19-cr-00529-TDS  Document 361  Filed 02/04/22  Page 105 of 246

1  Q    And so I'm going to direct your attention to an

2  investigation in April of 2018.

3       Did you participate in an investigation related to a

4  homicide at Carlton Crossing Drive?

5  A    Yes, I did.

6  Q    And was there more than one thing you did as part of that

7  investigation?

8  A    Yes, there was.

9  Q    Okay.  I'm just going to direct your attention to the

10 retrieval of a video from Chapel Tower Apartments.  Is that

11 something you did?

12 A    Yes, I did retrieve video from Chapel Tower Apartments.

13 Q    Can you tell the jurors about how that came about?

14 A    I was requested by Investigator Cramer with the Durham

15 Police Department to retrieve the video from the apartment

16 complex at 1315 Morreene Road.  I responded to the complex and

17 was able to retrieve surveillance video.

18 Q    And can you -- how many times did you go out to Chapel

19 Tower Apartments?

20 A    I actually went to Chapel Tower Apartments on three

21 occasions.  There was -- Investigator Cramer had stated that he

22 was looking for a white --

23           MR. BRYSON:  Object to what Officer Cramer said he

24 was looking for.

25           THE COURT:  Well, I'll allow him to testify as to

Case 1:19-cr-00529-TDS  Document 361  Filed 02/04/22  Page 106 of 246

1  what the officer may have told him, only to the extent that it

2  explains what he's about to do next, for the nonhearsay

3  purpose.

4           So you're allowed -- so it is overruled.  You are

5  allowed to testify as to what the officer told you, only

6  insofar as it explains why you did what you did.

7           Otherwise, you are not to consider it for the truth,

8  ladies and gentlemen.

9           **THE WITNESS:**  Investigator Cramer was looking for a

10  white SUV that may show up in the video.  He had a time frame

11  that he was looking for.  The first time frame, I did not see

12  the SUV in the video.  So I went back on a second occasion, for

13  a second time frame, which, again, I did not see the SUV in the

14  video.  I went back on the third time and was able to retrieve

15  surveillance video from 11:00 p.m. on April 15, 2018, until

16  approximately 2:30 in the morning on April 16, 2018.

17  **BY MR. PRINCIPE**

18  Q    So, ultimately, after that third visit, you had collected

19  numerous videos from Chapel Tower Apartments for that date

20  range?

21  A    I just retrieved video on the third occasion.  On the

22  first two occasions, I didn't see the SUV that he was looking

23  for, so I did not retrieve any video at that time.

24  Q    Okay.  So just reviewed video first time and the second

25  time?

US v. Wiley  -- Trial/Vol III of VII -- 4/21/21

1  A    That's correct.

2  Q    Can you tell the jurors a little bit about the process of

3  copying or getting a copy of the videos on that third visit?

4  A    The surveillance system that they had at Chapel Tower

5  Apartments is a Dahua digital video recorder.  It is a

6  standalone digital video recorder.  The cameras are connected

7  to the Dahua system, and the video is saved on a hard drive on

8  there.

9      You are able to go through the menu and search for video

10 based on dates and times and the different cameras that they

11 have out there.  They had a seven cameras, and the system time

12 was approximately five minutes fast.

13 Q    Okay.  And do you recall; were there multiple camera

14 angles in the data that you copied from that system?

15 A    Yes.  There were -- like I said, there were seven total

16 cameras.  I retrieved the video from five of the exterior

17 cameras.  That was Cameras 5, 6, 7, 8 and 10.

18        **MR. PRINCIPE:**  May I approach the witness, Your

19 Honor?

20        **THE COURT:**  Yes.

21 **BY MR. PRINCIPE**

22 Q    I'm showing you Government's Exhibit 74, a disk that

23 contains video from Camera 10.

24     Would you recognize that if you saw it?

25 A    Yes.

US v. Wiley  -- Trial/Vol III of VII -- 4/21/21

1  Q    I am going to show you a portion of that on your monitor.

2  A    Okay.

3       (Government's Exhibit No. 74 was played.)

4  Q    Do you recognize the image on this video?

5  A    Yes.  This is the video from Camera 10 at the Chapel Tower

6  Apartments.

7  Q    And does it show a date and timestamp on that video?

8  A    It does show a date and timestamp.

9  Q    What is the date and time?

10  A    The date and time showing on this is April 16, 2018, at

11  12:18 a.m.

12          **MR. PRINCIPE:**  Your Honor, Government would move

13  Government's Exhibit 74 into evidence.

14          **THE COURT:**  Admitted.

15          **MR. PRINCIPE:**  And permission to publish that?

16          **THE COURT:**  You may.

17       (Government's Exhibit No. 74 was played.)

18          **MR. PRINCIPE:**  I have no additional questions, Your

19  Honor.

20          **THE COURT:**  Any cross?

21          **MR. BRYSON:**  I have no questions.

22          **THE COURT:**  All right.  You may step down.

23          **MR. PRINCIPE:**  May this witness be released for

24  today, Your Honor?

25          **MR. BRYSON:**  No objection.

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 109 of 246

1          **THE COURT:**  "Released for today," does that mean that

2   you may recall him?

3          **MR. PRINCIPE:**  It's possible, Your Honor.

4          **THE COURT:**  You're still subject to the subpoena.

5          **MR. GREEN:**  Your Honor, may we approach?

6          **THE COURT:**  Yes.

7       (The following proceedings were had at the bench by the

8       Court and Counsel out of the hearing of the jury:)

9          **MR. GREEN:**  There was some confusion about when our

10  next witness was supposed to be here.  He said he would be here

11  at noon.  It's two 'til noon.  Can I go outside and just see if

12  he's about?

13         **MR. PRINCIPE:**  I think they said he's here.

14         **MR. GREEN:**  Okay.  Are you sure?

15         **THE COURT:**  Why don't you go check.

16      (End of bench conference.)

17  **CHRIS FILES**, GOVERNMENT'S WITNESS, being first duly affirmed,

18  at 11:57 a.m. testified as follows:

19         **THE COURT:**  Sir, if you would remove your mask so we

20  can see and hear you during the proceedings, and take the

21  microphone and just direct it toward your mouth so we can hear

22  you.

23         Thank you.

24                         DIRECT EXAMINATION

25

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 110 of 246

1  **BY MR. PRINCIPE**

2  Q    Can you please introduce yourself to the jurors.

3  A    I'm Chris Files.  I'm a property manager at Chapel Tower

4  Apartments.

5  Q    You said Chris Files?

6  A    Yes.  F-I-L-E-S.

7  Q    And where is Chapel Tower Apartments located in Durham?

8  A    It's 1315 Morreene Road, Durham, North Carolina.

9  Q    And what is your role there?

10 A    I'm the property manager.

11 Q    What are some of the things the property manager does?

12 A    Basically take care of the operations of the whole

13 property, invoices, rentals, everything, basically the whole

14 property, service.

15 Q    How long have you been in that position?

16 A    I have been with the company for 15 years and at that

17 location for 10.

18 Q    And you were in that same role in April of 2018?

19 A    Correct.

20 Q    In your role, are you also familiar with who is renting

21 apartments at that complex?

22 A    Yes.

23 Q    Were you familiar with somebody named Taquila House?

24 A    They were there, yes.

25 Q    Okay.  And were you familiar with a woman renting an

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 111 of 246

1  apartment named Lashea Stackhouse?

2  A    Yes.

3  Q    Are you also responsible for security matters related to

4  the apartment complex?

5  A    Yes, we have security, but we also have security cameras.

6  Q    Can you generally explain to the jurors, how many security

7  cameras did you have and generally where are they located?

8  A    We have -- the main entrance, there's four cameras; two so

9  you can see cars coming in, two so you can see cars coming out.

10 The second entrance has just two cameras, so you can just see

11 one in and one out.  And then we have two in the back corner of

12 the property.

13 Q    Okay.  I would like to show you a diagram, Government's

14 Exhibit 75.

15       Do you recognize that diagram?

16 A    Yes.

17 Q    And what is that a diagram of?

18 A    It is a diagram of Chapel Tower Apartments, and then I

19 have a diagram of the gatehouse that's at the front entrance

20 and the second entrance showing the location of the cameras.

21 Q    Okay.  And does that diagram -- is that a regular diagram

22 that's part of the materials you have at the apartment complex?

23 A    Yes, the map is, yes.

24 Q    And then there is also some handwritten notations on the

25 map?

Case 1:19-cr-00529-TDS  Document 361  Filed 02/04/22  Page 112 of 246

1  A    Correct.

2  Q    And does that document fairly and accurately show the

3  parking areas and the roads at the apartment complex?

4  A    Yes, it shows everything.

5  Q    Okay.

6           **MR. PRINCIPE:**  And Government would move Government's

7  Exhibit 75 into evidence.

8           **THE COURT:**  Admitted.

9           **MR. PRINCIPE:**  And permission to publish that?

10          **THE COURT:**  You may.

11          **MR. PRINCIPE:**  Let's zoom in on just the left third

12  of the document.

13  **BY MR. PRINCIPE**

14  Q    Can you see; what is the road running along the left side

15  of the complex?

16  A    It's Morreene Road.

17  Q    Okay.  And are there two entrances off of that section of

18  the road?

19  A    Yes, there is two entrances into Chapel Tower.

20  Q    Okay.  And can you describe what is -- it looks to be a

21  line drawn in a circular area near the top.  What is that?

22  A    That's the first entrance, and there is an island there

23  and there is a post on either side with a camera.  So there is

24  only two cameras at that location.

25  Q    If you look further down, there is another road that

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 113 of 246

1  appears to come off of Morreene Road and another circle with a

2  line.  What is that?

3  A    It's the same thing.  That comes -- the other part of the

4  complex, and it is before the rental office.  And right there,

5  there is actually a guard shack, and there is four cameras

6  attached to that.  So you can take pictures of cars coming in

7  and leaving.

8  Q    What are the orange objects on that map?

9  A    What now?

10 Q    The orange or tan-colored rectangles on the map?

11 A    Those are all the buildings.

12 Q    I would like to zoom in on a different portion of that.

13           **MR. PRINCIPE:**  And if you could zoom in at the upper

14 left corner where there is some hand notations?

15 **BY MR. PRINCIPE**

16 Q    It says "island with camera"; is that right?

17 A    Right.

18 Q    And it makes reference to D10.  What is that a reference

19 to?

20 A    That was the camera number.  The cameras had different

21 numbers:  10, 8, 9.  The cameras are labeled.

22 Q    Does Camera 10 tend to face away from Morreene Road and

23 towards the apartment complex?

24 A    Correct.

25 Q    And that would tend to show the back of a car entering?

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 114 of 246

1   A    Correct.

2   Q    I would like to zoom in on the bottom.  There is a

3   building there marked 21A through L.

4        Are you familiar with that building?

5   A    Yes.

6   Q    And is that a separate parking area or road that comes off

7   of where that guard shack was?

8   A    Yes.  It is parallel to it, yeah.

9   Q    Okay.  Are you familiar with Taquila House renting an

10  apartment in that building on April of 2018?

11  A    Yes.

12  Q    I would like to show you another area.  Do you see where

13  there is a building marked 27A through L?

14  A    Yes.

15  Q    Was Lashea Stackhouse renting an apartment in that

16  building in April of 2018?

17  A    Yes.

18  Q    I would like to show you Government's Exhibit 76.  I'm

19  showing you Government's Exhibit 76A.

20       Do you recognize that to be an aerial map of the same

21  apartment complex?

22  A    Yes.  That's correct.

23  Q    Does that fairly and accurately show where those two

24  gatehouses are where the cameras were?

25  A    Yes.

1  Q    And the two entrances off of Morreene Road in that portion

2  of the complex?

3  A    Yes.

4           **MR. PRINCIPE:**  The Government moves Government's

5  Exhibit 76A into evidence, Your Honor.

6           **THE COURT:**  Admitted.

7           **MR. PRINCIPE:**  Permission to publish that?

8           **THE COURT:**  You may.

9  **BY MR. PRINCIPE**

10 Q    I would like to zoom in on the right-hand section of that

11 photograph.  Again, does that show the area to the right where

12 Miss House was living?

13 A    Yes.

14 Q    I'm now going to show you Government's Exhibit 76B.

15      What does that show?

16 A    That's the island at that first entrance.

17 Q    Is that the island where Camera 10 was?

18 A    Yeah, 10 and 11.

19           **MR. PRINCIPE:**  Move Government's Exhibit 76B into

20 evidence.

21           **THE COURT:**  Admitted.

22           **MR. PRINCIPE:**  Permission to publish?

23           **THE COURT:**  You may.

24 **BY MR. PRINCIPE**

25 Q    I would like to show you Government's Exhibit 77.

Case 1:19-cr-00529-TDS  Document 361  Filed 02/04/22  Page 116 of 246

1     On the left side of that document, does it show the same

2  aerial map of the apartment complex?

3  A    That's correct.

4  Q    And the same entrance where that island was located?

5  A    Yes.

6  Q    And do you see on the right-hand side -- is there an

7  image?

8  A    Yes.

9  Q    Do you recognize that to be an image from Camera 10 at

10 Chapel Tower Apartments?

11 A    Yes.

12 Q    I would like to show you -- I'm going to show you

13 Government's Exhibits 74, which is already in evidence.

14     Is that from the surveillance cameras from Camera No. 10

15 at Chapel Tower Apartments?

16 A    Yes.

17          **MR. PRINCIPE:**  Your Honor, move Government's

18 Exhibit 77 into evidence.

19          **THE COURT:**  Admitted.

20          **MR. PRINCIPE:**  And permission to publish that?

21          **THE COURT:**  You may.

22 **BY MR. PRINCIPE**

23 Q    Is the image on the right-hand side there just a still

24 image from that vehicle that went through that gate?

25 A    Yes.

US v. Wiley  -- Trial/Vol III of VII -- 4/21/21

 1              MR. PRINCIPE:  I have no additional questions, Your

 2   Honor.

 3              THE COURT:  Any cross?

 4              MR. BRYSON:  I have no questions, Your Honor.

 5              THE COURT:  All right.

 6              MR. PRINCIPE:  May he be released?

 7              THE COURT:  Any objection?

 8              MR. BRYSON:  No objection.

 9              THE COURT:  You are free to leave, sir.  Thank you.

10   If you would put your mask back on before you leave.

11              Thank you.

12         (At 12:10 p.m., witness excused.)

13              MR. GREEN:  May we approach, Your Honor?

14              THE COURT:  Yes.

15         (The following proceedings were had at the bench by the

16         Court and Counsel out of the hearing of the jury:)

17              MR. GREEN:  The next witness is here ready to go.  I

18   will let you know it is going to be a very long witness.  I

19   don't know if this is a natural breaking point, but it is going

20   to be multiple photographs, physical evidence.  It's the CSI.

21              THE COURT:  We'll just keep going until 12:30.  Thank

22   you.

23         (End of bench conference.)

24   INVESTIGATOR BENJAMIN SHIELDS, GOVERNMENT'S WITNESS, being

25   first duly affirmed, at 12:11 p.m. testified as follows:

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 118 of 246

1          **THE COURT:**  If you would please remove your mask so

2    we can see and hear you and make sure the microphone is

3    directed toward your mouth.

4                        DIRECT EXAMINATION

5    **BY MR. GREEN**

6    Q    Would you tell the jury your full name.

7    A    My name is Benjamin Shields.

8    Q    And what do you do?

9    A    I'm a crime scene investigator for the Durham Police

10   Department.

11   Q    Will you tell the jurors what a crime scene investigator

12   does.

13   A    We respond to all natures of incidents where a crime has

14   been committed and material evidence is on the scene that needs

15   to be collected and processed.

16   Q    And how long have you been doing that job?

17   A    Four and a half years.

18   Q    Were you employed as a crime scene investigator on

19   April 15, 2018?

20   A    That is correct.

21   Q    Had you received any training to do your job?

22   A    I have completed a bachelor's and master's degree in

23   anthropology, which included forensic science courses.  I have

24   also taken extra training in the amount of about 240 hours of

25   class time.  And I have also received a certification from the

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 119 of 246

1  International Association for Identification as a crime scene

2  investigator.

3  Q    Would you describe generally the steps for the members of

4  the jury when you arrive at a crime scene?  What are the

5  general steps that you take?

6  A    The general steps that we take -- we often will brief with

7  the investigating officers or investigators at the scene who

8  will inform us of the events that transpired during the

9  commission of the offense in question.  And then also then from

10 that, we will map out a strategy for how we are going to

11 process the crime scene.

12 Q    Now, are crime scene investigators usually the first

13 persons on the scene?

14 A    Often it could be EMS personnel, like officers -- or like

15 folks with an ambulance or police officers who are the first on

16 scene.

17 Q    And when you arrive at a scene, what do you try and do?

18 A    What we try -- what we are trying to do is reconstruct the

19 events that happened at the crime scene during the incident in

20 question based on the material evidence and the information

21 that we have received from officers and witnesses.

22 Q    Do you identify and collect evidence?

23 A    Yes, we do.

24 Q    How do you document it typically?

25 A    We document evidence on crime scenes through the use of

1  video, photography, sketches, maps, diagrams, and the

2  collection of material evidence which we have identified during

3  the course of our search of a crime scene.

4  Q    Directing your attention to April 15, 2018, do you recall

5  that date?

6  A    Yes, I do.

7  Q    Did you respond to a crime scene that was on Carlton

8  Crossing Drive in Durham?

9  A    That is correct.

10 Q    And describe for the members of the jury how you responded

11 out there and what you found when you first got there.

12 A    Upon responding to the scene -- my supervisor and I

13 responded and arrived on the scene at close to 1:00 in the

14 morning.  It was raining and slightly windy, and we located --

15 or we identified the scene by the pure number of police cars

16 that were in the roadway with their lights on.  And then, you

17 know, eventually once we got there, we briefed with the lead

18 investigator.

19 Q    Now, was there crime scene tape that had been established?

20 Do you recall?

21 A    There was crime scene tape on both ends of the street to

22 block off the street, the roadway, and in front of the

23 residence.

24 Q    Now, do officers responding to a scene -- will they do

25 anything typically perhaps to assist crime scene investigators

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 121 of 246

1  when they come to the scene?

2  A    Sometimes they will direct us to where there might be an

3  investigator waiting for us, or they'll have something that

4  they want to show us just so we're aware of it, for any number

5  of reasons, including safety and also to maintain the integrity

6  of the scene.

7  Q    When you arrived on April 15, did you find certain items

8  had been blocked off?

9  A    Yes.  The officers -- oftentimes when we have certain

10  kinds of scenes that involve shootings, they will locate

11  cartridge cases in the roadway.  So they will place orange

12  cones on them just so that we know where they're at when we get

13  there.  They also -- like you mentioned, they will use crime

14  scene tape to block off certain areas of a crime scene.

15  Q    As you document the crime scene, are you taking notes,

16  hand notes?

17  A    Yes.  Our note taking begins with the meeting we have with

18  the investigator or the officer that we're -- that we meet with

19  upon arrival where we get a synopsis of the incident that

20  occurred.  And then we'll, from there, walk -- do a scene

21  walk-through to take notes on what we observe in relation to

22  what we have been told is on the scene, and we do that with an

23  eye of having been to several crime scenes in the past and some

24  certain kind of incidents; we know what to look for.

25  Q    Are those -- I'm sorry.

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 122 of 246

1        As you find an item, an exhibit item, is it given a

2   number?

