```
 1                IN THE UNITED STATES DISTRICT COURT
              FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
 2

 3   UNITED STATES OF AMERICA      )   CASE NO. 1:19CR529-1
                                   )
 4          vs.                    )
                                   )   Winston-Salem, North Carolina
 5   MAURICE OWEN WILEY, JR.       )   April 22, 2021
     _____   9:07 a.m.
 6

 7                  TRANSCRIPT OF THE TRIAL
                 VOLUME IV OF VII (Pgs. 704-917)
 8          BEFORE THE HONORABLE THOMAS D. SCHROEDER
                  UNITED STATES DISTRICT JUDGE
 9

10   APPEARANCES:

11   For the Government:       GRAHAM GREEN, AUSA
                               CRAIG M. PRINCIPE, AUSA
12                             Office of the U.S. Attorney
                               251 N. Main Street, Suite 726
13                             Winston-Salem, North Carolina 27101

14
     For the Defendant:        JOHN D. BRYSON, ESQ.
15                             Wyatt Early Harris & Wheeler, LLP
                               P.O. Drawer 2086
16                             High Point, North Carolina 27261-2086

17                             MARK P. FOSTER , JR., ESQ.
                               Foster Law Offices, PLLC
18                             409 East Boulevard
                               Charlotte, North Carolina 28203
19

20   Court Reporter:          BRIANA L. BELL, RPR
                               Official Court Reporter
21                             P.O. Box 20991
                               Winston-Salem, North Carolina 27120
22

23

24
          Proceedings recorded by mechanical stenotype reporter.
25       Transcript produced by computer-aided transcription.
```

Case 1:19-cr-00529-TDS   Document 362   Filed 02/04/22   Page 1 of 214

```
 1                              INDEX
```

**GOVERNMENT'S WITNESSES:**                                    **PAGE:**

MICHELLE AURELIUS, M.D.

     Direct Examination by Mr. Principe                735

MICHAEL GURDZIEL

     Direct Examination by Mr. Principe                750

ALLYSON ANDERSON

     Direct Examination by Mr. Principe                774
     Cross-Examination by Mr. Foster                   860

PROBATION OFFICER ERICA LEE

     Direct Examination by Mr. Principe                862
     Cross-Examination by Mr. Bryson                   865

SARAH FOX

     Direct Examination by Mr. Green                   874

OFFICER WILLIAM JOINT

     Direct Examination by Mr. Principe                876

STAFF SERGEANT JUSTIN ELLERBE

     Direct Examination by Mr. Principe                883

INVESTIGATOR DAVID L. CRAMER

     Direct Examination by Mr. Green                   888

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

```
1                            EXHIBITS

2   Exhibits:                                Identified    Received
    G-289    Diagram of Shell Casings by                      851
3            Firearm
    G-293    NC Evidence Inventory and         745          746
4            Disposition Form
    G-294    Photograph of projectile          747          748
5            recovered from Hong Zheng
    G-295    Photograph of projectile          747          748
6            recovered from Hong Zheng
    G-296    Photograph of projectile          748          749
7            recovered from Hong Zheng
    G-297    Firearm and toolmark              783          784
8            identification slides
    G-298    Cartridge Comparison Chart        797          798
9   G-299    Report of Allyson Anderson        799          800
    G-300    Photograph of .40 caliber Smith   815          817
10           & Wesson and 10mm cartridges
    G-301    List of caliber families          818          818
11  G-302    Video clip of cycling of a        819          820
             firearm
12  G-303    Diagram of rifling                824          825
    G-304    Report of Allyson Anderson        827          827
13  G-305    Firearms Summary Chart            847          848
    G-306    Durham Police Department          754          754
14           Evidence Submission Form
    G-307    Laboratory Report/glass           759          760
15           fragments
    G-308    Refractive Index Examination      765          767
16           Summary
    G-311A   CD of phone conversation          901          902
17           between the Defendant and
             Taquila House
18  G-314    CD of Officer Justice's           879          880
             body-worn camera footage
19  G-315    Photograph of injury to wrist     864          865
             of Hykeem Cox
20  G-316    Photograph of face injury of      886          887
             Semaj Bradley

21

22

23

24

25
```

Case 1:19-cr-00529-TDS   Document 362   Filed 02/04/22   Page 3 of 214

P R O C E E D I N G S

1

2     (The Defendant was present.)

3     **THE COURT:**  Okay.  Good morning.  Before we get

4  started, something has been brought to my attention that we are

5  going to need to address.  Ms. Engle has reported that -- and

6  let the record reflect that the jury is not in the room -- that

7  one of the jurors has reported that two other jurors have

8  discussed the case in some respect, and this was brought to the

9  attention of Ms. Engle this morning.  I don't know any details

10  about any of it, other than that at some point two of the

11  jurors were talking about something about the case.

12         I can't tell yet whether that's in violation of my

13  instruction.  And so the question is whether to make inquiry

14  about it and then how to proceed.  My inclination would be to

15  bring in the one juror who reported it, find out what that

16  juror says.  And then after that, if there is reason to

17  proceed, bring in the other two jurors, find out what the

18  discussion has been about.  And then we'll decide where we go

19  from there.

20         So before I do that, let me ask if you want to be

21  heard on that.

22     **MR. GREEN:**  No, Your Honor.  Obviously, I know you

23  would plan to bring them in individually to do that.  And then

24  certainly we're interested in the first reporting juror, what

25  is the nature of the discussion.

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1          And I guess the question is more generally and to the

2    extent that we can elicit some details in terms of, you know,

3    whether it was a fleeting discussion or prolonged discussion.

4    That sort of inquiry would be the only request by the

5    Government.

6          **THE COURT:**  All right.  Do you want to be heard,

7    Mr. Bryson?

8          **MR. BRYSON:**  Your Honor, we have no objection to the

9    Court's proposed inquiry.

10          **THE COURT:**  Okay.  All right.  Ms. Engle, if you

11    would bring in Juror No. 1, please.  Juror No. 1 is the one who

12    reported it.

13          Does anybody contend that she needs to be sworn?

14          **MR. GREEN:**  I do not.

15          **MR. BRYSON:**  No, Your Honor.

16          **THE COURT:**  All right.  Please bring her in.

17       (Juror No. 1 entered the courtroom.)

18          **THE COURT:**  Good morning.  You're Ms. Lancaster,

19    Juror No. 1?

20          **JUROR NO. 1:**  Yes.

21          **THE COURT:**  If you would speak loudly so that the

22    lawyers can all hear you as well.

23          It was reported to me that you reported to Ms. Engle

24    some conversation among some jurors about the case.

25          **JUROR NO. 1:**  Just --

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1          THE COURT:  I'm here to learn what it -- and we all

2    want to know what it is that you heard, and then I may have

3    some follow-up questions.

4          JUROR NO. 1:  Okay.  Just, in general, chatter when

5    we go back.  You know, it was my understanding and everyone

6    else's not to discuss it in any way, shape, or form amongst

7    ourselves.  And they will just talk about maybe what we've just

8    seen and kind of speculate on things.  And, you know, I just

9    felt that it probably wasn't right, and I didn't want it to

10   hinder anything going on.  So I felt I should probably say

11   something.

12         THE COURT:  All right.  I appreciate you bringing it

13   to our attention.  When were these discussions you've heard?

14         JUROR NO. 1:  There was a little bit the first day,

15   Tuesday, and then I noticed it again yesterday afternoon during

16   the break.  And, you know, I just, again, felt I should

17   probably say something.

18         THE COURT:  All right.

19         JUROR NO. 1:  It is just a couple that will engage.

20   I mean, that's it.

21         THE COURT:  I will have to ask you:  Who were the

22   jurors?  Which jurors?

23         JUROR NO. 1:  Juror No. 3.

24         THE COURT:  Ms. Spach?

25         JUROR NO. 1:  Yes, I believe.  And No. 9.

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1          **THE COURT:**  Ms. Alderman?

2          **JUROR NO. 1:**  Yes.

3          **THE COURT:**  Were they -- were they both discussing it

4    or was one discussing it and the other listening, or how would

5    you describe what happened?

6          **JUROR:**  I would say they were both discussing it.

7    One will bring it up more often, which is No. 3, and I would

8    say maybe she's the instigator a little bit, but other people

9    just kind of sit back and shake their head and do not engage at

10   all.

11         **THE COURT:**  All right.  Could you tell whether either

12   juror had formed any opinion in the case or not?

13         **JUROR NO. 1:**  I could not, no.

14         **THE COURT:**  What was the length of these discussions?

15         **JUROR NO. 1:**  I would say probably about ten minutes

16   or so, just kind of back and forth.  It was really mainly going

17   on pretty much the whole break -- afternoon break yesterday.

18         **THE COURT:**  All right.  What about on Tuesday?

19         **JUROR NO. 1:**  Tuesday I think that they engaged with

20   themselves and I think, like, turned to other people a little

21   bit, which I said no one else would engage and just kind of

22   didn't have anything to do with it, but then they would get on

23   another topic.

24         **THE COURT:**  About the case?

25         **JUROR NO. 1:**  No.

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1     **THE COURT:** How long would you say Tuesday's

2  discussion about the case occurred?

3     **JUROR NO. 1:** Probably about the same.

4     **THE COURT:** When they discussed the case, what types

5  of things were they discussing? Was it the evidence, or was it

6  something else?

7     **JUROR NO. 1:** Yes, and talking a little bit about the

8  witnesses and how they would have to see what else came out or

9  kind of -- you know, to -- and then ask, like, why certain

10  things happened the way they did.

11     **THE COURT:** Okay. All right. Do you know; did

12  anybody say anything to them that they should not be doing

13  that?

14     **JUROR NO. 1:** No.

15     **THE COURT:** All right. I may have some more

16  questions for you. Just for ease of facilitation, I may ask if

17  you don't mind -- Ms. Engle, if you would take Ms. Lancaster

18  just outside of the door for a minute. Let me talk to the

19  lawyers.

20     Thank you for bringing that to my attention. You did

21  the right thing.

22    (Juror No. 1 departed the courtroom.)

23     **THE COURT:** Ms. Engle, I will let you know if we need

24  her back in the courtroom.

25     All right. So the juror is outside the courtroom.

Case 1:19-cr-00529-TDS   Document 362   Filed 02/04/22   Page 8 of 214

1          Let me ask the Government:  Any follow-up questions?

2          **MR. GREEN:**  No follow-up questions.

3          **THE COURT:**  Mr. Bryson?

4          **MR. BRYSON:**  And I don't know whether it needs to be

5  asked or not, if it's clear in the Court's mind.  It's my

6  understanding this is happening in the jury room where they are

7  all sitting at the same time?

8          **THE COURT:**  I will ask that question.

9          **MR. BRYSON:**  It wasn't clear to me exactly where this

10  is happening and if all the other jurors are present when this

11  is happening.

12          **THE COURT:**  All right.  Bring her back in, please.

13      (Juror No. 1 entered the courtroom.)

14          **THE COURT:**  Ms. Lancaster, where did these

15  discussions take place that you heard these two jurors talking?

16          **JUROR NO. 1:**  In the jury room.

17          **THE COURT:**  Were all other jurors in the area.

18          **JUROR NO. 1:**  Yes, I believe so.  It was during the

19  break.

20          **THE COURT:**  Do you know whether some were in the

21  restroom and some were not?  In other words, what I'm asking

22  is:  Do you know how many jurors were in the room at the time?

23          **JUROR NO. 1:**  I believe it was all of us, maybe minus

24  one that could have been in the restroom, but the room was

25  full.

1          **THE COURT:**  Do you know, based on how they were

2    talking, whether others in the room were able, in your view, to

3    be able to hear them or not, given where they were spread out

4    in the room?

5          **JUROR NO. 1:**  Yes, but everyone else just kind of --

6    no one -- no one else engaged.  And then the other people would

7    just start different conversations amongst themselves.

8          **THE COURT:**  Do you know whether the other jurors

9    actually listened to what they said throughout the

10   conversation?

11         **JUROR NO. 1:**  I believe, you know, especially the

12   ones that were right behind them, I'm sure heard.  The way they

13   were talking, they weren't giving an opinion either way or

14   anything like that.  They were just discussing what we had seen

15   and things that they didn't understand.

16         **THE COURT:**  Okay.  Were other jurors talking at some

17   point while these folks were talking?

18         **JUROR NO. 1:**  Yes.

19         **THE COURT:**  They had their own conversations --

20         **JUROR NO. 1:**  Yes.

21         **THE COURT:**  -- about something else?

22         **JUROR NO. 1:**  Yes.

23         **THE COURT:**  All right.  Thank you very much.

24       (Juror No. 1 departed the courtroom.)

25         **THE COURT:**  All right.  Juror 1 has left the room.

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

```
 1              Any further questions?
 2         MR. GREEN:  No, Your Honor.
 3         THE COURT:  Mr. Bryson?
 4         MR. BRYSON:  No, Your Honor.
 5         THE COURT:  All right.  So at this point, it would be
 6  my inclination then to call in the two jurors one at a time and
 7  ask them about what occurred.
 8         MR. GREEN:  Yes, Your Honor.
 9         THE COURT:  All right.  If you would please bring in
10  next Juror No. 3.
11      (Juror No. 3 entered the courtroom.)
12         THE COURT:  Give me just a moment, ma'am.
13         All right.  You're Ms. Spach; is that correct?
14         JUROR NO. 3:  Yes.
15         THE COURT:  Ms. Spach, have you had conversations
16  with at least one other juror about the evidence during the
17  breaks?
18         JUROR NO. 3:  What do you mean exactly?
19         THE COURT:  Well, have you talked to another juror
20  during any of the breaks about the case?
21         JUROR NO. 3:  About the case?
22         THE COURT:  Yes, or the evidence you've seen.
23         JUROR NO. 3:  I mean, we've talked just about how
24  long it's going to last and, you know, things like that, yeah.
25         THE COURT:  Have you talked about the evidence?
```

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1          **JUROR NO. 3:**  To just the jurors.

2          **THE COURT:**  Have you talked about the evidence, what

3  you've seen in court?

4          **JUROR NO. 3:**  We were just talking about the

5  procedures and how long it takes, that kind of thing.

6          **THE COURT:**  Have you talked about any of the

7  witnesses with another juror?

8          **JUROR NO. 3:**  I didn't know we weren't supposed to

9  talk about it to the jurors.

10          **THE COURT:**  Well, I'm asking you whether you did.

11          **JUROR NO. 3:**  I don't know.  I can't really recall

12  specifically.

13          **THE COURT:**  Did you have any discussions with another

14  juror either on Tuesday or Wednesday with respect to the

15  evidence in this case during a break?

16          **JUROR NO. 3:**  I don't really recall.

17          **THE COURT:**  Okay.  When you say you don't recall,

18  does that mean you may have?

19          **JUROR NO. 3:**  Possibly.

20          **THE COURT:**  Okay.

21          **JUROR NO. 3:**  I have done everything you said as far

22  as not talking to anybody about it.  Everything you said

23  outside of the -- you know --

24          **THE COURT:**  Well, I'm interested to know whether

25  you've had any discussion about the evidence with any another

1 juror; and, if so, who that person might be.

2          JUROR NO. 3:  I don't think I have.

3          THE COURT:  Did you understand my instructions to the

4 jurors has been not to discuss about the case or any matter

5 related to the case until I directed them to do that after I

6 gave the final instructions in the case?

7          JUROR NO. 3:  Yes.

8          THE COURT:  Do you understand that?

9          JUROR NO. 3:  Yes.

10          THE COURT:  Have you understood that to be my

11 direction?

12          JUROR NO. 3:  I think so.  I guess I don't

13 specifically understand -- I mean, as far as -- do you mean

14 specific pieces of evidence, that we're being shown, that we

15 can't discuss it among other jurors?

16          THE COURT:  Well, did you discuss that or not?

17          JUROR NO. 3:  I don't think so.  I mean, the only

18 thing we talked about was how long it took, you know,

19 procedures were taking and that kind of thing.

20          THE COURT:  All right.  Have you formed any opinion

21 in the case?

22          JUROR NO. 3:  No.

23          THE COURT:  All right.  Are you able to keep an open

24 mind in the case?

25          JUROR NO. 3:  Yes.

```
1              THE COURT:  Are you able to wait until all the

2    evidence is in before you form an opinion in the case?

3              JUROR NO. 3:  Yes.

4              THE COURT:  Are you able to follow all my

5    instructions, including an instruction not to talk about

6    anything related to the case during any time until I tell you

7    to deliberate?

8              JUROR NO. 3:  Yes.

9              THE COURT:  Which wouldn't mean during any break with

10   other jurors.

11             JUROR NO. 3:  Yes.

12             THE COURT:  All right.  Give me a moment.  I'm going

13   to ask Ms. Engle to take you out of the courtroom just for a

14   moment.  I may have more questions for you, so don't go too

15   far.  Thank you, ma'am.

16        (Juror No. 3 exited the courtroom.)

17             THE COURT:  All right.  Juror No. 3 has left the

18   courtroom.

19             Let me ask counsel, starting with the Government, any

20   follow-ups?

21             MR. GREEN:  No follow-up questions.

22             MR. BRYSON:  No follow-up questions.

23             THE COURT:  I would now propose bringing in Juror

24   No. 9 and asking similar questions.  Any objection?

25             MR. GREEN:  No objection.
```

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1          **MR. BRYSON:**  No objection.

2          **THE COURT:**  All right.  If you would please bring in

3    Juror No. 9.

4          While she's doing that, let me say that it's clear

5    that throughout this process there is a balance because I do

6    not want to magnify any problem that we have.  So I am trying

7    to be cautious about that.  Obviously bringing in the jurors

8    who may be involved might raise that.

9          All right.  So I am trying to find a way to do this

10    in a way that doesn't alter that.

11          **MR. GREEN:**  Yes, Your Honor.

12       (Juror No. 9 entered the courtroom.)

13          **THE COURT:**  Good morning.  You're Juror No. 9,

14    Ms. Alderman?

15          **JUROR NO. 9:**  Yes.

16          **THE COURT:**  Ms. Alderman, have you had any

17    discussions about any of the evidence with any other juror

18    during any of the breaks?

19          **JUROR NO. 9:**  No, Your Honor.

20          **THE COURT:**  Have you had any discussions with any

21    juror on Tuesday or Wednesday, including yesterday afternoon,

22    discussing any of the proceedings that have been occurring in

23    the courtroom?

24          **JUROR NO. 9:**  Maybe in the jury room where we're

25    waiting, kind of talking about what we saw.

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1              **THE COURT:**  Okay.  And who did you have that

2 conversation with?

3              **JUROR NO. 9:**  I don't know the names of --

4              **THE COURT:**  Do you know where the juror sits?

5              **JUROR NO. 9:**  I'm not sure.

6              **THE COURT:**  How many jurors were involved with you?

7 Is it one or more?

8              **JUROR NO. 9:**  I think it was just us kind of sitting

9 in the bench area.

10              **THE COURT:**  Who were you having your conversation

11 with?

12              **JUROR NO. 9:**  I know -- I don't know where he sits.

13 I think he's a pharmacist.  I'm not sure his name.

14              **THE COURT:**  Was that person, the pharmacist, having a

15 conversation, or was that person in the area?  I'm interested

16 in knowing who you may have had conversations with.

17              **JUROR NO. 9:**  Right.  I'm trying to think.  I don't

18 know if he was sitting -- and then there was another guy behind

19 me, and we were all just kind of talking about what we had

20 seen, what we had talked about.

21              **THE COURT:**  Can you identify any other person who

22 participated?

23              **JUROR NO. 9:**  I don't think so.

24              **THE COURT:**  All right.  Did you have any

25 conversations with Juror No. 3, Ms. Spach?

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1      **JUROR NO. 9:**  Yes.

2      **THE COURT:**  When was that?

3      **JUROR NO. 9:**  Again, that was just sitting on the

4  bench.  We were waiting.  That probably would have been

5  yesterday.

6      **THE COURT:**  All right.  What was the nature of the

7  conversation?

8      **JUROR NO. 9:**  Just talking about kind of what we

9  had -- what I had heard and just that a few things that I had

10  seen had upset me; but other than that, that was really the

11  nature.

12      **THE COURT:**  All right.  Did you express any opinions

13  in the case?

14      **JUROR NO. 9:**  No.

15      **THE COURT:**  Did anyone express any opinions?

16      **JUROR NO. 9:**  No.  It's too unclear still.

17      **THE COURT:**  And have you formed an opinion?  Don't

18  tell me what it is, if you have, but have you formed an opinion

19  yet?

20      **JUROR NO. 9:**  I have not.

21      **THE COURT:**  How long do you think your discussion was

22  yesterday?

23      **JUROR NO. 9:**  Maybe five minutes.

24      **THE COURT:**  Okay.  I have been instructing the jury

25  not to talk about the case or any matter directed about the

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1  case until they are instructed to deliberate.

2        **JUROR NO. 9:**  Okay.  I apologize.  I thought that if

3  we were within our jury confinements that we could kind of talk

4  about what we had seen.

5        **THE COURT:**  Do you understand my instruction now?

6        **JUROR NO. 9:**  Yes, Your Honor.

7        **THE COURT:**  Will you be able to follow that?

8        **JUROR NO. 9:**  Yes.

9        **THE COURT:**  Do you have an open mind about the case?

10        **JUROR NO. 9:**  Absolutely.

11        **THE COURT:**  Are you prepared to hear the rest of the

12  evidence?

13        **JUROR NO. 9:**  Absolutely.

14        **THE COURT:**  Will you follow the Court's instructions?

15        **JUROR NO. 9:**  Yes.

16        **THE COURT:**  Give me a minute.  I am going to ask

17  Ms. Engle to take you outside just for a minute, and I may talk

18  to the lawyers for a minute.  And if I have more questions, I

19  will let you know.

20        Thank you very much, ma'am.

21      (Juror No. 9 departed the courtroom.)

22        **THE COURT:**  All right.  Mr. Green?

23        **MR. GREEN:**  No follow-up for this juror.

24        **MR. BRYSON:**  No follow-up, Your Honor.

25        **THE COURT:**  All right.  Let me ask what the parties

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1 propose ought to be the next step.

2       **MR. GREEN:** Well, she did reference a pharmacist,

3 having a discussion with a pharmacist, which the only one I

4 recall is Juror No. 7, Mr. Okafor. I don't know if the Court

5 needs to inquire of him what he heard and what his status is.

6 I will tell you now that the -- hold on just a minute.

7       Our view now, based on what I've heard -- and, again,

8 just -- the Court will ultimately judge the credibility of what

9 you heard, but our request is that you strike Juror 3 and

10 Juror 9 and seat the alternates in order.

11       **THE COURT:** Okay. Let me hear from the Defendant.

12     (Defendant's attorneys conferred.)

13       **MR. BRYSON:** We disagree. We feel like at this point

14 they should be able to continue with a very strong admonition,

15 whether privately or as a group, but they should continue.

16       **MR. GREEN:** Your Honor, the Court gave clear

17 instructions to the jury. Both of these jurors have

18 disregarded that instruction, which causes me some concern

19 about their ability to continue to follow the Court's

20 instructions.

21       Again, I'm listening. I found that Juror No. 1,

22 Ms. Lancaster -- I found her very credible about her

23 allegations about what she was seeing and hearing. Juror

24 No. 3, her denial was not credible. And then ultimately her

25 admission minimized, at best, what went on. So being

US v. Wiley -- Trial/Vol. IV of VIII -- 4/22/21

1  questioned by a federal judge -- and then also Ms. Alderman,

2  again, the initial denials and minimization seemed quite

3  inconsistent with what -- Juror No. 1 seemed quite credible.

4          So we have kind of multiple considerations.  Even by

5  their admission, they have violated the Court's instruction,

6  and then, further, they have -- appear to, one, have been less

7  than forthright with the Court initially and, at best,

8  minimization.  And, quite honestly, this is why we seat

9  alternates for just this circumstance.

10          **THE COURT:**  Does anybody believe that any other juror

11  should be called in?

12          **MR. GREEN:**  Well, I guess the issue is we have a

13  record of Ms. Alderman saying she spoke some to a pharmacist.

14  That's Juror No. 7, if I recall from the jury selection, and so

15  we may need to inquire of him if there was any conversation;

16  and, if so, where he's at.

17          **THE COURT:**  Mr. Bryson, what is the Defendant's view

18  about that?

19          **MR. BRYSON:**  Your Honor, the original report from

20  Ms. Lancaster was that there was only two and everybody else

21  was trying to ignore them.  So while the Government has pointed

22  out that Ms. Alderman has not been credible, we don't believe

23  there is any reason to go any further with that.

24          **THE COURT:**  Does anybody believe that each of the

25  jurors needs to be called in to determine what they heard, or

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1  are they satisfied with where things are subject to, I guess,

2  the Government saying that maybe No. 7 should be brought in?

3          **MR. GREEN:**  I think -- I would be satisfied, assuming

4  that Juror No. 7 doesn't further disclose some additional

5  conversations of other jurors.  And then whatever the Court

6  decides, obviously, there would have to be -- whether those

7  jurors are excluded or taken out, there's obviously going to

8  have to be some curative -- not curative but rehabilitation of

9  the instruction to make sure they all can follow it.  I think

10 that can be can done in a group setting.

11         **THE COURT:**  Mr. Bryson?

12         **MR. BRYSON:**  Is the Court suggesting that you're

13 going to bring them in each one by one and --

14         **THE COURT:**  I'm asking whether the parties believe

15 that's necessary in this case.  I would not do it as a group.

16 I would bring them in one by one.

17         **MR. BRYSON:**  No, we are not asking that, Your Honor.

18         **THE COURT:**  So do I understand then at this point the

19 Government's request is to strike Juror 3 and Juror 9, and the

20 Defendant opposes that?  Is that correct?

21         **MR. GREEN:**  That is the Government's request.

22         **MR. BRYSON:**  And that is our -- we do oppose that.

23         **THE COURT:**  Okay.  And the Government wants me to

24 bring in Juror 7; is that right?

25         **MR. GREEN:**  Yes, Your Honor.

1          **THE COURT:**  All right.  Because Juror No. 7 was

2     mentioned, I do think we will bring him in.

3          So if you would bring in Juror No. 7, Mr. Okafor.

4     (Juror No. 7 entered the courtroom.)

5          **THE COURT:**  Good morning.  You're Mr. Okafor?

6          **JUROR NO. 7:**  Yes, I am.

7          **THE COURT:**  No. 7?

8          **JUROR NO. 7:**  Yes, sir.

9          **THE COURT:**  All right.  Have you either participated

10    in or heard any discussion among jurors about the evidence

11    during breaks in the jury room or outside of the courtroom?

12         **JUROR NO. 7:**  Well --

13         **THE COURT:**  Speak loudly so we can all hear you, if

14    you would, please, sir.

15         **JUROR NO. 7:**  Sure.  Nothing in particular in the

16    sense that -- it was more like myself when the discussion was

17    going on, I just -- so more in the line of that evidence is

18    almost, like, continuous.  It is nonstop.  It keeps going on

19    and on and on.  I said something like -- give me a second so I

20    can recollect exactly -- more -- just paraphrasing.  It was

21    more like it was continuous, nonstop.  Similar things.

22         **THE COURT:**  Who made this comment?

23         **JUROR NO. 7:**  I said that.  I said it was similar

24    things going on, but that's all.

25         **THE COURT:**  Okay.  When was this?

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1          **JUROR NO. 7:**  This was yesterday.

2          **THE COURT:**  Okay.  Any other conversation about the

3    evidence?

4          **JUROR NO. 7:**  Not necessarily.  There were two ladies

5    that kept talking about -- just -- I tried to take my mind from

6    listening a whole lot.  But when they laugh, I said, wow, I

7    feel bored sometimes because it felt like the same thing over

8    and over.  Because at some point yesterday, it felt like we

9    were watching the same said video over and over, the same

10   picture over and over.  That is all.  That's as far as it goes.

11         **THE COURT:**  You said two ladies were talking?

12         **JUROR NO. 7:**  Yes, having a discussion amongst

13   themselves.

14         **THE COURT:**  Who were they?

15         **JUROR NO. 7:**  The first two ladies you called here.

16   And --

17         **THE COURT:**  Is that --

18         **JUROR NO. 7:**  They weren't particularly discussing

19   whether the evidence was right or wrong.  It was more like --

20   it was more like -- hold on.  Let me recall very well.  It was

21   more like those were a lot of bullets.

22         **THE COURT:**  Were what?

23         **JUROR NO. 7:**  A lot of bullets, pretty much.

24         **THE COURT:**  Okay.  How long did they have that

25   conversation?

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1      **JUROR NO. 7:**  Less than ten seconds.  Ten seconds.

2  At least that's how much long I paid attention, but not much

3  more than that.

4      **THE COURT:**  All right.  Did you participate with

5  them?

6      **JUROR NO. 7:**  No.

7      **THE COURT:**  Have you formed any opinion in the case

8  yet?

9      **JUROR NO. 7:**  No.  I have no intention of forming one

10 until at least I hear everything.

11      **THE COURT:**  Okay.  Were there any other discussions

12 other than the one you told me about yesterday?

13      **JUROR NO. 7:**  No.  As far as I'm concerned, once that

14 happened, I think a lot of people around there just kind of

15 came up with excuses to step around.  Some went to the

16 bathroom, went to get some cookies.  I think it quickly

17 dissipated and switched topics to COVID and all that stuff.

18 But nothing more than that.

19      **THE COURT:**  Do you know whether other jurors other

20 than the two women you talked about -- do you know whether the

21 other jurors participated in conversation?

22      **JUROR NO. 7:**  No.  When I made the --

23      **THE COURT:**  No, they didn't or you don't know?

24      **JUROR NO. 7:**  Not that I know of, at least as far as

25 I know.  When I said continuous supply of evidence, everybody,

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1  the people around me, they just laughed, and then we changed

2  topics quickly, wanted to cut it off --

3          THE COURT:  And other than that conversation

4  yesterday, were there any others?

5          JUROR NO. 7:  No, not that I know of.

6          THE COURT:  Are you able to keep an open mind until

7  the end of the case?

8          JUROR NO. 7:  I have no doubts about that.  I will

9  keep an open mind.  I think the prosecution is doing their job.

10  And the defense has an opportunity to do theirs.

11          THE COURT:  And will you follow all of the Court's

12  instructions?

13          JUROR NO. 7:  Absolutely.

14          THE COURT:  Thank you, sir.  You can put your mask

15  back on.  Ms. Engle will take you out, and if I need to ask you

16  some more questions, I will let you know right away.  Thank you

17  for coming in.

18      (Juror No. 7 departed the courtroom.)

19          THE COURT:  Government want to be heard?

20          MR. GREEN:  No further questions.  And we would not

21  request that Mr. Okafor be struck, based on his answers.

22  Certainly anybody who had to sit through yesterday afternoon,

23  there was a continuous stream of evidence.

