```
 1                IN THE UNITED STATES DISTRICT COURT
             FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
 2

 3   UNITED STATES OF AMERICA    )   CASE NO. 1:19CR529-1
                                 )
 4          vs.                  )
                                 )   Winston-Salem, North Carolina
 5   MAURICE OWEN WILEY, JR.     )   April 23, 2021
     _____   8:57 a.m.
 6

 7                   TRANSCRIPT OF THE TRIAL
               VOLUME V OF VII (Pgs. 918-1149)
 8           BEFORE THE HONORABLE THOMAS D. SCHROEDER
                 UNITED STATES DISTRICT JUDGE
 9

10   APPEARANCES:

11   For the Government:     GRAHAM GREEN, AUSA
                             CRAIG M. PRINCIPE, AUSA
12                           Office of the U.S. Attorney
                             251 N. Main Street, Suite 726
13                           Winston-Salem, North Carolina 27101

14
     For the Defendant:      JOHN D. BRYSON, ESQ.
15                           Wyatt Early Harris & Wheeler, LLP
                             P.O. Drawer 2086
16                           High Point, North Carolina 27261-2086

17                           MARK P. FOSTER , JR., ESQ.
                             Foster Law Offices, PLLC
18                           409 East Boulevard
                             Charlotte, North Carolina 28203
19

20   Court Reporter:         BRIANA L. BELL, RPR
                             Official Court Reporter
21                           P.O. Box 20991
                             Winston-Salem, North Carolina 27120
22

23

24
         Proceedings recorded by mechanical stenotype reporter.
25        Transcript produced by computer-aided transcription.
```

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 1 of 232

1  INDEX

2  **GOVERNMENT'S WITNESSES:**                              **PAGE:**

3  INVESTIGATOR DAVID L. CRAMER (Continued)

4      Direct Examination by Mr. Green              924
       Cross-Examination by Mr. Foster             931
5      Redirect Examination by Mr. Green           933

6  FBI TASK FORCE OFFICER JUSTIN T. GRYDER

7      Direct Examination by Mr. Principe          939
       Cross-Examination by Mr. Bryson             956
8      Redirect Examination by Mr. Principe        958
       Recross-Examination by Mr. Bryson           958
9

10 FBI SPECIAL AGENT MARIA JOCYS

11     Direct Examination by Mr. Green             959
       Cross-Examination by Mr. Foster            1038
12

13 FBI TASK FORCE OFFICER JUSTIN HEINRICH

14     Direct Examination by Mr. Principe         1042
       Cross-Examination by Mr. Bryson            1077
15

16 HYKEEM D. COX

17     Direct Examination by Mr. Green            1079
       Cross-Examination by Mr. Bryson            1099
18     Redirect Examination by Mr. Green          1119

19 JOHN SCOTT

20     Direct Examination by Mr. Green            1120

21 JEREMY FLETCHER

22     Direct Examination by Mr. Principe         1132

23

24

25

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 2 of 232

EXHIBITS

| Exhibits: | | Identified | Received |
|---|---|---|---|
| G-309 | Charles Daniels' cell phone | 928 | 928 |
| G-310 | Hykeem Cox's cell phone | 928 | 929 |
| G-311 | Defendant's cell phone | 929 | 929 |
| G-312 | Interstate nexus examination stipulation | 936 | 938 |
| G-313 | Previous conviction stipulation | 938 | 939 |
| G-317 | Cellebrite extraction report of Government's Exhibit No. 311, LG cell phone | 948 | 949 |
| G-317A | T-Mobile phone record for subscriber (864)484-6112 | 963 | 963 |
| G-317B | T-Mobile phone record for subscriber (313)718-3594 | 965 | 965 |
| G-317C | T-Mobile phone record for subscriber (864)484-6112 | 967 | 967 |
| G-318 | Cell Phone and Instagram Records Stipulation | 1045 | 1045 |
| G-319 | Historical call detail records | 977 | 977 |
| G-320 | Instagram record -- Darryl Bradford | 968 | 968 |
| G-321 | Instagram record -- Semaj Bradley | 969 | 970 |
| G-322 | Instagram record -- Hykeem Cox | 970 | 971 |
| G-323 | Instagram record -- Charles Daniels | 971 | 972 |
| G-324 | Photograph of bed inside residence 610 East Ellerbee Street | 973 | 973 |
| G-325 | Photograph of LG cell phone | 974 | 974 |
| G-326A | Defendant's second cell phone | 929 | 929 |
| G-326 | Photograph of ZTE cell phone | 974 | 975 |
| G-327 | Photograph of cell phone belonging to Semaj Bradley | 975 | 976 |
| G-328 | Summary chart of cell phone records | 978 | 978 |
| G-329 | Summary of phone detail records | 982 | 983 |
| G-330 | Photograph from Instagram of Semaj Bradley with Darryl Bradford | 999 | 1000 |
| G-331 | Photograph of pistol from Hykeem Cox's Instagram account | 1000 | 1001 |
| G-332 | Page from Hykeem Cox's Instagram account regarding sale of pistol | 1001 | |

US v. Wiley -- Trial/Vol. V of VII -- 4/23/21

```
1                              EXHIBITS

2    Exhibits:                              Identified    Received
     G-334    Page from Hykeem Cox's        1003          1003
3             Instagram account regarding
              sale of pistol
4    G-335    Page from Hykeem Cox's        1004
              Instagram account regarding
5             sale of pistol
     G-336    Photograph of Taurus PT145    1005          1005
6             Millennium Pro .45 pistol
     G-337    Photograph of XD9  from Hykeem 1005         1006
7             Cox's Instagram account
     G-338    Cellebrite excerpt/Maurice    1007          1009
8             Wiley's LG phone
     G-339    Cellebrite excerpt/Maurice    1013          1013
9             Wiley's LG phone
     G-340    Cellebrite excerpt/Maurice    1013          1013
10            Wiley's LG phone
     G-341    Cell Phone web search Re:     1014          1015
11            Murder of Hong Zheng
     G-342    Cell Phone web search Re:     1014          1015
12            Murder of Hong Zheng
     G-343    Durham Police Department Hot  1017          1018
13            Sheet
     G-344    Cell Phone web search Re:     1017          1018
14            Murder of Hong Zheng
     G-347    Cellebrite excerpt/Maurice    1018          1019
15            Wiley's LG phone
     G-348    Cellebrite excerpt/Maurice    1024          1024
16            Wiley's LG phone
     G-349    Cellebrite excerpt/Maurice    1024
17            Wiley's LG phone
     G-350    Cellebrite excerpt/Maurice    1027          1028
18            Wiley's LG phone
     G-351    CD of Cell Phone recrods from 1049          1050
19            CAST Analysis
     G-352    Cellular Analysis Report      1050          1051
20   G-353    May 2, 2019, Examiner Fletcher 1137         1139
              FBI Lab Report
21   G-363    Google Event and Time/Charles' 1129
              Daniels residence
22   G-364    Google Event and Time/Zheng   1129
              Residence
23   G-365    Google Event and Time/Carlton 1129
              Crossing
24   G-366    Google Event and Time/Mr.     1129
              Wiley's Parents' Residence
25
```

US v. Wiley  -- Trial/Vol. V of VII  -- 4/23/21

```
                              EXHIBITS

Exhibits:                                    Identified    Received
G-367      Google Event and Time/China Wok   1129
           Restaurant
G-368      Google Event and Time/Four        1129
           Seasons Auto Care
G-369      Google Event and Time/Auto        1129
           Glass Now
G-370      Google Event and Time/The         1129
           Amigos Auto Repair


D-1        Record from Hykeem Cox's          1041
           Instagram
D-2        Record from Hykeem Cox's          1042
           Instagram
```

US v. Wiley  -- Trial/Vol. V of VII  -- 4/23/21

1      P R O C E E D I N G S

2          (The Defendant was present.)

3          **THE COURT:**  All right.  Good morning.

4          **MR. GREEN:**  Good morning, Your Honor.  I was just

5  going to say, I think we're ready to proceed with witnesses.

6          I will say that -- and I beg the Court's

7  indulgence -- after we reached some agreement regarding

8  Mrs. Wiley's -- I'm sorry -- Mr. Wiley's texts with Ms. Poole,

9  we were in the process of isolating those and redacting those

10  consistent with the agreement.  We're doing that now.  That

11  would come in, not this current witness, not the next witness,

12  but the following witness, Agent Jocys.

13          The point being, if you will allow us briefly -- I

14  just to make sure the attorneys have an opportunity to review

15  the exhibit, and we can -- obviously, I would -- because of the

16  way it's laid out, Your Honor, and the actual cell phone

17  extraction, there are other conversations which were redacted,

18  and I just don't want to put -- make sure in the process we

19  missed a stray remark that wasn't agreed to by the parties.

20          **THE COURT:**  Okay.  That's a good idea, particularly

21  if it's all agreed to.  Let's make sure it's correct.

22          I understand the jury is here.

23          Are you all ready to proceed?

24          **MR. GREEN:**  We are.

25          **THE COURT:**  I have a draft of the proposed

US v. Wiley  -- Trial/Vol. V of VII  -- 4/23/21

1  instructions.  I will wait until a break, and then I will get a

2  copy of this.

3           Let's bring the jury in, please.

4           We're rebooting the computer for the realtime

5  transcription, so if everyone would just wait.

6       (Pause in the proceedings.)

7       (The jury returned to the courtroom at 9:01 a.m. )

8           **THE COURT:**  Please be seated, everyone.

9           Welcome back, ladies and gentlemen of the jury.  We

10 had a slight technology issue we had to work through, and it's

11 resolved now so we're ready to go forward.  I hope you are

12 rested up and ready for another's day worth of court.

13          Mr. Green.

14          **MR. GREEN:**  We'll recall David Cramer.

15          **THE COURT:**  I will remind you you are still under

16 oath, sir.

17                   DIRECT EXAMINATION (Continued)

18 **BY MR. GREEN**

19 Q    Can you relate again the nicknames and the associated

20 names that you began to focus your investigation on?

21 A    Yes.  So the four nicknames that I researched was Chub,

22 who I identified as Hykeem Deshun Cox; Semaj, whom I identified

23 as Semaj Bradley; Tweet, who I identified as Maurice Wiley; and

24 Stretch, who I identified as Darryl Bradford, Jr.

25 Q    And with regard to Chub, did you have an indication of his

   US v. Wiley  -- Trial/Vol. V of VII  -- 4/23/21

1  age?

2  A    Yes, he was 21 years of age.

3  Q    Mr. Bradford?

4  A    Nineteen.

5  Q    Mr. Daniels?

6  A    Nineteen as well.

7  Q    Did you and -- what about Tweet?  How old was he?

8  A    He was around 28, 29 years of age.

9  Q    I'm sorry.  Mr. Bradley?

10 A    Eighteen.

11 Q    And you had mentioned that you had earlier identified a

12 call related to Mr. Daniels.

13      And how old was he?

14 A    Nineteen.

15 Q    Now, did you begin to look for any other associations

16 between those individuals in your investigation?

17 A    Yes.  So in addition to the incident report I located from

18 April 15, I checked the databases for each name that I had just

19 mentioned to see if there was any associated links, that they

20 had been involved in any other incidents together.

21 Q    And did you find an incident in November of 2017 where

22 some of those names were associated together?

23 A    Yes, I did.

24 Q    And what were the names that were associated?

25 A    Hykeem Cox, Charles Daniels, and Darryl Bradford.

US v. Wiley  -- Trial/Vol. V of VII  -- 4/23/21

1  Q    Now, as you started to -- did your investigation then

2  begin to start to focus on those individuals?

3  A    Yes.  So after I had identified these names, I contacted

4  the FBI and I provided them an update and the additional

5  individuals that we had identified.  And they began assisting

6  us with trying to get additional information, such as telephone

7  numbers and things of that nature.

8  Q    And did they do that?

9  A    Yes.

10 Q    And did you then take those telephone numbers and start to

11 examine to see if there were might be certain linkages between

12 the individuals that were named?

13 A    Yes.

14 Q    I'll ask, if after you had talked at some time with

15 Miss House and saw the body camera, did you attempt to obtain

16 surveillance video or video from the Chapel Towers?

17 A    Yes, I did.

18 Q    And at some point after April 26, did you get that video?

19 A    I did.

20 Q    And did you review it?

21 A    I did.

22 Q    I'm going to show you Government's Exhibit 74 and see if

23 you recognize what it is.

24      (Government's Exhibit No. 74 was played.)

25      Do you recognize the surveillance?

US v. Wiley  -- Trial/Vol. V of VII  -- 4/23/21

1  A    I do.

2  Q    And what were you looking for when you got this

3  surveillance?

4  A    I was trying to determine at what point the Lincoln MKX

5  may have arrived back at the apartment complex the night of the

6  15th and 16th.

7         **MR. GREEN:**  If we can continue the video.

8         (Government's Exhibit No. 74 was played.)

9  **BY MR. GREEN**

10 Q    At 12:19:06 a.m. on the 16th, we see a vehicle go through

11 the gate.  Do you recognize that vehicle?

12 A    I do.

13 Q    How do you recognize it?

14 A    It appears to be a Lincoln MKX.

15 Q    And did you determine, at least in your mind, that was the

16 vehicle you were looking for?

17 A    Yes.

18 Q    As the investigation continued, were you involved or

19 witnessed the taking of certain buccal swabs from suspects?

20 A    I was.

21 Q    Did you also become involved in the seizing of or

22 collection of cell phones?

23 A    Yes.  I was provided multiple cell phones.

24 Q    And do you recall the cell phones that you collected?

25 A    Yes.  I was provided two cell phones from the FBI in

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 10 of 232

1  relation to Maurice Wiley.  I was provided a cell phone in

2  relation to Hykeem Cox and a cell phone in relation to Charles

3  Daniels.

4  Q    Were these cellphones collected and put in evidence?

5  A    They were.

6           **MR. GREEN:**  May I approach?

7           **THE COURT:**  You may.

8  **BY MR. GREEN**

9  Q    I show you Government's Exhibit No. 309, and ask if you

10 are familiar with what that is?

11 A    I am.

12 Q    What is it?

13 A    It's a cell phone belonging to Charles Daniels.

14 Q    And was that the cell phone you provided?

15 A    It was.

16          **MR. GREEN:**  I'll ask Government's No. 309 to be

17 entered into evidence.

18          **THE COURT:**  Admitted.

19 **BY MR. GREEN**

20 Q    Now, I'll show you Government's Exhibit No. 310, and ask

21 if you are familiar with what that is?

22 A    I am.

23 Q    What is it?

24 A    A cell phone belonging to Hykeem Cox.

25 Q    And did you take that into evidence and eventually give

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 11 of 232

1    it -- put it in the evidence of the DPD?

2    A    I did.

3              MR. GREEN:  I move introduction of Government's

4    Exhibit No. 310.

5              THE COURT:  Admitted.

6    BY MR. GREEN

7    Q    I will show you Government's Exhibit No. 311.

8         What is it?

9    A    A cell phone belonging to Maurice Wiley.

10   Q    And did you get collection of that item and put it in

11   Durham PD evidence?

12   A    I did.

13   Q    I'm going to show you what's been marked as Government's

14   Exhibit 326A, and just ask if you recognize what that is?

15   A    I do.

16   Q    What is it?

17   A    Another cell phone belonging to Maurice Wiley.

18             MR. GREEN:  Your Honor, I'm going to move

19   introduction of 310, 311, and 326A.

20             THE COURT:  They are all admitted.

21   BY MR. GREEN

22   Q    Now, during the investigation, was the FBI -- in terms of

23   the division of labor, what were you doing and what was the FBI

24   doing?

25   A    I was focusing on surveillance review, trying to see if I

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 12 of 232

1  could locate any more additional footage.  I was also still

2  trying to interview people as I could.  The FBI was assisting

3  with the cell phone location information, getting call detail

4  records, things of that nature.

5  Q    And are you aware as to whether you were actually provided

6  associated call detail records for each of the individuals you

7  have identified?

8  A    Yes.  Throughout the investigation, I would receive call

9  detail records for all of those individuals.

10 Q    And was there also cell phone extraction from various

11 exhibits?

12 A    Yes, there was.

13 Q    And were you provided the results of those as well?

14 A    I was.

15 Q    I'll ask if there came a time when you attempted to submit

16 or have determined the caliber of bullet that was removed from

17 the victim, Hong Zheng?

18 A    Yes.  On April 26, I submitted a forensics request.

19 Q    And did you get the results of that back?

20 A    Yes, the same day.

21 Q    And what did you -- what did you determine in your

22 investigation?

23 A    The determination was it was a .40 caliber.

24 Q    Did you also seek to determine whether -- or seek to

25 understand whether there were multiple weapons out there?

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 13 of 232

1  A    Yes.  We would also submit a forensics request to process

2  and analyze all the shell casings on scene to determine how

3  many firearms had fired all those shell casings.

4  Q    And did you also have -- seek to have determined how many

5  different bullets had been recovered and what their caliber

6  was?

7  A    Yes.

8  Q    Ultimately, was a decision made to take state -- certain

9  state arrest warrants out for named individuals?

10  A    Yes, there was.

11  Q    Can you describe who was charged on the state level

12  initially with this event?

13  A    On April 27th, Maurice Wiley was charged in relation to

14  this incident.

15  Q    And who else?

16  A    Charles Daniels, Darryl Bradford, Hykeem Cox, and Semaj

17  Bradley.

18  Q    And did you have an opportunity at some point to interview

19  Mr. Cox or be part of an interview?

20  A    I did.

21        **MR. GREEN:**  Thank you, Your Honor.  That's all the

22  questions I have.

23        **THE COURT:**  Any cross?

24                    CROSS-EXAMINATION

25

1  BY MR. FOSTER

2  Q    So, Detective Cramer, what time was it that you arrived on

3  the scene at 4617 Carlton Crossing Drive?

4  A    It was close to midnight.  I believe it was around 2358.

5  Q    As part of your investigation, you testified yesterday

6  that you sought and obtained surveillance footage for the

7  period between April 8 and April 15 for McDonald's and Kroger?

8  A    No, just the Kroger.

9  Q    Okay.  And you also sought and obtained surveillance video

10 from another business that's in that same China Wok little

11 shopping center, a store called Tobacco?

12 A    Yes, that is correct.

13 Q    And that was interior camera footage?

14 A    Yes.  They only had interior cameras.

15 Q    What time period did that cover?

16 A    My recollection is the retention period for that camera

17 was very short, so I was only able to get a shorter period of

18 time.  I couldn't get an extended period like I could with the

19 Kroger footage.  I don't recall exactly how much footage I got

20 from there.

21 Q    Was it April --

22 A    It would have been -- yes, it would have been that night.

23 Q    Of April 14th?

24 A    April 15th.  I don't recall if I have footage from the

25 14th.

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 15 of 232

1  Q    Now, we heard the recording yesterday of the telephone

2  call where you were present with Taquila House, and Mr. Wiley

3  was on the other end of the call; correct?

4  A    Correct.

5  Q    And after the call terminated, Taquila House told you that

6  she had made up the fake story and then told Wiley what the

7  story was; correct?

8  A    That sounds correct.

9  Q    Were you present at Wiley's arrest on April 27th?

10 A    I was not present when he was physically arrested, no.

11 Q    You also testified yesterday that at some time, days after

12 the incident at Carlton Crossing Drive, you came back and had a

13 further discussion with Wai Ping Chan?

14 A    Yes, that is correct.

15 Q    And so what she told you is that normally they would bring

16 the proceeds of the business home that night, but on that

17 particular night, they did not?

18 A    I don't recall if she said the frequency of it.  I just

19 recall that she said that night she didn't have anything on

20 her.

21          MR. FOSTER:  No further questions.

22          MR. GREEN:  Can I speak to counsel for just a minute?

23          THE COURT:  Yes.

24       (Off-the-record discussion.)

25                      REDIRECT EXAMINATION

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 16 of 232

1  **BY MR. GREEN**

2  Q    With reference to the Kroger videos --

3  A    Yes.

4  Q    -- was there occasion in which you went back to Kroger or

5  tried to look at an expanded window of time?

6  A    Yes.

7           **THE COURT:**  Can you adjust your microphone towards

8  your face?

9           **MR. GREEN:**  Yes, Your Honor.

10 **BY MR. GREEN**

11 Q    And why was that?

12 A    Through the course of the investigation, speaking with the

13 rental company, AVIS, and additional aspects of the

14 investigation, it led me back to April the 13th.

15 Q    And with regard to the April 13 time frame, what

16 specifically were you looking for?

17 A    I was looking for a red-in-color Ford Explorer.

18 Q    And why was that?

19 A    Because that was the first vehicle that was rented by

20 Miss House on April 13th.

21 Q    I'm going to show you an excerpt from Exhibit 26, and I'll

22 ask if you recall viewing this video?

23      (Government's Exhibit No. 26 was played.)

24 Q    I will pause that.

25      Do you recognize that as the video?

 1  A    I do.

 2       (Government's Exhibit No. 26 was played.)

 3  Q    We're looking at timestamp 2241 on 4/13/2018.  There was a

 4  vehicle that's just backed into the spot.

 5       Do you recall seeing that vehicle when you reviewed the

 6  tape?

 7  A    I do.

 8  Q    And what did you notice, if anything, about it?

 9  A    That it was a red Ford Explorer.

10            **MR. GREEN:**  Thank you.

11            **THE COURT:**  Any further questions?

12            **MR. GREEN:**  No, Your Honor.

13            **THE COURT:**  Any further from Mr. Foster?

14            **MR. FOSTER:**  No, Your Honor.

15            **THE COURT:**  Thank you.  You may step down, sir.

16  Please put your mask back on as you step down.

17            **MR. FOSTER:**  We would ask that he be reserved for

18  possible recall, Your Honor.

19            **THE COURT:**  All right.

20            **MR. GREEN:**  I would like to read a couple of

21  stipulations into the record.

22            **THE COURT:**  Ladies and gentlemen, Mr. Green is going

23  to read a stipulation.  A stipulation is where the parties have

24  agreed as to some matter.  When the parties have agreed or

25  stipulated to a matter, you can treat that matter as having

1  been proved for purposes of the case.

2          **MR. GREEN:**  Your Honor, the first stipulation is

3  marked Government's Exhibit No. 312, and I will read it.

4          Now comes the United States of America by Sandra J.

5  Hairston, acting United States Attorney for the Middle District

6  of North Carolina, and Assistant United States Attorneys

7  Graham T. Green, Craig M. Principe, and the Defendant, Maurice

8  Owen Wiley, Jr., in his own person and through his attorneys,

9  John D. Bryson and Mark P. Foster, Jr., and stipulate and agree

10  to the following facts:

11          On April 5, 2021, Special Agent Collin Kilpatrick of

12  the Bureau of Alcohol, Tobacco, Firearms, and Explosives

13  performed an interstate nexus examination of Government's

14  Exhibit 99, a Winchester .45 caliber spent cartridge stamped

15  "Winchester .45 Auto."

16          Special Agent Kilpatrick determined, and the parties

17  now stipulate, that the cartridge case is ammunition, as

18  defined in Title 18, United States Code, Section 912(a)(17)(A),

19  and was manufactured outside the state of North Carolina and,

20  therefore, had traveled and affected interstate commerce.

21          On April 5, 2021, Special Agent Collin Kilpatrick of

22  the Bureau of Alcohol, Tobacco, Firearms, and Explosives

23  performed an interstate nexus examination on Government's

24  Exhibit 97, a Winchester .45 caliber spent cartridge stamped

25  "WIN .40 S&W."

Case 1:19-cr-00529-TDS  Document 363  Filed 02/04/22  Page 19 of 232

1          Special Agent Kilpatrick determined, and the parties

2    now stipulate, that this cartridge is ammunition, as defined in

3    Title 18, United States Code, Section 921(a)(17)(A), and was

4    manufactured outside the state of North Carolina and,

5    therefore, had traveled in and affected interstate and/or

6    foreign commerce.

7          On April 5, 2021, Special Agent Collin Kilpatrick of

8    the Bureau of Alcohol, Tobacco, Firearms, and Explosives

9    performed an interstate nexus examination on Government's

10   Exhibit 91, a Winchester 9mm Luger shell casing marked "WIN 9mm

11   Luger."

12         Special Agent Kilpatrick determined, and the parties

13   now stipulate, that this cartridge case is ammunition, as

14   defined by Title 18, United States Code, Section 921(a)(17)(A),

15   and was manufactured outside the state of North Carolina and,

16   therefore, had traveled in and affected interstate and foreign

17   commerce.

18         On April 5th, Special Agent Collin Kilpatrick of the

19   Bureau of Alcohol, Tobacco, Firearms, and Explosives performed

20   an interstate nexus examination on Government's Exhibit 91, a

21   Starline 9mm casing, 9mm Luger, and determined, and the parties

22   now stipulate, that the cartridge is ammunition, as defined in

23   Title 18, United States Code, Section 921(a)(17)(A), and was

24   manufactured outside the state of North Carolina and,

25   therefore, had traveled in interstate commerce.

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 20 of 232

1          Your Honor, I move introduction of Government's 312.

2          **THE COURT:**  Let me see the stipulation, please.

3          It's admitted.

4          **MR. GREEN:**  The next stipulation, Your Honor, is

5    marked Government's Exhibit 313.

6          Now comes the United States of America and

7    Sandra J. Hairston, acting United States Attorney for the

8    Middle District of North Carolina, and Assistant United States

9    Attorneys Graham R. Green and Craig M. Principe and the

10   Defendant, Maurice Owen Wiley, Jr., in his own person and

11   through his attorneys, John D. Bryson and Mark P. Foster, Jr.,

12   and stipulate and agree that the following facts are true and

13   correct:

14         The parties stipulate that on April 15, 2018, the

15   Defendant, Maurice Owen Wiley, Jr., had previously been

16   convicted in a court of a crime punishable by a term of

17   imprisonment for a term exceeding one year within the meaning

18   of Title 18, United States Code, Section 921(a)(2) and

19   922(g)(1), and had knowledge that he had been convicted of a

20   crime of imprisonment for a term exceeding one year.

21         As of that date, the conviction had not been expunged

22   or set aside, nor had the Defendant been pardoned or had his

23   civil rights restored.

24         Your Honor, that's Government's Exhibit No. 313.  I

25   move introduction of it.

 1          **THE COURT:**  It's admitted.

 2          **MR. GREEN:**  We're ready to call our next witness,

 3   Your Honor.

 4          **THE COURT:**  All right.

 5          **MR. PRINCIPE:**  Your Honor, the next witness is Justin

 6   T. Gryder.

 7   **FBI TASK FORCE OFFICER JUSTIN T. GRYDER,** GOVERNMENT'S WITNESS,

 8   being first duly affirmed, at 9:28 a.m. testified as follows:

 9                       DIRECT EXAMINATION

10   **BY MR. PRINCIPE**

11   Q    Would you please state your name.

12   A    Justin Gryder.

13          **THE COURT:**  Please remove your mask so that we can

14   see and hear you, sir.

15          Thank you, sir.

16   **BY MR. PRINCIPE**

17   Q    Who do you work for?

18   A    The Durham County Sheriff's Office.

19   Q    And how long have you worked for the Durham County

20   Sheriff's Office?

21   A    Approximately 15 years.

22   Q    And are you also a task force officer?

23   A    I am, with the FBI Safe Streets.

24   Q    What does that mean to be a task force officer?

25   A    I'm assigned to the FBI Safe Streets Task Force, and we

1  investigate gun and gang crimes.

2  Q    Okay.  And do you have any specialized training with

3  regard to extraction of data from cellular phone devices?

4  A    I do.  I'm certified by Cellebrite to extract the data.

5  Q    What is Cellebrite?

6  A    It's a company.  They provide a device that enables me to

7  extract all the data from a cellular device.

8  Q    So that's a software package?

9  A    Software and hardware.

10  Q    And what is that training like to learn how to use that

11  software?

12  A    It's a 40-hour block provided by Cellebrite themselves.

13  Q    And do you become -- do you receive certifications for

14  completing that course?

15  A    I do.  I'm certified to do a logical as well as a physical

16  extraction.

17  Q    And did you have that certification around the time of

18  April 2018?

19  A    I did.

20  Q    During the course of an investigation of a robbery and

21  homicide at Carlton Crossing Drive in April 2018, did you have

22  some involvement in that investigation?

23  A    I did.

24  Q    Were you asked to perform cellular extractions of data

25  from some cell phone devices?

1   A    I was.

2   Q    Were two of those devices seized pursuant to a search

3   warrant on April 27, 2018, from Maurice Wiley?

4   A    Correct.

5   Q    And do you recall what devices those were?

6   A    One was an LG.  I don't recall the exact make of the

7   other.

8   Q    Okay.  I'm going to show you on your monitor first what's

9   been introduced into evidence as Government's Exhibit 326A.

10       And do you recognize that writing at all?

11  A    Yes, sir.

12  Q    And do you recognize this phone?

13  A    Yes, sir.

14  Q    Was that one of the phones that you did a cellular data

15  extraction on?

16  A    Correct.

17  Q    And can you see the information that's written on there?

18  A    Yes, sir, I can.

19  Q    Does it say "ZTE Model Z982"?

20  A    That's correct.

21  Q    So that was one of the cell phones; correct?

22  A    Yes.

23  Q    Is this an important number?

24  A    It is.

25  Q    Does that mean anything to you?

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 24 of 232

1  A    Yes, sir.  It's the IMEI number, which is the

2  International Mobile Equipment Identifier.  It's basically like

3  a Social Security number for a cell phone.  It's unique to each

4  device.

5  Q    It's unique to the device?

6  A    Correct.

7  Q    So I've just taken that device out and laid it on the

8  ELMO.

9       Can you see that?

10 A    Yes, sir.

11 Q    Does it say "ZTE" on the back?

12 A    It does.

13 Q    Does it have information down here?

14 A    Yes, it does.

15 Q    And it also says "Model Z982"?

16 A    That's correct.

17 Q    And is that information usually put on there by the

18 manufacturer of the phone?

19 A    Correct.

20 Q    And just explain to the jurors, when you get a device like

21 this to perform a cellular extraction, what are the steps that

22 you take in order to do that?

23 A    So once I've confirmed the investigator has a search

24 warrant, I power up the Cellebrite machine, and it's plugged

25 into it with a cord that's unique to each sort of device.

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 25 of 232

1  Like, Androids will have a certain cord and Apples will have a

2  cord, and the Cellebrite reads that and determines if it's able

3  to perform an extraction on that device.

4  Q    Okay.  And when we say "extraction," what is an

5  extraction?

6  A    An extraction is basically copying all of the information

7  on that device to a separate device such as a disk, a DVD, or a

8  thumb drive.

9  Q    And why do you want to make a copy of that?

10 A    To preserve it and to present that to the investigators,

11 and then we put the device itself back into property.

12 Q    And is the Cellebrite software especially designed for

13 this purpose?

14 A    It is.

15 Q    Is it considered a forensic tool?

16 A    It is.

17 Q    And what makes it a forensic tool?

18 A    It analyzes and copies the data without changing or

19 altering anything.

20 Q    Does it also make it more user friendly or searchable for

21 investigators?

22 A    It does.  It can put it in numerous different formats, PDF

23 and Excel and what's called a UFED reader, which is basically

24 just a really user friendly search engine.

25 Q    Okay.  And so by doing that, you then have a copy of the

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 26 of 232

1  data that's stays static; right?

2  A    Correct.

3  Q    And that preserves the data at a point in time for that

4  device; correct?

5  A    Yes.

6  Q    And then you, as an investigator, if asked to look for

7  certain data, you can do that?

8  A    Correct.

9  Q    Okay.  And, now, with regard to Government's Exhibit 326A,

10 did you attempt to do an extraction of the data from that

11 phone?

12 A    Correct.  Yes, sir.

13 Q    And were you able to extract any data from that phone?

14 A    Not from the ZTE.

15 Q    And why not?

16 A    ZTEs are sort of like -- or at least they were at that

17 time, sort of an oddball phone, and Cellebrite doesn't put

18 quite as much research into being able to crack those as they

19 would an Apple or a higher-end Android phone.  They just --

20 there are just so many phones.  They dedicate their resources

21 to the most prevalent ones, and it was just unable to crack

22 that one.

23 Q    And do you have any kind of sense of how many different

24 manufacturers and models of cell phones are out there?

25 A    Hundreds.  There's estimated that a brand-new phone comes

1  out every day, a new model, usually in Asia.

2  Q    And so the Cellebrite software has to be programmed by

3  computer programmers to work with each of the devices that it

4  might be asked to do an extraction from?

5  A    That's correct.

6  Q    I'm going to show you what's marked as 311.  As you can

7  see, it's Durham Police Department Item No. 127, cell phone

8  with owner name Maurice Wiley?

9  A    Yes, sir.

10 Q    Is this the other cell phone that you examined?

11 A    The LG, correct.

12 Q    I'm going to open that envelope.

13      Do you recognize that phone?

14 A    Yes, sir, that's the same one.

15 Q    And does it have a logo and the letters "LG" at the

16 bottom?