3   A     Yes.  So once we have identified the evidence which we

4   have decided to collect from a crime scene, we place a

5   placard -- or a yellow placard with a black number on it which

6   helps us identify -- place it in the scene but also for

7   reference purposes later, as documented through photographs and

8   video and diagrams.

9   Q     And do you then produce a typed product -- or is a typed

10  product produced in which the crime scene is identified and

11  then there might be a long listing of all the items you

12  collected?

13  A     That's correct.

14  Q     I'm going to show you Government's Exhibit No. 78, and ask

15  if you're familiar with what that is?

16  A     That is a Property and Evidence Voucher for the Durham

17  Police Department.

18  Q     Do you recognize it as associated with this crime scene

19  that occurred on April 15, 2018?

20  A     Yes, that is correct.

21  Q     And does it have a name associated with who submitted this

22  evidence voucher?

23  A     It was submitted by myself, yes.

24  Q     And is this document several pages long, a running

25  document of all of the various exhibits that would ultimately

1  be collected?

2  A    Yes.

3  Q    And it's updated over time?

4  A    It is updated over time.  As different items are

5  processed, they may be submitted to the Property and Evidence

6  Unit when we're done finished completing the processing.  And

7  then as follow-ups occur, we're at different scenes and

8  different locations where evidence may be collected, that

9  evidence would also be submitted in the same manner.

10 Q    So looking at the cover of Exhibit No. 78 --

11        **MR. GREEN:**  First, I'll move introduction of 78, and

12 ask that it be published?

13        **THE COURT:**  Admitted.  You may.

14 **BY MR. GREEN**

15 Q    You note on this property and evidence log the date/time

16 of the crime scene, the time the incident was reported.  I see

17 your name as the collecting officer and submitted by.  Is that

18 correct?

19 A    That's correct.

20 Q    And also looking at that first item there, we see No. 1,

21 Bag 1, Item 1.  So could you describe for the members of the

22 jury that nomenclature.

23 A    The No. 1, Bag 1, Item 1, this was the first item that was

24 submitted for this case.  So Bag 1 is the first bag that it's

25 in.  And a bag may have more than one item in it with certain

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 124 of 246

1  kinds evidence.  But Bag 1, Item 1 means that there was one

2  item in that bag, and that particular item was assigned the

3  number Item 1.

4  Q    Is the item described?

5  A    Yes.

6  Q    What was the item, Bag 1, Item 1?

7  A    Bag 1, Item 1 was a blue Nike shoe which also -- it looks

8  like I also added the particular model of the shoe, Air

9  Huarache by Nike was written on the tongue of the shoe.  It was

10 a size 10, and it was a left shoe.

11 Q    Now, when you give exhibit number, are you ranking them in

12 any way in significance?

13 A    No, there is no ranking of the evidence in terms of

14 importance, size, or whatever it might be.

15 Q    And then in terms of exhibits, might you collect more

16 exhibits than ultimately are determined to be relevant?

17 A    The crime scene investigators -- we have some somewhat of

18 a say in determining what's relevant; but as questions change,

19 the investigators and other folks may determine what's

20 relevant.  So we collect what we know to exist on a crime

21 scene, what we locate on a crime scene, and what our attention

22 has been drawn to by investigators and officers on a crime

23 scene.

24 Q    I'm going to ask you to look at Exhibit No. 79, and ask if

25 you're familiar -- if that is a continuation of this Property

1   and Evidence Voucher.

2   A    It is a continuation of the Property and Evidence Voucher,

3   though it is not something that I submitted.

4   Q    Who submitted that?

5   A    Investigator Cramer.

6   Q    So there could be other individuals who submit items?

7   A    Yes.  Like I may submit -- for just an example, I might

8   submit a property voucher that has 50 items on it.  The next

9   person who wants to submit a Property and Evidence Voucher

10  would pick up with the next number in that sequence, so Item

11  51.  So I submitted the first 50 items, and then the next

12  person takes up the next number that is available in the

13  system.

14  Q    Now, with regard to Exhibit 79, do you recognize it as a

15  Property and Evidence Voucher related to this case?

16  A    Yes, that's correct.

17          **MR. GREEN:**  I move introduction of Exhibit 79.

18          **THE COURT:**  Admitted.

19          **MR. GREEN:**  I will ask it that be published?

20          **THE COURT:**  You may.

21  **BY MR. GREEN**

22  Q    And, again, looking at the top portion, do you see the

23  same incident?  And is there also an OCA number that tells you

24  that it's associated with the case?

25  A    Yes, that's correct.

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 126 of 246

1  Q    And the collecting officer is listed in this case as D.L.

2  Cramer?

3  A    Correct.

4  Q    And do you recognize who that is?

5  A    Yes, he is the lead investigator for the case.

6  Q    Now, with regards to evidence in Durham -- the Durham

7  Police Department, does the Durham Police Department also work

8  with other agencies in the investigation of crimes, to your

9  knowledge?

10 A    To a certain degree, yes.  It depends on the crime and the

11 relationship of those two different agencies and context, yes.

12 Q    And are you familiar whether the Durham Police Department

13 worked with the Federal Bureau of Investigation on this case?

14 A    That is correct, yes.

15 Q    And the Federal Bureau of Investigation also might be

16 involved in the collection of evidence?

17 A    That is correct, yes.

18 Q    But it would not be reflected necessarily on your form?

19 A    That is correct.

20 Q    Some of the evidence in your case might be transferred to

21 the FBI to be tested further?

22 A    That is correct.

23 Q    Thank you.

24      When you got on scene and you had your initial

25 conversation with the agents, what did you understand had

1  happened?

2  A    My understanding of the evidence that occurred was that

3  a -- the victim and his wife had returned from the restaurant

4  where they -- that they owned and were employed at and had

5  been -- one of them had been approaching the front door when

6  multiple subjects approached from the outside of the house or

7  around the sides of the house who were armed and were demanding

8  valuables.

9  Q    And with that information, how did you start?

10 A    With that information -- and, you know, I would add to

11 that that multiple -- we had learned that multiple shots had

12 been fired.  So we started by first conducting a walk-through

13 through the scene, like, as I said, taking written notes of our

14 observations of what we were observing on the scene.  And then

15 we divided tasks, where my coworker who was with me completed a

16 video recording of the scene, and then I would follow along,

17 following her, taking photographs of the scene.

18 Q    And did you draw a sketch of -- a rough sketch of what you

19 were seeing?

20 A    The -- that would be part of the process.  I don't believe

21 we started the sketch until we had placed numbered placards

22 down on the scene.

23 Q    I'm going to show you Government's Exhibit No. 80, and ask

24 if you're familiar with what that is?

25 A    That is the rough sketch that was completed on the crime

1  scene on the night in question.

2          **MR. GREEN:**  All right.  Your Honor, I would move

3  introduction of Government's Exhibit No. 80, and ask that it be

4  published?

5          **THE COURT:**  Admitted.  It may be.

6  **BY MR. GREEN**

7  Q    Now, can you tell the jurors -- just generally orient them

8  to -- there appears to be a rough rectangle with the No. 4617

9  on it.  What is that?

10  A    4617, that is the residence of the victim.

11  Q    And looking at this, there appears to be a rough sketch of

12  a vehicle in a driveway.

13  A    Yes, that's correct.

14  Q    Is that what you found?

15  A    Yes, that is the approximate location of the vehicle in

16  the driveway.

17  Q    Outside the residence at 4617, did there appear to be cars

18  that were parked?

19  A    That is correct.

20  Q    And I'll ask you to -- did you note the presence of those

21  cars?

22  A    I believe so, yes, we did.

23  Q    You also made certain notations on the sketch of some

24  things that you were seeing and you included a legend; is that

25  correct?

US v. Wiley  -- Trial/Vol III of VII -- 4/21/21

1  A    That is correct.

2  Q    And looking at your sketch initially, on No. 80, you noted

3  that there was an area of broken glass?

4  A    That is correct.

5  Q    And why did you note that area on your sketch?

6  A    That would be further down.  Because it -- based on our

7  training and experience, it's not often the case where we find

8  small patches of broken glass in the roadway.  I mean, it

9  seemed unusual.

10 Q    Looking at Government's Exhibit No. 81 -- I will show that

11 to you.  And this is -- is this the opening notes that you took

12 on arriving on scene, and you indicated the weather conditions?

13 A    That is correct.

14 Q    And what were the weather conditions?

15 A    It was raining periodically during the time I was on the

16 scene.  It would get heavier and then lighter, heavier and

17 lighter throughout the night.

18        **MR. GREEN:**  I am going to ask that Government's

19 Exhibit 81 be admitted and published.

20        **THE COURT:**  It is admitted.  It may be.

21 **BY MR. GREEN**

22 Q    And looking at that, I notice the date is 4/16.  I think

23 you indicated you had arrived at 1:00 in the morning?

24 A    1:00 in the morning, yes.

25        **THE COURT:**  All right.  Is that a good place to stop?

Case 1:19-cr-00529-TDS  Document 361  Filed 02/04/22  Page 130 of 246

1          **MR. GREEN:**  It can be, yes, Your Honor.

2          **THE COURT:**  All right.  Ladies and gentlemen, it is

3   12:30.  It is time for lunch.  So I'm going to ask you to put

4   your notes in the envelopes for those who are taking notes.

5   Leave your envelopes in your chairs, of course.

6          And remember all my admonitions to you:  Don't

7   discuss the case; don't do any research; don't let anybody

8   mention it or discuss it with you.  Keep an open mind.  You

9   have not heard all the evidence.  Remember all my admonitions.

10         I think it's still a nice day outside, so it would be

11  a good day to get outside a little bit.  I'm going to ask that

12  you come back at 1:45.  That will give you an hour and 15

13  minutes.  If that's not enough time, raise your hand.  If you

14  are back at 1:45 and we're all good to go, we'll start at 1:45

15  and just keep moving forward.  So I would ask you to be as

16  punctual and possible and do that for all of your colleagues as

17  well, fellow jurors.

18         And collect, if you would, back across the hall in

19  Courtroom No. 3, and we'll bring you in just as soon as we can.

20         At this time, I am going to dismiss the jury for

21  lunch, if Ms. Engle would escort them out.

22         Everyone else please remain in the courtroom until

23  they have cleared the lobby.

24      (The jury departed the courtroom at 12:31 p.m.)

25         **THE COURT:**  All right.  You may be seated.  You may

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 131 of 246

 1  step down, if you wish.  Remain in the courtroom, though, until
 2  we've gotten word that they have cleared the hall.
 3          MR. GREEN:  Your Honor, if I may, he came before I
 4  could admonish him not to discuss his testimony with any other
 5  witness.
 6          THE COURT:  You are not to discuss your testimony
 7  with any other witness.  All right?
 8          You can admonish him further during the break.
 9          So give them a minute to leave.
10          Do you have any issue we need to address at this
11  time?
12          MR. GREEN:  No, Your Honor.
13          THE COURT:  The Defendant?
14          MR. BRYSON:  No, Your Honor.
15          THE COURT:  Okay.  Now, I want to stop today at
16  5:00 -- at a hard stop at 5:00.  I don't know that I'm going to
17  be able to entertain any argument after 5:00 on any issue.
18          Is there going to be anything you are going to want
19  addressed -- would want addressed at 5:00?
20          MR. GREEN:  I don't think so.  I'm going to have a
21  conversation with Mr. Bryson, given the Court's guidance.  I
22  don't think we'll need to hash it out with you, but we are
23  discussing the guidance that you gave relative to the text
24  messages.
25          THE COURT:  All right.  It was guidance.  It wasn't a

Case 1:19-cr-00529-TDS  Document 361  Filed 02/04/22  Page 132 of 246

 1  ruling, just so that you're clear.  If that changes, let me

 2  know, and we'll build in some time around when the jury is

 3  here.  I, of course, want to keep moving as much as we can.

 4          So if you would be ready to go at 1:45, I would like

 5  to start 1:45, if we could, and just keep moving.

 6          Do you believe you will have enough coverage until

 7  5:00?

 8          **MR. GREEN:**  We're -- the short answer is yes.  We're

 9  starting to now call people over who we had scheduled on

10  Thursday.  We are alerting them and getting them en route this

11  way.  So we will make sure or endeavor that we fill up the day

12  until 5:00.  I will say that we're going much more rapidly than

13  we had anticipated.

14          **THE COURT:**  All right.  I would like to advise the

15  jury at 5:00, generally speaking, how we're doing on the

16  schedule.  They'll begin to wonder.  And I would be inclined to

17  tell them, if it's possible, that it looks like the Government

18  will finish its evidence by Friday.

19          **MR. GREEN:**  There is no question that at the current

20  rate we will finish by Friday.

21          **THE COURT:**  I would not intend to say anything other

22  than that.

23          **MR. GREEN:**  Yes, Your Honor.

24          **THE CLERK:**  Several of the jurors are in the

25  restroom.

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 133 of 246

1          **THE COURT:**  So we have several jurors who are in the

2    restroom, so let's give them just a minute.

3          **MR. PRINCIPE:**  Your Honor, with regard to scheduling,

4    just since you've indicated you do want to stop right at 5:00,

5    we are asking several additional witnesses to start making

6    their way here from the Durham area.  There was one or two more

7    we were going to potentially call, but it sounds like the

8    Court -- we're going to fill up as much time today as we can,

9    but people also are rearranging schedules based on earlier

10   information.

11         So I just want to make sure, if we finish 15 or 20

12   minutes earlier, is that preferable to having additional

13   witnesses that would take us past 5:00?

14         **THE COURT:**  My preference is to continue testimony up

15   until the quitting time.

16         **MR. PRINCIPE:**  Sure.

17         **THE COURT:**  Unless it's within three or four or five

18   minutes.  So if it means you are going to have a witness who is

19   already here, go ahead and start the witness, and then we'll

20   pick them up the next day.

21         On the other hand, if a witness has to make a

22   substantial trip and hasn't made the trip, then I don't know

23   that that would be an issue, because if they haven't made the

24   trip, then you wouldn't be able to put them on anyway.  But I

25   would like to just keep -- as long as the jury is here, I would

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 134 of 246

1  like to have them hearing testimony.  We've told them what the

2  time frame is.  And I think to respect their time, I would like

3  to continue to present evidence as much as possible.

4          **MR. PRINCIPE:**  Yes, Your Honor.

5          **THE COURT:**  Okay.  I understand the jurors are now

6  out of the hallway, so I think we're okay.  So folks can leave.

7  Of course, everybody knows not to have any contact with any of

8  the jurors or to say anything to them.  They'll be wearing

9  stickers.

10         So enjoy your lunch.  We'll see you at 1:45.

11     (Proceedings recessed at 12:35 p.m.)

12     (Proceedings called back to order at 1:52 p.m.)

13     (The Defendant was present.)

14         **THE COURT:**  Are you ready to bring the jury in?

15         **MR. GREEN:**  We have a modified schedule that we have

16 provided the Court.  We shifted some witnesses over to today,

17 anticipating that we may get to them.  I will just say it may

18 not be a discussion point for now.  On Friday there are two

19 witnesses who are traveling from outside the state, one from

20 Colorado.  Those -- as we go through Thursday, we again

21 anticipate we can use the majority of Thursday, but it would be

22 extremely difficult to move the witnesses that are currently

23 scheduled for Friday morning.  I will hand those up.

24         **THE COURT:**  Who are the two from Colorado?

25         **MR. GREEN:**  One is from Colorado.  That's John Scott,

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 135 of 246

1  Your Honor.  And the other witness is Jeremy Fletcher.  He is

2  the FBI.  He's traveling from Quantico.

3          **THE COURT:**  All right.  So if we were to stay on this

4  schedule, you have the Government resting sometime Friday?

5          **MR. GREEN:**  Friday morning.

6          **THE COURT:**  In the morning?

7          **MR. GREEN:**  Yes, sir.

8          **THE COURT:**  All right.

9          **MR. GREEN:**  I will just say if there is -- I think --

10  and we can get to it later.  I don't want to hold us up any

11  further, but if there is a hole on Thursday afternoon, we think

12  that many of the witnesses will be sufficient to where we could

13  probably hold a meaningful charge conference if there is a gap

14  in time.

15          **THE COURT:**  All right.

16      (The jury returned to the courtroom at 1:53 p.m. )

17          **THE COURT:**  Please have a seat, everyone.

18          Is your witness available?

19          **MR. GREEN:**  He should be.

20          **THE COURT:**  All right.  Welcome back, ladies and

21  gentlemen.  I hope you had an enjoyable lunch.  I didn't get a

22  chance to make it outside.  Hopefully some of you all did.

23          All right.  If you would retake the stand, sir.  I

24  will remind you that you are still under oath.

25          Please continue.

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 136 of 246

1  **BY MR. GREEN**

2  Q    Mr. Shields, as you assessed the scene there on Carlton

3  Crossing Drive, what -- generally, what items did you note

4  before you started taking photographs?  What did you see?

5  A    A number of orange cones that we knew to cover cartridge

6  cases or shell casings from fired rounds and glass fragments in

7  the roadway and a van almost completely out of the driveway at

8  the address with the doors open.

9  Q    I'm going to show you what's marked as Exhibits 82, 83,

10  84, and 85.

11      Do you recognize those as photographs you took?

12  A    That is correct.

13          **MR. GREEN:**  I am going to move introduction of those

14  exhibits, and ask they be published?

15          **THE COURT:**  Admitted.  They may.

16  **BY MR. GREEN**

17  Q    Looking first at Government's Exhibit 82, can you tell the

18  jury what that photograph depicts?

19  A    This is an overall photograph of a series of cartridge

20  cases and glass fragments just to note the location of those in

21  the crime scene approximately to the -- I'm trying to

22  remember -- to the west of the minivan that's in the driveway.

23  Q    And there is a vehicle that appears to be at the end of

24  the driveway kind of blocking the roadway.  Is that the minivan

25  that you identified?

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 137 of 246

 1  A    Yes, that's correct.

 2  Q    I am showing you Government's Exhibit No. 83.

 3       Can you tell us what 83 depicts?

 4  A    That is the same series of round orange cones in the

 5  roadway from the other direction of the roadway.

 6  Q    And each of those cones represents some item of evidence?

 7  A    An item of evidence, correct.

 8  Q    I will show you what's been marked as Government's

 9  Exhibit 84 and admitted.

10       Can you tell me what that depicts?

11  A    That is more of a midrange photograph of the minivan as

12  it's on the edge of the driveway there with a view of the

13  address on the mailbox post.

14  Q    At this point is the victim still in the van?

15  A    That is correct.

16  Q    Did he remain in the van?

17  A    Yes, he did.

18  Q    Why was that?

19  A    Certain scene conditions and also due to the fact that he

20  was deceased, and we undergo a series of steps in the

21  processing of the victim on scene.

22  Q    I'm going to show you Government's Exhibit 85.

23       What is that?

24  A    That is another view of the -- I believe the west side of

25  the van.

1  Q    And the door being open, is that as you saw it on that

2  occasion?

3  A    That is correct.

4  Q    All right.  I'm going to show you on your monitor

5  Government's Exhibits 86, 87, 88, and 89.

6       Do you recognize those?

7  A    Yes, I do.

8  Q    And what are they?

9  A    They are photographs that I captured at the crime scene.

10          **MR. GREEN:**  Your Honor, I am going to move

11  introduction of Government's Exhibits 86, 87 and 88 and 89, and

12  ask that they be published?

13          **THE COURT:**  They are admitted.  You may.

14  **BY MR. GREEN**

15  Q    Can you describe for the members of the jury what you're

16  looking at in Government's Exhibit 86?