24          THE COURT:  All right.  Mr. Bryson, what's the

25  defense's view?

1        **MR. BRYSON:**  We have no follow-up questions, and we
2 don't want him -- any action taken against him.
3        **THE COURT:**  Based on that, does either side think at
4 this point I need to question any other jurors, or are you
5 satisfied?
6        **MR. GREEN:**  The Government is satisfied.
7        **MR. BRYSON:**  We're not asking for any further
8 inquiry.
9        **THE COURT:**  All right.  Give me just a minute.
10      (Pause in the proceedings.)
11      **THE COURT:**  Okay.  I'm going to make some findings.
12 That is first that Juror No. 1's report was credible, and she
13 reported two instances at least of jurors -- two jurors
14 talking, No. 3 and No. 9, and making comments that related to
15 the evidence, described as general chatter, but it was about
16 the evidence.  One occurred on Tuesday; another conversation
17 occurred Wednesday afternoon during a break.
18       Juror No. 3 was reported to be the instigator of
19 these conversations, but No. 9 was involved as well.  Juror 1
20 could not tell if anybody had formed any opinion.
21       The conversation on Wednesday, the second of the two,
22 was roughly ten minutes in length.  It would appear that the
23 other jurors tried to distance themselves from this
24 conversation, indicating some recognition that it's
25 inappropriate and contrary to the Court's instructions.

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1          According to Juror No. 1, they talked about -- two

2    women, No. 3 and No. 9, talked about evidence and witnesses and

3    asked questions, but nobody spoke to them.  This occurred in

4    the jury room.

5          When I brought in Juror No. 3, she denied any such

6    discussions.  Based on the totality of the interviews, I find

7    her denial to be untruthful.  She tried to grossly minimize it,

8    and she clearly violated my directions on multiple occasions.

9    I don't think they could have been any clearer.  When she was

10   brought into Court, she was evasive and ultimately untruthful,

11   and she appears to be the instigator.

12         Juror No. 9 was more forthcoming.  She seemed to

13   express an opinion that she didn't realize they could not at

14   least chat among themselves in some respect.  Juror No. 9 did

15   indicate that she had an open mind, that she would follow the

16   Court's instructions, and that she had not formed any opinion.

17         Based on this record, I'm going to strike Juror No.

18   3.  She's clearly violated the Court's instructions and, worse,

19   was -- essentially lied to my face when she came in and was

20   questioned.  She instigated this.  I do not know whether she

21   has an open mind at this point.  I think it's hard to

22   understand whether she would, in light of the fact that she's

23   been untruthful about other matters.

24         Juror No. 9 was more forthcoming, and I sensed some

25   remorse for what she expressed as perhaps a misunderstanding of

1 the scope of my instruction, but she did indicate that she

2 would keep an open mind and continue.

3          As to Juror No. 7, he was implicated potentially, I

4 believe, by Ms. Alderman, No. 9; but, in any event, he said he

5 would keep an open mind and he tried to distance himself from

6 the conversation, and he appears to be truthful in this regard.

7 And neither party seeks to have him struck.

8          So I am going to strike Juror No. 3, replace her with

9 our first alternate, Ms. Fraizer.  I am going to keep Juror

10 No. 9 at this point.  The Defendant does not ask that Juror

11 No. 9 be struck.

12          That's correct; right, Mr. Bryson?

13          **MR. BRYSON:**  Correct.  We did not ask for any juror

14 to be struck.

15          **THE COURT:**  Hold on just a minute.  I do find that

16 misconduct alleged did occur.  The question is whether it's

17 prejudiced the rights of the parties in the case.  I'm finding

18 that, as to Ms. Spach, her conduct requires her to be struck as

19 a juror or, at least in my discretion, I'm striking her as a

20 juror.

21          I do not find that the conduct of any of the jurors

22 so far prejudices the right of the Defendant to a fair trial or

23 to the Government.

24          Does anybody want to be heard on that?  Mr. Green?

25          **MR. GREEN:**  No, Your Honor.

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1           **THE COURT:**  Mr. Bryson?

2           **MR. BRYSON:**  No.

3           **THE COURT:**  I'm finding that the misconduct that has

4    occurred has not prejudiced either party's rights.

5           Do you agree or disagree?

6           **MR. BRYSON:**  We do not disagree.

7           **THE COURT:**  You do not disagree?

8           **MR. BRYSON:**  We agree with the Court.

9           **THE COURT:**  Okay.  All right.  Okay.  So, Ms. Engle,

10   if you would, let Ms. Spach know her services will not be

11   needed any longer.  I'll decide later whether there is going to

12   be separate punishment for her.

13          In fact, I think if you'll just bring her into the

14   courtroom, I will tell her that.  And then we'll bring the jury

15   in reconstituted after that.  Have her bring her things so she

16   does not go back to the jury room when she's done.  She'll

17   leave straight from the courtroom and exit the building.

18       (Juror No. 3 entered the courtroom.)

19          **THE COURT:**  Ms. Spach, I am going to discharge you as

20   a juror.  Your services will no longer be required in this

21   case.  I do that with the admonition that I found that you've

22   been discussing the evidence to some extent with at least one

23   other juror that's contrary to my instructions.  You also came

24   in here, though, and did not admit to that and denied that.

25          So I'll decide later what, if anything, I will do

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1   about that, but at this point -- you don't need to say anything

2   at this time.  But I just want to let you know that's the

3   reason that you are being let go.  We're going to continue the

4   trial without you.  So your services will not be needed.  So

5   you do not need to, nor should you, go back to the jury room.

6   You'll be directed outside the building.

7           All right.  Thank you, ma'am.

8           **JUROR NO. 3:**  I'm sorry.  I think I misunderstood

9   your rules.

10      (Juror No. 3 exited the courtroom.)

11          **MR. BRYSON:**  Is she going to bring the jury back in

12  now?

13          **THE COURT:**  In a moment.

14          **MR. BRYSON:**  At some point -- and I know she's not

15  here, but at some point, I just wanted to note our exception to

16  the Court's record -- for the record to the Court's ruling.

17          **THE COURT:**  Okay.  To the extent --

18          **MR. BRYSON:**  The excusal of Juror No. 3.

19          **THE COURT:**  Oh, okay.  You had objected.  I

20  understand.  You don't need to note an exception, but it's in

21  the record.

22          So the next question I have is at some point the

23  jurors are going to be wondering about what's going on, if they

24  don't already have some inkling.  It would be my inclination to

25  bring them in, continue the evidence and then, when we break,

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1  to remind them at that point and to stress what their duty is.

2        Does anybody want me to proceed in any other fashion?

3        **MR. GREEN:**  No, Your Honor.

4        **MR. BRYSON:**  Are you going to move one of the

5  alternates up?

6        **THE COURT:**  Yes.  Number -- Alternate 1, Ms. Frazier,

7  will become Juror No. 3, Ms. Spach's spot.

8        **MR. BRYSON:**  Yes, Your Honor.

9        **THE COURT:**  Okay.  Bring them in.

10        If you would hold the door just a minute.  Ms. Engle

11  did tell me this morning, just so that you know, Juror No. 9

12  apparently had a grandmother pass away this week.  The funeral

13  is tomorrow.  But my understanding is she's not planning to

14  attend.

15        Does anybody want to be heard about that?

16        **MR. GREEN:**  No, Your Honor.

17        **MR. BRYSON:**  No, Your Honor.

18        **THE COURT:**  Okay.

19    (The jury returned to the courtroom at 10:04 a.m. )

20        **THE COURT:**  Ms. Engle, the second alternate can move

21  up to the front row now, if she wishes.

22        Please be seated, everyone.

23        Good morning, ladies and gentlemen.  I apologize for

24  the delay.  We are now ready to proceed.  And the Government

25  may call its next witness.

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1          **MR. PRINCIPE:**  Thank you, Your Honor.  The Government

2    calls Dr. Michelle Aurelius.

3    **MICHELLE AURELIUS, M.D.,** GOVERNMENT'S WITNESS, being first duly

4    affirmed, at 10:06 a.m. testified as follows:

5                              DIRECT EXAMINATION

6    **BY MR. PRINCIPE**

7    Q    Would you state your name.

8    A    Dr. Michelle Aurelius.  For the record, my last name is

9    spelled A-U-R-E-L-I-U-S.

10   Q    And, Dr. Aurelius, who do you work for?

11   A    I work for the Office of the Chief Medical Examiner under

12   the Department of Health.

13         **THE COURT:**  You may remove your mask, ma'am, if you

14   would.  That way we can see and hear you better.

15         **THE WITNESS:**  Thank you, Your Honor.

16   **BY MR. PRINCIPE**

17   Q    And are you a forensic pathologist?

18   A    Yes.

19   Q    Can you explain to the jurors what that is?

20   A    As a forensic pathologist, I am a medical doctor, and the

21   patients that I serve are all deceased.  And we have

22   jurisdiction over all sudden, unexpected, and violent deaths

23   here in the state of North Carolina.

24         And as a forensic pathologist, I perform autopsy

25   examinations and work as a medical examiner, the chief examiner

Case 1:19-cr-00529-TDS   Document 362   Filed 02/04/22   Page 32 of 214

1  for the State.

2  Q    Are there different kinds of pathologists?

3  A    Yes.  There are a multitude of different kinds of

4  pathologists.

5  Q    And what does the forensic portion of forensic pathology

6  refer to?

7  A    So the forensic portion is essentially sort of defined

8  as -- so pathology is sort of disease or injury, and the

9  forensic part is how that applies to the law.

10 Q    Okay.  Can you please explain to the jurors your current

11 position, how long you have had held it, and then the prior

12 positions you've held?

13 A    I am the chief medical examiner for the State of North

14 Carolina.  I have been in this position for about two years.

15 And I have brought my CV, and I have it in front of me so I can

16 make sure I get all of the dates right for you all.

17      Prior to that -- actually, during that time period, I have

18 also served as the interim chief toxicologist for the State

19 Laboratory at the Office of the Chief Medical Examiner for

20 almost a year.  I was also the deputy chief medical examiner

21 here in North Carolina from 2015 to 2019.  So I came here to

22 North Carolina in 2015 as your deputy chief medical examiner.

23      Prior to that, I was in New Mexico.  In New Mexico, we had

24 a statewide medical examiner system like we do here in North

25 Carolina.  And there I was the assistant chief medical

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1  examiner, and I had that position for -- from 2011 to 2015.

2       Also during that time period, I had an appointment at the

3  University of New Mexico, and I was the associate professor in

4  pathology.  And prior to that, I was an assistant professor of

5  pathology.

6       From 2008 to 2015 in New Mexico, as a part of my duties, I

7  was also the hospital autopsy director for the University of

8  New Mexico.  And I was an associate medical investigator at the

9  Office of the Chief Medical Examiner from 2005 to 2011 before I

10 transitioned to become the assistant chief medical examiner.

11      And prior to that and during that time period, I was also

12 a cohospital autopsy director before they decided to put all

13 the responsibility on me.

14 Q   And do you also hold two degrees?

15 A   I have a medical degree, yes, and I have a bachelor's of

16 science degree.

17 Q   And when did you obtain those and what from universities?

18 A   I obtained my medical degree from the Oregon Health

19 Sciences University in 1999, and I obtained my bachelor's of

20 science in general science -- and I'm going to look here to

21 make sure I get it right -- way back in 1993.

22 Q   Are you also board-certified in any fields?

23 A   Yes.  I am a board-certified forensic pathologist, and I'm

24 board-certified in forensic pathology, anatomic pathology, and

25 clinical pathology.

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1  Q    And who does that certification, what organization?

2  A    It is the American Board of Pathology.

3  Q    Is it difficult to become board-certified in a field, or

4  what is required to become board-certified in a field?

5  A    It is a lot.  So it requires residency training as a

6  medical doctor.  So that means that there is time invested for

7  a multitude of years.  For me to be board-certified in all of

8  these areas, it was six years of additional training after

9  medical school to be able to sit for my anatomical clinical and

10  forensic pathology boards.

11      The examination -- initial examination process occurs over

12  one to two days.  And it's an exam with a microscope and lots

13  of questions, and then there is a maintenance of certification

14  where every two years I have to submit evidence of my ongoing

15  education, my certification and continue examination process so

16  that I can maintain the standards for my practice of pathology.

17  Q    Do you also hold medical licenses?

18  A    Yes.

19  Q    Which ones do you hold?

20  A    I have a medical license here in North Carolina to

21  practice medicine and another one also in the state of New

22  Mexico to practice medicine.

23  Q    Have you published papers?

24  A    Yes.

25  Q    Have you taught other medical students?

Case 1:19-cr-00529-TDS   Document 362   Filed 02/04/22   Page 35 of 214

1  A    Yes.

2  Q    Have you conducted lectures based on your experience?

3  A    Yes.

4        **MR. PRINCIPE:**  Your Honor, the Government would

5  tender Dr. Michelle Aurelius as an expert in forensic

6  pathology.

7        **THE COURT:**  Do you want to be heard?

8        **MR. FOSTER:**  No objection.

9        **THE COURT:**  All right.  She may give her opinions.

10 **BY MR. PRINCIPE**

11 Q    Dr. Aurelius, did you end up performing an autopsy

12 examination on Hong Zheng?

13 A    Yes.

14 Q    And when did you conduct that examination?

15 A    That was April 18, 2018.  And we started the examination

16 process at about 9:54 in the morning.

17 Q    Can you just explain:  What is the process from beginning

18 to end of what an autopsy examination consists of?

19 A    So an autopsy examination for our patient population is

20 taking a look to help determine cause and manner of death.  For

21 an autopsy examination, our patients arrive to us within a body

22 bag.  They are transported locally from where they are usually

23 discovered or sometimes from a hospital.  When they arrive to

24 us, we verify who they are with their identification tags, and

25 then we undergo an autopsy examination.

Case 1:19-cr-00529-TDS   Document 362   Filed 02/04/22   Page 36 of 214

1    An autopsy examination starts by looking at the outside of

2 the body first as our patients are received.  So that's taking

3 a look at the top to bottom, head to toe, front to back and

4 looking for any type of evidence of injury, any type of natural

5 disease, and any documentation that needs to be made or looking

6 for any evidence that might need to be collected.

7    And this process continues through multiple layers.  We

8 then remove any medical equipment and the clothing and again

9 look at the front and the back of the body.  And then after

10 that, doing the same again after the patient has been cleaned,

11 again viewing front and back for any injury or natural disease

12 or the collection of any type of evidence.

13    And after that, we move on to the internal examination.

14 So a surgical-type incision is made in our patients in a Y

15 incision so we can look at the organs as they sit inside of the

16 body as well as the tissues inside of the body.  We will get

17 all of them inside of the body cavities as well as inside of

18 the neck, and then we also look inside of the head after making

19 an incision on the scalp and reflecting it and removing the top

20 portion of the skull.

21    The organs are then removed and each of them are examined

22 separately, again looking for any kind of evidence, natural

23 disease, or any type of injury.

24    During this process, at any stage, photographs can be

25 taken.  They are all taken under my direction.  Some of them

1  are taken by my hands.  In addition to that, I can order

2  testing that can be radiographs, meaning x-rays taken of the

3  body in different areas.  I can collect samples and send them

4  off for any type of testing that needs to happen.

5       And then after that, putting together a report and working

6  on that to determine cause and manner of death for my patients.

7  Q    Are there other people who may be present during your

8  autopsy examination?

9  A    Yes.

10 Q    And what are their roles?

11 A    They can have different roles.  We typically have an

12 autopsy assistant present with us.  Sometimes we have another

13 pathologist who also may be in the room with us because we can

14 have more than one pathologist doing an examination at a time.

15 Those are typically the people who are helping and assisting me

16 in the autopsy.

17 Q    Do you sometimes collect evidence that is then turned over

18 to law enforcement?

19 A    Yes.

20 Q    Turning your attention then to the autopsy examination you

21 performed on Hong Zheng, were you able to determine a cause of

22 death?

23 A    Yes.

24 Q    What did you determine was the cause of death?

25 A    Gunshot wound of the head.

1   Q    Did you also document any biographical information about

2   Mr. Zheng?

3   A    Yes.

4   Q    What information did you document?

5   A    Mr. Zheng was a 42-year-old Asian gentleman.  His first

6   name was Hong and his last name was Zheng.  I apologize if I am

7   mispronouncing his name in any way.  He is a gentleman.  And

8   then I went through and documented additional findings for the

9   autopsy during the examination.

10  Q    Can you tell the jurors about the wounds that you may have

11  seen on Mr. Zheng?

12  A    In relation to gunshot wounds, Mr. Zheng had two gunshots

13  wounds of his head.  They both entered on the left side of his

14  face and they both had retained projectiles.

15       The retained projectiles, one was a core, a lead core for

16  a bullet, and the other was a jacket, as if the projectile had

17  separated before going into the skin.

18       A gunshot wound on Mr. Zheng on the left side of the head

19  on his face near his cheek went through the skin, the

20  underlying subcutaneous tissue and muscle, went through the

21  mandible, which is your jawbone, on the left-hand side, went

22  through the tissue and the muscle underneath and it penetrated

23  the first and -- I apologize -- the second and the third

24  cervical vertebrae and lodged there.  That was the projectile

25  core, so the internal portion of a bullet.

Case 1:19-cr-00529-TDS   Document 362   Filed 02/04/22   Page 39 of 214

1      And the cervical vertebrae are numbered No. 1 at the top

2   where it connects with your skull, and then as the numbers go

3   up, we descend down the cervical spine which encases the spinal

4   cord.

5      Associated with where the lead core was recovered from, he

6   had a tear on his cervical spine.  So his spinal cord that is

7   chambered within the bones of the cervical neck bones was torn.

8      In addition to that, he had, as I mentioned, another

9   entrance wound closer to the chin on the left side of his face.

10  This went through the skin and the subcutaneous tissue, the

11  underlying musculature, and grazed along the mandible.  So it

12  skimmed along the mandible.  It went through the underlying

13  soft tissue and the musculature of the neck and was recovered

14  on the left lateral side of the neck in the subcutaneous and

15  muscular tissue deep beneath it.

16     What was recovered was a jacket, as if the bullet, again,

17  had separated before entering Mr. Zheng, causing two injuries

18  from one projectile.

19     In addition to that, surrounding both of these wounds was

20  something called pseudo-stippling.  And the pseudo-stippling is

21  a collection of injuries around the wounds of varying size,

22  some very small, some large, and this is when an object hits

23  the skin around the entrance gunshot wounds and often falls

24  away.

25     This can occur when there is an intermediary object

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1 between a decedent's skin and the firearm.  So if the firearm

2 travels through something, the bullet itself can fragment into

3 pieces and crash into the side of the skin, causing this type

4 of injury.

5      In addition to that, if the bullet or the projectile goes

6 through something, it can fragment whatever that object is, and

7 those small fragments then have velocity and are pushed against

8 the decedent's skin.

9      In addition to that, Mr. Zheng has some pseudo-stippling

10 on his left anterior lateral upper arm, so that's the front and

11 the side of his upper arm, with sparing of the area where his

12 shirt covered.

13 Q    Dr. Aurelius, with regard to intermediate objects that

14 could cause pseudo stippling, is a glass pane or windshield

15 from a vehicle something that could be one of those

16 intermediary objects?

17 A    Yes.  And I did collect glass from his body around the

18 entrance wounds and also within the body bag.

19 Q    Did you also look at the path of the wounds in the body?

20 A    Yes.

21 Q    Could you explain those to the jurors?

22 A    So both of the jacket and the core both traveled in

23 relationship to the decedent's anatomic position.  So let me

24 start with that.

25      So when I describe how a trajectory or how a bullet

1  travels through an individual, it's as if they are standing

2  straight up, nose forward, palms forward looking at you.  And

3  the left and the right sides relate to the left and the right

4  sides of our patients or our decedents, not mine, when I'm

5  looking at someone.  So the wound tracts traveled from

6  Mr. Zheng's left to right, front to back, and downward.

7  Q    Did you collect the projectiles from inside Mr. Zheng's

8  head?

9  A    Yes.

10 Q    And what did you do with those objects?

11 A    I photographed them, I packaged them, and I put them in

12 our evidence log so that it could be released.

13 Q    Were there some other items that were also turned over to

14 law enforcement?

15 A    Yes.

16 Q    I would like to show you Government's Exhibit 293.  It

17 will appear in just a moment on your monitor.

18      Do you recognize that document?

19 A    Yes, I do.

20 Q    And what is that document used for?

21 A    This is an Evidence and Inventory Disposition Form.  This

22 helps me document what I have collected as evidence for my

23 patients on their case.  And it documents not only that --

24 who's collected it, but it also documents who that is released

25 to.

1   Q    And that is a standard form that your office uses?

2   A    Yes.

3   Q    And does this form here -- is it filled out with

4   information?

5   A    Yes.

6   Q    And does that information pertain to your autopsy

7   examination of Hong Zheng?

8   A    Yes.

9            **MR. PRINCIPE:**  Your Honor, the Government would move

10  Government's Exhibit 293 into evidence.

11           **THE COURT:**  Admitted.

12           **MR. PRINCIPE:**  Permission to publish that?

13           **THE COURT:**  You may.

14           **MR. PRINCIPE:**  If we could zoom in on the top

15  portion?

16  **BY MR. PRINCIPE**

17  Q    Does that contain your name, the date of your examination,

18  and the patient that you collected the evidence from?

19  A    Yes.

20           **MR. PRINCIPE:**  If we can zoom in on the middle

21  section?

22  **BY MR. PRINCIPE**

23  Q    Does that document the items that you collected and later

24  turned over to law enforcement?

25  A    Yes.

Case 1:19-cr-00529-TDS   Document 362   Filed 02/04/22   Page 43 of 214

1  Q    At the bottom, did that include glass fragments and then

2  the projectiles that you described taking from Mr. Zheng's

3  head?

4  A    Yes, and neck.

5  Q    Thank you.  Head and neck.

6       And then also in the bottom portion, it says "chain of

7  custody."  Does that have your name listed on there?

8  A    Yes.

9  Q    Does it also list the name of Lindsey Kincaid?

10 A    Yes.

11 Q    Thank you.  I'm now showing you Government's Exhibits 294

12 and 295.

13      Do you recognize both of those photographs?

14 A    Yes.

15 Q    What are those photographs of?

16 A    These are photographs of the projectiles that I recovered

17 from Mr. Zheng, and you can tell that because his name is

18 written in my terrible handwriting at the top, as well as the

19 case number.  Just like with any of us when we go and see our

20 physician providers, we have a medical record number; when my

21 patients came to me, they also have a medical record number.

22 In addition to that, you can see my signature at the bottom as

23 well as the dates.

24      And these are two photographs of the same projectile

25 jacket.  The first one on my screen, it's on my left,

1   projectile jacket times one, left anterior neck.  So this is

2   the one that was recovered from the gunshot wound that entered

3   around the area of the chin.

4   Q    Thank you.

5        **MR. PRINCIPE:**  Your Honor, Government moves

6   Government's Exhibits 294 and 295 into evidence.

7             **THE COURT:**  Admitted.

8             **MR. PRINCIPE:**  And permission to publish those?

9             **THE COURT:**  You may.

10  **BY MR. PRINCIPE**

11  Q    So Government's 294, that is a top-down view of that

12  object?

13  A    That is correct.  And you can almost see how the interior

14  is hallow at this time because the projectile core is absent

15  from it, has separated.

16  Q    Okay.  And then Government's Exhibit 295 shows the side

17  view of that same object?

18  A    That is correct.

19  Q    I'm now showing on your screen Government's Exhibit 296.

20       What is that a photograph of?

21  A    So this is a photograph of the projectile lead core that I

22  recovered from Mr. Zheng.  This was recovered from his

23  posterior lateral neck, embedded within the second and third

24  cervical vertebrae, so the bones around his neck.

25  Q    Does that include the same kinds of information that you

1  talked about on the prior two exhibits?

2  A    Yes.

3            **MR. PRINCIPE:**  Your Honor, Government moves

4  Government's Exhibit 296 into evidence.

5            **THE COURT:**  Admitted.

6            **MR. PRINCIPE:**  And permission to publish that?

7            **THE COURT:**  Yes.

8            **MR. PRINCIPE:**  If we can zoom in on the object.

9  **BY MR. PRINCIPE**

10 Q    Does that have a different coloration and shape than the

11 prior object?

12 A    Yes.

13           **MR. GREEN:**  I have no additional questions, Your

14 Honor.

15           **THE COURT:**  Any cross?

16           **MR. FOSTER:**  I have no questions.

17           **THE COURT:**  All right.  Thank you.  You may step

18 down, ma'am.  You can put your mask back on.

19           **THE WITNESS:**  Thank you.  May I be excused?

20           **MR. PRINCIPE:**  May this witness be excused, Your

21 Honor?

22           **THE COURT:**  Any objection?

23           **MR. FOSTER:**  No, Your Honor.

24           **THE COURT:**  All right.  You're excused.  You are free

25 to leave.  Thank you.

Case 1:19-cr-00529-TDS   Document 362   Filed 02/04/22   Page 46 of 214

1          (At 10:29 a.m., witness excused.)

2               **MR. PRINCIPE:**  Your Honor, the Government next calls

3    Michael Gurdziel.

4    **MICHAEL GURDZIEL,** GOVERNMENT'S WITNESS, being first duly

5    affirmed sworn, at 10:29 a.m. testified as follows:

6               **THE COURT:**  You may remove your mask so we can see

7    and hear you clearly.

8               **THE WITNESS:**  Thank you, sir.  Appreciate it.

9               **THE COURT:**  Please proceed.

10                         DIRECT EXAMINATION

11   **BY MR. PRINCIPE**

12   Q    Would you please state your name.

13   A    It's Michael Gurdziel.  It's spelled G-U-R-D-Z-I-E-L.

14   Q    And what position do you hold?

15   A    I'm a forensic scientist at the North Carolina State Crime

16   Laboratory in Raleigh in the Trace Evidence Section.

17   Q    What is the North Carolina State Crime Laboratory?

18   A    It's the State-run laboratory that performs scientific

19   analysis as it relates to a court of law.

20   Q    Did that laboratory at one point operate under the North

21   Carolina State Bureau of Investigation?

22   A    That's correct.

23   Q    But does it currently?

24   A    No, it's a separate entity under the North Carolina

25   Department of Justice.

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1  Q    How long have you worked as a forensic scientist at the

2  North Carolina State Crime Laboratory?

3  A    For over 20 years now.

4  Q    And what is trace evidence?

5  A    Trace evidence is any small amount of material that when

6  identified and/or compared to a known substance is useful in

7  forming some type of judgment or conclusion as it relates to a

8  court of law.  Examples would include gunshot residue, paint,

9  glass, fire debris, looking for accelerants.

10 Q    And how long have you worked in the Trace Evidence Section

11 of the State Crime Laboratory?

12 A    Since 2006.

13 Q    So what degrees do you hold?

14 A    I have a bachelor's degree in chemistry with an additional

15 major in biology.

16 Q    Do you have any professional affiliations or

17 certifications?

18 A    I do.  I'm certified through the American Board of

19 Criminalistics, and I am a member of the American Chemical

20 Society and American Society for Trace Evidence Examiners.

21 Q    At some point, did you begin to develop some

22 specialization within trace evidence for glass comparison?

23 A    Yes, I did.

24 Q    And what kind of training, experience, and knowledge have

25 you developed over the years with regard to glass comparison?

Case 1:19-cr-00529-TDS   Document 362   Filed 02/04/22   Page 48 of 214

1   A     In September of 2010, I completed a training program at

2   the North Carolina State Crime Laboratory designed to teach me

3   the skills and techniques needed to perform glass comparisons.

4        External training I received in addition to that included

5   a course at the McCrone Research Institute in Chicago, Illinois

6   regarding glass analysis, and that was back in 2010; a glass

7   evidence course at the Florida International University in

8   Miami in 2011; also completed a forensic glass analysis course

9   through West Virginia University, and that was back in 2014.

10       Additionally, I have training specifically regarding the

11  types of instruments used in glass comparisons, training on the

12  use of the Glass Refractive Index Measurement system, also

13  known as the GRIM, and training regarding the use of the x-ray

14  fluorescence spectrometer and also training regarding the

15  polarized light microscope.

16  Q     Thank you.  And have you also testified one time as an

17  opinion witness with regard to glass comparison?

18  A     Yes, I have.

19        **MR. PRINCIPE:**  Your Honor, the Government would

20  tender Michael Gurdziel as an expert in glass analysis,

21  identification, and comparison.

22        **MR. BRYSON:**  No objection, Your Honor.

23        **THE COURT:**  All right.  He may give his opinions.

24  **BY MR. PRINCIPE**

25  Q     Mr. Gurdziel, can you describe the room or location where

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1  you would do a glass comparison examination?

2  A    So that would be in my laboratory workspace.  I would

3  perform a portion of the analysis identifying whether glass is

4  present.  I'm observing the physical characteristics of the

5  glass.  That's an area -- that's my own laboratory work space.

6       I also have access to the XRF, or x-ray fluorescence

7  spectrometer, that's in our main instrument room that's on the

8  third floor of the State Crime Laboratory in the trace evidence

9  section.  And also that is where our Glass Refractive Index

10 Measurement system, also known as the GRIM, is located.

11 Q    And is the North Carolina State Crime Laboratory a

12 controlled-access facility?

13 A    Yes, it is.

14 Q    And can you describe the general process by which evidence

15 is submitted to the lab and then moves its way through the

16 laboratory to your work space?

17 A    Sure.  Evidence is received from agencies across the state

18 of North Carolina at our Raleigh facility through our evidence

19 control unit.  There, evidence is received in a sealed

20 condition along with an evidence submission form.  It is given

21 a case number, a laboratory case number, and each item is given

22 a specific laboratory item number.

23 Q    Now, does the -- so the lab maintains its own numbering

24 system for items that come in?

25 A    Yes, sir, that's correct.

Case 1:19-cr-00529-TDS   Document 362   Filed 02/04/22   Page 50 of 214

1  Q    Is that often different than an item number that has been

2  assigned to it by the submitting agency?

3  A    Yes.  The item number is given -- yes, that's correct.

4  Q    I'm going to show you Government's Exhibit 306.

5       Do you recognize that document?

6  A    Yes.

7  Q    What kind of document is that?

8  A    Government's Exhibit 306 is an evidence submission sheet

9  that shows what agency submitted evidence in this case and what

10 items -- what their agency item number is and as it relates to

11 our laboratory item number.

12 Q    Okay.  And was this document pertaining to the Durham

13 Police Department?

14 A    Yes, that's correct.

15 Q    And what was the date of the submission?

16 A    The date of the submission was 5/31/2018.

17 Q    And did that -- did those items listed on that form -- are

18 they associated with an agency case number?

19 A    Yes, that would be the Durham Police Department's Case

20 No. 18-011976.

21       **MR. PRINCIPE:**  Your Honor, the Government moves to

22 introduce Government's Exhibit 306.