17 A    Yes, sir, that's correct.

18 Q    Did it have a cracked screen like that at the time you

19 examined it?

20 A    Correct.

21 Q    And on the back it also has the logo LG?

22 A    Yes, sir.

23 Q    And it says "Verizon 4G" at the top?

24 A    Yes, sir.

25 Q    And did you attempt the same process of connecting this

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 28 of 232

1  cell phone with the Cellebrite software and tools?

2  A    Yes, sir.

3  Q    Were you able to get an extraction off of this phone?

4  A    I was.

5  Q    And please explain to the jurors what types of data or

6  categories of data does a Cellebrite extraction extract from a

7  phone.

8  A    Basically anything that you interface with on a phone:

9  Your chats, which is like instant messaging, WhatsApp; your

10  messages, what you call texts, which is SMS texts; MMS

11  messages, which is like a group text for the groups of persons;

12  pictures you send, pictures you take; videos you take,

13  locations you're at; if you have your GPS signals turned --

14  your GPS activated -- basically, anything you do on the phone,

15  any notes you take, anything like that is on the phone

16  somewhere, and I can usually extract it.  Even if you feel like

17  it's been deleted, a lot of times I can extract it because it

18  hasn't been overwritten yet.

19  Q    Okay.  Let's talk about that for a second.

20      So how would the Cellebrite software reflect data that's

21  extracted that at some point had been deleted but was copied as

22  part of the extraction?

23  A    So a lot of times if you took a picture and you just

24  wanted to delete it to free up room, it looks like it's deleted

25  to you.  However, until you rewrite over that, it is still

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 29 of 232

1  there in the background.  You can't see it, but it's still

2  there just waiting to be rewritten over with another photo or

3  another use of that space.

4  Q    So the device -- or the software on the device recognizes

5  that as deleted content and can overwrite it with a new photo

6  or new data as the phone generates more data?

7  A    Correct.  But if you have plenty of data left -- I'm

8  sorry -- plenty of space left on the phone, it may be a while

9  before that gets written over.

10 Q    Now, if the Cellebrite software finds and copies data that

11 had previously been deleted, is it possible that it can be

12 partially overwritten?

13 A    Possibly.  I'm not sure.  Usually when the Cellebrite

14 notices that and copies that, it denotes that it is a deleted

15 item by a small red X or asterisk beside it.

16 Q    Okay.  How does the Cellebrite extraction process compare

17 to if someone were to just back their phone up on the cloud?

18 Is it similar or is it different?

19 A    It's similar.  Cellebrite also can perform what's called a

20 logical extraction, which is like that, like you were backing

21 up your phone on the iCloud.  It's what you can see.  That's

22 just a logical extraction.  It's basically what you can still

23 see on the phone.

24         **THE COURT REPORTER:**  I'm sorry.  Just a little

25 slower.

1          **THE COURT:**  You need to slow down just a little,

2    please.

3          **THE WITNESS:**  I'm sorry.

4          It's -- the logical extraction is basically just what

5    you can see on the phone at any given time.  Like, if you

6    pulled your phone out right now and looked at it, that's a

7    basic backup.  A physical extraction gets everything, including

8    the deleted data.

9    **BY MR. PRINCIPE**

10   Q    So when you generate a report from the Cellebrite

11   software, can it be produced in a PDF format?

12   A    It can, yes, sir.

13   Q    I would like to show you Government's Exhibit 317.

14        Do you recognize that document?

15   A    Yes, sir.

16   Q    It's two pages.  I am going to show you the second page.

17   And let's go back to the first page.

18        So are those the first two pages of the extraction report

19   for the LG cell phone that was Government's Exhibit 311?

20   A    Yes, sir.

21   Q    And when you generate an extraction report, how many pages

22   is it generally?

23   A    It can be anywhere from a few dozen to a few thousand,

24   depending how large the phone is, how much data is on the

25   phone, things like that.

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 31 of 232

1  Q    Now, was your report for this cell phone many, many pages

2  long?

3  A    Yes.  They generally all are.

4  Q    So we're just going to talk about the content on the first

5  two pages; okay?

6  A    Yes, sir.

7  Q    Now, what information is on the first two pages of this

8  extraction report?

9  A    It's my name, the time, and UTC -- if you can blow it up,

10 I can be a little more descriptive.  My name, fourth line down,

11 Durham County Sheriff's Office, the time the extraction was

12 created -- started, the end time of it, at the top there, the

13 UFED physical version, the software that was installed at that

14 time, and everything else -- and the type of phone as well, the

15 LG CDMA.

16 Q    And you recognize this to be the first two pages of the

17 report that you generated; correct?

18 A    Correct.

19        **MR. PRINCIPE:**  The Government would move Government's

20 Exhibit 317 into evidence.

21        **THE COURT:**  Admitted.

22        **MR. PRINCIPE:**  And permission to publish that?

23        **THE COURT:**  You may.

24 **BY MR. PRINCIPE**

25 Q    So let's focus first on the first box at the top.

US v. Wiley  -- Trial/Vol. V of VII  -- 4/23/21

1      So this is entitled "Summary"; correct?

2  A    Yes, sir.

3  Q    So why don't you explain to the jurors the information in

4  that box.

5  A    Okay.  The UFED physical analyzer version is just the

6  version of software running on the Cellebrite at the time.  It

7  gets updated every few months when they come out with a new

8  version, just like what would be on your phones.  The report

9  created time, May 1, 2018, at 1526.  And the minus 04 is for

10 UTC time.  At the time we were minus 4 because we live in

11 the --

12 Q    Let's stop right there.  What is UTC time?

13 A    It's Universal Coordinated Time.  UTC time here in the

14 eastern part of the United States, we're usually in minus 4 and

15 I believe minus 5 during the Daylight Saving Time.  It's

16 basically what you would -- it was commonly referred to as like

17 Greenwich Mean Time or Zulu Time previously.  Now it's UTC

18 time.

19 Q    So that refers to a time somewhere to the east of the

20 United States; correct?

21 A    Yes, sir.  It's in Europe.  It's zero.  UTC is zero.

22 Q    And so you subtract four hours to get to the Eastern

23 Standard Time; correct?

24 A    Correct.

25 Q    Does that factor in sometimes to the information in the

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 33 of 232

1  records that you look at from the cell phones?

2  A    It does.  There's also an option where I can have it

3  automatically correct for UTC time, and it will denote that on

4  the line if it has.

5  Q    What did you do in this particular extraction?

6  A    I would have to look at the line item, but usually I

7  request that it go ahead and correct for that because it's

8  easier to read.

9  Q    Okay.  And then the time and creation date of the report,

10 is what when you did this extraction and generated the report?

11 A    That's when the report was generated.

12 Q    Okay.  And then it has your name.

13 A    That's correct.  And my employer.

14 Q    Great.

15      Let's look at the next box.  Can you walk the jurors

16 through the information in this section of the report?

17 A    Uh-huh.  The extraction start time is 1318, 1:00.  And

18 then it looks like it finished a little less than 20 minutes

19 later.  The UFED version is also the same thing that was at the

20 very top there.  Some manufacturer's stuff.  The manufacturer

21 again is the LG, which is the phone brand, and CDMA is the type

22 of carrier it was running.

23 Q    So explain that to the jurors.

24      What does CDMA refer to?

25 A    It's just the type -- it's basically how the phone uses

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 34 of 232

1   the cell phone towers.  There are two main types, GSM and CDMA.

2   CDMA is what most phones use now to communicate with the

3   towers.

4   Q    And have you heard of 5G?

5   A    Yes.

6   Q    Is that a newer form of technology for phones to connect

7   to cell towers?

8   A    It is.

9   Q    Okay.  So this is just a different technology for

10  connecting the phone towers?

11  A    Yes.  And the CDMA and GSM don't -- that's not the 4G/5G

12  that you hear.  That's a different issue.

13  Q    So that just reflects the technology that this phone had

14  at the time; correct?

15  A    Correct.

16  Q    And what other information is there about the device?

17  A    The cable number, 100, is just the cable number that was

18  used to connect to Android phones at the time.  The physical --

19  I mean, the extraction type, physical, which is what I

20  explained to you earlier, was the extraction where I get the

21  most data, including the deleted data.  And the extraction --

22  Q    Go ahead.

23  A    And the extraction ID is just an ID number for that

24  particular extraction.  It's just an another unique identifier.

25  Q    So that's like a reference number for the extraction that

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 35 of 232

1  you performed?

2  A    That's correct.

3  Q    What does the "Selected Device Name" refer to?

4  A    So there's -- like I was saying earlier, there are tons

5  and tons of devices.  Even under the LG Optimus, it's just

6  their -- it's how LG denoted this phone.  It's the Optimus.

7  Zone 3 was just -- not the brand, but the model, basically, of

8  this phone.

9  Q    Okay.  Let's look at the second page, and let's look at

10 the box at the top that says "Device Information."

11      Can you highlight any important information related to the

12 device information?

13 A    The operating system version, 5.1.1, was just what Android

14 was using at that time on that particular device.

15 Q    What about the Bluetooth device name and MAC address?

16 What does that refer to?

17 A    I'm not as familiar with those.

18 Q    Does it relate to Bluetooth technology?

19 A    It does.

20 Q    If we go to the MSISDN numbers at the bottom, what do

21 those numbers refer?

22 A    Those are basically just phone numbers -- complete phone

23 numbers with the country code.

24 Q    Okay.  Do those phone numbers relate to the device that

25 the extraction is performed on?

Case 1:19-cr-00529-TDS  Document 363  Filed 02/04/22  Page 36 of 232

1  A    Correct.  That would be phone numbers that have been used

2  by that device.

3  Q    So why are there two phone numbers that have been used by

4  one device?

5  A    The only way that that would happen is if you went back to

6  the phone store and you asked them to change your number, and

7  they put a new SIM card and they changed out the SIM card and

8  gave you a new phone number, or you had a separate SIM card and

9  you changed it out yourself and got a new phone number.

10 Q    And when you say "SIM card," that's S-I-M?

11 A    That's correct.

12 Q    What does that SIM card look like?

13 A    It is just a very small card, very small -- it's about the

14 size of your pinky now.

15 Q    Do all phones have a SIM card or similar technology?

16 A    Yes, sir.

17 Q    Are all models of phones made in a way that you can swap

18 out the SIM card easily?

19 A    I'm not sure if all are, but most are.

20 Q    And so what's the first MSISDN number that's listed there

21 for this extraction?

22 A    13133004268.

23 Q    Okay.  And what does that first number denote?

24 A    The country code.

25 Q    And what country code is that for?

1  A    United States.

2  Q    What are the next three numbers there?

3  A    Area code.

4  Q    Okay.  So that would be -- for the first number, that

5  would be a (313) area code?

6  A    Correct.

7  Q    What are the next three numbers?

8  A    Well, the next fours are just your actual phone number.

9  I'm sorry.  The next seven numbers are just your actual phone

10 number.

11 Q    So area code followed by seven digits for the rest of the

12 phone number?

13 A    Yes, sir.

14 Q    Okay.  And what's the second MSISDN listed there?

15 A    18644846112.

16 Q    So that phone number ends in 6112?

17 A    Yes, sir, that's correct.

18 Q    Okay.  And the area code is (864)?

19 A    Correct.

20        **MR. PRINCIPE:**  May I have one moment, Your Honor?

21        **THE COURT:**  Yes.

22 **BY MR. PRINCIPE**

23 Q    When you generated this extraction report, the full report

24 with all the data, did you make that accessible to other

25 investigators in the case?

1  A    Yes, sir, I did.

2  Q    And who did you provide it to?

3  A    I believe a copy went to Detective Cramer as well as

4  another copy went to my task force.

5  Q    Okay.  And did that task force include Special Agent Maria

6  Jocys?

7  A    That's correct.

8         **MR. PRINCIPE:**  I have no additional questions, Your

9  Honor.

10        **THE COURT:**  Any cross?

11                    CROSS-EXAMINATION

12 **BY MR. BRYSON**

13 Q    The carrier for this phone was Verizon; correct?

14 A    It did say "Verizon" on the back of the phone.

15 Q    And while there were two numbers listed on your second

16 page of your extraction report, the phone was -- during the

17 month of April was actually operating under the number

18 (313)300-4268; is that correct?

19 A    I don't know, without looking at the report, what phone

20 numbers were used at what time.

21 Q    Okay.  And if you saw something from your extraction

22 report, you would be able to tell?

23 A    Yes, sir, possibly.

24        **MR. BRYSON:**  May I approach the witness?

25        **THE COURT:**  You may.

1  **BY MR. BRYSON**

2  Q    Can I ask you to look at this and see if it does reflect

3  from your extraction report?

4  A    It looks like a page from a report?

5  Q    Can you tell from that that on April 14 and 15 that phone

6  was using the (313) number.

7  A    So at the end of the report -- or at the end of the

8  extraction, it looks like it denotes that every number is the

9  same number as the SIM card that is in the phone at the time of

10 the extraction.

11 Q    Okay.  This is text messages; right?

12 A    I'm looking for the subject name.  Well, it just doesn't

13 say SMS, but, yes, sir, they appear to be text messages.

14 Q    Okay.  Don't they show incoming and outgoing messages?

15 A    Correct.

16 Q    And don't they show for the number for each incoming and

17 outgoing?

18 A    Correct.

19 Q    Doesn't that reflect that that phone is using the (313)300

20 number?

21 A    Yes, sir, possibly.

22 Q    Is there some doubt about that?

23 A    No, sir.  Just what I said before, that at the time of the

24 extraction, the SIM card that's in the phone -- the phone

25 generates the report to show that number at the time.

US v. Wiley  -- Trial/Vol. V of VII  -- 4/23/21

1  Q    Okay.  But you can't tell from this that on April 14 and

2  15 that that phone wasn't operating under the (313) number?

3  A    Yes, sir, that's what the report appears to show.

4  Q    It does show that?

5  A    Yes, sir.

6          **MR. BRYSON:**  Those are my questions?

7          **THE COURT:**  Any redirect?

8          **MR. PRINCIPE:**  Yes, Your Honor.

9                      REDIRECT EXAMINATION

10 **BY MR. PRINCIPE**

11 Q    With regard to the "Verizon" being on the body of the

12 phone, are you familiar with how phones are marketed?

13 A    Yes, sir.

14 Q    Does that mean that that phone can only operate or be

15 connected through a Verizon service provider, or can that

16 phone, even if it says "Verizon" on it, be used with different

17 providers?

18 A    It can be used with a different provider granted you have

19 a different SIM card.

20         **MR. PRINCIPE:**  I have no additional questions, Your

21 Honor.

22                      RECROSS-EXAMINATION

23 **BY MR. BRYSON**

24 Q    So was the carrier Verizon for this phone?

25 A    That I don't know, sir.

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 41 of 232

1           MR. BRYSON:  Those are my questions.

2           THE COURT:  You may step down, sir.  Please put your

3   mask back on.  Watch your step down the ramp.

4           You may call your next witness.

5           MR. PRINCIPE:  May this witness be released, Your

6   Honor?

7           MR. BRYSON:  No objection.

8           THE COURT:  He may be released.

9       (At 9:56 a.m., witness excused.)

10          MR. GREEN:  The Government calls Maria Jocys.

11  **FBI SPECIAL AGENT MARIA JOCYS,** GOVERNMENT'S WITNESS, being

12  first duly affirmed, at 9:56 a.m. testified as follows:

13                    DIRECT EXAMINATION

14  **BY MR. GREEN**

15  Q    Would you tell the jurors your name and occupation.

16  A    Maria Jocys.  I am a special agent with the Federal Bureau

17  of Investigation.

18  Q    And how long have you been employed with the FBI?

19  A    Twenty-four years.  And before that, I spent eight years

20  as a police officer with the City of Greenville, North

21  Carolina.

22  Q    Can you describe some of the duties you've held with the

23  FBI?

24  A    Yes.  I have been a special agent.  I have been a

25  supervisory special agent, an assistant section chief, and a

US v. Wiley  -- Trial/Vol. V of VII  -- 4/23/21

1  detailee to the Central Intelligence Agency.

2  Q    Were you working with the FBI on April 15, 2018?

3  A    I was.

4  Q    And did you become involved or aware of a homicide that

5  had happened on April 15 at Carlton Crossing Drive?

6  A    I did.

7  Q    And did the FBI decide to assist local investigators?

8  A    Yes.

9  Q    And how does that work generally?  How does the FBI make a

10 decision generally to render assistance?

11 A    In this case we rendered assistance because we had become

12 aware that it was an attempted robbery and a murder of an Asian

13 business owner in Durham, and for us, that gave us

14 jurisdiction.

15 Q    And did you decide to begin to assess and aid the Durham

16 PD?

17 A    Yes.

18 Q    And who were you working with principally?

19 A    Detective David Cramer.

20 Q    Once you began your assessment and working with Detective

21 Cramer, talk about the division of labor between the Durham

22 Police Department and what the FBI was seeking to do?

23 A    The FBI took on some of the more technical requirements of

24 gathering phone records, assisting with interviews, identifying

25 potential leads in the case and passing those to Detective

1  Cramer.

2  Q    And did you start that process?

3  A    Yes, I did.

4  Q    During the course of that process, did you become involved

5  or aware that the Durham Police Department had developed

6  certain suspects?

7  A    Yes.

8  Q    And who were these suspects?

9  A    Maurice Wiley, Hykeem Cox, Darryl Bradford, Semaj Bradley,

10 and Charles Daniels.

11 Q    Did you determine whether any of those individuals you

12 just named were related?

13 A    Yes, I did.

14 Q    And who was related?

15 A    Maurice Wiley and Charles Daniels are cousins.

16 Q    And as you started to look at the case, what types of

17 evidence did you seek to gather?

18 A    Historical caliber detail records for phone numbers that

19 were identified as used by those individuals, Instagram or

20 social media records, evidence from cell phones.

21 Q    And was that evidence collected?

22 A    Yes, it was.

23 Q    In particular, were you present when Mr. Wiley was

24 arrested?

25 A    Yes, I was.

US v. Wiley  -- Trial/Vol. V of VII  -- 4/23/21

1  Q    And when Mr. Wiley was arrested, were cell phones seized?

2  A    Yes, they were.

3  Q    And was there an extraction done from at least one of

4  those cell phones?

5  A    Yes, there was.

6  Q    Did you also seek -- as you started to develop the case,

7  talk about the steps you took to try and have attribution or

8  associate an individual with that particular phone number.

9  A    Several of the phones that we seized actually came off of

10 the individuals as we arrested them, and then other phones were

11 recovered in separate, unrelated incidents that provided phone

12 numbers for the individuals involved.  And --

13 Q    Did you also -- I'm sorry.

14 A    And, also, once we acquired social media records within

15 the user account information, there were phone numbers

16 identified.  And we also knew that three of the individuals

17 were on probation with the State of North Carolina, and they

18 provided their phone numbers as well.

19 Q    And you then compiled those records and what you were

20 seeing and started to try to analyze the data; is that right?

21 A    That's correct.

22 Q    Now, I'm going to ask you to look at Government's

23 Exhibit 317A.

24      This is a new exhibit.  You may not have it in your

25 folder.

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 45 of 232

1      Do you recognize what that is?

2  A    I do.

3  Q    What is it?

4  A    It is a record from T-Mobile for a phone number.

5  Q    And what was the phone number associated that the record

6  relates to?

7  A    (864)484-6112.

8  Q    And is there subscriber information?

9  A    Yes, there is.

10 Q    And can you describe that generally for the members of the

11 jury?

12 A    Yes.  The subscriber name of this phone number is Maurice

13 Wiley.  The subscriber address is 1413 Maplewood Drive, Durham,

14 North Carolina.

15 Q    Now, this subscriber information is maintained by the

16 company?

17 A    Yes, it is, by T-Mobile.

18 Q    And it associates a phone number and the name?

19 A    Correct.

20      **MR. GREEN:**  I am going to move introduction of

21 Government's Exhibit 317A.

22      **THE COURT:**  Admitted.

23      **MR. GREEN:**  May it be published?

24      **THE COURT:**  You may.

25

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 46 of 232

1  BY MR. GREEN

2  Q    And, again, in the highlighted section, you see the phone

3  number?

4  A    Yes, I do.

5  Q    And the associated subscriber name?

6  A    Correct.

7  Q    The address -- are you familiar with that address?

8  A    I am.

9  Q    What's that address?

10 A    It's the address of Maurice Wiley's parents.

11 Q    If we scroll upwards, does it indicate in the subscriber

12 records both the activation and termination date?

13 A    Yes, it does.

14 Q    And what was that?

15 A    The activation date was March 13, 2018, and the

16 termination date was April 18, 2018.

17 Q    Did it also indicate a phone model that was associated

18 with this record?

19 A    It did.

20 Q    And what was that phone model?

21 A    An LG K20 plus BLK TMUS KIT RSU.

22 Q    All right.  I'll ask if it also had a mission ID number

23 associated with it?

24 A    It did.

25 Q    And what was that number?

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 47 of 232

1   A    8644846112.

2   Q    Now, did you also get additional subscriber information?

3   A    Yes.  T-Mobile provided, along with this, additional

4   information.

5   Q    I'll show you Government's Exhibit No. -- my apologies --

6   317B, and ask if you are familiar with what that is?

7   A    Yes.  It's a record provided by T-Mobile on the exact same

8   date that they provided the other record.

9   Q    And with regard to that data, do you recognize it as

10  associated with a particular phone number?

11  A    I do.

12  Q    And what was that phone number?

13  A    (313)718-3594.

14  Q    And was that -- was there an associated subscriber name

15  and address?

16  A    Yes.  The subscriber name was Maurice Wiley, and the

17  address was 1413 Maplewood Drive, Durham, North Carolina.

18          **MR. GREEN:**  Your Honor, I am going to move

19  introduction of Government's Exhibit No. 317B.

20          **THE COURT:**  Admitted.

21          **MR. GREEN:**  May it be published?

22          **THE COURT:**  You may.

23  **BY MR. GREEN**

24  Q    As you look at this exhibit again, the highlighted

25  portions show the mission ID, or telephone number.  Is that

Case 1:19-cr-00529-TDS  Document 363  Filed 02/04/22  Page 48 of 232

1  what you associate it with?

2  A    Yes, sir.

3  Q    And also the name and address?

4  A    Correct.

5          MR. GREEN:  Scroll down to the bottom, please.

6  **BY MR. GREEN**

7  Q    Did you also see -- did it also provide information in

8  terms of an effective date and the MSISDN number?

9  A    Yes, it did.

10 Q    What was that?

11 A    The effective date was April 18, 2018, and the MSISDN

12 number was 3137183594.

13 Q    And was there a phone that was associated with that?

14 A    Yes, there was.

15 Q    And what was it?

16 A    The phone was a ZTE Blade Z Max TMUS KIT RSU.

17 Q    As you consider these two subscriber information from

18 T-Mobile, based on your experience, what were you looking at in

19 terms of identification of Mr. Wiley and association with phone

20 numbers?

21 A    The phones -- looking at the phone numbers, looking at the

22 address, the subscriber name, and the account number was the

23 same for both.

24 Q    I'll show you Government's Exhibit No. 47 -- I'm sorry --

25 317C, and I'll ask if you are familiar with what that is?

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 49 of 232

1  A     Yes.  It a record provided by T—Mobile on the same date as

2  the other record.

3  Q     And what was the -- the MSISDN number associated with that

4  record?

5  A     8644846112.

6  Q     And the name and address?

7  A     Maurice Wiley, 1413 Maplewood Drive, Durham.

8           **MR. GREEN:**  Your Honor, I'm going to ask that

9  Government's Exhibit 317C be published.

10          **THE COURT:**  You may.  Do you want to introduce it

11  first?

12          **MR. GREEN:**  Yes.  Introduced and then published.

13          **THE COURT:**  All right.  It's admitted.  You may

14  publish it.

15 **BY MR. GREEN**

16 Q     Again, do we see in the highlighted section the associated

17 number and subscriber information?

18 A     Yes.

19          **MR. GREEN:**  And if you will scroll down.

20 **BY MR. GREEN**

21 Q     And looking at that phone, what was the phone model

22 associated with this phone?

23 A     A ZTE Blade Z Max TMUS KIT RSU.

24 Q     I notice that there is an effective date and expiration.

25 You saw that on the record?

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 50 of 232

1  A    I did.

2  Q    When you considered the subscriber records as a whole,

3  what conclusion did you draw with regards to the phone numbers

4  and what was changing, if anything?

5  A    Phone numbers were dropping off and new numbers were being

6  added.

7  Q    Now, you mentioned that you obtained certain records from

8  Instagram?

9  A    That's correct.

10 Q    I'm going to show you what's been marked as Government's

11 Exhibit No. 320.  I'll ask you first to look at Government's

12 Exhibit No. 320.

13      Do you recognize this as a record that you got from

14 Instagram?

15 A    I do.

16 Q    And why did you request that record?

17 A    It was obtained via search warrant, and it's because it

18 belonged -- the Instagram account belonged to Darryl Bradford.

19 Q    All right.

20      **MR. GREEN:**  I am going to move introduction of

21 Government's Exhibit 320.

22      **THE COURT:**  Admitted.

23      **MR. GREEN:**  May it be published?

24      **THE COURT:**  Yes.

25

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 51 of 232

**BY MR. GREEN**

Q    When you looked at the Instagram record in Exhibit 320,

were you able to get an email associated with that account?

A    Yes, I was.

Q    And what was the email?

A    DarrylBradford4@gmail.com.

Q    And were there also associated vanity names?

A    Yes, there were.

Q    And what were some of the -- what was the vanity name

associated with that account?

A    The active vanity name associated with the account at the

time I received the records was the name "5tretxh."

Q    Now, with regard to Mr. Bradford, can you describe his

physical appearance?

A    Tall and slender, over six foot.

Q    I am going to show you Government's Exhibit No. 321, and

ask if you are familiar with what that is?

A    I am.

Q    What is it?

A    It's the Instagram records return for the Instagram

account belonging to Semaj Bradley.

Q    And did it also provide -- do you recognize it as the same

sort of Instagram background information?

A    Yes.

          **MR. GREEN:**  I'm going to move introduction of

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 52 of 232

1  Government's Exhibit 321.

2            **THE COURT:**  It's admitted.

3  **BY MR. GREEN**

4  Q    As you look at the -- that Instagram account -- Instagram

5  record, did you see a registered email address and also a

6  vanity name?

7  A    Yes, I did.

8  Q    And what was it?

9  A    The email address was 5queez300HP@gmail.com.  The vanity

10 name at the time that the records were provided was the name

11 "5queez."

12           **MR. GREEN:**  Now, if we can return to Exhibit 320.

13 **BY MR. GREEN**

14 Q    On the second page of that exhibit, was there a phone

15 number associated with that account?

16 A    Yes, there was.

17 Q    And what was the phone number?

18 A    1-919-423-7490.

19 Q    I'm going to show you what's been marked as Government's

20 Exhibit 322, and ask if you are familiar with what that is?

21 A    I am.

22 Q    And what is it?

23 A    It is the Instagram records returned for the Instagram

24 account used by Hykeem Cox.

25 Q    And with regard to Mr. Cox, do you recognize the vanity

1  name associated with that?

2  A    I do.

3  Q    And what was the vanity name?

4  A    At the time that the record was provided the vanity name

5  was "Eastdurham_youngboy."

6       **MR. GREEN:**  Your Honor, I am going to move to

7  introduce Exhibit No. 322.

8       **THE COURT:**  It's admitted.

9       **MR. GREEN:**  Ask that it be published?

10      **THE COURT:**  It may.

11 **BY MR. GREEN**

12 Q    Was there also an associated telephone number with that

13 account?

14 A    There was.

15 Q    And what was that number?

16 A    1-919-519-4224.

17 Q    I'm going to show you Government's Exhibit No. 323, and

18 ask if you are familiar with what that account is related to?

19 A    I am.  It's the Instagram records returned for an

20 account -- Instagram account used by Charles Daniels.

21 Q    And with regard to Mr. Daniels, do you recognize the

22 vanity name?

23 A    I do.

24 Q    What was the vanity name?

25 A    "Eastdurham_murda."

1          **MR. GREEN:**  I am going to move introduction of

2    Government's Exhibit 323.

3          **THE COURT:**  It's admitted.

4          **MR. GREEN:**  With regard to that exhibit, I would ask

5    that it be published.

6          **THE COURT:**  It may be.

7    BY MR. GREEN

8    Q    Was there a phone number associated with the account

9    information?

10   A    There was.

11   Q    What was that phone number?

12   A    1-984-260-1816.

13   Q    Now, I'm going to show you what's been marked as -- I'm

14   sorry.

15         Before I do that, you mentioned that you were present

16   there at the arrest of Mr. Wiley?

17   A    That's correct.

18   Q    And describe the circumstances of his arrest.

19   A    We were provided the warrants for his arrest regarding the

20   murder of Mr. Hong Zheng.  One of our task force officers took

21   lead on developing a location where he would be found.  He

22   obtained a search warrant for that address which was 610 East

23   Ellerbee Street in Durham.  Surveillance was initiated by the

24   Raleigh-Durham Safe Streets Task Force on that residence, and

25   the search warrant was executed and he was found inside the

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 55 of 232

1  residence.

2  Q    Was there anyone else with him inside?

3  A    No, there was not.

4  Q    And where specifically inside the residence was he found?

5  A    Right inside the front door it was like a living room but

6  there was what I recall like a mattress or something that he

7  was lying on.

8  Q    I show you what's been marked as Government's Exhibit

9  No. 324.

10     Are you familiar with what that is?

11 A    I am.  It's a photograph that I took that day.

12 Q    And what does it depict?

13 A    The bed that Mr. Wiley was found lying on.

14          **MR. GREEN:**  I'm going to ask that Government's

15 Exhibit No. 324 be published.

16          **THE COURT:**  Do you want to admit it first?

17          **MR. GREEN:**  Yes, I do.

18          **THE COURT:**  It's admitted.  You may.

19 **BY MR. GREEN**

20 Q    This is the bed he was lying on?

21 A    Yes, sir.

22 Q    Was there anything of note that was seized near him or

23 near that area?

24 A    Yes.  There two cell phones that were on the floor by him.

25 Q    I am going to show you Government's Exhibit No. 325.

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 56 of 232

1      And do you recognize what that is?

2  A    Yes.  It's an LG phone with a cracked screen.

3  Q    And is that a photograph that accurately depicts the phone

4  on the floor?

5  A    It does, and I took that photograph.

6          **MR. GREEN:**  I'll ask that Government's Exhibit

7  No. 325 be admitted.

8          **THE COURT:**  It's admitted.

9          **MR. GREEN:**  And ask that it be published?

10          **THE COURT:**  It may.

11  **BY MR. GREEN**

12  Q    Was Government's Exhibit 325 a photograph of the phone

13  that there was an eventual extraction that the jury has heard

14  about?

15  A    That's correct.

16  Q    I'm going to show you Government's Exhibit 326, and ask if

17  you are familiar with what that is?

18  A    I am.

19  Q    And what is it?

20  A    It is a photograph that I took of a ZTE phone that was

21  lying on the floor by Mr. Wiley as well.

22  Q    With regards to Government's Exhibit No. 326, does that

23  accurately depict the phone on the floor?

24  A    Yes, it does.

25          **MR. GREEN:**  I am going to move introduction of

1  Government's Exhibit 326 and ask that it be published?

2          **THE COURT:**  It's admitted.  You may.

3  **BY MR. GREEN**

4  Q    Was that phone seized?

5  A    Yes, I seized it.

6  Q    Was an extraction attempted on that phone?

7  A    It was.

8  Q    Was it completed?

9  A    No, it was not.

10 Q    Now, as you gathered evidence in the case, did you attempt

11 to further verify phone numbers associated with the various

12 defendants that you were looking at?

13 A    Yes.

14 Q    I'm going to show you Government's Exhibit No. 327, and

15 ask if you are familiar with what that is?

16 A    I am.

17 Q    What is it?

18 A    It was a cell phone that was recovered May 7, 2018, in a

19 separate, unrelated incident involving Semaj Bradley.

20 Q    And were you able to get into that -- was the FBI able to

21 get into that phone?

22 A    No.

23 Q    And were you able to derive any information from the

24 phone?

25 A    Yes, I was able to take a photograph of the screen.

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 58 of 232

1  Q    And would -- Government's Exhibit 327, did you take that

2  photograph?

3  A    I did.

4           **MR. GREEN:**  I am going to move introduction of

5  Government's Exhibit 327.

6           **THE COURT:**  Admitted.

7           **MR. GREEN:**  And ask that it be published?

8           **THE COURT:**  You may.

9  **BY MR. GREEN**

10  Q    As you looked at the screen, was there certain information

11  that you could derive from that screen?