17  A    This is the driveway and the roadway to the east side of

18  the gray Toyota Sienna van.  The evidence markers that are

19  depicted there are round cones, and they mark, if I recall

20  correctly, .40 caliber cartridge cases in the roadway.

21  Q    I show you the next exhibit, 87.

22       What is that?

23  A    This is a long-exposure photograph of the crime scene with

24  numbered placards in the roadway, which the crime scene

25  investigators place in the roadway to replace the round cones

US v. Wiley  -- Trial/Vol III of VII -- 4/21/21

1  that the officers have placed on evidence in the roadway.

2  Q    Once a placard is placed on it, is the same number used as

3  the exhibit item, or no?

4  A    We start at 1 generally and can proceed in sequence to

5  whatever number we might end up with.

6  Q    And then that's logged in some way and then transferred to

7  that other exhibit we talked about, the evidence log?

8  A    Correct.

9  Q    Right.  I will show you the next exhibit, 88.

10      Can you describe what that is?

11 A    This is a view to, if I remember correctly, the northeast

12 from the front porch of the residence.

13 Q    So if I'm standing in the front door, looking outwards

14 toward the street in the driveway, this is the view?

15 A    Yes.

16 Q    I look in the lower left-hand corner.  It looks there is

17 an orange cone; is that correct?

18 A    That is correct.

19 Q    Was that an item of evidence?

20 A    That was also a cartridge case that was marked by a round

21 cone by officers.

22 Q    I'm going to show you Government's Exhibit 89.

23      Do you recognize what that is?

24 A    This is just panning left from the previous photograph, a

25 view from the front porch towards the roadway.

1  Q    And, again, I see orange markers in the foreground.

2       Do you recall what those were?

3  A    In addition, those are also cartridge cases marked by

4  orange cones.

5  Q    I will show you Government's Exhibits 90 and 91.

6            **THE COURT:**  I don't have a 91.

7            **MR. GREEN:**  It should be 90, Your Honor.

8  **BY MR. GREEN**

9  Q    I will show you Government's Exhibit No. 90.

10      Do you recognize that as a photograph that you took?

11 A    Yes, I do.

12 Q    And that's a photograph you took out there that night?

13 A    Yes.  That is the same night.  It's just to the left of

14 the previous photograph, showing the roadway as you stand on

15 the front porch.

16           **MR. GREEN:**  I'll ask that Government's Exhibit No. 90

17 get admitted.

18           **THE COURT:**  Admitted.

19 **BY MR. GREEN**

20 Q    And it looks like just under the Government's

21 exhibit sticker under 90 --

22           **MR. GREEN:**  May it be published, please?

23           **THE COURT:**  Yes.

24 **BY MR. GREEN**

25 Q    It looks like, just under the Government's exhibit

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 141 of 246

1  sticker, there's more of those orange cones.

2      Were those also shell casings?

3  A    That is correct.

4  Q    Now, as you continued to document the shell casings on the

5  scene, are those actually physically collected?

6  A    Yes.

7  Q    And are they bagged in some way?

8  A    Yes, they are collected on scene with cartridge case cups,

9  which are plastic and round, and we will often place, you know,

10 our collection of those in a brown paper bag.  And once they

11 are -- once they are processed and on -- back in our

12 laboratory, they will be placed in a more or less 9-by-11 or

13 8-by-11 manila envelope and turned in to our Property and

14 Evidence Unit.

15          **MR. GREEN:**  May I approach the witness?

16          **THE COURT:**  Yes, you may.

17 **BY MR. GREEN**

18 Q    I'm going to hand you first Government's Exhibit 91, and

19 ask if you're familiar with what it is?

20 A    Yes, I am.

21 Q    What is it?

22 A    It is an evidence envelope containing three 9mm cartridge

23 cases.

24 Q    Is that the envelope that you just described for the jury?

25 A    Yes.

US v. Wiley  -- Trial/Vol III of VII -- 4/21/21

1  Q    In that process, does it matter -- do you have a certain

2  number that you want to put in a bag?  More or less?  Is there

3  any significance to --

4  A    We place like items with like and up to three in number.

5  So for something like a cartridge case, if we have multiple 9mm

6  cartridge cases, we're allowed to only place three of them in

7  one of these envelopes.

8  Q    Do you recognize that as the bag associated with the

9  evidence collection that went on at Carlton Crossing?

10  A    That is correct.

11  Q    Do you see any initials on there?

12  A    Yes.  My initials are right here for BS on the front.  And

13  then we also -- once we seal a package, we put our name, our

14  employee number, the case number, the item number, the date in

15  which we are sealing it and the time.

16  Q    All right.

17          **MR. GREEN:**  I move introduction of Government's

18  Exhibit No. 91.

19          **THE COURT:**  Admitted.

20          **MR. GREEN:**  I would like to use the ELMO, Your Honor.

21          **THE COURT:**  You may.

22          **MR. GREEN:**  I ask that it be published using the

23  ELMO?

24          **THE COURT:**  Yes, you may.

25

1  BY MR. GREEN

2  Q    You mentioned that each individual bag has information

3  associated with it.  The bag says "Owner Name," and it's got a

4  name.

5       Does that actually indicate who the owner of these

6  exhibits is?

7  A    No.  That is -- at the time in which we -- the bag was

8  created and the label was created, if we are unaware of any

9  additional names associated with the incident, it is our common

10 practice to use the victim's name.

11 Q    All right.  I see "Submitted by B. Shields"?

12 A    Yes.

13 Q    Is that you?

14 A    Yes, that's me.

15 Q    There are also some other markings on this bag.  I think

16 you referenced the initials.

17 A    Uh-huh.

18 Q    Are those your initials?

19 A    Yes.

20 Q    And also information associated with each item?

21 A    Uh-huh.

22 Q    And that's your writing?

23 A    That is my writing, correct.

24 Q    Now, once a piece of evidence is taken into the Durham

25 Police Department or you're collecting it there on the scene,

1  is it also potentially sent out to other location -- other

2  people for additional testing?

3  A    It could be, depending on the investigator.  If the

4  investigator has filed a forensic request for a particular item

5  of evidence to be further analyzed, that item of evidence may

6  be taken out of property by the investigator or sent to a

7  different laboratory for it to undergo further examination.

8  Q    You see a barcode -- I see a barcode and a sticker there.

9  Do you recognize that sticker?

10  A    Yes, I do.

11  Q    What is it of?

12  A    It is a chain of custody sticker.  The sticker on the

13  envelope that you have up on the screen is a chain of custody

14  sticker placed there, I believe, by either our own Property and

15  Evidence Unit or the North Carolina State Crime Lab.

16  Q    There are also a series of other --

17  A    Notations.

18  Q    -- notations?

19  A    Those are -- any time that an envelope or evidence

20  envelope is opened -- we open it, and then once the evidence

21  is -- and do our examinations, and then the evidence is

22  replaced by back in the envelope, and tape is used to seal the

23  envelope.  And then we use -- different agencies might have

24  different ones, but we use an initial seal which might include

25  name, date, et cetera.

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 145 of 246

 1  Q    All right.  I'm going to cut open Government's Exhibit
 2  No. 91.
 3       Don't know if you need gloves.  I will give you a pair.
 4  A    All right.  Thank you.
 5  Q    Can you take out the items that are in Government's
 6  Exhibit No. 91.
 7  A    (Complies).
 8  Q    What are they?
 9  A    These are 9mm cartridge cases that are in plastic, round
10  containers.
11  Q    I am going to take those from you.
12       I notice that each 9mm cartridge case has a corresponding
13  item number; is that correct?
14  A    Yes.
15  Q    So I'm seeing 5, 6, and 7 there?
16  A    That is correct.
17  Q    As we look at what you've described, that's the 9mm
18  cartridge case?
19  A    That is correct.
20  Q    And it also appears to have a corresponding item number.
21  A    Item 6, that's correct.
22  Q    So Item 6 is from this bag which is marked Item 6?
23  A    Yes.
24  Q    And the same for Item 7?
25  A    Yes.

US v. Wiley  -- Trial/Vol III of VII -- 4/21/21

1  Q    And Item 5?

2  A    Yes.

3  Q    And so as we go through this evidence, without opening

4  every bag, if it's marked as such on the exterior of the bag,

5  inside the bag of the particular piece of evidence will be what

6  you just described?

7  A    That is correct.

8  Q    All right.  Government's Exhibit No. 92, do you recognize

9  it?

10 A    Yes, I do.

11 Q    What is it?

12 A    It is an envelope of the same character and nature as the

13 previous envelope, which contains three 9mm cartridge cases.

14 Q    Do you recognize it as something that you collected and

15 bagged?

16 A    Yes, I do.

17       **MR. GREEN:**  I move introduction of Government's

18 Exhibit 92.

19       **THE COURT:**  Admitted.

20 **BY MR. GREEN**

21 Q    Showing you Government's Exhibit 93, are you familiar with

22 what it is?

23 A    Yes, I am.  It is --

24 Q    What is it?

25 A    It is an evidence envelope.

US v. Wiley  -- Trial/Vol III of VII -- 4/21/21

1  Q    And what is contained in it?

2  A    It contains three 9mm cartridge cases.

3         **MR. GREEN:**  Move introduction of Government's

4  Exhibit 92.

5         **THE COURT:**  Admitted.

6  **BY MR. GREEN**

7  Q    I'm showing you Government's Exhibit 94.

8       What is it?

9  A    It is an evidence envelope with three 9mm cartridge cases.

10 Q    And did you submit it?

11 A    Yes, I did.

12 Q    Does it also contain those same item -- a running list of

13 item numbers that corresponds to what you were keeping track

14 of?

15 A    That is correct.

16        **MR. GREEN:**  I am to going to move introduction of

17 Government's Exhibit 94.

18        **THE COURT:**  Admitted.

19 **BY MR. GREEN**

20 Q    Government's Exhibit 95, what is it?

21 A    It is an evidence envelope containing three 9mm cartridge

22 cases.

23 Q    These were all collected at the scene?

24 A    That is correct.

25 Q    Bagged by you?

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 148 of 246

1  A    Yes.

2  Q    And with the corresponding item number?

3  A    Yes.

4  Q    And you submit -- you collected it?

5  A    Yes.

6         **MR. GREEN:**  Move introduction of Government's Exhibit

7  No. 95.

8         **THE COURT:**  Admitted.

9  **BY MR. GREEN**

10 Q    I show you Government's Exhibit No. 96.

11      What is it?

12 A    It is an envelope with -- evidence envelope containing two

13 cartridge cases.

14 Q    And what kind?

15 A    Two 9mm cartridge cases.

16 Q    Did you bag it?

17 A    Yes, I did.

18 Q    And at Carlton Crossing?

19 A    Yes.

20         **MR. GREEN:**  I'm going to move introduction of

21 Government's Exhibit 96.

22         **THE COURT:**  Admitted.

23 **BY MR. GREEN**

24 Q    I show you what's marked Government's Exhibits 97 and 98,

25 and ask if you are familiar with what it is?

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 149 of 246

1    A    Yes.

2    Q    97 first, what is it?

3    A    This is an evidence envelope containing three .40 caliber

4    cartridge cases.

5    Q    Is that different from the 9mm?

6    A    Yes, they are a different caliber from the 9mm.

7    Q    Okay.  I'm going to show you Government's Exhibit No. 98.

8         What is it?

9    A    This is also -- Exhibit 98 is also an evidence envelope

10   containing two .40 caliber cartridge cases.

11   Q    Now, 97 and 98, were they collected by you?

12   A    Yes.

13           **MR. GREEN:**  Your Honor, I am going to move

14   introduction of 97 and 98.

15           **THE COURT:**  Admitted.

16   **BY MR. GREEN**

17   Q    When you say cartridge casings, is there a difference

18   between an unfired cartridge and a cartridge casing?

19   A    Yes.  The cartridge case is ejected when the round is

20   fired from the firearm; whereas, the cartridge is what you load

21   into the firearm.

22   Q    I'm going to show you Government's Exhibit No. 99, and ask

23   if you are familiar with what that is?

24   A    This is an evidence envelope containing two .45 caliber

25   cartridge cases.

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 150 of 246

1    Q    And did you collect that?

2    A    Yes, I did.

3    Q    From the scene there at Carlton Crossing?

4    A    Yes.

5              **MR. GREEN:**  I'm going to move introduction of

6    Government's Exhibit 99.

7              **THE COURT:**  It is admitted.

8    **BY MR. GREEN**

9    Q    So now we got 9mm, .40 caliber.  And, now, is the .45 a

10   separate caliber?

11   A    That is correct.

12   Q    I'm going to show you Government's Exhibit No. 100.

13        Are you familiar with what it is?

14   A    Yes.

15   Q    What is it?

16   A    It is an evidence envelope containing three 9mm

17   cartridges.

18   Q    And was that collected by you?

19   A    Yes.

20   Q    And did you bag it?

21   A    Yes, I did.

22             **MR. GREEN:**  Move introduction of Government's

23   Exhibit No. 100.

24             **THE COURT:**  Admitted.

25

1  **BY MR. GREEN**

2  Q    I will show you Government's Exhibit 101.

3       What is it?

4  A    It is an evidence envelope containing three 9mm cartridge

5  cases.

6  Q    These are all cartridge cases recovered from Carlton

7  Crossing?

8  A    That is correct.

9  Q    And I'll ask if you bagged those exhibits?

10 A    Yes, I did.

11          **MR. GREEN:**  I move introduction of Government's

12 Exhibit No. 101.

13          **THE COURT:**  Admitted.

14 **BY MR. GREEN**

15 Q    I'm going to show you what's been marked as Government's

16 Exhibit No. 102, and ask if you are familiar with what

17 Government's Exhibit No. 102 is?

18 A    Exhibit 102 is an evidence envelope containing glass

19 fragments.

20 Q    Now, you mentioned glass fragments earlier in your

21 testimony.

22 A    Yes.

23 Q    Do you know where those were collected?

24 A    I believe these were located in the roadway at Carlton

25 Crossing.

US v. Wiley  -- Trial/Vol III of VII -- 4/21/21

1  Q    And did you collect them?

2  A    Yes, I did.

3  Q    And did you bag them?

4  A    Yes, I did.

5        **MR. GREEN:**  I am going to move introduction of

6  Government's Exhibit 102.

7        **THE COURT:**  Admitted.

8  **BY MR. GREEN**

9  Q    I am going to show you Government's Exhibit No. 103.  It

10 may be a little bit different.

11       Are you familiar with what that is?

12 A    Yes, I am.

13 Q    What is it?

14 A    It is an evidence envelope containing one 9mm -- a series

15 of 9mm cartridges.

16 Q    Are those fired or unfired?

17 A    These are unfired.

18 Q    Do you know where they came from?

19 A    Offhand, I think I do, but I don't have my notes in front

20 of me.

21 Q    That's fine.  We'll come back to them in a moment.

22       **MR. GREEN:**  I am going to move introduction of

23 Government's Exhibits 102 and 103.

24       **THE COURT:**  I thought was 102 was moved already.  But

25 it's admitted, 103.

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 153 of 246

1  **BY MR. GREEN**

2  Q    I'm going to show you Government's Exhibit No. 104, and

3  ask if you are familiar with what that is?

4  A    104 is an evidence envelope containing a swab of suspected

5  touch DNA.

6  Q    And tell us what a swab of suspected touch DNA is.

7  A    Anything that we believe to have been touched by a

8  perpetrator of a crime, we will -- and especially with

9  vehicles, but in other contexts as well, we will collect a swab

10 of what we suspect might be DNA on that particular item.

11 Q    Do you recall where you took that swab?

12 A    This particular swab, no.

13 Q    Okay.  I'll return --

14         **MR. GREEN:**  If I may have just one moment, Your

15 Honor?

16         I will return that exhibit.  Thank you.

17 **BY MR. GREEN**

18 Q    I'm showing you what's been marked as Government's

19 Exhibit 105, and ask if you are familiar with what that is?

20 A    Yes, I am.  It is an evidence envelope containing a 9mm

21 handgun.

22 Q    And where was that seized?

23 A    This one in particular, I believe it was the master

24 bedroom of the house.

25 Q    I am going to open up 105.

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 154 of 246

 1              **MR. GREEN:**  Your Honor, that item has been zip-tied

 2   and cranked open.

 3              **THE COURT:**  Okay.

 4   **BY MR. GREEN**

 5   Q    Can you stand up, please.

 6        Would you show that -- I'm sorry.  I haven't introduced

 7   it.

 8              **MR. GREEN:**  I am going to ask that 105 be introduced.

 9              **THE COURT:**  Admitted.

10        Ladies and gentlemen, it's been secured so it cannot

11   fire at the present time, so it's safe to be displayed.

12   **BY MR. GREEN**

13   Q    Would you just hold that up so that the jurors can see it.

14   A    (Complies.)

15   Q    Thank you.

16        I'm going to show you what's been marked as

17   Exhibit No. 106, and ask what that is?

18   A    This is an evidence envelope containing a blue plastic

19   glove.

20   Q    And do you know where that blue glove was located?

21   A    It was located on the front porch of the residence.

22              **MR. GREEN:**  I move introduction of Exhibit No. 106.

23              **THE COURT:**  Admitted.

24   **BY MR. GREEN**

25   Q    I'm going to show you what's been marked as 107.

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 155 of 246

1  A    This is an evidence envelope containing two projectiles.

2  Q    Now, describe what you mean by "projectile."

3  A    A projectile is more or less the end result of firing a

4  weapon.  It is the bullet that we're often familiar with that

5  ends up in whatever is being aimed at.  And then as far as the

6  crime scene investigator goes, we're the ones that come around

7  and collect the projectiles, or the bullets.

8  Q    Was that collected at Carlton Crossing Drive?

9  A    Yes.

10 Q    I will show you Government's Exhibit No. 108.

11 A    This is an evidence envelope containing a projectile

12 fragment.

13 Q    What is the difference between a projectile and a

14 projectile fragment?

15 A    A projectile fragment is often like a piece of a

16 projectile that may have less utility for later analytical

17 purposes but is, nonetheless, important to collect because it's

18 evidence that a shooting took place.

19       **MR. GREEN:**  I'll introduce at this time, if I have

20 not done so, Your Honor, Exhibit 107 and move the introduction

21 of Exhibit 108.

22       **THE COURT:**  Admitted.

23 **BY MR. GREEN**

24 Q    I'm going to show you Government's Exhibit Nos. 109, 110,

25 111, and 112.

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 156 of 246

1       Let me know when you see them on your screen.

2  A    Still blank.

3       Okay, there we go.

4  Q    Do you recognize these as photographs you took at Carlton

5  Crossing?

6  A    That is correct.

7  Q    And what do they depict generally?

8  A    They generally depicted the gray Toyota Sienna minivan

9  with the doors open and the victim in the left front or

10 driver's seat of the vehicle with a suspected bullet hole in

11 the front windshield.

12           **MR. GREEN:**  I'm going to move introduction of

13 Government's Exhibits 109, 110, 111, and 112.

14           **THE COURT:**  Admitted.

15           **MR. GREEN:**  I'll ask to publish Government's 109?

16           **THE COURT:**  You may.

17 **BY MR. GREEN**

18 Q    Describe for the jurors what they are seeing.

19 A    I believe this is a view of the east side or left side of

20 the gray Toyota Sienna van with the victim visible in the left

21 front seat.

22 Q    And is that the victim reclined there in the driver's

23 seat?

24 A    Yes, it is.

25 Q    The door -- side -- passenger side door being opened --

1  the sliding door on the van, was it opened when you found it?