23       **THE COURT:**  Admitted.

24       **MR. PRINCIPE:**  Permission to publish that?

25       **THE COURT:**  You may.

1          **MR. PRINCIPE:**  First, let's zoom in on the top

2   portion of the document.

3   **BY MR. PRINCIPE**

4   Q    That has the Durham Police Department and your agency, the

5   North Carolina State Crime Laboratory?

6   A    Yes, that's correct.

7   Q    And the submission date and time?

8   A    Yes, sir.

9   Q    And now if we focus on the Evidence Item Description area,

10  can you go through each item and first identify the laboratory

11  identifying information?

12  A    Sure.  The laboratory case number that this case was given

13  was R201806525.  There were four laboratory item numbers for

14  the four different items of evidence that the Durham Police

15  Department submitted in this case.

16       Laboratory Item No. 28 was glass fragments from roadway at

17  scene, and that corresponds to Durham Police Department's Case

18  No. 18-011976, Item No. 35.

19       The next item number was laboratory Item 29, glass

20  fragments under right front seat of white Lincoln MKX.  That

21  had the same Durham case number with Durham Item No. 55.

22       The third item that was submitted in this case was lab

23  Item No. 30, glass fragments from left rear compartment of

24  white Lincoln MKX.  It is the same Durham case number, their

25  Item No. 56.

1       The fourth item that was received in this case was given

2  lab Item No. 31.  That was glass fragments from left rear door

3  interior of white Lincoln MKX.  And it was the same Durham Case

4  No. 18-011976, and that was the Durham Police Department's Item

5  No. 57.

6  Q     Thank you.

7        I would like to show you an item that's already in

8  evidence.  This is Government's Exhibit 102.

9        Can you see a case number written in the upper left-hand

10 corner where it says IR number?

11 A     Yes, I do.

12 Q     Is that the same number that was just on that form?

13 A     Yes.  18-011976.  That would be the Durham Police

14 Department's agency case number.

15 Q     Do you see that there is an Item No. 35 listed on there?

16 A     That's correct.

17 Q     That corresponds to one of the items that you looked at

18 during your examination?

19 A     That was the Durham Police Department's Item No. 35, which

20 corresponds to the laboratory Item No. 28.

21 Q     And then when items move through your laboratory, do they

22 get a barcode sticker on them?

23 A     Yes, they are given a barcode sticker identifying that

24 item when it's received into the evidence control unit.

25 Q     Okay.  Is this on your screen one of those barcoded

1  stickers?

2  A    Yes, sir.  It has the laboratory case number and the

3  corresponding lab item number.

4  Q    What is that item number on this exhibit, Government's

5  Exhibit 102?

6  A    Lab Item No. 28.

7  Q    And that corresponds to the document that we just looked

8  at; correct?

9  A    Yes, sir.  Lab Item 28 is Durham Police Department's item

10  35.

11  Q    I'm going to open up the envelope for that exhibit.

12       Do you recognize that object?

13  A    Yes, sir.  That's lab Item No. 28.  I recognize it from

14  the barcode sticker that I placed on it when I opened the outer

15  packaging, and it also has my initials and the date that I

16  marked the evidence.

17  Q    What is inside of this object?

18  A    That would be the glass from roadway at scene.

19  Q    What is this object that was in there with it?

20  A    That would be -- that would contain the microscope slide

21  that I used as part of my examination to measure the refractive

22  index of the glass.

23  Q    Okay.  Let's pause for a moment right here.  Can you

24  explain to the jurors, what is glass?

25  A    Scientifically speaking, glass is an inorganic product of

1  fusion cooled to a rigid state without crystallization.  I

2  think we all have a pretty good understanding of glass.  It is

3  everywhere in our environment.  Examples would include flat

4  glass, which -- window glass, automotive glass, container

5  glass, bottles, eyeglasses, fiberglass, glass wool would be a

6  couple of examples.

7  Q    And then how is it possible, from the perspective of your

8  discipline, to even compare samples of glass to one another?

9  What are you looking for?

10  A    Once we have identified that glass is present, we will

11  look at the physical characteristics of the glass, the

12  thickness, whether it has a tint or color to it.  We'll look at

13  what type of glass it is.  We'll then look at the elemental

14  composition of the glass using an instrument called an x-ray

15  fluorescence spectrometer.

16       And then, additionally, we'll measure the refractive index

17  of the glass, and that means how much that glass bends light as

18  the light passes through it.  And those are the types of

19  characteristics that we're looking at when comparing a

20  questioned glass to a known glass standard.

21  Q    Do you typically do those three stages each time for each

22  item?

23  A    Well, we start with the -- looking at the physical

24  characteristics of the glass.  If there is any difference noted

25  in the physical characteristics, say, maybe there is a

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1   different color tint to it, or a different thickness, then we

2   have -- then I will have determined that, hey, this glass is

3   not consistent with the known standard or the known sample.

4   Therefore, the analysis will conclude at that point.

5        However, if all the physical characteristics are

6   consistent with the known, then I'll look at the -- I'll

7   analyze and determine the elemental composition of the glass,

8   comparing what elements are present to see if those are

9   consistent.

10       If those elements are consistent, then I'll measure the

11  refractive index and see if there are any differences in

12  refractive index between the questioned glass and the known

13  glass.

14  Q    I'm going to show you Government's Exhibit 307.

15       Do you recognize that document?

16  A    Yes, I do recognize Government's Exhibit 307 as a copy of

17  my laboratory report in this case.

18  Q    Is that just the first two pages of that lengthy report?

19  We'll show you the next page.

20  A    Well, the laboratory report is a two-page document.

21  Q    Okay.  So does this laboratory report document your -- the

22  conclusions of your examination of the items that were

23  submitted, those items that were in Government's Exhibit 306?

24  A    That is correct.

25  Q    Okay.  And does it list the same items that were on that

Case 1:19-cr-00529-TDS   Document 362   Filed 02/04/22   Page 56 of 214

1  other form here at the top of the document?

2  A    Yes, it does.  Laboratory Item Nos. 28, 29, 30, and 31 are

3  listed on my laboratory report.

4  Q    Okay.  Then below that, does it show the type of exam and

5  then your conclusions?

6  A    Yes, it does, indicating the type of exam is a glass

7  analysis, and then it gives my results of examination in this

8  case.

9  Q    All right.  Thank you.

10        **MR. PRINCIPE:**  The Government would move Government's

11  Exhibit 307 into evidence.

12        **THE COURT:**  Admitted.

13  **BY MR. PRINCIPE**

14  Q    And what was your conclusion with regard to your

15  comparison of Item No. 28, which was Durham Police Department's

16  Item 35, glass fragments from roadway at scene, with Item

17  No. 29, glass fragments under right front seat of white Lincoln

18  MKX, Durham Item 55?

19  A    Analysis showed the black-tinted, broken glass fragments

20  in Item 28 were consistent in physical properties, refractive

21  index, and elemental composition to the black-tinted, broken

22  glass fragments in Item No. 29.  These fragments could have

23  shared a common origin.

24        **MR. PRINCIPE:**  And permission to publish that, Your

25  Honor?

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1              **THE COURT:**  You may.

2    **BY MR. PRINCIPE**

3    Q    What was -- what comparison did you perform between Item

4    No. 28 -- or lab Item No. 28 and lab Items 30 and 31?

5    A    I performed an examination of the physical characteristics

6    of the glass between Item 28 and Items 30 and 31 and found

7    those to be consistent.

8    Q    You found the physical properties to be consistent?

9    A    Correct.

10   Q    Did you perform the second or third stage of analysis for

11   those two additional item numbers?

12   A    Not for those two item numbers.

13   Q    Why not?

14   A    Since Item No. 29 was consistent with Item No. 28, I did

15   not conduct the analysis of the elemental composition and the

16   refractive index for Item Nos. 30 and 31, since an association

17   was already made between the Item 28 and the Item No. 29.

18   Q    Okay.  I'm now going to show you on your monitor

19   Government's Exhibit 125.

20        Is that also the same agency number associated with it at

21   the top?

22   A    That's correct, 18-011976.

23   Q    Does it also show --

24              **THE COURT:**  Is this in evidence yet?

25              **MR. PRINCIPE:**  Yes.  Yes, Your Honor.

1  BY MR. PRINCIPE

2  Q    And then does it also list the Durham Police Department

3  Item No. 55 on that document?

4  A    That's correct.

5  Q    And listed there as well?

6  A    Yes, sir, they have a barcode sticker that indicates the

7  same information.

8  Q    And does Government's Exhibit 125 also contain that same

9  North Carolina State Crime Lab sticker with barcode?

10  A    Yes, and with the laboratory Item No. 29 correlating to

11  Durham Police Department's Item No. 55.

12  Q    I'm going to open that envelope.

13       Do you recognize that object?

14  A    Yes, that would be lab Item No. 29.  I recognize it from

15  the barcode sticker that I placed on it, indicating the lab

16  item number as lab Item 29.  It also has my initials and the

17  date that I marked that evidence.

18  Q    Can you see what's inside of that?

19  A    Yes, it contains broken glass, black tint.

20  Q    This was also in the envelope.  Do you recognize what that

21  object is?

22  A    Yes.  That is the -- contains the microscope slide that I

23  used to obtain the refractive index measurement of lab Item

24  No. 29.

25  Q    I'm taking the objects that were previously removed from

1   Government's Exhibit 102.

2        And your comparison where you went through all three

3   stages of examination was a comparison of the objects from

4   these two jars; correct?

5   A    Yes, sir, that's correct.

6   Q    I'm also showing you Government's Exhibit 126, which is

7   already in evidence.

8        Does that show the same agency number and item number 56

9   from the Durham Police Department?

10  A    Yes, sir, that's correct.  That would be Durham Police

11  Department's Item No. 56.

12  Q    Does it also have the same barcode from the State Crime

13  Lab with your agency item number?

14  A    Yes, it does, indicating laboratory item number 30.

15  Q    Showing you Government's Exhibit 27, which is already in

16  evidence.

17       Does that also have the same Durham Police Department

18  agency number and Item No. 57, glass fragments?

19  A    Yes, it indicates the same Durham Police Department agency

20  item number, and it indicates Durham agency Item No. 57.

21  Q    Does that exhibit, Government's Exhibit 127, also contain

22  the State Crime Lab barcode and item number?

23  A    Yes, it does, indicating laboratory Item No. 31.

24  Q    And those are also the items that you compared against lab

25  Item No. 28 from the roadway?

Case 1:19-cr-00529-TDS   Document 362   Filed 02/04/22   Page 60 of 214

1    A    That is correct.

2    Q    And you just did the physical characteristic comparison

3    between those items; correct?

4    A    That's correct.

5    Q    Could you exclude either of those items based on the

6    physical characteristics compared to Item 28 from the roadway?

7    A    The physical characteristics were consistent for 30 and

8    31.  However, laboratory Item No. 31 also contained one

9    blue-tinted, broken glass fragment and one green-tinted, broken

10   glass fragment that were not consistent with the glass

11   fragments from roadway at scene.

12   Q    Which item was that again?

13   A    So that was laboratory Item 31.

14   Q    I'm showing you Government's Exhibit 306.  It was the

15   document that you looked at before, which is in evidence.

16        And where was that item collected from?

17   A    Laboratory Item 31 was glass fragments from left rear door

18   interior of white Lincoln MKX.

19   Q    Collected near the left rear door?

20   A    Correct.  That laboratory item number contained broken --

21   black-tinted, broken glass fragments and then also contained

22   one blue-tinted, broken glass fragment and one green-tinted,

23   broken glass fragment.

24           **MR. PRINCIPE:**  Just one moment, Your Honor.

25           Your Honor, we would like to publish Government's

Case 1:19-cr-00529-TDS   Document 362   Filed 02/04/22   Page 61 of 214

1   Exhibit 34.

2              **THE COURT:**  You may.

3   **BY MR. PRINCIPE**

4   Q    I would like to show you on your monitor Government's

5   Exhibit 308.

6        Do you recognize that document?

7   A    Yes.  I recognize Government's Exhibit 308 as a summary of

8   results of my refractive index examination.

9   Q    Okay.  And which items does this document pertain to as

10  far as the items that you examined?

11  A    Yes, that would be laboratory Item No. 28, the glass

12  fragments from roadway, and the laboratory Item No. 29, glass

13  fragments from under right front seat of white Lincoln MKX, and

14  then also a glass standard, B4, that we run to verify that the

15  instrument's operating properly.

16             **THE COURT:**  It's 11:00.  Is this a good point where

17  we can take a morning break?

18             **MR. PRINCIPE:**  If Your Honor wishes to.

19             **THE COURT:**  Ladies and gentlemen, we're going to take

20  a morning break.  Although you all may not have been in here

21  the whole time, everybody else has been, and I think a comfort

22  break is in order.

23        If you're taking notes, please put your notes in your

24  envelopes.  Leave your envelopes in your chairs.  We're going

25  to take our morning break for roughly 20 minutes.

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1            And I want to reiterate to you my standard

2    admonitions, and please make sure you understand that when I

3    say you are not to discuss this case at all, that means at any

4    point in time among yourselves or among anybody else.  So you

5    are not to discuss any aspect of this case in the jury room,

6    even during breaks or when you go to the bathroom or when you

7    go home, at any point.

8            So there is no research to be done.  Everything

9    you're going to learn is going to come to you in this

10   courtroom.  You are not to discuss the case at all with each

11   other or with anybody else, period, until I tell you to do

12   that, and that will be only after all the evidence is in,

13   you've heard the arguments of the lawyers, and I've told you

14   what the law is and instructed you.  And then I'll let you know

15   when you're free to say anything.

16           So you're not to make any comments about anything

17   that occurs here in the courtroom at all, period.  Just put it

18   out of your mind and relax, and then keep an open mind.  You

19   have not heard all the evidence.  And then we'll bring you back

20   in here in 20 minutes.

21           If you would leave your notepads in your envelopes in

22   your chairs, relax, use the facilities, and be refreshed and

23   ready to go here in 20 minutes.

24           Ms. Engle, if you would escort them across the hall,

25   please.

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

```
 1        (The jury departed the courtroom.)

 2              THE COURT:  Please be seated, everyone.  Give them a

 3    moment to get across the hall to the jury room, please.

 4              Anybody have any issue they need to raise with me at

 5    this time?

 6              MR. GREEN:  No, Your Honor.

 7              MR. BRYSON:  No, Your Honor.

 8              THE COURT:  We'll take our morning break.  Please be

 9    ready to go at 11:20, if you would.

10        (Proceedings recessed at 11:02 a.m.)

11        (Proceedings called back to order at 11:22 a.m.)

12        (The Defendant was present.)

13              THE COURT:  All right.  Please bring the jurors in.

14    And you can bring the witness in, too, and he can retake the

15    stand.

16              MR. GREEN:  Yes, Your Honor.

17        (The jury returned to the courtroom.)

18              THE COURT:  Please be seated, everyone.

19              You may remove your mask.

20              Mr. Principe, you may continue, sir.

21              MR. PRINCIPE:  Thank you, Your Honor.

22              Your Honor, the Government moves Government's

23    Exhibit 308 into evidence.

24              THE COURT:  Admitted.

25              MR. PRINCIPE:  And permission to publish that?
```

Case 1:19-cr-00529-TDS   Document 362   Filed 02/04/22   Page 64 of 214

1          **THE COURT:**  You may.

2          **MR. PRINCIPE:**  So if we can just click to the second

3   page of this document.  And then back to the first page.

4   **BY MR. PRINCIPE**

5   Q    So what do these charts on this two-page document pertain

6   to as part of your -- the three steps of your examination?

7   A    They pertain to the refractive index measurements that

8   were obtained using the glass refractive index measurement

9   system, also known as the GRIM.

10  Q    And what physical equipment are you using during that

11  stage?

12  A    So the GRIM is comprised of a type of microscope called a

13  phase contrast microscope, enhancing the contrast between

14  different substances.  It also has a -- the stage has a

15  temperature regulator so it can heat and cool the -- any

16  material that's on that stage of the phase contrast microscope.

17  Q    Is it capable of taking various different kinds of

18  measurements?

19  A    Yes.  Yes.  And that's -- it uses measurements that we

20  obtained using certified standards of known refractive index to

21  obtain a curve of known refractive indices, and then those

22  values are then used to calculate the refractive index of the

23  other glasses that we're measuring for case work.

24  Q    Okay.  Is that what the information in the yellow box on

25  both pages represents?

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1  A    The yellow box is information for the standard that we use

2  as a check to ensure that the instrument's operating properly.

3  Q    Where do you get those standards from?

4  A    They come with the purchase of the instrument, or a

5  company named Locke makes them.

6  Q    So that's a scientific manufacturing company that produces

7  those items to go with the equipment?

8  A    Produces those standards.  That's correct.

9  Q    And once that device is calibrated, then you compare that

10 standard against your other items that were submitted?

11 A    The B4 standards run first to ensure that the instrument

12 is running properly before additional measurements for case

13 work are conducted.

14 Q    Okay.  If we go to the red box, that was the lab Item 28?

15 A    Yes, sir, that's correct, the glass fragments from roadway

16 at scene.

17 Q    And does it have a refractive index for that glass?

18 A    Yes, it does.  The average refractive index measurement

19 was 1.52393, the range being between 1.52385 and 1.52400.

20 Q    And if we go into the green box, Item No. 29?

21 A    That was lab Item No. 29, or known glass fragments under

22 right front seat of white Lincoln MKX.  The average refractive

23 index measurement for that item was 1.52400 with a range of

24 values between 1.52385 and 1.52415.

25 Q    What were you able to conclude about the refractive index

Case 1:19-cr-00529-TDS   Document 362   Filed 02/04/22   Page 66 of 214

1   of both of those items?

2   A     That they were consistent with each other.

3   Q     Okay.  So, again, that was part of the third step of your

4   examination of those items; correct?

5   A     Yes, that's correct.

6   Q     I would just like to briefly walk through the three steps

7   with you once again.

8         Step one was the physical characteristics comparison?

9   A     Yes.  So the physical characteristics looked at the color

10  of the glass.  Both items had a black tint that were consistent

11  with each other.  And then also I measured the thickness of the

12  glass using a caliper, which is a type of ruler, and found a

13  range of thickness between 4.73 millimeters and 4.76

14  millimeters for lab Item 28.  And the thickness for lab Item

15  No. 29 was between 4.72 millimeters and 4.76 millimeters, so

16  those were consistent in thickness.

17        I looked at the glass under a specific wavelength of light

18  in the ultraviolet range, and that's light that's not visible

19  to the naked eye.  We do this to see if the glass fluoresces on

20  one side.  And when I say "fluoresce," it means that the light

21  that -- that the ultraviolet light that can't be seen as it

22  hits the sample, it generates a light that can be observed.

23        So what does that tell me as a glass examiner?  If the

24  glass fluoresces on one side, then it indicates it's a float

25  glass.  Float glass is a type of technique of -- is a type of

1  technique in making a flat glass where the glass -- molten

2  glass is carried over a bed of molten tin.  So that's why the

3  tinted -- I'm sorry -- float glass has fluorescence on one side

4  is from the residue of the tin.

5      And in this case, I observed that both lab Item 28 and lab

6  Item 29 fluoresced under the short wavelength on one side.  So

7  it was float glass.

8  Q    Can I ask you a question about that?

9  A    Yes, sir.

10  Q    When we're talking about automotive glass, is that a type

11  of float glass or not?

12  A    Yes, automotive glass is a float glass.

13  Q    What other observations did you make about the physical

14  characteristics of those items?

15  A    So I also looked at it under the polarized light

16  microscope.  I did this to confirm that it was, in fact, glass.

17  Glass is an isotropic compound, meaning that light travels

18  through it the same way in all orientations versus an

19  anisotropic substance, a crystalline material that -- where

20  light can travel through it in different ways when you change

21  its orientation.  An example would be -- quartz would be an

22  anisotropic substance.  So using the polarized light microscope

23  is a useful way in distinguishing glass from other substances.

24  Q    And what did you observe about those two items when you

25  did that step?

Case 1:19-cr-00529-TDS   Document 362   Filed 02/04/22   Page 68 of 214

1  A    Both lab Item 28 and lab Item 29 were isotropic.

2  Q    And then let's move on to step two, the elemental

3  characteristics.

4      What are you looking for there and what equipment are you

5  using?

6  A    So the x-ray fluorescence spectrometer is a type of

7  instrument that is useful in determining the elemental

8  composition of a substance.  It does this by exposing the

9  sample to x-rays, and then the interaction of the x-rays with

10  the sample will generate what are called characteristic x-rays.

11  Those are characteristic of the element that the sample is made

12  up of.

13  Q    When you are saying "elements" here, what are you actually

14  talking about?

15  A    Elements on the periodic table.  So in the case of glass,

16  we are talking about silicon, calcium, iron is typically found

17  as an impurity in glass.

18  Q    So the periodic table like in chemistry class?

19  A    Yes, sir.

20  Q    And what did you observe about lab Item 28 and 29 during

21  that step of your analysis?

22  A    They were consistent in elemental composition.  They had

23  the same -- we look at ratios of how much calcium and iron are

24  present, and those were consistent with each other.  We also

25  look at the ratios in the amount of zirconium and strontium

1  that are present.  Those were also consistent with each other.

2  Then I also observed that both lab Item 28 and lab Item 29

3  contained the elements titanium and selenium.

4  Q    And then step three was the refractive index, which we

5  already talked about when we showed the chart with the three

6  different colors on it; correct?

7  A    That's correct.

8  Q    And your conclusion on that?

9  A    That they were consistent in refractive index.

10 Q    Thank you.

11          **MR. PRINCIPE:**  I have no additional questions, Your

12 Honor.

13          **THE COURT:**  Any cross?

14          **MR. BRYSON:**  No questions, Your Honor.

15          **THE COURT:**  All right.  You may step down, sir.  If

16 you would put your mask back on, please.

17          **MR. PRINCIPE:**  May Mr. Gurdziel be released, Your

18 Honor?

19          **MR. BRYSON:**  No objection.

20          **THE COURT:**  You are free to leave.  Thank you.

21      (At 11:36 a.m., witness excused.)

22          **MR. PRINCIPE:**  Your Honor, the Government next calls

23 Allyson Anderson.

24 **ALLYSON ANDERSON,** GOVERNMENT'S WITNESS, being first duly

25 affirmed, at 11:36 a.m. testified as follows:

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1          **THE COURT:**  If you would remove your mask so we can

2    see and hear you and make sure the microphone is directed

3    toward your mouth.

4          Please proceed.

5                       DIRECT EXAMINATION

6    **BY MR. PRINCIPE**

7    Q    Would you state your name.

8    A    Allyson Anderson.

9    Q    And who do you work for?

10   A    I work for the Durham Police Department.

11   Q    How long have you worked for the Durham Police Department?

12   A    I started in 2018.

13   Q    And what position do you have there?

14   A    I'm the technical lead of the firearms and toolmark

15   section.

16   Q    And how many years in total do you have in law

17   enforcement?

18   A    I started my career in 2010 with the Winston-Salem Police

19   Department.

20   Q    And have you always done the same kind of work for law

21   enforcement?

22   A    It's all been under the scope of forensics.  I was a

23   forensic service technician when I got hired in 2010, and then

24   I got promoted to a firearms examiner, and then I moved to the

25   Durham Police Department as their firearms examiner.

Case 1:19-cr-00529-TDS   Document 362   Filed 02/04/22   Page 71 of 214

1  Q    Okay.  And can you tell the jurors a little bit about your

2  training and experience with regard to firearms and toolmark

3  examination?

4  A    Yes, of course.  I was trained by the ATF, which is the

5  Bureau of Alcohol, Tobacco, Firearms.  It is a yearlong

6  training program called the National Firearms Examiner's

7  Training Academy.  It is a very rigorous program.  They bring

8  in a bunch of examiners in order to get a good feel for

9  different perspectives and different learning styles.

10       After that class, then we come back to our home labs and

11  we are still going through about a six- to eight-month period

12  where you're working one on one with a mentor of some sort,

13  somebody who has some season in the field, until you're

14  actually able to be signed off on case work.

15  Q    And how long does that process take in total?

16  A    It's pretty much about a two- to three-year process

17  altogether.

18  Q    Do you also have degrees from universities?

19  A    Yes.  I have a Bachelor of Science in forensics science

20  with a concentration in biology and a minor in chemistry from

21  Virginia Commonwealth University in Richmond.

22  Q    Have you testified in state and federal court as a

23  firearms and toolmark examiner?

24  A    Yes, I have.

25  Q    Is there anything else noteworthy with regard to your

Case 1:19-cr-00529-TDS   Document 362   Filed 02/04/22   Page 72 of 214

1  training and experience with firearms?

2  A    I am certified in firearms identification by AFTE, which

3  is the Association of Firearm and Tool Mark Examiners.  It's

4  pretty much the standard for any type of certification within

5  our field.

6  Q    Have you ever visited a place where firearms or ammunition

7  is manufactured or tested?

8  A    Yes.  Actually, that's part of our training when I went

9  through the ATF academy.  We went to multiple different

10 manufacturers, including Ruger, Smith & Wesson, Sig, and then

11 also I have been to manufacturers like Glock and FN.

12      The reason for going to these places is because, in order

13 to really do our job, you need to know the manufacturing

14 processes.  And it is really nice to be able to be in there in

15 the industry in front of people doing the work in order to

16 really be able to apply it to our profession.

17 Q    Have you also attended numerous workshops?

18 A    So every year we have a conference that is, again, an AFTE

19 conference, which is the Association of Firearm and Tool Mark

20 Examiners, and that is our yearly training that we can take

21 part in in order to kind of hone in our skills, find out the

22 new products that are out, and figure out if there is any new

23 information or new styles that we're doing in our profession.

24 So I do that.

25      I have been to every single one of them since I became a

1  firearms examiner, and I also take any type of training that I

2  can that's online right now or any other auxillary training.

3  Q    Did you always know about firearms?

4  A    No, I did not, actually.  This is something that I

5  definitely, in my professional life, came into.  I was not

6  raised around firearms.  This was never anything -- I never

7  owned a firearm growing up.  So this is something I learned

8  mainly in an academic setting.

9  Q    Have you fired firearms before?

10  A    Yes.

11  Q    What kind?

12  A    In my job, obviously, we do fire a lot of firearms.  Every

13  firearm that is seized in the Durham Police Department by the

14  Durham Police Department, we do have to fire -- or test-fire is

15  what we call it.  Also, I did the same thing in Winston-Salem

16  when I worked for the Winston-Salem police.  I fired all the

17  firearms that came through their doors in order to get

18  test-fires.

19        And just during our training, we fired a bunch of

20  firearms, different types, semiautomatic, automatic firearms in

21  order to just get a feel for it and make sure you're familiar

22  with all types of firearms.

23  Q    Do you also have to take proficiency tests as part of your

24  work?

25  A    So even with the Winston-Salem Police Department and also

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1  now with Durham Police Department, I've worked for -- they were

2  both accredited.  Forensics has a different -- has a higher

3  standard that you have to go through for accreditation.

4      Per accreditation standards for these two police

5  departments that I have worked for, you are required to take

6  proficiency tests yearly, which essentially are tests that you

7  purchase from an outside source in order for you to be tested

8  on your skills.  You submit the results and just make sure that

9  your answer is the same that they want you to get in order to

10  make sure you're doing the work like everybody else in the

11  field is doing it.

12  Q    Have you also toured laboratories in multiple different

13  states across the United States?

14  A    Yes.  So it's been really fortunate that I have been able

15  to go to different places, especially with the conferences.  It

16  is always in a different city.  So a lot of times, I am able to

17  go to different labs and tour their facility to kind of see

18  what they have, their equipment and their processes that they

19  are using to do our job in the field.  It helps build you as an

20  examiner and build your lab that you work for as well.

21  Q    So basically you gained additional experience through

22  those tours and visits?

23  A    Yes.  They are not just, you know, for fun.  They are

24  actually a learning experience where you can get a good grasp

25  over, again, what other labs are doing and their equipment that

1  they have.

2            MR. PRINCIPE:  Your Honor, the Government would

3  tender Allyson Anderson as an expert witness in firearm and

4  toolmark analysis, identification, and comparison.

5            MR. FOSTER:  No objection.

6            THE COURT:  She may give her opinions.

7  BY MR. PRINCIPE

8  Q    Let's talk about how you do your work when a request for

9  an examination is performed.  Okay?

10 A    Okay.

11 Q    So when do you first know that there is something that an

12 investigator needs you to do?

13 A    So we are actually given request forms.  They are

14 submitted by the case officer or can be submitted by anybody

15 who needs a request done.  It is a standard request, and that's

16 where we will get issued that, and that's how we know what type

17 of evidence and what type of analysis or examination that they

18 are wanting for this case.

19 Q    And in this particular investigation, were you involved in

20 the -- in doing work related to the investigation of a robbery

21 and homicide on Carlton Crossing Drive in Durham, North

22 Carolina, on April 15, 2018?

23 A    Yes, I was involved.

24 Q    And did you do two different kinds of examinations?

25 A    Yes, I received two different requests at two different

1  times, so that's why I generated two different reports.

2  Q    What kind of examination was the first exam?

3  A    The first exam, I was requested to look at the bullet.

4  There were two bullets that came from the autopsy, and this was

5  in order that the examiner -- or the officer had asked for me

6  to look at it in order to try to determine what caliber they

7  were.  And caliber is essentially the size of the bullet in

8  order to kind of determine what kind of firearm may have fired

9  it.

10 Q    Okay.  And what was the second examination that you were

11 asked to perform?

12 A    The second examination was a lot more comprehensive

13 examination.  It came a little bit later after the incident

14 happened, so they were able to kind of see all the different

15 firearms evidence that was with the case and kind of involved

16 in this case.  So I looked at all the cartridge cases, all the

17 projectiles and a firearm that was related to this case and

18 compared them all together.

19 Q    Let's talk briefly about firearms.  So what is a handgun?

20 A    So a handgun can be one of two different types of

21 firearms.  It could be a semiautomatic pistol or revolver.  A

22 handgun is pretty much designed to be fired from the hand as

23 opposed to a rifle or shotgun that's designed to be fired from

24 the shoulder.  That's the difference between those.

25 Q    And what are some of the main differences or features of a

Case 1:19-cr-00529-TDS  Document 362  Filed 02/04/22  Page 77 of 214

1  revolver versus a semiautomatic handgun?

2  A    So a revolver is kind of that cowboy-style firearm.  It

3  has the revolving cylinder, which is how it gets its name.  And

4  it has different chambers inside the cylinder that you can load

5  in the cartridges, and it spins.  That's -- again, it's fired

6  from the hand, and that's going to be your revolver style.

7      A semiautomatic pistol is going to be one that's actually

8  fed through a magazine.  So there is actually going to be a

9  different part of the firearm that is loaded with the

10 cartridges and then inserted into what's called the magazine

11 well, which is the grip portion of the firearm.