12  A    Yes, there was.

13  Q    And would you describe what information is depicted in

14  Government's Exhibit 327?

15  A    Mr. Bradley's Gmail account is on the screen.  His name,

16  Semaj Bradley, is shown as well.  And those are related to jobs

17  that he may have been seeking.

18  Q    And with regard -- were you able to use that information

19  in some way?

20  A    Yes.

21  Q    And how?

22  A    There was the ability to get the cell phone number from

23  the SIM card, and that phone number was then attributed to

24  being Mr. Bradley's.

25  Q    Now, as you had collected the various record details --

1  I'm going to show you Government's Exhibit No. 319.

2         **MR. GREEN:**  May I approach?

3         **THE COURT:**  Yes.

4  **BY MR. GREEN**

5  Q    Through court orders and other ways, did you get records

6  related, as we described, for Mr. Wiley?

7  A    Yes.

8  Q    I'm going to show you Government's Exhibit No. 319, and

9  ask if you're familiar -- if those are the records from the

10 providers?

11 A    Yes.  It would be the historical call detail records.

12 Q    Was that from T-Mobile?

13 A    Correct.

14 Q    And also Sprint?

15 A    Yes.

16        **MR. GREEN:**  I move introduction of Government's

17 Exhibit 319.

18        **THE COURT:**  It's admitted.

19 **BY MR. GREEN**

20 Q    Now, as you started to associate the names and numbers,

21 did you do so both by their name, the phone, the source of

22 where that information came from, as well as what provider was

23 associated with the records?

24 A    That's correct.

25 Q    I'm going to show you Government's Exhibit No. 328.

US v. Wiley  -- Trial/Vol. V of VII  -- 4/23/21

1          **MR. GREEN:**  May I approach?

2          **THE COURT:**  Yes, you may.

3     **BY MR. GREEN**

4     Q    Do you recognize Government's Exhibit 328 as a summary

5     chart of the -- your analysis of the records and the names

6     associated with those records?

7     A    I do.

8     Q    And does that aid you in your testimony as you describe

9     these records?

10    A    It does.

11         **MR. GREEN:**  Your Honor, I actually have copies of

12    these exhibits.  I would like to actually publish those

13    physically to the jury.

14         **THE COURT:**  All right.  Did you move its admission?

15         **MR. GREEN:**  I will move Exhibit 328 into evidence and

16    ask that this be published?

17         **THE COURT:**  All right.  It's admitted.  You may

18    publish those.

19         If you hand it to the clerk, she'll hand it to the

20    jurors.

21         **MR. GREEN:**  Thank you.

22       (Pause in the proceedings.)

23         **THE COURT:**  Please proceed.

24         **MR. GREEN:**  Thank you.

25

US v. Wiley  -- Trial/Vol. V of VII  -- 4/23/21

1    BY MR. GREEN

2    Q    Now, as we look at Government's Exhibit 328, there is a

3    source column --

4    A    It's not published on mine.

5    Q    It's broken down in columns with the cell phone number; is

6    that correct?

7    A    Yes.

8    Q    And then the source of the attribution; is that right?

9    A    Yes.

10   Q    Meaning the source of the underlying information you're

11   using to associate the number; correct?

12   A    Yes.

13   Q    And then it's associated with a particular individual; is

14   that right?

15   A    Correct.

16   Q    And so as we associate the numbers, one line appears to be

17   lighter than the others, kind of a not yellow but beige line,

18   and that indicates "Source:  LG phone extraction."

19        Can you explain that to the jury?

20   A    Yes.  As Detective Gryder testified earlier, when he

21   conducted the cell phone extraction of the LG phone that we

22   recovered for Mr. Wiley, there were two phone numbers that were

23   associated and used with that device.

24   Q    And what were those two phone numbers?

25   A    (313)300-4268 and (864)484-6112.

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 62 of 232

1   Q    And so if we look at Government's Exhibits 311 and 326 --

2            **MR. GREEN:**  May I approach?

3            **THE COURT:**  You may.

4   **BY MR. GREEN**

5   Q    So these two exhibits -- first, 311, could you describe

6   what that is?

7   A    Yes.  311 is the LG cell phone that we recovered from

8   Mr. Wiley on April 27th during his arrest.

9   Q    Now, the actual extraction of data, did it come from that

10  phone?

11  A    Yes, it did.

12  Q    And I'll show you Government's Exhibit 326A, and ask if

13  you are familiar with what that is?

14  A    I am.

15  Q    What is that?

16  A    It is the ZTE phone that we recovered from Mr. Wiley

17  during his arrest on April 27, 2018.

18  Q    And was an extraction of data attempted from that phone?

19  A    Yes, it was.

20  Q    Could it be completed?

21  A    No, it could not.

22  Q    Now, did you also -- let me go back to our chart.  Thank

23  you.

24       For each associated phone number, separate and apart from

25  the extraction, those two numbers you talked about -- as to the

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 63 of 232

1  (846)484-6112 number, did you attempt to get records from

2  T-Mobile as to any transactions or messaging that are

3  associated with that account?

4  A    Yes.  And we did receive those.

5  Q    And did you also get records associated from -- for

6  Mr. Bradley?  I believe he had two phone numbers associated

7  with him; is that correct?

8  A    Yes, that's correct.

9  Q    And Mr. Bradford also?

10 A    Correct.

11 Q    Mr. Cox?

12 A    Correct.

13 Q    And as well as Mr. Daniels?

14 A    Yes.

15 Q    Now, as you -- how did you go about trying to examine all

16 these records?  Describe that process for the jury.

17       What are you looking for, and what steps did you take as

18 you started to assemble all these records?

19 A    We took the records and put them into an Excel spreadsheet

20 for the dates that we were looking for related to the attempted

21 robbery and homicide of Mr. Zheng and overlaid the call detail

22 records which would show outgoing/incoming calls.  It would not

23 show the text, but it would indicate if a text message was sent

24 or received and overlaid that to get a picture of the contacts.

25 And then went further out to show contacts that were sooner

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 64 of 232

 1 than the date of April 15th, the date of April 14th, the date

 2 of April 13th.  We were -- I looked to see if I could show that

 3 they were -- there were associations prior to that.

 4 Q    And that's what you were trying to do, to see if there was

 5 connections between these phone numbers that you had associated

 6 with the Defendant?

 7 A    That's correct.

 8 Q    I'm going to show you on your screen Government's Exhibit

 9 No. 329.

10      As you look at Government's Exhibit 329, do you recognize

11 what that is?

12 A    I do.

13 Q    What is it?

14 A    It is a summary of the phone detail records that I had at

15 the time that I conducted this.

16 Q    And did you eventually get other information related to

17 calls or other -- or is this the complete summary of the

18 records you reviewed?

19 A    No, it's not a complete summary.  It's just of the records

20 that I had at the time that I conducted this analysis.

21 Q    And does it accurately capture your observation regarding

22 the records you were looking at?

23 A    It does.

24          **MR. GREEN:**  I'm going to move Government's Exhibit

25 No. 29 into evidence.

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 65 of 232

1        **THE COURT:**  It's admitted.

2        **MR. GREEN:**  And ask that it be published?

3        **THE COURT:**  You may.

4        **MR. GREEN:**  May I approach the clerk?

5        **THE COURT:**  You may.

6  **BY MR. GREEN**

7  Q    Now, looking at Government's Exhibit 329, did you review

8  the records of the phone numbers associated with Darryl

9  Bradford, Jr.?

10  A    Yes, I did.

11  Q    And what was that number?

12  A    (919)423-7490.

13  Q    Can you tell us the time frame that you were looking at as

14  you started to review these records?  It's on the second

15  paragraph.

16  A    The time frame was between April 1, 2018, through

17  April 29, 2018.

18  Q    And when you reviewed the call detail records of

19  Mr. Bradford, what did you take note of?

20  A    I found that Mr. Bradford and Hykeem Cox had been in

21  contact several times on April 13, 2018, with the last contact

22  at approximately 9:52 p.m.; that their phone numbers had been

23  in contact on April 14, 2018, between 6:45 p.m. and 6:49 p.m.

24  Q    Did you determine whether Mr. Bradford's phone had been in

25  contact with Mr. Wiley's phone at any time?

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 66 of 232

1  A    I did, and I found that in the records.

2  Q    What did you find?

3  A    I found that Mr. Bradford's phone number had been in

4  contact with Maurice Wiley's phone number identified as

5  (313)300-4268.  That contact included two calls to Mr. Wiley on

6  April 7, 2018.

7  Q    Did you also locate Mr. Charles Daniels' known phone

8  number in the records of Mr. Bradford?

9  A    I did.

10  Q    And what did you note when you made that analysis?

11  A    I found that Mr. Bradford's phone number had been in

12  contact with Charles Daniels' number, (984)260-1816, over 50

13  times, and it was both voice and text.

14  Q    Did you look at the records associated with Mr. Charles

15  Daniels separately?

16  A    I did.

17  Q    And did you find Mr. Wiley's number in those call details?

18  A    I did.  I found Mr. Wiley's phone number, (984)260-1816,

19  was also found in call detail records -- excuse me.  I'm sorry.

20  That's Charles Daniels' number -- was also found in records for

21  Maurice Wiley's known phone number, (864)484-6112, and that

22  contact occurred on April 1, 2018.

23  Q    Now, earlier -- if you could go back up -- you noted a

24  known phone number of Mr. Wiley, (313)300-4268; is that

25  correct?

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 67 of 232

1  A     That's correct.

2  Q     What was that based -- so now it appears you're

3  attributing two phone numbers to Mr. Wiley?

4  A     That's correct.

5  Q     And just describe that.  Where were you able to put those

6  two phone numbers together?  How did you do that?

7  A     The phone number that's shown here is the same phone

8  number that is in the LG phone extraction.

9  Q     And the (864)484-6112 number?

10  A     That is also in the LG phone extraction.

11  Q     And would that number show up in other places in the

12  investigation?

13  A     Yes, it would.

14  Q     Now, with regard to Mr. Daniels' record, did you find

15  connections with Mr. Wiley at the (313) number as well as

16  Mr. Cox and Mr. Bradford?

17  A     I did.  I found contact between Mr. Daniels' number with

18  Maurice Wiley's number, (313)300-4268; Hykeem Cox,

19  (919)519-4224; and Darryl Bradford, (919)423-7409, during the

20  time frame of March 31, 2018, and until May 2, 2018.  And they

21  each had over 50 contacts, voice and text, with Daniels' phone

22  number during that identified time frame.

23           **MR. GREEN:**  If we could go to the next page.

24  **BY MR. GREEN**

25  Q     Now, did you try and zone in as you examined these records

1  that you described for a particular window of time?

2  A    I did.

3  Q    And what window of time were you looking at?

4  A    April 13 through April 15, 16, 2018.

5  Q    And tell us why you chose that window of time.

6  A    I knew at that point of the investigation that it had

7  become of interest, regarding surveillance at the China Wok,

8  the attempted robbery on the 13th, the 14th, and also the

9  attempted robbery/murder on the 15th.

10 Q    As you now focus in -- let's first look at April 13th.

11      Did you note any connection between the two individuals as

12 far as their phone records?

13 A    Yes.  I noted that on April 13, 2018, at 8:56 p.m., Hykeem

14 Cox's phone number, (919)519-4224, called Charles Daniels for a

15 duration of 1 minute.

16 Q    And was there another call on the 13th that you noted?

17 A    Yes.  Following that call, at 9:53 p.m., Charles Daniels

18 called (313)300-4268, which belonged to Maurice Wiley, and the

19 duration was unknown.

20 Q    Now, looking at April 14, I'll ask you first to describe

21 five calls.

22      Could you relate to the jury what you determined?

23 A    Yes.  These are calls and contacts back and forth between

24 individuals that we were looking at as suspects in the case.

25      On April 14, 2018, at 8:56 a.m., Darryl Bradford called

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 69 of 232

1  Charles Daniels for a duration that was unknown.  Later that

2  day, at 5:32 p.m., Charles Daniels called Hykeem Cox for a

3  duration of 29 seconds.

4  Q    You can continue.

5  A    On that same date, at 5:41 a.m., Hykeem Cox called Charles

6  Daniels, duration of 37 seconds.  On that same date, at

7  5:57 p.m., Charles Daniels called Maurice Wiley for a duration

8  of 42 seconds.

9  Q    The next entry?

10 A    At 5:59 p.m., Charles Daniels turned around and called

11 Hykeem Cox for a duration of 30 seconds.

12 Q    I'd ask you to look at the next five entries.

13 A    On April 14, 2018, at 6:05 p.m., Maurice Wiley called

14 Charles Daniels for a duration of 38 seconds.

15      On the same date, at 6:06 p.m., Charles Daniels called

16 Hykeem Cox, duration of 7 seconds.  Same date, at 6:06 p.m.,

17 Charles Daniels sent a text to Hykeem Cox.

18      On the same date, at 6:07 p.m., Charles Daniels called

19 Maurice Wiley for a duration of 1 second.

20      On April 14, 2018, at 6:14 p.m., Charles Daniels called

21 Maurice Wiley for a duration of 7 seconds.

22 Q    I'll ask you to look at the next two entries.

23 A    April 14, 2018, at 6:22 p.m., Charles Daniels called

24 Hykeem Cox for a duration of 3 minutes.  Same day, at 6:25

25 p.m., Darryl Bradford called Charles Daniels, duration of 3

1  minutes.

2  Q    Now, at this point in your investigation, before we move

3  on to the next five entries, had you associated Darryl Bradford

4  and Charles Daniels?

5  A    Yes, I had.

6  Q    And how had you done that?

7  A    That's through prior incident reports.

8  Q    And did that relate to a report of a shooting -- a

9  drive-by shooting?

10 A    Yes.

11 Q    And when did that drive-by shooting occur?

12 A    I would have to look at the report.

13 Q    Was it on the evening of April 15th?

14 A    Yes.  Yes.

15 Q    Now, looking at the next five entries, what did you note

16 on April 14th?

17 A    Continuing on April 14, 2018, at 6:42 p.m., Darryl

18 Bradford sent a text to Charles Daniels.

19      Same date, at 8:00 p.m., Charles Daniels called Hykeem Cox

20 for a duration of 1 minute and 14 seconds.

21      Same date, at 8:04 p.m., Charles Daniels called Maurice

22 Wiley for a duration of 28 seconds.

23      Same date, at 8:05 p.m., Charles Daniels called Maurice

24 Wiley for a duration of 2 seconds.

25      Same date, at 8:09 p.m., Hykeem Cox called Charles Daniels

1  for a duration of 1 minute and 54 seconds.

2  Q    I'll ask you to look at the next entry by itself, April 14

3  at 8:34 p.m.  What did your investigation determine, looking at

4  the records?

5  A    Yes.  Because I had reviewed the cell phone extraction for

6  Mr. Wiley's LG phone, I was aware on April 14, 2018, at

7  8:34 p.m., from the call detail records that when Charles

8  Daniels sent a text to Maurice Wiley, that text from the cell

9  phone extraction was, *We out here waiting on u to pull Chub* --

10 who I know to be Hykeem Cox -- *said he need to talk to u.*

11 Q    Looking at the next five entries -- I'm sorry -- the

12 remaining entries for April 14, what do you note?

13 A    April 14, 2018, at 9:08 p.m., Charles Daniels called

14 Maurice Wiley for a duration of 17 seconds.

15     Same date, at 11:00 p.m., Charles Daniels call-forwarded

16 to Hykeem Cox.

17     Same date, at 11:11 p.m., Charles Daniels called Maurice

18 Wiley for a duration of 9 seconds.

19 Q    Did you also move your analysis to the date of the

20 attempted robbery --

21 A    I did.

22 Q    -- April 15th?

23     Beginning with the first four entries under April 15th

24 that you noted, describe for the jury what you noted in the

25 records.

1  A    On April 15, 2018, at 1:00 a.m., Charles Daniels called

2  Maurice Wiley for a duration of 11 seconds.

3       Same date, at 1:20 a.m., Hykeem Cox called Charles Daniels

4  for a duration of 1 minute and 15 seconds.

5       Same date, at 1:22 a.m., Charles Daniels sent a text to

6  Hykeem Cox.

7       Same date, at 1:24 a.m., Hykeem Cox called Charles Daniels

8  for a duration of 21 seconds.

9  Q    Continue to the next page of that exhibit, looking at the

10 next five entries for April 15th.

11 A    At 1:25 a.m., Charles Daniels called Hykeem Cox for a

12 duration of 8 seconds.

13      Same date, at 1:27 a.m., Hykeem Cox called Charles

14 Daniels, duration 52 seconds.

15      Same date, 9:07 a.m., Charles Daniels called Hykeem Cox,

16 duration of 30 seconds.

17      Same date, at 9:08 a.m., Charles Daniels called Darryl

18 Bradford for a duration of 1 minute and 25 seconds.

19      On April 15, 2018, at 9:13 p.m., Hykeem Cox called Charles

20 Daniels, duration unknown.

21 Q    Now, what time were you using as a working model as to

22 when the murder happened at Carlton Crossing Drive?

23 A    I was using the times that were from the incident report

24 by the Durham Police Department.

25 Q    Which was?

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 73 of 232

1  A     Between 10:00 p.m. and 10:22 p.m. on April 15, 2018.

2            **THE COURT:**  Let me ask you if this is a good time --

3  we need to take a break.

4            **MR. GREEN:**  We can.

5            **THE COURT:**  All right.  Ladies and gentlemen, we're

6  going to take our morning break.  We've been at it here for

7  little more than an hour and a half.

8            If you're taking notes, please put your notes in your

9  envelopes and put your envelopes in your chairs.  Remember all

10 my admonitions to you.  Don't do any research, and you're not

11 to discuss the case or any matter that's occurred here even in

12 the courtroom among yourselves at all.  Simply put the case out

13 of your mind, take a break, use the facilities.

14           And we'll take a 20-minute break and be ready to come

15 back refreshed, and we'll continue up to the lunch hour.

16 Please leave your notes in your -- envelopes in your chairs.

17 Remember all my admonitions, and I'll ask Ms. Engle, if she

18 would, please, escort the jurors to their jury room.

19      (The jury departed the courtroom at 10:48 p.m.)

20           **THE COURT:**  All right.  Let the record show the jury

21 has now left the courtroom.

22           Let me just for the record ask -- both of these

23 stipulations, Government's 313 and Government's 312, appear to

24 bear Mr. Wiley's signature as well.  There is some case law in

25 the Fourth Circuit indicating that it is the Defendant's right,

US v. Wiley  -- Trial/Vol. V of VII  -- 4/23/21

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 74 of 232

 1 of course, to decide whether to stipulate to facts.

 2          I would like to make inquiry of the Defendant just to

 3 ensure that that's his signature.

 4          So, Mr. Wiley, both of these stipulations appear to

 5 bear your signature along with that of your lawyers.  Is that,

 6 in fact, your signature on both?

 7          **THE DEFENDANT:**  Yes, sir.

 8          **THE COURT:**  And did you intend to stipulate to the

 9 facts that are set out in both?

10          **THE DEFENDANT:**  Yes, sir.

11          **THE COURT:**  And do you understand by doing that the

12 jury can conclude that those facts have been proved without any

13 further evidence?

14          **THE DEFENDANT:**  Yes, sir.

15          **THE COURT:**  Did you decide to sign that after you

16 discussed that with your lawyers?

17          **THE DEFENDANT:**  I did, yes, sir.

18          **THE COURT:**  Did anybody make any kind of threat or

19 promise to you in regard to that that induced you in any way to

20 sign that?

21          **THE DEFENDANT:**  No, sir.

22          **THE COURT:**  All right.  And you're aware you had the

23 right not to do that if that was your choice?

24          **THE DEFENDANT:**  Yes, sir.

25          **THE COURT:**  All right.  Thank you, sir.

1          **MR. GREEN:**  Your Honor, at this time there was one

2  additional stipulation that we were going to introduce.  It's

3  just as to records and authenticity, but it also bears

4  Mr. Wiley's signature.  It's Government's Exhibit 318.

5          **THE COURT:**  All right.  I have been handed what's

6  been marked as Government's Exhibit 318 which has not yet been

7  introduced, but it appears to be a stipulation that also bears

8  your signature, Mr. Wiley, signed on April 19th.  And the

9  stipulation relates to a number of records from telephone

10 companies and Instagram accounts as well as Property and

11 Evidence Voucher logs from the police department in Durham.

12          Did you, in fact, sign this stipulation as well?

13          **THE DEFENDANT:**  Yes, sir.

14          **THE COURT:**  And the stipulation agrees to the

15 admissibility of these records that are listed in it without

16 any further proof of authenticity or foundation or chain of

17 custody.

18          Did you understand that?

19          **THE DEFENDANT:**  Yes, sir.

20          **THE COURT:**  Did you talk to your lawyers about

21 whether or not it was in your interest to agree to the

22 stipulation?

23          **THE DEFENDANT:**  Yes, sir, I did.

24          **THE COURT:**  And did you have a full and complete

25 discussion with your lawyers?

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 76 of 232

1          THE DEFENDANT:  Yes, sir.

2          THE COURT:  Was it your intention to sign the

3  stipulation and be bound by it?

4          THE DEFENDANT:  Yes.

5          THE COURT:  All right.  Did anybody make any threat

6  or promise in that regard to induce your signature on this

7  stipulation?

8          THE DEFENDANT:  No, sir.

9          THE COURT:  All right.  So do you understand that

10 these various records that are introduced in here -- or records

11 that are reflected in here that relate to the exhibits that are

12 indicated are now admissible without any further proof of

13 authenticity, foundation, or chain of custody?

14         THE DEFENDANT:  Yes, sir.

15         THE COURT:  Thank you, sir.

16         Let me just say for the record as well that when I

17 replaced Juror No. 3, Ms. Spach, she was a white female.

18 Alternate No. 1, Ms. Fraizer, is also a white female.  Juror

19 No. 9, who I did not replace, was a white female as well.

20         Anybody want to be heard on that?

21         MR. GREEN:  No, Your Honor.

22         MR. BRYSON:  No, Your Honor.

23         THE COURT:  Okay.  Any other issue you want to bring

24 to my attention?

25         MR. GREEN:  Not at this time.

1          **THE COURT:**  From the Defendant?

2          **MR. BRYSON:**  No, Your Honor.

3          **THE COURT:**  Okay.  If you all can put together

4    whatever version of the superseding indictment you believe

5    ought to be submitted as an exhibit -- or as a record, rather,

6    for the jury.  Typically, I would send back a copy of the

7    current indictment, so if you would agree on whatever version

8    of that the parties are in agreement to.  Just giving you a

9    heads-up, I would like to have that appropriate time, if we get

10   to that phase of the case.

11          All right.  We'll take a break then.  So let's be

12   ready to go at 11:15.

13          (Proceedings recessed at 10:54 a.m.)

14          (Proceedings called back to order at 11:16 a.m.)

15          (The Defendant was present.)

16          **THE COURT:**  Ready to proceed?

17          **MR. GREEN:**  We did discuss the redaction, and I

18   believe the agreement of the parties regarding the

19   admissibility of certain exhibits -- they are going to be

20   Exhibit No. 350 -- I'm sorry -- 348, 349, 350, and we're

21   actually working on a 347.  We just noticed one error -- I'm

22   sorry.  And so -- and this does relate to that question with

23   regard to the motion in limine.  And so I think do we do have

24   resolved, and the parties have reviewed the exhibits and I

25   think --

1      **THE COURT:**  Okay.

2      **MR. GREEN:**  -- we're good to go.

3      **THE COURT:**  All right.  I note that the jurors -- you

4  published for the jurors Government's 328, which has the cell

5  phone numbers.  Ordinarily, I would not allow the jurors to

6  continue to maintain any exhibit so that there is no undue

7  reference to any particular exhibit.  It was published to them,

8  but now they each have a copy.  There will be a copy for the

9  jury at the appropriate time when they deliberate.

10      **MR. GREEN:**  Yes, Your Honor.

11      **THE COURT:**  My question is whether, in your view --

12  or your request is that they continue to possess it for this

13  period of time or whether it's sufficient to collect them up at

14  this point?

15      **MR. GREEN:**  I think they likely can collect them up.

16  There's going to be references again to telephone numbers, but

17  we would -- the Government will ask that that exhibit be

18  republished during the next witness' testimony, which has to do

19  with the CAST analysis.

20      **THE COURT:**  That's fine.  I was just going to collect

21  it from the jurors unless there was some reason you were going

22  to be objecting to that.

23      **MR. GREEN:**  All right.  No, Your Honor.

24      **THE COURT:**  All right.  Okay.  Let's bring the jury

25  back in then, please.

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 79 of 232

1              (The jury returned to the courtroom at 11:18 a.m.)

2                   **THE COURT:**  Please be seated, everyone.

3                   Ms. Engle, I'm going to ask, if you would -- the

4     jurors have Government's Exhibit 328, which copies were handed

5     out for your review.  If you have those with you, if you would

6     then pass them back up.  It will be available, along with all

7     the other exhibits, at the end of the case.

8                   Please continue.

9                   **MR. GREEN:**  If you could return to Government's

10    Exhibit No. 329, and ask you to go to the third page.

11    **BY MR. GREEN**

12    Q    Looking at that, I think before we left, you were

13    describing the information you were using to kind of bracket

14    when the attempted robbery occurred?

15    A    That's correct.  I got those times from the incident

16    report from the Durham Police Department regarding the murder

17    of Mr. Zheng.

18    Q    And what were those times?

19    A    10:18 p.m. until 10:22 p.m. on April 15, 2018.

20    Q    Now, what was the next significant event you noticed, at

21    least for purposes of your investigation, in those records that

22    occurred on April 15?

23    A    It was the 911 call placed by Charles Daniel at

24    approximately 10:46 p.m. on April 15, 2018.

25    Q    And which 911 call is this?

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 80 of 232

1  A    It's the call regarding the shooting injury to Darryl

2  Bradford on North Driver and Main Street in Durham.

3  Q    Continuing for the next five entries on April 15, I would

4  like you to tell me first the time of the next call.

5  A    11:05 p.m.

6  Q    So that 911 call had occurred at 10:46 p.m.?

7  A    That's correct.

8  Q    And describe what the records were showing in the next

9  entries.

10  A    11:05 p.m., Hykeem Cox called Charles Daniels for a

11  duration of 1 minute.

12      On the same time date, at 11:17 p.m., Charles Daniels

13  called Maurice Wiley for a duration of 6 minutes.

14      Same date, at 11:29 p.m., Charles Daniels called Hykeem

15  Cox for a duration of 2 seconds.

16      Same date, 11:29 p.m., Hykeem Cox called Charles Daniels

17  back, no duration.

18  Q    Next?

19  A    Same date, at 11:29 p.m., Hykeem Cox called Charles

20  Daniels back, and the duration was 1 minute and 34 seconds.

21  Q    All right.  Starting on April 16, in the early morning

22  hours, would you describe the two entries on that page?

23  A    At 12:54 a.m., Charles Daniels called Maurice Wiley for a

24  duration of 59 seconds.

25      And at 2:16 a.m., Charles Daniels called Hykeem Cox for a

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 81 of 232

1  duration of 4 seconds.

2  Q    Also on April 16?

3  A    At 2:18 a.m., Charles Daniels called Hykeem Cox for a

4  duration of 6 seconds.

5  Q    And then did you conduct a more general analysis for the

6  rest of the day on April 16?

7  A    I did.

8        **MR. GREEN:**  If you would highlight that section.

9  **BY MR. GREEN**

10 Q    And what did you find?

11 A    Showed that Daniels had phone contact during the day of

12 April 16, 2018, with Hykeem Cox, Darryl Bradford, and Maurice

13 Wiley.

14 Q    Now, I'm going to show you what's been marked as

15 Government's Exhibit No. 330.

16      As you looked at the records you received, did you also

17 try and look at the Instagram business records for relevant

18 information?

19 A    I did.

20 Q    And what is depicted in Government's Exhibit No. 330?

21 A    It is a page from Semaj Bradley's Instagram account.  That

22 is the photograph of him standing with Darryl Bradford.

23 Mr. Bradley is seen with a pistol in his waistband.

24        **MR. GREEN:**  I'll ask that Government's

25 Exhibit No. 330 be introduced and then published.

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 82 of 232

1     **THE COURT:** All right. It's admitted. You may

2  publish it.

3     **MR. GREEN:** And if we can go to the second page.

4  **BY MR. GREEN**

5  Q    Is there information in the upper section about when that

6  photograph was posted?

7  A    Yes, there is.

8  Q    And when is that?

9  A    It is posted on April 18, 2018, at 18:35 p.m., which is

10  UTC time.

11  Q    I'm going to show you Exhibit 331.

12     Now, as you examined the Instagram records, in addition to

13  seeking to see associations, what other things were you looking

14  for in the Instagram records?

15  A    I was looking for firearms, communication between all the

16  individuals that we had identified as being involved.

17  Q    I'm going to show you Government's Exhibit No. 331, and

18  ask if you are familiar with what that is?

19  A    I am.

20  Q    And what is it?

21  A    It is a page from the Instagram records belonging to

22  Hykeem Cox.

23  Q    And what does it depict?

24  A    A pistol.

25  Q    And as you reviewed the messages associated with

1  Government's Exhibit No. 331, did you glean any information as

2  to what might be going on with that pistol?

3  A    The pistol was advertised for sale.

4         **MR. GREEN:**  I'm going to move introduction of

5  Government's Exhibit No. 331.

6         **THE COURT:**  It's admitted.

7         **MR. GREEN:**  And I'll ask that it be published?

8         **THE COURT:**  You may.

9  **BY MR. GREEN**

10 Q    And what time was -- in the lower corner, what was the

11 date when that was published?

12 A    February 25, 2018, at 12:28 a.m. UTC time.

13        **MR. GREEN:**  If we could turn to the second page, and

14 highlight starting right there.

15 **BY MR. GREEN**

16 Q    And as you looked at the messages, did you see indications

17 that there was a firearm for sale in those messages?

18 A    I did.

19 Q    And what did you note?

20 A    Noticed that Hykeem Cox was advertising that he had a .40

21 on the market, which would be a .40 caliber pistol.

22 Q    All right.  I'm going to show you Government's Exhibit

23 No. 332, and ask if you're familiar what with Government's

24 Exhibit 332 is?

25 A    Yes.  It is a page from the records of Hykeem Cox's

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 84 of 232

1  Instagram account.

2  Q    And with regard to that Instagram account, as you reviewed

3  the messages, did you make any -- did you reach some kind of

4  conclusion about what you were reading?

5  A    Yes, I did.

6  Q    What was it?

7  A    I can't see the text.

8  Q    Okay.  Would that aid you?  If not, I can approach.

9  A    No.  Mr. Hykeem Cox is advertising the sale of a pistol.

10 Q    And what was the date associated with the records?

11 A    April 6, 2018.

12        **MR. GREEN:**  And go on to the next page.

13 **BY MR. GREEN**

14 Q    Was there a photograph also posted?

15 A    Yes.  It's this photograph.

16 Q    And what's reflected in that photograph?

17 A    It's an SR9 compact pistol.

18 Q    And can you tell in the photograph anything about the

19 magazine?

20 A    It's an extended magazine.

21 Q    And what was the time associated when that photograph was

22 posted?

23 A    April 6, 2018, at 5:05 UTC time, 5:05 p.m.

24        **MR. GREEN:**  Next page.

25

**BY MR. GREEN**

Q    Did it appear there were other firearms for sale on
Mr. Hykeem Cox's Instagram account?

A    It did.

Q    And, again, looking at the text, what did you notice?

A    Another Instagram user offered to sell -- or it was
advertising and telling Mr. Cox that that individual had a gun
for sale for $450.

Q    I'm going to show you Government's Exhibit No. 334.

     I'm going to ask if you are familiar with what that is?

A    Yes.  It's a page from the Instagram account belonging to
Hykeem Cox.

Q    And with regard to that page, does that exhibit fairly and
accurately depict the records you got in terms of exchanges
with Mr. Cox with other individuals?

A    Yes, it does.

     **MR. GREEN:**  I'm going to move introduction of
Government's Exhibit 334.

          **THE COURT:**  Admitted.

          **MR. GREEN:**  And ask that it be published?

          **THE COURT:**  You may.

**BY MR. GREEN**

Q    Now, at the top section, when you reviewed that section,
what did you notice in the texts that you were seeing from
Mr. Cox's Instagram account?

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 86 of 232

1  A    The date is April 17, 2018, at 19:58 p.m. UTC time, and

2  Mr. Cox is informing another Instagram user that the MMP is

3  gone.

4  Q    And are you familiar, based on your experience with

5  firearms, what MMP might be referencing?

6  A    It's a firearm, pistol.

7  Q    Thank you.

8       During that Government's Exhibit No. 334, did you note

9  that there were other exchanges on that Instagram messaging

10  related to Mr. Cox attempting to sell more than one pistol?

11  A    Yes.

12  Q    I'm going to show you Government's Exhibit No. 335, and

13  ask if you are familiar with what that is?