2  A    Yes, it was.

3            **MR. GREEN:**  Ask that No. 110 be published?

4            **THE COURT:**  It may.

5  **BY MR. GREEN**

6  Q    What is it?

7  A    It's another view of the minivan from the perspective of

8  the left front bumper from the driveway.

9  Q    And you're standing in the driveway when you took this

10 shot?

11 A    That is correct.

12 Q    Do you remember -- recall anything in particular about

13 that driveway, whether it was steep, not steep?

14 A    There was a slope up towards the garage from the roadway.

15 It wasn't steep, steep, but it was a gradual slope, yes.

16 Q    I'm going to show you --

17           **MR. GREEN:**  I'll ask that 111 be published, Your

18 Honor?

19           **THE COURT:**  Yes.

20 **BY MR. GREEN**

21 Q    What is it?

22 A    This is a view of the front windshield of the vehicle, the

23 gray Toyota Sienna, with the suspected bullet hole in the

24 windshield.

25 Q    I'll show you Government's Exhibit 112.

US v. Wiley  -- Trial/Vol III of VII -- 4/21/21

1              **MR. GREEN:**  And ask that it be published?

2              **THE COURT:**  You may.

3   **BY MR. GREEN**

4   Q    What is it?

5   A    That is a closeup photograph of the suspected bullet hole

6   in the left side of the front windshield.

7   Q    I'm going to show you Government's Exhibits 113, 114, 115,

8   and 116.

9        Do you see them on your screen?

10  A    Yes, I do.

11  Q    Are those photographs you took out there that night?

12  A    That is correct.

13             **MR. GREEN:**  I am going to move introduction of

14  Government's Exhibits 113, 114 and 115 and 116.

15             **THE COURT:**  Admitted.

16             **MR. GREEN:**  I'll ask that each of those be published.

17             **THE COURT:**  They may.

18  **BY MR. GREEN**

19  Q    I will show you first Government's Exhibit 113.

20       Can you describe for the members of the jury what they are

21  looking at?

22  A    Those images of are suspected bullet holes in the left

23  front door exterior of the vehicle.

24  Q    Exhibit 114, what is that?

25  A    Those are the same bullet holes from the previous

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 159 of 246

1 photograph, but in this case, they are marked with lettered

2 markers.

3 Q    I'll show you Exhibit 115.

4      What are the jurors looking at?

5 A    This is a photograph of the head of the victim who has

6 sustained two gunshot wounds to the left side of his chin and

7 the cheek area.

8 Q    Government 116, what is it?

9 A    This is an overall photograph of the, I guess, west side

10 of the gray Toyota Sienna which also depicts the location of

11 two suspected bullet holes that also have trajectory rods

12 sticking out of them.

13 Q    What is a trajectory rod?

14 A    We use the trajectory rod to determine the path through

15 which a -- or the path that a bullet travels.  In this case,

16 we're looking -- we're trying to figure out the directionality

17 of a projectile hitting that side of the van.

18         **MR. GREEN:**  If you could return to Exhibit 114?

19 **BY MR. GREEN**

20 Q    So if I understand you correctly, there are bullet holes

21 on the driver's side?

22 A    Correct.

23         **MR. GREEN:**  And then return to 116.

24 **BY MR. GREEN**

25 Q    And there are also bullet holes on the passenger side?

Case 1:19-cr-00529-TDS  Document 361  Filed 02/04/22  Page 160 of 246

```
 1  A    That is correct.

 2  Q    I'm going to show you Government's Exhibits 117, 118, 119,

 3  and 120.

 4       Do you see them on your screen?

 5  A    Yes, I do.

 6  Q    Do you recognize those exhibits as photographs that you

 7  took out there that night?

 8  A    That is correct.

 9       MR. GREEN:  I'm going to move introduction of 117,

10  118, 119, and 120.

11       THE COURT:  Admitted.

12       MR. PRINCIPE:  Ask they published?

13       THE COURT:  You may.

14  BY MR. GREEN

15  Q    Starting with No. 117, can you tell the jurors what they

16  are looking at?

17  A    This is an overcall photograph of the right front door of

18  the gray Toyota Sienna van with a suspected bullet hole in the

19  right front door exterior that is marked with a lettered marker

20  and also a trajectory rod.

21  Q    Government's 118, what is it?

22  A    This is also a suspected bullet hole in the right rear

23  quarter panel that is marked by a lettered marker and also

24  marked with a trajectory rod.

25  Q    Government's Exhibit No. 119, what is it?
```

US v. Wiley  -- Trial/Vol III of VII -- 4/21/21

1  A    This is an image of the left front door exterior that

2  also -- of the previous bullet holes that we've already pointed

3  out with lettered markers and, in addition, trajectory rods in

4  this image.

5  Q    Government's Exhibit No. 120, what's depicted there?

6  A    This is an image of glass fragments also on the east side

7  of the van on the pavement, but also there are two numbered

8  placards in the roadway and Nos. 8 and 9 that are marking .40

9  caliber cartridge cases.

10  Q    I'm going to show you -- I'm sorry.

11          **MR. GREEN:**  Can I have just a moment, Your Honor?

12          **THE COURT:**  Yes.

13  **BY MR. GREEN**

14  Q    Did you take suspected swabs of touch DNA out there at the

15  scene?

16  A    I believe because -- in part, because of the conditions of

17  the weather and what have you, we collected the cartridge

18  cases, and then they were later swabbed for touch DNA back in

19  our laboratory.

20  Q    I'm going to show you Government's Exhibits 121 and 122.

21          Are you familiar with what they are?

22  A    Each one of these envelopes is an evidence envelope

23  containing swabs of suspected touch DNA.

24  Q    And were they collected by you?

25  A    Yes, they were.

US v. Wiley  -- Trial/Vol III of VII -- 4/21/21

 1              MR. GREEN:  I am going to move introduction of
 2   Government's Exhibits Nos. 121 and 122.
 3              THE COURT:  Admitted.
 4   BY MR. GREEN
 5   Q    Looking at Government's Exhibit 121, do you recall where
 6   that suspected swabbing was taken?
 7   A    From these three particular swabs of suspected touch DNA,
 8   I don't recall exactly where these came from.
 9   Q    Did you make notes, as we referred to earlier, in the
10   evidence inventory log?
11   A    Yes.
12   Q    Might that help refresh your memory?
13   A    That might refresh my memory, yes.
14   Q    I am going to show you a page from that evidence log.
15   A    Uh-huh.
16   Q    And is there a corresponding exhibit number?
17   A    For these three, 47, 48 and 49, there is an another item
18   number, yes.
19   Q    Right.  Do you recognize where those swabs came from, now
20   that you've reviewed the evidence log?
21   A    Yes.
22   Q    And where do they come from?
23   A    Item 47 is a swab of touch DNA that was taken from the
24   left front door area of the gray Toyota Sienna.
25         Item 48 was also from the gray Toyota Sienna, from the

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 163 of 246

1  left rear door area.

2       And Item 49 was a swab of suspected touch DNA from the

3  right front door area of the gray Toyota Sienna.

4            **THE COURT:**  Do those correspond to the exhibits?

5  **BY MR. GREEN**

6  Q    Do these correspond to exhibits?

7  A    Yes, they do.

8  Q    And if I may, looking at Exhibit 122, do you recall where

9  that swabbing was made?

10  A    That was also a suspected touch DNA swab.

11  Q    And do you recall where from?

12  A    No, I do not.

13  Q    I'm going to show you again from the Property and Evidence

14  Voucher -- I'll ask you to look at that and see if it refreshes

15  your recollection as to where that was --

16  A    Yes.  Item 50 was a swab of suspected touch DNA from the

17  right rear door of the gray Toyota Sienna.

18            **MR. GREEN:**  I am going to move introduction of 121

19  and 122, Your Honor.

20            **THE COURT:**  Admitted.

21  **BY MR. GREEN**

22  Q    I'm going to show you what's marked as Government's

23  Exhibit No. 104, which I think I've previously shown you.

24       Do you recognize what that is?

25  A    Yes, it is also a swab of suspected touch DNA.

1  Q    And do you recall, just sitting here, where that came

2  from?

3  A    Just sitting here, no.

4  Q    I am going to ask you to look at the Property and Evidence

5  Voucher log.

6       Does that help refresh your recollection as to where that

7  swab was taken?

8  A    Yes.  This is Item 38, which in the evidence log says was

9  from a 9mm handgun --

10 Q    All right.

11 A    -- Item 40.

12          **MR. GREEN:**  I am going to move introduction of

13 Government's Exhibit No. 104 at this time.

14          **THE COURT:**  Admitted.

15 **BY MR. GREEN**

16 Q    Showing you Government's Exhibit No. 123, and ask if you

17 are familiar with what that is?

18 A    It is an evidence envelope containing three projectiles.

19 Q    And, again, what is a projectile?

20 A    A projectile is the bullet that comes out of a firearm

21 once it's fired.

22 Q    Do you recall where that was collected?

23 A    These three projectiles in particular, no.

24 Q    Would the evidence log help refresh your recollection?

25 A    That would be of assistance, yes.

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 165 of 246

1  Q    Looking at Government's Exhibit No. 123, does it have a

2  corresponding description on the evidence log as to where you

3  located those projectiles?

4  A    51, 52, and 53, all projectiles, were in order collected

5  from -- 51 was the interior plastic panel of the rear hatch of

6  the Toyota Sienna; 52 was the interior right rear quarter panel

7  of the Toyota Sienna; and 53 was from the left front door

8  interior panel.

9  Q    I will show you what's been marked as Government's Exhibit

10 No. 124, and ask if you are familiar with what that is?

11 A    This is also a projectile.

12 Q    And where was it collected?

13 A    It was collected from the left front door interior panel.

14 Q    Of what?

15 A    Of the gray Toyota Sienna.

16        **MR. GREEN:**  I am going to move introduction of

17 Government's Exhibits Nos. 123 and 124.

18        **THE COURT:**  Admitted.

19 **BY MR. BRYSON**

20 Q    I'm going to show you Government's Exhibit No. 125, and

21 ask if you are familiar with what it is?

22 A    This exhibit is glass fragments.

23 Q    And where was that collected?

24 A    I believe these were collected from -- this is the

25 evidence voucher -- from under the left front seat of a white

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 166 of 246

1 | Lincoln MKX.

2 | Q    Ultimately, were you involved in the processing of a white

3 | Lincoln MKX?

4 | A    Yes, I was.

5 | Q    I am going to show you Government's Exhibit No. 126, and

6 | ask if you are familiar with what that is?

7 | A    Number 56 [sic] is our glass fragments which were

8 | collected from the left rear compartment of a white Lincoln

9 | MKX.

10 | Q    And, finally, I will show you Government's Exhibit No. 57

11 | for this series, and ask if you are familiar with what it is?

12 | I'm sorry.  Let me correct.  I will show you Government's

13 | Exhibit No. 127, and ask if you are familiar with what it is?

14 | A    This exhibit is also glass fragments that were collected

15 | from the left rear door interior of the white Lincoln MKX.

16 |          **MR. GREEN:**  I am going to move introduction, Your

17 | Honor, of Government's Exhibits 125, 126, and 127.

18 |          **THE COURT:**  Admitted.

19 | **BY MR. GREEN**

20 | Q    I'm going to show you a series of photographs.  Stand by.

21 |      You should see on your screen Government's Exhibits Nos.

22 | 128, 129, 130, and 131.  Do you?

23 | A    Yes.

24 | Q    Do you recognize those?

25 | A    Yes.

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 167 of 246

1  Q    What are they?

2  A    They are photographs of evidence marked in the roadway to

3  the southwest of the residence.

4          **MR. GREEN:**  I move the introduction of Government's

5  Exhibits No. 128, 129, 130, and 131, and they ask they be

6  published?

7          **THE COURT:**  Admitted.  They may.

8  **BY MR. GREEN**

9  Q    What is Government's Exhibit No. 128?

10 A    These are more closer up photographs of the cartridge

11 cases in the roadway.

12 Q    And in the -- I see two parked cars.

13 A    Uh-huh.

14 Q    And then I see in the far distance -- is that the Toyota

15 Sienna van that we've identified earlier?

16 A    Correct.

17 Q    I will show you Government's Exhibit No. 129.

18      What is it?

19 A    This is a cartridge case in the roadway.  Just from

20 looking at it, I'm unsure if it's a 9mm or .40 caliber or what

21 I recorded it as.

22 Q    All right.  I will show you Government's Exhibit No. 130.

23      What am I looking at?

24 A    These are also photographs of placarded evidence in the

25 roadway.

1  Q    Government's Exhibit No. 131, what is that?

2  A    This is Placard 3, another marked cartridge case in the

3  roadway.

4  Q    I'm going to show you four more photographs.

5       (Off-the-record discussion.)

6       **THE COURT:**  All right.  Let me -- it is not quite

7  time for a break yet, but I am going to ask the jurors just to

8  stand up for a moment and stretch your legs just a little bit

9  just to get some fresh air in.

10       Mr. Green, if you could slow down just a little.  Our

11  clerk is having a hard time recording the exhibits as we go

12  through and the court reporter, I think, as well.  So that

13  would help.

14       And if you -- if the witness would just allow

15  Mr. Green to finish his question.  It is a natural reaction to

16  want to anticipate an answer when you think you know what the

17  question is.  If you would just give a little time, that way

18  the court reporter can get the question and the answer.

19       Okay.  Everybody have a seat.  Thank you.

20       Please proceed.

21  **BY MR. GREEN**

22  Q    On your screen, do you see four photographs, Government's

23  Exhibits 132, 133, 134 and 135?

24  A    Yes, I do.

25  Q    Do you recognize those?

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 169 of 246

1   A    Yes, I do.

2   Q    And what are they?

3   A    These are photographs of placarded evidence in the roadway

4   and also just to the east of the gray Toyota Sienna van.

5   Q    And everywhere we see a placard marking evidence, is that

6   evidence that's ultimately collected?

7   A    Yes.

8   Q    And is it logged in that log we've discussed?

9   A    Yes.

10  Q    And is its location noted in that log?

11  A    Yes.

12          **MR. GREEN:**  I am going to move introduction of

13  Government's Exhibits 132, 133, 134, and 135.

14          **THE COURT:**  They are admitted.

15          **MR. GREEN:**  I ask that they be published?

16          **THE COURT:**  You may.

17  **BY MR. GREEN**

18  Q    Can you describe for the members of the jury what they are

19  looking at in Exhibit No. 132?

20  A    These are placards marking evidence in the roadway.  I

21  believe No. 5 is cartridge case and No. 6 is marking glass

22  fragments.

23  Q    Now, you mentioned glass fragments.  There was also glass

24  fragments that I believe you described close to the van?

25  A    Yes.

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 170 of 246

1    Q    These are at different locations?

2    A    Yes.  These are to the west of the van, just as an

3    approximation, probably 50, 60 feet minimum; whereas, the glass

4    fragments that were in the roadway underneath the left front

5    door of the vehicle were on the other side of the vehicle.

6    Q    And did you notice anything different about the glass when

7    you looked at it?

8    A    This glass appeared to be from -- have a darker tint to it

9    than the glass that was found directly beside the gray Toyota

10   Sienna.

11   Q    And those glass fragments were, in fact, collected?

12   A    Yes.

13   Q    I'm going to show you Government's Exhibit 133.

14        What is that?

15   A    That is a closeup photo of the glass fragments in the

16   roadway.

17   Q    I'll show you Government's Exhibit No. 134.

18        What is that?

19   A    Those are -- that is an image of the east side of the gray

20   Toyota Sienna van with glass fragments below the left front

21   door and also an evidence marker marking, I believe, a .40

22   caliber cartridge case.

23   Q    And so as we described glass fragments, again, there are

24   some beside the minivan?

25   A    Yes.

US v. Wiley  -- Trial/Vol III of VII -- 4/21/21

1  Q    And some 40 to 50 feet down the road?

2  A    Yes.

3  Q    And the ones that were down the road you described as

4  having a darker tint?

5  A    Yes.

6  Q    I'll show you the next exhibit, Exhibit No. 135.

7       Can you tell me what I'm looking at?

8  A    These are evidence marked with eight -- Placards 8 and 9,

9  both of which were .40 caliber cartridge cases.

10 Q    I will show you Exhibit No. 136 -- I will show you on your

11 screen Exhibit No. 136, and ask if you are familiar with what

12 that is?

13 A    That is Placard 9, which I just identified in the previous

14 photograph.  That is marking a .40 caliber cartridge case.

15 Q    All right.

16          **MR. GREEN:**  I'll ask that exhibit be introduced and

17 published.

18          **THE COURT:**  It's admitted.  You may.

19 **BY MR. GREEN**

20 Q    Now, with each of the -- we described in the introduction

21 of the actual physical exhibits .40 caliber casings.

22       Is this one of the casings that you collected?

23 A    Yes, it is.

24 Q    And so that then becomes bagged in its own bag and

25 described on the bag; is that correct?

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 172 of 246

1  A    Correct.

2  Q    All right.  I'm going to show you exhibit -- Government's

3  Exhibits Nos. 137, 138, 139, and 140.

4       Exhibit No. 137 in the -- what would be your upper

5  left-hand corner, can you describe what that is?

6  A    This is the rough sketch that I completed on the scene of

7  the -- on the scene of the scene.

8  Q    Now, we've already introduced another sketch.  Is this a

9  sketch of a different area?

10 A    This may also include a portion of the interior of the

11 residence.

12 Q    I'm going to show you the next -- of those other exhibits

13 that we're looking at, do you recognize those as photographs

14 that you've taken?

15 A    Yes, they are.

16 Q    Now, in the series of photographs, it appears we're now

17 moving from the casings and evidence in the street and roadway

18 and now you're starting to move up the sidewalk and driveway.

19 Is that what's happening?

20 A    That is correct.

21       **MR. GREEN:**  We'll -- I'd ask that these exhibits be

22 introduced and published, Your Honor.

23       **THE COURT:**  They are admitted.  You may.

24 **BY MR. GREEN**

25 Q    So looking at Exhibit No. 137, can tell you the jurors

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 173 of 246

1  what they are looking at?

2  A    This is a rough sketch that was completed on the scene

3  that includes the victim's vehicle, the gray Toyota Sienna van

4  in the driveway, but also a portion -- or the -- the evidence

5  that was immediately visible on the -- along by the front

6  porch.  There is a blown-up diagram of the porch up to the top

7  there, and then also some of the interior residence is also

8  depicted.

9  Q    Why did you find it necessary to make a separate sketch

10 or, if not necessary, important to make a separate sketch of

11 the porch area?

12 A    There were a number of cartridge cases on the front porch,

13 indicating that a shooting incident had occurred -- or actions

14 during this incident had occurred on the front porch.  And

15 based on information that we had received from investigators

16 and officers on the scene, we were already aware of that prior

17 to even looking for the evidence up there.

18 Q    Ill show you Government's Exhibit 138.

19       What are the jury looking at?

20 A    These are cartridge casings that are marked by Placards 10

21 and 11 just off the driveway on a kind of sidewalk and the

22 grass there in the front yard.

23 Q    Each of these items of evidence were collected?

24 A    Yes.

25 Q    And documented in that evidence log as to where they were?

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 174 of 246

1    A    Yes.

2    Q    And Government's Exhibit No. 139?

3    A    This is more of an up-close view of those cartridge cases.

4    Q    Government's Exhibit No. 140?

5    A    This is a cartridge case marked by Placard 10.

6    Q    I'm going to show you another series of photographs.  It

7    is going to be Government's Exhibits Nos. 141, 142, 143, and

8    144.