12     It is kind like a PEZ dispenser, if you want to think

13 about it, that when you put the cartridges into the magazine,

14 you insert it into the firearm.  Then the cartridges are fed

15 into the firearm, just like a PEZ dispenser would be, to put it

16 in kind of easier terms to think of.

17     That type of firearm -- the difference between that and

18 the revolver is that when you shoot a semiautomatic pistol, the

19 cartridge cases, which are the brass or the metal part that

20 comes out of the firearm, it actually gets expended out of an

21 opening in the pistol; while a revolver, when the cartridges

22 are fired, the cartridge cases actually are -- stay inside of

23 that -- that cylinder that I spoke about.  So they don't

24 actually spit out any type of cartridge case.

25 Q    With the semiautomatic handgun, how quickly is that shell

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1  casing ejected from the firearm?

2  A    It's pretty much instantaneous.  If you saw it in a slow

3  motion, you would see, you know, all the different components

4  move like they should; but when you are actually firing, it's

5  almost instantaneous.

6  Q    Which type of handgun, revolver versus semiautomatic

7  handgun, is more likely to leave shell casings at a crime

8  scene?

9  A    The one that would be most likely to leave shell casings

10  would be the semiautomatic pistol because it spits out those

11  cartridge cases, like I mentioned.

12  Q    Which type of firearm has a higher capacity in terms of

13  being able to have more ammunition ready to fire at a given

14  point in time?

15  A    So this could be either/or.  It really just depends on the

16  type of firearm.  There are revolvers that are smaller calibers

17  that can fit 12, and then there's some pistols that are larger

18  calibers and they can fit five.  So it really depends on the

19  size of the cartridge, the caliber, and the amount of capacity.

20      The benefit to a semiautomatic pistol would be that you

21  can kind of change the capacity with the size of magazine.  If

22  you had an extended magazine or a longer magazine, you could

23  put more cartridges in there and shoot more from a

24  semiautomatic pistol.  So you have a little bit of I, guess,

25  options for that capacity.

1  Q    And what would have to happen with regard to a revolver

2  for that to leave shell casings at a crime scene?

3  A    So you would actually -- the shooter would have to

4  manually open the cylinder, that spinning cylinder, and eject

5  manually with your hand the cartridge cases.

6       There are types of revolvers that have pins that you can

7  eject pretty quickly, and they kind of all eject at one time.

8  But you would have manually do that, as opposed to a

9  semiautomatic pistol that would shoot out the cartridge case.

10 Q    Would a person with a revolver have to eject them onto the

11 ground?

12 A    Yes, they would have to eject them onto the ground or into

13 their hand or whatever they would need to do.

14 Q    With a semiautomatic firearm, would a person firing that

15 gun be able to catch or recover the shell casing as it came out

16 of the gun when being fired?

17 A    I don't want to say it's impossible, but it would be

18 really to difficult to be able to do at the same time.  It

19 would be very difficult.

20 Q    I'm going to show you now Government's Exhibit 297.  This

21 is the first page of a series of slides.

22      Are you familiar with this document?

23 A    Yes, I am.

24 Q    And are these slides that you have used in the past to

25 discuss firearm and toolmark identification?

1  A     Yes.

2         **MR. PRINCIPE:**  The Government would move Government's

3  Exhibit 297 into evidence.

4         **THE COURT:**  Admitted.

5         **MR. PRINCIPE:**  And permission to publish that?

6         **THE COURT:**  You may.

7  **BY MR. PRINCIPE**

8  Q     So what is this first slide that we're looking at?

9  A     So as I mentioned earlier, I am a firearm and toolmark

10  examiner.  What that means is that we actually look at firearms

11  and tools.  I think it is important for that to be understood

12  because a firearm in our field is actually considered a tool.

13  And this is why.  It's because a tool is any harder object that

14  can impart any type of, I guess -- well, if it comes in

15  contact, it can impart marks or anything onto a softer object.

16        So you got to think, you know, if we want to go to, like,

17  a hammer, if you hit a hammer to wood hard enough, it can make

18  an indention.  If the firearm -- it's all made out of metal for

19  the most part.  Then that can make these marks onto a softer

20  metal, which would be the cartridge case or the bullet.

21        So we kind of consider them as roughly the same thing.

22  They are all tools.  And that's why we're able to link them and

23  kind of group them into the same profession.  So this just

24  gives you the definition of a tool, which is any harder of two

25  objects that comes into forceful contact with each other

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1  resulting in the softer object being marked.

2  Q    Let's move to the next slide.  And what is this slide?

3  A    So this is the result of the tool coming in contact with

4  that softer object.  It would be an actual toolmark, and so,

5  again, it's some type of mark.  It can be different types of

6  marks.  There's two different that are labeled on here.  It's

7  striated and impressed.  So there are different types of marks

8  that can be made.  But it is essentially the softer object that

9  the tool is making a mark on.

10  Q    Let's look at Slide No. 3.

11       What does this slide show?

12  A    So this is kind of looking at what exactly an impressed

13  mark is.  And we deal with both of these in our -- in the

14  firearm world.  And essentially, like, a good example of an

15  impressed mark, as you can see on this slide, is a firing pin

16  impression.

17       So the firing pin is the part of the firearm that will

18  actually hit the primer that's on the cartridge, and that

19  primer will then ignite the powder that's inside.  So that

20  forceful firing pin impression is what we look at, and that's

21  that little dimple that you see that's in that circle.  That's

22  going to be the primer with the firing pin impression.  So it's

23  actually in the name, firing pin impression.

24       The other mark is going to be a toolmark that you can kind

25  of see.  It's like a rounded arc.  That's going to be from an

Case 1:19-cr-00529-TDS   Document 362   Filed 02/04/22   Page 82 of 214

1  actual mechanical tool.

2  Q    Let's look at Slide No. 4.

3       What is this slide showing?

4  A    So these are striated toolmarks.  You can see this is when

5  motion is, like, applied to the mark.  So with impressed marks,

6  you kind of have just the force of something coming on down on

7  it, where striated marks have movement involved in that.  So

8  these are showing the striations that we can look at during our

9  comparison.  The one to the right is a bullet, and you can see

10 that's your land and groove impressions that we look at.

11 Q    Let's look at Slide No. 5.

12      And what is this slide about?

13 A    So in order for us to really be able to compare and look

14 at two different items, we look at different types of

15 characteristics.  We have class characteristics and individual

16 characteristics.  These are class characteristics.  They are

17 features that are determined by the manufacturer in order to

18 make it -- kind of set it apart from something else.

19      And so they are typically measurable, but they are design

20 features.  So, for example, it could be caliber, because if you

21 have a 9mm firearm and a .40 caliber firearm, the manufacturer

22 has decided to make that firearm a 9mm and this firearm to be a

23 .40 caliber.  That's a design feature from the manufacturer.

24 It could be the number of lands and grooves that are in the

25 barrel to have the rifling.  So there can be a lot of different

Case 1:19-cr-00529-TDS   Document 362   Filed 02/04/22   Page 83 of 214

1  class characteristics.

2  Q    Okay.  Let's look at Slide No. 6.

3       And what does Slide No. 6 show?

4  A    So, again, this is kind of going into the example.  As I

5  mentioned, it could be the number of lands and grooves.  So as

6  you can see in the picture, you have land and then groove and

7  then land and then groove, and it is pretty much the negative

8  impression on the bullet that's in the rifling of the barrel.

9  So the barrel is what's made by the manufacturer and determined

10 by the manufacturer, but that number is going to correspond

11 with the fired bullet.

12      Essentially you won't be able to have a barrel that has

13 five lands and grooves make a bullet that has six lands and

14 grooves.  It is just not going to happen.  They are going to

15 mimic each other and be the same.

16 Q    And just so we're clear, what is the image on the

17 left-hand side showing?

18 A    So the left-hand side is going to be kind of a cutout or a

19 cross-section of the inside of a barrel of a firearm.

20 Q    What is the barrel of a firearm?

21 A    So the barrel of a firearm is actually going to be the

22 part that the bullet is expelled out of.  So it's going to be

23 the longer -- the longer cylindrical part of the firearm.

24      The firearm in general, in order to have accuracy, the

25 manufacturers will put rifling inside the barrel.  What that

Case 1:19-cr-00529-TDS   Document 362   Filed 02/04/22   Page 84 of 214

1    does is it puts a spin on the bullet.  So think of it kind of

2    like a football.  And if you throw a football, you want it to

3    have spin.  And if you're a good quarterback, you're actually

4    going to be able to place that football exactly where you want

5    it and as far as you want it, and that's because you've been

6    able to hone in your spin, which makes you more accurate.

7         So it is kind of the same concept for a bullet that's

8    coming out of a barrel.  These grooves are going to be cut

9    inside or formed inside the barrel to give the bullet some spin

10   so it has accuracy for its flight path in order to essentially

11   hit the target that it's aiming for.

12   Q    So the image on the right then is the kind of marks that

13   can be left on a bullet after it travels down a rifle barrel?

14   A    Correct.

15   Q    Let's look at Slide No. 7.

16        What is this showing?

17   A    This is just kind of going back to the manual tools that

18   we were talking about.  This is the screwdriver and a piece of

19   lead sheeting.  And the screwdriver is the harder tool making

20   the impressions or the striations on the softer lead, and you

21   can see the marks as it travels.

22   Q    Let's look at Slide No. 8.

23        What is this slide talking about?

24   A    So individual characteristics are the second type of

25   characteristic that I mentioned.  They are -- kind of be more

1  your more unique characteristics.  During your manufacturing

2  process -- and this is why it's important to visit these

3  manufacturers during our training.  You will have different

4  types of ways that the firearms manufacturers will make the

5  firearms.  And with this, you can have drilling, or you can

6  have polishing, or you can different things that the

7  manufacturer is going to do in order to actually form and

8  create that firearm.

9       So with that, the metal is formed in a way that is unique.

10 That process is kind of the basis for what we use for when a

11 firearm makes marks on a cartridge case or a bullet is that

12 these marks during the manufacturing process are unique.

13      And so that's when they are then imparted onto the firearm

14 components.  They themselves are also unique, which are what

15 these individual characteristics are.

16 Q   Let's look at Slide No. 9.

17      Is that some of the things you've just spoken about, or is

18 this something different?

19 A   Yeah, these are pretty much -- the only other things that

20 they add here is that there can be individual characteristics

21 that are through abuse and use.  That mainly talks more for the

22 mechanical tools like a screwdriver or a hammer, but you can

23 also use and abuse firearms to then kind of alter the marks in

24 the future.

25 Q   Does that mean that a firearm that has been used and

Case 1:19-cr-00529-TDS  Document 362  Filed 02/04/22  Page 86 of 214

1  abused could be different than a brand-new firearm that's the

2  same make and manufacture and model?

3  A    The difference is that you have -- most of the components

4  that we use for firearms examination are housed inside of the

5  actual firearm, so the likelihood is extremely low, but you're

6  still going to have the actual marks that are made by the

7  manufacturer that are there.  And you won't see a huge amount

8  of difference unless somebody has just completely destroyed

9  something.

10 Q    Let's look at Slide No. 10.

11      What is this depicting?

12 A    So this is just another example of some individual

13 characteristics.  This is going to be a knife and then the

14 sharpening process of a knife.  You can actually have -- it

15 will make obviously very unique and individual markings and

16 characteristics on that blade.

17 Q    Let's look at Slide No. 11.

18      What is this showing?

19 A    So this shows the actual use and abuse.  And as you can

20 tell, they are both mechanical tools that are -- that show the

21 use and abuse on it, and that's where you typically see that

22 happening.  And that's going to be those pictures right there.

23 Q    Let's look at Slide No. 12.

24      What does this show?

25 A    So as I mentioned earlier, if you have a bullet that is --

Case 1:19-cr-00529-TDS   Document 362   Filed 02/04/22   Page 87 of 214

1  has five lands and grooves, it is not going to -- a barrel, I'm

2  sorry -- a barrel that has five lands and grooves, it is not

3  going to produce a bullet that has six lands and grooves.

4      So this is a really good diagram, or picture, that shows

5  that you can have differences in class that are pretty much not

6  going to be from the same firearm because they are so

7  different.  It is a difference of class characteristics.

8      So there's two different differences -- main differences

9  that you can see in these photos.  First is going to be your

10 direction of twist.  You see the yellow arrow that points to

11 the direction.  So we actually look at the bullets and can tell

12 the direction of twist, which is whichever direction that the

13 spin is going to be placed on that bullet.

14      So a right bullet can't come out of a left twist gun, and

15 a left twist bullet can't come out of a right twist gun.  Also,

16 the diameters of these bullets are different, which would mean

17 the caliber is going to be different.  So the size of the

18 bullet, which is kind of synonymous with caliber, will also be

19 different.

20 Q   Let's look at the next slide, Slide 13.

21     What does this show?

22 A   So this is the type of equipment that we use in our

23 examination.  This is a comparison microscope.  The microscope

24 is essentially two microscopes that are independent of each

25 other, but they are linked together by what's called an optical

1  bridge so that when you look at it, you can compare two items
2  side by side for comparison.
3      And the next picture shows that side-by-side comparison.
4  You can see the line going through the middle, which is our
5  line of demarcation that has the two pictures or the two images
6  as you are looking at them side by side.
7  Q   And what does this next slide show?
8  A   So these are our range of conclusions.  We can have three
9  different conclusions that we can make as firearms examiners.
10  They can be an identification, an inconclusive, or an
11  elimination.
12  Q   Let's look at the next slide.
13      So what is an identification?
14  A   An identification is when the examiner looks at two items
15  and they have commonalities in their class characteristics.
16  So, again, like I mentioned, you've got a five-right barrel
17  making a five-right bullet, for example.  So you have -- the
18  class characteristics are in agreement, but then you also have
19  those individual characteristics.  When comparing them on a
20  comparison microscope, you're able to see those individual
21  characteristics also having good pattern correspondence in
22  order to show that the reproducibility of the marks is likely
23  that these were fired from the same firearm.
24  Q   Next slide.
25      What does this slide show?

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1  A    So this is showing more of those comparison photos.  You

2  can see the side-by-side comparison, and you can see the

3  striations that the examiner has lined up in this photo in

4  order to show the striations, as they move across the page and

5  across the photo, how they are corresponding.

6  Q    Look at the next slide.

7       What is an inconclusive result?

8  A    So inconclusive is also a result that we get a lot in our

9  field, and the reason for that is that sometimes, especially

10 with bullets, these bullets go through a lot of different

11 substrates after they have been fired from the barrel.  And so

12 the different substrates can damage the bullets, can do -- you

13 know, can break the bullets apart where you may not even have

14 the full bullet, or then they can go through another harder

15 surface to make marks onto them from another area.  So if it

16 goes through a wall, that could then make marks on the bullet

17 that are not from the actual firearm barrel.

18      So the thing with inconclusive is we're looking at them

19 and they do have similar class characteristics; so, again, they

20 may have the same amount of lands and grooves or they may have

21 the same direction of twist, and it may be the same caliber,

22 but the actual individual characteristics are either not

23 reproducing well and there is not enough for a comparison, or

24 there's not enough positive agreement when you look at it for

25 the comparison to be able to go to an identification.  So

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1  you're kind of just a little unsure on if this came from that

2  firearm or not.

3  Q    Let's look at the next slide.

4       What does this show?

5  A    This shows an inconclusive in a single photograph.  You

6  can kind of see those brighter lines at the bottom how those

7  look kind of nice, but you really don't have a lot of good

8  detail anywhere else.  It's very porous and not a lot of those

9  nice striations that you saw in the other photographs.

10      So this is just something that happens that when you just

11 don't have enough good detail on the evidence, as an examiner,

12 you don't want to make a poor call, so you will go with an

13 inconclusive.

14 Q    So you make that determination as the examiner?

15 A    Yes.  Due to our training and experience, we're able to

16 make that correlation and that determination on the conclusion.

17 Q    Is your work ever peer-reviewed or reviewed by somebody

18 else?

19 A    Yes, every single bit of our work is peer-reviewed.

20 Q    And who does that?

21 A    Another qualified examiner.

22 Q    And in your work in this case, did somebody do that for

23 your work in this case?

24 A    Yes.

25 Q    Let's look at the next slide.

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1      And what is a conclusion of elimination?

2  A    So we've touched on this multiple times.  It is when

3  you're either looking at class characteristics that are not the

4  same -- so I am going to go back to my same example, the

5  five-twist barrel cannot make a six-twist bullet.  That would

6  be an easy elimination just because, again, it can't happen.

7      Now, you can have eliminations that are just a

8  disagreement of individual characteristics, and that's mainly

9  when you have a good reproducing sample.  So if you have --

10 you're looking at other, let's just say bullets, and the

11 bullets -- you have a few, three, and you can tell that these

12 three bullets came from the same firearm because they have

13 reproducing marks on all the three bullets, but then you have

14 another bullet that is introduced into it and it is not

15 producing those marks the same, you can actually still say that

16 that firearm -- that bullet was not fired from the same group

17 as this firearm -- or these bullets because the marks are not

18 reproducing correctly.

19 Q    Let's look at the next slide.

20     So what does this photo show?

21 A    So this is a photograph of an elimination.  So as you can

22 tell, it is kind of -- a circle is on one side, which is that

23 firing pin impression, and then the other side is more of an

24 oval firing pin impression with a box around it.  So it is kind

25 of that same, you know, I guess saying you can't make a round

Case 1:19-cr-00529-TDS   Document 362   Filed 02/04/22   Page 92 of 214

1  hole with a square peg.  It is the same concept here.  Your

2  shapes have to correspond.

3         So that would be a good elimination of class

4  characteristics that the shapes are not the same.

5  Q    Let's look at the next slide.

6         What is this showing?

7  A    This is another -- showing another elimination.  This is a

8  mechanical tool.  So you have a crowbar where it has two prongs

9  and then the toolmark, which is a linear consistent mark.  And,

10  again, you just wouldn't be able to make that same mark -- with

11  the two-prong crowbar, make that long linear mark.

12  Q    So within your field of firearm and toolmark examination,

13  you typically will reach a conclusion of identification,

14  inconclusive, or elimination; is that right?

15  A    That is correct.

16  Q    When you reach those conclusions, are those just your

17  opinions based on your training and experience?

18  A    Yes, that is correct.

19  Q    Let's look at the last slide.

20         What does this slide show?

21  A    So this is the basis of firearm and toolmark

22  examination -- or identification.  There are some foundations

23  that we kind go off of in our field, the first one being

24  standard of identification.

25         In order to go through your training, you will look at a

Case 1:19-cr-00529-TDS   Document 362   Filed 02/04/22   Page 93 of 214

1  bunch of items that you know were fired from the same firearm.

2  That gives you that threshold of what two items that should

3  look the same or look similar should look like.  It starts to

4  build your threshold.  So these were fired from the same

5  firearm.

6       Well, then you start to look at things that you know were

7  not fired from the same firearm.  Potentially, they could be

8  the same make and model of the firearm, but they are not the

9  same firearm.  And by looking at things that you know were not

10 fired from the same firearm and things that you know were fired

11 from the same firearm, you start to build a good threshold as

12 an examiner.

13      And by looking at the surface contours and the peaks and

14 valleys of all these marks that are made, whether they are

15 striated or impressed, that's how you're able to build your

16 ability to say whether or not something is an identification or

17 an elimination.

18 Q   Okay.  Let's pause for just a second.  I want to shift

19 gears and discuss the first examination that you did, the

20 caliber examination.

21      But before we do that, let me show you Government's

22 Exhibit 9 -- I'm sorry, 298.

23      What does this exhibit show?

24 A   So this is another good exhibit that shows a difference of

25 caliber.  And kind of how I mentioned earlier, caliber kind of

1  is synonymous with size.  So you can tell the .45 ACP, which

2  means automatic Colt pistol, is larger, then as it goes down

3  the line to the .380 ACP.

4       So, again, different firearm manufacturers are going to

5  determine these calibers for the firearm that they are

6  producing and the firearm that they are manufacturing.  So the

7  different sizes of the cartridge will obviously have to kind of

8  correspond with the actual firearm.  So as you can tell, there

9  is different types.

10  Q   Can I stop you for just a second?

11          **MR. PRINCIPE:**  Your Honor, may I move Government's

12  Exhibit 298 into evidence and publish that?

13          **THE COURT:**  It's admitted.  You may.

14  **BY MR. PRINCIPE**

15  Q   Okay.  Can you continue?

16  A   Yes.  So I was just going to say, as you can tell on the

17  bottom, there's different verbiage or different numbers that

18  will kind of correspond with the different sizes of calibers.

19  And that's just -- this is just a snapshot of all the different

20  calibers.  There are tons of calibers that are within the

21  world, and this is just a small snippet of a few.

22  Q   What are some of the most common calibers for handguns?

23  A   9mm I would say would be the most common, followed by .40

24  Smith & Wesson, and .45 are your main three calibers.

25  Q   And what is a caliber family?

1 A    So when we look at caliber, again, we're looking at size.

2 So when you measure the diameter of the bullet, which is what

3 you're actually measuring when you deal with caliber because

4 the bullet is what actually travels down the barrel.  So that's

5 what you need to care about, what size the bullet is.  That

6 diameter is -- can be used in multiple different types of

7 cartridges.

8      So with here that we're looking at, technically the last

9 two, a 9mm and a .380, they are the same diameter.  The length

10 is a little bit different, and the physical characteristics and

11 the features that are within the design of the cartridges are

12 different, but the diameter is roughly the same.  So when we

13 talk about caliber families, they are going to be families in

14 which multiple calibers can fall within.

15 Q    Let's -- I'm going to show you now Government's

16 Exhibit 299.

17      Do you recognize what that document is?

18 A    Yes, I do.

19 Q    And what is that document?

20 A    That is my first report that I made for this case.

21      **MR. PRINCIPE:**  And if we can zoom in on the top half

22 of the page.

23 **BY MR. PRINCIPE**

24 Q    How do you know that this report pertains to this

25 investigation?

1  A    Because the case number is the number that is assigned to
2  this investigation.
3  Q    And what items were submitted as part of that examination?
4  A    I was given two different items.  It was Item 110 and Item
5  111.
6  Q    And what type of examination did you perform at that time?
7  A    This was the bullet caliber determination where I tried to
8  figure out what caliber that this bullet was and any other
9  physical features that I could look at to find out any other
10 information for the investigators.
11       **MR. PRINCIPE:**  The Government would move Government's
12 Exhibit 299 into evidence.
13       **THE COURT:**  Admitted.
14       **MR. PRINCIPE:**  Permission to publish that?
15       **THE COURT:**  You may.
16       **MR. PRINCIPE:**  If we could just scroll through the
17 pages briefly.  Let's go to page 3.
18 **BY MR. PRINCIPE**
19 Q    What is that showing?
20 A    Page 3 shows -- anytime I do an examination, before I
21 start actually comparing anything, I want to look at each item
22 of evidence independently.  And this is important to me because
23 I think that looking at each item independently gives you a
24 more comprehensive feel of each item of evidence before you
25 start getting into the actual comparison of different items.

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1      So here I will actually put down some design features that

2  I see, the make -- or not the make.  I'm sorry -- the material

3  of which -- that this item is made out of.  So for bullets,

4  they can be made out of many different types of materials.

5  They can be all lead; they can have a lead core but have a

6  copper jacket; they can have a nickel-plated jacket; they can

7  actually be formed and drilled out of a single piece of metal;

8  and they also can be formed by a compressed metal.

9      So there is a lot of options out there.  So you want to

10  make sure you're looking at the material that this item is made

11  out of.

12      I also took measurements for the diameter.  I weighed the

13  item.  And then I drew a little diagram because I think it's

14  important to remember for instances like this, where I do come

15  to court, what the item looked like when I first received it.

16  And a picture can show that for sure.  But this is in my notes

17  where I don't have to embed a picture and I can just draw what

18  I saw and kind of annotate it.

19  Q    Okay.  And what item number does this page correspond to?

20  A    This is 110.

21          **MR. PRINCIPE:**  If you will move to the next page.

22  **BY MR. PRINCIPE**

23  Q    What item number does this page correspond to?

24  A    This is 111.

25  Q    And you also did a diagram for that item?

Case 1:19-cr-00529-TDS   Document 362   Filed 02/04/22   Page 98 of 214

1  A    Absolutely.  I did the whole -- all the information at the

2  top, and then I drew the diagram for this one.

3  Q    And those are the two items that you looked at for the

4  caliber determination; correct?

5  A    Yes, that is correct.

6  Q    I'm showing you what's already in evidence, Government's

7  Exhibit 262.  Just wait a second.

8       So Government's Exhibit 262, and do you recognize the

9  writing on that -- well, not do you recognize the writing, but

10 is that number associated with your investigation and the item

11 you looked at?

12 A    Yes, that is correct.

13 Q    I will zoom out a little bit.  Does it also have a Durham

14 Police Department barcode on it?

15 A    Yes, it does.

16 Q    And it has information and writing on the back.  Do you

17 recognize that?

18 A    Yes.  That's my writing.

19 Q    And so you made these initials here?

20 A    Yes, I did.

21 Q    AA for Allyson Anderson?

22 A    That's correct.

23 Q    And why did you write on there where piece of tape is?

24 A    Because that just shows that I resealed package and that

25 was the date that I resealed the package back in order to

1  submit it back to property.

2  Q    So you did that on August 12, 2019?

3  A    Yes.

4  Q    Does that correspond to the time that you did this

5  examination?

6  A    It does.

7  Q    I'm going to open up Government's Exhibit 262.

8       What is this that just came out of that larger envelope?

9  A    That's what we call the inner package.  It is holding some

10 type of evidence, but it is the inner packaging inside of the

11 larger package.

12 Q    It's got a barcode and label on there; is that correct?

13 A    That is correct.

14 Q    And other information on the back of it?

15 A    Yes, that's correct.

16 Q    Are those your initials there as well?

17 A    Yes, they are.

18 Q    I am going to open that envelope.

19      Is there a piece of paper in there?

20 A    Yes.

21 Q    And an object?

22 A    Yes, that's the lead core.

23 Q    I'm showing you what's already in evidence, Government's

24 Exhibit 263.

25      Is that the same file number and information and item

1  number 111 pertaining to this case?

2  A    Yes, it is.

3  Q    Is Item 111 the other object that you examined as part of

4  this caliber determination?

5  A    Yes, it was.

6  Q    I am going to open up Government's Exhibit 263.  There is

7  another envelope inside of that larger envelope; correct?

8  A    Correct.

9  Q    Are those your initials on the inner envelope?

10 A    Yes, they are.

11 Q    I am going to open up that smaller envelope.

12      There is another card that was inside?

13 A    Yes.

14 Q    And a metal object?

15 A    Yes, that's the bullet jacket.

16 Q    Let's go back to Government's Exhibit 299.

17      So what results or conclusions were you able to reach

18 during this examination?

19 A    So due to the measuring of the diameter of the jacket

20 piece, that's -- was the item that had that shape still intact,

21 the core was essentially not useful to me just because it was

22 so damaged.

23      The jacket -- I was able to get the diameter of that

24 jacket piece, both the jacket core -- I'm sorry -- the jacket

25 in general, and then weigh them both together.  So with the

1  weight and the diameter and then also looking at the rifling

2  features that I talked about, those lands and grooves on the

3  side of the jacket, I was able to determine that we were

4  looking at either a .40 caliber Smith & Wesson bullet or a 10mm

5  bullet.  And then also the rifling was polygonal, and there was

6  a list of firearms that may have fired that bullet.

7  Q    And what were the list of firearms that could have fired

8  that bullet?

9  A    So the list was it could have been a Glock, an H&K, IMI,

10 Kahr, Vector, and then possible others that are unknown to

11 myself.

12 Q    And why might they be unknown to you?

13 A    So what we actually do for this is we enter the design

14 features and the information from our analysis into a database.

15 The database that I used for this case is actually made by the

16 FBI and maintained by the FBI.  So they try to compile as many

17 firearms that they know of into this database and put the

18 information in there.

19     There is always a chance that there is something out there

20 they did not have in the database.  So when we enter them into

21 the database, it kind of compiles a list; but we always like to

22 say that there could be other ones that we don't know of just

23 because they may not be in the database.

24 Q    And with regard to Item 110, paragraph 3, it seems to say

25 it was unsuitable for comparison.  And why was that?

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1   A    That was that lead core that I was talking about, and just

2   due to the damage.  So it appeared to me like the jacket and

3   the core -- it appeared to be a single bullet to begin with and

4   that they separated either inside the body or outside, but most

5   likely inside the body that they separated from each other.

6   And that happens pretty frequently because the jackets are not

7   typically bonded to the cores.  So there is that possibility

8   for separation.

9        So because of that, that lead core which was a very soft

10  metal was damaged, and there was just no rifling information

11  and nothing that I could use for caliber determination other

12  than utilizing it as part of the weight.

13  Q    Okay.  I'm going to show you page 5 of your report.

14       And what does this page show?

15            **MR. PRINCIPE:**  If we can zoom in on the top half.

16            **THE WITNESS:**  That is that GRC database that I was

17  talking about.  GRC stands for general rifling characteristics.

18  So, again, those are those design features that we find on the

19  bullets that we can enter into this database in order for them

20  to generate some possible make and models of firearms.  This

21  was the front cover page showing the information that I entered

22  into the system to elicit the results.

23  **BY MR. PRINCIPE**

24  Q    So what were some of the data points you entered?

25  A    I entered that the caliber family was .40.  So that --

Case 1:19-cr-00529-TDS   Document 362   Filed 02/04/22   Page 103 of 214

1  actually there is caliber family.  If I wanted to be specific

2  about the caliber types, I would go to cartridges.  And then I

3  also entered in that it was polygonal rifling and that it was a

4  right twist with six lands and grooves.

5  Q    And then did the database return a number of hits?

6  A    Yes.  It returned, I want to say, nine results.

7  Q    And then if we go to the next page, what does this page

8  show?

9  A    That's the result page.

10 Q    Can you go through the information on the left-hand side?

11 A    So on the left-hand side, you can see the first result

12 shows a 10mm and then the following results are all .40 Smith &

13 Wesson.  This is because, like I said, I put in .40 caliber

14 family, which we talked about could encompass multiple

15 different cartridges -- or multiple different caliber types.

16 So that made it so I was including all different possibilities

17 that it could be and I wasn't limiting my search.

18      And then it shows -- as you follow through the result

19 list, it shows that these were all right twists with six lands

20 and grooves.  And all the measurements for this one is zero to

21 zero, and that's because of the polygonal rifling that it is.

22            **THE COURT:**  Is that a good place to stop?  It's

23 12:30.

24            **MR. PRINCIPE:**  Sure, Your Honor, we can stop there.