14  A    Yes.  It is another page from Mr. Cox's Instagram records.

15  Q    Do you recognize the date associated with that -- those

16  messages?

17  A    Yes.

18  Q    And what was the date?

19  A    April 19, 2018.

20  Q    And when you looked at those messages, did you note that

21  there was yet another firearm for sale?

22  A    Yes.

23  Q    And what was -- how was the firearm described?

24  A    A Millennium .45.

25  Q    Now, as you noted that, you referenced specific calibers,

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 87 of 232

1  a .40, a 9, and a .45.

2       Why did you make note of that as you looked at these

3  records?

4  A    I was aware at that time that the shell casings that were

5  recovered from the crime scene at Carlton Crossing Drive

6  involved those caliber of firearms.

7  Q    Looking at Government's Exhibit No. 336, are you familiar

8  with what that is?

9  A    Yes.

10 Q    What is it?

11 A    It's a Taurus PT145 Millennium Pro .45 caliber pistol.

12 Q    And from whose Instagram was this taken?

13 A    Mr. Cox's Instagram.

14 Q    And this appears to be a stock photo; is that correct?

15 A    Correct.

16        **MR. GREEN:**  I'm going to move to introduction of

17 Government's Exhibit 336.

18        **THE COURT:**  Admitted.

19 **BY MR. GREEN**

20 Q    And would you -- can you tell us the date that this was

21 posted?

22 A    Yes.  April 19, 2018, at 15:10 UTC time.

23 Q    I'm going to ask you to look at Government's Exhibit

24 No. 337, and ask if you are familiar with what that is?

25 A    Yes, I am.

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 88 of 232

1   Q    What is it?

2   A    It is a page from Mr. Cox's Instagram records.

3   Q    And are you familiar with what it depicts?

4   A    Yes.  It is a photograph of a pistol, an XD9.

5           **MR. GREEN:**  I'm going to ask that Government's

6   Exhibit No. 337 be admitted.

7           **THE COURT:**  It's admitted.

8           **MR. GREEN:**  And published?

9           **THE COURT:**  You may.

10  **BY MR. GREEN**

11  Q    And I'll ask if you can associate the date with that

12  particular posting?

13  A    January 28, 2018, at 6:24 in the morning, UTC time.

14          **MR. GREEN:**  If we can go back to the photograph.

15  **BY MR. GREEN**

16  Q    Can you read the description of the firearm in that -- in

17  the upper left-hand corner, the etching on the firearm?  If

18  not, I can approach.

19  A    It is a little blurry on the screen.

20          **MR. GREEN:**  May I approach the witness?

21          **THE COURT:**  You may.

22  **BY MR. GREEN**

23  Q    Does that help?

24  A    Yes, it does.

25  Q    Do you recall what -- how was the etching on the firearm?

1   What did it describe the firearm as?

2   A    As an XD subcompact.

3   Q    Thank you.

4        Now, as we turn to these records, both the phone records

5   that you were provided, cell data records -- cell extraction

6   records, are those uploaded so that other agents can review

7   them?

8   A    Yes, they are.

9   Q    And just describe that process generally.

10  A    We receive the records.  We do an official document, which

11  is called an FD-302, to enter it into the records-keeping

12  system of the FBI, which is called Sentinel, and that

13  information becomes available to other investigators that are

14  assigned to the case.

15  Q    And then they could use those records to do their own

16  analysis?

17  A    That's correct.

18  Q    Now, I'm going to turn now to Government's Exhibit

19  No. 338.

20       Did you conduct an examination of certain records related

21  to the cell phone extraction of Mr. Wiley's phone?

22  A    I did.

23  Q    And now, to be clear, we're referring to the LG phone?

24  A    That's correct.

25  Q    And not the ZTE phone?

Case 1:19-cr-00529-TDS  Document 363  Filed 02/04/22  Page 90 of 232

 1 | A    Correct.  The LG phone.

 2 | Q    You got them up there.  Thank you.

 3 |     Now, that LG phone was associated -- that was located when

 4 | he was arrested?

 5 | A    Correct.  On April 27, 2018, I seized that phone.

 6 | Q    As well as the other phone?

 7 | A    The ZTE phone.

 8 | Q    All right.  Looking at Government's Exhibit No. 338, are

 9 | you familiar with what it is?

10 | A    I am.

11 | Q    What is it?

12 | A    It is taken from my FBI report, which is my review of the

13 | LG phone belonging to Mr. Wiley.

14 | Q    And when you say review of that phone, you mean the data

15 | that was extracted from it?

16 | A    My review may have been different from the date that the

17 | information was extracted from his phone.

18 | Q    I'm sorry.  I said "data."

19 | A    Data.  Yes.  Sorry.

20 | Q    No worries.

21 |     Looking at Government's Exhibit No. 338, did you attempt

22 | to locate certain things that you found significant in your

23 | investigation?

24 | A    I did.

25 |         **MR. GREEN:**  Your Honor, I am going to move

Case 1:19-cr-00529-TDS  Document 363  Filed 02/04/22  Page 91 of 232

1    introduction of Government's Exhibit No. 338.

2              **THE COURT:**  Admitted.

3    **BY MR. GREEN**

4    Q    Now, beginning at the top, did you get certain information

5    that both associated -- the phone numbers associated with that

6    device as well as any user account ID?

7    A    Correct.  It was in the data extraction report.

8              **MR. GREEN:**  Yes.  I am going to move to publish

9    Exhibit 338.

10             **THE COURT:**  You may.

11   **BY MR. GREEN**

12   Q    And when you looked at that -- first, what did you notice

13   regarding numbers that had been associated with that device?

14   A    There were two phone numbers that were associated with the

15   LG phone, and those numbers were (313)300-4268 and

16   (864)484-6112.

17   Q    Was there also user account information?

18   A    There was.

19   Q    And what was that user account information you noted?

20   A    There was a Gmail account, aadonomauri@gmail.com; and the

21   account name, Maurice Wiley; service type, Google photos.

22   Q    Now, as part of the data extraction, were you able to

23   locate certain contacts between phone numbers and text

24   messages?

25   A    Yes.

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 92 of 232

1  Q    And did you note those in your report?

2  A    I did.

3           MR. GREEN:  All right.  If we could highlight that

4  section "Contacts of Interest."

5  BY MR. GREEN

6  Q    Looking at 4/10 -- now, I just want to make sure we

7  understand.  This information is coming from the data that was

8  extracted from the phone?

9  A    That's correct.

10 Q    And you also had information which you were looking at

11 which was information that had come from the cell phone

12 providers; is that right?

13 A    Correct, the historical call detail records.

14 Q    All right.  Looking at the data from the phone extraction,

15 what was the first contact of interest you noted?

16 A    On April 10, 2018, 15:42, UTC minus 4, Semaj Bradley's

17 phone number, (919)258-8452, sent an SMS text message to

18 Maurice Wiley.

19 Q    The next entry?

20 A    April 10, 2018, at 16:01, UTC minus 4, Mr. Wiley sent a

21 reply to Mr. Bradley.

22 Q    The next entry?

23 A    April 11, 2018, at 12:56 a.m. UTC minus 4, Charles

24 Daniels, (984)260-1218, sent an SMS text to Mr. Wiley which

25 read:  *Cuz, I'm still waiting on u but 5queez told me to call*

US v. Wiley  -- Trial/Vol. V of VII  -- 4/23/21

1  *him when I with u.*

2  Q    The next entry?

3  A    April 14, 2018, at 1807, UTC minus 4, Hykeem Cox,

4  (919)519-4224, called Mr. Wiley for a duration of 1 minute and

5  18 seconds.

6  Q    And the next entry?

7  A    April 14, 2018, at 20:34, UTC minus four, Mr. Daniels sent

8  an SMS text to Mr. Wiley which read:  *We out here waiting on u*

9  *pull Chubb said he need to talk to u.*

10  Q    Now, looking at the next entries on -- the next entry on

11  4/14, just the one, and what was the last entry on 4/14 that

12  you noted?

13  A    22:23, UTC minus 4, Cox called Wiley for a duration of 18

14  seconds.

15          **MR. GREEN:**  4/15, if you will highlight that.

16  **BY MR. GREEN**

17  Q    Now, turning to April 15, 2018, what did you note from the

18  cell extraction?

19  A    There was contact between Mr. Cox and Mr. Wiley on

20  April 15, 2018, beginning at 15:06, UTC minus four.  Mr. Cox

21  called Mr. Wiley for a duration of 22 seconds.

22      Same date, at 20:44, UTC minus four, Mr. Cox called

23  Mr. Wiley for a duration of 43 seconds.

24      On April 15, 2018, at 23:05, UTC minus four, Mr. Wiley

25  called Mr. Cox for a duration of 1 minute.

US v. Wiley  -- Trial/Vol. V of VII  -- 4/23/21

1  Q    Now, looking at the extraction, the call history detail

2  for April 15, that next paragraph, what did you notice as to

3  the extraction from that LG phone?

4  A    There was no record in the data extraction of outgoing

5  calls for Mr. Wiley -- now, these are outgoing calls -- on

6  April 15, 2018, from 16:58 p.m., UTC minus four, until

7  23:05 p.m., UTC minus four, which was the time that Mr. Wiley

8  called Mr. Cox.

9  Q    I'll ask you look at the next page.

10       Did you also look -- does the extraction report provide

11 you some indication about web history, where that phone might

12 be looking at things on the Internet?

13 A    It does.

14 Q    And did you note that when you started to look through the

15 extraction?

16 A    Yes, I did.

17 Q    Would you describe some of the information you noted on

18 the web history?

19 A    Yes.  When I reviewed the LG phone, the extraction from

20 Mr. Wiley's phone, I noticed that on 4/21 and 4/22, 2018, and

21 again on 4/23/2018 there were web searches regarding the murder

22 of Mr. Zheng.

23           **MR. GREEN:**  I'm going to move introduction --

24 **BY MR. GREEN**

25 Q    I'm sorry.  I am going to show you Government's

1  Exhibit 339, and ask if you are familiar with what that is?

2  A    It's an entry that is from the extraction report regarding

3  Mr. Wiley's LG phone.

4  Q    And how is it labeled?

5  A    "Device User."

6        **MR. GREEN:**  I'll ask that Government's Exhibit 339 be

7  admitted and published.

8        **THE COURT:**  It's admitted.  You may.

9  **BY MR. GREEN**

10  Q    Is that the device information?

11  A    Yes, for the user.

12  Q    All right.  I'm going to show you Exhibit No. 340, and

13  I'll ask if you are familiar with that?

14        **MR. GREEN:**  If you can blow that up so she can see

15  it?

16        **THE WITNESS:**  Yes, I am.

17  **BY MR. GREEN**

18  Q    What is it?

19  A    It is an entry from the data extraction performed on

20  Mr. Wiley's LG phone.

21        **MR. GREEN:**  And I'm going to ask that Government's

22  Exhibit 40 be admitted.

23        **THE COURT:**  You may.

24        **MR. GREEN:**  And that it be published.

25        **THE COURT:**  You may.

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 96 of 232

1  **BY MR. GREEN**

2  Q    Can you point to the information related to the name

3  associated from that extraction?

4  A    Yes.  To the right of the No. 65 is the name Maurice

5  Wiley.

6  Q    And was there also a phone number and address that you

7  found in that phone?

8  A    Yes.  The phone number identified is (864)484-6112, and

9  the address was 1413 Maplewood Drive, Durham.

10  Q    And do you know who lives at that address?

11  A    Yes.  Mr. Wiley's parents.

12  Q    I'm going to show you Government's Exhibit No. 341.

13      Are you familiar with what that is?

14  A    Yes.

15  Q    What is it?

16  A    They are additional web searches regarding the murder and

17  the Durham Police Department investigation of that murder of

18  Mr. Zheng.

19  Q    And I'll ask you to look at Exhibit 342.

20      Are you familiar with what that is?

21  A    Yes.

22  Q    And what is it?

23  A    Again, it's web searches regarding information concerning

24  the murder of Mr. Zheng.

25          **MR. GREEN:**  I'm going to ask that Government's

1 | Exhibits 341 and 342 be admitted.

2 |     **THE COURT:** They're admitted.

3 |     **MR. GREEN:** If we can go to Exhibit 342, and to help

4 | us understand the record, if we can -- I'm going to ask that it

5 | be published.

6 |     **THE COURT:** You may.

7 |     **MR. GREEN:** As well as 341, if I didn't so move.

8 |     **THE COURT:** You may.

9 | **BY MR. GREEN**

10 | Q I'm going to ask you to highlight a little bit about the

11 | record.

12 |   There are timestamps associated with each Internet

13 | activity; is that right?

14 | A That's correct.

15 | Q And it looks like you start at the bottom as the earliest

16 | entry, and then you move your way up?

17 | A Correct.

18 | Q So looking at Government's Exhibit 342 first, I see a line

19 | there.

20 |   Can you just read what's written there?

21 | A "A Call for Justice at Candlelight Vigil for Slain Durham

22 | Restaurant Owner."

23 | Q And that was from what source?

24 | A ABC11.com.

25 | Q And what time?

1   A    10:20 a.m., UTC minus 4, on April 21, 2018.

2   Q    Now, is there another entry four minutes later?

3   A    There is.

4   Q    All right.

5           MR. GREEN:  If we can highlight that entry.

6   BY MR. BRYSON

7   Q    Can you read that into the record?

8   A    Yes.  It's ABC11.com, ABC11 WTVD Raleigh-Durham,

9   Fayetteville, North Carolina, news that occurred at 10:24 a.m.

10  UTC minus four, on April 21, 2018.

11  Q    Looking at what's marked as UTC time of 10:44?

12  A    Yes.  It's, again, "A Call for Justice at Candlelight

13  Vigil for Slain Restaurant Durham Restaurant Owner," ABC11.com

14  at 10:44 a.m., UTC minus four, April 21, 2018.

15          MR. GREEN:  If we could turn to Exhibit 341.

16  BY MR. GREEN

17  Q    The date associated with this Internet activity?

18  A    April 22, 2018.

19  Q    So this is the following day?

20  A    Correct.

21  Q    And what was the entry?

22  A    "Durham Family Mourns After Beloved Husband/Father Killed

23  in Driveway," ABC11.com.

24  Q    Was the next entry three minutes later?

25  A    That's correct.

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 99 of 232

1  Q    And would you read the story?

2  A    "Durham Police Investigate After Man Found Fatally Shot in

3  Driveway," ABC11.com.

4  Q    And then a few moments later -- or minutes later, there

5  was another -- there was more Internet activity?

6  A    Yes.  On April 22, 2018, "A Call for Justice at

7  Candlelight Vigil for Slain Durham Restaurant Owner,"

8  ABC11.com.

9  Q    I am going to show you Government's Exhibit No. 343, and

10 ask if you recognize what it is?

11 A    I do.

12 Q    What is it?

13 A    It's a hot sheet from Durham Police Department.  That's

14 their most wanted that's published to the Internet.

15 Q    When you say a "hot sheet," what are you describing?

16 A    It's people that are wanted by the Durham Police

17 Department.  It's like Crime Stoppers.

18 Q    And I'll ask if you can look at the entry -- the date of

19 the entry?

20 A    April 22, 2018, at 17:18, UTC minus four.

21 Q    And I'm going to show you Government's Exhibit 344.

22      And do you recognize what that is?

23 A    Yes, sir.

24 Q    What is it?

25 A    It's another web search/web history regarding "Durham

 1  Family Mourns After Beloved Husband/Father Killed in Driveway,"

 2  ABC11.com.

 3          **MR. GREEN:**  I'd ask that Government's Exhibit No. 344

 4  be admitted and published.

 5          **THE COURT:**  It's admitted.  You may.

 6          **MR. GREEN:**  If I have not done so, I move admission

 7  of 343.

 8          **THE COURT:**  It's admitted.

 9          **MR. GREEN:**  Thank you.

10  **BY MR. GREEN**

11  Q    Did you also look at text message history in the

12  extraction from the phone?

13  A    I did.

14          **MR. GREEN:**  If I may have just one moment?

15      (Pause in the proceedings.)

16          **MR. GREEN:**  May I approach the witness?

17          **THE COURT:**  You may.

18  **BY MR. GREEN**

19  Q    I'm going to show you what's been marked as Government's

20  Exhibit No. 347, and ask if you are familiar with what that is?

21  A    I am.

22  Q    What is it?

23  A    It is a page from the data extraction that was performed

24  on Mr. Wiley's LG phone.

25  Q    Is that technically two pages?

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 101 of 232

1  A    It is.

2  Q    And with regard to Government's Exhibit 347, what were you

3  able to identify about the text messages in terms -- who was

4  texting who in that exchange?

5  A    The exchange was between Mr. Wiley and Demetrice Poole.

6  Q    Were you able to verify in some way Miss Poole's number?

7  A    Yes, I was.

8  Q    And how did you do that?

9  A    It's identified via subscriber information, and it was

10  found in the extraction report with the name "Metris."

11  Q    Now, looking at Government's Exhibit No. 347, page 2 --

12  again, did these text messages from the data extraction start

13  kind of bottom up for the conversation?  In other words, that

14  one would be the first message and then you go up the screen?

15  A    That's correct.

16  Q    All right.

17        **MR. GREEN:**  I'm going to move introduction of

18  Government's Exhibit 347, and I believe we can publish that

19  now, Your Honor.

20        **THE COURT:**  Admitted.  You may.

21  **BY MR. GREEN**

22  Q    Now, can you identify that text message?

23  A    Yes.  It is an incoming text from Miss Poole using

24  (910)479-6462.  The date of this text message, which was

25  incoming, was April 20, 2018, at 12:48 a.m., UTC minus four.

Case 1:19-cr-00529-TDS  Document 363  Filed 02/04/22  Page 102 of 232

1  Q    And with regard to the number texted, what was the number

2  that was being texted?

3  A    Mr. Wiley's number, (313)300-4368.

4  Q    And with regard to the source of this information, this

5  information comes from the data extraction of the LG phone?

6  A    That's correct.

7  Q    Now, can you read, slowly for the members of the jury, the

8  text message sent by Miss Poole?

9  A    Yes.

10       *This stress is gonna to kill me.  I'm really worried about

11  you.  I can't stop thinking about you.  I love you so much man

12  but I can't do it.  I'm sorry.  I really am.*

13  Q    And what time was that sent and what date?

14  A    April 20, 2018, at 12:48, UTC minus four.

15  Q    That's late in the evening?

16  A    A.M.

17  Q    I'm going to show the next text message in that exchange.

18       And, first, can you tell us what that text message --

19  which way this text message is going?

20  A    It's outgoing from Mr. Wiley to Miss Poole.

21  Q    And what time is associated with that?

22  A    It is on April 20, 2018, at 9:50 a.m., UTC minus four.

23  Q    And so this is roughly nine hours later?

24  A    Correct.

25  Q    And what's the text message?

US v. Wiley  -- Trial/Vol. V of VII  -- 4/23/21

1  A    *Bae.*

2  Q    Do you recognize that "bae" name at all?

3  A    It's a loving reference to girlfriend, boyfriend, friend.

4  Q    All right.  Looking at the next message in that chain, is

5  that an outgoing message as well from Mr. Wiley?

6  A    Yes, to Miss Poole.

7  Q    And the same date and time?

8  A    Correct.

9  Q    And what is the text message?

10 A    *You can't do what?*

11 Q    The next text message, is that outgoing as well?

12 A    Yes, it is.

13 Q    And what time is that?

14 A    It's an outgoing from Mr. Wiley to Miss Poole at

15 10:00 a.m., UTC minus four.

16 Q    That's ten minutes later?

17 A    Correct.

18 Q    And what is the text message?

19 A    *Bae you scaring me.*

20 Q    The next message?

21 A    Is an outgoing from Mr. Wiley to Miss Poole at 10:03 a.m.,

22 UTC minus four, on April 20, 2018:  *At least respond and let me*

23 *know you ok.*

24 Q    And that was three minutes after the previous text?

25 A    That's correct.

Case 1:19-cr-00529-TDS  Document 363  Filed 02/04/22  Page 104 of 232

1  Q    The next text message?

2  A    Is an outgoing from Mr. Wiley to Miss Poole at 10:07 a.m.,

3  UTC minus four, on April 20, 2018: *Just say something please.*

4  Q    And that's four minutes later; correct?

5  A    Correct.

6  Q    The next text message?

7  A    Another outgoing from Mr. Wiley to Miss Poole at

8  10:26 a.m., UTC minus four, April 20, 2018: *Is they fuccin*

9  *with you.*

10 Q    The next text message?

11 A    Is another outgoing from Mr. Wiley to Miss Poole,

12 April 20, 2018, 10:26 a.m., UTC minus four: *Please talk to me.*

13 Q    Next text message?

14 A    Is another outgoing from Mr. Wiley to Miss Poole at

15 10:28 a.m., UTC minus four, April 20, 2018: *Bae you got me*

16 *calling your friends, your job, and everything...please say*

17 *something.*

18 Q    Next message?

19 A    Is another outgoing from Mr. Wiley to Miss Poole at

20 10:33 a.m., UTC minus four, April 20, 2018: *Bae.*

21 Q    Next message?

22 A    Outgoing message from Mr. Wiley to Miss Poole, 10:33 a.m.,

23 UTC minus four, April 20, 2018: *What's going on.*

24 Q    Next message?

25 A    Outgoing message from Mr. Wiley to Miss Poole, 10:34 a.m.,

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 105 of 232

1  UTC minus four, April 20, 2018: *So you really gone leave me in*

2  *the blind.*

3  Q    Next message?

4  A    Outgoing from Mr. Wiley to Miss Poole, 10:36 a.m., UTC

5  minus four, April 20, 2018: *Did they come there.*

6  Q    Next message?

7  A    Outgoing, Mr. Wiley to Miss Poole, 10:37 a.m., UTC minus

8  four, April 20, 2018: *Did you turn me in.*

9  Q    What time was that, the "Did you turn me in" message?

10 A    It was at 10:37 a.m., UTC minus four.

11 Q    Next message?

12 A    Outgoing from Mr. Wiley to Miss Poole, 10:40 a.m., UTC

13 minus four, April 20, 2018: *My life is on the line and you are*

14 *really making me nervous.*

15 Q    Next message?

16 A    Outgoing, Mr. Wiley to Miss Poole, 10:41 a.m., UTC minus

17 four, April 20, 2018: *Please say something b4 I start thinking*

18 *crazy.*

19 Q    Next message?

20 A    Outgoing, Mr. Wiley to Miss Poole, 10:45 a.m., UTC minus

21 four, April 20, 2018: *Tell your mom to call me.*

22 Q    And the final message?

23 A    Outgoing, Mr. Wiley to Miss Poole, 11:31 a.m., UTC minus

24 four, April 20, 2018: *Bout to shower in case you call and i*

25 *miss it.*

1  Q    I'm going to show you Government's Exhibit No. 348.

2       Looking at that, are you familiar with what that is?

3  A    Yes, it's a page from the data extraction that was

4  conducted on Mr. Wiley's LG phone.

5  Q    And did you -- and can you tell us what -- is it -- the

6  nature of that text message, is it --

7  A    Yes.

8  Q    -- outgoing?

9  A    It's outgoing from Mr. Wiley to Miss Poole on April 21,

10 2018, at 11:20 a.m., UTC minus four.

11            **MR. GREEN:**  I'm going to ask that Government's

12 Exhibit 348 be published -- admitted and published.

13            **THE COURT:**  It's admitted.  You may publish it.

14 **BY MR. GREEN**

15 Q    Could you read the text message?

16 A    *Metris if you wanted to see me and get the money you could*

17 *come to Massey...I'm not driving...if that niggas was going in*

18 *the direction of one of my plays I would ask to ride...as for*

19 *that telling on me shit...if I really thought you was a rat ass*

20 *bitch I wouldn't have came to you about shit...I been calling*

21 *and shit BC I've noticed my wrongs...but gn.*

22 Q    I'm going to show you Government's Exhibit No. 349.

23       Are you familiar with what that is?

24 A    Yes, it is a page from the data extraction that was

25 conducted on Mr. Wiley's LG phone.

Case 1:19-cr-00529-TDS  Document 363  Filed 02/04/22  Page 107 of 232

1    **MR. GREEN:**  I'm going to move introduction of

2    Government's Exhibit 349.

3            **THE COURT:**  It's admitted.

4    **BY MR. GREEN**

5    Q    We'll go to the second page again.  Starting at the

6    bottom, it's the first message; is that right?

7    A    That is correct.

8            **MR. GREEN:**  I'm going to ask that it be published.

9            **THE COURT:**  It may.

10            **MR. GREEN:**  Again, I'll ask that you isolate the

11    number and time.

12    **BY MR. GREEN**

13    Q    First, can you tell the time associated with the

14    particular message?

15    A    Yes.  16:08 p.m., UTC minus four, on April 22, 2018.

16    Q    Is that incoming or outgoing?

17    A    It is incoming from Miss Poole to Mr. Wiley.

18    Q    Can you read that text message?

19    A    *Care about everybody else but me and my child!  Put me*

20    *last all the fucking time but when you told me to move I move*

21    *told me to hold yo shit down I did that hide yo shit I did that*

22    *ask for everything you get that you call I pick up you text I'm*

23    *texting right tf back you ungrateful asf and you will never*

24    *meet another bitch like me I promise you.*

25    Q    Next message?

Case 1:19-cr-00529-TDS  Document 363  Filed 02/04/22  Page 108 of 232

1   A    This is an outgoing from Mr. Wiley to Miss Poole at

2   16:08 p.m., UTC minus four, April 22, 2018:  *What tf happened*

3   *now*.

4   Q    Next message?

5   A    Outgoing message from Mr. Wiley to Miss Poole, 16:09 p.m.,

6   UTC minus four, April 22, 2018:  *From the time we spoke last*

7   *night to now.*

8   Q    Next message?

9   A    Outgoing from Mr. Wiley to Miss Poole, again 16:09 p.m.,

10  UTC minus four, April 22, 2018:  *Wtf happened.*

11  Q    Next message?

12  A    Outgoing, Mr. Wiley to Miss Poole, 16:10 p.m., UTC minus

13  four, April 22, 2018:  *I didn't have to call Shea rides Metris.*

14  Q    Next message?

15  A    Outgoing from Mr. Wiley to Miss Poole, 16:10 p.m., UTC

16  minus four, April 22, 2018:  *She was calling Raheem and her*

17  *sister herself...what are you talking about.*

18       Outgoing, Mr. Wiley to Miss Poole, 16:11 p.m., UTC minus

19  four, April 22, 2018:  *And i told you that's not the same meme.*

20  Q    Next message?

21  A    Outgoing, Mr. Wiley to Miss Poole, 16:12 p.m., UTC minus

22  four, April 22, 2018:  *Its like you want to beef with me...I*

23  *ain't been doing shit but hiding.*

24  Q    Next message?

25  A    Outgoing from Mr. Wiley to Miss Poole, 16:16 p.m., UTC

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 109 of 232

1  minus four, April 22, 2018:  *But please stop threatening my*

2  *freedom...and im dead ass.*

3  Q    Next message?

4  A    Outgoing, Mr. Wiley to Miss Poole, 16:18, UTC minus four,

5  April 22, 2018:  *You making me feel like you putting my bacc*

6  *against the wall...stop that shit, frfr.*

7  Q    I'm going to show you Government's Exhibit No. 350.

8       Are you familiar with what that is?

9  A    I'm not seeing 350.  I'm seeing 349.

10 Q    Sorry.  Just a moment.

11          **MR. GREEN:**  May I approach?

12          **THE COURT:**  You may.

13 **BY MR. GREEN**

14 Q    I'm handing you Government's Exhibit 350, and ask if you

15 are familiar with what that is?

16 A    Yes, I am.

17 Q    What is it?

18 A    It is a page from the data extraction that was conducted

19 on Mr. Wiley's LG phone.

20 Q    And is that, again, text messages between Mr. Wiley and

21 Miss Poole?

22 A    Yes, it is, incoming and outgoing.

23          **MR. GREEN:**  I'm going to move introduction of

24 Government's Exhibit 350.

25          **THE COURT:**  It's admitted.

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 110 of 232

1    Ladies and gentlemen, let me instruct you that, while

2    you're hearing this evidence, the evidence that relates to

3    Miss Poole is being admitted not for the truth of the matter

4    asserted in her statements, but, rather, to put in context

5    whatever statements are made by Mr. Wiley.  So you are to

6    consider Miss Poole's comments not for the truth of the matter

7    asserted, but for the context that you may consider it puts

8    Mr. Wiley's statements in.  All right.

9           **MR. GREEN:**  Thank you, Your Honor.

10    If we could go to -- I'm going to move introduction

11    and ask that Government's Exhibit No. 350 be published.  We

12    have it now on the screen?

13           **THE COURT:**  You may.

14    **BY MR. GREEN**

15    Q    I would like you to look at the first text message and

16    tell us what -- page 4 of the text message.  And, first, can

17    you tell also what time that message was sent?

18    A    It was sent at 10:21 a.m., UTC minus four, April 25, 2018,

19    and it's outgoing from Mr. Wiley to Miss Poole.

20    Q    All right.  Could you read the text message?

21    A    *And how much money do you think I have?...you really think*

22    *I have enough money to get you a oil change, fix the damage on*

23    *the car, do everything for your birthday and still be able to*

24    *maintain on the run?...like fr?...I slept inna trap last night*

25    *BC I couldn't afford a room...everything you bitching you about*

US v. Wiley  -- Trial/Vol. V of VII  -- 4/23/21

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 111 of 232

1 *right now involves money...I had to spend most of my savings*

2 *getting the rental str8 and turned in b4 shit hit the fan...im*

3 *out here barely making it like everybody else...*

4 Q    The next text message that you noted?

5 A    It's incoming from Miss Poole to Mr. Wiley at 10:22 a.m.,

6 UTC minus four, April 25, 2018:  *Still not understanding what*

7 *tf I'm saying alright tweet.*

8 Q    The next message that you noted?

9 A    Outgoing from Mr. Wiley to Miss Poole, 10:46 a.m., UTC

10 minus four, April 25, 2018:  *Do what you gotta do...and if you*

11 *really go down there and put some BS on my name with 12 then*

12 *ill know what I have to do...*

13 Q    And with regard to that reference "12," have you heard

14 that reference before?

15 A    Yes.  In my investigative experience, 12 is a reference to

16 Adam-12, meaning police.

17 Q    The next text message?

18 A    It's an incoming from Miss Poole to Mr. Wiley at 10:53

19 a.m., UTC minus four, April 25, 2018:  *Now my shifted fucked up*

20 *and you can ride around in rental cars?*

21 Q    Next message?

22 A    Outgoing, Mr. Wiley to Miss Poole, 10:53 a.m., UTC minus

23 four, April 25, 2018:  *You really trying to get me jammed about*

24 *a fuccin oil change?*

25 Q    Next message?

US v. Wiley  -- Trial/Vol. V of VII  -- 4/23/21

1  A    Incoming from Miss Poole to Mr. Wiley, 10:54 a.m., UTC

2  minus four, April 25, 2018:  *You obviously not getting what I'm*

3  *saying.*

4  Q    Next message?

5  A    Incoming from Miss Poole to Mr. Wiley, 10:55 a.m., UTC

6  minus four, April 25, 2018:  *You see wtf you wanna see like you*

7  *don't do no wrong I can't even get the support I need when*

8  *that's all I been doing.*

9  Q    Next message?

10 A    Outgoing, Mr. Wiley to Miss Poole, 10:56 a.m., UTC minus

11 four, April 25, 2018:  *You supporting me going to jail with the*

12 *way you talking.*

13 Q    The next message in that chain that you noted?

14 A    Incoming from Miss Poole to Mr. Wiley, 11:06 a.m., UTC

15 minus four, April 25, 2018:  *I know the whole story don't ever*

16 *forget.*

17 Q    Next message?

18 A    Outgoing Mr. Wiley to Miss Poole, 11:07 a.m., UTC minus

19 four, April 25, 2018:  *What yo stupid ass don't understand is I*

20 *didn't do anything...if I did who helped me?...seems like that*

21 *would be you since you know everything...you coming to jail*

22 *with me with me too...does that mean your child won't see you*

23 *either?*

24 Q    The next message?

25 A    Incoming from Miss Poole to Mr. Wiley, 11:12 a.m., UTC

Case 1:19-cr-00529-TDS  Document 363  Filed 02/04/22  Page 113 of 232

1  minus four, April 25, 2018, in capital letters:  *TRYNA take me*

2  *down with you nah nigga.*

3  Q    Next message?

4  A    Outgoing from Mr. Wiley to Miss Poole, 11:12 a.m., UTC

5  minus four, April that, 2018:  *Im not playing at all...I*

6  *wouldn't dare play with no serious shit like that...im not even*

7  *going to act like that shit cool...mfs get life in prison*

8  *playing, saying a bunch of stupid shit BC they mad at somebody.*

9  Q    Next message that you noted?

10 A    Incoming from Miss Poole to Mr. Wiley, at 11:14 a.m., UTC

11 minus four, April 25, 2018:  *Maurice Wiley.*

12 Q    Next message?

13 A    Outgoing, Mr. Wiley to Miss Poole, 11:14 a.m., UTC minus

14 four, April 25, 2018:  *That's me.*

15 Q    The next message you noted?

16 A    Incoming, Miss Poole to Mr. Wiley, 11:30 a.m., UTC minus

17 four, April 25, 2018:  *Now you mad at me cause I'm telling the*

18 *truth.*

19 Q    Next message?

20 A    Outgoing, Mr. Wiley to Miss Poole, 11:30 a.m., UTC minus

21 four, April 25, 2018:  *When go down there and lie to them*

22 *craccers make sure you tell them your part.*

23 Q    Next message?

24 A    Incoming from Miss Poole to Mr. Wiley, 11:30 a.m., UTC

25 minus four, April 25, 2018:  *What part mufucker you slow.*

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 114 of 232

1  Q    Next message?

2  A    Outgoing, Mr. Wiley to Miss Poole, 11:31 a.m., UTC minus

3  four, April 25, 2018:  *Idk whatever you come up with.*

4  Q    Next message?

5  A    Incoming, Miss Poole to Mr. Wiley, 11:31 a.m., UTC minus

6  four, April 25, 2018:  *You act like I asked you for some money*

7  *I was just saying.*

8  Q    Final message you noted?

9  A    Outgoing, Mr. Wiley to Miss Poole, 11:31 a.m., UTC minus

10 four, April 25, 2018:  *You have to have a part inna story if*

11 *you know details that nobody else knows.*

12         **THE COURT:**  It is almost 12:30.  Do you have much

13 more with this witness?