9        Looking at those exhibits, do you recognize them?

10   A    Yes, I do.

11   Q    What are they?

12   A    These are photographs that I took in the front yard of the

13   crime scene.

14           **MR. BRYSON:**  I am going to move introduction of

15   Government's Exhibits, 141, 142, 143 and 144.

16           **THE COURT:**  Admitted.

17           **MR. GREEN:**  I ask they be published?

18           **THE COURT:**  You may.

19   **BY MR. GREEN**

20   Q    Looking at Exhibit No. 141, what is it?

21   A    This is a cartridge case marked by Placard 11 in the front

22   yard near the driveway and the sidewalk.

23   Q    I want to ask you, Mr. Shields, as we move through these

24   photographs, each time we are seeing a photograph of a

25   cartridge casing, that's a separate cartridge casing; is that

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 175 of 246

1  correct?

2  A    Yes.

3  Q    So it's not repeats of the same one?

4  A    Correct.

5  Q    I am going to show you Government's Exhibit No. 142, and

6  ask if you can tell me what that is?

7  A    This is a photograph of the front yard between the roadway

8  and the front porch of the residence.

9  Q    I'm going to show you Government's Exhibit No. 143.

10      Can you tell the jurors what they are seeing in that?

11  A    This is a more close-up view of a blue shoe that was

12  located in front yard of the residence.

13  Q    I'll show you Government's Exhibit No. 144.

14      What is that?

15  A    This is a closer-up view of the blue shoe in the front

16  yard of the residence.

17  Q    Now, earlier when we were talking about the evidence log,

18  did you identify that exhibit as the first exhibit that you

19  marked and bagged?

20  A    That was submitted to the Property and Evidence unit;

21  correct.  That is correct.

22  Q    I'm going to show you Government's Exhibits 145, 146, 147,

23  148.

24      Are you familiar with what that is?

25  A    These are photographs of marked cartridge cases in the

1  flowerbed in front of the front porch of the residence.

2  Q    And did you take these photographs?

3  A    Yes, I did.

4        **MR. GREEN:**  I am going move the introduction of these

5  exhibits, Your Honor.

6        **THE COURT:**  Admitted.

7        **MR. GREEN:**  I ask they be published?

8        **THE COURT:**  Yes.

9  **BY MR. GREEN**

10  Q    Now, earlier I had asked you whether we were seeing

11  individual cartridge casings and repeats.  In this series of

12  photographs, we have the orange cones and then those orange

13  cones are removed; is that right?

14  A    That's correct.

15  Q    So you would have potentially two photographs of the same

16  casing?

17  A    That's possible, yes.

18  Q    Looking at Exhibit No. 145, describe for the jurors what

19  they are seeing.

20  A    There are five orange cones, each of which are marking at

21  least one cartridge case in the flowerbed and on the edge of

22  the flowerbed in front of the front porch, but there is also

23  another orange cone to the -- on the west side of the front

24  porch that you can barely see above the first step to the

25  porch.

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 177 of 246

1  Q    I will show you Exhibit 146.

2       What is that?

3  A    That is an orange cone marking a cartridge case.

4  Q    And is that just representative of the -- each of the

5  cartridge casings you are seeing?

6  A    Yes.

7  Q    I'll show you Government's Exhibit 147.

8       What is that?

9  A    Once we have -- you know, these are cartridge cases that

10 are marked by numbered placards.

11 Q    And each of those then are logged and described, their

12 location, in that evidence log?

13 A    Correct.

14 Q    I'm going to show you Government's Exhibit No. 148, and

15 ask if you're familiar with what that is?

16 A    That is a cartridge case marked by Placard 16.

17 Q    I'm going to show you more four exhibits:  149, 150, 151,

18 and 152.

19      Now, can you describe what that is?

20 A    This series of photographs are composed -- they represent

21 the front porch of the residence.

22 Q    So now we transitioned -- if I understand this series of

23 photographs, we started in the roadway, now have worked our way

24 up the driveway, down the front walkway, and now we're turning

25 towards the house?

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 178 of 246

1  A    Yes, that's correct.

2           **MR. GREEN:**  I'm going to move introduction of

3  Government's Exhibit Nos. 149, 150, 151, and 152.

4           **THE COURT:**  Admitted.

5           **MR. GREEN:**  Ask they be published?

6           **THE COURT:**  You may.

7  **BY MR. GREEN**

8  Q    Can you describe what's depicted there in Government's

9  Exhibit No. 149?

10 A    This is a view of the front porch from the sidewalk and

11 depicts a -- a number of evidence markers on the front porch.

12 Q    I am going to show you Government's Exhibit No. 150, and

13 ask what that is?

14 A    Those are numbered placards on the more or less west side

15 of the front porch.

16 Q    And do you know what those placards represent?

17 A    Nos. 18 and 19 and 20 I believe were 9mm cartridges.

18 Q    And you described cartridges, not cartridge casings; is

19 that right?

20 A    Correct.

21 Q    So these would be unfired?

22 A    Unfired rounds, correct.

23 Q    I am going to show you Exhibit No. 151, and ask what we're

24 looking at?

25 A    We're looking at the front porch directly towards the

1  doorway.

2  Q    And these numbered placards that we're seeing, what are

3  those?

4  A    Those are -- except for -- with the exception of Placard

5  21 on the doormat there, the remainder are marking cartridge

6  casings.

7  Q    And so those are fired cartridge casings?

8  A    Correct.

9  Q    And I see in No. 21 -- is that the blue glove that has

10  previously been introduced?

11  A    Yes, it is.

12  Q    I am going to show you Government's Exhibit No. 152.

13  Again, now are we turning a little bit as we go around the --

14  marking each one?  Is what that this depicts?

15  A    Yes.

16  Q    Can you describe for the jurors what you saw on this

17  photograph?

18  A    In this photograph, Placards 22 through 30 that I see in

19  this photograph are each marking individual cartridge casings.

20  Q    These are fired cartridge casings?

21  A    Yes.

22  Q    I'm going to show you Government's Exhibit 153, 154, 155,

23  and 156.

24       Looking at those, do you recognize those as photographs

25  that you've taken?

1  A    Yes, they are photographs of items that were identified on

2  the front porch.

3  Q    And was that at Carlton Crossing?

4  A    Yes.

5         **MR. GREEN:**  I am going to move introduction of

6  Exhibit Nos. 153, 154, 155, and 156.

7         **THE COURT:**  Admitted.

8         **MR. GREEN:**  I ask they be published?

9         **THE COURT:**  You may.

10  **BY MR. GREEN**

11  Q    Looking at Government's Exhibit No. 153, do you recognize

12  what that is?

13  A    This is an image of cartridge cases and the blue plastic

14  glove on the floor mat on the front porch.

15  Q    Is the open door of the residence visible in this

16  photograph?

17  A    Yes, it is.

18  Q    There appears to be a bag of some type.  Did you notice

19  that bag when you were out there?

20  A    Yes.  It looked like a plastic bag of takeout food from a

21  Chinese restaurant.

22  Q    And is that how you found it or is that how you saw it on

23  the --

24  A    That is how it appeared during my presence on the scene.

25  Q    I will show you Government's Exhibit No. 154.

US v. Wiley  -- Trial/Vol III of VII -- 4/21/21

1     Earlier you identified unfired cartridge casings.  Is this

2 a photograph of one of those cartridge casings?

3 A    Yes, this is a photograph of a 9mm cartridge on the front

4 porch.

5 Q    Show you Exhibit 155.

6     Is that a closeup of the blue glove?

7 A    Yes, it is.

8 Q    And 156, is that a closeup of a shell casing?

9 A    That's correct.

10 Q    I am going to show you Government's Exhibits 157, 158,

11 159, and 160.

12     Do you recognize what that is?

13 A    Yes, I do.

14 Q    What is it?

15 A    They are additional cartridge cases near the front porch,

16 or just below it.

17         **MR. GREEN:**  I am going to move introduction of 157,

18 158, and 159.

19         **THE COURT:**  Admitted.

20         **MR. GREEN:**  I ask they be published?

21         **THE COURT:**  They may.

22 **BY MR. GREEN**

23 Q    Looking at 157, can you describe what we're looking at?

24 A    This is a cartridge case, I believe, on the front porch.

25 Q    158?

1  A    These are -- this is another photograph of cartridge cases

2  in the flowerbeds that align the sidewalk leading up to the

3  front porch.

4  Q    And 159?

5  A    This is a closeup of a cartridge case marked by Placard 33

6  in the flowerbed just to the east of the front porch.

7  Q    I'm going to show you what's been marked as Government's

8  Exhibit No. 144A, and ask if you are familiar with what that

9  is?

10 A    This is an evidence bag containing a blue Nike shoe.

11 Q    And is this the blue Nike shoe that is in the photograph?

12 A    That is correct.

13 Q    And that was the Exhibit 1 on your list?

14 A    Yes.

15 Q    And that was taken from the yard at Carlton Crossing?

16 A    Yes.

17        **MR. GREEN:**  I'm going to move the introduction of No.

18 144A.

19        **THE COURT:**  Admitted.

20 **BY MR. GREEN**

21 Q    I'm going to show you Exhibits 160, 161, 162 and 163.

22      Can you see those on your screen?

23 A    Yes, I do.

24 Q    Do you recognize what they are?

25 A    They are images of bullet damage to the front door frame

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 183 of 246

1  and the front foyer of the residence.

2  Q    And so now in this series of photographs, we've now moved

3  off the porch and now we're moving inside the residence first

4  in the door/foyer area?

5  A    Correct.

6         **MR. GREEN:**  All right.  I'm going to ask Government's

7  Exhibits 160, 161, 162, and 163 be admitted.

8         **THE COURT:**  Admitted.

9         **MR. GREEN:**  I would ask that they be published.

10         **THE COURT:**  They may.

11 **BY MR. GREEN**

12 Q    Looking at Government's Exhibit 160, what is that a

13 photograph of?

14 A    This is more of an overall photograph of bullet damage

15 to -- from our perspective here, the right side of the door

16 frame.

17 Q    Now, I'm looking at an orange cone in the bottom of that

18 photograph near the door.

19 A    Uh-huh.

20 Q    And is that a piece of evidence that ultimately would be

21 collected?

22 A    That is correct.

23 Q    I'll show you Government's Exhibit No. 161.

24      Can you describe what the jury is seeing?

25 A    This is a photograph of a -- of suspected bullet damage to

1  the door frame of the front door.

2  Q    I'm going to show you Exhibit No. 162.

3       Can you tell me what we're looking at?

4  A    The previously noted takeout food that looks upended on

5  the floor is in the bottom left of the photograph.  But the --

6  there are also lettered markers showing bullet damage in the

7  floor of the front foyer of that residence.

8  Q    And so if I'm looking at this photograph, there appears to

9  be a blue rag or T-shirt.  Just below that, I see a white piece

10 of paper.  Is that the marker?

11 A    Yes.  That's correct.

12 Q    With the marked bullet damage?

13 A    Yes.

14 Q    And, again, above the Government's exhibit sticker, is

15 that also the marker showing the bullet damage?

16 A    Yes.

17 Q    Looking at 164 -- I'm sorry.  I'm going to show you four

18 more photographs:  164, 165, 166, 167.  I'm going to ask if you

19 are familiar with what those are?

20 A    Yes, these are lettered markers that are marking suspected

21 bullet damage in the front foyer of the residence.  And the

22 last image is a view from the foyer into a living room in the

23 rear of the residence.

24 Q    Each of those exhibits are photographs you took?

25 A    Yes.

Case 1:19-cr-00529-TDS  Document 361  Filed 02/04/22  Page 185 of 246

1          **MR. GREEN:**  I'm going to move introduction of

2    Government's Exhibits 164, 165 and 166 and 167.

3          **THE COURT:**  Admitted.

4          **MR. GREEN:**  Ask they be published?

5          **THE COURT:**  They may.

6    **BY MR. GREEN**

7    Q    I show you Government's Exhibit No. 164.

8         What is it?

9    A    That is suspected bullet damage to the floor marked by

10   lettered marker I1.

11   Q    I will show you 165.

12        What is it?

13   A    Those are also a little bit of a closer-up image of

14   that -- the previous lettered marker and also another lettered

15   marker which I take to be G1 to mark suspected bullet damage.

16   Q    I will show you Exhibit 166.

17        What is it?

18   A    That is suspected bullet damage in the floor of the foyer

19   just inside the doorway marked by lettered marker G1.

20   Q    I will show you Exhibit No. 167.

21        Tell me what I am looking at.

22   A    This is a view from the front foyer just inside the front

23   door to the living room in the rear of the house.

24   Q    And the purpose of taking that photograph?

25   A    Just to identify -- just to -- it is a perspective to show

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 186 of 246

1  where the living room was in relationship to the foyer, but

2  also because we had located a suspected bullet hole in a

3  freezer in the living room.

4  Q    And so based on this orientation of this photograph and

5  the bullet damage you saw, are you now going to continue

6  through the house looking for additional fragments or

7  projectiles?

8  A    That is correct.

9  Q    I'm going to show you four photographs:  168, Government's

10 169, 170, and Government's 171.

11      Do you recognize those as photographs you took?

12 A    Yes, I do.

13          **MR. GREEN:**  I'm going to the move introduction of

14 Government's Exhibits 168, 169, 170 and 171.

15          **THE COURT:**  Admitted.

16          **MR. GREEN:**  I'm sorry.  Let me correct myself, Your

17 Honor.  168, 169 and 170 at this time.

18          **THE COURT:**  All right.  Those three are admitted.

19          **MR. GREEN:**  I am going to ask that 168 be published?

20          **THE COURT:**  You may.

21 **BY MR. GREEN**

22 Q    Can you tell the jurors what they are looking at?

23 A    We're looking at the front side of a -- well, an open deep

24 freezer in the living room of the residence.

25 Q    Why did you take this photograph?

US v. Wiley  -- Trial/Vol III of VII -- 4/21/21

1  A     Because we had located a suspected bullet hole in the

2  front side of the bottom portion of the deep freezer.

3  Q     I'm going to show you Government's Exhibit 169.

4        Is that the same freezer that was depicted in the earlier

5  photograph?

6  A     That is correct.

7  Q     I'm going to show you Government's Exhibit No. 170.

8        What is that?

9  A     That is a depiction of the rear side of the freezer once

10 it has been pulled away from the wall.

11 Q     And what, if anything, did you notice when you examined

12 the freezer?

13 A     We examined the freezer and noticed that the suspected

14 bullet hole -- or the projectile that entered the deep freezer

15 traveled all way the through the freezer and stuck in the wall

16 behind the freezer.

17 Q     I'm going to show you Government's Exhibits 171, 172, 173

18 and 174.

19       Looking at those four photographs, do you recognize those

20 as photographs you took?

21 A     Yes, I do.

22        **MR. GREEN:**  I'm going to move the introduction of

23 Government's Exhibits 171, 172, 173, and 174.

24        **THE COURT:**  They're admitted.

25        **MR. GREEN:**  Ask they be published?

1          **THE COURT:**  You may.

2  **BY MR. GREEN**

3  Q    Government's Exhibit No. 171, what does that depict?

4  A    That is a suspected bullet hole on the rear side of the

5  deep freezer in the living room.

6  Q    Government's Exhibit No. 172?

7  A    That is a closeup of the same bullet hole.

8  Q    Exhibit 173?

9  A    These are -- this was an attempt to show the relationship

10 between the suspected bullet hole in the rear side of the

11 freezer with a projectile stuck in the wall behind the freezer.

12 Q    I'll show you an -- is that what you're trying to capture

13 in that photograph?

14 A    Correct.

15 Q    And then Government's Exhibit No. 174?

16 A    And then that's a closeup of the projectile in the wall

17 behind the freezer.

18 Q    Was that projectile collected?

19 A    Yes, it was.

20 Q    And bagged by you?

21 A    Yes.

22 Q    And did you label it on the exhibit form where exactly

23 that had been located and collected?

24 A    Correct.

25 Q    I am going to show you Exhibits 175, 176, 177 and 178.

US v. Wiley  -- Trial/Vol III of VII -- 4/21/21

1      Do you recognize those as photographs you took?

2   A    Yes, I do.

3   Q    And that was at Carlton Crossing?

4   A    Correct.

5           **MR. GREEN:**  I am going to move introduction of 175,

6   176, 177, and 178.

7           **THE COURT:**  Admitted.

8           **MR. GREEN:**  Ask they be published?

9           **THE COURT:**  You may.

10  **BY MR. GREEN**

11  Q    I'm showing you Government's Exhibit No. 175.

12       Do you recognize what it is?

13  A    Yes.  This is the floor of the foyer in the front of the

14  residence.

15  Q    There appears to be a white marker on the floor.  What is

16  it?

17  A    That is a marker showing additional suspected bullet

18  damage to the floor of the foyer.

19  Q    And this would be bullet damage separate from the door

20  frame?

21  A    That is correct.

22  Q    The two in the foyer?

23  A    Yes.

24  Q    And the one that went through the freezer?

25  A    Yes.

Case 1:19-cr-00529-TDS  Document 361  Filed 02/04/22  Page 190 of 246

1    Q    I'm going to show you Government's Exhibit No. 176.

2         What is that?

3    A    This is a closeup of the previously pictured suspected

4    bullet damage in the floor.

5    Q    177, I'll ask you to identify what that is?

6    A    That is a staircase leading up to the second story of the

7    residence.

8    Q    Government's Exhibit No. 178, what is it?

9    A    This is the wall on the side of the staircase, and in the

10   middle of the photograph, we have additional suspected bullet

11   damage.

12   Q    I'm going to show you Government's Exhibit Nos. 179, 180,

13   181, and 182.

14        Do you recognize those as photographs you took?

15   A    Yes, I do.

16           **MR. GREEN:**  I am going to move introduction of

17   Government's Exhibits 179, 180, 181, and 182.

18           **THE COURT:**  Admitted.

19           **MR. GREEN:**  Ask they be published?

20           **THE COURT:**  They may.

21   **BY MR. GREEN**

22   Q    Showing you Government's Exhibit No. 179, what is it?

23   A    This is suspected bullet damage on the wall of the

24   staircase that was depicted in the previous photograph.

25   Q    Government's Exhibit No. 180, now we're back downstairs?

1  A    Yes.

2  Q    Did you find any other bullet damage above that last mark

3  on the -- there in the staircase?

4  A    I don't believe so in the second story of the house, no.

5  Q    Now we're back downstairs at the front door --

6  A    Yes.

7  Q    -- in this photograph, 180?

8  A    Yes.

9  Q    Tell us what 180 depicts.

10 A    180 is a broader image of Placard 34, which is a

11 projectile -- or projectile fragment on the floor just inside

12 the doorway.

13 Q    I'm going to show you Government's Exhibit 181.

14      What is that?

15 A    I believe a projectile.

16 Q    Is that a closeup of the previous photograph?

17 A    Yes.

18 Q    When you say "projectile," do you mean a fired bullet?

19 A    Yes, a fired bullet.

20 Q    Looking at Government's Exhibit 182, what is it?

21 A    This is a photograph of a bathroom on the second floor of

22 the residence.

23 Q    I'll show you Government's Exhibit 183 -- I'm sorry --

24 183, 184, 185.

25      Do you recognize those?

1    A    Yes, I do.

2    Q    What are they?

3    A    183 and 184 are photographs of a gun case for a 9mm

4    handgun in the bathroom on the second floor of the residence.

5    Q    And --

6    A    And then 185 is a photograph of the master bedroom of the

7    residence on the second floor.