25            **THE COURT:**  All right.  Ladies and gentlemen, it is

Case 1:19-cr-00529-TDS  Document 362  Filed 02/04/22  Page 104 of 214

1    time for lunch, so we're going to stop right here.  So please

2    put your notes in your envelopes.  Leave your envelopes in your

3    chairs.  They will be safeguarded in your absence and returned

4    to you when you're back.

5            Now, I'm going to dismiss you for lunch.  Remember

6    all my admonitions, especially my admonition not to discuss any

7    aspect of this case among yourselves or with anyone else.

8    Completely put it out of your mind.  All right.  And I'll ask

9    that you be in Courtroom 3 across the hall, which is your jury

10   room, at 1:45.  So it will give you an hour and maybe 13

11   minutes.  Hopefully that's enough time.

12           As far as I know, we're still on track, and I will

13   give you a better report this afternoon; but it looks like

14   we're still on track, as I indicated yesterday.  All right.  So

15   please enjoy your lunch.

16           Everyone else remain in the courtroom while they're

17   being excused, please.

18       (The jury departed the courtroom at 12:30 p.m.)

19           **THE COURT:**  Give them a moment until I know they are

20   out of the hallway.

21           All the jurors are out of the courtroom.  You may

22   step down off the witness stand, if you wish, ma'am.

23           So any report you need to make to me on any issue?

24           **MR. GREEN:**  Your Honor, I think the parties have

25   largely resolved the question of the text messages and context.

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1  I'm trying to prepare a document to make sure we're in

2  agreement on exactly the items that we agreed to.

3            And then consistent with that conversation, the

4  Government will not introduce evidence of flight, but we do

5  think we have an agreed-upon number of text messages as it

6  relates to specifically to Miss Poole and Mr. Wiley, the

7  subject of the motion in limine.  I will present that document

8  before we get started after lunch just so the Court has it and

9  can kind of understand where we are.  We think it's consistent.

10            **THE COURT:**  All right.  You said "largely."  Is

11  that --

12            **MR. GREEN:**  Yeah, I think we're there, but until

13  the -- it's kind of like the -- until the check is signed, it's

14  not signed.

15            **THE COURT:**  I understand.

16            **MR. GREEN:**  So I think we're there in terms of

17  agreement.

18            **THE COURT:**  Okay.  All right.  How are we doing on

19  progress?

20            **MR. GREEN:**  Doing fine, Your Honor.  I think we're

21  still on track.  Just so you know in terms of forecast, each

22  witness has its own pace.  Ms. Anderson will continue with a

23  pretty detailed analysis as we continue.  Then the next

24  witnesses on the list will go much more rapidly.  They are kind

25  of short witnesses.  As we get past David Cramer, the next

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1    group of witnesses will be relatively short.  And then when we

2    get to Agent Jocys, again they will slow down.  So we may not

3    get to Justin Heinrich today at the current pace, but he was

4    actually pulled over from Friday, as we had previously planned.

5    So I think we're still on pace.

6            **THE COURT:**  All right.  If Mr. Cox testifies, you've

7    alerted his counsel, I take it?

8            **MR. GREEN:**  I have.  And they are going to come by

9    today.  I don't anticipate that we are on pace to have him

10   testify today, but we'll be ready -- he's here, and we'll be

11   ready in case we do have that opportunity to start.

12           **THE COURT:**  Since we're talking about him, he's in

13   custody; correct?

14           **MR. GREEN:**  He is.

15           **THE COURT:**  My presumption is they will bring him in

16   restrained?

17           **MR. GREEN:**  Yep.

18           **THE COURT:**  All right.  Anybody want to be heard on

19   that?

20           **MR. GREEN:**  No, I do not.

21           **MR. BRYSON:**  We do not.

22           **THE COURT:**  All right.  Anything else?

23           **MR. GREEN:**  No, Your Honor.

24           **THE COURT:**  How about from the Defendant?

25           **MR. BRYSON:**  You wanted to talk -- the Court

Case 1:19-cr-00529-TDS  Document 362  Filed 02/04/22  Page 107 of 214

1  indicated the other day that you might at some point want to

2  know about whether or not we intend to call witnesses.  Do

3  you --

4          **THE COURT:**  I'm only interested in the schedule.  And

5  I certainly don't want to ask anything that might affect your

6  strategy or how you're going to proceed.  But I need to have

7  some planning to know whether we'll be finishing Friday or

8  whether we'll be -- where we'll be.  It would be helpful to

9  know that.

10         **MR. BRYSON:**  Your Honor, I would say this.  The

11  decision for us as to whether or not we will be calling any

12  witnesses will depend, in large part, on how Mr. Cox testifies.

13  If he acknowledges what we ask him, there is a strong

14  likelihood that we will not be calling any witnesses.  If it

15  doesn't go that way, there is a likelihood that we would call

16  one, possibly two, and on an extremely remote basis, three

17  witnesses; and if we did that, they would all be very short.

18  It would be surprising to me, even if we had to call three

19  witnesses, that it would take longer than an hour.

20         **THE COURT:**  How long do you think you'll need for

21  closings?  I'm going to assume -- you said you thought the

22  Government might rest by lunchtime.  Is it possible before

23  lunch, or lunch?

24         **MR. GREEN:**  I think lunch is probably a fair --

25         **THE COURT:**  So there is the possibility that if the

1  Defendant did not present any evidence, at 2:00, we'd be -- or

2  1:45, we'd be ready to proceed.  So I will get you proposed

3  jury instructions this afternoon then for you to at least have,

4  not to prejudge any motions.  I just want to have them out

5  there since you've already submitted them.  They are largely

6  what you've submitted.  I made just a few tweaks.  And we can

7  talk about the objections the Defendant had, and I would be

8  glad to hear you on that further.

9          But I don't know whether the -- presumptively, we'll

10 be in position maybe by after lunch to have closings.  I'm just

11 curious as to what you think that's going to require timewise.

12         **MR. BRYSON:**  I try never to argue more than an hour.

13 And it's still a work in progress, but I would say 45 minutes

14 maybe.

15         **THE COURT:**  Okay.

16         **MR. GREEN:**  I think in toto, both the opening and the

17 closing close, rebuttal, again, I think 45 minutes would

18 probably be much further than I would actually --

19         **THE COURT:**  So there is at least a possibility the

20 case could be instructed on Friday, it sounds like?

21         **MR. GREEN:**  Yes.

22         **THE COURT:**  Okay.  We'll see where we are with the

23 time.  The last comment I wanted to make, just a heads-up, is

24 you had some wording on the instruction in the jury

25 instructions on reasonable doubt, and there was a sentence or

Case 1:19-cr-00529-TDS  Document 362  Filed 02/04/22  Page 109 of 214

1  two that I have not normally seen.  I don't know where that

2  originated.

3          The Fourth Circuit has made it very clear that I am

4  not to define reasonable doubt.  Contrary to other circuits

5  where apparently you can, it is reversible error to define

6  reasonable doubt.  So I would simply ask you to look at that

7  language.  If somebody knows where it came from, that would be

8  helpful.  I don't have my draft right in front me, but there

9  was an extra sentence or so that I had not normally seen.  So

10 does anybody know the origin of that?

11          **MR. PRINCIPE:**  We could go back and figure that out.

12 I do know that some of the instructions defense counsel gave to

13 us might have been, what, Fifth Circuit or Eleventh?

14          **MR. FOSTER:**  That's right.  A lot of the ones we

15 submitted were Fifth Circuit.  So that's a likely source of the

16 other sentence.

17          **THE COURT:**  Well, I may have to tweak that then.  And

18 I probably will tell you I am going to tweak that.  My normal

19 instruction reads something like:  The burden is on the

20 Government to prove beyond a reasonable doubt all of the

21 elements of the offense.  The Government does not have to prove

22 beyond all doubt, only reasonable doubt.  A reasonable doubt

23 may arise from the evidence or the lack of evidence.  And I

24 think that's it.

25          **MR. GREEN:**  Yes, Your Honor.

Case 1:19-cr-00529-TDS  Document 362  Filed 02/04/22  Page 110 of 214

1          THE COURT:  Something like that.  That's typically

2   what's instructed here.  If you have any support for more than

3   that, I would be glad to look at it.  But I just advise you

4   about the standard in our circuit, and I have some concern

5   about the language that was submitted.

6          Okay.  And the caution that goes with that is be

7   careful what you argue in closing in terms of defining

8   reasonable doubt.  You can certainly argue the lack of evidence

9   and you can argue reasonable doubt, but just be careful.  I had

10  one closing where a lawyer tried to put a percentage on it, for

11  example.  So I'm not going to prejudge any argument.  I'm just

12  saying keep an eye it.  If you have any questions about it, let

13  me know.

14         All right.  Enjoy your lunch.  We'll see you back

15  then at 1:45.

16      (Proceedings recessed at 12:39 p.m.)

17      (Proceedings called back to order at 1:47 p.m.)

18      (The Defendant was present.)

19         THE COURT:  Okay.  I am going to bring the jury in,

20  unless you have any issues.

21         MR. GREEN:  No, Your Honor.

22         THE COURT:  If you will get the witness and please

23  bring in the jury.

24      (The jury returned to the courtroom.)

25         THE COURT:  Welcome back, ladies and gentlemen.  I

Case 1:19-cr-00529-TDS   Document 362   Filed 02/04/22   Page 111 of 214

1  will give you a moment, if you're taking notes, to get your

2  notepads out.

3             Mr. Principe, you may continue with your examination.

4             I remind you you are still under oath.

5             **MR. PRINCIPE:**  Thank you, Your Honor.

6             If we can pull back up the exhibit we were looking

7  at, Government's Exhibit 299.  And I think we were looking at

8  the last page.

9  **BY MR. PRINCIPE**

10 Q    And what is the information pertaining to that list that

11 you got from the database?  On the left-hand side, it lists the

12 possible cartridge calibers.  What is the information about the

13 manufacturer and model on the right?

14 A    So, yes, on the right, it says the list of manufacturers

15 that have produced firearms that have these same

16 characteristics.

17 Q    So is a Glock Model 20 a model of Glock firearm?

18 A    Yes, it is.

19 Q    Is a Glock 27 a model of Glock firearm?

20 A    Yes, it is.

21 Q    Okay.  Let me show you Government's Exhibit 300.

22      What is that exhibit?

23 A    This picture is showing a .40 caliber Smith & Wesson and a

24 10mm cartridge side by side.

25 Q    Okay.  And previously you said, as a result of your first

1   examination, you determined that the -- one of the -- the

2   jacket was from either a .40 caliber Smith & Wesson or 10mm;

3   correct?

4   A    That is correct.

5   Q    Why did you characterize your conclusion as either one or

6   the other?

7   A    So when the manufacturer or the designer of a certain

8   cartridge is, you know, putting their features together for

9   this particular cartridge, they can take different items from

10  other cartridges in order to kind of make hybrid cartridges

11  essentially.  And so for these two, they actually utilize the

12  same bullet.  It's the same size; it's the same weight;

13  everything is the same with the bullet.

14       As you can tell from the photo, the only difference is the

15  length of the cartridge case.  So you can see that the one on

16  the right is taller, and it's got more room in there for more

17  powder, and essentially it makes more, you know, pow aspect for

18  it; so it has a bigger bang.  The first one is going to be your

19  .40 Smith & Wesson.  It has a smaller cartridge case, but,

20  again, the bullets are the same.

21       So when I'm, you know, looking at a bullet, and strictly

22  just a bullet from a scene, if I don't have anything -- you

23  know, the whole piece put together, there's really no way for

24  me to determine which one it came from.

25       Now, the .40 Smith & Wesson is a more popular cartridge,

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1  but it could still be from either one of them.

2  Q    And that's what this photograph, Government's Exhibit 300,

3  demonstrates?

4  A    Absolutely.

5         MR. PRINCIPE:  Government moves Government's

6  Exhibit 300 into evidence.

7         THE COURT:  Admitted.

8         MR. PRINCIPE:  And permission to publish them?

9         THE COURT:  You may.

10 BY MR. PRINCIPE

11 Q    So the one on the left-hand side with the silver-colored

12 metal, that is which one?

13 A    The one with the silver color is going to be your .40

14 Smith & Wesson, and the one with the gold color to the right is

15 going to be your 10mm, where it's longer and has more room for

16 more powder.

17 Q    Now, at the crime scene at Carlton Crossing Drive, you

18 were not involved in collection of any evidence, were you?

19 A    No, I never went on scene.

20 Q    But after you performed your caliber determination, have

21 you reviewed information related to the shell casings found at

22 that crime scene?

23 A    Yes.  Within passing, I have seen bits and pieces of that.

24 Q    Were any 10mm shell casings found at that crime scene?

25 A    No.  None were submitted to me and none were found.

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1  Q    Were .40 caliber shell casings found at that crime scene?

2  A    Yes, they were.

3  Q    I'm going to show you Government's Exhibit 301.

4       And what is this document a document of?

5  A    This is a list, and it is a few pages long, and it shows

6  the extensive list of the multiple cartridges and types of

7  calibers that can fall within a caliber family.  So it's just

8  an official document that we utilize in order to -- once we get

9  that diameter of the bullet, in order to try to figure out what

10  are our options that would potentially be caliber-wise that

11  fall in that family that we talked about earlier.

12          **MR. PRINCIPE:**  Government moves Government's

13  Exhibit 301 into evidence.

14          **THE COURT:**  Admitted.

15          **MR. PRINCIPE:**  Permission to publish?

16          **THE COURT:**  Yes.

17  **BY MR. PRINCIPE**

18  Q    So this is a standard reference document that you use in

19  doing your firearms and toolmark examinations?

20  A    Yes, that's correct.

21  Q    Okay.

22          **MR. PRINCIPE:**  If we will zoom in a little bit --

23  actually, let's go to page 2 and zoom in at the bottom third of

24  the page, the full third of the page.

25

Case 1:19-cr-00529-TDS   Document 362   Filed 02/04/22   Page 115 of 214

BY MR. PRINCIPE

Q    So what are the numbers on the left-hand side of those lists?

A    So if you can see, you see the .40, that's kind of out by itself.  That's that caliber family .40.  And, again, that's why when I did my GRC search, I had .40 in there and not 10 because .40 is the actual family that it's designated.  And then to the right of the .40 are the lists of all the cartridges that fall within that family.

Q    So there is actually many cartridges within the .40 caliber family that you eliminated as not being possibly related to the bullet, Item 110 or Item 111?

A    Correct, because what you're looking at with the family is the diameter only.  Weight is different and other design features are different, and I was able to eliminate those due to the fact that the diameter and the features and weight put it just within the family for the .40 Smith & Wesson and the 10mm.

Q    Thank you.  I'm going to show you now Government's Exhibit 302.

Now, this is a video clip.  Are you familiar with this video clip?

A    Yes, I am.

Q    What is this a video clip of?

A    This is a video clip of a cycling of a firearm.

1 Q    And would that be helpful in illustrating the testimony

2 you have given as far as how a firearm might leave toolmarks on

3 a bullet or shell casing?

4 A    I think it would be very helpful if I could walk through

5 after it was published, yes.

6            **MR. PRINCIPE:**  Government would move Government's

7 Exhibit 302 into evidence.

8            **THE COURT:**  Admitted.

9            **MR. PRINCIPE:**  Permission to publish?

10           **THE COURT:**  You may.

11           **MR. PRINCIPE:**  Let's play that one time.

12      (Government's Exhibit No. 302 was played.)

13           **MR. PRINCIPE:**  So if we can bring that back to the

14 beginning.

15 **BY MR. PRINCIPE**

16 Q    So can you describe some of the components of a

17 semiautomatic firearm like the one shown in this video?

18 A    Yes, absolutely.

19      So for this particular firearm, we do have -- it's going

20 to be a magazine-fed firearm.  So as you can tell, the

21 cartridges that are in that grip or the magazine well are, like

22 I mentioned earlier, the PEZ dispenser, how they are inserted

23 in.

24      What's going to happen is the first -- when the magazine

25 is inserted, first you need to chamber a cartridge.  To chamber

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1  a cartridge is to put the cartridge in place to be fired, which

2  is where that one that's kind of out by its side -- that

3  cartridge is.  So you want to have it in the position that it

4  needs to be and not in the magazine anymore in order to have it

5  in that position for the firing pin to strike it.

6  Q    Okay.  And are the cartridges the yellow objects?

7  A    Yes, the cartridges are the yellow.

8  Q    And what is the gray thing that sticks off the right-hand

9  side of the gun?

10 A    That's going to be the hammer.  Not all firearms -- not

11 all semiautomatic pistols have hammers that are exposed like

12 that.  So they can be a little different depending on the make

13 and model.

14 Q    And where is the firing pin located within that diagram?

15 A    So the firing pin, if you see towards the right -- kind of

16 to the right of the cartridge that's alone -- correct.  So the

17 silver part in the middle is going to be the firing pin.  There

18 is a lot of springs and housings.  The firing pin is going to

19 be the actual tip that kind of comes very close in contact with

20 that cartridge right there.

21 Q    Does the firing pin kind of poke the end of the bullet?

22 A    Yes.  So when the hammer is drawn backwards, it will

23 actually what they call cock the firing pin, and that's pulling

24 the spring to the rear, causing spring tension.

25      When the hammer then is released by pulling the trigger,

Case 1:19-cr-00529-TDS   Document 362   Filed 02/04/22   Page 118 of 214

1  that's going to release the spring tension, which allows the

2  firing pin to fall down the channel and strike the firing

3  pin -- or the primer on the cartridge.

4          **MR. PRINCIPE:**  Let's play the video one more time.

5          (Government's Exhibit No. 302 was played.)

6  **BY MR. PRINCIPE**

7  Q    What kind of toolmark can be left on the cartridge when

8  the firing pin strikes the cartridge?

9  A    So when the firing pin strikes the cartridge, first you

10 are going to have the firing pin impression that strikes the

11 primer, which is the smaller circle in the headstamp.  Then

12 what you also can have, depending on the type of firearm, you

13 may have the opening of the firing pin, because that opening

14 has to be channeled out in the machining process of the

15 firearm.  What -- that opening is what we kind of sometimes

16 call an aperture, because the word "aperture" actually means

17 opening.  If anybody does cameras, you change the aperture

18 size.  It is an opening.  So it is the same thing with

19 firearms; it's the opening that the firing pin will come out

20 of.

21         That aperture can also impress a mark onto the headstamp

22 of the cartridge case in addition to also breech face marks,

23 which is the area around the aperture on the firearm.

24 Q    Now, we talked about rifling before; is that right?

25 A    Yes.

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1  Q    So where is the rifling in this diagram?

2  A    So once the firing pin hits the primer -- the primer has a

3  lot of volatile chemicals inside that make a spark.  They

4  ignite really quickly.  With that quick spark, then it's going

5  to ignite the rest of the gun powder that's inside the

6  cartridge case.  That gun powder is then going to ignite and

7  build up pressure.

8       Once the pressure is built up, that's going to cause the

9  bullet to be expelled from the barrel.  As the bullet travels

10 down the barrel, that's when those rifling marks are imparted

11 on the bullet during that traveling.

12 Q    Does that red oval shape indicate the area of the barrel

13 where rifling may be on a firearm?

14 A    Yes, it does.

15 Q    And, lastly --

16         MR. PRINCIPE:  Play the video one more time.

17      (Government's Exhibit No. 302 played.)

18 BY MR. PRINCIPE

19 Q    So what's happening at that moment where the video is

20 paused?

21 A    So due to that built-up pressure that happens in the

22 chamber, once the bullet is expelled out the barrel, it also

23 causes the slide, which is that moving part up top, to go back

24 to the rear.

25      When that happens, you see the barrel doesn't move.  The

Case 1:19-cr-00529-TDS   Document 362   Filed 02/04/22   Page 120 of 214

1   barrel stays stationary for most the part.  The slide will move

2   back to the rear.  And it actually has a claw -- it is called

3   an extractor -- that keeps that rim of the cartridge case in

4   place.

5       So when the slide moves back to the rear, it's actually

6   going to pull that cartridge case out of the chamber and then

7   you're going to have an ejector, which is -- kind of sticks out

8   like this, which will then -- once it gets to that point, it

9   kicks it out the ejection port.  So that's what's happening

10  right here.

11  Q    Can that process also leave a toolmark on the shell casing

12  that's ejected?

13  A    Yes.  You can get marks from the ejector, you can get

14  marks from the extractor, and also from inside of the chamber

15  wall.

16  Q    And that entire cycling process, as we've watched a few

17  times, how quickly can that cycle occur?

18  A    So this is definitely slow motion.  So it happens very

19  quickly; like I mentioned earlier, almost instantaneously.

20  Q    I'm going to show you Government's Exhibit 303.

21      And what is this a diagram of?

22  A    So this is another one those of diagrams that has a cut

23  section of two different types of rifling.

24  Q    What are those two different types of rifling called?

25  A    It's conventional and polygonal.

Case 1:19-cr-00529-TDS   Document 362   Filed 02/04/22   Page 121 of 214

1          MR. PRINCIPE:  Government would move Government's

2    Exhibit 303 into evidence.

3          THE COURT:  Admitted.

4          MR. PRINCIPE:  Permission to publish?

5          THE COURT:  You may.

6    BY MR. PRINCIPE

7    Q    What is the type on the left-hand side of the screen?

8    A    So the left-hand is going to be your conventional rifling.

9    Q    And on the right-hand side?

10   A    Is your polygonal rifling.

11   Q    What are you looking for on a bullet to determine if the

12   firearm that fired the bullet had conventional or polygonal

13   rifling?

14   A    So during the examination, when I'm looking at that

15   bullet, either the jacket or the full bullet, when I'm looking

16   at it independently and drawing up my picture, making all my

17   notes, what I'm going to do is look at the rifling.

18        There's -- like I mentioned here, and you can see in the

19   picture, there's two different types.  The conventional is cut

20   rifling.  Kind of easy to remember, C for "conventional," C for

21   "cut."  And you can see in the picture, because that's the

22   left-hand side -- now, that one is going to be where during the

23   manufacturing process, a tool will be used to go into the

24   barrel and cut grooves in the barrel.

25        For polygonal it's a little bit different.  It is formed

Case 1:19-cr-00529-TDS   Document 362   Filed 02/04/22   Page 122 of 214

1  rifling.  So you have polygonal that's formed.  What will

2  happen for that one is a mandrel, is what the piece called,

3  will be placed inside the barrel, and it is hammer-forged.  So

4  all these hammers will beat on the outside of the barrel to

5  form and mold the metal around a -- pretty much a template.

6      So you have two different types of rifling.  With that --

7  it's pretty obvious when you look at a bullet which one it is

8  because of the way that you can tell in the picture.  One is

9  very defined and one is just kind of wavy.

10     So what I do, you know, or anybody -- you look at the

11 bullet.  A good way and kind of an easy way that I've found to

12 figure out whether or not it's conventional or polygonal is

13 actually you kind of run your fingernail around the

14 circumference of the bullet, and if it catches, it is cut,

15 because it actually has something to catch on to.  There's

16 something cut there.  If it just kind of flows around and it

17 just moves back around the circumference, then it's actually

18 going to be that formed, more wavy rifling.

19     So those are two different design features that, depending

20 on the manufacturer, they will utilize to actually make their

21 barrels.  This is important because, as you saw earlier in the

22 GRC when I said I put in 00 right before the break, that's

23 because with polygonal rifling, you don't have defined

24 shoulders to measure from one point to point -- from like Point

25 A to Point B.  And when you don't have those defined shoulders,

Case 1:19-cr-00529-TDS   Document 362   Filed 02/04/22   Page 123 of 214

1  you can't get a measurement, so they just say zero to zero

2  because it's not consistent enough.

3  Q    Okay.  Let's discuss the second examination you did as

4  part of the investigation.

5       I'm showing you now Government's Exhibit 304.

6       And do you recognize that document?

7  A    Yes, I do.

8  Q    And that document is close to 81 pages; is that right?

9  A    Yes, it is.

10 Q    Okay.  And this was the more extensive examination that

11 you performed?

12 A    Yes, it was just more lengthy with more evidence.

13        **MR. PRINCIPE:**  Government moves Government's

14 Exhibit 304 into evidence.

15        **THE COURT:**  Admitted.

16        **MR. PRINCIPE:**  Permission to publish?

17        **THE COURT:**  You may.

18        **MR. PRINCIPE:**  If we can zoom in on just the top

19 third.

20 **BY MR. PRINCIPE**

21 Q    So this has the same incident number at the top; correct?

22 A    Yes, it does.

23 Q    The date of your report was July 17, 2019; is that

24 correct?

25 A    That is correct.

1  Q    Let's talk about the items submitted.

2       What does that mean?

3  A    So when the request is made from the investigator or the

4  officer, they will actually denote which items they want us to

5  examine.  These were the items that they wanted us to examine

6  for this case.  So those were the ones that I signed out of

7  property and opened and did my examination on.

8  Q    Okay.  What are the first two items on that list?

9  A    The first two items are -- one of them is Item 40, which

10 is a 9mm FN semiautomatic pistol, and 39 is an FN magazine.

11 Q    And what is the model of the pistol, Item No. 40?

12 A    The model is FNS9.

13 Q    Now, are those item numbers the Durham Police Department

14 item numbers?

15 A    Yes, they are.

16 Q    Do those typically correspond to a Property and Evidence

17 Voucher document that's maintained as part of the investigative

18 case file?

19 A    Yes.  Everything is digital, so it will correspond with

20 the barcode and everything in there.

21 Q    Now, when you're taking evidence out to perform your

22 examination, do you generally have a lot of knowledge about an

23 investigation or a little bit of knowledge about an

24 investigation?

25 A    I actually have very little knowledge about the

1  investigation due to the fact that I don't actually go on scene
2  and I stay in the lab.
3  Q    Okay.  What did you do when you take a piece of evidence
4  out of the property to use for your examination?
5  A    So once we sign it out of property, we will start our
6  investigation.  And as I mentioned earlier, I will actually
7  independently look at every item of evidence and write up a
8  worksheet on each item prior to doing any analysis or
9  comparison.
10 Q    And can you slowly go through each of the items that you
11 examined as part of this examination --
12 A    Yes, I can.
13 Q    -- starting with Item 5.
14 A    Can I refer to my notes?
15 Q    Either your notes or the screen, whatever is easier for
16 you.
17 A    I can do it on here, then.
18      Item 5 is a Winchester, caliber 9mm, fired cartridge case.
19      Item 6 is a Starline, caliber 9mm, fired cartridge case.
20      Item 7 is a Winchester, caliber 9mm, fired cartridge case.
21      Item 8 is a Blaser, caliber 9mm, fired cartridge case.
22      Item 9 is a Federal, caliber 9mm, fired cartridge case.
23      Item 10 is a PMC, caliber 9mm, fired cartridge case.
24      Item 11 is a Blaser, caliber 9mm, fired cartridge case.
25      Item 12 is a Speer, caliber 9mm, fired cartridge case.

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1      Item 13 is a Winchester, caliber 9mm, fired cartridge
2 case.
3      Item 14 is an HRTRS, caliber 9mm, fired cartridge case.
4      Item 15 is a PPU, caliber 9mm, fired cartridge case.
5      Item 16 is an S&B, caliber 9mm, fired cartridge case.
6      Item 17 is a Blaser, caliber 9mm, fired cartridge case.
7      Item 18 is a Federal, caliber 9mm, fired cartridge case.
8      Item 19 is a GFL, caliber 9mm, fired cartridge case.
9      Item 20 is a Winchester, caliber 9mm, fired cartridge
10 case.
11     Item 21 is a Winchester, caliber 9mm, fired cartridge
12 case.
13     Item 22 is a Winchester, caliber 9mm, fired cartridge
14 case.
15     Item 23 is a Winchester, caliber .40 Smith & Wesson, fired
16 cartridge case.
17     Item 24 is a Winchester .40 Smith & Wesson fired case.
18     Item 25 is a Winchester, caliber .40 Smith & Wesson, fired
19 cartridge case.
20     Item 26 is a Winchester, caliber .40 Smith & Wesson, fired
21 cartridge case.
22     Item 27 is a Winchester, caliber .45 auto, fired cartridge
23 case.
24     Item 28 is a Winchester, caliber .45, fired cartridge
25 case.

Case 1:19-cr-00529-TDS  Document 362  Filed 02/04/22  Page 127 of 214

1       29 is a Federal, caliber 9mm, unfired cartridge.

2       Item 30 is a Speer, caliber 9mm, unfired cartridge.

3       Item 31 is a Remington, caliber 9mm, unfired cartridge.

4       Item 32 is a Winchester, caliber 9mm, fired cartridge

5  case.

6       Item 33 is a Winchester, caliber 9mm, fired cartridge

7  case.

8       Item 34 is a Winchester, caliber 9mm, fired cartridge

9  case.

10      Item 42 is one fired jacketed bullet.

11      Item 43 is one fired jacketed bullet.

12      Item 44 are two copper and lead fired bullet jacket

13  fragments.

14      Item 51 is one lead core.

15      Item 52 is one fired jacket.

16      Item 53 is one fired jacket -- bullet.  The first one was

17  a jacketed bullet too.  I'm sorry.

18      52 is also a jacketed bullet.

19      53, jacketed bullet.

20      54, one fired jacketed bullet.

21      54, one fired jacketed bullet.

22      63, one fired jacketed bullet.

23      79, one fired jacketed bullet.

24      102, one partial fired bullet jacket.

25      103 is one partial fired bullet jacket.

Case 1:19-cr-00529-TDS   Document 362   Filed 02/04/22   Page 128 of 214

1          104 is one lead core.

2          110 is one bullet core.

3          And 111 is one bullet jacket.

4    Q    And aside from the last two items, Items 110 and 111, were

5    all of the other items collected from the crime scene at

6    4617 Carlton Crossing Drive?

7    A    Yes, to my knowledge, I believe so.

8    Q    I would like to show you Government's Exhibit 270.

9          Do you recognize that item?

10   A    Yes, I do.

11   Q    And what is that?

12   A    That is the firearm that I examined in this case.

13   Q    As part of your examination, did you test-fire that

14   firearm?

15   A    Yes, I did.

16   Q    Did it fire?

17   A    It did.

18   Q    What did you collect after test-firing that firearm?

19   A    So when we test-fire a firearm, we will use lab stock

20   ammunition and -- which just means ammunition that we have

21   purchased to fire -- test-fire the firearm and collect -- we

22   want to do it at least twice, so we'll collect two bullets and

23   two cartridge cases front that, if not more.

24   Q    What do you use those for?

25   A    We use them as our known samples for analysis.

Case 1:19-cr-00529-TDS   Document 362   Filed 02/04/22   Page 129 of 214

1  Q    And what do you fire that firearm into -- or the bullets

2  into?

3  A    We have a few different devices, but for this case, I

4  fired it into -- it is called a Savage Range Buddy, and it is

5  made up of ballistic balls that are kind of rubber in

6  consistency, and they stop the bullet from traveling outside of

7  the tube that they are housed in in order for us to collect the

8  bullets.