14         **MR. GREEN:**  No, Your Honor.

15         **THE COURT:**  Do you believe you can finish by close to

16 12:30?

17         **MR. GREEN:**  I think so, Your Honor.

18         **THE COURT:**  All right.

19 **BY MR. GREEN**

20 Q    I'm going to show you two exhibits.

21         **MR. GREEN:**  I'm going to ask that they be published.

22 It's Government's Exhibit 317A and C.

23         **THE COURT:**  I'm sorry?  Say those again.

24         **MR. GREEN:**  317A and C.  They have already been

25 admitted.

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 115 of 232

1       **THE COURT:**  All right.  You may publish them.

2  **BY MR. GREEN**

3  Q    I show you the subscriber records from T-Mobile.  And

4  looking at the MSN number with Government's Exhibit 317A, what

5  was that number?

6  A    (864)484-6112.

7  Q    And look at the bottom of the same exhibit, is there

8  information related to the device that was associated with

9  that?

10 A    Yes.  The LG K20 plus BLK TMUS KIT RSU phone.

11 Q    Now, looking at Government's Exhibit 317C, I'll ask you to

12 again look at the number associated with that exhibit.

13 A    (864)484-6112.

14 Q    And, again, looking at the T-Mobile device information,

15 what was the device associated?

16 A    ZTE Blade Z Max TMUS KIT RSU phone.

17 Q    So both the ZTE and the LG were both associated with that

18 number ending 6112?

19 A    That's correct.

20       **MR. GREEN:**  That's all the questions I have.

21       **THE COURT:**  We're going to stop here.  So if you're

22 taking notes, please put your notes in your envelopes.  Please

23 leave your envelopes in your chairs, as I've instructed you

24 throughout.

25       And please remember all my admonitions:  Don't do any

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 116 of 232

1  research; don't discuss the case or any matter related to the

2  case or any of the evidence or any of the goings-on here in

3  court.  Simply put the case out of your mind, relax, enjoy your

4  lunch.  I think it is another pleasant day outside.  It would

5  be a good day to go outside and get some fresh air.

6          So I ask that you be back across the hall ready to go

7  no later than 1:45 p.m.  I will give you a report when you come

8  back as to kind of where we are on the schedule.  I don't have

9  any reason to think we're any different from what I told you

10 before, but I will let you know at that time.

11         Please enjoy your lunch.  Remember all my

12 admonitions.

13         Everyone else please remain in the courtroom.

14         Ms. Engle, if you would escort them out.

15    (The jury departed the courtroom at 12:30 p.m.)

16         **THE COURT:**  Please be seated.

17         You may step down, Special Agent.

18         The record should reflect the jurors have left the

19 courtroom.  Please remain in the courtroom until I get word

20 that the jurors have cleared out of the lobby area.

21         Any objection -- I gave a limiting instruction

22 consistent with the jury's consideration of Miss Poole's

23 statements.  Anybody have any objection to my instruction?

24         **MR. GREEN:**  Not from the Government.

25         **MR. FOSTER:**  No, Your Honor.

US v. Wiley  -- Trial/Vol. V of VII  -- 4/23/21

1        **THE COURT:**  It was not requested, but I thought it

2   appropriate to give.

3        I want to cover just a few matters before we leave

4   for lunch.  First, I guess my principal question is where the

5   Government believes it is in terms of its case and when it

6   might be resting?

7        **MR. GREEN:**  I think we will rest today.  That does

8   depend on some cross-examination and how long it takes.

9   Mr. Cox is going to testify, so that could be short or not

10  short.  And we are planning now, I think, to rest with the

11  evidence today.  We do have a few more experts left.  Again,

12  just anticipating how the cross-examination has gone, I don't

13  know how fulsome that will be, but we do believe we can end the

14  evidence today but feel like it's unlikely that we would get to

15  arguments today.

16        **THE COURT:**  All right.  That may leave us time then

17  to talk about jury instructions if we get to that point,

18  depending on whether you rest the evidence and I hear from you

19  all on your motions.

20        I did want to alert you to a couple of things.  I

21  have drafts of the jury instructions.  They are not very

22  different at all from what you submitted.  I just added a few

23  things.  However, it occurred to me that you've handed up a new

24  stipulation that's not reflected in the instructions with

25  respect to the ammunition.  You had the stipulation about the

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 118 of 232

1  prior felony and the knowledge of it.  You incorporated that

2  into your draft of the instructions.  The stipulation about the

3  ammunition, that it constitutes ammunition and which pieces and

4  that it was in commerce, is not reflected in the instruction.

5           So I leave it to you all whether you request anything

6  in that regard, and, if so, if you could come to some agreement

7  about what you want to say about that.

8           **MR. GREEN:**  Yes, Your Honor.

9           **THE COURT:**  And then I would be glad to take a look

10 at that.

11          I don't think I have anything else.

12          Any other issue you want to bring to my attention?

13          **MR. PRINCIPE:**  Your Honor, we had handed up a third

14 stipulation earlier.  Do you still have that?

15          **MR. GREEN:**  It's right here.

16          **THE COURT:**  All right.  Mr. Foster, Mr. Bryson,

17 anything you want to bring to my attention?

18          **MR. FOSTER:**  No, Your Honor.

19          **THE COURT:**  And I understand that Mr. Cox's counsel

20 will be here this afternoon when he testifies.

21          **MR. GREEN:**  He has been here, and I'll instruct him

22 to --

23          **THE COURT:**  Who is his lawyer?

24          **MR. PRINCIPE:**  It's Dan Roberts and Stacey Rubain.

25 Dan Roberts I know is in the building.  I'm not sure if Stacey

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 119 of 232

1  Rubain will be here as well.

2           **THE COURT:**  All right.  If we could be ready at 1:45,

3  that would be terrific, and we'll try to make progress this

4  afternoon.  Thank you all.

5           All right.  We still have a juror that's in the

6  restroom.  Why don't we wait just a minute.

7           So we collected Government's Exhibit 328.  My memory

8  still works a little bit.  And it would be my proposal that we

9  shred those.  I think a juror or two may have made some marks

10 on some of them, but that would be my proposal.

11          Any objection to that?

12          **MR. GREEN:**  That's fine, Your Honor.

13          **MR. FOSTER:**  No objection.

14          **THE COURT:**  So, Ms. Engle, please shred those.

15          Are we good?  The lobby is clear.  Of course, avoid

16 all the jurors if you to happen to see them, for obvious

17 reasons.

18          Enjoy your lunch.  We'll see you at 1:45.

19      (Proceedings recessed at 12:35 p.m.)

20      (Proceedings called back to order at 1:47 p.m.)

21      (The Defendant was present.)

22          **THE COURT:**  Are we ready to bring the jury in?

23          Please bring the jury in.

24      (The jury returned to the courtroom.)

25          **THE COURT:**  Please be seated.

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 120 of 232

1      Any cross-examination?

2      **MR. FOSTER:** Yes, thank you, Your Honor.

3                  CROSS-EXAMINATION

4  **BY MR. FOSTER**

5  Q    Good afternoon, Agent Jocys.

6  A    Good afternoon, sir.

7  Q    So you testified before lunch that as part of the

8  investigation you tried to determine associations and links

9  among the people that you were investigating?

10  A    Didn't try to, sir.  Did.

11  Q    Right.

12  A    Yes.

13  Q    And you did.  And, in fact, what you -- part of what you

14  determined is you validated that Cox, Daniels, Bradley, and

15  Bradford were all validated as being Bloods gang members?

16  A    During trial, sir?  I'm sorry.  Could you -- I didn't

17  testify to that here.

18  Q    No.  But I'm asking you if you, in fact, did that?

19  A    Yes.

20  Q    Okay.  And also as part of that same background

21  investigation, you determined that Mr. Wiley, on the other

22  hand, is not a member of the Bloods, but is a member of the

23  Crips?

24  A    That's right.  He's a validated Crip.

25  Q    Those two gangs are rival gangs; right?

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 121 of 232

1  A     What we have seen over the last couple years is that they

2  will align together for common things, and some neighborhoods

3  have started aligning in Durham, whether they are Crips or Nine

4  Trey Bloods.

5  Q     Traditionally, those two gangs have been rivals; right?

6  A     Historically, yes.

7  Q     Now, you were present when Mr. Wiley was arrested in the

8  residence that you've testified about?

9  A     Yes, sir.

10 Q     And you testified that the items you seized that day were

11 the two cell phones you've identified?

12 A     Correct.

13 Q     Did you seize anything else?

14 A     There were other items seized.

15 Q     No firearms; correct?

16 A     No firearms.

17 Q     So during -- in your review -- well, in your gathering up

18 and reviewing the various cell phone extraction records and

19 subscriber records and that sort of thing, you determined that

20 during the month of April, Mr. Wiley had two different cell

21 phone numbers operating?

22 A     T-Mobile provided the phone records that showed that.

23 Q     Yes.  So for the text -- the back-and-forth text stream

24 that you testified about this morning that was incorporated

25 into Exhibits, I believe, 347 through 350 between Mr. Wiley and

1  Miss Poole, those exhibits show that the phone number that was

2  being used by Mr. Wiley was the (313) area code number;

3  correct?

4  A    Yes.

5  Q    And that phone number is (313)300-4268?

6  A    Yes, sir.

7  Q    Okay.

8          MR. FOSTER:  And could you pull up Exhibit 345?

9  BY MR. FOSTER

10 Q    Can you see that on your monitor?

11 A    Whatever you want me to look at, it will have to be

12 enlarged.  It's very small.

13         MR. FOSTER:  Well, can you zoom in on the top quarter

14 maybe, the top -- yeah.

15 BY MR. FOSTER

16 Q    So the little tab there says "345 Wiley Extraction."  So

17 do you recognize this as something that was extracted from his

18 phone?

19 A    Yes, it's a page from his extraction report.

20 Q    Okay.  From the LG phone?

21 A    Yes, sir.

22 Q    Okay.  And so the numbers that -- the phone number that

23 indicates he was communicating with back and forth is, again,

24 the same (313)300-6248 number?

25 A    Correct.

Case 1:19-cr-00529-TDS  Document 363  Filed 02/04/22  Page 123 of 232

1  Q   Or 4268, rather.

2       And this is in -- in all these -- in front of you, that

3  exhibit, the date -- this is on April 15, 2018; correct?

4  A   Yes.

5  Q   Now, you testified this morning about various Instagram

6  business records you obtained on the people that are alleged to

7  have participated in this robbery and murder?

8  A   Yes.

9  Q   And one of those people was Hykeem Cox?

10 A   Yes, sir.

11 Q   Okay.  And so his Instagram record -- his identifier, or

12 whatever, was Eastdurham_youngboy?

13 A   Correct.

14         **MR. FOSTER:**  May I approach the witness, Your Honor?

15         **THE COURT:**  You may.

16 **BY MR. FOSTER**

17 Q   I'm showing you what's been marked as Defendant's

18 Exhibit 1.

19      Can you take a look at that and tell me whether you

20 recognize that as being part of the Instagram business record

21 regarding Mr. Cox?

22 A   It is.

23 Q   Okay.  Thank you.

24      So that was obtained by you and reviewed by you at some

25 point?

Case 1:19-cr-00529-TDS  Document 363  Filed 02/04/22  Page 124 of 232

1   A    Yes, it was.

2   Q    And the same question:  Showing you Defendant's Exhibit 2

3   for identification, do you recognize that as being part of that

4   same Hykeem Cox Instagram profile?

5   A    I do.

6   Q    Thank you.

7        Okay.  Going back to the phone number (313)300-4268, I

8   believe you indicated that the subscriber and other information

9   on that one came from T-Mobile.  But didn't it actually come

10  from the extraction from the LG phone itself?

11  A    Yes.  I don't recall testifying that that came from

12  T-Mobile.

13              **MR. FOSTER:**  I have no further questions.

14              **THE COURT:**  Any redirect?

15              **MR. GREEN:**  No redirect, Your Honor.

16              **THE COURT:**  You may step down.

17       (At 1:57 p.m., witness excused.)

18              **MR. PRINCIPE:**  Your Honor, the Government next calls

19  Justin Heinrich.

20  **FBI TASK FORCE OFFICER JUSTIN HEINRICH,** GOVERNMENT'S WITNESS,

21  being first duly affirmed, at 1:57 p.m. testified as follows:

22              **THE COURT:**  If you would remove your mask, please, so

23  we can see and hear you and make sure the microphone is

24  directed toward your mouth.

25              **MR. PRINCIPE:**  Before I start my examination, may I

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 125 of 232

1  retrieve Government's Exhibit 319?

2             **THE COURT:**  Yes.

3                        DIRECT EXAMINATION

4  **BY MR. PRINCIPE**

5  Q    Would you please state your name.

6  A    My name is Justin Heinrich.

7  Q    And who do you work for?

8  A    I'm a special agent with the North Carolina State Bureau

9  of Investigation.  I'm also a task force officer with the

10 Federal Bureau of Investigation.

11 Q    And what do you do for those agencies?

12 A    I'm currently assigned as an assistant special agent in

13 charge over the SBI's Criminal Apprehension Team.  And I'm a

14 task force officer with the FBI currently assigned to the

15 Raleigh office.  And I'm also a certified member of the

16 Cellular Analysis Survey Team with the FBI.

17 Q    And is there an acronym for that team?

18 A    Yes, it's the CAST team.

19 Q    And what does that team do?

20 A    The Cellular Analysis Survey Team is a group of highly

21 trained special agents and task force officers with the FBI.  I

22 think right now there are fewer than 75 in the world, who --

23 their primary function is to analyze phone records to determine

24 where a phone was historically over time.

25 Q    And when you say "phone records," where do those records

Case 1:19-cr-00529-TDS  Document 363  Filed 02/04/22  Page 126 of 232

1  come from?

2  A    Phone records are provided to investigators by the cell

3  phone companies themselves, so AT&T, Verizon, Sprint, T-Mobile.

4  Q    Is that separate and different from data that might be

5  stored on a cell phone device?

6  A    Yes.  These are records that are maintained for billing

7  purposes to ensure the quality of the network from the cell

8  phone providers themselves.  It's not data that's stored

9  locally on the actual device itself.

10  Q    And how many total years of law enforcement experience do

11  you have?

12  A    I have approximately 13, 14 years of experience.  I began

13  my law enforcement career in 2007, and I have been employed by

14  the SBI since 2008.  I've been a member of the FBI task force

15  since 2015.

16  Q    And at what point did you start to develop this

17  specialization in cellular phones, and when did you become a

18  member of the CAST team?

19  A    I began looking at cell phone records in case work

20  starting probably in 2008, 2009.  I, over the course of the

21  following years following that, attended numerous training

22  classes and began my CAST supervision process to become a

23  subject matter expert in that field around 2014 and completed

24  that certification process in 2016.

25  Q    And so you were certified as of April 2018?

US v. Wiley  -- Trial/Vol. V of VII  -- 4/23/21

1  A    As of 2016 is when I became a certified member of the

2  FBI's Cellular Analysis Survey Team.

3  Q    Right.  And that continued through 2018; correct?

4  A    Yes, that is correct.  I was a certified member as of

5  April of 2018.

6  Q    Okay.  What types of training do you receive, and what

7  types of things do you learn about during that training?

8  A    Certainly.  So the training process itself took several

9  years to complete.  It involved hundreds of hours of

10 specialized training in the fields of radio frequency theory,

11 cellular protocols, call record analysis.  That training was

12 conducted by the FBI as well as by the analysts and engineers

13 from the various phone companies themselves.

14         MR. PRINCIPE:  Your Honor, the Government would

15 tender Justin Heinrich as an expert in cellular technology,

16 cellular location data mapping, and historical cellular call

17 detail records analysis.

18         MR. BRYSON:  No objection.

19         THE COURT:  All right.  He may give his opinions.

20         MR. PRINCIPE:  Your Honor, first, I would like to

21 introduce into evidence Government's Exhibit 318, which is a

22 stipulation between the parties pertaining to cell phone

23 provider records and Instagram records.

24         THE COURT:  All right.  It's admitted.

25         MR. PRINCIPE:  And we are not going to read that into

1  the record.  We're just going to introduce it into evidence.

2            **THE COURT:**  All right.

3  **BY MR. PRINCIPE**

4  Q    Now, are you typically the person who gets the records

5  from the provider directly?

6  A    Sometimes, but not usually.  Normally, I'm provided with a

7  copy of the records that were obtained by the investigator who

8  was the lead or assisting the lead investigator.  And once I am

9  provided with those records, I can conduct my analysis.

10 Q    And did you become -- did you receive a request to perform

11 an examination with regard to some cellular phone records that

12 included a number that ended in 6112?

13 A    Yes, I did.

14 Q    And was that in 2018?

15 A    Yes, it was.

16            **MR. PRINCIPE:**  And I'm showing the jurors what's

17 already in evidence as Government's Exhibit 319, which were

18 cellular phone provider records from T-Mobile and Sprint.

19 **BY MR. PRINCIPE**

20 Q    At some point did you become notified that records had

21 been uploaded for you to review as part of your investigation

22 pertaining to this case?

23 A    Yes, I was provided with numerous sets of records to

24 analyze in this case.

25 Q    And how did you access those records?

Case 1:19-cr-00529-TDS  Document 363  Filed 02/04/22  Page 129 of 232

1  A    I believe they were provided to me via email.

2  Q    Okay.  And do you recall how many different phone numbers

3  those records pertained to?

4  A    I believe there were seven separate phone numbers, five of

5  which were T-Mobile numbers and two of which were Sprint

6  records.

7  Q    Did you know who those numbers were believed to belong to

8  when you conducted your analysis?

9  A    No, I did not.  I generally do not have any information

10 about the case outside of what was provided to me by the

11 investigator.  So I was asked to analyze the activity of the

12 phones in question; but beyond some very limited case facts,

13 including some addresses, locations that were pertinent to the

14 case and the dates of analysis that I was requested to look at,

15 I don't have much information about the case itself.

16 Q    Primarily, what were you asked to do with the data?

17 A    I was asked to look at the data that was provided and to

18 determine if I could see where the cell phones for which those

19 records were provided -- if I could identify the locations of

20 those relevant cell phones during three days in April of 2018

21 during specific time periods on April 13, April 14, and

22 April 15, and plot that information in relation to several

23 known addresses that were pertinent to the case.

24 Q    Okay.  Now, tell the jurors:  What do the cell provider

25 records look like, and can they be different between one

1  provider like Sprint versus another provider like T-Mobile?

2  A    Absolutely.  It would make my job a lot easier if all the

3  records were provided in the exact same format, but each

4  provider provides records in their own proprietary format.

5  Generally, that's in the form of a spreadsheet, and so those

6  spreadsheets are provided to us.  And then I examine the data

7  that's contained within and can draw my own conclusions.

8  Q    Do those provider records often include other information

9  such as subscriber account information?

10  A    Yes, that's correct.  Usually, there are -- it depends on

11  the phone company again, but the call detail records are

12  provided, which are essentially a list of transactions that a

13  phone had with the network, including what time that activity

14  occurred, the duration, type of that activity, you know, which

15  other phones may have been in contact with the target phone,

16  and the network equipment that was utilized to facilitate that

17  transaction.

18      In addition to the call records themselves, other

19  information, like explanation sheets and subscriber information

20  pages identifying, you know, a name that might be associated

21  with that specific phone are also provided when records are

22  turned over by the phone company.

23  Q    Now, is some of the data better than other parts of the

24  data when you're specifically trying to determine a cellular

25  phone's location or connection to a cell tower at a given point

1  in time?

2  A    Yes, they are.  When I'm conducting my analysis specific

3  to where a phone was at a certain time, there's certain pieces

4  of information I'm looking for.  And some of the files that

5  those phone companies provide don't contain that location

6  information in there, or the location information that's

7  included in that file is known not to be valid or may have

8  issues, and so we won't include that in our analysis.

9       So we focus our analysis on the records themselves that

10  are known to have valid location information that would be

11  usable to draw a conclusion to where that phone was at a given

12  time.

13  Q    So, in this particular case, when you started your

14  examination, did you limit those spreadsheets or that data down

15  to the ones that had valid, reliable cellular location data?

16  A    Yes, I did.

17            **MR. PRINCIPE:**  May I approach the witness?

18            **THE COURT:**  You may.

19  **BY MR. PRINCIPE**

20  Q    I'm showing you a disk marked Government's Exhibit 351.

21       Do you recognize that exhibit?

22  A    Yes, I do.

23  Q    And what's on this disk?

24  A    I've had a chance to review this exhibit, and contained

25  within that disk is several folders, each identified with a

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 132 of 232

1  phone number and the name of the cellular provider associated

2  with that number, and within each folder contains the records

3  that I used to formulate my opinions in this case.

4  Q    So this disk is limited to just the records you used for

5  your CAST analysis?

6  A    That's accurate, yes.

7         **MR. PRINCIPE:**  Your Honor, the Government moves to

8  admit 351 into evidence.

9         **THE COURT:**  Admitted.

10 **BY MR. PRINCIPE**

11 Q    Let me show you on your screen Government's Exhibit 352.

12 And this is a multipage document.

13        **MR. PRINCIPE:**  If you could show him the number of

14 pages.  It looks like 32 pages.

15 **BY MR. PRINCIPE**

16 Q    Do you recognize this document?

17 A    Yes, I do.

18 Q    And what is that document?

19 A    It appears to be the report that I prepared summarizing

20 the analysis that I conducted in this case as to the locations

21 of the phones that I was asked to analyze on the pertinent

22 dates and times in relation to the pertinent locations that I

23 was provided.

24        **MR. PRINCIPE:**  And, Your Honor, the Government moves

25 Government's Exhibit No. 352 into evidence.

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 133 of 232

1        **THE COURT:**  Admitted.

2        **MR. PRINCIPE:**  And permission to publish that?

3        **THE COURT:**  You may.

4  **BY MR. PRINCIPE**

5  Q    So can you explain what this first page shows about your

6  examination?

7  A    Yes, sir.  This first page is the title page that

8  identifies me as the author of the report, a task force officer

9  with the FBI assigned out of the Charlotte division.  The date

10 that this report was drafted was August 15, 2018.  And the

11 numbers which I was asked to analyze and the findings that are

12 included in this report are listed there.

13       And if you wish, I can read those aloud, if you would like

14 me to.

15 Q    Well, on later pages, do you break it down phone number by

16 phone number?

17 A    Yes, I do.

18 Q    Why don't we address it then.

19       **MR. PRINCIPE:**  If you will go to next page.

20 **BY MR. PRINCIPE**

21 Q    So what does this slide here show?

22 A    So the first couple of pages of the report are a general

23 explanation that helps me describe how I conduct some of my

24 analysis.  This is showing how you can think of a cellular

25 tower if you were to look at it from a bird's eye view over top

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 134 of 232

1  of the tower.  Generally, a cell phone tower is designed to

2  provide service in the area around it.  And instead of just

3  broadcasting one signal in, you know, a 360-degree ring all the

4  way around it, many times the network engineers that develop

5  the network -- or design the network will arrange banks of

6  antennas oriented in specific directions around the top of that

7  tower to serve a specific area direction off of the top of that

8  tower.  Those banks of antennas that point in a specific

9  direction we refer to as a cell phone sector or tower sector.

10       And what you're seeing here is an example of what it might

11  look like from a bird's eye view with a three-sector tower,

12  which is certainly the most common arrangement of tower

13  sectors.

14  Q    And who gets to decide where a cell tower gets placed?

15  A    The network engineers themselves are going to decide where

16  towers would best be placed, but many factors go into where the

17  tower is actually placed, things like property rights; things

18  like, you know, the capacity, how many users are going to be on

19  the network; and the terrain itself, you know, more rural

20  versus more urban areas, mountainous terrain; buildings in the

21  area -- all these factors are taken into account by the network

22  engineers when they are developing their network and deciding

23  where towers are going to be placed.

24  Q    Can different cell providers have antennas on the same

25  towers?

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 135 of 232

1  A    Yes, they can.  One tower may have leasing arrangements
2  with several cellular providers.  So one tower might actually
3  include antennas for multiple different phone carriers.
4  Q    When you're performing your analysis, how do you know
5  where those towers are located and whose towers they are?
6  A    The cell providers themselves provide us with an ongoing
7  current list of where their tower and their network equipment
8  is located.  Then we can plot that information out for each
9  provider and show a map of where the different towers for each
10 network are located geographically.
11      When I'm conducting my analysis, one of the first things
12 that I do is to take a look at which providers the phones
13 utilized.  So, for example, a T-Mobile phone, I will look at
14 the T-Mobile tower list to see where the T-Mobile towers are,
15 and I use that within my analysis.  And so I will limit my
16 analysis of the tower lists to just the providers that were
17 actually used by the phones.
18 Q    Are you more likely to find a lot of towers in a city or
19 fewer towers in a city?
20 A    Generally, more urban areas in a city contain more towers
21 because there are more people in that area to use the network
22 equipment, so it puts a higher demand for capacity on the
23 network.  It also demands that more towers be placed because
24 taller buildings and more structure can interfere with the
25 radio frequency footprints of those towers, and so the network

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 136 of 232

1  engineers will generally take that into account and space their

2  towers more closely in urban areas so that calls aren't dropped

3  and to ensure the quality of their network for their customers.

4  Q    Are cell phone towers sometimes arranged in any kind of

5  configuration?

6  A    Can you explain what you mean by that?

7  Q    Sure.  I mean, are towers placed in relation to one

8  another in any type of geometric configuration that is

9  beneficial to the network?

10 A    So, generally, when the network engineers are designing

11 their network, they are interested in making sure that they

12 don't have -- that they're efficiently providing coverage in a

13 given area.

14     The way I like to think about it is you don't want to have

15 holes in the network.  The network engineer certainly doesn't

16 want to have gaps in coverage, because if they had gaps in

17 coverage their customers wouldn't have usable cell phone

18 service, and they wouldn't have a quality network there.  At

19 the same time, if they were to pack towers -- the more towers

20 they put out there, the more costly it is to the company.  So

21 they want to be as efficient with how they design their network

22 as possible.

23 Q    Let's look at the next slide.  What does this slide

24 represent?

25 A    This, again, is an explanation of how we can decide where

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 137 of 232

1  a specific cell phone sector -- the direction that it points.

2  So included within the tower lists themselves are something

3  called the azimuth, or the direction that a given cell phone

4  tower sector is designed to point.

5       So in this case the sector would have an azimuth of

6  30 degrees, the same way that that arrow is pointing.  And so

7  by determining the direction of the middle of that sector, we

8  can map out the direction that a sector would be facing when

9  we're plotting it on the map.

10  Q    What that might tell you about the location of a cell

11  phone that's connected to that tower and that sector?

12  A    If, for example, Sector 1 of the tower had an azimuth of

13  30 degrees, as would be pictured in this example here in front

14  of you, we could tell that -- if a phone was using Sector 1 of

15  that tower at a certain time, we could draw the conclusion that

16  that phone was accessing that tower in a generally -- in an

17  area to the northeast of that tower.  Or, more simply put, the

18  tower was transmitting information to and from that cell phone

19  in the direction generally in which the arrow on the slide

20  points, and so we can determine that the phone was likely in

21  that general side of that tower.

22  Q    Okay.  What are the components of a cell phone that

23  actually let it connect to a cell phone tower?

24  A    So a cell phone is really a radio, and just like any other

25  radio, it's going to have an antenna built into it and that

1  antenna reaches out and talks with the cell network via a

2  connection with a cell phone tower.

3  Q    How does a tower recognize a particular cell phone device?

4  A    So there are unique identifiers that are associated with a

5  specific cellular device that are unique to that one phone and

6  is not identical to any other phones on the network.  So when a

7  phone wants to make a call -- at any given time, a phone is

8  constantly scanning its surrounding environment and looking at

9  the usable signals from the network -- from its network that it

10  could use, and it identifies the clearest and cleanest of those

11  signals and identifies that sector and tower as its serving

12  sector.

13      If a call is made, that phone then reaches out and sends a

14  signal to that sector requesting network resources be allocated

15  to it to be used; and once that network authenticates that that

16  device belongs on its network, then a hand shake happens with

17  the network and the network assigns that phone into a traffic

18  channel on that tower so that the transaction can be completed,

19  whether it is a voice call, a data transaction, or a text

20  message.

21  Q    Is there a component on a particular cell phone that

22  allows that connection or to recognize it as being associated

23  with that provider's network, whether it be Sprint, T-Mobile,

24  or Verizon?

25  A    I think I understand your question in that there are

1  unique device identifiers.  There's numbers that are associated

2  with a target telephone number that the network uses to

3  authentic it with the network to make sure it's a device that's

4  allowed to use the network.  As I said, that identifier is

5  unique to any other phone.

6  Q    Okay.  And if a person has a cell phone and they want to

7  change that number, what would they have to do to change that

8  number?

9  A    If somebody wants to change their cell phone number, they

10  can generally call in to the provider and ask that their number

11  be changed.  That's one way that it can be done.  Another way

12  that it can be done is on some phones there's what's called a

13  SIM card, which is a chip that is plugged into the side of a

14  phone, and the subscriber information associated with that

15  phone, including the target telephone number itself, is on that

16  chip.  So if a chip is -- the SIM card is taken out of a phone

17  and replaced with a different one, that would result in the

18  phone number change for that device even though the actual

19  hardware, the phone itself, stayed the same.

20  Q    Is the SIM card always put in through the side of the

21  phone or can it be put in in other places?

22  A    Depending upon the model of the phone, it can be put in in

23  several different places.  It can be put underneath the

24  battery.  It can be inserted in a slot on the side or at the

25  bottom of the phone.  It really depends on the hardware itself.

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 140 of 232

1  Q    I am going to show you the next slide.

2      What were some of the locations provided to you as

3  locations of relevance?

4  A    Sure.  So this is summarizing the analysis that I was

5  asked to do, and the three addresses that you see in the middle

6  of that slide just above the No. 2 are the three relevant

7  addresses that I was asked to include within the maps for my

8  analysis.

9  Q    And what was the location -- the addresses of those

10 locations?

11 A    Certainly.  So the first location was identified as the

12 China Wok restaurant, which I was told was the victim's work

13 place.  That location was 3825 South Roxboro Street in Durham,

14 North Carolina.

15     The second pertinent location was identified to me as the

16 scene of the robbery and homicide, and that was clarified to be

17 the victim's residence in this case with an address of 4617

18 Carlton Crossing Drive in Durham, North Carolina.

19     And the final pertinent address that was provided to me

20 was associated with Charlie Daniels' residence, and that

21 address was given to me as 207 North Driver Street in Durham,

22 North Carolina.

23 Q    And then did you reach conclusions with regard to each one

24 of the cell phone numbers that you looked at during the

25 relevant time periods on April 13, 2018, April 14, 2018, and

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 141 of 232

1  April 15, 2018?

2  A     Yes, I did.

3  Q     And did you summarize those conclusions in the remainder

4  of the report?

5  A     I did, and I broke apart those conclusions based on the

6  particular phone in question.