8    Q    Did you take each of those photographs?

9    A    Yes, I did.

10         **MR. GREEN:**  I am going to move introduction of 183,

11    184, and 185.

12         **THE COURT:**  Admitted.

13   **BY MR. GREEN**

14   Q    Can you describe 183?

15   A    183 is a --

16         **THE COURT:**  Do you want to publish these?

17         **MR. GREEN:**  I do.  I'm sorry, Your Honor.

18   **BY MR. GREEN**

19   Q    What is it?

20   A    183 is a photograph of a gun case as found, was closed on

21   the counter of the bathroom upstairs of the residence.

22   Q    It appears to bear some manufacturing logo.  Are you

23   familiar with what that is, or do you know?

24   A    I'm not certain, no.

25   Q    I'll show you Government's Exhibit 184.

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 193 of 246

1      What is that?

2  A    This is the open gun case on the counter in the bathroom

3  on the second floor.

4  Q    There appears to be some documentation inside that gun

5  case.  Do you recognize that manufacturer now?

6  A    FNH USA.  Beyond that, I can't say.

7  Q    Below that?

8  A    There is a website.  I don't know what you're asking.

9  Q    Okay.  I am going to show you Government's Exhibit

10 No. 185, and ask if you are familiar with what that is?

11 A    That is the master bedroom of the residence.

12 Q    There appears to be a dark object on the bed.  Do you

13 recognize what that was?

14 A    Yes, I do.  That was a 9mm handgun on the bed.

15 Q    And is that the handgun that's previously been introduced?

16 A    Yes.

17 Q    I'm going to show you Government's Exhibits 186, 187,188,

18 and 189.

19      Can you tell us what those photographs are?

20 A    These are photographs of the right rear taillight of the

21 gray Toyota Sienna van that depict a suspected bullet hole in

22 them.

23 Q    Now, these photographs, are they taken at the scene or

24 have you moved the van?

25 A    This is the vehicle in our garage once the vehicle -- a

US v. Wiley  -- Trial/Vol III of VII -- 4/21/21

1  decision was made to tow the vehicle for further processing in

2  a controlled indoor environment.

3  Q    And that was because why?

4  A    Partly because of the weather.

5  Q    Was Mr. Hong Zheng -- was he in the van when it got

6  transported?

7  A    He was in the van.

8  Q    I am going to show you -- you've identified those

9  exhibits.

10       **MR. GREEN:**  I'm going to move introduction of 186,

11  187, 188, and 189.

12       **THE COURT:**  Admitted.

13       **MR. GREEN:**  I would ask that they be published?

14       **THE COURT:**  They may.

15  **BY MR. GREEN**

16  Q    Can you tell us what we're looking at?

17  A    We're looking at the right rear taillight of the gray

18  Toyota Sienna van.

19  Q    187?

20  A    This is a closeup view of the right rear taillight with a

21  suspected bullet hole in it.

22  Q    188?

23  A    This is a closer-up view of the same bullet hole.

24  Q    And 189?

25  A    This is an interior view when we pulled the right rear

1  taillight back or off of the rear end of the vehicle to capture

2  a photograph of additional suspected bullet damage on the

3  interior side of the light.

4          **THE COURT:**  Is that a good place to stop for

5  afternoon break?

6          **MR. GREEN:**  It is.

7          **THE COURT:**  Ladies and gentlemen, if you're taking

8  notes, please put your notes in your envelopes.  We'll take a

9  break at this time.  Leave your envelopes in your chairs.

10         Remember all my admonitions to you.  Simply take a

11 break.  Don't discuss the case.  You have not heard all the

12 evidence.  Keep an open mind.

13         At this time, Ms. Engle, will take you to the jury

14 room across the hall, and we'll take a 20-minute break and

15 we'll start promptly in 20 minutes.

16     (The jury departed the courtroom at 3:26 p.m.)

17         **THE COURT:**  Please be seated, everyone.  Let's give

18 them a minute just to go across the hall.

19         All right.  The jury has left the courtroom.

20         I see you have Ms. Jocys testifying twice in the

21 case; is that right?

22         **MR. GREEN:**  I do.

23         **THE COURT:**  Is she testifying as a fact witness in

24 both capacities?

25         **MR. GREEN:**  Yes, Your Honor.

Case 1:19-cr-00529-TDS  Document 361  Filed 02/04/22  Page 196 of 246

1          **THE COURT:**  I didn't know if she was testifying

2    otherwise.

3          Okay.  All right.  Any issue you need to bring to my

4    attention?

5          **MR. GREEN:**  No, Your Honor.

6          **MR. BRYSON:**  No, Your Honor.

7          **THE COURT:**  You say you are having some discussion

8    with each other about the issues we talked about yesterday.

9          Do you want to talk about that tomorrow?

10         **MR. GREEN:**  Yes.

11         **MR. BRYSON:**  Yes.

12         **THE COURT:**  Maybe we'll do that whenever it is

13   convenient.  Should we do it in the morning, or should we do it

14   at lunch?  What's your plan?

15         **MR. GREEN:**  Ideally, it might be in the morning.

16   Maybe a forecast.  I think we'll have some idea whether we are

17   going to need a ruling from the Court by then.  If we can -- if

18   an agreement can be reached, we'll try to reach it by the

19   morning.

20         **THE COURT:**  Just let me know in the morning.  That

21   would be helpful, a little bit of advance notice.  So if I need

22   to make a ruling, I will.

23         Anything else?

24         We'll take a break.  Let's start back in 20 minutes.

25   So let's try to be as prompt as we can.  Thank you.

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 197 of 246

1           Let me ask you:  How much longer do you think this

2    witness will be?

3           **MR. GREEN:**  At least 40 minutes.

4           **THE COURT:**  Okay.  Are you anticipating having the

5    other two testify today or not?

6           **MR. GREEN:**  I am.  We brought them over.

7           **THE COURT:**  Okay.  Please be back in 20 minutes.

8    Thank you.

9        (Proceedings recessed at 3:28 p.m.)

10       (Proceeding called to order at 3:52 p.m.)

11       (The Defendant was present.)

12          **THE COURT:**  As soon as we find Ms. Engle, we'll be

13   ready to go.

14          Do you want to bring the jury in?

15       (The jury returned to the courtroom at 3:53 p.m. )

16          **THE COURT:**  All right.  Please be seated, everyone.

17   I will give you a moment to get your notepads for those taking

18   notes.  Just a little more than an hour to go for this evening.

19          Mr. Green.

20   **BY MR. GREEN**

21   Q    On your screen, do you see four photographs?

22   A    That is correct.

23   Q    And did you take those photographs?

24   A    Yes.

25   Q    That's Government's Exhibits 190, 191, 192, and 193.

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 198 of 246

1          **MR. GREEN:**  I'm going to move introduction of those

2    four exhibits, Your Honor.

3          **THE COURT:**  Admitted.

4          **MR. GREEN:**  I'll ask they be published?

5          **THE COURT:**  They may.

6    **BY MR. GREEN**

7    Q    Showing you Government's Exhibit 190, can you tell us what

8    we're looking at?

9    A    We're looking at a photograph on the interior side of the

10   right rear taillight of the gray Toyota Sienna.

11   Q    Number 191?

12   A    That is an additional suspected bullet hole on -- I guess

13   it would be the -- behind the rear taillight of the gray Toyota

14   Sienna.

15   Q    192?

16   A    This is an image of us pulling the interior panel inside

17   the vehicle back adjacent to the right rear taillight of the

18   gray Toyota Sienna.

19   Q    And 193?

20   A    This is a projectile at the bottom of like a well that's

21   created in the space between the panel and the frame of the

22   vehicle near the right rear taillight.

23   Q    And was that projectile collected?

24   A    Yes, it was.

25   Q    And bagged?

US v. Wiley  -- Trial/Vol III of VII -- 4/21/21

1    A    Yes.

2    Q    Did you mark its location when you bagged it on the

3    evidence log?

4    A    Correct.

5    Q    I'm going to show you four additional photographs:

6    Government's Exhibits 194, 195, 196 and 197.

7         Do you recognize those as photographs?

8    A    Yes.

9    Q    And are they photographs related to the processing of the

10   Toyota Sienna?

11   A    Correct.

12   Q    And that's at your -- the vehicle has been moved to the --

13   you have a garage that you do this in?

14   A    Yes.  The vehicle's been moved to a garage for a more

15   controlled environment.

16           **MR. GREEN:**  I'm going to move introduction of

17   Government's Exhibits 194 through 197.

18           **THE COURT:**  Admitted.

19           **MR. GREEN:**  Ask they be published?

20           **THE COURT:**  You may.

21   **BY MR. GREEN**

22   Q    Looking at Government's Exhibit 194, what is it?

23   A    This is a projectile that was collected from inside the

24   right rear taillight of the gray Toyota Sienna.

25   Q    Exhibit 195?

US v. Wiley  -- Trial/Vol III of VII -- 4/21/21

1   A     This is a photograph of a trajectory rod protruding from

2   the suspected bullet hole in the -- I guess the right -- the

3   front windshield of the gray Toyota Sienna.

4   Q     Now, this trajectory rod, in earlier exhibits, we had seen

5   trajectory rods that went through the side -- each side of the

6   vehicle; is that correct?

7   A     That's correct.

8   Q     And then you replicated that with the bullet hole in the

9   windshield?

10  A     Correct.

11  Q     I want to show you 196 -- I'm sorry.  I'm going to show

12  you Government's Exhibit 196, and ask what that is a picture

13  of?

14  A     That is another image of the suspected bullet hole with a

15  trajectory rod in it in the front windshield of the vehicle

16  with the victim visible in the driver's seat of the gray Toyota

17  Sienna.

18  Q     197?

19  A     That is the interior view of the windshield showing the

20  trajectory rod and the suspected bullet hole in the windshield.

21  Q     I'm going to show you Government's Exhibits 198, 199, 200,

22  and 201.

23        Do you recognize those photographs as photographs taken

24  during the processing of that minivan?

25  A     That is correct.

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 201 of 246

1              **MR. GREEN:**  And I'm going to move Government's

2   Exhibits 198 through 201 into evidence at this time.

3              **THE COURT:**  They are admitted.

4              **MR. GREEN:**  I am going to ask that they be published?

5              **THE COURT:**  You may.

6   **BY MR. GREEN**

7   Q    Looking at Government's Exhibits 198, can you tell me what

8   that is?

9   A    This is a photograph of the left front interior of the

10  vehicle, showing the driver's area with a suspected bullet hole

11  and a trajectory rod in the windshield.  The victim is barely

12  present -- or visible at the bottom of the photograph below the

13  steering wheel.

14  Q    Now, we saw that you took the taillight apart.

15       Did you also start to take other parts of that minivan

16  apart to try and see if there was interior damage that you

17  could document?

18  A    Yes.  We had identified the left front door and the right

19  front seat as target areas that we wanted to, you know,

20  dismantle to search for additional projectiles.

21  Q    I will show you Exhibit 199.

22       What is that?

23       Apologies.  Exhibit 199.

24  A    199 is -- it depicts the exterior of the left front door

25  of the gray Toyota Sienna van dismantled and displayed on the

1  ground there.

2  Q    Exhibit 200?

3  A    200 shows the lettered markers, marking suspected bullet

4  holes in the interior of the exterior panel of the door.

5  Q    Exhibit 201?

6  A    That is a closeup of a suspected bullet hole in the left

7  front door, interior side of the door exterior.

8  Q    I'm going to show you now on your screen four more

9  photographs.  These are Government's Exhibits 202, 203, 204,

10 and 205.

11      Do you recognize those?

12 A    I do.

13 Q    And what are they?

14 A    They are photographs of the interior of the door of the

15 gray Toyota Sienna with attention -- with Placards 5 and 6

16 depicting projectiles.

17      **MR. GREEN:**  I'm going to move to introduction of

18 Government's Exhibits 202 through 205.

19      **THE COURT:**  Admitted.

20      **MR. GREEN:**  Ask they be published?

21      **THE COURT:**  You may.

22 **BY MR. GREEN**

23 Q    Looking at Government's Exhibit 202, what is that?

24 A    That is a suspected bullet hole on the interior of the

25 door exterior.

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 203 of 246

1  Q    Looking at Exhibit 203, what is that?

2  A    This is the door panel -- exterior panel taken off and

3  showing the approximate locations of projectiles.

4  Q    And it looks like that door has been peeled, laid open; is

5  that right?

6  A    That is correct.

7  Q    So right in the V of where that door is, I see two yellow

8  markers.  Is that what you're referring to?

9  A    Yes.

10 Q    Looking at Government's Exhibit 204, what is that?

11 A    Those are the placards marking the locations of

12 projectiles.  And you will also note the location of several

13 glass fragments inside the door there.

14 Q    Looking at 205, could you describe it?

15 A    This is Placard 5 which marks a projectile.

16 Q    Was that projectile collected?

17 A    Yes, it was.

18 Q    And was it bagged?

19 A    Yes.

20 Q    And labeled?

21 A    Yes.

22 Q    And the location documented on the Government's

23 exhibit log?

24 A    Yes.

25 Q    I'm going to show you four more photographs:  206, 207,

1  208, and 209.

2       Do you recognize those?

3  A    Yes, I do.

4  Q    And are those photographs you took?

5  A    Yes.

6           **MR. GREEN:**  I'm going to move Government's

7  Exhibits 206 through 209 into evidence.

8           **THE COURT:**  Admitted.

9           **MR. GREEN:**  Ask they be published?

10          **THE COURT:**  You may.

11 **BY MR. GREEN**

12 Q    Looking at Government's 206, what is it?

13 A    That is a projectile inside the door of -- the left front

14 door of the gray Toyota Sienna.

15 Q    Earlier you referenced two projectiles.  We've seen one

16 closeup of one.  This is the closeup of the second?

17 A    That's correct.

18 Q    Was that projectile collected?

19 A    Yes.

20 Q    And bagged?

21 A    Yes.

22 Q    Labeled?

23 A    Yes.

24 Q    Thank you.

25      Government's Exhibit 207, what is it?

US v. Wiley  -- Trial/Vol III of VII -- 4/21/21

1  A    This is a suspected bullet hole in the right front door

2  exterior of the gray Toyota Sienna.

3  Q    Looking at 208, what is that?

4  A    That's a closeup of the suspected bullet hole.

5  Q    209, what is it?

6  A    That is the interior side of the right front door of the

7  gray Toyota Sienna.

8  Q    On the other side of this door is the bullet hole; is that

9  correct?

10  A    Yes.

11  Q    I'm going to show you Government's Exhibits 210, 211, 212,

12  and 213.

13      Do you see those?

14  A    Yes, I do.

15  Q    Do you recognize those as photographs you took during the

16  processing of this vehicle?

17  A    Yes.

18           **MR. GREEN:**  I'm going to move introduction of

19  Government's Exhibits 210 through 213.

20           **THE COURT:**  Admitted.

21           **MR. GREEN:**  Ask they be published?

22           **THE COURT:**  You may.

23  **BY MR. GREEN**

24  Q    Looking at Government's Exhibit No. 210, can you describe

25  to the jury what you're seeing?

1  A    These are photographs of the right side of the right front

2  seat.  This particular photograph is actually the interior of

3  the right front door, showing a suspected bullet hole.

4  Q    211?

5  A    211 is showing the right side of the right front seat with

6  a suspected bullet hole marked by lettered marker A3.

7  Q    So, Mr. Shields, if I shut that door, am I getting -- are

8  those roughly aligned, the bullet hole in the exterior, the

9  bullet hole in the interior of the door, now the bullet hole in

10 the right front seat?

11 A    That is correct.

12 Q    Showing you Government's Exhibit No. 212, what is that?

13 A    This is a closeup of the suspected bullet hole in the

14 right front seat.

15 Q    And 213?

16 A    This is our effort to pull apart the paneling of the right

17 front seat to locate a projectile.

18 Q    I'm going to show you four more photographs:  214, 215,

19 216 -- I'm sorry -- three more photographs.

20     Are you familiar with those as photographs of the interior

21 of the Sienna?

22 A    That's correct.

23           **MR. GREEN:**  I'm going to move introduction of

24 Government's Exhibits Nos. 214 through 216.

25           **THE COURT:**  They are admitted.

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 207 of 246

1      **MR. GREEN:**  May they be published?

2      **THE COURT:**  Yes.

3   **BY MR. GREEN**

4   Q    Looking at Government's Exhibit No. 214, what are we

5   seeing?

6   A    We see a closeup of a projectile that is within the right

7   front seat that is marked by a lettered marker, A4.

8   Q    Government's Exhibit 215?

9   A    This is a photograph of the projectile once it has fallen

10  out when we were -- when the piece of the seat was being

11  jostled around.

12  Q    So you see it in there, and then you're moving the seat

13  around, and then it falls out?

14  A    Yes.

15  Q    And then you take a picture where it falls?

16  A    Yes.

17  Q    And 216?

18  A    That is a closeup of the projectile that fell out of the

19  seat.

20  Q    All right.  Now, were you also involved in looking at the

21  Lincoln MKX -- a white Lincoln MKX, and processing that?

22  A    That is correct.

23  Q    And do you recall when that was?

24  A    I don't have my notes front in of me, but that was perhaps

25  a week or so later, week or two later.

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 208 of 246

1  Q    After you had processed the van?

2  A    Yes.

3  Q    Where was that Lincoln processed?

4  A    That Lincoln was processed in our garage at our forensic

5  lab.

6  Q    Now, did you also make a sketch of the Lincoln and some of

7  the items that you saw in the Lincoln?

8  A    Yes, I did.

9  Q    I'm going to show you Government's Exhibit No. 217, and

10  ask if you recognize that.

11  A    Yes, I do.

12  Q    And what is it?

13  A    It is a sketch of a -- the interior of the white Lincoln

14  MKX.

15  Q    And as part of that sketch, did you make notes where you

16  suspected that you might be seeing blood on the interior of the

17  Lincoln?

18  A    That is correct.

19  Q    And notes where you had taken swabs?

20  A    That is correct.

21         **MR. GREEN:**  Your Honor, I will publish Government's

22  Exhibit No. 217.

23         **THE COURT:**  Is it admitted?

24         **MR. GREEN:**  I'm sorry.  Ask it that it be admitted?

25         **THE COURT:**  It's admitted.

 1              **MR. GREEN:**  And now published?

 2              **THE COURT:**  You may.

 3    **BY MR. GREEN**

 4    Q    Now, as we look at that, are we looking, I guess, at a

 5    bird's eye view down from the top of the car?

 6    A    That is correct.

 7    Q    You've got notes down in the bottom left-hand corner.

 8         Can you tell the jury a little bit about your notes?

 9    A    Yes.  So the swab -- 87, 88, 80 -- the Nos. 87, 88, 80,

10    81, and 84 identify locations in the diagram where we took

11    swabs from.

12    Q    Okay.  And then if you go back up, do you also document

13    with red marks where you suspected you might find blood

14    evidence?

15    A    That is correct.

16    Q    And where swabs were done?

17    A    That's correct.

18    Q    All right.  I'm going to show you Government's

19    Exhibits 218, 219, 220, and 221.

20         While those are being pulled up, for each of those swabs,

21    describe that process for the members of the jury.

22    A    When we identify the location of what we believe to be

23    suspected blood, we will -- you know, in certain circumstances,

24    if there is a question about whether or not it's blood, we may

25    use some presumptive tests to identify it as human or animal

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 210 of 246

1 blood.