9  Q    I am now showing you Government's Exhibit 265.  Now, did

10 you have a magazine from that firearm?

11 A    Yes, I did.

12 Q    But it was a different magazine than this one; correct?  I

13 believe you had Item 39, one FN magazine?

14 A    Yeah, that sounds right.  Correct.

15          **MR. PRINCIPE:**  And that was previously identified

16 yesterday as another magazine collected from Carlton Crossing

17 Drive.  And if you will now show them Government's Exhibit 267.

18          And this is Item 37, which was the ammunition that

19 was taken out of that magazine.

20          If you can zoom in on about half of those.

21 **BY MR. PRINCIPE**

22 Q    Are you able to see the manufacturing identifiers on the

23 bottom of those bullets?

24 A    Yes, I am able to read most of them.

25 Q    Do you recognize some of those?

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1  A    I recognize the manufacturers, yes.

2  Q    Are they the same, or is there a wide range of different

3  manufacturers?

4  A    I see a wide range.  I see S&B, Blaser, Perfecta, Federal.

5  Q    If we will look at the other half of those, can you

6  recognize any of those?

7  A    Yes, I see PPU is another additional one.

8  Q    Thank you.

9       Now, as part of your examination, you looked at 9mm shell

10 casings; correct?

11 A    Correct.

12 Q    .40 caliber shell casings?

13 A    Correct.

14 Q    And .45 caliber shell casings?

15 A    Yes.

16 Q    I'm going to show you what's already in evidence as

17 Government's Exhibit 91.

18      Do you recognize at least what's described on this

19 envelope?

20      Let me see if I can get that in focus.

21 A    Yes, I recognize it.

22 Q    Are those Durham Police Department Items 5, 6 and 7?

23 A    Yes, it is.

24 Q    And are those items that you examined as part of your

25 examination?

1    A    Yes, they are.

2    Q    Is that what they looked like when you took them out for

3    examination?

4    A    Yes, they did.

5    Q    Those were 9mm casings; correct?

6    A    Yes, they were.

7    Q    I show you now what's in evidence as Government's

8    Exhibit 97.  And those are Durham Police Department Items 22,

9    23, and 24.

10        You looked at those as part of your examination; correct?

11   A    Yes.

12   Q    And the difference here is these are .40 caliber cartridge

13   cases?

14   A    Correct.

15   Q    I'm going to open that.

16        So you looked at all three of those; correct?

17   A    That's correct.

18   Q    Is that how they looked like when you took them out for

19   examination?

20   A    Yes.

21   Q    Now I'm showing you Government's Exhibit 99 which lists

22   Durham Police Department Item Nos. 27 and 28.  And you examined

23   those as part of your examination; correct?

24   A    Yes, I did.

25   Q    And the difference there is those are .45 caliber

1  cartridges?

2  A     Correct.

3  Q     I am going to open that envelope.

4        Is that what they looked like when you took them out for

5  your examination?

6  A     Yes.

7  Q     I just showed you an example of 9mms, .40 and .45.  But

8  you opened all of the packages and looked at all the items that

9  you listed on your report; correct?

10 A     That is correct.

11 Q     Going back to your report, Government's Exhibit 304, I

12 want show you some diagrams on pages 26 through 55.

13       Do you see that diagram?

14 A     Yes, I do.

15 Q     And there's a drawing on there?

16 A     Yes.

17 Q     So explain to me what that page represents, that entire

18 page.

19 A     So this page is similar to the one we talked about with

20 the bullet.  I will put down basic information that I read on

21 the headstamp.  I will look at features and marks that are

22 imparted on the cartridge case that I have noted by looking at

23 my stereo microscope, and I will draw a picture showing where

24 those marks are and any notable features that I feel like need

25 to be noted on that.

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1  Q    And what item number does this page refer to?

2  A    This item number is 5.

3  Q    And you made a diagram like that for each one of the items

4  that you looked at?

5  A    Correct.  As I mentioned, I like to look at every item

6  independently prior to any type of comparison.

7             **MR. PRINCIPE:**  Go to the next page.

8  **BY MR. PRINCIPE**

9  Q    Is that the diagram you did for Item No. 6?

10 A    Yes, it is.

11 Q    And next page, Item No. 7?

12 A    Correct.

13 Q    Now, we're looking at Item No. 8?

14 A    Yes.

15 Q    Item No. 9?

16 A    Yes.

17 Q    Item 10?

18 A    Yes.

19 Q    Item 11?

20 A    Correct.

21 Q    Item 12?

22 A    Yes.

23 Q    So you did that for each of the items you looked at;

24 correct?

25 A    I did.

Case 1:19-cr-00529-TDS   Document 362   Filed 02/04/22   Page 134 of 214

1  Q    Was that one of the first things that you did?

2  A    Yes.

3  Q    Why is that?

4  A    I just find it very important to, like I said, look at

5  every item of evidence independently and note any marks that I

6  find just looking at that item; and then once I have a good

7  idea of what each item of evidence and the marks that they

8  hold, then I can characterize and compare them via common class

9  characteristics.

10       So like I mentioned earlier, you won't have a square hole

11 or a square aperture make a round aperture, essentially.  So if

12 I can go ahead and look at them and draw pictures of their

13 characteristics, then I know which items need to be compared to

14 each other further by just their class characteristics.

15 Q    Okay.  I'm showing you now page 10 of your report.

16       Can you explain to the jurors what you were notating on

17 this page?

18 A    So once I have looked at everything independently and I

19 make my comparisons and I start to group items into, in my

20 opinion, firearms that had fired these items, I do like a

21 summary page.  And this one helps me, especially in times like

22 now when in I'm court, to remember what I looked at and the

23 groups that I had the items kind of grouped into for my report.

24 Sometimes the words can just get very wordy.  This helps me see

25 it a lot more visual because I had the pictures of what these

Case 1:19-cr-00529-TDS   Document 362   Filed 02/04/22   Page 135 of 214

1   firing pins looked like beside them.

2   Q    So at this stage you're starting to group things together

3   that are similar?

4   A    Yes.

5            **MR. PRINCIPE:**  If you will zoom in just on the top

6   two.

7   **BY MR. PRINCIPE**

8   Q    And you have a "9mm" written next to both of those?

9   A    Yes, I do.

10  Q    And what is the little picture you drew there?

11  A    Those are of the firing pin and the apertures.  So the one

12  to the left you can see is a circle with a circle outside of

13  it.  So that shows me that the aperture, which is that opening

14  that the firing pin comes out of, is a circle aperture, and

15  then the firing pin with circle.

16       The little tongue that sticks out up top is called a

17  firing pin drag, and that happens when the slide is coming back

18  to the rear and the firing pin is still sticking out a little

19  bit.  So it shows that the firing pin is still protruded when

20  there's movement going in the chamber and it makes a drag mark.

21  Q    What does that mean that you wrote 5, 12, 32, 33, and 34

22  underneath that diagram?

23  A    So those were the item numbers that had those features

24  that were consistent with that group.

25  Q    Okay.  Was the features of Item No. 6 different?

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1  A    Yes.

2  Q    Is that why you listed it separately?

3  A    It's why I listed it separately and drew a different

4  picture, because you can tell the aperture for that one is

5  actually rectangle.

6  Q    And that's what you saw when you looked at them closely?

7  A    Correct.

8  Q    And now if we move down, you made similar groupings for

9  another 9mm?

10 A    Correct.

11 Q    And for a .40 Smith & Wesson?

12 A    Yes.

13 Q    And for a .45 caliber grouping; correct?

14 A    Yes.

15 Q    So how many different groupings did you end up with that

16 were 9mm caliber?

17 A    There were three different groupings for 9mms.

18 Q    And that was primarily based on the different toolmarks

19 that you observed on those items?

20 A    Yes.

21 Q    How many different ones did you end up with for .40

22 caliber?

23 A    For .40 caliber, I just had one group.

24 Q    And for .45 caliber?

25 A    Also just one group.

Case 1:19-cr-00529-TDS   Document 362   Filed 02/04/22   Page 137 of 214

1  Q    I would like to go to page 15.

2       What are we seeing on page 15 of your report?

3  A    So those are the photographs I took during my actual

4  examination on the comparison microscope.  So these are similar

5  to the ones that we had in the slides before, but these were

6  ones that I had actually taken for this case.

7       What you have on the top is two exhibits compared side by

8  side, and this will be Item 7 and Item 13.  And so what you can

9  see in this picture is that you have these individual lines.  A

10 lot of times, they are -- the brighter lines are the ones that

11 I am looking at, the striations that are corresponding and

12 lining up between the two sides.

13      And this is just a snapshot of my entire analysis and

14 every aspect of the cartridge case that I looked at, but I like

15 to take a representation photograph for court purposes of some

16 of the detail that I used for my conclusion.

17           **MR. PRINCIPE:**  Go to the next page.

18 **BY MR. PRINCIPE:**

19 Q    And there is another example?

20 A    Yes.

21           **MR. PRINCIPE:**  Go to the next page.

22 **BY MR. PRINCIPE:**

23 Q    Is that another example?

24 A    Yes.

25 Q    So you did this multiple times throughout your process;

Case 1:19-cr-00529-TDS   Document 362   Filed 02/04/22   Page 138 of 214

1  correct?

2  A    Yes.  There will be a photo of every single one of my

3  identifications with using one of the cartridge cases as, like,

4  a guide.

5           **MR. PRINCIPE:**  If we can go to page 5.

6  **BY MR. PRINCIPE**

7  Q    And what have you done here on page 5 of your report?

8  A    So on page 5 and the other pages are just me writing out

9  my conclusions and the parts that I am looking at, the areas

10 that I am looking at for my comparison and what my conclusions

11 were.

12 Q    Okay.  Can you give us an example with regard to that

13 first area, items -- starting with Items 5, 12, 32, and 33 and

14 34?

15 A    Yes.  So what I wrote is for those items, there was

16 agreement inside the firing pin impression, the sheer mark at

17 6 o'clock position, area around the breech face, and I drew a

18 little picture and I said the agreement is sufficient for an

19 identification or an ID.

20 Q    And that means sufficient for an identification in your

21 opinion?

22 A    In my opinion, correct.

23 Q    And then below that, there is another grouping that starts

24 with Item 7; is that right?

25 A    Correct.

1  Q    And you made a similar conclusion with regard to those

2  items?

3  A    Yes.  I said that the agreement on the breech face at 3

4  and 6, that's o'clock positions, on the primer and on the

5  headstamp and inside the firing pin impression -- again, they

6  were -- agreement was sufficient for an ID.

7  Q    Okay.  And now focusing on Item 6, what did you note about

8  item 6?

9  A    I said that the firing pin shape was elliptical and that

10  it was unlike any of the other 9mms that were submitted in this

11  case.  Therefore, it was an elimination.

12  Q    And by eliminating it, what does that actually mean?

13  A    It means that, in my opinion, it was not fired from the

14  same firearm as any of the other 9mms from that case.

15  Q    So that one stands alone?

16  A    It stands alone.

17        **MR. PRINCIPE:**  Go to page 6.  Let's focus on the

18  first third of that page.

19  **BY MR. PRINCIPE**

20  Q    What did you note about the items starting with Item 22?

21  A    So I said that the Items 22, 23, 24, 25, and 26 -- that

22  there was agreement inside the aperture sheer mark at 6 o'clock

23  and inside the firing pin impression.  Agreement is sufficient

24  for ID.

25  Q    Okay.  And then the middle, Items 27 and 28?

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1  A    I said that agreement across the breech face at 6 o'clock

2  and 12 o'clock and also inside the firing pin impression --

3  that the agreement was sufficient for ID.

4  Q    Okay.  And, lastly, at the bottom?

5  A    I said Items 29, 30, and 31 were unfired cartridges.  They

6  were not examined, but then I did examine them.  I said it

7  cannot be compared due to too many unknown marks and lack of

8  orientation.  And what this means is essentially they had so

9  many erroneous marks that due to the fact that they weren't

10 fired and I couldn't orient what -- where the marks should lie,

11 I was unable to be able to tell any type of marks that would be

12 able to be used for comparison.

13      And this is kind of indicative for a cartridge, because a

14 cartridge that is unfired that has been loaded into a firearm

15 multiple times, it's getting marked up multiple times, and none

16 of them are firing marks.  So those are the definitive marks

17 for firing.

18      If it were a clean cartridge, like it had never been in a

19 gun before and it had just one mark or two marks on it, then it

20 might be used for some type of analysis or comparison.  But

21 once it gets too many marks, it's just not helpful for anybody

22 to look at it for comparison value.  It is not reliable.

23 Q    Let's talk about some of the conclusions that you reached.

24 If I can direct you to paragraph 1 of your report.  And if you

25 will refer to your own personal copy.

1  A    Okay.

2  Q    What did you conclude with regard to paragraph 1?

3  A    So in paragraph 1, I said that Items 5, 12, and 32 through

4  34, cartridge cases, which were 9mms, were microscopically

5  compared and determined to have similar class characteristics

6  and sufficient agreement of individual characteristic.  So,

7  therefore, in my opinion, they were fired in the same firearm.

8  Q    Okay.  So that would be one 9mm firearm associated with

9  those cartridges?

10  A    Correct.

11  Q    What about in paragraph 2?  What did you determine?

12  A    That's where I talked about Item 6.  That kind of stood

13  alone.  It was also a 9mm, but it had different class

14  characteristics from the other 9mm cartridge cases.  And,

15  therefore, it was eliminated from being -- in my opinion, it

16  was eliminated from being fired from the same firearm as the

17  other items.

18  Q    Okay.  So that would be a second 9mm handgun?

19  A    Correct.

20  Q    And what did you determine with regard to paragraph 6?  I

21  apologize.  I'm sorry.

22       Start with paragraph 3.  What did you determine in

23  paragraph 3?

24  A    So Items 7 through 11 and 13 through 21, cartridge cases,

25  they were also 9mms.  I microscopically compared and determined

1  them to have similar class characteristics and sufficient

2  agreement of individual characteristics.  Therefore, in my

3  opinion, they were fired from the same firearm.

4  Q    And then to jump to paragraph 6, what did you conclude in

5  paragraph 6?

6  A    I said, using ammunition from lab stock, Item 40, pistol,

7  was test-fired and the recovered cartridge cases were compared

8  to Items 7 through 11 and Items 13 through 21, cartridge cases,

9  and that they had similar class characteristics and sufficient

10 agreement of individual characteristics.  Therefore, in my

11 opinion, those items were fired from the Item 40 pistol.

12 Q    And that was the firearm that was recovered from Carlton

13 Crossing Drive?

14 A    Correct.

15 Q    And so the items listed in paragraph 3 you concluded were

16 fired from that pistol?

17 A    Yes, I did.

18        **MR. PRINCIPE:**  If we can zoom in on those items.  If

19 you can highlight or zoom in on Items 7 through 11 first.

20 **BY MR. PRINCIPE**

21 Q    Okay.  Are there about four different brands of 9mm

22 cartridges there?

23 A    Yes, there are.

24        **MR. PRINCIPE:**  If you can zoom on Items 13 through

25 21.

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1  BY MR. PRINCIPE

2  Q    Again, is there a wide range or number of different

3  manufacturers of shell casings?

4  A    There is a wide range; correct.

5  Q    Now, what was your opinion that you made in paragraph 4?

6  A    In paragraph 4, I said Items 22 through 26, which were .40

7  Smith & Wesson, were microscopically compared and determined to

8  have similar class characteristics and sufficient agreement of

9  individual characteristics.  Therefore, in my opinion, Items 22

10 through 26 were fired in the same firearm.

11 Q    What was your opinion in paragraph 5?

12 A    In paragraph 5, I said Items 27 and Items 28, which were

13 .45 caliber cartridge cases, were microscopically compared and

14 determined to have similar class characteristics and sufficient

15 agreement of individual characteristics.  Therefore, in my

16 opinion, they were fired in the same firearm.

17 Q    Now, I would like to show you Government's Exhibit 305.

18      Do you recognize this document?

19 A    I do.

20 Q    And is this a summary chart that was prepared for trial?

21 A    Yes, it was.

22 Q    Did you have an opportunity to look at this chart and

23 compare it against the conclusions you reached in your report,

24 Government's Exhibit 304?

25 A    Yes, I was.

1  Q    Did you find this summary chart to be accurate in terms of

2  reflecting five separate potential firearms that fired shell

3  casings collected from the scene at Carlton Crossing Drive?

4  A    I do find it accurate.

5          **MR. PRINCIPE:**  Government moves Government's

6  Exhibit 305 into evidence.

7          **THE COURT:**  Admitted.

8          **MR. PRINCIPE:**  And permission to publish?

9          **THE COURT:**  You may.

10          **MR. PRINCIPE:**  So if we can zoom in on the top third

11  of the page.

12  **BY MR. PRINCIPE**

13  Q    What are the five different headers there?

14  A    So the five different headers is -- the first blue header

15  is Item 40, FNS 9mm and 9mm G1.

16  Q    Okay.  And the second column?

17  A    The second column in red is .40 caliber G2.

18  Q    The third column?

19  A    Is green, .45 caliber G3.

20  Q    The fourth column?

21  A    It's in purple, and it's 9mm G4.

22  Q    And the last column?

23  A    It's in yellow, and it's 9mm G5.

24  Q    So each of those colors represents a potential separate

25  firearm that could have discharged shell casings that were

Case 1:19-cr-00529-TDS   Document 362   Filed 02/04/22   Page 145 of 214

1  found at the Carlton Crossing Drive crime scene?

2  A    Correct.

3  Q    How many shell casings were determined to be fired for the

4  G5 that's in yellow?

5  A    Just one.

6  Q    And the 9mm G4?

7  A    Five.

8  Q    The .45 caliber G3?

9  A    Two.

10 Q    The .40 caliber G2?

11 A    Five.

12 Q    And then the Item 40 handgun identified as G1, how many

13 total shell casings were fired by that firearm?

14 A    Fourteen.  And, also, I linked it back to that firearm,

15 Item 40.

16 Q    Okay.  Now I would like to show you Government's

17 Exhibit 288.

18     Are you familiar with this diagram that was prepared by a

19 crime scene investigator, Ben Shields?

20 A    Yes, I am.

21 Q    And he discussed this diagram as being where he had marked

22 different cartridge casings of different calibers at the

23 Carlton Crossing crime scene.  Is that your understanding?

24 A    Correct.

25 Q    And the numbers on there are not Durham Police Department

1  item numbers, are they?

2  A    No, those are placard numbers.

3  Q    Okay.  Because he's working with the placards that he is

4  placing down at the crime scene; correct?

5  A    That is correct.

6  Q    Now I am going to show you Government's Exhibit 289, which

7  was marked for identification yesterday but not introduced.

8       And do you recognize that diagram?

9  A    Yes, I do.

10 Q    Does this diagram incorporate the analysis that you

11 performed in your second examination?

12 A    It does.

13 Q    Does it use the reference to the different firearms by

14 using color coding and the references to G1 through G5?

15 A    Yes, it does.

16 Q    And even though -- the numbers on that diagram still

17 correspond to the placards that were in place at the crime

18 scene; correct?

19 A    Yes, they are still the placard numbers.

20 Q    Did you have an opportunity to cross-check those placard

21 numbers against the corresponding item numbers to make sure

22 that this diagram is consistent with your analysis?

23 A    I did.

24 Q    And is it?

25 A    It is.

Case 1:19-cr-00529-TDS   Document 362   Filed 02/04/22   Page 147 of 214

1          **MR. PRINCIPE:**  The Government would move Government's

2     Exhibit 289 into evidence.

3          **THE COURT:**  Admitted.

4          **MR. PRINCIPE:**  Permission to publish?

5          **THE COURT:**  You may.

6          **MR. PRINCIPE:**  I would like to zoom in on a couple

7     different portions.  First let's zoom in on the area near the

8     front porch.

9     **BY MR. PRINCIPE**

10    Q    So is it accurate that the green color corresponds to .45

11    caliber shell casings?

12    A    Correct.

13    Q    And those were identified on the front porch?

14    A    Yes.

15    Q    And the blue color were shell casings fired by the Item 40

16    pistol?

17    A    The blue color -- yes, Item 40.  Correct.

18    Q    And then the yellow coloration refers to a separate 9mm

19    pistol; is that right?

20    A    Yes, that's correct.

21         **MR. PRINCIPE:**  Let's back out.  And now if we focus

22    on the area around the minivan.

23    **BY MR. PRINCIPE**

24    Q    And there is two colors there; correct?

25    A    Yes.

Case 1:19-cr-00529-TDS   Document 362   Filed 02/04/22   Page 148 of 214

1  Q    And one of them refers to .40 caliber cartridges that were

2  collected near the street or sidewalk?

3  A    Yes.

4  Q    And then there was one purple color that represents a

5  separate 9mm handgun?

6  A    That is correct.

7         **MR. PRINCIPE:**  If we can back out and then zoom in on

8  the area around the other vehicles that were parked on the

9  street.

10 **BY MR. PRINCIPE**

11 Q    And there we have two red shell casings and then four

12 yellow shell casings; correct?

13 A    That is correct.

14         **MR. PRINCIPE:**  If we back out.

15 **BY MR. PRINCIPE**

16 Q    And the red corresponds to .40 caliber shell casings?

17 A    Yes.

18 Q    And the yellow corresponds to 9mm shell casings that were

19 not associated with the Item 40 handgun; correct?

20 A    Correct.

21 Q    Did you also examine bullets as part of your examination

22 No. 2?

23 A    Yes, I did.

24 Q    And I would like to refer you to paragraph 7.

25       What was your conclusion in paragraph 7?

Case 1:19-cr-00529-TDS   Document 362   Filed 02/04/22   Page 149 of 214

1  A    I said that the examination of Items 42, 52, 63, and 103

2  disclosed the bullets to be 9mm.

3  Q    Do you know where those bullets were collected from?

4  A    I do not.

5  Q    Okay.  Would looking at a copy of the Property and

6  Evidence Voucher that's in evidence help you identify what

7  those item numbers correspond to in terms of where those items

8  were located when they were collected?

9  A    Yes, I could read those property reports.

10          **MR. PRINCIPE:**  May I approach the witness, Your

11  Honor?

12          **THE COURT:**  You may.

13  **BY MR. PRINCIPE:**

14  Q    First, I would like to focus on Item 42.  We'll also pull

15  up Government's Exhibit 274 on the monitor.

16       Where was Item 42 collected from?

17  A    Forty-two says it was collected from the floor in the

18  foyer just inside the doorway.

19  Q    Okay.  Now, Government's Exhibit 280, that shows Item 52.

20       Where was Item 52 collected from?

21  A    Interior right rear quarter panel of F3.  I don't know

22  what that means.

23  Q    And Government's Exhibit 264, that's item 63.  Where was

24  that collected from?

25  A    Located on floor of entryway at 4618 Carlton Crossing.

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1  Q    And, last, Government's Exhibit 268, which is Item 103,

2  where was that collected from?

3  A    Under front left tire of tan van in roadway on Carlton

4  Crossing.

5  Q    And you determined that each of those was a 9mm caliber

6  bullet?

7  A    Correct.

8  Q    Were you able to determine rifling characteristics

9  associated with those items and reach some conclusions in

10 paragraph 15?

11 A    Yes.

12 Q    And what were your conclusions about those four items?

13 A    I said that the examination of the general rifling

14 characteristics of Items 42, 52, and 103 -- they were -- had

15 similar rifling characteristics and they -- the items that

16 could be fired from those are a list of firearms.

17      Do you want me to read the full list?

18 Q    Is it a large number of firearms?

19 A    It is a very large number, yeah.

20 Q    Okay.  And now I am directing you to paragraph 16.

21      What did you determine with regard to Item 63?

22 A    Sixty-three was disclosed to be -- have similar rifling

23 characteristics to a separate list.

24 Q    Okay.  Can you identify that list?

25 A    That one is much shorter.  I can read that one.

1  Q    Okay.

2  A    It's Bersa, FIE, Glock, H&K, IMI, Kahr, LIW, and other

3  possible known -- unknown to the examiner.

4  Q    Okay.  Did you reach a conclusion with regard to three of

5  those 9mm projectiles, 42, 52 and 103 in paragraph 12?

6  A    Yes.  So in paragraph 12, I microscopically compared those

7  items and determined them to have similar class characteristics

8  and sufficient agreement of individual characteristics.

9  Therefore, in my opinion, they were fired from the same

10 firearm.

11 Q    Now I want to direct your attention to paragraph 8.

12       What did you conclude about those items?

13 A    Items 53, 54, 79, 110 and 111 were determined to be

14 caliber .40 Smith & Wesson/10mm.

15 Q    Where was Item 53 collected from?

16 A    The left front door interior panel.

17 Q    Does it list a location where that was collected from, an

18 address?

19 A    I believe they are all from the 4617 Carlton Crossing

20 Drive.

21 Q    So that would be left front door of a vehicle at that

22 address?

23 A    Correct.

24 Q    Item 54?

25 A    The left front door interior panel.

1  Q    Item 79?

2  A    Interior right front seat in silver Toyota Sienna.

3  Q    And then Items 110 and 111?

4  A    110 was from the victim, collected at the OCME.

5  Q    And 111?

6  A    From the victim, collected at the OCME.

7  Q    Now I want to direct your -- to paragraph 17.

8       What conclusion did you reach in paragraph 17?

9  A    The examination of the general rifling characteristics for

10 items 53, 54, 79, and 111 had the same rifling characteristics,

11 and they could be fired from a Bersa, Glock, H&K, IMI, Kahr,

12 Vector, and possible others.

13 Q    Okay.  And why was 110 not included on that list for that

14 conclusion?

15 A    Because 110 was that lead core that we had looked at in

16 the initial examination, and it had no rifling characteristics.

17 Q    So you couldn't make that determination; is that right?

18 A    Correct.

19 Q    I would like to direct your attention to your conclusion

20 in paragraph 9.  What was your conclusion?

21 A    Examination of the 43 -- Item 43, bullet, was a .45

22 caliber.

23 Q    Okay.  And where was that item located?

24 A    In wall behind freezer in living room.

25 Q    And what was the address?

1  A    4617 Carlton Crossing Drive.

2  Q    And what was your conclusion in paragraph 18 of your

3  report?

4  A    Examination of the general rifling characteristics of

5  item 43 were consistent with having been fired from an Eagle

6  Arms, a National Cartridge, or Taurus, and then possible others

7  unknown to the examiner.

8  Q    Are you familiar with Taurus firearms?

9  A    Yes, I am.

10  Q    Have you ever heard of a Millennium .45?

11  A    Yes, I have.

12  Q    Is that a Taurus firearm?

13  A    Yes, it is.

14  Q    I would like to direct your attention to paragraph 10.

15  What was your conclusion in paragraph 10?

16  A    Examination of the 44, 51, 102, and 104 items were bullets

17  or fragments that the caliber was unknown.

18  Q    And why were they unknown?

19  A    Due to the state that they were when I got them, either

20  they didn't have enough weight or the diameter wasn't there for

21  me to be able to determine an accurate caliber.

22  Q    Okay.  And let's go through the location of where they

23  were found.

24       Where was Item 44 located?

25  A    In wall of foyer opposite doorway.

Case 1:19-cr-00529-TDS   Document 362   Filed 02/04/22   Page 154 of 214

1  Q    Item 51?

2  A    Interior plastic panel of rear hatch.

3  Q    And what was the location for that item or address?

4  A    It was at 4617 Carlton Crossing Drive.

5  Q    Item 102?

6  A    From sidewalk in front of 4619 Carlton Crossing.

7  Q    And Item 104?

8  A    Located inside left front tire of tan van in roadway on

9  Carlton Crossing Drive.

10  Q    Were you able to exclude -- well, let me just direct your

11  attention to your conclusion in paragraph 19.

12        You mentioned before that you test-fired Item 40?

13  A    Correct.

14  Q    Did you compare the bullet that you test-fired from Item

15  40 to the 9mm bullets?

16  A    Yes, I did.

17  Q    And what conclusion did you reach in paragraph 19?

18  A    So using, again, laboratory stock and from firing that .40

19  caliber pistol, we recovered the bullets, the test-fired

20  bullets, and they were compared to the 9mm bullets in the case.

21  And they were found to have some similar class characteristics,

22  but lacked sufficient agreement of individual characteristics

23  for an identification.  Therefore, in my opinion, they were not

24  fired from the Item 40 pistol.

25  Q    So you were able to exclude those bullets as having been

Case 1:19-cr-00529-TDS   Document 362   Filed 02/04/22   Page 155 of 214

1  fired from that handgun?

2  A    Correct.

3  Q    And where was Item 42 collected from?

4  A    On floor in foyer just inside the doorway.

5  Q    And Item 52?

6  A    Interior right rear quarter panel from a car at 4617

7  Carlton Crossing Drive.

8  Q    And Item 63?

9  A    Located on the floor of the entryway at 4618 Carlton

10 Crossing Drive.

11 Q    4618?

12 A    4618 is what it says.

13        **MR. PRINCIPE:**  Your Honor, I would like to publish

14 Government's Exhibit 15.

15        **THE COURT:**  All right.

16        **MR. PRINCIPE:**  And Government's Exhibit 17.

17 **BY MR. PRINCIPE**

18 Q    So that was excluded as being fired from the Item 40

19 pistol?

20 A    Correct.

21 Q    And Item 103?

22 A    Under front left tire of tan van in roadway on Carlton

23 Crossing.

24 Q    And then in paragraph 20, what conclusion did you reach?

25 A    Items 29, 30, and 31 were unfired 9mm cartridges.  They

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1  were examined and found to have multiple miscellaneous cycling

2  marks that appeared to have been reloaded.  No comparison could

3  be completed.

4  Q    Why did you not complete a comparison?

5  A    As I mentioned earlier, there was just so many markings on

6  those that any type of conclusions would have been inaccurate

7  or unable to really get a definitive on that.

8         **MR. PRINCIPE:**  I have no additional questions, Your

9  Honor.

10         **THE COURT:**  All right.  Any cross?

11                    CROSS-EXAMINATION

12 **BY MR. FOSTER**

13 Q    So, Ms. Anderson, you testified about five bullets that

14 you determined to be .40 -- either .40 caliber Smith & Wesson

15 or 10mm.  This was in paragraph 8 of your report on page 3,

16 Items 53, 54, 79, 110 and 111; correct?

17 A    That is correct.

18 Q    Okay.  And so I gathered from your testimony referring to

19 the evidence log -- I'm sorry -- the Property and Evidence

20 Voucher, that the first of those three items -- or the first

21 three of those items, 53, 54 and 79, all were removed from the

22 vehicle that was at the scene of the crime; correct?

23 A    I would have to look that up.  Do you want me to look it

24 up to verify?