7  Q     Let's go to page 7.

8        What does this slide show?

9  A     This is an overview of the locations that I was asked to

10 include within my analysis.  For clarity, I colored each one of

11 the pushpins that I put on the map associated with those

12 addresses as a different color.  So in this case, there is a

13 blue pushpin, a green pushpin, and a red pushpin.  The blue

14 pushpin is associated with Charlie Daniels' residence and that

15 address of 207 North Driver Street.  The green pushpin is

16 associated with China Wok restaurant at 3825 South Roxboro

17 Street.  And the red pushpin is associated with the scene of

18 the robbery/homicide, which was at 4617 Carlton Crossing Drive.

19       And it is important to note that in each of the subsequent

20 slides on all of the -- throughout the remainder of my report,

21 those colors will remain consistent with those locations.

22 Q     And what about the information on the upper right corner

23 of that slide?

24 A     Certainly.  So what you see there is -- elsewhere on the

25 map, you will see a bunch of green dots and a bunch of black

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 142 of 232

1  dots, and those green and black dots represent the cell phone

2  towers associated with the Sprint network and the T-Mobile

3  network respectively.  The T-Mobile network towers are the

4  green dots, and the black dots represent the Sprint towers in

5  that area.

6  Q    Okay.  And in the order of your analysis, I believe the

7  two first phone numbers you looked at were (864)484-6112 and

8  (313)718-3594; is that correct?

9  A    I believe so.  I don't know the order in which the

10 analysis was done, but I was asked to analyze those records.

11         **MR. PRINCIPE:**  Well, if we can move -- go back to

12 Government's Exhibit 328.  If we can show -- first zoom in on

13 (846)484-6112.

14 **BY MR. PRINCIPE**

15 Q    And I know this is not an exhibit that you prepared, but

16 is there a name associated with that phone number on that

17 diagram?

18 A    Based on what I am reading on this diagram, the

19 (864)484-6112 number is associated with a Maurice Owen Wiley,

20 Jr.

21 Q    And you didn't have any knowledge of that at the time you

22 did your examination, did you?

23 A    I did not.  This is the first time seeing it.

24 Q    Let me back out.  There is also a number (313)718-3594.

25 And based upon this Government's Exhibit 328, who is that

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 143 of 232

1  associated with?

2  A    Again, as is listed here on this exhibit, (313)718-3594

3  appears to be associated with a Maurice Owen Wiley, Jr.

4  Q    Let's go back to your report, Government's Exhibit 352.

5       And this is the beginning portion of where you plotted the

6  location for that phone number ending in 6112?

7  A    Correct.  This is the title slide for the activity

8  associated with that phone number.

9           **MR. PRINCIPE:**  Let's go to the next page.

10 **BY MR. PRINCIPE**

11 Q    And what conclusions did you draw with regard to the

12 location of that phone number on April 13, 2018, from

13 10:00 p.m. through 11:00 p.m.?

14 A    Certainly.  So this slide is summarizing that activity

15 during the time period.  What you can see pictured within this

16 slide, first, are the pushpins that we previously looked it.

17 So you can see the blue pushpin, the red pushpin, and the green

18 pushpin, which can orient you as to where -- the general

19 location we're talking about.

20      And then what you see is four towers pictured here --

21 tower sectors that are pictured here.  They are -- they have a

22 red dot on the towers themselves, and the direction that the

23 sector on each of those towers is directing that radio

24 frequency, that radio energy, off of it is the direction that

25 those kind of arms off the towers are pointing.

 1      By looking at this picture here, you can see the towers

 2   and sectors that were utilized during that time frame, and the

 3   call-out boxes which list the phone number and times in those

 4   boxes are the times that transactions occurred on the T-Mobile

 5   network with this target phone utilizing those corresponding

 6   towers and sectors.

 7           MR. PRINCIPE:  Let's zoom in on Boxes 1 and 2.

 8   BY MR. PRINCIPE

 9   Q    And those two pushpins are near the China Wok restaurant

10   and Carlton Crossing Drive; correct?

11   A    That's correct.

12   Q    Can you summarize -- first, what's the information in Box

13   No. 1?

14   A    So Box No. 1 is featured at the bottom of the screen

15   there, and it shows that at 10:12 p.m. and 37 seconds that

16   phone was utilizing the tower sector that is located just below

17   that green pushpin, and the antennas that were on that tower

18   were generally facing in a northeasterly direction, generally

19   in the direction towards that green pushpin.

20       Then very shortly after that transaction occurred at

21   10:12:37, at 10:13:24 another transaction occurred with the

22   T-Mobile network using a different tower and sector and that

23   other tower and sector -- that other tower and sector is

24   located just to the northwest of the green tower, and the radio

25   energy was being projected from that sector in a generally

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 145 of 232

1    southeasterly direction, again pointing in the general

2    direction of the green pushpin.

3         Based on my training and experience, I know that when you

4    see two different transactions occur in close time to each

5    other, off of two different pieces of network equipment that

6    both service the same area, it is possible that the phone may

7    not have moved in that time frame, and that it could be, in

8    fact, in an area that there is usable coverage area provided by

9    both of those towers and sectors.

10        In this case, based on my analysis, I would expect that

11   the address in the vicinity of the China Wok restaurant at 3825

12   South Roxboro Street would likely fit within that area, which

13   would be a usable service area of both of those sectors that

14   are featured there.

15   Q    Sure.  Thank you.

16        And then let's look at the area including the boxes and

17   the towers for Nos. 3 and 4?

18        And what did you determine about the location of that

19   phone during that time period?

20   A    Again, just as previously described for the area further

21   to the southwest, this is going -- these towers and sectors are

22   located in an area just to the southwest of the blue pushpin in

23   the general vicinity of Highway 147 there just west of Durham

24   Tech Community College.  Those two tower sectors -- the two

25   separate towers and the sectors point in an area where I would

1   expect them to overlap some coverage area.  And what that

2   indicates is that this phone was in that general area at

3   10:37 p.m., 10:39 p.m., 10:40 p.m., and 10:41 p.m.

4   Q    Are the times associated with that location usually

5   generated by some activity on the phone?

6   A    Yes.  Generally, it's going to be associated with either a

7   voice call, a text message, or a data usage associated with

8   that phone.

9   Q    So you don't have a data point for every single minute

10  where that phone is, do you?

11  A    No.  Generally, it's where that transaction was initiated

12  on the network.  So when it -- when the call is placed or a

13  text message is sent or data session is initiated, that's when

14  the network will record the network equipment that's being used

15  to support the initiation of that activity.

16  Q    Okay.  Let's look at the next page.

17       Does this -- the information on this page summarize the

18  data for the same phone number?

19  A    Yes, it does.

20  Q    And is this for April 14, 2018, from 11:00 p.m. to

21  11:30 p.m.?

22  A    Yes, it is.

23  Q    Let's focus, first, on the information in the tower for

24  Box No. 1.

25       And what did you learn from the data when looking at this

1  data?

2  A    So what I can see here is that at 11:01 p.m. and again at

3  11:08 p.m. the target number in question that ends with 6112

4  utilized the tower and sector that's located just to the

5  northwest of the green pushpin.  That tower and sector points

6  to the southeast, again generally towards the green pushpin.

7  Q    Okay.  Let's back out and look at the information

8  pertaining to Box No. 2.

9  A    Again, Box 2 here indicates that this phone in question at

10  11:02 p.m., 11:04 p.m., and again at 11:13 p.m. was utilizing

11  the tower and sector that serves just to the west of that

12  tower, and that sector is pointed generally towards the red

13  pushpin there, which is the crime scene location.

14  Q    And that's the crime scene for Carlton Crossing Drive;

15  correct?

16  A    That's correct.

17  Q    And now let's focus on the area for Box No. 3.

18       And what does this data -- what did you learn from the

19  data for this time period?

20  A    So this indicates that the phone number that ends 6112 had

21  transactions on the T-Mobile network at 11:18 and 11:19 p.m.;

22  and those transactions utilized two different sectors, but they

23  were both off the same tower, and those sectors overlap in the

24  middle.  So you can see the first sector generally pointed to

25  the south, and the other sector generally pointed to the east.

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 148 of 232

1   Q    Do you sometimes see overlapping tower sectors like that?

2   A    Occasionally you do.  The network engineers -- again, they

3   design the orientation of the direction those sectors point to

4   make sure that they provide the best service to their

5   customers.  So if there was a higher capacity need, maybe

6   there's a road that goes right by that tower, they may make

7   some of those sectors overlap so that they provide more and

8   better coverage in that area.

9   Q    And is there a road that goes by that tower?

10  A    There is.

11       **MR. PRINCIPE:**  Let's go to the next page.

12  **BY MR. PRINCIPE**

13  Q    Does this slide pertain to the same phone number?

14  A    Yes, it is.

15  Q    Is this for April 15, 2018, from 10:00 p.m. to 10:30 p.m.?

16  A    Yes, it is.

17       **MR. PRINCIPE:**  And if we can focus in on the data and

18  tower for Box No. 1.  Yeah, get the tower.

19  **BY MR. PRINCIPE**

20  Q    And what is the first time associated with that cell phone

21  in Box No. 1?

22  A    Sure.  So this is, again, for phone number 6112, and it

23  indicates that the tower sector that is pictured there on the

24  screen with the "1" written on the tower location, that tower

25  and that sector featured there was used to support a

US v. Wiley  -- Trial/Vol. V of VII  -- 4/23/21

1  transaction on the T-Mobile network with the target number

2  at 10:25 p.m.

3         **MR. PRINCIPE:**  If we can back out.

4  **BY MR. PRINCIPE**

5  Q   And then Box No. 2?

6  A   Again, this similarly shows transaction with the T-Mobile

7  network at 10:26 p.m. utilizing that tower marked with a "2,"

8  which would be facing to the east.

9  Q   And does that also face a roadway?

10 A   Yes.  It's in close proximity to Interstate 40.

11 Q   And then Box No. 3?

12 A   This would be highlighting the use of a sector at

13 10:29 p.m., and that sector points due to the north.

14 Q   And so for those three boxes, those times are within just

15 a few minutes of one another; correct?

16 A   That's correct.

17 Q   And if you have a phone connecting to three different

18 towers within a few minutes of one another, what does that

19 suggest to you, or what could that suggest?

20 A   I would have to take into account the general area of each

21 of those towers to draw my conclusion, but in this case because

22 the tower featured with the No. 2 on it is considerably further

23 west than the tower with the No. 3 on it, and given the short

24 period of time, you know, just a minute or two between those

25 two transactions, based on my training and experience, that

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 150 of 232

1 would be consistent with travel on a roadway like a highway

2 there.  So it would be intuitive to assume that the user of

3 this phone was moving generally from the west to the east,

4 likely on Interstate 40.

5 Q    Now, if we go to the next page, this is the second phone

6 number we talked about --

7 A    Yes.

8 Q    -- is that right?

9 A    Yes, it is.

10 Q    And if we'll go to page 13, what did you do determine with

11 regard to that phone number for April 13, 2018, from 10:00 p.m.

12 to 11:00 p.m.?

13 A    So when I examined the records that were provided to me

14 for that phone number, I was unable to find any transactions in

15 those records that had data which I could map between

16 10:00 p.m. and 11:00 p.m. on April 13, between 11:00 p.m. and

17 11:30 p.m. on April 14, or 10:00 p.m. through 10:30 p.m. on

18 April 15.

19 Q    So for all three dates?

20 A    That's correct.

21          **MR. PRINCIPE:**  Let's go to the next page.

22 **BY MR. PRINCIPE:**

23 Q    So this is for phone number (919)423-0535?

24 A    That is correct.

25          **MR. PRINCIPE:**  And if we can go to Government's

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 151 of 232

1  Exhibit 328 and highlight both numbers there.  Go down one

2  more.

3  **BY MR. PRINCIPE**

4  Q    And there's two numbers there with a name associated with

5  each number.

6       Can you just read to the jurors that information from

7  Government's Exhibit 328?

8  A    According to this document, it appears that (919)423-0535

9  and (919)258-8452 appear to be associated with an individual by

10 the name of Semaj Bradley.

11 Q    Now, at the time you did your examination of these cell

12 phone records, did you know that that individual might be

13 associated with these numbers?

14 A    I did not.  This is the first information I am seeing to

15 that effect.

16 Q    Let's go back to your report on page 15.

17      And is this the data you plotted for April 13, 2018, for

18 the phone number ending in 0535?

19 A    That's correct.

20 Q    And that's during the time period of 10:00 p.m. to

21 11:00 p.m.?

22 A    That's correct.

23 Q    What did you determine?

24 A    During the time frame from 10:00 p.m. through 11:00 p.m.,

25 the target number that ends 0535 had one transaction with the

Case 1:19-cr-00529-TDS  Document 363  Filed 02/04/22  Page 152 of 232

1  Sprint network.  That occurred at 10:43 p.m., and it used a

2  tower and sector that was located right off of Highway 147 in

3  close proximity to the blue pushpin, which again corresponds to

4  207 North Driver Street.  That tower and sector generally

5  points to the east and to the south in the general direction of

6  Durham Tech Community College.

7  Q    And the next page, is this the same number?

8  A    Yes, it is.

9  Q    And does that pertain to the data you had for that phone

10 number on April 14, 2018, from 11:00 p.m. to 11:30 p.m.?

11 A    Yes, it does.

12 Q    Were there any mappable transactions on that date for that

13 phone number in that time period?

14 A    No, there were not.

15       **MR. PRINCIPE:**  Go to the next page.

16 **BY MR. PRINCIPE**

17 Q    Does this pertain to the same phone number ending in 0535

18 for the date April 15, 2018, from 10:00 p.m. to 10:30 p.m.?

19 A    Yes, it does.

20 Q    And what did you determine about the device from that data

21 for that date and time?

22 A    During that time frame, there were only two mappable

23 transactions contained within the records for this Sprint

24 telephone number that ends 0535.  Those transactions occurred

25 at 10:05 p.m. and 10:06 p.m.  They both utilized the same tower

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 153 of 232

1  and sector that are featured there on the screen in the -- it

2  appears to be the same tower and sector that was featured on

3  the last slide with a sector that we just described, again

4  pointing in the general direction of Durham Tech Community

5  College.

6  Q    And you said a prior slide.  Did you mean two slides

7  earlier on April 13?

8  A    That's correct.

9         MR. PRINCIPE:  If we can go to the next slide.

10 BY MR. PRINCIPE

11 Q    Now, this starts the data for the phone number ending in

12 8452?

13 A    That's correct.

14        MR. PRINCIPE:  If we can go to the next slide.

15 BY MR. PRINCIPE

16 Q    What did you determine about that phone number for the

17 dates of April 13, April 14, and April 15 of 2018, during those

18 relevant time periods?

19 A    That there were no mappable transactions associated with

20 that target phone that ends 8452.

21        MR. PRINCIPE:  Go to the next slide.

22 BY MR. PRINCIPE

23 Q    And this is a phone number ending in 7490; correct?

24 A    That's correct.

25 Q    We'll go to Government's Exhibit 328.

1     Based on Government's Exhibit 28, is there a name

2    associated with that?

3          **THE COURT:**  328.

4    **BY MR. PRINCIPE**

5    Q    I'm sorry.  Government's Exhibit 328.

6    A    Yes, it appears that, according to this document,

7    (919)423-7490 is associated with an individual by the name of

8    Darryl Bradford, Jr.

9    Q    We will go back to your report, Government's Exhibit 352,

10   page 20.

11         **MR. PRINCIPE:**  And let's go to the next page.

12   **BY MR. PRINCIPE**

13   Q    Is this data plotting the location of that phone on

14   April 13, 2018, between 10:00 p.m. and 11:00 p.m.?

15   A    Yes, it is.

16   Q    And what did you determine?

17   A    I determined that on April 13 between 10:00 p.m. and

18   11:00 p.m. that there were six transactions with the Sprint

19   network which occurred at 10:03 p.m., another one at

20   10:03 p.m., two at 10:23 p.m., and two at 10:33 p.m., that all

21   utilized Sector 1 of the tower that's featured near the blue

22   pushpin there right off of Highway 147.  That sector again is

23   pointing in the general direction of Durham Tech Community

24   College.

25         Then at 10:55 p.m., there are two transactions on the

US v. Wiley  -- Trial/Vol. V of VII  -- 4/23/21

1  network which appear to use a different sector off of the same

2  tower, and that other sector is directed due south of that

3  tower.

4          **MR. PRINCIPE:**  Okay.  If we can go to the next slide.

5  **BY MR. PRINCIPE**

6  Q    What did you determine about the location of the device

7  with phone number 7490 on April 14, 2018, from 10:59 p.m.

8  through 11:30 p.m.?

9  A    That during that time period, the target number that ends

10  7490 had two transactions on the Sprint network, both of which

11  occurred at 10:59 p.m., a second apart, and both of those

12  transactions occurred utilizing the sector that points

13  generally towards Durham Tech Community College off the tower

14  that's located near 147 in the vicinity of the blue pushpin.

15          **MR. PRINCIPE:**  If we can go to the next page.

16  **BY MR. PRINCIPE**

17  Q    And what about that phone number for April 15, 2018, from

18  10:00 p.m. to 10:30 p.m.?

19  A    There were no mappable transactions for the target number

20  that ends 7490 during that pertinent time frame.

21          **MR. PRINCIPE:**  If you will go to the next slide.

22  **BY MR. PRINCIPE**

23  Q    So the next section deals with data for the phone number

24  ending in 4224; is that correct?

25  A    That's correct.

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 156 of 232

1          **MR. PRINCIPE:**  If we can go to Government's

2     Exhibit 328, the second from the bottom.

3     **BY MR. PRINCIPE**

4     Q    And, again, based on Government's Exhibit 328, is there a

5     name associated with that phone number?

6     A    According to this document, (919)519-4224 is an associated

7     with an individual named Hykeem Deshun Cox.

8     Q    We'll go back to your report, Government's Exhibit 352,

9     page 25.

10         Was there any mappable data transactions for that device

11    or phone number on April 13, 2018, from 10:00 p.m. 11:00 p.m.?

12    A    No, there was not.

13         **MR. PRINCIPE:**  If you'll go to the next slide.

14    **BY MR. PRINCIPE**

15    Q    Were there any mappable transactions for that phone number

16    on April 14, 2018, from 11:00 p.m. to 11:30 p.m.?

17    A    Yes, there were.

18    Q    Can you explain those?

19    A    Yes.  During that time frame, at 11:03 p.m. and again at

20    11:11 p.m. on the 14th, the target phone number that ends 4224

21    utilized a tower just to the east of the red pushpin there,

22    which is the crime scene in this case.

23    Q    The crime scene at Carlton Crossing Drive?

24    A    That's correct.

25         And the sector that was used off of that tower was

Case 1:19-cr-00529-TDS  Document 363  Filed 02/04/22  Page 157 of 232

1 designed to project energy and provide a usable footprint to

2 the west side of that tower, again generally pointing towards

3 the crime scene location with the Carlton Crossing Drive

4 address.

5 Q    Okay.  On the next slide, were there any mappable

6 transactions for that phone number between the period of

7 10:00 p.m. and 10:30 p.m. on April 15, 2018?

8 A    No, there was not.

9         **MR. PRINCIPE:**  If we can go to the next slide.

10 **BY MR. PRINCIPE**

11 Q    This starts a section dealing with data for the phone

12 number ending in 1816; is that correct?

13 A    That's correct.

14         **MR. PRINCIPE:**  If we can go to Government's

15 Exhibit 328.

16 **BY MR. PRINCIPE**

17 Q    And based on Government's Exhibit 328, is there a phone

18 number associated -- or a name associated with that number?

19 A    According to this document, (984)260-1816 is associated

20 with an individual named Charles Daniels.

21 Q    Okay.  If we go back to your report, Government's

22 Exhibit 352, page 29, were there mappable transactions for that

23 phone number on April 13, 2018, from 10:00 p.m. to 11:00 p.m.?

24 A    Yes.  At 10:23 p.m., the target number that ended 1816 had

25 a transaction on the T-Mobile network using the tower located

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 158 of 232

1  just to the northwest of the green pushpin, and the sector that

2  was used points generally in the direction of that green

3  pushpin.

4  Q    And that's the location of China Wok?

5  A    That's correct.

6  Q    On the next slide, were there mappable transactions for

7  the phone number ending in 1816 on April 14, 2018, from

8  11:00 p.m. through 11:30 p.m.?

9  A    Yes, there was.

10 Q    And can you describe that?

11 A    There was a single transaction during that pertinent time

12 frame which occurred at 11:11 p.m. on the 14th.  That used a

13 tower that was located just to the east of the red pushpin

14 there, and it was using a sector pointing westward towards that

15 red pushpin.

16 Q    And that's the location of the crime scene at Carlton

17 Crossing Drive?

18 A    Yes, sir.

19 Q    Were there any mappable transactions for that phone number

20 on April 15, 2018, from 10:00 p.m. through 10:30 p.m.?

21 A    No, there were not.

22 Q    If a person were to turn off their phone, would that phone

23 still be able to connect to a cell phone tower?

24 A    No, it would not.

25 Q    Why not?

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 159 of 232

1  A    If there's no power to the device, the device can't

2  connect with the network, and, therefore, there would not be

3  any tower location listed on the call detail records for that

4  device if that device is not in contact with the network

5  itself.

6  Q    What if the phone was still on, but the person was not

7  texting or calling or accessing the Internet?

8  A    If the individual using that phone was not texting,

9  calling, or using the Internet, generally that phone is not

10 going to be using network resources, and, therefore, it's not

11 going to document where that phone was at a given time.

12        **MR. PRINCIPE:**  I have no additional questions, Your

13 Honor.

14        **THE COURT:**  Any examination?

15        **MR. BRYSON:**  Yes.

16        Can I ask you to pull up the cover page for 352?  Can

17 you zoom in on just the phone numbers in the middle bottom?

18                    CROSS-EXAMINATION

19 **BY MR. BRYSON**

20 Q    Agent Heinrich, your analysis was done based on carrier

21 phone records that you received regarding these numbers shown

22 on the screen; is that correct?

23 A    Yes, sir.

24 Q    All right.  And, in fact, the carriers that you received

25 records from were either T-Mobile or Sprint; is that correct?

Case 1:19-cr-00529-TDS  Document 363  Filed 02/04/22  Page 160 of 232

1  A    Yes, sir.

2  Q    You didn't receive any records from Verizon?

3  A    No, I did not.

4  Q    In looking at these numbers, I see one number that has a

5  (313) area code number; is that correct?

6  A    Yes, sir.

7  Q    All right.  And that's (313)718-3594; is that correct?

8  A    Yes, sir.

9  Q    All right.  You did not get any phone records for the

10 telephone number (313)300-4268; is that correct?

11 A    I was not provided with those records to conduct my

12 analysis on, no.

13 Q    And so you did not attempt to do any kind of location

14 analysis for the telephone number (313)300-4268?

15 A    No, sir, that was not part of the request.

16 Q    Okay.

17         MR. BRYSON:  Those are my questions?

18         THE COURT:  Any redirect?

19         MR. GREEN:  I have no additional questions, Your

20 Honor.

21         THE COURT:  You may step down, sir.

22         MR. PRINCIPE:  May this witness be released?

23         THE COURT:  Any objection?

24         MR. BRYSON:  No objection.

25         THE COURT:  You are free to leave, sir.

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 161 of 232

1    (At 2:56 p.m., witness excused.)

2         **THE COURT:**  Call your next witness.

3         **MR. GREEN:**  The Government is going to call Hykeem

4    Deshun Cox.  May I step outside?

5         **THE COURT:**  You may.

6    (Pause in the proceedings.)

7         **MR. GREEN:**  May we approach, Your Honor?

8         **THE COURT:**  You may.

9     (The following proceedings were had at the bench by the

10     Court and Counsel out of the hearing of the jury:)

11         **MR. GREEN:**  His attorney was sitting outside.  He is

12    now not there.

13         **MR. FOSTER:**  He's right there in the front row.

14         **MR. GREEN:**  I'm sorry.  I went running outside and

15    ran right past him.

16         Thank you.

17    (End of bench conference.)

18    **HYKEEM D. COX,** GOVERNMENT'S WITNESS, being first duly affirmed,

19    at 2:58 p.m. testified as follows:

20         **THE COURT:**  Sir, if you would remove your mask so we

21    can see and hear you and bend the microphone down towards your

22    mouth so it can capture your voice.

23         Please proceed.

24                   DIRECT EXAMINATION

25

Case 1:19-cr-00529-TDS  Document 363  Filed 02/04/22  Page 162 of 232

1   **BY MR. GREEN**

2   Q    Would you tell the jurors your name.

3   A    Hykeem Deshun Cox.

4   Q    And how old are you, Mr. Cox?

5   A    Twenty-four years old.

6   Q    Were you living in Durham in April of 2018?

7   A    Yes, sir.

8   Q    Mr. Cox, at one point were you a gang member?

9   A    Yes, sir.

10  Q    What gang was that?

11  A    Blood.

12  Q    During the period of -- let me ask you another question.

13       Have you been convicted of a felony offense?

14  A    Yes, sir.

15  Q    What was it?

16  A    A robbery.

17  Q    And that's on the state side?

18  A    Yes, sir.

19  Q    Were you charged in federal court with conspiracy to

20  commit a Hobbs Act robbery and attempt to commit a Hobbs Act

21  robbery?

22  A    Yes.

23  Q    Did you plead guilty?

24  A    Yes, sir.

25  Q    Prior to April 2018, did you have a job?

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 163 of 232

1  A    No, sir.

2  Q    How did you fill up your time during the day?

3  A    I would go around stalking businesses.

4  Q    You say "stalking businesses"?

5  A    Yes, sir.

6  Q    And what did you do?

7  A    Rob them.

8  Q    Would you be by yourself?

9  A    Sometimes.

10 Q    What about other times?

11 A    No, sir.

12 Q    Who would be you with you sometimes?

13 A    Semaj Bradley, Darryl Bradford, and Murda, Charles

14 Daniels.

15 Q    Why would you rob businesses?

16 A    For money.

17 Q    Did you rob a lot of businesses?

18 A    Yes, sir.

19 Q    In April of 2018, did you and others decide to rob the

20 owners of the China Wok in Durham?

21 A    Yes, sir.

22 Q    Why the China Wok?

23 A    Because we heard -- word on the street is they have a lot

24 of money.

25 Q    When you say "they," who are you talking about?

1   A    China Wok.

2   Q    Anything in particular about the owners of this business

3   that you made you think they might be a good target?

4   A    Yes, sir.

5   Q    What about them?

6   A    Because they are Asian and they don't believe in banks.

7   Q    Is that what you thought?

8   A    Yes, sir.

9   Q    And so what was the reason for targeting Asians who don't

10  believe in banks?

11  A    Because they have a lot of money in their house.

12  Q    Did you and others formulate a plan to try and rob them?

13  A    Yes, sir.

14  Q    Who was in involved in that plan to try and rob the China

15  Wok?

16  A    Me, myself, Darryl Bradford, Semaj Bradley, Charles

17  Daniels, and Tweet, Marcus Wiley.

18  Q    Can you point that gentleman out in the courtroom?

19  A    Yes, sir.

20  Q    Would you do so?

21  A    (Indicating) Right there with the glasses and a blue face

22  mask.

23           **MR. GREEN:**  Let the record reflect that he's

24  identified the Defendant, Your Honor.

25           **THE COURT:**  All right.  It will so reflect.

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 165 of 232

1  BY MR. GREEN

2  Q    Where would you all meet to discuss what your plans were?

3  A    Sometimes at my house or on Driver Street.

4  Q    And where was your house?

5  A    Maple Street, 217.

6  Q    And where specifically on Driver?

7  A    At Charles Daniels' house.

8  Q    And how did that go, the discussions about robbing the

9  China Wok?

10 A    It was planned to lay in the bushes in the yard, but when

11 we got -- when we went there one night, we discovered there was

12 too much light, and they would spot us before they got there.

13 Q    When you say the plan, who was involved in that planning?

14 A    Me, myself, Semaj Bradley, Darryl Bradford, Marcus Wiley,

15 and Charles Daniels.

16 Q    Did you surveil the China Wok and where those people

17 lived?

18 A    Yes, sir.

19 Q    And how did that work?

20 A    We followed them from their business to their home.

21 Q    Did you see where they lived?

22 A    Yes, sir.

23 Q    Do you remember the night the shooting happened?

24 A    Yes, sir.

25 Q    Several nights before had you been over there with those

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 166 of 232

1   same individuals at the China Wok?

2   A    Yes, sir.

3   Q    I'm going to show you an exhibit.  I'm going to show you

4   Government's Exhibit 26.

5            **MR. GREEN:**  Just a moment, Your Honor.

6        (Government's Exhibit No. 26 was played.)

7   **BY MR. GREEN**

8   Q    Do you recognize that parking lot?

9   A    Yes, sir.

10  Q    And what's that parking lot?

11  A    Where the China Wok is.

12  Q    Now, this video says 4/13 a little after ten -- 10:41.  Do

13  you recall going over to that area on that time?

14  A    Yes, sir.

15  Q    How did you get over there?

16  A    We was in a red vehicle.  Marcus Wiley driving.

17  Q    Are you referring to Tweet?

18  A    Yes, sir.

19  Q    Do you know where he got that red vehicle?

20  A    No, sir.

21  Q    Where did you all leave from?

22  A    Driver Street.

23  Q    When you got in this vehicle, were you armed?

24  A    Yes, sir.

25  Q    Who had guns?

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 167 of 232

1   A   Everybody.

2   Q   Why did you have guns?

3   A   Because we was going to commit a robbery.

4   Q   Was that the agreement between you --

5   A   Yes, sir.

6   Q   -- to have guns to commit a robbery?

7   A   Yes, sir.

8   Q   Do you recall what kind of guns everybody had?

9   A   Yes, sir.

10  Q   What were the guns folks had?

11  A   I had a Glock 27 .40 caliber; Tweet had a SR9 9mm; Darryl

12  Bradford had a Glock 19 9mm; Semaj had a .45 caliber

13  Millennium; and Murda had a Bersa .40.

14  Q   You seem to know a lot about guns?

15  A   Yes, sir.

16  Q   Why is that?

17  A   Because I like guns.

18  Q   Do you sell them?

19  A   Yes, sir.

20  Q   Were you selling them prior to the events of April 15?

21  A   Yes, sir.

22      (Government's Exhibit No. 26 was played.)

23  Q   Do you recognize that vehicle?

24  A   Yes, sir.

25  Q   Who is in that vehicle?

1  A    Me, Tweet, Semaj, Stretch, and Murda.

2  Q    Who is driving?

3  A    Tweet.

4  Q    And what was the plan when you went over there on 4/13?

5  A    To follow them home.

6  Q    Did everybody understand that was the plan?

7  A    Yes, sir.

8  Q    And why are you going to follow them home?

9  A    To rob them.

10 Q    Rob them of what?

11 A    Money.

12 Q    Money from where?

13 A    Their business.

14 Q    Did the robbery happen this night on the 13th?

15 A    No, sir.

16 Q    Did you sit and watch and wait to see them leave?

17 A    Yes, sir.

18 Q    Did you go before them?  Did you leave before they got

19 home?

20 A    Yes.

21 Q    What happened when you got there?

22 A    It was the plan for us to get out and be already in the

23 yard, but they -- while Semaj, Darryl, and Murda was walking

24 down the sidewalk, they pulled up, and we left that night.

25 Q    Didn't do the robbery that night?

1   A    No, sir.

2   Q    Where did you go after?

3   A    Back to Charles' house.

4   Q    Did you discuss what you needed to do?

5   A    Yes, sir.

6   Q    Who was part of that discussion?

7   A    Me, Semaj, Darryl, Tweet, and Murda.

8   Q    What happened next?

9   A    Everybody left.

10  Q    Where did you leave from?

11  A    Driver Street.

12  Q    The next day -- night, the 14th, did you go back?

13  A    Yes, sir.

14  Q    Were you going to conduct the robbery that night?

15  A    Yes, sir, I think.  Yes, sir.

16  Q    What happened?

17  A    We didn't do it that night.

18  Q    Where did you go?

19  A    We went -- if I recall, we went to their house -- or we

20  went to the business.  We went back to the business.

21  Q    Did you go by their house as well?

22  A    Yes, sir.

23  Q    Why didn't you do the robbery that night?

24  A    I don't remember.

25  Q    Did you leave?

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 170 of 232

1   A    Yes, sir.

2   Q    Where did you go back to?

3   A    Always back to Driver Street.

4   Q    I'll direct your attention to April 15.  Where did you

5   meet up?

6   A    Driver Street.

7   Q    Who was there?

8   A    Me, Stretch, Darryl -- I mean, me, Stretch, Semaj, and

9   Murda, and Tweet pulled up to come get us.

10  Q    Was there anyone else present?

11  A    Iquwan Timmons.

12  Q    Did you know Iquwan Timmons?

13  A    Yes, sir.

14  Q    How did you know him?

15  A    He's my cousin.

16  Q    He was a juvenile --

17  A    Yes, sir.

18  Q    -- at that time?

19  A    Yes, sir.

20  Q    What kind of car did Tweet pull up in?

21  A    On the 15th, we was in a white Lincoln.

22  Q    Do you know where that car came from?

23  A    No, sir.

24  Q    Where did you go after you all got in that car?

25  A    We went to the -- we went by their business, and then we

1  went to their house and sat and waited on them.