2        And in certain other circumstances, if we're curious if

3 it's human blood, we can use a different test to determine

4 whether it's human blood.  But then when we -- once we

5 determine that it is blood, we will use a cotton swab -- two

6 cotton swabs and distilled water.  We're always wearing gloves,

7 of course.  But we'll moisten one of the cotton swabs with

8 distilled water, and then we will swab the blood with the

9 cotton swabs and then stick them in a small cardboard tube that

10 we have marked with the case identifying information, our own

11 identifying information, and the date and time and location of

12 where we collected it from.

13 Q    And then for each of those swabs, they are also bagged?

14 A    They are also bagged and labeled accordingly, much like

15 the other evidence we collect.

16 Q    Looking at your screen now, do you see photographs that

17 you took of the Lincoln processing?

18 A    That is correct.

19        **MR. GREEN:**  I am going to move introduction of

20 Government's Exhibits 218 through 221, Your Honor.

21        **THE COURT:**  Admitted.

22        **MR. GREEN:**  I ask they be published?

23        **THE COURT:**  You may.

24 **BY MR. GREEN**

25 Q    Looking at Government's Exhibit 218, what I am looking at?

1  A    We're looking at the interior side of the left rear door

2  of the Lincoln MKX.

3  Q    Now, at the time you began your processing, had another

4  Durham Police Department CSI been involved in processing the

5  vehicle?

6  A    Yes, she had.

7  Q    And who was that?

8  A    That was CSI Dale Rio.

9  Q    Dale Rio?

10  A    Yes.

11  Q    So at the time you found the Lincoln, this door panel had

12  been removed?

13  A    That is correct.

14  Q    Now, with regard to CSI Rio, would she collect evidence

15  and then leave it for you in some place to become part of the

16  larger evidence chain?

17  A    Yes.  As the -- on any given case that we work on, we

18  assign a lead crime scene investigator.  So in this case I was

19  the lead in this case.  When different CSIs would collect

20  information in different contexts, like from this vehicle, that

21  evidence would be collected and then a chain of custody would

22  be filled out and placed on a locker for me or for the lead.

23  Q    And then you might be the one that actually bags that

24  particular item inside the bags that we described?

25  A    That's correct.

1  Q    And that's -- also would be noted on that evidence log

2  that I referred to?

3  A    That's correct, yes.

4  Q    All right.  Looking at Government's Exhibit No. 219, can

5  you describe for the jury what they are seeing?

6  A    In a different image, you might be able to see -- like we

7  had a suspicion that some work had been completed on the left

8  rear door of the vehicle to obscure the presence of a suspected

9  bullet hole.

10      So in the interior of the vehicle, we took the door apart

11 and located what -- suspected bullet damage on the interior of

12 the vehicle -- interior left rear door of the vehicle.  And

13 what you're seeing in the image is Bondo, or a putty-like

14 substance, on the interior side of the exterior of the door.

15 Q    Looking at Government's Exhibit No. 220, what is that?

16 A    That is the right front door -- right front door,

17 interior, of the Lincoln MKX.

18 Q    Looking at Government's Exhibit No. 221, can you tell me

19 what I'm looking at?

20 A    These are lettered markers of locations where we

21 identified suspected blood on the right front door, interior.

22 Q    I'm looking at a blowup of that Government's exhibit.  Is

23 that -- just on the left side of that image, I see a little

24 dot.  Is that what you're referring?

25 A    Yes.  There is suspected blood that was marked by marker

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 213 of 246

1  B.

2  Q    Did you swab that?

3  A    That's correct.

4  Q    What am I looking at?

5  A    We're looking at suspected blood on the interior side of

6  the right front door of the vehicle.

7  Q    And was that swabbed?

8  A    Yes.

9  Q    I'm going to show you four more photographs:  Government's

10 Exhibits 222, 223, 224, and 225.

11      Do you recognize those as photographs you took?

12 A    Correct.

13 Q    And that's the interior of the Lincoln?

14 A    Yes.

15      **MR. GREEN:**  I'm going to move introduction of

16 Government's Exhibits 222 through 225.

17      **THE COURT:**  They are admitted.

18      **MR. GREEN:**  May they be published?

19      **THE COURT:**  Yes.

20 **BY MR. GREEN**

21 Q    Looking at Government's Exhibit 222, can you describe what

22 that is?

23 A    This is a closeup of suspected blood of the interior side

24 of the right front door.

25 Q    And you mentioned that was swabbed?

1    A    Yes.

2    Q    223?

3    A    That is also a closeup of suspected blood on the right

4    interior door, right side -- or interior side of the right

5    front door.  It was also swabbed.

6    Q    224?

7    A    This is lettered marker C on the cover for the middle

8    console in the middle of the vehicle which is marking suspected

9    blood, which was also swabbed.

10   Q    225?

11        I'm going to load four more photographs for you.

12   Government's Exhibits 225, 226 --

13            **THE COURT:**  Well, we just did 225, I believe.

14            **MR. GREEN:**  Sorry, Your Honor.

15   **BY MR. GREEN**

16   Q    226, 227, 228, and 229, do you recognize those

17   photographs?

18   A    Yes.

19   Q    Are those photographs of the Lincoln?

20   A    Yes.

21   Q    During processing?

22   A    Yes.

23            **MR. GREEN:**  I'm going to move introduction of

24   Government's Exhibits 226 through 229.

25            **THE COURT:**  Admitted.

US v. Wiley  -- Trial/Vol III of VII -- 4/21/21

 1              **MR. GREEN:**  Ask they be published?

 2              **THE COURT:**  Yes.

 3  **BY MR. GREEN**

 4  Q    Can you describe what you're seeing in Government's

 5  Exhibit 226?

 6  A    This is a photograph -- a midrange photograph of suspected

 7  blood on the left shoulder of the right front seat of the white

 8  Lincoln MKX.

 9  Q    And I'm seeing a D there.  Is that the marker?

10  A    Yes.  That is a marker D for suspected blood.

11  Q    And was that area swabbed?

12  A    Yes.

13  Q    And bagged?

14  A    Yes.

15  Q    Labeled?

16  A    Yes.

17  Q    I'm going to show you Government's Exhibit 227.

18  A    This is closeup of the suspected blood or Marker D.

19  Q    Government's Exhibit 228?

20  A    That is Marker E, which is like -- which is marking

21  suspected blood on the right rear -- or right front floorboard

22  area near the doorframe.

23  Q    And 229?

24  A    That is a closeup of suspected blood for Marker E.

25  Q    Is that the mark I'm seeing just above the white placard?

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 216 of 246

1  A    Yes.

2  Q    Was that area swabbed?

3  A    Yes.

4  Q    Bagged?

5  A    Yes.

6  Q    And labeled?

7  A    Yes.

8  Q    I'm going to show you Government's Exhibits 230, 231, 232,

9  and 233.

10      Do you recognize those photographs of photographs taken of

11  the processing of the Lincoln?

12  A    Yes, I do.

13          **MR. GREEN:**  I'm going to move the introduction of

14  Government's Exhibits 230 through 233.

15          **THE COURT:**  They are admitted.

16          **MR. GREEN:**  May they be published?

17          **THE COURT:**  Yes.

18  **BY MR. GREEN**

19  Q    I show you Government's Exhibit 230.

20      Can you tell me what we're seeing there?

21  A    This is a photograph of a white substance on the left rear

22  seat of the vehicle.

23  Q    Government's Exhibit 231?

24  A    This is a closeup of that white substance.

25  Q    Why did you take this photograph?

1  A    We had information that we believed that the left rear

2  door of the vehicle had been painted, which we saw -- painted a

3  white color, so we saw this and collected a sample of it.

4  Q    Looking at Government's 232.

5  A    This is a photograph of a reaction to a processing

6  technique that we use called BLUESTAR, where it is a chemical

7  reaction that is used to develop the presence of blood that may

8  have been washed -- washed away or obscured in any particular

9  way or, you know, someone has made an effort to clean it up.

10 We use a chemical reagent that causes it to fluoresce.  I don't

11 know if you can zoom in on that or not, but it causes it -- the

12 presence of blood to fluoresce.  And we take long-exposure

13 photographs to show it.

14 Q    Government's Exhibit 233?

15 A    This is another example of the BLUESTAR processing that we

16 did on the vehicle.  We were able to locate additional areas of

17 suspected blood that were invisible to the naked eye through

18 the processing, the chemical -- use of the chemical reagent.

19 Q    Now, is that area swabbed, or no?

20 A    Yes.

21 Q    And was that done in this case?

22 A    Yes.

23 Q    Each of those areas that have been described?

24 A    Yes.

25 Q    All right.  I'm going to show you four new photographs:

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 218 of 246

1  234, 235, 236, and -- I'm sorry -- three.  I will stop at those

2  three.

3       Are you familiar with those as photographs you took?

4  A    Yes, I am.

5  Q    And are they from the processing of the Lincoln?

6  A    Yes, they are.

7            **MR. GREEN:**  I will move introduction of Government's

8  Exhibits 234 through 236.

9            **THE COURT:**  They're admitted.

10           **MR. GREEN:**  Ask they be published?

11           **THE COURT:**  Yes.

12  **BY MR. GREEN**

13  Q    Government's Exhibit 234, could you describe it?

14  A    That is the interior of the right front door showing the

15  presence of blood, as identified through the application of a

16  chemical reagent called BLUESTAR.

17  Q    Government's Exhibit 235?

18  A    This is an over -- or long-exposure photograph of

19  additional areas of the right front seat area that tested -- or

20  gave positive reactions through the application of BLUESTAR for

21  the presence of blood.

22  Q    Each one of those items were swabbed?

23  A    Yes.

24  Q    Bagged?

25  A    Yes.

 1  Q    Labeled?

 2  A    Yes.

 3  Q    All right.  Turning to -- I have four more photographs for

 4  you -- I'm sorry.  I'm going to show you -- I'm going to show

 5  you Government's Exhibit No. 237, and ask if you are familiar

 6  with what that is?

 7  A    That is an evidence envelope with a blue cigarette lighter

 8  in it.

 9  Q    And the blue cigarette lighter came from?

10  A    The Lincoln MKX.

11  Q    I'll show you Government's Exhibit No. 238, and ask if you

12  are familiar with what that is?

13  A    These are swabs of suspected touch DNA.

14  Q    And those swabs came from?

15  A    I believe the Lincoln MKX.

16  Q    Going I'm to show you Government's Exhibits 239, and ask

17  if you are familiar with what that is?

18  A    These are also swabs of suspected touch DNA.

19  Q    And where do they come from?

20  A    They came from the Lincoln MKX.

21  Q    I will show you Government's Exhibit No. 240.

22  A    These are also swabs of suspected touch DNA.

23  Q    And where do they come from?

24  A    I believe the Lincoln MKX.

25  Q    And with regard to each of those items, it indicates on

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 220 of 246

1  those items, it looks like, you had submitted them and bagged

2  them?

3  A    That's correct.

4          **MR. GREEN:**  I move introduction of Government's

5  Exhibits 237, 238, 239, and 240.

6          **THE COURT:**  Admitted.

7  **BY MR. GREEN**

8  Q    Now, were actual items collected from the -- besides

9  projectiles, actual physical items collected from the inside of

10  the Lincoln?

11  A    I believe so, yes.

12  Q    I'm going to show you Government's Exhibit No. 241, and

13  ask if you recognize what that is?

14  A    This is a clear plastic bottle that was collected, I

15  believe, from the left front seat area.

16  Q    Exhibit 242?

17  A    This is a clear plastic bag that was also collected from

18  the Lincoln MKX.

19  Q    And 243?

20  A    And this is an Airheads candy packet that was also

21  collected from the Lincoln MKX.

22          **MR. GREEN:**  I am going to move introduction of

23  Government's Exhibits 241, 242 and 243.

24          **THE COURT:**  Admitted.

25

Case 1:19-cr-00529-TDS  Document 361  Filed 02/04/22  Page 221 of 246

1  **BY MR. GREEN**

2  Q    I'm going to show you Government's Exhibit 244.

3       Do you recognize that?

4  A    Yes.  It is an envelope with a swab of suspected blood

5  DNA.

6  Q    Where did that come from?

7  A    The Lincoln MKX.

8  Q    Exhibit No. 245?

9  A    These are also swabs of suspected blood DNA collected from

10 the Lincoln MKX.

11 Q    And Exhibit 246?

12 A    An additional envelope containing a swab of suspected

13 blood DNA from the Lincoln.

14 Q    Exhibit 247?

15 A    This is an envelope containing three more swabs of

16 suspected blood DNA from the Lincoln.

17 Q    And Exhibit 248?

18 A    This envelope contains two additional swabs of suspected

19 blood DNA from the Lincoln.  That contains suspected blood DNA

20 swabs.

21 Q    And as to Exhibits 244 through 248, it contains labeling;

22 is that correct?

23 A    Yes.

24 Q    And it looks like your name?

25 A    Yes.

1  Q    And then each swab has a corresponding exhibit item

2  number?

3  A    Yes.

4  Q    And that then matches up with the log that has previously

5  been introduced?

6  A    That's correct.

7         **MR. GREEN:**  I am going to introduce, Your Honor,

8  Government's Exhibits 244 through 248.

9         **THE COURT:**  Admitted.

10 **BY MR. GREEN**

11 Q    I am going to show you Exhibit No. 249, and ask if you are

12 familiar with what it is?

13 A    This exhibit is an envelope containing a cellophane

14 wrapper.

15 Q    And did that come from the Lincoln?

16 A    And that came from the Lincoln, yes.

17 Q    I'm going to show you Exhibit No. 250.

18 A    This envelope contains a sample from the left rear seat.

19 Q    And the sample in question, do you remember anything about

20 that sample?

21 A    I believe it was the white paint-like substance that we

22 believed to be paint on the left rear seat.

23 Q    Exhibit No. 251?

24 A    This is a piece of the wrapper from the Lincoln.

25 Q    And Exhibit No. 252?

1  A    These are three additional swabs of suspected touch DNA

2  from Lincoln.

3  Q    253?

4  A    Two additional swabs of suspected touch DNA from the

5  Lincoln.

6  Q    And, again, as to each of one these items, do they bare

7  your name as a submission?

8  A    They bear my name and employee ID number.

9  Q    And then also an exhibit number?

10  A    Yes.

11  Q    And so the exhibit log would contain a record of exactly

12  where each of those items were collected?

13  A    Yes.

14  Q    And Exhibit No. 254?

15  A    This is also a swab of suspected touch DNA.

16  Q    Now, this Exhibit 255, I ask that you to look at it

17  carefully.

18       Do you recognize that item?

19  A    That is a swab of suspected saliva DNA.

20  Q    Do you recall where that came from?

21  A    I believe this was from the plastic bottle in the white

22  Lincoln.

23            **MR. GREEN:**  I am going to move introduction, Your

24  Honor, of Government's Exhibits 249 through 255.

25            **THE COURT:**  They are admitted.

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 224 of 246

1  BY MR. GREEN

2  Q    I'm going to show you Item Nos. 256, 257, 258, 259, 260,

3  and 261.

4        Showing you Item No. 256, are you familiar with what that

5  is?

6  A    Item 256 is a paper receipt.

7  Q    And with regard to that receipt, do you recall where that

8  was located?

9  A    I do not just offhand.

10 Q    What is the item number?

11 A    The item number is 118.

12 Q    Looking at the Property and Evidence voucher, do you know

13 where that item was collected?

14 A    Yes.  Item 118 was collected from the victim.

15 Q    All right.  Thank you.

16       Looking at Government's Exhibit 257, what is it?

17 A    This is a projectile.

18 Q    And the item number?

19 A    Sixty-three.

20          **THE COURT:**  I'm sorry.  What number?

21          **THE WITNESS:**  Sixty-three.

22          **THE COURT:**  Thank you.

23 BY MR. GREEN

24 Q    And using the Government's property voucher, can you tell

25 us where that was collected?

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 225 of 246

1  A    That projectile was located on the floor of the entryway

2  at 4618 Carlton Crossing.

3  Q    Thank you.

4       Looking at Government's Exhibit No. 258.

5  A    Item 79.

6  Q    And are you -- could you use the evidence log to tell us

7  where that was collected?

8       What is it, first?

9  A    It was a projectile that was located in the interior right

10 front seat of the interior -- or the silver Toyota Sienna.

11 Q    Looking at Exhibit No. 259, what is it?

12 A    Item 102.  It is a projectile.

13 Q    And using the evidence log, can you tell us where that was

14 located?

15 A    The evidence log states that it was from the sidewalk in

16 front of 4619 Carlton Crossing.

17 Q    Looking at evidence 103 and 104, do you recognize those?

18 A    Yes.  103 is a projectile fragment and 104 is a

19 projectile.

20 Q    And with regard to those, can you --

21      THE COURT:  I'm sorry.  You said 103 and 104.  We're

22 talking about different exhibit numbers.

23 BY MR. GREEN

24 Q    I'm sorry.  260 and 261.  The item number for 260?

25 A    The item number for 260 is 103, and that is a projectile

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 226 of 246

1  fragment that was collected under the front left tire of a tan

2  van in the roadway on Carlton Crossing.

3  Q     And Exhibit 261?

4  A     Exhibit 261 was Item 104.  It was a projectile, and it was

5  located inside the left front tire of the tan van in the

6  roadway in front of the residence.

7            **MR. GREEN:**  I'm going to move introduction, if it

8  please the Court, of items 256 through 261.

9            **THE COURT:**  They are admitted.

10  **BY MR. GREEN**

11  Q     I'm going to show you Items 262 and 263, and ask if

12  you're -- Government's Exhibit 262 and 263, and ask if you are

13  familiar with what they are?

14  A     262, or Item 110, is a projectile.

15  Q     And --

16  A     Government's Exhibit 263, or Item 111, is a projectile

17  fragment.

18  Q     And were you able to determine, looking at the Government

19  log, the Property and Evidence Voucher log, where those items

20  were recovered?

21  A     Yes.  Item 110 is a projectile collected from the victim

22  at the medical examiner's office.  Item 111 is a projectile

23  fragment collected also from the victim at the medical

24  examiner's office.

25            **MR. GREEN:**  I am going to move introduction of

1  Government's Exhibits 262 and 263.

2            **THE COURT:**  Admitted.

3  **BY MR. GREEN**

4  Q    I'm going to show you four photographs, and ask if you are

5  familiar with what those are?

6            **THE COURT:**  What numbers are they?

7            **MR. GREEN:**  I'm sorry, Your Honor.  264, 265, 266,

8  and 267.

9  **BY MR. GREEN**

10  Q    Are you familiar with those?

11  A    Yes, I am.  I am familiar with them.

12  Q    What are they?

13  A    These are photographs of projectiles and cartridges and I

14  believe a 9mm magazine.

15  Q    Do these also -- these photographs bear item numbers?

16  A    Yes.

17  Q    And so do these item numbers correspond with the evidence

18  log?

19  A    Yes.

20  Q    And also what would be in the bag with the corresponding

21  item numbers?

22  A    Yes.  So Item 63, if it's -- on the envelope with the

23  label, it says "Item 63."  You see Item 63 there, a photograph,

24  is a projectile.  So it will say -- it would be the same thing.

25  Q    Thank you.

US v. Wiley  -- Trial/Vol III of VII -- 4/21/21

 1                  **MR. GREEN:**  Your Honor, I am going to move

 2   introduction of 264 through 267.

 3                  **THE COURT:**  They are admitted.

 4                  **MR. GREEN:**  I ask they be published?

 5                  **THE COURT:**  You may.