25 Q    Well, you read those off a minute ago.  I mean, you said

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1 | 79 was from the Sienna and then 53 and 54 were from the
2 | vehicle -- although it didn't say Sienna, it was the vehicle
3 | that was at 4617 Carlton Crossing; correct?
4 | A    That sounds correct.
5 | Q    And then Nos. 110 and 111 came from the victim's body via
6 | the Office of the Chief Medical Examiner?
7 | A    That is correct.
8 | Q    Now, on page 1 of your report, you listed Item 22 as being
9 | a 9mm, but then another in another exhibit -- well, do you
10 | recall that?  Do you see that in front of you?
11 | A    I'm sorry.  What item were you talking about again?
12 | Q    Item 22.
13 | A    Yes, that's a 9mm.
14 | Q    Okay.  Then if you go to page 43 of your report.  And
15 | that's for Item 22.  Do you see that?
16 | A    I do see that.
17 | Q    And there you've done your detailed listing, and it is a
18 | .40 caliber; correct?
19 | A    It says on there .40 caliber, yes.
20 | Q    So that would be the correct information, wouldn't it?
21 | A    Yeah, it seems like there was a typo in the report.  I
22 | apologize.
23 | Q    Okay.
24 |         **MR. FOSTER:**  Thank you.  I have no further questions.
25 |         **THE COURT:**  Any redirect?

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1           MR. PRINCIPE:  No, Your Honor.

2           THE COURT:  All right.  You may step down, ma'am.

3           THE WITNESS:  Thank you, Your Honor.

4           THE COURT:  Are you releasing this witness?

5           MR. PRINCIPE:  Yes, Your Honor, we'd like to.

6           THE COURT:  Any objection?

7           MR. FOSTER:  No objection.

8           THE COURT:  You are free to leave.

9       (At 3:05 p.m., witness excused.)

10          THE COURT:  How long will your next witness be?

11          MR. PRINCIPE:  Short.

12          THE COURT:  Maybe we do one more.  Anybody need an

13  immediate break?

14          Call your next witness, please.

15          MR. PRINCIPE:  Your Honor, the next witness will be

16  Erica Lee.

17  PROBATION OFFICER ERICA LEE, GOVERNMENT'S WITNESS, being first

18  duly affirmed, at 3:05 p.m. testified as follows:

19          THE COURT:  If you could remove your mask so we can

20  see and hear you and make sure the microphone is directed

21  toward your mouth.

22          Thank you.

23                      DIRECT EXAMINATION

24  BY MR. PRINCIPE

25  Q    Would you please state your name.

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1    A    Erica Lee.

2    Q    What do you do for a living?

3    A    I'm a state probation and parole officer, currently in

4    Durham County.

5    Q    Were you working in that position in April of 2018?

6    A    Yes.

7    Q    Are you familiar with the name Hykeem Deshun Cox?

8    A    Yes.

9    Q    Who is that person?

10   A    I supervised Mr. Cox when he was placed on probation in

11   April 2018.

12   Q    And how long did you supervise him around that time

13   period?

14   A    Not quite 60 days.

15   Q    Okay.  When you supervise somebody, what types of

16   information do you have or collect about them?

17   A    We collect the judgments.  If there is a plea agreement,

18   that paperwork is inside the original warrant.  Intake

19   information like address, who they live with, phone number,

20   additional contact information, additional contacts.

21   Q    How often do you update that information, let's say if

22   somebody moves or changes their phone number?

23   A    Regularly.  We check that at every meeting.

24   Q    Do you recall having an appointment with Mr. Cox in May of

25   2018?

1  A    Yes.

2  Q    And what did you notice during that appointment?

3  A    During that appointment, he had a raised bump on his right

4  wrist.  I inquired about it.

5  Q    What did you find out?

6  A    He informed me that he got that from working on a vehicle

7  with his grandfather.

8  Q    And what was the date of this appointment with Mr. Cox?

9  A    5/9/2018.

10  Q    And at some point, did you report that information to

11  another law enforcement agency?

12  A    Yes, I did.  I reported it to Task Force Officer Tim

13  Thomas.

14  Q    Why did you report it to him?

15  A    He brought it to my attention and asked for a photo.

16  Q    Okay.  And was photos eventually taken?

17  A    Yes, on that same day.

18  Q    I'm going to show you now Government's Exhibit 315.

19       Do you recognize that photograph?

20  A    Yes.

21  Q    And what is that a photograph of?

22  A    That is Mr. Cox's right wrist with the scab.

23  Q    Okay.

24       **MR. PRINCIPE:**  Your Honor, Government moves

25  Government's Exhibit 315 into evidence.

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1          **THE COURT:**  It's admitted.

2          **MR. PRINCIPE:**  Permission to publish?

3          **THE COURT:**  You may.

4    **BY MR. PRINCIPE**

5    Q    That's what it looked like that day to you?

6    A    Yes.

7    Q    Around that same time, did you collect a most recent

8    address information for Mr. Cox?

9    A    Yes.

10   Q    Do you recall what that address was?

11   A    217 North Maple Street, Durham, North Carolina.

12   Q    Is that an area you are familiar with?

13   A    Yes.

14   Q    Did you also get an updated phone number or phone numbers

15   for Mr. Cox around that time?

16   A    Yes.

17   Q    And do you recall the number (919)519-4224 as being one of

18   those numbers?

19   A    Yes.

20   Q    And what was Mr. Cox on probation for at that time?

21   A    Robbery with a dangerous weapon.

22          **MR. PRINCIPE:**  No further questions, Your Honor.

23          **THE COURT:**  Any cross?

24                    CROSS-EXAMINATION

25

Case 1:19-cr-00529-TDS   Document 362   Filed 02/04/22   Page 162 of 214

1  BY MR. BRYSON

2  Q    Mr. Cox was placed on probation on April 5 of 2018; is

3  that right?

4  A    Correct.

5  Q    And that's the day where he goes to court and enters his

6  guilty plea; right?

7  A    Correct.

8  Q    And that was ten days before April 15, 2018; is that

9  right?

10  A    Correct.

11  Q    Okay.  And, actually, he was on probation for conspiracy

12  to commit robbery with a dangerous weapon; isn't that right?

13  A    I would have to look back at the judgment.

14        **MR. BRYSON:**  May I approach the witness, Your Honor?

15        **THE COURT:**  You may.

16  BY MR. BRYSON

17  Q    I'm going to show you this and see if it helps remind

18  yourself.  There's more pages too.

19  A    There you go.  So whenever it pops up, we just see this

20  here on the original offense.  But, yes, correct.

21  Q    All right.  He received a suspended sentence of a minimum

22  of 18 months --

23        **MR. PRINCIPE:**  Objection, Your Honor.

24        **THE COURT:**  Grounds?  Do you want to approach?

25        **MR. PRINCIPE:**  Yes, Your Honor.

Case 1:19-cr-00529-TDS   Document 362   Filed 02/04/22   Page 163 of 214

1          **THE COURT:**  All right.

2          (The following proceedings were had at the bench by the

3      Court and Counsel out of the hearing of the jury:)

4          **THE COURT:**  All right.

5          **MR. PRINCIPE:**  Your Honor, our position is that he

6   will have an opportunity to impeach Mr. Cox in more detail

7   about that, but, essentially, other than the fact of what he

8   was on probation for, the details of his judgment or the term

9   of his probation doesn't seem relevant or appropriate at this

10  time.

11         **THE COURT:**  Are you contending that it's not

12  admissible under 609, or is it just a relevancy objection?

13         **MR. PRINCIPE:**  One moment, Your Honor.

14      (Defendant's counsel conferred.)

15         **MR. PRINCIPE:**  Under 609, the fact of conviction may

16  be, but not all the details of how a judgment was structured or

17  the length of the sentence, just the fact of conviction.

18         **THE COURT:**  What is your response?

19         **MR. BRYSON:**  Well, I think one of the things that's

20  going on here is that he ultimately gets violated for his

21  probation, and the probation ultimately gets terminated without

22  any revocation.  I just wanted to inquire about that.

23         **THE COURT:**  What does the length of the sentence have

24  anything to do with -- can't you make that point without --

25         **MR. BRYSON:**  I guess --

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1          **THE COURT:**  All right.

2          **MR. BRYSON:**  -- if the Court wants to sustain that.

3          **THE COURT:**  I will sustain it for now.

4      (End of bench conference.)

5          **THE COURT:**  All right.  Sustained.

6  **BY MR. BRYSON**

7  Q    So the offense that he was convicted of, the conspiracy,

8  that is a felony offense in North Carolina; correct?

9  A    Correct.

10 Q    All right.  So having been convicted of a felony, it would

11 be unlawful for him to possess a firearm; correct?

12 A    Correct.

13 Q    In fact, even separate and apart from that, as a standard

14 condition of probation in North Carolina, one is not allowed to

15 possess a firearm; is that correct?

16 A    Correct.

17 Q    As another standard condition of probation, he's not to be

18 convicted of any further criminal offenses; is that correct?

19 A    Correct.

20 Q    And as a probation officer, you will monitor that to make

21 sure that your probationers do not pick up new charges;

22 correct?

23 A    Correct.

24 Q    And at some point in this case, you became aware that he

25 did pick up new charges; is that right?

1  A    Yes.

2  Q    And you became aware that the offense date for those new

3  charges was April 15, 2018?

4  A    Correct.

5  Q    And you filed a violation report against him in this case?

6  A    Correct.

7          **MR. PRINCIPE:**  Objection, Your Honor.

8          **THE COURT:**  Overruled.

9  **BY MR. BRYSON**

10  Q    You filed a violation report against him in this case?

11  A    Correct.

12  Q    Okay.  His probation was not revoked?

13  A    No, it was not.

14  Q    It was terminated?

15  A    Correct.

16  Q    Which means he'll never have to serve any of his suspended

17  sentence?

18  A    Correct.

19          **MR. BRYSON:**  Those are my questions.

20          **THE COURT:**  All right.  Any redirect?

21          **MR. PRINCIPE:**  No, Your Honor.

22          **THE COURT:**  All right.  You may step down.

23          **MR. GREEN:**  Your Honor, may we approach?

24          **THE COURT:**  Yes.

25          (The following proceedings were had at the bench by the

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1          Court and Counsel out of the hearing of the jury:)

2                  **MR. PRINCIPE:**  We need the witness not to leave yet.

3                  **THE COURT:**  Well, that's up to you.

4                  **MR. GREEN:**  Would you go stop that witness.

5          Your Honor, the clear import of those questions was

6   to suggest that something nefarious has happened.  I have no

7   independent information as to why Mr. Cox's probation was

8   terminated.  I would like a recess to find out why it was

9   terminated, if there has been some agreement or deal which the

10  Government is not aware of.  We would have an obligation to

11  disclose that, and we would disclose it.

12                 **THE COURT:**  All right.  There was no objection to the

13  questions.

14                 **MR. PRINCIPE:**  I objected.  I did object when it got

15  to the violation.

16                 **THE COURT:**  I did not hear any objection.

17                 **MR. PRINCIPE:**  I'm sorry.  I thought you overruled

18  the second objection.  You said overruled, and then she

19  answered the question.

20                 **THE COURT:**  On whether he violated.  There was a

21  question of whether he violated, and the answer was, yes,

22  because of this offense apparently, and then there were further

23  questions without any objection.

24                 **MR. GREEN:**  I thought he said "Objection", but maybe

25  I am misremembering.

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1              **MR. BRYSON:**  I don't remember.

2              **THE COURT:**  Well, if you want to go talk to your

3    witness, we're going to take a break now anyway, we can bring

4    it up after that.  But I don't recall there being any other

5    objection other than those.  Justice is invoked.  So if you

6    want to object, object.

7          (End of bench conference.)

8              **THE COURT:**  All right.  Ladies and gentlemen, we're

9    going to take our afternoon break right here.  So if you are

10   taking notes, please put your notepads in your envelopes.

11   Leave your envelopes in your chair.

12             And remember all my admonitions to you.  You are not

13   to discuss the case among yourselves or any aspect of the case.

14   Simply take a break.  Remember all my admonitions.  We'll take

15   a 20-minute break, and then we'll call for you after that, and

16   we'll continue with the evidence.

17             If you would, please take the jury to the jury room.

18   And everyone else remain in the courtroom.

19         (The jury departed the courtroom at 3:18 p.m.)

20             **THE COURT:**  All right.  Please be seated.  Everyone

21   else remain in the courtroom until the jurors are safely across

22   the hall.

23             My review of the transcript reveals no objection

24   other than the objection to the question of whether a violation

25   report was filed.  There was an answer and then an objection,

Case 1:19-cr-00529-TDS   Document 362   Filed 02/04/22   Page 168 of 214

1  but I overruled it.  After that, there were no further

2  objections, according to the transcript.  That was my

3  recollection.  If your recollection is different, let me know.

4        **MR. PRINCIPE:**  My recollection is different, Your

5  Honor.  I objected the one time.  We had the bench conference.

6  They circled back around to the same line of questioning.  When

7  they asked if he had been revoked, I objected again because we

8  were going back to the same subject matter that you had

9  previously sustained.

10        **THE COURT:**  Well, you did.  And your objection was to

11  the length of sentence, and I overruled the objection because

12  they were simply asking whether he had been revoked on his

13  probation.  After that, there were no other objections.  There

14  were more questions without objections.  So you're correct; you

15  did object at that point.  I overruled it.  But the question

16  was:  "And you filed a violation report against him?"  And

17  answer:  "Correct."

18        You objected after that, but I overruled it, in any

19  event.  But there were more questions without objections.

20        **MR. PRINCIPE:**  Okay, Your Honor.

21        **THE COURT:**  That's why I didn't rule, because I was

22  not going to jump in and sustain my own objections.

23        Okay.  So if you think there is something that needs

24  to be raised with the witness, then you will need to do that

25  before the 20 minutes is up so I know whether you are going to

Case 1:19-cr-00529-TDS  Document 362  Filed 02/04/22  Page 169 of 214

1   come back.  Maybe Mr. Green knows what he wants to do.

2       (Mr. Green returned to the courtroom.)

3           **MR. PRINCIPE:**  Yes, Your Honor.

4           **THE COURT:**  I guess you are in a little bit of a

5   difficult position because the witness is still testifying, but

6   you're trying to find information about what's going on with

7   the witness.

8           In your absence, we established that the objection

9   was to the question of whether Mr. Cox had been revoked.  The

10  objection came after the answer, but I went ahead and overruled

11  it.  After that, there were no further objections.

12          **MR. GREEN:**  Yes, Your Honor.

13          **THE COURT:**  So that's why I did not rule.  So I don't

14  know whether you think the witness is necessary again or not.

15          **MR. GREEN:**  We need to make further inquiry, given

16  what was suggested.  We do.  So I would like to speak with that

17  witness further.  I certainly welcome counsel to join me.

18          **THE COURT:**  All right.  That's fine.  Why don't you

19  all make arrangements, and then if there is any chance she's

20  going to testify when we start back up, let me know.  I would

21  like to start in 20 minutes, if we can do that.

22          **MR. GREEN:**  Yes, Your Honor.

23          **THE COURT:**  We'll take a break.  Please be ready at

24  20 'til.

25      (Proceedings recessed at 3:24 p.m.)

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1      (Proceedings called back to order at 3:43 p.m.)

2      (The Defendant was present.)

3           **THE COURT:**  Okay.  Mr. Green?

4           **MR. GREEN:**  We'll move to release that witness.  We

5  have some other inquires we need to make, Your Honor, but

6  nothing further.

7           **THE COURT:**  Okay.  All right.  We're ready to proceed

8  then?

9           **MR. GREEN:**  We are.

10           **THE COURT:**  Okay.  All right.  Let's bring the jury

11  back in, please.

12           Do you know who your next witness is?

13           **MR. GREEN:**  Sarah Fox.

14           **THE COURT:**  You can bring that witness in.

15      (The jury returned to the courtroom.)

16           **THE COURT:**  Please be seated, everyone.

17           The Government may call its next witness.

18           **MR. GREEN:**   The Government calls Sarah Fox.

19  **SARAH FOX**, GOVERNMENT'S WITNESS, being first duly affirmed, at

20  3:46 p.m. testified as follows:

21           **THE COURT:**  Please remove your mask so we can see and

22  hear you and point the microphone toward your mouth.

23           Thank you.

24                    DIRECT EXAMINATION

25

Case 1:19-cr-00529-TDS   Document 362   Filed 02/04/22   Page 171 of 214

1    **BY MR. GREEN**

2    Q    Would you tell the jurors your full name.

3    A    My name is Sarah Fox.

4    Q    And, Miss Fox, where generally did you live in April of

5    2018?

6    A    In Durham, North Carolina.

7    Q    Did you live near Driver Street?

8    A    Yes.

9    Q    I'll direct your attention to the late evening of

10   April 15, 2018.  Do you recall that day?

11   A    No, I don't.

12   Q    Do you recall placing a 911 call?

13   A    I don't.

14   Q    I am going to play an audio for you and ask if you -- from

15   Government's Exhibit 7 and see if you recognize your voice.

16        (Government's Exhibit No. 7 was played.)

17   **BY MR. GREEN**

18   Q    Do you recognize your voice?

19   A    Yes, I do.

20   Q    And do you recall now making a 911 call in April of '18

21   about something?

22   A    I don't recall that specific 911 call, but I do recognize

23   my voice.

24   Q    I'll ask you to listen to this call.

25        (Government's Exhibit No. 7 was played.)

1  **BY MR. GREEN**

2  Q    Have you heard that call before?

3  A    Yes, I have.

4  Q    And does that refresh your recollection about hearing

5  gunshots somewhere near your home on Driver Street?

6  A    Yes, that's what I called about.

7  Q    And -- and you described hearing two shots?

8  A    That's correct.

9        **MR. GREEN:**  Thank you.  That's all the questions I

10 have.

11       **THE COURT:**  Any cross?

12       **MR. BRYSON:**  No questions, Your Honor.

13       **THE COURT:**  Thank you.  You may step down, ma'am.

14       **MR. GREEN:**  May the witness be released?

15       **MR. BRYSON:**  No objection.

16       **THE COURT:**  You're free to leave, ma'am.

17    (At 3:52 p.m., witness excused.)

18       **THE COURT:**  Call your next witness.

19       **MR. PRINCIPE:**  Your Honor, the next witness is

20 William Joint.

21 **OFFICER WILLIAM JOINT,** GOVERNMENT'S WITNESS, being first duly

22 affirmed, at 3:52 a.m. testified as follows:

23       **THE COURT:**  Please remove your mask so we can see and

24 hear you and point the microphone toward your mouth.

25       Thank you.

Case 1:19-cr-00529-TDS   Document 362   Filed 02/04/22   Page 173 of 214

```
 1                   DIRECT EXAMINATION
 2  BY MR. PRINCIPE
 3  Q    Would you state your name.
 4  A    Officer William Joint.
 5  Q    Who do you work for?
 6  A    Durham Police Department.
 7  Q    How long have you worked with the Durham Police
 8  Department?
 9  A    Three years.
10  Q    Were you working there in April of 2018?
11  A    Yes, sir.
12  Q    How long had you been working there in April of 2018?
13  A    I was hired in July and then went through training, so I
14  was in the first phase of PTO.
15  Q    So you were hired in July of 2017?
16  A    Correct.  But I wasn't working until 2018.
17  Q    Okay.  And do you recall responding to a call for service
18  on North Driver Street on April 15, 2018?
19  A    Yes, sir.
20  Q    Approximately what time of day was that that you responded
21  to that call?
22  A    10:46 in the evening, close to 11:00 p.m.
23  Q    Okay.  Were you a patrol officer at the time?
24  A    Yes, sir.
25  Q    Are you a patrol officer now?
```

Case 1:19-cr-00529-TDS  Document 362  Filed 02/04/22  Page 174 of 214

1  A    Yes.

2  Q    Were you working with somebody that night?

3  A    Yes, my PTO, Officer Joseph Justice.

4  Q    And what is a PTO?

5  A    It is the officer that the department uses to train new

6  officers that are just coming out of the academy.

7  Q    So you were the new guy; right?

8  A    Yes, sir.

9  Q    Okay.  Who was driving the vehicle to that location when

10 the call came in?

11 A    I was, sir.

12 Q    And what information did you receive when you were

13 dispatched to that location?

14 A    That a GS -- gunshot wound was reported in the 200 block

15 of West Main Street and Driver Street.

16 Q    Had you been to that area before?

17 A    Yes.  Through the training, I've been in that area before.

18 Q    So you were generally familiar with that area?

19 A    Yes, sir.

20 Q    I am going to play a 911 call from Government's Exhibit 7.

21      (Government's Exhibit No. 7 was played.)

22 **BY MR. PRINCIPE**

23 Q    Officer Joint, what was the weather like when you

24 responded to that call?

25 A    It was raining that night.

1              MR. PRINCIPE:  May I approach the witness?

2              THE COURT:  Yes.

3  BY MR. PRINCIPE

4  Q    What was the first name of your PTO?

5  A    Joseph.

6  Q    Did Joseph Justice have body-worn camera at that time?

7  A    Yes, sir.

8  Q    And I'm showing you Government's Exhibit 314.

9       Do you recognize that disk?

10 A    Yes.

11 Q    Did you have an opportunity to review the body camera

12 footage on this disk?

13 A    Yes.

14 Q    Was that body-worn camera footage from the camera that

15 Officer Justice was wearing that night?

16 A    Yes, sir.

17 Q    Did you see yourself on that footage?

18 A    Yes.

19 Q    Did you interact with the person who had an injury at that

20 scene?

21 A    Yes.

22 Q    Is that captured on the footage from Officer Justice's

23 camera?

24 A    Yes.

25             MR. PRINCIPE:  Government would move Government's

Case 1:19-cr-00529-TDS  Document 362  Filed 02/04/22  Page 176 of 214

1  Exhibit 314 into evidence.

2          **THE COURT:**  Admitted.

3          **MR. PRINCIPE:**  Permission to publish the video, Your

4  Honor?

5          **THE COURT:**  You may.

6          **MR. PRINCIPE:**  We'd like to advance the video to

7  approximately three minutes.

8      (Government's Exhibit No. 314 was played.)

9  **BY MR. PRINCIPE**

10 Q   Do you recognize the person in this image at 5 minutes and

11 14 seconds?

12 A   Yes, sir.

13 Q   Who is that?

14 A   Myself.

15         **MR. PRINCIPE:**  Continue playing.

16     (Government's Exhibit No. 314 was played.)

17         **MR. PRINCIPE:**  Stop at 5 minutes and 40 seconds and

18 advance it to 7 minutes and 30 seconds.

19 **BY MR. PRINCIPE**

20 Q   Is that you in the image there?

21 A   Yes.

22         **MR. PRINCIPE:**  Continue.

23     (Government's Exhibit No. 314 was played.)

24 **BY MR. PRINCIPE**

25 Q   So we watched those two segments of the body-worn camera.

Case 1:19-cr-00529-TDS  Document 362  Filed 02/04/22  Page 177 of 214

1  A    Yes.

2  Q    Let me ask you first about the tall individual in black.

3  Did you see an injury on that person?

4  A    Yes, he was shot in the back.

5  Q    Did you obtain the names of any of the three individuals

6  that were out there?

7  A    The man in the red pants was Charles Daniels.

8  Q    And who was the tall person with the injury to his back?

9  A    Darryl Bradford.

10 Q    Did you or any other officers look for any evidence of a

11 drive-by shooting in the areas described by those witnesses?

12 A    Sergeant Frances was the woman in the video, and Officer

13 Justice looked for shell casings, and none were found.

14      **MR. PRINCIPE:**  I apologize.  May I have one moment,

15 Your Honor?

16      **THE COURT:**  All right.

17      (Assistant U.S. attorneys conferred.)

18 **BY MR. PRINCIPE**

19 Q    And there was accounts of that drive-by shooting by two

20 individuals; correct?

21 A    Can you repeat that question?

22 Q    Sure.  When you were standing there first with

23 Mr. Bradford, did he give an account of what happened?

24 A    Yes, sir.

25 Q    What did he say happened?

Case 1:19-cr-00529-TDS   Document 362   Filed 02/04/22   Page 178 of 214

1   A    He said he was shot walking down Main Street and that the

2   vehicle went west on Main Street.

3   Q    And then the second segment, you spoke with Mr. Daniels;

4   correct?

5   A    Yes.

6   Q    And what did Mr. Daniels say happened?

7   A    He said also a black car was believed to be the suspect

8   vehicle, but it went the opposite way.

9   Q    So they had statements that were not -- that were

10  inconsistent with one another?

11  A    Yes, sir.

12       **MR. PRINCIPE:**  And if we could just pull up the very

13  beginning of that video and just stop it.

14  **BY MR. PRINCIPE**

15  Q    So you were responding -- well, where is this video

16  starting where there is walking?

17  A    From the previous call that I was leaving, which was in

18  the general area of the gunshot wound call.

19  Q    Okay.  And we started the video at approximately -- the

20  first clip was at approximately three minutes when you arrived

21  at the Driver Street scene?

22  A    Yes, sir.

23  Q    So is it fair to say you arrived at Driver Street three

24  minutes after the timestamp here?

25  A    Yes, sir.

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1  Q    And what is the date and time stamp -- please go back.

2  What is the date and timestamp at the very beginning of this

3  video?

4  A    April 15, 2018, at 10:48 p.m.

5  Q    So you would have arrived on Driver Street about five

6  minutes after that?

7  A    Yes, sir.

8           MR. PRINCIPE:  No further questions.  Thank you.

9           THE COURT:  Any cross?

10          MR. BRYSON:  No questions, Your Honor.

11          THE COURT:  You may step down, sir.  If you would put

12 your mask back on as you exit the courtroom.

13          MR. PRINCIPE:  May this witness be released, Your

14 Honor?

15          THE COURT:  Any objection?

16          MR. BRYSON:  No objection.

17          THE COURT:  You're free to leave, sir.

18          THE WITNESS:  Thank you, Your Honor.

19     (At 4:13 p.m., witness excused.)

20          MR. PRINCIPE:  The Government next calls Justin

21 Ellerbe.

22 **STAFF SERGEANT JUSTIN ELLERBE**, GOVERNMENT'S WITNESS, being

23 first duly affirmed, at 4:13 p.m. testified as follows:

24          THE COURT:  Please remove your mask so we can see and

25 hear you and point the microphone toward your mouth.

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1          Thank you.

2                    DIRECT EXAMINATION

3  **BY MR. PRINCIPE**

4  Q    Would you state your name.

5  A    Justin Ellerbe.

6  Q    And who do you work for?

7  A    The Durham County Sheriff's Office.

8  Q    What position are you in?

9  A    I'm a staff sergeant currently assigned as the detention

10 intelligence supervisor.

11 Q    Where do you operate out of?

12 A    The Durham County Detention Facility.

13 Q    So is that basically the detention center or jail?

14 A    Yes, sir.

15 Q    And how long have you worked for the Durham County

16 Sheriff's Office?

17 A    Twenty-one years.

18 Q    And what are the different roles that you have had?

19 A    I've worked everything from a detention officer to a

20 deputy sheriff, everything in the detention center, all of

21 those positions.  And, again, my current assignment for the

22 past six years has been detention intelligence.

23 Q    What does a detention intelligence officer do?

24 A    Process information gathered within -- from various

25 sources within the detention facility and turn it into actual

1  intelligence for our law enforcement partners.

2  Q    And what is the purpose of that information or

3  intelligence?

4  A    To aid our law enforcement partners in ongoing

5  investigations.

6  Q    So you were in that position in May of 2018?

7  A    Yes.

8  Q    Were you familiar at that time with Semaj Jayron-Maleek

9  Bradley?

10 A    Yes, sir.

11 Q    Did you have an encounter with him at the detention center

12 on May 29, 2018?

13 A    Yes, sir, I did.

14 Q    Where was he at the time?

15 A    He was housed in the detention facility in one of the

16 housing units, Pod 4D.

17 Q    And why did you have contact with him on that date?

18 A    At the request of Corporal Champagne, he asked me to take

19 a photo of Mr. Bradley's face.

20 Q    Okay.  Did he give you any more details as to why?

21 A    Not that I can recall.

22 Q    Okay.  And so what did you do when you were asked to do

23 that?

24 A    Shortly after 5:00 p.m., I went to the Housing Unit 4D and

25 escorted Mr. Bradley from that housing unit, and I told him

1  that I needed to take a picture of his face.

2  Q   Did he say something at that point?

3  A   Yes.  When I said, "I need to take a picture of your

4  face," he pointed to a scar just beneath his left eye on his

5  check and said, "What?  This?"

6          **MR. PRINCIPE:**  May I approach the witness --

7  **BY MR. PRINCIPE**

8  Q   Actually, let me show you Government's Exhibit 316 on your

9  monitor.

10         **THE COURT:**  All right.

11 **BY MR. PRINCIPE**

12 Q   Do you recognize what that is?

13 A   Yes, sir.

14 Q   What is that?

15 A   That's a photo I took of Mr. Bradley.

16 Q   Okay.  And when was that photo taken?

17 A   May 28.

18 Q   Was that during the encounter you had with him while he

19 was in the detention center that you just testified to a few

20 minutes ago?

21 A   Yes, sir.

22 Q   Okay.  Did that fairly and accurately show the condition

23 of his face at that time?

24 A   Yes, sir.

25         **MR. PRINCIPE:**  Your Honor, Government moves

Case 1:19-cr-00529-TDS   Document 362   Filed 02/04/22   Page 183 of 214

1 Government's Exhibit 316 into evidence.

2        **THE COURT:**  Admitted.

3        **MR. PRINCIPE:**  Permission to publish that?

4        **THE COURT:**  You may.

5        **MR. PRINCIPE:**  If we can zoom in around the eye and

6 cheek area.

7 **BY MR. PRINCIPE**

8 Q    Is that the area of his body that he pointed to?

9 A    Yes, sir, it is.

10        **MR. PRINCIPE:**  Back out.

11        Thank you.  No further questions.

12        **THE COURT:**  Any cross?

13        **MR. FOSTER:**  I have no questions.

14        **THE COURT:**  Thank you, sir.  You may step down.  Don

15 your mask again and be careful on the step down from the

16 witness stand.

17        **MR. PRINCIPE:**  May the witness be released, Your

18 Honor?

19        **THE COURT:**  Any objection?

20        **MR. FOSTER:**  No objection.

21        **THE COURT:**  You're free to leave.  Thank you.

22     (At 4:18 p.m., witness excused.)

23        **THE COURT:**  Call your next witness.

24        **MR. GREEN:**  David Cramer.

25 **INVESTIGATOR DAVID L. CRAMER,** GOVERNMENT'S WITNESS, being first

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1  duly affirmed, at 4:19 p.m. testified as follows:

2          **THE COURT:**  If you would remove your mask so we can

3  see and hear you and bend the microphone so it's directed

4  toward your mouth.

5          **THE WITNESS:**  Yes, Your Honor.