2  Q    I'm going to show you another clip from the video.

3            **THE COURT:**  Which exhibit is this?

4            **MR. GREEN:**  Twenty-six, Your Honor.

5       (Government's Exhibit No. 26 was played.)

6  **BY MR. GREEN**

7  Q    Do you recognize that white car?

8  A    Yes, sir.

9  Q    Who is in that white car?

10  A    Me, Tweet, Stretch, Squeeze, Iquwan, and Murda.

11  Q    Who is driving?

12  A    Tweet.

13  Q    Who is the front passenger seat?

14  A    Stretch.

15  Q    Who is the backseat?

16  A    Me, Iquwan, Murda, and Squeeze.

17  Q    Do you sit there and watch?

18  A    Yes, sir, for a little bit.

19  Q    Who is armed in the car?

20  A    Everyone.

21  Q    Why do you have guns?

22  A    Because we about to rob them.  We're about to rob the

23  owners of the China Wok.

24  Q    And what are you going to rob them off?

25  A    Their money.

Case 1:19-cr-00529-TDS  Document 363  Filed 02/04/22  Page 172 of 232

1  Q   Money from where?

2  A   Their business.

3  Q   Did everybody have a gun that night?

4  A   Yes, sir.

5  Q   Did you have to provide any firearms to anyone?

6  A   Yes, sir, one.

7  Q   Who did you provide a firearm to?

8  A   Murda.

9  Q   Why did you provide him with a firearm?

10 A   Because he didn't have one of his own.

11 Q   Why was it necessary to make sure he was armed?

12 A   Because everybody needs a gun.

13 Q   Why do you need a gun?

14 A   Because we fixing to go rob somebody.

15 Q   What happened after you left this parking lot?

16 A   We went to the homeowners of the China Wok, and we sat

17 across the street.

18 Q   What did you do while you sat there waiting?

19 A   We just waited on them to come home.

20 Q   Did they come home?

21 A   Yes, sir.

22 Q   Did you see the headlights of the minivan?

23 A   Yes, sir.

24 Q   What was said?

25 A   Mr. Wiley said, "Headlights coming down.  Get on point."

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 173 of 232

1  Q    What do you understand "get on point" to mean?

2  A    It means we fixing -- it's time to do this robbery.

3  Q    What happened next?

4  A    They pulled in the driveway of their home and we all --

5  Q    What did you see?

6  A    We seen the lady exiting the van with a money bag.

7  Q    Did you call that out?

8  A    No, sir.  We just -- we all just jumped out.

9  Q    You saw the bag?

10 A    Yes, sir.

11 Q    What happened next?

12 A    She started firing -- we ran up to her after we jumped

13 out.  I ran up on one side of the van.  Mr. Wiley ran up on the

14 other side of the van.  Semaj and Stretch ran up to the lady,

15 and she started firing.

16 Q    Did they say anything to her when they ran up to her?

17 A    They said, "Give it up."

18 Q    Give up what?

19 A    The money.

20 Q    The money from where?

21 A    Their business.

22 Q    What happened when she started firing?

23 A    Everybody else -- I mean, everybody started firing.

24 Q    When you say "everybody," describe who you saw shooting.

25 A    I saw -- I was shooting, Tweet was shooting, Stretch was

1  shooting, and Semaj was shooting.  I could not account for

2  where Charles and Timmons was.

3  Q    You had a .40?

4  A    Yes, sir.

5  Q    You shot in the van?

6  A    Yes, sir.

7  Q    You killed that man?

8  A    Yes, sir.

9  Q    What happened next?

10 A    We all got back into the car to leave, and we was trying

11 to pull off, but the car wasn't even in drive, and she shot the

12 window out, and she shot the side of the SUV.

13 Q    Anybody in the car get shot?

14 A    I got shot in the wrist.  Stretch had got shot in the

15 back.

16 Q    What happened next?

17 A    We went back to Murda's house.

18 Q    As you were going to Murda's house, what were people

19 saying?

20 A    We said -- well, I said to keep quiet; don't nobody need

21 to know about this.  They made a plan for them to shoot in the

22 air and call the police and say Stretch got hit in a drive-by

23 shooting.

24 Q    You heard that?

25 A    Yes, sir.

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 175 of 232

1    Q    Where did you all go back to?

2    A    Driver Street.

3    Q    Did Mr. Bradley get hurt during this deal?

4    A    He said he got grazed over the eye.

5    Q    Do you believe that?

6    A    I don't, but I don't know.

7    Q    When you got back to Driver Street, what happened next?

8    A    I left.  I left.  Murda mom dropped me off at my granddad

9    house right around the corner.  And as I'm going in, I hear

10   gunshots, but I knew that it was them shooting in the air

11   already.

12   Q    When you got home, what did you do?

13   A    After my granddad dropped me off at my house, I rolled up

14   a blunt.  I was looking at the news, and I didn't see it on the

15   11:00 o'clock news, so I rolled up another blunt.  At 11:30, it

16   came on the news that there was a homicide at Carlton Crossing

17   Drive and I dialed -- I called Murda and told him, "Let me

18   speak to Iquwan."  And when I spoke to Iquwan, I told him that

19   somebody had died and don't nobody need to know about this.

20   Q    What did you think?

21   A    Sir?

22   Q    What did you think?

23   A    What did I think about what?

24   Q    That somebody had died at that time?

25   A    I didn't know.

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 176 of 232

1  Q    Did you still have that bullet in your wrist?

2  A    Yes, sir.

3  Q    Were you bleeding?

4  A    Yes, sir.

5  Q    Was there a period of time in which you went in to your

6  probation officer?

7  A    Yes, sir.

8  Q    Did she take a picture of that bullet in your wrist?

9  A    Yes, sir.

10 Q    What did you tell her about where that injury had come

11 from?

12 A    I told her I got hurt working on a car at my granddad's

13 shop.

14 Q    That wasn't true, was it?

15 A    No, sir.

16 Q    Do you remember the day they arrested you?

17 A    Yes, sir.

18 Q    Where did they take you first?

19 A    To Duke Regional.

20 Q    What happened there?

21 A    They x-rayed my arm for bullet fragments.

22 Q    Was there one in there?

23 A    Yes, sir.

24 Q    Where did they take you next?

25 A    To the headquarters.

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 177 of 232

1  Q    When you say "headquarters," are you talking about police

2  headquarters?

3  A    Yes, sir.

4  Q    And when got there, did you talk to them?

5  A    Yes, sir.

6  Q    They read you your rights, told you didn't have to, but

7  you did?

8  A    Yes, sir.

9  Q    Why did you do that?

10 A    Because I felt bad for what I had did, and that family

11 deserved justice, so I decided to tell them what happened.

12 Q    You didn't tell them the truth that first time?

13 A    No, sir.

14 Q    What did you tell them?

15 A    I told them that I did not have a gun and that I did not

16 shoot.

17 Q    Was that true?

18 A    No, sir.

19 Q    Why did you tell them that lie?

20 A    Because I wanted to minimize my role in the robbery.

21 Q    They talked to you a couple of times, didn't they?

22 A    Yes, sir.

23 Q    There were other things you told them that wasn't true; is

24 that right?

25 A    Yes, sir.

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 178 of 232

1  Q    Did you eventually tell them what you did?

2  A    Yes, sir.

3  Q    Now you're in here telling this jury?

4  A    Yes, sir.

5  Q    You hope to have some benefit from telling this jury what

6  happened?

7  A    It's not a part of my plea agreement, no, sir.

8  Q    Do you understand that if you tell the truth, you might

9  not get as much time as if you had not cooperated?  Do you

10 understand that?

11 A    Yes, sir.  I understand the 5K1, but, like I said, it's

12 not part of my plea agreement.

13         **MR. GREEN:**  If I can have just a minute?

14         **THE COURT:**  All right.

15     (Assistant U.S. attorneys conferred.)

16         **THE COURT:**  We need to take a break.  Is this a good

17 time to take one, or are you almost done?

18         **MR. GREEN:**  I am almost done.

19         **THE COURT:**  All right.

20 **BY MR. GREEN**

21 Q    Those firearms, do you recall the calibers?

22 A    Yes, sir.

23 Q    What calibers were out there among you robbers?

24 A    A .40, a .45, and 9mm.

25 Q    Were they loaded?

Case 1:19-cr-00529-TDS  Document 363  Filed 02/04/22  Page 179 of 232

1   A    Yes, sir.

2   Q    With ammunition?

3   A    Yes, sir.

4   Q    Now, you mentioned you were a Blood at one time?

5   A    Yes, sir.

6   Q    Did you know if Mr. Wiley was in a gang?

7   A    Yes, he was a Crip.

8   Q    Now, did Blood and Crips associate?

9   A    Yes, sir.

10  Q    Describe that for the jury.

11  A    Well, you got some Bloods and some Crips that do not

12  associate at all, but all Bloods and Crips do not be just

13  because they Blood and Crip.  You got some Crips that are,

14  like, Eight Trey and some in Durham are like 800.  I might be

15  Blood, be from the 800.  That don't mean I be with the Eight

16  Treys.

17  Q    Were you beefing with Mr. Wiley at any point prior to

18  this?

19  A    No, sir.

20          **MR. GREEN:**  That's all the questions I have.

21          **THE COURT:**  All right.  Is this a good to take a

22  break?

23          **MR. GREEN:**  It is.

24          **THE COURT:**  For those taking notes, if you would, put

25  your notes in your envelopes.  Leave your envelopes in your

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 180 of 232

 1  chairs.  Remember all my admonitions to you, of course,

 2  including the admonition not to discuss any aspect of the case

 3  or any of the evidence or any matter related to any of the

 4  proceedings here.  Just simply take a break, relax.  I will

 5  call for you in 20 minutes.

 6          Everyone else please remain in the courtroom.

 7          If you would escort them to the jury room please.

 8      (The jury departed the courtroom at 3:27 p.m.)

 9      **THE COURT:**  Please be seated everyone.  Give them a

10  moment to get across the hall before anybody leaves the

11  courtroom, please.

12          All right.  He may step down.  You may take him back

13  for the time being.

14          Does anybody need to raise any issue with me?

15      **MR. GREEN:**  No, Your Honor.

16      **THE COURT:**  All right.  It's 3:30.  What's your

17  expectation for the remainder of the day?

18      **MR. GREEN:**  Just drive on, Your Honor.  I don't know

19  how to characterize it.  We have three more experts --

20      **THE COURT:**  I guess to ask it more accurately:  It

21  looks like you will be presenting evidence perhaps up to 5:00?

22      **MR. GREEN:**  Yes, Your Honor.

23      **THE COURT:**  That's fine.  All right.  I'm just going

24  to leave it at that.  We'll take our break, and then in 20

25  minutes, we'll proceed.

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 181 of 232

1            Do you know how long your cross is going to be?

2            **MR. BRYSON:**  Again, it's difficult --

3            **THE COURT:**  I understand.

4            **MR. BRYSON:**  Given his demeanor, I'm thinking it

5   might not be that long.

6            **THE COURT:**  That's fine.  You're entitled to whatever

7   time you need, of course.  I'm just curious.

8            Let's take a break for 20 minutes.

9       (Proceedings recessed at 3:29 p.m.)

10      (Proceedings called back to order at 3:48 p.m.)

11      (The Defendant was present.)

12           **THE COURT:**  All right.  Are we ready to proceed?

13           **MR. GREEN:**  We are.

14           **THE COURT:**  Let's bring the jury in, please.

15      (The jury returned to the courtroom.)

16           **THE COURT:**  Please be seated, everyone.

17           All right.  Any cross-examination?

18                      CROSS-EXAMINATION

19  **BY MR. BRYSON**

20  Q   Mr. Cox, on April 8, 2018, you pled guilty to carrying a

21  concealed gun; is that correct?

22  A   Yes, sir.

23  Q   And the date of that offense that was November 18 of 2014;

24  is that correct?

25  A   Yes, sir.

   Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 182 of 232

1  Q    You were 17 years of age at the time of the offense?

2  A    Yes, sir.

3  Q    And you were put on probation as your punishment?

4  A    Yes, sir.

5  Q    And within two months, you violated your probation?

6  A    My suspended sentence was six months probation, suspended

7  sentence 15 days.  So I told my probation officer instead of me

8  doing six months, I would rather her revoke me so I can do the

9  15 days.

10 Q    So you elected to do the jail time rather than be on

11 probation?

12 A    Yes, sir.

13 Q    Then on April 23, 2017, you were involved in a robbery?

14 A    Yes, sir.

15 Q    It was a robbery of a business?

16 A    Yes, sir.

17 Q    The business was called Diamond Girls?

18 A    Yes, sir.

19 Q    You were charged with robbery?

20 A    Yes, sir.

21 Q    You were also charged with conspiracy to commit robbery?

22 A    Yes, sir.

23 Q    In that case you cooperated with law enforcement?

24 A    Yes, sir.

25 Q    You gave law enforcement the names of the other people

1  that you said were involved in the robbery?

2  A    Yes, sir.

3  Q    As a reward for your cooperation, you were given a plea

4  agreement?

5  A    Yes, sir.

6  Q    As part of your plea agreement, the actual robbery charge

7  was dismissed; correct?

8  A    Yes, I guess so, yes, sir.

9  Q    And had you been convicted of actual robbery with a

10  dangerous weapon, you would have faced mandatory jail time;

11  right?

12  A    I guess so.  I don't know how it works.

13  Q    Well, you pled guilty to conspiracy to commit robbery;

14  correct?

15  A    Yes.

16  Q    And they guaranteed you probation as part of your plea

17  agreement right?

18  A    Yes, sir.

19  Q    And that's what you got, probation; right?

20  A    Yes, sir.

21  Q    The conspiracy charge was still a felony?

22  A    Yes, sir.

23  Q    And -- which meant after your court date, it would be

24  illegal for you to possess a firearm; right?

25  A    I'm not sure how it works.

US v. Wiley  -- Trial/Vol. V of VII  -- 4/23/21

1  Q    Well, you went into court on April 5, 2018; right?

2  A    Yes, sir.

3  Q    And you pled guilty to felony conspiracy to commit robbery

4  with a dangerous weapon; right?

5  A    Yes, sir.

6  Q    And that made you a convicted felon; right?

7  A    Yes, sir.

8  Q    And convicted felons aren't allowed to possess firearms,

9  are they?

10 A    No, sir.

11 Q    You knew that; right?

12 A    Yes, sir.

13 Q    Okay.  And then ten days after you walked out of that

14 courthouse, you committed this robbery in this case?

15 A    Yes, sir, I guess.

16 Q    You armed yourself with a .40 caliber semiautomatic

17 handgun?

18 A    Yes, sir, I did.

19 Q    Even though it was illegal for you to possess a firearm?

20 A    Yes, sir.

21 Q    You went to do this robbery; right?

22 A    Yes, sir.

23 Q    And during this robbery, you fired your gun?

24 A    Yes, sir.

25 Q    You fired it into the minivan?

1  A    Yes, sir.

2  Q    And you were the one that killed Mr. Zheng?

3  A    Yes, sir.

4  Q    But that's not what you told the police, is it?

5  A    No, sir, not in the first interview, no, sir.

6  Q    They picked you up on May 18, 2018; correct?

7  A    Yes, sir.

8  Q    And, actually, you weren't arrested when they first picked

9  you up, were you?

10 A    No, sir.

11 Q    They had a search warrant to search your wrist; correct?

12 A    Yes, sir.

13 Q    And they were going to take you to the hospital; right?

14 A    They did.

15 Q    Before they took you to the hospital, you had to sit in

16 the car with them for a little while.  Do you remember that?

17 A    Yes, sir.

18 Q    And that's when they started asking you about this

19 robbery; right?

20 A    Yes, sir.

21 Q    And you told them that you didn't have anything to do with

22 this robbery; right?

23 A    Yes, sir.

24 Q    And you told them that you were not a murderer?

25 A    Yes, sir.

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 186 of 232

1  Q    And you told them that the injury to your arm occurred

2  when you were working in your grandfather's shop?

3  A    Yes, sir.

4  Q    In fact, when they took you to the hospital to get your

5  arm x-rayed, that's also what you told the nurse happened to

6  your arm; isn't that right?

7  A    Yes, sir.

8  Q    And after you got your arm x-rayed, they took you to the

9  police department?

10 A    Yes, sir.

11 Q    And that's when you started telling them about the

12 robbery?

13 A    Yes, sir.

14 Q    Now, did you say earlier that you decided to waive your

15 *Miranda* rights because you felt bad about what had happened?

16 A    Yes, sir.

17 Q    Okay.  But you started telling the police lies; right?

18 A    Yes, sir.

19 Q    You told them that you were present at the robbery, but

20 that you didn't have a gun; right?

21 A    Yes, sir.

22 Q    You told them that Tweet shot Mr. Zheng, didn't you?

23 A    Yes, sir.

24 Q    You said you had been a Blood; right?

25 A    Yes, sir.

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 187 of 232

1  Q    You got kicked out after they found out that you

2  cooperated in the Diamond Girls case; right?

3  A    I didn't get kicked out.  I stop banging.

4  Q    Okay.  Wasn't your "Big Homie" Foot?

5  A    Yes, sir.

6  Q    Didn't he tell you he couldn't deal with you anymore after

7  it was disclosed that you were working with law enforcement

8  during the Diamond Girls case?

9  A    Yes, sir.

10 Q    Now, Darryl Bradford is called Stretch; right?

11 A    Yes, sir.

12 Q    And he's a Blood?

13 A    Yes, sir.

14 Q    And Semaj Bradley is -- you call him Squeeze?

15 A    Yes, sir.

16 Q    He's a Blood?

17 A    Yes, sir.

18 Q    Charles Daniels is called Murda?

19 A    Yes.

20 Q    He's a Blood?

21 A    Yes.

22 Q    And Iquwan Timmons you call him Coppo; right?

23 A    Yes, sir.

24 Q    You also call him Fat Boy?

25 A    Yes, sir.

US v. Wiley  -- Trial/Vol. V of VII  -- 4/23/21

1   Q     And he's a Blood?

2   A     Yes, sir.

3   Q     But Tweet was a Crip?

4   A     Yes, sir.

5   Q     And that's who you told the police killed Mr. Zheng?

6   A     Yes, sir.

7   Q     You also told them that the plan for the robbery was

8   Tweet's?

9   A     Yes.

10  Q     That wasn't true, was it?

11  A     No, sir.

12  Q     So during your questioning at the police department, they

13  took a break at some point; right?

14  A     Yes, sir.

15  Q     And Detective Cramer came back in and he confronted you

16  with the fact that your story didn't make sense about you not

17  having a gun; right?

18  A     Yes, sir.

19  Q     And so at that point you changed your story; right?

20  A     Yes.

21  Q     And you said that you had a gun; but while you were in the

22  car on the drive over there, you gave your gun to Iquwan

23  Timmons?

24  A     Yes, sir.

25  Q     All right.

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 189 of 232

1    Now, they also asked you why your cell phone was pinging

2   over at the restaurant at 3:00 p.m. on April 15, 2018, the day

3   of the robbery; right?

4   A    Yes, sir.

5   Q    And you told them that all six of you were in the Lincoln

6   out at the restaurant at 3:00 p.m.; right?

7   A    No, sir, I don't remember that.

8            **MR. BRYSON:**  Can I get this up on the screen?

9            **THE COURT:**  What exhibit is that?

10           **MR. BRYSON:**  It's not an exhibit.

11           **THE COURT:**  Do you want it just for the witness?

12           **MR. BRYSON:**  Yes.

13           **THE COURT:**  All right.

14  **BY MR. BRYSON**

15  Q    Can you see that?

16  A    Yes, sir.

17  Q    Does that look like you?

18  A    Yes, sir.

19  Q    It looks like you in the police room?

20  A    Yes, sir.

21  Q    Okay.  Let me play a little of this for you and see if it

22  refreshes your memory.

23           **MR. BRYSON:**  May I approach the witness, Your Honor?

24           **THE COURT:**  You may.

25           (Video was played.)

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 190 of 232

BY MR. BRYSON

Q    Does that refresh your memory?

A    Yes, sir.

Q    So you did tell them that at 3:00, the day of the

robbery --

A    Yes, sir.

Q    -- all six of you were in the Lincoln out there; right?

A    Yes, sir.

Q    Okay.  Now, you use Instagram; right?

A    Yes, sir.

Q    Your handle was Eastdurham_youngboy; correct?

A    Yes.

Q    And on April 15, you were on Instagram, and you were

messaging with someone called Street Rich Jay Money; is that

right?

A    I guess.  I don't remember.

        **MR. BRYSON:**  May I approach the witness, Your Honor?

        **THE COURT:**  Yes.

BY MR. BRYSON

Q    I'm going to show you something that has previously been

marked Defendant's Exhibit 2.

     And do you see Street Rich Jay Money there?

A    Yes, sir.

Q    And do you also see Eastdurham_youngboy?

A    Yes, sir.

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 191 of 232

1  Q    So you have a communication with him at some point that

2  starts you saying, *th you doing*?

3  A    Yeah.

4  Q    Is that "the hell you doing"?

5  A    Yes, sir.

6  Q    Okay.  And then again Eastdurham_youngboy says*:  I know*

7  *you got a stolen car*?

8  A    Yes.

9  Q    All right.  And then he responds back:  *Cool mg.  What the*

10 *hell you on waaaup*?

11 A    Yes, sir.

12 Q    Is that what he says?

13 A    Yes, sir.

14 Q    But you were looking for a stolen car; right?

15 A    Yes.

16 Q    And you said the reason was -- you said*:  I need that*

17 *bitch to hit some shit right quick*?

18 A    Yes, sir.

19 Q    So on April 15, 2018, earlier in the day, you were looking

20 for a stolen car?

21 A    Yes, sir.

22 Q    No, you also were communicating with Squeeze that day?

23 A    Yes.

24 Q    And that one -- and his handle is 5queez?

25 A    Yes, sir.

US v. Wiley  -- Trial/Vol. V of VII  -- 4/23/21

1  Q    And in this one, he communicates to you; right?  He says

2  *wya*?

3  A    Yes, sir.

4  Q    That's where are you at?

5  A    Yes, sir.

6  Q    All right.  And then you responded:  *Hood*?

7  A    Yes, sir.

8  Q    Okay.  And then he says:  *U im the hood in a little bit u*

9  *think u can come get me*?

10 A    Yes.

11 Q    All right.  And then you respond:  *I ain't got the car*?

12 A    Yes, sir.

13 Q    Because you didn't have access to a car right then?

14 A    No, sir.

15 Q    When you do have access to a car, it's usually a Honda

16 that you drive; right?

17 A    Yes.

18 Q    And then 5queez says to you:  *But look u still doing that*?

19 A    Yes, sir.

20 Q    And he's referring to the robbery?

21 A    Yes, sir.

22 Q    And you respond back:  *Wht*?

23 A    Yes, sir.

24 Q    Meaning what?

25 A    Yes, sir.

Case 1:19-cr-00529-TDS  Document 363  Filed 02/04/22  Page 193 of 232

1  Q    And he says: *Brah don't hit that without me*?

2  A    Yes, sir.

3  Q    He's talking about the robbery?

4  A    Yes, sir.

5  Q    And then you respond back: *Ight*.

6       And that's basically all right?

7  A    Yes, sir.

8  Q    And then later on, you say to him -- and this is all on

9  April 15; right?

10 A    Yes, sir.

11 Q    Do you say to him: *Come to the hood*?

12 A    Yes, sir.

13 Q    He says: *It's going to be raining all day u still want to*

14 *do it?*

15 A    Yes, sir.

16 Q    And then you said: *Hell yeah*?

17 A    Yes.

18 Q    And he says to you: *Im with it u don't got to tell me*

19 *twice?*

20 A    Yes.

21 Q    And then you responded: *Yeah*?

22 A    Yes, sir.

23 Q    All right.  So then after the police talked you on May 18,

24 they came back and talked to you again on June 7th of 2018;

25 right.

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 194 of 232

1  A    Yes, sir.

2  Q    And then they came back and talked to you again on

3  June 25th to 2018; right?

4  A    Yes, sir.

5  Q    And at this time you told them -- they wanted to know who

6  had what guns; right?

7  A    Yes, sir.

8  Q    You told them Tweet had a 9mm?

9  A    Yes, sir.

10  Q    You told them Murda had a .40 caliber?

11  A    Yes, sir.

12  Q    You didn't tell them you had to give Murda the .40

13  caliber, did you?

14  A    No, sir.

15  Q    In fact, you never told anybody that before until you got

16  here today?

17  A    No, sir -- well, yes, sir.

18  Q    All right.  You told them Stretch had a 9mm; right?

19  A    Yes, sir.

20  Q    That Squeeze had a .45?

21  A    Yes, sir.

22  Q    And you told them that you had the .40 caliber, but you

23  gave yours to Iquwan Timmons?

24  A    Yes, sir.

25  Q    That was still the story at that point?

1  A    Yes, sir.

2  Q    All right.  You once again told them that Tweet was the

3  one that shot Mr. Zheng?

4  A    Yes, sir.

5  Q    You also told them that on the ride back, after the

6  robbery, Tweet had called the lady who got him the rental car?

7  A    Yes, sir.

8  Q    And you overheard that phone call while you were in the

9  car on the way back?

10 A    Yes.

11 Q    And you, again, denied shooting a gun on that occasion?

12 A    Yes, sir.

13 Q    The police came back to see you on August 20th of 2018?

14 A    Yes, sir.

15 Q    And then on September 18th of 2018?

16 A    Yes, sir.

17 Q    And then finally they came back on May 21st of 2019;

18 right?

19 A    Yes, sir.

20 Q    And this is over a year after your first statement?

21 A    Yes, sir.

22 Q    They did not read you your *Miranda* rights?

23 A    No, sir.

24 Q    And they did that on purpose; right?  They told you they

25 were not reading you your *Miranda* rights?

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 196 of 232

1  A    Yes, sir.

2  Q    And they told they were not recording your statement

3  either; correct?

4  A    Yes, sir.

5  Q    And that was different.  All your other statements had

6  been recorded; right?

7  A    Yes, sir.

8  Q    And that was because they wanted to ask you about what

9  really happened out there; right?

10 A    Yes, sir.

11 Q    Because up until that point you told everybody that you

12 hadn't -- didn't have a gun or you gave your gun away, or you

13 didn't shoot a gun; right?

14 A    Yes, sir.

15 Q    And they confronted you with the fact that the story you

16 were telling them didn't match up with the physical evidence;

17 right?

18 A    Yes, sir.

19 Q    And that's when you told that you had the .40, that you

20 didn't give it away?

21 A    Yes, sir.

22 Q    And you were the one that shot into the minivan?

23 A    Yes, sir.

24 Q    Okay.  Today you said that the failed robbery, when you

25 went out there and you tried to do it but it didn't happen,

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 197 of 232

1  happened on April 13, 2018; right?

2  A    Yes, sir.

3  Q    And you said you couldn't remember what happened on the

4  14th?

5  A    No, sir.

6  Q    All right.  Before this, on prior occasions, you had

7  always said that the failed robbery happened on April 14th;

8  right?

9  A    Yes, sir, I guess.  I mean, I don't keep up with the

10 dates.  It happened three years ago.  I can't tell whether it

11 was April or May.  I mean, I really don't know.

12 Q    Okay.  Well, you went out to the restaurant three times;

13 right?

14 A    Yes, sir.

15 Q    And on one occasion, there was a failed robbery attempt;

16 right?

17 A    Yes, sir.

18 Q    And on the second one, there was a big shootout -- the

19 next one was a big shootout; right?

20 A    Yes, sir.

21 Q    So you've never said that the failed robbery happened on

22 the very first day, have you?

23 A    No, sir.

24 Q    And you did that because Mr. Green just showed you a video

25 that was from the 13th; right?

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 198 of 232

1    A    Yes, sir.

2    Q    All right.  You want to answer his questions, "Yes, sir,"

3    don't you?

4    A    I want to answer truthfully.  That's what I want to do.

5    Q    All right.  Now, you mentioned your plea agreement in this

6    case; right?

7    A    Yes, sir.

8    Q    All right.  And in the plea agreement itself, they've

9    agreed not to prosecute you for possession of a firearm by a

10   felon; isn't that right?

11   A    Yes, sir.

12   Q    Okay.  And you've pled guilty to the conspiracy to commit

13   a Hobbs Act robbery; right?

14   A    Yes, sir.

15   Q    And you've also pled guilty to the attempted Hobbs Act

16   robbery; correct?

17   A    Yes, sir.

18   Q    And when you were talking, you mentioned 5K1; right?

19   A    Yes, sir.

20   Q    And that refers to a specific part of the guidelines, the

21   federal Sentencing Guidelines; isn't that right?

22   A    I'm really not sure.  I heard that the 5K1 is a sentence

23   reduction.

24   Q    Right.

25   A    Yes, sir.

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 199 of 232

1  Q    And the Government makes a recommendation for a sentence

2  reduction; isn't that right?

3  A    Yes, but it's only a recommendation.  It's not in my plea

4  agreement for them to give me 5K1, no, it's not.

5  Q    But you want the Government in this case to make a

6  sentence recommendation; isn't that right?

7  A    I hope they do, but it's not in my -- like I said, it's

8  not in my plea agreement, so they do not have to, no, they

9  don't.

10 Q    Okay.  But that's one of the reasons why you're testifying

11 here is to earn that sentence reduction?

12 A    No, it's not.

13 Q    It's not?  You have not -- you're not doing this to try to

14 get a sentence reduction?

15 A    I'm doing this because that family needs justice for what

16 we did to them.

17 Q    But you're the one that killed Mr. Zheng; right?

18 A    Yes, sir.  And Mr. Wiley was also there with me.

19 Q    But you should be punished more severely than anybody;

20 right?

21 A    Sir, we all did the crime.

22 Q    But you killed the man?

23 A    Yes, sir, my -- you are correct; my bullet is the one who

24 killed the man, but I'm not the only one who fired a weapon,

25 sir.

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 200 of 232

1  Q    But you said you're testifying here for justice; right?

2  A    Yes.

3  Q    And justice would be for you to be punished most severely,

4  wouldn't it?

5  A    Justice would be for everybody who committed that robbery

6  to be punished, yes, sir, it would.

7  Q    And if you get by with a lighter sentence, that will be

8  justice too; right?

9  A    Justice will be for everyone to get sentenced for the

10 robbery that we committed.

11 Q    So the real reason you're here is to try and convict

12 Mr. Wiley; is that what you're saying?

13 A    No, I'm here because I want to tell the truth.

14 Q    All right.  So during your first interview on May 18,

15 2018, after it was all over, the police came in and they gave

16 you a telephone to make some phone calls.

17      Do you remember that?

18 A    Yes, sir.

19 Q    And you got on the phone, and you were talking to

20 somebody; right?

21 A    Yes, sir.

22 Q    And you told that person that you hoped that you would get

23 ten years; right?

24 A    Yes, sir.

25 Q    And that that would be cut by 40 percent; right?

1    A    Sir, I do not remember that.

2    Q    Okay.

3            **MR. BRYSON:**  May I approach the witness, Your Honor?

4            **THE COURT:**  You may.

5    **BY MR. BRYSON**

6    Q    I'm showing you the same interview room.

7    A    Yes, sir.

8         (Video was played.)

9    Q    Okay.  Do you remember that?

10   A    Yes, sir.

11   Q    All right.  So you did say you hope to get ten years;

12   right?

13   A    Yes, sir.

14   Q    And that it will be cut by 40 percent?

15   A    Yes.

16   Q    So that would be six years; right?

17   A    Yes, sir.

18   Q    All right.  And you've already served almost three; right?

19   A    Yes, sir.

20   Q    So you hope that you'll be home in three years; right?

21   A    Yes, sir.

22           **MR. BRYSON:**  Those are my questions.

23           **THE COURT:**  Any redirect?

24                        REDIRECT EXAMINATION

25

1  **BY MR. GREEN**

2  Q    Anybody tell you you're going home in three years?

3  A    No, sir.

4         **MR. GREEN:**  That's all the questions I got.

5         **THE COURT:**  All right.  You may step down, sir.

6  Please don your mask again on your way down.  Please be careful

7  going down the ramp.

8      (At 4:22 p.m., witness excused.)

9         **MR. GREEN:**  The Government calls John Scott.

10 **JOHN SCOTT**, GOVERNMENT'S WITNESS, being first duly affirmed, at

11 4:22 p.m. testified as follows:

12        **THE COURT:**  If you would remove your mask so we can

13 hear and see you and bend the microphone towards your mouth.

14        Please proceed.

15                    DIRECT EXAMINATION

16 **BY MR. GREEN**

17 Q    Tell the jurors your name.

18 A    John Scott.

19 Q    And, Mr. Scott, what do you do?

20 A    I'm a traffic accident reconstructionist and forensic

21 engineer with Delta |v| Forensic Engineering.