 6   **BY MR. GREEN**

 7   Q     264?

 8   A     That's a projectile, or Item 63.

 9   Q     265?

10   A     That is a 9mm magazine.

11   Q     266?

12   A     That is also a projectile.

13   Q     267?

14   A     Those are cartridges, I believe, from the magazine.

15   Q     Thank you.  Looking at Government's Exhibit -- I'm sorry,

16   I am going to load four more photographs for you:  268, 269,

17   270, and 271.

18        Do you recognize those photographs of item numbers that

19   have been introduced?

20   A     Yes, I do.

21                  **MR. GREEN:**  I am going to introduce -- Your Honor,

22   move to introduce Government's Exhibits 268 through 271.

23                  **THE COURT:**  Admitted.

24                  **MR. GREEN:**  Ask they be published?

25                  **THE COURT:**  You may.

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 229 of 246

1  **BY MR. GREEN**

2  Q    Looking at Government's Exhibit No. 268, what is it?

3  A    It looks to be a projectile fragment.

4  Q    And what is the corresponding item number?

5  A    Item is 103.

6  Q    Government's Exhibit No. 269?

7  A    This is Item 104, which is a projectile.

8  Q    Government's Exhibit 270?

9  A    This is Item 40, which is the 9mm handgun that was

10 collected from the bed in the master bedroom of the residence.

11 Q    And 271?

12 A    This, I believe, is the projectile collected from behind

13 the freezer in the living room of the residence.

14 Q    And it has a corresponding item number?

15 A    Yes, Item 79.

16 Q    I'm going to load up four more photographs for you.

17      Do you recognize those photographs of items of evidence

18 that you collected?

19 A    Yes.

20           **THE COURT:**  What numbers are these?

21           **MR. GREEN:**  272, 273, 274, and 275, Your Honor.

22           **THE COURT:**  Thank you.

23           **MR. GREEN:**  I'm going to move the introduction of

24 those exhibits.

25           **THE COURT:**  They are admitted.

1          MR. GREEN:  Ask they be published?

2          THE COURT:  They may.

3   BY MR. GREEN

4   Q    Item 272, can you tell us what that is?

5   A    That is a photograph of the serial number on the 9mm

6   handgun collected from the bedroom of the -- in the second

7   floor of the residence.

8   Q    Item 273?

9   A    This is -- it looks to be a projectile.

10  Q    Item 274?

11  A    This is also -- Item 42 is also a projectile.

12  Q    Again, does it have a corresponding -- you mentioned item

13  42.  You're describing Exhibit 274?

14  A    Yes.

15  Q    But it's Item 42 that's photographed?

16  A    Yeah.

17  Q    And Item 275?

18  A    Exhibit 275, or Item 43 in the photograph, is also a

19  projectile.

20  Q    I am going to show you four more photographs:

21  Government's Exhibits 276, 277, 278, 279.

22       Do you recognize those as photographs of projectiles that

23  were recovered?

24  A    That's correct.

25          MR. GREEN:  I'm going to move introduction of 276

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 231 of 246

1  through 279.

2          **THE COURT:**  They are admitted.

3          **MR. GREEN:**  May they be published?

4          **THE COURT:**  They may.

5  **BY MR. GREEN**

6  Q    Government's Exhibit 276 is?

7  A    This is a projectile, or Item 111 in our list.

8  Q    277?

9  A    This is also a projectile or -- of the same -- different

10 vantage point of the same projectile, Item 111.

11 Q    278?

12 A    These are projectile fragments, or Item 44 in our system.

13 Q    And 279?

14 A    This is also a projectile, or Item 51 in our system.

15 Q    I'm going to show you three more photographs:  280 through

16 282.

17     Do you recognize those as photographs of projectiles that

18 were collected?

19 A    That's correct.

20          **MR. GREEN:**  I am going to move introduction of

21 Government's Exhibits 280 through 282.

22          **THE COURT:**  Admitted.

23 **BY MR. GREEN**

24 Q    With regard to Government's Exhibit 280, what am I looking

25 at?

Case 1:19-cr-00529-TDS  Document 361  Filed 02/04/22  Page 232 of 246

```
1    A    This is a projectile, or Item 52 in our system.

2    Q    Government's Exhibit 281?

3    A    This is also a projectile, or Item 53 in our system.

4    Q    Government's Exhibit 282?

5    A    This is also a projectile and -- Item 54 in our system.

6    Q    Now, early on in this process, did you attempt to make a

7    schematic as to where the shell casings were located?

8    A    At the crime scene?

9    Q    Yes.

10   A    Yes, I did.

11   Q    And did you subsequently transfer that to a computer-aided

12   drawing?

13   A    Yes, I did.

14   Q    I'm going to show you Government's Exhibit No. 288.

15        Do you recognize that?

16   A    Correct.

17   Q    And is that the drawing you indicated depicting where

18   those shell casings were located?

19   A    That is correct.

20   Q    Did you attempt to group those shell casings by their

21   caliber?

22   A    In this sketch, yes.

23   Q    And were they -- at this point in time in the

24   investigation, did you have any additional information about

25   distinguishing the shell casings or matching them?
```

US v. Wiley  -- Trial/Vol III of VII -- 4/21/21

1  A    At the time that this sketch was created, no.

2  Q    And so this is just -- for instance, all the 9mm, whether

3  fired by Shirley or anyone else, would be labeled as a 9mm?

4  A    Yes.  In this sketch, for instance, the 9mm cartridge

5  cases or shell casings are colored in blue.

6  Q    I'm going to show you --

7       **MR. GREEN:**  I am going to move introduction of

8  Government's Exhibit 288.

9       **THE COURT:**  It's admitted.

10      **MR. GREEN:**  May it be published?

11      **THE COURT:**  You may.

12 **BY MR. GREEN**

13 Q    Now, you have a color code for each of these individual

14 shell casings.

15      Could you review the legend with the jury?

16 A    Yes.  The blue placard numbers denote cartridge cases that

17 were fired by a 9mm handgun.  The red placard numbers signify

18 cartridge cases that were fired by a .40 caliber handgun, and

19 the green placard numbers denote cartridge cases that were

20 fired by a .45 caliber handgun.

21 Q    Did you also notice certain other placards?

22      **MR. GREEN:**  Can you bring that back up, please?

23      **THE WITNESS:**  Yes.  Placard 6 is the -- are the glass

24 fragments that were found in the roadway; placard 12 is the

25 blue shoe that was found in the front yard; and Placard 21 is

1  the blue plastic glove that was found on the front porch.

2  **BY MR. GREEN**

3  Q    All right.  Now, around the front door area, what was

4  the -- what were the types of cartridge cases you found?

5  A    Most of the cartridge cases that you see there are 9mm --

6  are 9mm cartridge cases.  You see two green ones that are .45

7  caliber cartridge cases.  And then the 21 there is also -- is a

8  blue plastic glove.

9  Q    If we move down to around the van area.

10 A    So what you're seeing there is that the red numbers are --

11 symbolize .40 caliber cartridge cases, whereas the blue No. 10

12 is a 9mm cartridge case.

13 Q    And then down the road?

14 A    So down the road, we see, you know, a number of 9mm

15 cartridge cases as symbolized in blue and -- but also in

16 this -- what's blown up in front of me, two additional .40

17 caliber cartridge cases as designated by red.

18 Q    And then the Placard No. 6?

19 A    That is the location of the dark-tinted glass fragments.

20 Q    And I'm going to show you what's been marked as

21 Government's Exhibit 289.

22      Do you recognize what that is?

23 A    Yes.

24 Q    What is it?

25 A    In this version of the sketch, we have used additional

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 235 of 246

1  information that we gained through the examination of all of

2  the cartridge cases that were collected on the scene to

3  distinguish which cartridge cases were fired by which gun.

4  Q    I'm going to ask to look at the area around the front

5  door.

6  A    Yes.

7  Q    And what did you denote?

8  A    What this denotes is that the blue cartridge cases that

9  are -- most -- you know, the majority of the blue -- of the 9mm

10  cartridge cases, as designated by the color blue, were fired by

11  the handgun of the -- that the victim used.

12        **MR. FOSTER:**  Objection.  Lack of foundation for this

13  witness to be giving that type of testimony.

14        **MR. GREEN:**  We'll use it with another witness, Your

15  Honor.

16        **THE COURT:**  All right.  Sustained.

17  **BY MR. GREEN**

18  Q    I will show you Government's Exhibit 290.  Strike that.

19        I'm going to show you Government's Exhibit 283, and ask if

20  you are familiar with what that is?

21  A    This is a buccal swab.

22  Q    What is a buccal swab?

23  A    A buccal swab is a swab that we will take from a subject

24  which an investigator has identified as possibly being involved

25  in a crime, and it is a sample of DNA that is collected from

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 236 of 246

1  the inside of their cheek.

2  Q    Does it indicate the name associated with that sample?

3  A    Yes, it does.

4  Q    And what is the name?

5  A    Hykeem Cox.

6  Q    I will show you Government's Exhibit 284.

7       What is it?

8  A    These are two buccal swab standards, the same process,

9  that were collected from Maurice Wiley.

10 Q    Show you Government's Exhibit 285.

11      What is it?

12 A    This is a buccal swab collected from Semaj Bradley.

13 Q    Government's Exhibit 286?

14 A    This is a buccal swab collected from Darryl Bradford.

15 Q    And Government's Exhibit No. 287?

16 A    This is a buccal swab collected from Charles Daniels.

17 Q    And the purpose of the buccal swab again?

18 A    Is to collect a standard by which we can compare DNA

19 samples collected at crime scenes and vehicles, et cetera.

20 Q    Each of these exhibits bear the stamp of the Durham Police

21 Department?

22 A    That is correct.

23           **MR. GREEN:**  I am going to move introduction of

24 Government's Exhibits 283 through 287.

25           **THE COURT:**  Admitted.

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 237 of 246

 1              **MR. GREEN:**  I believe that's all the questions I

 2   have.

 3              **THE COURT:**  Any cross?

 4              **MR. FOSTER:**  Yes, Your Honor.

 5                          CROSS-EXAMINATION

 6   **BY MR. FOSTER**

 7   Q    So, Mr. Shields, when you arrived at the scene, it was

 8   1:00 in the morning.  Actually, the crime scene -- or the crime

 9   happened on the night of April 15th, but you arrived on

10   April 16th at about 1:00 in the morning?

11   A    That is correct.

12   Q    And it was your understanding that the complaint number,

13   whatever, the time that the crime was reported was 2222, which

14   is 10:22 p.m.?

15   A    That's correct.

16   Q    And so then obviously you're aware that officers arrived

17   within a few minutes of that time; correct?

18   A    Yes.

19   Q    Okay.  So when you arrived at the crime scene, it was

20   roughly two and a half hours after the crime was reported?

21   A    Correct.

22   Q    Okay.  And when you arrived, there was already the yellow

23   police tape set up that was screening people out from the crime

24   scene area?

25   A    Yeah.

Case 1:19-cr-00529-TDS  Document 361  Filed 02/04/22  Page 238 of 246

1  Q    Okay.  In some of the photos that you identified showing

2  the street scene when you arrived, and you were asked about the

3  orange cones, many of those cones that had the cartridge

4  casings and glass fragments, they were outside the yellow

5  taped-in area; correct?

6  A    I don't believe so, no.

7            **MR. FOSTER:**  Could you pull up Exhibit 82, please?

8  **BY MR. FOSTER**

9  Q    You see Exhibit 82 that's been admitted into evidence?

10 A    Yes.

11 Q    Doesn't it look like here that the yellow crime scene tape

12 is further back and we have these cones in the foreground?

13 A    That's because there is crime scene tape behind me as I am

14 taking the photographs as well.

15 Q    There was?

16 A    That is closer down towards the victim in the minivan, but

17 there's crime scene tape on the -- behind me as well.

18 Q    Okay.  So what would the reasoning be for having two

19 different zones of crime scene tape?

20 A    Well, the crime scene -- the tape is actually encompassing

21 one zone by having two ends of it.  Like everything between the

22 two tapes is the crime scene.

23 Q    And so by the time you arrived, you have no -- you had no

24 personal observation of how many civilians or people had been

25 walking around, touching or moving any of the eventual items;

1   correct?

2   A    No, I can only speak to when I was there.

3           MR. FOSTER:  Now, can we pull up Exhibit 78?  And if

4   we could scroll through to -- somehow so we could find Item 22.

5   If you find it, could you zoom in on 22, please.

6           Thank you.

7   **BY MR. FOSTER**

8   Q    So Item 22 you've indicated was a .40 caliber cartridge

9   case; correct?

10  A    Correct.

11  Q    And in one of the exhibits, you identified a photograph

12  that -- in the doorway of the house, the residence where the

13  victim lived; correct?

14  A    Yes.

15  Q    Do you recall identifying a bag of takeout Chinese food?

16  A    Yes.

17  Q    And so there was not, in addition to that bag, a bag of

18  cash, was there?

19  A    I do not recall, no.

20  Q    I mean, as far as you recall, there was not a bag of cash;

21  right?

22  A    No.

23  Q    Now, you've testified about swabbing the interior of the

24  Lincoln for suspected blood and also for touch DNA; correct?

25  A    Correct.

1  Q    Was anyone from CSI also involved in dusting the interior

2  of the car on hard, flat surfaces for fingerprints?

3  A    The interior of the vehicle, I believe so, yes.

4  Q    So that was done?

5  A    I would have to look at my report.  I'm not fully aware if

6  it was.

7  Q    If it would have been done --

8  A    I completed some interior processing after swabs were

9  completed, yeah.

10 Q    So I'm not sure.  Do you mean that you dusted for prints?

11 A    Following, like, the collection of swabs, yes.

12 Q    Okay.  So you did that yourself?

13 A    Yes.

14 Q    Okay.  And was that preserved in evidence?

15 A    Yes.

16 Q    Okay.  And in your testimony about where the various

17 suspected blood was swabbed from, some of those locations were

18 in the driver's seat area; correct?

19 A    Yes.

20          MR. FOSTER:  I have no further questions.

21          THE COURT:  Any redirect?

22          MR. GREEN:  No, Your Honor.

23          THE COURT:  All right.  Sir, you may step down.

24      (At 4:59 p.m., witness excused.)

25          MR. PRINCIPE:  Your Honor, may we call Officer Erica

Case 1:19-cr-00529-TDS  Document 361  Filed 02/04/22  Page 241 of 246

1  Lee?

2          THE COURT:  Well, it's 5:00.  I thought we would stop

3  at this point.

4          All right.  Ladies and gentlemen, it is 5:00, and we

5  are going to stop right at 5:00.  Please put your notepads in

6  your envelopes for those who are taking notes, and leave your

7  envelopes in your chairs.  They will be secured as they were

8  last night.  They will be returned to you first thing in the

9  morning.

10         Remember all my admonitions to you.  I appreciate

11 your alertness and your patience.  I can report to you that in

12 talking with the lawyers I think it would appear that the

13 Government may very well rest its case by Friday.  So the five

14 to six to maybe seven days may be a little longer than what it

15 actually may take, but we'll see.  But we're actually working a

16 little ahead of schedule.  I just thought I would report that.

17 I will try to keep you up to date as I learn more about that.

18 I don't know if we'll finish this week or maybe on Monday, but

19 something like that may be the schedule.  If that changes, I

20 would certainly let you know as soon as we get some feeling

21 about that.

22         In the meantime, keep an open mind.  You have not

23 heard all the evidence.  Remember all my admonitions.  It is

24 critically important that you not attempt to learn anything

25 about the case or any aspect of it.  Put it out of your mind.

US v. Wiley  -- Trial/Vol III of VII -- 4/21/21

1  You will learn everything you need to know here in this

2  courtroom.  Remember all my admonitions.  Please have a safe

3  trip home.

4          We'll look forward to seeing you tomorrow at 8:45 in

5  the morning.  We'll start just as soon as everybody is

6  gathered.  Thank you, and have a good night.

7          Everybody else, please remain the courtroom.

8          And, Ms. Engle, you may escort the jurors out.

9      (The jury departed the courtroom at 5:01 p.m.)

10         **THE COURT:**  All right.  Please be seated.  If you all

11  would just wait until we get word they are cleared out of the

12  lobby.  Then you all can head out.

13         In the meantime, since the jury is not in the

14  courtroom, do you have any matters that you want me to address?

15         **MR. GREEN:**  No, Your Honor.

16         **MR. BRYSON:**  No, Your Honor.

17         **THE COURT:**  All right.  Okay.  I don't know where you

18  stand as well on the issue related to the alleged flight and

19  whether that's a subject that you all are communicating about

20  as well or not, or whether there was any further ruling you

21  think you may need on that, because I think I did ask you all

22  to take a look at the case law, and if there was anything to

23  report on that, to let me know.  So I simply want to remind you

24  of that so that I have a heads-up about that before you want a

25  ruling on it.

US v. Wiley  -- Trial/Vol III of VII -- 4/21/21

1            MR. GREEN:  Yes, Your Honor.

2            THE COURT:  Okay.  If you can let me know when they

3   are out of the lobby.  I'm told that one may be in the

4   restroom.

5            While we are waiting, how are we doing on the

6   Government's forecast of timing?  Anything material to report?

7            MR. GREEN:  I think we anticipated maybe getting

8   through a few more witnesses today.  So we'll continue to drive

9   on.  I don't think that's going to change much.  I was

10  concerned that Thursday was going to have a gap maybe in the

11  late afternoon, and now I'm not concerned.  I think we'll use

12  all Thursday.

13           THE COURT:  So you still think you may rest by the

14  morning or before lunch on Friday?

15           MR. GREEN:  Yes.

16           THE COURT:  Okay.  All right.  Would --

17           MR. GREEN:  I'm sorry, Your Honor?

18           THE COURT:  Yes.  I was getting ready to say

19  something.  At some point -- I don't need to know now, but at

20  some point, if there is going to be evidence by the Defendant,

21  it would be helpful to know whether that would fill up Friday

22  afternoon and into Monday or not.  I don't need to know now,

23  but at some point, for purposes of scheduling -- because if

24  there is any way that we would be done, say, at lunchtime or

25  2:00 with the evidence in the case on Friday, then we very well

Case 1:19-cr-00529-TDS   Document 361   Filed 02/04/22   Page 244 of 246

1  need to consider closings and instructions to the jury.

2          Okay.  I'm told the jurors have left the floor.  So

3  if anybody wants to leave the courtroom, you are free to leave

4  at this time.

5          So I don't need to know now, but I am going to want

6  to know tomorrow kind of where we are, generally speaking.  If

7  you can give me some kind of forecast of timing, that would be

8  helpful.

9          Okay.  All right.  If there are no other issues,

10 we'll see you tomorrow at 8:45, ready to go.  Have a good

11 evening.  Thank you.

12      (Proceedings recessed for the evening at 5:05 p.m.)

13

14                  END OF VOLUME III OF VII

15

16

17

18

19

20

21

22

23

24

25

US v. Wiley  -- Trial/Vol III of VII -- 4/21/21

1  UNITED STATES DISTRICT COURT

2  MIDDLE DISTRICT OF NORTH CAROLINA

3  CERTIFICATE OF REPORTER

4

5

6        I,  Briana L. Bell, Official United States Court

7  Reporter, certify that the foregoing transcript is a true and

8  correct transcript of the proceedings in the above-entitled

9  matter prepared to the best of my ability.

10

11        Dated this 4th day of February 2022.

12

13

14        _____
          Briana L. Bell, RPR
15        Official Court Reporter

16

17

18

19

20

21

22

23

24

25