6                       DIRECT EXAMINATION

7  **BY MR. GREEN**

8  Q    Would you tell the jury your full name.

9  A    David Lee Cramer.

10 Q    Could you tell us what you do for a living?

11 A    I'm a homicide investigator with the Durham Police

12 Department.

13 Q    And how long have you held that job?

14 A    I have been a police officer for eight and a half years

15 and a homicide investigator for the last three.

16 Q    Were you a homicide investigator in April of 2018?

17 A    I was.

18 Q    And what, generally, are your duties as a homicide

19 investigator?

20 A    So I investigate any unnatural death that occurs in the

21 city of Durham, any natural death that does not have an

22 attending physician, and any homicide that occurs within the

23 city limits.

24 Q    And were you working in that capacity on April 15, 2018?

25 A    Yes, I was.

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1  Q     Could you describe to the jurors if you got dispatched
2  anywhere in reference to a shooting?
3  A     Yes.  The evening of April 15, shortly after 11:00 p.m., I
4  was notified of a homicide that occurred at 4617 Carlton
5  Crossing Drive.
6  Q     And did you respond to the area?
7  A     I did.
8  Q     What did you see when you arrived?
9  A     When I initially arrived, it was heavily raining.  It was
10  about 64 degrees outside.  And upon my arrival, I made initial
11  observations of the scene.
12  Q     And could you describe those initial observations?
13  A     Yes.  So as I said before, it was heavily raining.  I
14  observed shell casings -- fired shell casings in the roadway,
15  multiple calibers, some glass fragment in front of 4617 Carlton
16  Crossing.  I observed a Toyota Sienna van that was in the
17  roadway.  The decedent was sitting in the driver's seat.
18        I also observed a blue Nike shoe that was in the front
19  yard, multiple spent fired shell casings as well on the front
20  walkway that leads to the front porch, as well as on the front
21  porch with a latex glove.
22  Q     Did you speak to witnesses there?
23  A     I did.
24  Q     As you spoke to the witnesses, did that include the
25  family?

Case 1:19-cr-00529-TDS   Document 362   Filed 02/04/22   Page 186 of 214

1  A    Yes, it did.

2  Q    And did they relate to you what had happened?

3  A    They did.

4  Q    And what did they describe, generally?

5  A    They described -- Ms. Chan, Mr. Zheng's wife, described

6  responding home with her husband in the Toyota Sienna van.  As

7  she walked up to her front porch to retrieve the handgun, as is

8  their nightly routine, as described by the family, she observed

9  that her son reacted to seeing something.  As she turned

10 around, she fell into the front of the house through the door

11 and observed multiple people running towards her.  She heard

12 multiple shots.  And then she would exchange fire with the

13 suspects as they ran and jumped back into a white, as she

14 described, Jeep and drove away.

15 Q    Did you then kind of look around in terms of evidence

16 you're seeing on the scene for evidence that, for lack of a

17 better word, corroborated what was described?

18 A    Yeah.  At one point during her statement, she stated she

19 was unable to initially fire her weapon.  So she had to, as she

20 described, rack the slide multiple times, which ejected

21 multiple unfired rounds which were still visible on the porch.

22 And there were multiple shell casings from the same caliber

23 firearm as was located within her house, as well as multiple

24 shell casings outside the residence as well.

25 Q    Now, as you began to assess that scene, what did you

1    decide to do next?

2    A    After assessing the scene, we initially did a canvass of

3    the surrounding residences to look for surveillance footage or

4    any possible witnesses.

5    Q    Did you find witnesses?

6    A    I did.  I spoke to one individual that night.

7    Q    And what individual is that?

8    A    Matt Hofmeier, 4702 Carlton Crossing.

9    Q    What did Mr. Hofmeier relate?

10   A    He stated that he was inside of his residence and he heard

11   multiple gunshots.  As he looked out his window, he observed a

12   newer model white SUV driving southbound down Carlton Crossing,

13   and he observed the rear passenger door closing as the vehicle

14   was driving away.

15   Q    Did that pique your interest?

16   A    It did.

17   Q    What did you determine about where the victim and his

18   spouse had come from earlier that evening?

19   A    So they came from China Wok at 3825 South Roxboro Street.

20   Q    And given the information that you had been provided at

21   the scene and what you saw there, did you oversee -- were you

22   there as crime scene investigators responded and started

23   collecting evidence?

24   A    Yes, I was on scene as Forensics responded and processed

25   the scene.

1  Q    And you observed them documenting and picking up evidence,

2  et cetera?

3  A    I did.  And after the scene was completed, we did do an

4  evidence review together as well.

5  Q    Now, after you had got this kind of initial assessment of

6  what had happened, what did you do next?

7  A    So when we were still processing the scene, we had to have

8  the vehicle towed due to the weather.  So as we were beginning

9  to complete that processing, I was notified of additional

10 damage to a house across the street, 4618 Carlton Crossing

11 Drive.  I was unable to initially make contact with them, left

12 a business card, and then after the scene would be cleared some

13 hours later, I would receive a return phone call from the

14 family that resided that there, and I would respond back out

15 there with Forensics to collect a projectile that would be

16 located within the residence.

17 Q    Were you present when it was collected?

18 A    I was.  I located the projectile near a dresser near the

19 front door.

20 Q    Based on what you had seen in terms of the shell casing

21 and the evidence that you saw at the scene, how did you start

22 to formulate your investigation?

23 A    So based off of them -- and "them" being Ms. Chan and

24 Mr. Zheng -- arriving back from China Wok and upon their

25 arrival this incident occurring, I decided to go over to that

1  business and canvass the surveillance footage from surrounding

2  businesses that surrounded China Wok.

3  Q    And did you do that?

4  A    I did.

5  Q    And where did you look?

6  A    So I looked at every business that surrounded China Wok,

7  and I began at a business, McDonald's, as you turn into the

8  street and before you go into the parking lot.  But then I

9  would make it to a Kroger, which has cameras that faces the

10 actual business.

11 Q    And did you ask for the surveillance video?

12 A    Yes.

13 Q    And did you watch it that day or some later day?

14 A    Both.  I watched initial footage from the night of the

15 15th while I was inside the store, and I would request footage

16 from April 8 to April 15, which would be given to me at a later

17 date, and I would review that additional footage then.

18 Q    And when you looked at the surveillance on the 15th, what

19 were you looking for?

20 A    Based off of the witness statements, I was trying to see

21 if any vehicle had come and gone in short proximity to when the

22 victims left.  And I was looking for the victim's vehicle to

23 see what time they left, as well as a white in color SUV as

24 stated by the witnesses.

25 Q    And did you see that?

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1   A    I did.

2   Q    I'm going to show you an excerpt from Exhibit 26.

3        Do you recognize this surveillance camera?

4   A    I do.

5        (Government's Exhibit No. 26 was played.)

6   Q    I paused that at -- I'm sorry.  It's not paused -- at

7   22:05:21.

8        Do you recall seeing that video?

9   A    Yes, I do.

10  Q    And did you make note of it?

11  A    I did.

12  Q    Why did you make note of it?

13  A    Because this -- I observed a newer model white SUV pulling

14  into the parking lot and backing into a parking space in short

15  proximity to China Wok.

16  Q    As you watch this surveillance video, what do you recall

17  about watching it and what other significant things you saw on

18  it?

19  A    So near the top left corner of the video, there is a van

20  that's parked in front of the China Wok.  That is a Toyota

21  Sienna van belonging to Mr. Zheng and Ms. Chan.

22  Q    And why was that significant to you?

23  A    Because based off of what it appeared, the business was

24  about to close and they were about to leave.  So somebody that

25  was driving past would see their van parked in front of the

1  business.

2  Q    Also the date/time group in this video, could you read it

3  out loud?

4  A    I'm sorry, sir.  Can you repeat that?

5  Q    Can you read out loud the date and time.

6  A    April 15, 2018, 2205 and 29 seconds.

7  Q    How long, approximately, is this prior to when you get the

8  report of the shooting?

9  A    Around 15 to 17 minutes.

10 Q    What is the last timestamp you see on this particular clip

11 of the van?

12 A    April 15, 2018, 2208 and 19 seconds.

13 Q    And at this point had the white car left before the van

14 has departed?

15 A    Yes, it had.

16 Q    What is the next thing you did in your investigation?

17 A    So based off the surveillance footage and reviewing

18 additional footage within the parking lot of China Wok, we

19 determined it was a newer model Lincoln MKX was the vehicle we

20 were looking at in the surveillance footage.  So we checked

21 department databases for any incident reports of anyone

22 reporting any damage to a Lincoln MKX based off of what we had

23 seen on the scene with the glass fragments.

24 Q    Now, going back to the scene, had you noticed glass

25 fragments in the roadway?

1    A    Yes.

2    Q    And why was that significant?

3    A    Because with Ms. Chan's statement that she returned

4    gunfire with them, there was a good possibility that a vehicle

5    they may have been operating would have been struck by gunfire.

6    Q    Did you find a report of damage to a Lincoln MKX?

7    A    I did, reported the morning of April 16, 2018, roughly

8    nine hours after the incident.

9    Q    And what did you do when you found that report?

10   A    So I first read the report, got an initial understanding

11   of what was being reported, and then based off of the incident

12   report information, I would check 911 calls in the area that

13   the caller Taquila House would say that the incident had

14   actually occurred.

15   Q    Did you review the body-worn camera?

16   A    I did.

17   Q    I'm going to show you Government's Exhibit 32.

18        (Exhibit played.)

19   **BY MR. GREEN**

20   Q    Do you recognize that as the body-worn camera you

21   reviewed?

22   A    I do.

23   Q    You then pull the report associated with that body camera?

24   A    That's correct.

25   Q    And you mentioned Miss House, Taquila House?

1  A     Yes.  She was the reporting person for the incident

2  report.

3  Q     Do you recall what had been reported with regard to that

4  vehicle --

5  A     She had stated --

6  Q     -- initially?

7  A     I'm sorry.

8        She had stated that she had left this vehicle parked off

9  of a street called Wiggins Street, which was in the northern

10 part of the city.  And she had left it unoccupied around

11 10:00 p.m. the night of the 15th, and she returned back to the

12 car within about an hour, so about 11:00 p.m., and returned

13 back to her house -- or her apartment at 1315 Morreene Road,

14 but didn't notice the damage to the vehicle until the next

15 morning.

16 Q     And did you make an inquiry to see if there had been any

17 reports of shots fired in the Wiggins Road areas?

18 A     I did.  I checked for approximately a two-hour time frame

19 between 9:00 p.m. and 11:00 p.m.

20 Q     And was there?

21 A     There was not.

22 Q     So based on that information, now that you had seen a

23 Lincoln MKX with bullet damage on the side, what did you do

24 next?

25 A     I attempted to make contact with Miss House.

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1   Q    And did you?

2   A    I did.

3   Q    When you talked to her, initially, what did she tell you?

4   A    Initially, she provided the same statement that she stated

5   in the incident report in regards to how the damage got there.

6   She would -- I would ask her if the vehicle had been repaired,

7   and she stated that it had.  And then near the end of our

8   conversation, she would make statements saying that the vehicle

9   was still being repaired, but she did not know where it was

10  being repaired at.

11  Q    And what did you do with that information once she

12  provided it?

13  A    I asked her if we could meet in person.  She said that she

14  could not because she was going to work.  And she indicated

15  that she worked at Duke North, which is a part of the Duke

16  University Medical Center campus.

17  Q    Did you determine -- did you decide to go out there where

18  Miss House worked?

19  A    I did.

20  Q    Did you take -- were you by yourself or was there another

21  investigator with you?

22  A    Investigator Mitchell came to the hospital with me.

23  Q    Describe what happened once you got there.

24  A    So we made contact with Miss House in a supervisor's

25  office; and when we spoke with her, she would state that the

1    story that she had given was false, and she would indicate that

2    a gentleman by the name of Wiley was the one that was operating

3    the vehicle the day of the 15th.

4    Q    When you talked to Miss House, did she provide her

5    telephone number, either when you called her or at the time you

6    interviewed her?

7    A    I believe that the number that I got from her was from the

8    incident report, which worked.

9    Q    I am going to -- do you recall offhand what that number

10   was?

11   A    I would have to review my case notes.  I'm sorry.

12            **MR. GREEN:**  May I approach?

13            **THE COURT:**  You may.

14   **BY MR. GREEN**

15   Q    I'm looking at paragraph 70, and ask if that refreshes

16   your recollection as to the number that Miss House provided

17   that was her number?

18   A    Yes.

19   Q    What was the number?

20   A    (252)499-3761.

21   Q    While you were speaking with Miss House at Duke, what did

22   she relate to you in regards to what had happened with the

23   Lincoln?

24   A    She stated that she received a phone call from Wiley

25   sometime after 11:00 p.m., and he had indicated that he had

1  been in a location and there was shooting and he had tried to

2  drive off.

3  Q    And during that interview, did Miss House contact

4  Mr. Wiley?

5  A    Yes.  I can't recall -- I don't recall if he called or she

6  called, but that phone number was -- we did have communication

7  with him, yes.

8  Q    And at the time you communicated with him, tell me, were

9  you recording the interview with Miss House?

10 A    Yes, it was audio recorded.

11 Q    And during that call, tell us how -- did you actually

12 speak to the individual that she had identified as Wiley?

13 A    I did.

14 Q    And how did that come about?

15 A    So when she answered the phone, he multiple times asked,

16 "What's wrong with the car?  What's wrong with the car?"  I

17 asked him to come in and speak with us.  We can talk about it.

18 He became somewhat belligerent, stated that he would not come

19 in and talk with us and that he had the vehicle with him.  He

20 had just gotten it repaired and was on his way back in to

21 Durham to return the vehicle.

22 Q    And did you or Investigator Mitchell make a note of the

23 telephone number that this individual identified as Wiley had

24 called in?

25 A    Yes, we did.

Case 1:19-cr-00529-TDS   Document 362   Filed 02/04/22   Page 197 of 214

1  Q    Do you recall what that number was?

2  A    I do.

3  Q    What was the number?

4  A    (864)484-6112.

5  Q    I'm going to play you a portion of an audio recording and

6  ask if you recognize it.

7            **THE COURT:**  Does this have an exhibit number?

8            **MR. GREEN:**  It does.  It's 311A.

9            **THE COURT:**  Thank you.

10      (Government's Exhibit No. 311A was played.)

11  **BY MR. GREEN**

12  Q    Do you recognize that recording?

13  A    Yes.

14  Q    And I heard a female's voice.  Whose voice is that?

15  A    Taquila House.

16  Q    I heard a male voice.  Do you recognize that voice?

17  A    Yes.

18  Q    Whose voice?

19  A    Maurice Wiley.

20  Q    Now, have you had an opportunity to hear Mr. Wiley's voice

21  at other times?

22  A    Up to this point, no.

23  Q    But subsequently?

24  A    Afterwards?

25  Q    Yes.

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1  A    Yes, upon his arrest on April 27.

2  Q    And do you recognize the voice that you've identified as

3  Maurice Wiley as Maurice Wiley?

4  A    I do.

5        **MR. GREEN:**  And, Your Honor, I am going to move

6  introduction of Government's Exhibit 311A.

7        **THE COURT:**  All right.  It's admitted.

8        **MR. GREEN:**  I ask that it be published?

9        **THE COURT:**  It may.

10       (Government's Exhibit No. 311A played.)

11 **BY MR. GREEN**

12 Q    Who is that?

13 A    That would be me.

14       **MR. GREEN:**  Go ahead.

15       (Government's Exhibit No. 311A was played.)

16 **BY MR. GREEN**

17 Q    Did you -- did that conversation ultimately end?

18 A    Yes.  The phone call was disconnected.

19 Q    And did you -- while there still with Miss House, did she

20 receive a text message from the telephone number that you had

21 identified as the call originating from?

22 A    Yes.

23 Q    Do you recall what that text message -- do you note what

24 it took -- what the text message was?

25 A    I would have to review my notes for verbatim.

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1  Q    This is at the end of the interview?

2  A    Yes.

3  Q    Does that help refresh your recollection?

4  A    Yes, it does.

5  Q    What was the text message?

6  A    It says:  *If nobody can tell me what the problem is with*

7  *this car, I am not driving it.  Well, it will stay here.*

8  Q    What did you do next in your investigation after you left

9  your conversation with Miss House?

10 A    I would research the telephone in which we had spoken with

11 Mr. Wiley.

12 Q    And did you determine who that number was registered to?

13 A    Yes.

14 Q    And who was it registered to?

15 A    Maurice Wiley.

16 Q    Did -- after you had done that, at some point did the

17 Federal Bureau of Investigation become involved or assist the

18 Durham Police Department?

19 A    Yes.  Agents with the FBI's Raleigh Durham Safe Streets

20 Task Force.

21 Q    And did you then begin to communicate and coordinate with

22 those agents?

23 A    Yes, I did.

24 Q    And the task force agents; is that right?

25 A    Yes.

1  Q    What did you do next?

2  A    So I contacted the FBI, provided them the information that

3  I had been given at this point, and they assisted me with

4  getting phone records for, particularly, this phone at this

5  point.

6  Q    Did you do any further research on the Lincoln that was

7  found outside Miss House's residence?

8  A    On the Lincoln -- oh, in terms of -- so we would determine

9  that the vehicle had been rented by AVIS Rental at 1720 Guess

10 Road.

11 Q    And at some point, were you notified that the Lincoln had

12 been returned?

13 A    Yes.  The morning of April the 19th, we were notified.

14 Q    And did you respond to that location?

15 A    I did.

16 Q    And what did you find when you got there?

17 A    We observed a Lincoln MKX parked in the parking lot of the

18 AVIS Rental, which is on a strip mall, so it's got multiple

19 locations, it's a large parking lot, and the vehicle was parked

20 at the top corner of the parking lot kind of by itself.

21 Q    Did you seek to determine who had rented that Lincoln?

22 A    Yes.  We spoke with employees inside of AVIS.

23 Q    Did that include Mr. Hassan?

24 A    It did.

25 Q    And did Mr. Hassan -- let me back up.

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1        Once you had determined Mr. Wiley's identity from the

2   phone records, did you research that name to see if there are

3   other aliases and nicknames associated with it?

4   A    I did.

5   Q    And what was -- what did you find?

6   A    Tweet.

7   Q    Tweet?

8   A    Yes.

9   Q    Did you speak with Mr. Hassan?

10  A    I did.

11  Q    When you got out there to the -- before that, when you got

12  there and saw the Lincoln at the Budget -- or the AVIS, what

13  did you notice, if anything, about it?

14  A    The rear driver's side door, the paint was a different

15  coloration than the rest of the vehicle.  And we could see

16  through the outside to the inside and see small glass fragments

17  in the floorboard.

18  Q    Did you elect to get a search warrant?

19  A    Yes, we did.

20  Q    And seize that vehicle?

21  A    Yes.

22  Q    What did you do next in your investigation?

23  A    We spoke with Mr. Hassan.

24  Q    And did he give you some information at that time?

25  A    Yes.

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1  Q    I'll ask if you subsequently went back out to Carlton

2  Crossing Drive on or about April 19 and again talk to Ms. Chan,

3  Shirley, and her children?

4  A    Yes.  After leaving AVIS, I responded out to that location

5  and spoke with them in their residence.

6  Q    And so this is roughly four days after the event?

7  A    That's correct.

8  Q    And when you talked to them about what they had seen and

9  done, did you ask Ms. Chan if she had had any money with her on

10 the occasion of the robbery?

11 A    I did ask her that, yes.

12 Q    And what did she say?

13 A    She said that she did not.

14 Q    What did she say she had with her, if you recall?

15 A    I don't recall.  I would have to review my notes.

16 Q    When you left there, what happened next?

17 A    So I would also speak with, by telephone, another resident

18 who lives on Carlton Crossing Drive, 4705, Evrardo Macias.

19 Q    And what did he relate?

20 A    He would report that the night of the 15th he would hear

21 multiple gunshots; and when he looked outside, he saw a newer

22 model white SUV going southbound on Carlton Crossing.

23 Q    During this process, are you, as well as the FBI -- are

24 you beginning to assemble, via court orders, telephone records

25 associated with various numbers?

Case 1:19-cr-00529-TDS  Document 362  Filed 02/04/22  Page 203 of 214

1  A    Yes.  We received the phone records for the number that
2  Maurice Wiley communicated with us on April 19.
3  Q    After April 19, what is the next significant event in your
4  investigation?
5  A    We would receive a Crime Stoppers tip.
6  Q    Without relating the exact communication of that Crime
7  Stoppers tip, as a result, did you start looking for certain
8  nicknames?
9  A    I did.
10 Q    And what nicknames did you start to search for?
11 A    Stretch, Chub, Semaj, and Tweet.
12 Q    Now, the Tweet, you had already encountered that nickname?
13 A    I had.
14 Q    And starting with Stretch, did you research the Durham
15 database?
16 A    I did.
17 Q    Is that something that the police department keeps up with
18 when they interact with people, nicknames?
19 A    Yes.  If an officer encounters that individual and either
20 gets their nickname from them or is able to obtain it, they
21 will put that into our system for us to be able to see.
22 Q    What was the individual that was associated with the
23 nickname Stretch in the database?
24 A    Darryl Bradford.
25 Q    And what was the next nickname you looked for?

1  A    Chub.

2  Q    And when you started to search for the nickname of Chub,

3  what name did you come up with?

4  A    Hykeem Cox.

5  Q    And what other nicknames did you look for?

6  A    Semaj.

7  Q    And did you associate a name of an individual with that

8  nickname?

9  A    Yes.

10  Q    And who was that?

11  A    Semaj Bradley.

12  Q    And who else?

13  A    Tweet was the last one.

14  Q    Now, as you then took those nicknames, what did you do

15  with that information and the associated name of an actual

16  person?

17  A    So what I would normally do, someone that I'm

18  investigating in an incident, is try to see what incidents they

19  have been involved in, whether before the incident, after the

20  incident, in close proximity to the incident.  And I would

21  locate an incident report for Darryl Bradford from April 15th.

22  Q    And describe the incident report that you located.

23  A    So Darryl Bradford had reportedly been shot in the back.

24  The incident report time was around 10:44 p.m. on April 15th

25  and the call location was 207 North Driver Street, and the 911

1  caller was Charles Daniels.

2  Q    Now, had you gotten the name associated with Charles

3  Daniels yet?

4  A    No, I had not.

5  Q    Did you then start to look to see if there was other

6  information about the incident?

7  A    In regards to that report?

8  Q    Yes.

9  A    I was able to obtain the telephone number that Charles

10  Daniel called from.

11  Q    And what was that number?  Do you recall?

12  A    It would probably be better if I refer to my notes, sir.

13  Q    We'll return to that.  We'll return to that point.

14       As you investigated the incident, did you have an

15  opportunity to review the body cam associated with it?

16  A    I did.

17  Q    And I will play a portion of that body cam for you.

18            **THE COURT:**  What is the exhibit number?

19            **MR. GREEN:**  314.

20            **THE COURT:**  All right.

21       (Government's Exhibit No. 314 was played.)

22  **BY MR. GREEN**

23  Q    Do you recognize this as the body-worn camera video you

24  reviewed?

25  A    Yes, I do.

1      (Government's Exhibit No. 314 was played.)

2  **BY MR. GREEN**

3  Q    Do you recognize the taller of the gentlemen in the

4  right-hand side of that screen?

5  A    Yes, I do.

6  Q    Who is that?

7  A    Darryl Bradford.

8  Q    Was there anything about Mr. Bradford's description that

9  drew your attention in terms of his physical appearance?

10 A    Yes.

11 Q    And what was it?

12 A    His height and that he was skinny.

13 Q    And why did that draw your attention?

14 A    Ms. Chan described that as being one of the suspects in

15 the shooting.

16 Q    And there is a gentleman in the left -- I'm sorry -- my

17 left-hand corner of the monitor just now coming in.  Do you

18 recognize who that is?

19 A    Yes, I do.

20 Q    Who is that?

21 A    Charles Daniels.

22 Q    And at the time did you have any information about

23 Mr. Daniels?

24 A    Not that I can recollect.

25 Q    All right.

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1          **MR. GREEN:**  May I approach the witness?

2          **THE COURT:**  Yes.

3    **BY MR. GREEN**

4    Q    Looking at Government's Exhibit No. 159, I'll ask if you

5    were able to establish Charles Daniels' telephone number from

6    the information on the 911 call?

7    A    Yes.

8    Q    What was that number?

9    A    (984)260-1816.

10   Q    Now, you mentioned earlier that you had gotten some

11   telephone records associated with Mr. Wiley?

12   A    That is correct.

13   Q    Did you find Mr. Daniels' phone numbers in Mr. Wiley's

14   cell phone records?

15   A    Yes, in looking at his records, it showed that they had

16   communicated in April of 2018.

17          **MR. GREEN:**  Your Honor, that might be a good place to

18   pause.

19          **THE COURT:**  All right.  Ladies and gentlemen, we'll

20   stop here tonight.  If you will put your notes in your

21   envelopes.  Leave your envelopes in your chairs.  They will be

22   secured for the evening.

23          Let me ask the lawyers to step up here just a minute.

24          (The following proceedings were had at the bench by the

25          Court and Counsel out of the hearing of the jury:)

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1          **THE COURT:**  Just a quick update on the status of the

2    schedule.

3          **MR. GREEN:**  We're behind a witness and a half.  So

4    I've got another 45 minutes to go with this witness and then --

5    we are still going to finish on Friday.  I don't now believe

6    that we are going to finish prior to lunch.

7          **THE COURT:**  Okay.  All right.  You told me before

8    what your planning was.  Any change in that?

9          **MR. BRYSON:**  No.

10          **THE COURT:**  Okay.  Thank you.

11       (End of bench conference.)

12          **THE COURT:**  All right.  Ladies and gentlemen, we're

13    still ahead of the schedule that I told you.  I don't know that

14    we'll finish tomorrow, but my suspicion is we may finish by

15    Monday.  All right.  So somewhere in that time frame.  So

16    remember all my admonitions, particularly, importantly, don't

17    discuss the case with anyone or among yourselves at all or the

18    evidence.  Don't discuss anything about any of it.  Simply put

19    it out of your mind.  If anybody asks you, you know, how's the

20    trial going, just tell them, I can't talk about it, period, and

21    leave it at that and don't talk to anybody.

22          And when the case is over with, you can then talk to

23    somebody.  But not until then.  All right.  Remember all my

24    admonitions.  Don't try to do any research or -- you would be

25    best served not to go out and try to catch up on any kind of

Case 1:19-cr-00529-TDS   Document 362   Filed 02/04/22   Page 209 of 214

1  news or anything.  Just put it out of your mind.  I don't know

2  if there is anything on it.  But just make it easy for

3  yourself.  Go home and have a nice meal.  Get some sleep.  Come

4  back tomorrow refreshed and ready to go.

5        I appreciate your patience.  And you've been great

6  jurors.  You're prompt.  And we'll do all we can to stay on

7  schedule.  Remember all my admonitions.  Leave your notes here.

8  I am going to dismiss you for the evening.  We'll see you

9  tomorrow at 8:45.

10     (The jury departed the courtroom at Time     )

11        **THE COURT:**  All right.  Please be seated, everyone.

12  Give them a moment to clear out.

13        You may step down, if you will.

14        Do we have any other matter that you need to bring to

15  my attention at this time?

16        **MR. GREEN:**  No, Your Honor.  We do -- I'll just

17  present -- I think this is by agreement of the parties, but

18  just for the Court's awareness, out of the exchange between

19  Poole and Wiley, we edited the document down to what we think

20  is acceptable.  I will present that for whatever purpose the

21  Court --

22        **THE COURT:**  All right.

23        **MR. GREEN:**  -- make sure we're not hitting on

24  anything we shouldn't be.  I'll approach and hand that up.

25        **THE COURT:**  This is by agreement between the parties?

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1          **MR. BRYSON:**  Yes, Your Honor.

2          **THE COURT:**  Okay.  This will be coming in how?

3    Through a witness?

4          **MR. GREEN:**  No, it will come in through Agent Jocys.

5          **THE COURT:**  Okay.  All right.  Anything else?

6          **MR. GREEN:**  No.

7          **THE COURT:**  All right.  Anything from the Defendant

8    at this time?

9          **MR. BRYSON:**  No, Your Honor.

10          **THE COURT:**  Okay.  I think what I am going to do,

11    since it looks since you're still going to be going a little

12    bit tomorrow, first thing in the morning I will get you a draft

13    of the instructions.  I'm basically in agreement with what you

14    have all proposed.  I will hear the Defendant on his objections

15    on the two portions of them.  I do have a little bit of

16    language I typically use on some of these, so I'll highlight

17    anything that's new.  And then you can look at it tomorrow, and

18    then we'll go from there.

19          So the Government -- looks like you'll be going

20    tomorrow until roughly when?

21          **MR. GREEN:**  That's a great question.  I am doing my

22    best to get you a clear answer on that.  I don't know if the

23    Court has the schedule.  I might be able --

24          **THE COURT:**  I do.  I don't need an exact answer.  I'm

25    just trying to get a sense of whether the case might be

Case 1:19-cr-00529-TDS   Document 362   Filed 02/04/22   Page 211 of 214

1  resolved tomorrow in terms of evidence, which it sounds like

2  the answer to that is probably yes.

3          **MR. GREEN:**  Yes.

4          **THE COURT:**  And then whether the lawyers are going to

5  want to do their closings or if it's late in the day, whether

6  you are going to wait and do them on Monday and do everything

7  at once.

8          **MR. GREEN:**  My preference generally, and it is just

9  my preference, for whatever purpose, is to go ahead and argue

10  and if we have time and if the jury can get started, let them

11  get started.  That's my view, but obviously that's the Court's

12  discretion.

13          **THE COURT:**  That may be a function of when you finish

14  then if that happens tomorrow, based on what I'm hearing from

15  the parties, and whether the Defendant wishes to present any

16  evidence.

17          Okay.  Unless there is anything else then, I'll see

18  you all tomorrow at 8:45.  We still have some jurors apparently

19  in the restroom so we'll give them just a moment.  They are

20  using the public restrooms out there.  They are marked.

21          All right.  I'm told the jurors have left the floor.

22  So you all are free to leave.  And obviously if you see if any

23  jurors outside, leave them all alone.  Keep your distance from

24  them.

25          Please adjourn Court.

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1     (Proceedings overnight at 5:06 p.m.)

2

3                    END OF VOLUME IV OF VII

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

US v. Wiley  -- Trial/Vol. IV of VIII  -- 4/22/21

1  UNITED STATES DISTRICT COURT

2  MIDDLE DISTRICT OF NORTH CAROLINA

3  CERTIFICATE OF REPORTER

4

5

6         I,  Briana L. Bell, Official United States Court

7  Reporter, certify that the foregoing transcript is a true and

8  correct transcript of the proceedings in the above-entitled

9  matter prepared to the best of my ability.

10

11         Dated this 4th day of February 2022.

12

13

14         _____

15         Briana L. Bell, RPR
           Official Court Reporter

16

17

18

19

20

21

22

23

24

25