22 Q    What does Delta |v| Forensic Engineering do?

23 A    It's a private forensic engineering firm focused on

24 vehicle accident reconstruction.

25 Q    Tell us a little bit about your experience.

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 203 of 232

1   A    So I have been in this field for approximately 26 years

2   now.  I've reconstructed over 900 motor vehicle accidents.  And

3   then as part of my work, we also do pretty much anything that

4   involves a motor vehicle, not solely accident reconstruction,

5   but vehicle related.

6   Q    Did you receive any specialized training to do that job?

7   A    Yes, I have.

8   Q    And tell the jury a little bit about that training.

9   A    So after earning my engineering degree from the Colorado

10  School of Mines, I have had over 2,000 hours of continuing

11  training in accident investigation, accident reconstruction,

12  event data recorders, learning how to pull data from heavy

13  trucks and Infotainment, telematics systems.

14  Q    What is an Infotainment or telematic system?

15  A    So an Infotainment system is a device in a vehicle.

16  "Infotainment," the term means it's information that's

17  presented in an entertaining way.  I think of it as you

18  interacting with your vehicle, so it's usually on the center of

19  a dash on a vehicle.  There's a device that's going to control

20  your radio, navigation, any interactions that you might have

21  with a mobile device in the vehicle.

22  Q    Is there a way to extract that data?

23  A    There is.

24  Q    And, in particular, is there a company that provides

25  software and hardware that does that?

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 204 of 232

1  A    Yes.

2  Q    And what's that company?

3  A    It's called Berla.

4  Q    And with regard to that data and the extraction of that

5  data, have you been trained by Berla, and are you certified to

6  run their systems?

7  A    Yes.

8        **MR. GREEN:**  Your Honor, I'm going to tender Mr. Scott

9  as an expert in the area of accident reconstruction as well as

10 vehicle Infotainment and telematic systems.

11       **MR. BRYSON:**  No objection.

12       **THE COURT:**  He may give his opinions.

13 **BY MR. GREEN**

14 Q    Now, you started to discuss what an Infotainment system

15 is.  Could you tell the jury a little bit more about that?

16      I guess let's start with the history of event data

17 recorders and how did we get the Infotainment system.

18 A    Sure.  So the National Highway Transportation Safety

19 Administration started experimenting with event data recorders

20 back in the 1970s.  They were using chart recorders in studies

21 of vehicle accidents.

22      An event in my industry is when certain threshold criteria

23 are met.  That could be an acceleration trigger, it could be a

24 vehicle's last stop, or it could be restraint system deployment

25 like when airbag deploys.  Whenever those criteria are met, a

1  vehicle event recorder can record a predetermined set of data

2  elements about what has just occurred, and the event record

3  encompasses all of the information that's stored about a

4  particular event.

5      Modern event data recorders with computers in cars started

6  in about 1990, and I would say they became mainstream in my

7  industry of reconstructing accidents in the late 1990s when a

8  company named Vetronics came out with a way to obtain that

9  information.  Subsequent to passenger vehicle event data

10  recorders, we got into heavy truck data recorders.

11  Freightliners, over-the-road tractor-trailers also began to

12  have information that could be accessed.

13      And then starting in about 2007-2008 when the Apple iPhone

14  came out, in the following year, 2008 time frame, auto

15  manufacturers starting making cars able to sync with that

16  iPhone.

17      About five years after that, in 2013, it was realized that

18  individuals could obtain information from those Infotainment

19  systems, and Department of Homeland Security worked with Berla

20  and provided a lot of funding for them to be able to go in and

21  figure out how to capture data from Infotainment and telematics

22  systems.

23  Q    Now, in your job as an accident reconstruction

24  investigation expert, do you see a use of these Infotainment

25  centers as a forensic tool to figure out what's happened?

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 206 of 232

1   A    Yes, all the time.

2   Q    And what kinds of data will a modern Infotainment system

3   capture?

4   A    So the data in three broad categories that we can get from

5   an Infotainment system would be location data, like GPS

6   locations.  We can get vehicle events, which is things that are

7   coming from the vehicle systems, like if there is a door open

8   event, door close.  We've seen door ajar on our dash.  That

9   type of the information gets recorded as well as hard

10  acceleration events, hard braking, wheel slip, traction events,

11  when lights go on or off.  That type of data comes from the

12  systems.

13       And then any devices that are paired with an Infotainment

14  system, they also exchange information with the vehicle.  If

15  you connect a cell phone to a vehicle, for example, a lot of

16  that data is going to be stored on the vehicle as well.

17  Q    And so you mentioned GPS data, door event data, and it

18  also will record the pairing and unpairing; is that right?

19  A    Yes.

20  Q    Now, did you have an opportunity to provide consultation

21  and review certain records that related to an event that had

22  happened on Carlton Crossing Drive?

23  A    Yes, I have.

24  Q    And could you describe for the jury some of the items that

25  you reviewed?

1  A    Sure.  In general, I was provided the entire acquisition

2  file for this case from the Infotainment system.  I obtained a

3  bunch of materials like search warrants for the vehicle.  I

4  obtained printouts of what data was extracted from the

5  vehicle's Infotainment system.  And then I got some other law

6  enforcement reports that kind of described the overall events

7  and what their findings had been in the case.

8  Q    Now, when you're doing an accident reconstruction, do you

9  rely solely on the data coming from an Infotainment or event

10  data recorder, or do you also look to corroborate that

11  information with other information that might be available?

12  A    What we do in our industry, and I think this is also true

13  of other applications of the data -- you try and corroborate it

14  with physical evidence, verbal accounts, video, if you have

15  video, of portions of an event.  We use it all together.  It's

16  not just a standalone.

17  Q    Now, in this case, did you -- were you asked to look at

18  data that had been pulled from a Lincoln MKX automobile?

19  A    Yes, I was.

20  Q    And did you talk with the SBI Analyst Scott Bassett who

21  was involved in extracting that data?

22  A    Yes, I did.

23  Q    Now, can you explain how an Infotainment system -- how you

24  actually go about extracting the data?

25  A    Sure.  And it depends on the particular Infotainment

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 208 of 232

1  system, but the one that was in this vehicle is a Panasonic

2  SYNC G3-L.  It's also known as the Ford SYNC Gen 3 module, and

3  basically it's a computer screen that's in the center of the

4  dash on the vehicle, and it has to be physically taken out of

5  the vehicle.  So it's a box about the size of a VHS tape that

6  sits right behind the computer screen.  The trim has to be

7  pulled out, screws have to be loosened, and then the unit is

8  disconnected from it's wiring and taken out.

9      Once it gets back to a lab where you've got a Berla iVe

10 computer to run it, then the SYNC Gen 3 module actually has to

11 be opened up down to circuit board level, and then a set of

12 device interface ports are hooked up to it, along with some

13 cabling.  And then once you make connection with the chip that

14 holds the information, it actually gets copied onto a computer

15 and parsed out.

16     That's basically how you would do an acquisition on a SYNC

17 Gen 3 module.

18 Q    You mentioned GPS location data.  Is that some of the data

19 that that particular unit captured?

20 A    Yes.

21 Q    And has that technology, that is, the GPS data and being

22 caught by the Infotainment system -- has that been around for

23 some time now?

24 A    It has.  It's pretty much mainstream at this point.

25 Q    And based on your experience and training, is -- the GPS

1  data that's reported, is that accurate?

2  A    It's accurate.

3  Q    And as it relates to the GPS data, is that then -- are you

4  able to take that data -- is it recorded in longitude and

5  latitude?

6  A    Correct.

7  Q    How does it get recorded in terms of where a vehicle is?

8  A    So there's longitude and latitude, and then there's

9  typically a timestamp attached to it as well.  So you can take

10 a longitude and a latitude and plot it on a map.

11 Q    And you use just a commercial mapping process to do that?

12 A    Yes.  Google Earth, or something like that.

13 Q    Now, with these GPS data points, are there also other

14 information in terms of vehicle speed, gear selection, door

15 events, et cetera, that the Panasonic system captures?

16 A    Yes.

17 Q    And, likewise, has that been an industry standard for some

18 years?

19 A    Yes, it has.

20 Q    And has it been your experience that that Panasonic system

21 that was in this Lincoln accurately captures those events?

22 A    Yes, sir.

23 Q    And reports the GPS data?

24 A    It does.

25 Q    Now, as you reviewed the data in question, did you also

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 210 of 232

1  review the actual data that was extracted from the Lincoln MKX?

2  A    I did.

3  Q    And did you also talk with the analyst, Mr. Bassett, who

4  had extracted that data?

5  A    Yes, I did.

6  Q    Did you look for any logs or any evidence related to

7  whether that process had been performed properly?

8  A    Yes.  And in my discussions with him -- and then there is

9  also some internal reporting that is a function of how the iVe

10 system works -- there were no errors or anything with the data

11 when it was extracted.

12 Q    Based on that, do you have an opinion as to whether that

13 data was extracted properly from that Lincoln MKX?

14 A    It was, yes.

15 Q    Now, were you also provided certain data points that the

16 FBI had used from that Berla system to map locations as to

17 whether -- where that Lincoln was?

18 A    Yes, I was.

19 Q    Did it also have corresponding events located with it?

20 A    Corresponding events and times, yes.

21 Q    And when you reviewed those matters --

22          **MR. GREEN:**  May I approach the witness?

23          **THE COURT:**  Yes.

24 **BY MR. GREEN:**

25 Q    Did that come to you in the form of a serial -- what was

1  labeled a "serial"?

2  A    Yes.

3  Q    Do you recognize Government's Exhibit 363 as from that

4  serial?

5  A    Yes, I do.

6  Q    Government's Exhibit 364 also?

7  A    Yes.

8  Q    And 5?

9  A    365, yes.

10  Q    And 6?

11  A    Yes.

12  Q    And 7?

13  A    Yes.

14  Q    And 8?

15  A    Yes.

16  Q    And 369?

17  A    Yes, I recognize that.

18  Q    370?

19  A    Yes.

20  Q    And once you looked at the data points associated with the

21  FBI serial and report, did you attempt to look in the data to

22  see if there was data in the system, basically kind of

23  confirmation of what was reported on these exhibits?

24  A    Yes, I did.

25  Q    And did you find it?

1  A     I found data at every location where the FBI had plotted

2  latitude and longitude or a street address.  There was

3  Infotainment data at all of those locations.

4  Q     And do you believe -- do you have an opinion as to whether

5  this Panasonic SYNC 3 system and the data that was recorded in

6  those data points was accurate?

7  A     I believe the data is accurate, yes.

8  Q     Now, you mentioned that the Infotainment center system

9  will also -- can be paired with devices.

10        Could you talk about that a little bit?

11  A     Sure.  There's different ways that a mobile phone can be

12  connected to a car.  It can be connected through a Bluetooth or

13  by plugging it in to like a USB port with a charging cable or

14  data cable.  Every time that one of those devices pairs with

15  the Infotainment system, there's potential for that

16  Infotainment system to record that that pairing has occurred.

17  Q     And when it records the pairing has occurred, in other

18  words, is it saying that it recognizes that phone has either

19  been plugged in or connected by Bluetooth with that device?

20  A     Correct.  And there will be a date stamp and timestamp,

21  location stamped within this particular system.

22  Q     Now, as the -- as that data is collected, is it kept on a

23  computer or some kind of memory board inside that SYNC system?

24  A     Correct.  It's on a chip, nonvolatile memory, in the

25  Panasonic system.

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 213 of 232

1  Q    And it stays there?

2  A    It's going to be saved in that system until it gets

3  overwritten.

4  Q    Now, with regard to the pairing, does the SYNC system that

5  was in this Lincoln -- does it capture data from the phone that

6  it might be paired to?

7  A    Yes.

8  Q    What kind of data?

9  A    You will get things like call logs, inbound/outbound,

10  contact lists.  There may be media files that are on a phone if

11  somebody's got their music on their smartphone.  There's

12  potentially on some systems the ability to have text messages

13  recorded.

14  Q    And so just by pairing your phone with a system, the data

15  in your phone can be transferred and captured by that same

16  system?

17  A    Correct.  That's part of why it's named SYNC is it's

18  syncing information across these devices.

19  Q    Does that have forensic value in your field?

20  A    Absolutely.

21  Q    Why is that?

22  A    Pardon me?

23  Q    Why is that?

24  A    Just the stored information -- as an accident

25  reconstructionist or anybody that's an investigator, what we're

1  trying to determine is how an event occurred, and that gives us

2  information about, you know, what is taking place.

3  Q    And with regard to your experience, does that SYNC system

4  accurately capture that data from the paired device?

5  A    It does.

6            **MR. GREEN:**  I believe that's all the questions I

7  have.

8            **THE COURT:**  Any cross?

9            **MR. BRYSON:**  I don't have any questions, Your Honor.

10            **THE COURT:**  All right.  You may step down, sir.

11            **THE WITNESS:**  Thank you, Your Honor.

12            **MR. GREEN:**  May this witness be released?

13            **MR. BRYSON:**  No objection.

14            **THE COURT:**  You're free to leave.

15       (At 4:42 p.m., witness excused.)

16            **MR. PRINCIPE:**  Your Honor, the Government next calls

17  Jeremy Fletcher.

18  **JEREMY FLETCHER**, GOVERNMENT'S WITNESS, being first duly

19  affirmed, at 4:42 p.m. testified as follows:

20            **THE COURT:**  If you would please remove your mask so

21  we can see and hear you and direct the microphone toward your

22  mouth.

23            All right.  Please proceed.

24            **MR. PRINCIPE:**  Thank you.

25                         DIRECT EXAMINATION

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 215 of 232

1  **BY MR. PRINCIPE**

2  Q    Can you please state your name.

3  A    My name is Jeremy Fletcher.

4  Q    And who do you work for?

5  A    I work for the FBI laboratory in Quantico, Virginia.

6  Q    And what do you do there?

7  A    I'm a forensic DNA examiner in the DNA Case Working Unit.

8  Q    And what type of educational experience do you have with

9  regard to DNA analysis?

10  A    So I have two Bachelor of Science degrees, one in

11  molecular and microbiology and a second in forensic science,

12  both from the University of Central Florida in Orlando,

13  Florida.  I stayed on at the University of Central Florida and

14  got my master's in industrial chemistry with my thesis being in

15  forensic DNA testing.

16  Q    And what positions have you held since you got those

17  degrees?

18  A    I've worked for the FBI predominantly as a biologist or a

19  technician and then later as a forensic examiner, which is my

20  current position.

21  Q    What types of training and experience do you need to have

22  in order to perform an examination based on serology or based

23  on DNA analysis?

24  A    So besides my degrees in school, I also completed an

25  intensive year-and-a-half long training program at the FBI

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 216 of 232

1  which taught me all the knowledge, skills, and abilities

2  required of a forensic examiner.  I've completed multiple moot

3  court and oral board examinations and ultimately had to pass a

4  competency test, which tested all the abilities required of a

5  forensic examiner.

6  Q    Can you explain to the jury what the difference is between

7  serology testing and DNA testing?

8  A    Yes.  Serology is the identification of body fluids, so

9  it's the identification of blood or semen.  So it's testing

10 that is done in order to determine whether a substance is a

11 particular bodily fluid.  DNA testing is actually to identify

12 what a person's DNA profile is.

13      So we use those in conjunction with one another.  We use

14 serology to help us identify where body fluid may be

15 deposited -- Is this a bloodstain?  Is this a semen stain? --

16 in order to know where to test for DNA.

17 Q    And then can you talk a little bit about what the process

18 is for doing DNA testing, including the different methods for

19 testing DNA?

20 A    Sure.

21      DNA is a fairly simple process.  It's got five steps.

22      So the first is collection.  What we have to do is collect

23 the DNA off of an item of evidence.  So an item left a crime

24 scene, like a bloody shirt or a gun, we have to collect the

25 DNA.  So that can be either by cutting out the bloodstain or by

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 217 of 232

1  swabbing it.  So it's like using a big Q-tip and trying to

2  collect any DNA that may present on an item.

3      After the DNA -- or the cells are collected, we have to

4  remove the DNA from the cells.  So then we do a process called

5  extraction, and what we do is add a series of chemicals and use

6  a special instrument which breaks open your cells and basically

7  purifies it so that all we're left with is the DNA.

8      We then quantify it just to figure out how much DNA did we

9  get.  So through our collection and our extraction process, how

10 much DNA did we end up with?

11     The fourth step is amplification.  What we do is we add

12 another series of chemicals and use another instrument that

13 goes in and copies particularly regions of the DNA that I'm

14 interested in, and this copying process allows us to make

15 millions and millions of copies of the DNA that I care about

16 and that I'm interested in.

17     The last step is separation.  We run that copy DNA through

18 an instrument which separates out the DNA so that we can tell

19 the difference between one profile and another.

20 Q   And how many times have you performed serological testing

21 through your employment?

22 A   So in my previous position as a biologist, I performed

23 serology on a number of examinations.  As a forensic examiner,

24 I have overseen and reported the results of hundreds and

25 hundreds of serological examinations.

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 218 of 232

1  Q    And what about for DNA analysis?

2  A    Same.  It's been an enumerable amount of DNA.  I have been

3  doing this job as a forensic examiner now for 12 years.  So

4  every year we report hundreds and hundreds of DNA examinations.

5  Q    And is that primarily what you do?

6  A    Yes, that is my main job.

7  Q    Have you testified in federal or state court as an expert

8  in serology or DNA analysis?

9  A    Yes, I have had the privilege to testify 23 times in

10  either federal or state in forensic serology and/or DNA

11  testing.

12          **MR. PRINCIPE:**  Your Honor, the Government would

13  tender Jeremy Fletcher as an expert in forensic serology and

14  DNA testing.

15          **MR. BRYSON:**  No objection.

16          **THE COURT:**  He may give his opinions.

17  **BY MR. PRINCIPE**

18  Q    I now would like to direct your attention to work that you

19  performed with regard to a case ID of CE2598474-Hong.

20      Are you familiar with what I'm talking about?

21  A    Yes, I am.

22  Q    Can you describe for the jury overall the examinations

23  that you performed upon request as part of that investigation?

24  A    Sure.

25      So as a forensic examiner, it's my job to review a case

1  and determine what items of evidence need to be tested and what

2  exams need to be conducted on these items.  So I reviewed all

3  the items that were submitted in conjunction with this case,

4  and I determined what tests needed to be done.  A series of

5  technicians performed those examinations and provided me with

6  the results.

7       I then review those results and write up my

8  interpretations in a report of examination.  I then issue that

9  report and testify to those reports, if needed.

10 Q    And in this case ID number that I mentioned to you, did

11 you generate four separate reports at four different times?

12 A    Yes, I did.

13 Q    Okay.  I would like to focus on the first of those

14 reports, Government's Exhibit 353.  I'm going to show you that

15 on your monitor.

16      Are you able to see that?

17 A    Yes, I am.

18           **MR. PRINCIPE:**  And if we can zoom in on the upper

19 half of that document.

20 **BY MR. PRINCIPE**

21 Q    Do you recognize the lab number associated with that

22 document?

23 A    Yes, I do.

24      And the lab number is a specific number that we give to

25 every case that comes into the lab so that we can differentiate

1   from all the other cases that we receive.

2   Q    Okay.  And is there a date when you issued that report of

3   your examination?

4   A    Yes, there is.

5   Q    Does that report start out by listing the items of

6   evidence that were submitted for your possible examination?

7   A    Yes, it does.

8   Q    And does it identify the nature of the examination or the

9   discipline?

10  A    Yes, it does.

11  Q    And what is that?

12  A    Here it is listed as DNA.

13  Q    Does your laboratory generate a unique lab item number for

14  each item that is submitted to the lab?

15  A    Yes.  In order for us to identify and distinguish all of

16  the items that are submitted, within each case every item has a

17  unique identifier so that we can identify it within the

18  laboratory.

19  Q    Does that typically correspond to a separate unique

20  identifier from the agency which submitted the item?

21  A    Unfortunately, they are not usually the same number, but,

22  yes, I can track the Identifier No. 86 from my laboratory to

23  the Durham Police Department's Item 48, for instance, and I can

24  interact and basically connect those items.

25  Q    And when you generate your report, are those items listed

1  with descriptions and item numbers in the report?

2  A    Yes, they are.  In the listing of evidence, it lists it

3  and describes that relation or connection between us and the

4  submitting agency.

5  Q    And when you sit down to first start working on a case to

6  perform these types of examinations, what do you have in front

7  of you?

8  A    So usually when I start my examination, I get an incoming

9  communication, some sort of communication to tell me what type

10  of case this is and what type of things may or may not have

11  happened.  I then review that and review the evidence that's

12  submitted to try to figure out what I can do as a DNA examiner

13  to try to help the investigators to determine what may or may

14  not have happened.

15  Q    Okay.

16          **MR. PRINCIPE:**  The Government would move to introduce

17  Government's Exhibit 353.

18          **THE COURT:**  Admitted.

19          **MR. PRINCIPE:**  Permission to publish that?

20          **THE COURT:**  You may.

21          **MR. PRINCIPE:**  And now if we can zoom in on the item

22  numbers on the bottom half of that page and their descriptions,

23  all of them.

24          Thank you.

25

Case 1:19-cr-00529-TDS  Document 363  Filed 02/04/22  Page 222 of 232

1  BY MR. PRINCIPE

2  Q    Can you begin by telling the jurors what items were

3  submitted that you looked at for possible examination?

4  A    So in this list, what you're looking at here is the first

5  set of items that were submitted, or the first half of items.

6  You can see what's listed here is Item 86, Item 87, Item 88.

7  This is the FBI's item identifier.  This is the numbers that

8  we -- or we associate with the submitted items.

9       Each one of those items is then described as what they

10 are.  So, for instance, the first one you can see it says, "Two

11 swabs from front driver side, interior door and steering

12 wheel."  And then after that, you see it says, "DPD Item 47."

13 This is where we can see that the Durham Police Department's

14 Item 47 is now being referred to in our laboratory as Item 86.

15 Q    Okay.  Let's just focus on the first four of those items.

16      Can you give us a description of those first four items?

17 A    These are all swabs taken from various locations within a

18 vehicle.  I believe it was a Toyota.

19 Q    Okay.  Would looking at a copy of Government's Exhibit 78,

20 a property and evidence voucher list, help you be certain about

21 what vehicle those are from?

22 A    Yes, it would.

23           MR. PRINCIPE:  May I approach the witness, Your

24 Honor?

25           THE COURT:  Yes.

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 223 of 232

1  **BY MR. PRINCIPE**

2  Q    Are you able to remember what vehicle those were from?

3  A    Yes.  According to the Durham PD, their Items 47, 48, 49,

4  and 50, which relate to the FBI's items Eight 86, 87, 88, and

5  89, those are all from a Toyota Sienna.

6  Q    Next, I would like to focus on Items 90 through 97.

7       Can you describe where each of those items were taken

8  from?

9  A    So those were more swabs.  You can see here on this

10 display it's listing Items 90 through 95, but they are all

11 swabs from various locations on a Lincoln MKX.

12 Q    And for all the items we discussed so far, what type of

13 swabbings are those?  Do you know?

14 A    So they're described to me as swabbings.  So they were

15 collected in the field by police officers, evidence collection

16 technique -- or technicians.  But as described to me, they are

17 swabbings for DNA.  So they're swabbings of a surface to figure

18 out who may have come in contact or touched an item.  So they

19 were submitted to me for possible DNA testing.

20 Q    Is there a term "touch DNA"?

21 A    Yes.  That is one of the terms used to see who may have

22 left their DNA behind when they touched the item.

23 Q    And then there is also DNA that can be found in blood or

24 semen you mentioned?

25 A    Yes, so stains.  So sometimes you can get swabs of stains.

Case 1:19-cr-00529-TDS  Document 363  Filed 02/04/22  Page 224 of 232

1  So an evidence collection -- or a police officer may swab a

2  stain that they think may be blood or semen, or something like

3  that.  That's a different type of swab, and I will perform

4  different testing on that.

5  Q    Are there any other ways that you might find human DNA in

6  other substances other than somebody touching a surface or

7  bleeding or other bodily fluids?

8  A    So when we do DNA, we're looking for cells, and those

9  cells can get there in any manner.  Blood and semen are great

10  because they are a high concentration of cells.  So if an

11  officer or a technician thinks that there may be a stain left

12  by body fluid, that collection is great because it's highly

13  concentrated DNA.  There's tons of cells.

14      But you can also get cells from saliva or cells from

15  like -- we said touching.  Me touching this surface will leave

16  behind some of my cells.  The more I touch it, the more I

17  handle it, the more I move around, the more cells I will leave

18  behind.  And when we collect that -- when the officer goes and

19  swabs that area up, they collect those cells.  So any way cells

20  are collected, I can do DNA testing on those.

21  Q    Do you mean that it's great because it's more likely that

22  you will be able to develop a DNA profile from a sample of

23  blood or semen?

24  A    Yes.  The more cells, the better in terms of me being to

25  develop a full forensic DNA profile.  Bodily fluids are rich in

Case 1:19-cr-00529-TDS  Document 363  Filed 02/04/22  Page 225 of 232

1  cells.  There's just tons and tons of cells that are there.

2  When you touch items, you leave behind small amounts of cells,

3  and we never know how much it is.  The more I touch the

4  surface, the more cells I will leave behind.  But when you're

5  just swabbing a steering wheel or a center console or the

6  handle of a gun, you never know how many cells are going to be

7  there.  But body fluids -- semen, saliva, blood -- those are

8  rich in DNA and rich in cells, and they're very good at

9  developing forensic DNA profiles.

10 Q    Are there sometimes items that you determine that you're

11 not going to test?

12 A    So whenever I get a case, it's my job as an examiner to

13 triage what types of evidence we're going to get -- we're going

14 to test.  Unfortunately, we don't have the manpower and the

15 budget to test every item of evidence that comes in.  So it's

16 my job to look through evidence and figure out which of these

17 is most likely to help the case or help the investigators

18 figure out what may or may not have happened.  So that's my

19 job, to triage.

20       So I'll look at an evidence list and look at what the

21 crime was and figure out which items of evidence are the best

22 for DNA.  Not all items of evidence are good for DNA.

23       So that's my job to sift through and go and figure out

24 these are the best items, these are the next best items, and so

25 forth, and basically triage those items.  And in most cases, we

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 226 of 232

1   do not test every item that's submitted for DNA testing.

2           **THE COURT:**  It's 5:00.  Is this a good place to stop?

3           **MR. PRINCIPE:**  Yes, Your Honor.

4           **THE COURT:**  We're going to stop here, ladies and

5   gentlemen, for the evening.  If you're taking notes, please put

6   your notes in your envelopes.  Leave your envelopes in your

7   chairs.  They will be secured for the weekend.

8           I think I can report to you that we're still on

9   schedule.  I would expect perhaps sometimes Monday to wrap up

10  evidence, and then there will be arguments and my instructions,

11  at least that currently looks like the schedule.

12          But, remember, you've not heard all the evidence, so

13  you have to remember all my admonitions to you:  Keep an open

14  mind and don't talk about the case; don't do any research.

15  It's critically important.  You'll have two days off now, so

16  don't succumb to any temptation to try to get on the Internet

17  or go looking for anything.  That would be wholly improper, and

18  it would violate my instructions.  So don't talk about the case

19  with your spouse or your friends or even among yourselves or

20  any aspect of the case.

21          Monday will be here soon enough.  You will hear the

22  evidence, and then perhaps on Monday you might have the case at

23  that point.  So, as I said, I think we're still on track and

24  we're on the shorter side of what my estimate had been.  If

25  that changes, I'll let you know.

US v. Wiley  -- Trial/Vol. V of VII  -- 4/23/21

1          So remember all my admonitions to you.  They are very

2   important.  It's what ensures fairness throughout the trial

3   process.  I know that's what any juror would want, and that's

4   what the parties want and the Court expects.

5          So please go home for the weekend.  I thank you for

6   your patience, and you've been very prompt throughout the week,

7   and I appreciate that.  And we'll see you then Monday morning

8   at 8:45, and we'll start just as soon as we can.

9          All right.  So leave your envelopes here.  Enjoy your

10  weekend.  I look forward to seeing you on Monday.

11         Everyone else please remain in the courtroom while

12  Ms. Engle escorts the jury out.

13      (The jury departed the courtroom at 5:01 p.m.)

14         **THE COURT:**  Let's give them a moment to exit out of

15  the courthouse; and then as soon as I get word that they are

16  gone, I'll let you know.

17         You may step down, sir, if you would like to do that.

18         **MR. PRINCIPE:**  Your Honor, may this witness be

19  released for today?  He's got to drive back to Virginia.

20         **THE COURT:**  He may, but he will need to wait until

21  the jurors are outside of the space out there.  So just as soon

22  as -- if you want to wait in the courtroom.  As soon as we're

23  done here, I will let you know.

24         Okay.  So let me ask whether you have any issues I am

25  going to need to address?

US v. Wiley  -- Trial/Vol. V of VII  -- 4/23/21

1              **MR. GREEN:**  No, Your Honor.

2              **MR. FOSTER:**  No, Your Honor.

3              **THE COURT:**  I do have a draft of the jury

4    instructions.  I guess I ought to go ahead and get that to you.

5    I do need your input, if you have any, on the issue I

6    mentioned.  There's also a reference in there -- a placeholder

7    for a reference to the folks who are giving opinion testimony

8    and mentioning them by name.  Some judges do that.  Ordinarily,

9    I just indicate that certain witnesses have given opinion

10   testimony and leave it at that; but if you want me to mention

11   them by name, I am happy to do that.  You all decide what you

12   want to do about that, and let me know, if you would.

13             **MR. GREEN:**  We would not, Your Honor.

14             **THE COURT:**  Do you want to be heard on that?

15        (Defendant's attorneys conferred.)

16             **MR. FOSTER:**  We're okay with that, Your Honor.

17             **THE COURT:**  All right.  So I will make my general

18   reference to the fact that certain individuals were permitted

19   to give opinion testimony, and then the instruction will go on

20   from there.

21             Let me see what else I have here.  I also handed out

22   a potential form of verdict.  If you would just look at that

23   over the weekend.  Give me your comments on Monday morning

24   before we start.

25             Now, I'm anticipating the Government probably will be

1  wrapping up its case pretty soon.

2          **MR. GREEN:**  Yes.

3          **THE COURT:**  I'm not pressing, but it looks like

4  you're almost at the end of your list.

5          **MR. GREEN:**  We are.  Your Honor, we'll finish up with

6  Mr. Fletcher.  Scott Bassett, who is on your list, is a

7  relatively short witness.  We will recall Agent Jocys.  Hers

8  will be a little bit longish, but not as long as the text

9  message analysis that we did before.  And then Mr. Cross will

10 be very short, and we'll play a short video through his

11 testimony.  So I would certainly think before lunch that we

12 would be done with all of our evidence.  If I'm wrong, I

13 apologize.

14         **THE COURT:**  All right.  Before I forget, Ms. Engle

15 would you hand these out.  I've got one for each of the

16 lawyers.

17             That's the current draft of the instructions.  They

18 will need to be tweaked a little bit.

19             All right.  So the jurors are out of the building.

20 Sir, you may leave.  And anybody else in the courtroom, if you

21 would like to leave, you are welcome to leave.

22             So would you anticipate from the defense's point of

23 view the possibility of then having closings on Monday?

24         **MR. BRYSON:**  Yes.

25         **THE COURT:**  All right.  So what I'll plan to do is --

1  I would like to get any comments you have about the jury

2  instructions before we start Monday morning right at 8:45; and

3  if you have anything that's agreed to in that regard, if you

4  want to give that to Ms. Engle before we start, then might even

5  shorten that discussion a little bit.  And any comments you may

6  have on the verdict form at that point in time, if there is

7  anything obvious, that would be helpful.

8          I acknowledge that I'll be hearing motions from the

9  Defendant, so I'm not prejudging.  I'm just, just in case,

10  having things laid out so that we're ready to keep moving

11  forward.

12          Unless there is anything else you want to raise, I

13  will see you Monday at 8:45.

14      (Proceedings recessed for the weekend at 5:07 p.m.)

15

16                  END OF VOLUME V OF VII

17

18

19

20

21

22

23

24

25

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 231 of 232

1  UNITED STATES DISTRICT COURT

2  MIDDLE DISTRICT OF NORTH CAROLINA

3  CERTIFICATE OF REPORTER

4

5

6          I,  Briana L. Bell, Official United States Court

7  Reporter, certify that the foregoing transcript is a true and

8  correct transcript of the proceedings in the above-entitled

9  matter prepared to the best of my ability.

10

11         Dated this 4th day of February 2022.

12

13

14         _____
           Briana L. Bell, RPR
15         Official Court Reporter

16

17

18

19

20

21

22

23

24

25

Case 1:19-cr-00529-TDS   Document 363   Filed 02/04/22   Page 232 of 232